

**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

---

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*


Christopher J. Todd                    **Office of the District Counsel/SFR**
1 Shields Avenue, TB-30                **P.O. Box 26449**
Davis, CA 95616                        **San Francisco, CA 94126-6449**


**Name: \*F-BIOCINI, ANA BEATRIZ**              A91-182-333


**Type of Proceeding: Removal**                 **Date of this notice: 05/15/2006**

**Type of Appeal: Case Appeal**                 **Filed by:  Alien**

**FILING RECEIPT FOR APPEAL**

The Board of Immigration Appeals acknowledges receipt of your appeal and fee or fee waiver request (where applicable) on 05/15/2006 in the above-referenced case.


**PLEASE NOTE**:

In all future correspondence or filings with the Board, please list the name and alien registration number ("A" number) of the case (as indicated above), as well as all of the names and "A" numbers for <u>every</u> family member who is included in this appeal.

If you have any questions about how to file something at the Board, you should review the Board's <u>Practice Manual and Questions and Answers</u> at www.usdoj.gov/eoir.

<u>Proof of service on the opposing party at the address above is required for ALL submissions to the Board of Immigration Appeals</u> -- including correspondence, forms, briefs, motions, and other documents.  If you are the Respondent or Applicant, the "Opposing Party" is the District Counsel for the DHS at the address shown above.  Your certificate of service must clearly identify the document sent to the opposing party, the opposing party's name and address, and the date it was sent to them.  <u>Any submission filed with the Board without a certificate of service on the opposing party will be rejected</u>.

**WARNING:**  If you leave the United States after filing this appeal but before the Board isssues a decision, your appeal will be considered withdrawn and the Immigration Judge's decision will become final as if no appeal had been taken (unless you are an "arriving alien" as defined in the regulations under 8 C.F.R. section 1001.1(q)).

U.S. Department of Justice
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB# 1125-0002
**Notice of Appeal from a Decision of an
Immigration Judge**

---

**1.**   List Name(s) and "A" Number(s) of all Respondent(s)/Applicant(s):

*Staple Check or Money Order Here. Include Name(s) and "A" Number(s) on the face of the check or money order*

ANA B. BIOCINI
A# 91 182 333

For Official Use Only

RECEIVED
DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

MAY 15 2006

BOARD OF
IMMIGRATION APPEALS
OFFICE OF THE CLERK

**!**   **WARNING:** Names and "A" Numbers of **everyone** appealing the Immigration Judge's decision must be written in item #1.

---

**2.**   I am   ☒ the Respondent/Applicant   ☐ DHS-ICE   *(Mark only one box.)*

**3.**   I am   ☒ DETAINED   ☐ NOT DETAINED   *(Mark only one box.)*

**4.**   My last hearing was at ___SF, CA___ ———————————————— *(Location, City, State)*

**5.**   | What decision are you appealing? |

*Mark only one box below. If you want to appeal more than one decision, you must use more than one Notice of Appeal (Form EOIR-26).*

☒ I am filing an appeal from the Immigration Judge's decision *in merits proceedings* (example: removal, deportation, exclusion, asylum, etc.) dated ___4/13/06___ .

☐ I am filing an appeal from the Immigration Judge's decision *in bond proceedings* dated
——————————————————— . (For DHS use only: Did DHS invoke the automatic stay provision before the Immigration Court? ☐ Yes. ☐ No.)

☐ I am filing an appeal from the Immigration Judge's decision *denying a motion to reopen or a motion to reconsider* dated ———————————————— .

*(Please attach a copy of the Immigration Judge's decision that you are appealing.)*

Form EOIR-26
Revised Dec. 2005

000051



**6.**  | **State in detail the reason(s) for this appeal. Please refer to the General Instructions at item F for further guidance. You are not limited to the space provided below; use more sheets of paper if necessary. Write your name(s) and "A" number(s) on every sheet.**

I. The IJ incorrectly applied Matter of Y-L- and his decision that the Respondent was not eligible for Withholding of Removal was erroneous

II. The IJ's factual findings were incorrect and contradicted by the record.

III. The IJ misapplied the CAT standard to the facts of this case.

RECEIVED
DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

MAY 15 2006

BOARD OF
IMMIGRATION APPEALS
OFFICE OF THE CLERK

*(Attach additional sheets if necessary)*

**!** **WARNING:** You must clearly explain the specific facts and law on which you base your appeal of the Immigration Judge's decision. The Board may summarily dismiss your appeal if it cannot tell from this Notice of Appeal, or any statements attached to this Notice of Appeal, why you are appealing.

**7.**  Do you desire oral argument before the Board of Immigration Appeals?     ☐ Yes  ☑ No

**8.**  Do you intend to file a separate written brief or statement after filing this Notice of Appeal?  ☑ Yes  ☐ No

**!** **WARNING:** If you mark "Yes" in item #8, you will be expected to file a written brief or statement after you receive a briefing schedule from the Board. The Board may summarily dismiss your appeal if you do not file a brief or statement within the time set in the briefing schedule.

**9.**    X _____    5/12/06
                              Signature of Person Appealing        Date
                              *(or attorney or representative)*

Form EOIR-26
Revised Dec. 2005

**Page 2 of 3**

000052

10.

| Mailing Address of Respondent(s)/Applicant(s) |
|---|
| ANA B. BIOCINI |
| (Name) |
| ICE CUSTODY |
| (Street Address) |
| YUBA COUNTY JAIL |
| (Apartment or Room Number) |
| MARYSVILLE CA |
| (City, State, Zip Code) |
| — |
| (Telephone Number) |

11.

| Mailing Address of Attorney or Representative for the Respondent(s)/Applicant(s) |
|---|
| Christopher Todd |
| (Name) |
| Immigration Clinic, UCDavis |
| (Street Address) |
| 1 Shields Ave. TB-30 |
| (Suite or Room Number) |
| DAVIS CA 95616 |
| (City, State, Zip Code) |
| (415)846 9311  /  (530) 752 6942 |
| (Telephone Number) |

**NOTE:** You must notify the Board within five (5) working days if you move to a new address. You must use an alien's Change of Address Form (Form EOIR-33/BIA).

**NOTE:** If an attorney or representative signs this appeal for you, he or she must file *with this appeal*, a Notice of Entry of Appearance as Attorney or Representative Before the Board of Immigration Appeals (Form EOIR-27).

12.

**PROOF OF SERVICE**
**(You Must Complete This)**

I _____ mailed or delivered a copy of this Notice of Appeal
(Name)

on ___5/12/06___ to ___ICE - Ofc. of Chief Counsel___
(Date)                    (Opposing Party)

at ___550 Kearny St. Ste 1000 SF CA 94108___
(Number and Street, City, State, Zip Code)

SIGN HERE ➡   X _____
Signature

**NOTE:** If you are the Respondent or Applicant, the "Opposing Party" is the Assistant Chief Counsel of DHS - ICE.

**WARNING:** If you do not complete this section properly, your appeal will be rejected or dismissed.

**WARNING:** If you do not attach the fee or a completed Fee Waiver Request (Form EOIR-26A) to this appeal, your appeal will be rejected or dismissed.

☐ Read all of the General Instructions
☐ Provided all of the requested information
☐ Completed this form in English
☐ Provided a certified English translation for all non-English attachments

**HAVE YOU?**
☐ Signed the form
☐ Served a copy of this form and all attachments on the opposing party
☐ Completed and signed the Proof of Service
☐ Attached the required fee or Fee Waiver Request

**Page 3 of 3**

Form EOIR-26
Revised Dec. 2005

U.S. Department of Justice
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB# 1125-0003

**Fee Waiver Request**

Name: Ana Beatriz Biocini

Alien Number ("A" Number:) 91 182 333

> *If more than one alien is included in your appeal or motion, only the lead alien need file this form.*

I, Ana Beatriz Biocini , declare under penalty of perjury, pursuant to 28 U.S.C. section 1746, that I am the person above and that I am unable to pay the fee. I believe that my appeal/motion is valid, and I declare that the following information is true and correct to the best of my knowledge:

**Assets**

| | |
|---|---|
| Wages, Salary | $ 0 /month |
| Other Income (business, profession, (self-employed, rent payments, interest, etc.) | 0 /month |
| Cash | $5.00 |
| Checking or Savings Account | $ 200 - |
| Property (real estate, automobile, stocks, bonds, etc.) | 0 |
| Other Financial Support (public assistance, alimony, child support, gift, parent, spouse, other family members, etc.) | 0 /month |

**Expenses** (including dependents)

| | |
|---|---|
| Housing (rent, mortgage, etc.) | $ 0 /month |
| Food | 0 /month |
| Clothing | 0 /month |
| Utilities (phone, electric, gas, water, etc.) | 0 /month |
| Transportation | 0 /month |
| Debts, Liabilities | 0 /month |
| Other (specify) | $ 0 /month |

Under the Paperwork Reduction Act, a person is not required to respond to a collection of information unless it displays a valid OMB control number. We try to create instructions that are accurate, can be easily understood, and which impose the least possible burden on you to provide us with information. The estimated average time to complete this form is one (1) hour. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, you can write to the Executive Office for Immigration Review, Office of the General Counsel, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041.

Signature: *Ana Biocini*

Date: 4/15/06

RECEIVED
DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

MAY 15 2006

BOARD OF
IMMIGRATION APPEALS
OFFICE OF THE CLERK

Form EOIR-26A
October 2005

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
SAN FRANCISCO, CALIFORNIA


CHRISTOPHER TODD
IMMIGRATION LAW CLINIC- UC DAVIS SCHOOL OF LAW
ONE SHIELDS AVENUE TB-30
DAVIS          CA 95616-8821


IN THE MATTER OF          FILE A 91-182-333     DATE: Apr 13, 2006
*F-BIOCINI, ANA BEATRIZ
93061-011

__ UNABLE TO FORWARD - NO ADDRESS PROVIDED

Amended
X ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE. THIS DECISION
IS FINAL UNLESS AN APPEAL IS FILED WITH THE BOARD OF IMMIGRATION APPEALS
WITHIN 30 CALENDAR DAYS OF THE DATE OF THE MAILING OF THIS WRITTEN DECISION.
SEE THE ENCLOSED FORMS AND INSTRUCTIONS FOR PROPERLY PREPARING YOUR APPEAL.
YOUR NOTICE OF APPEAL, ATTACHED DOCUMENTS, AND FEE OR FEE WAIVER REQUEST
MUST BE MAILED TO:     BOARD OF IMMIGRATION APPEALS
                       OFFICE OF THE CLERK
                       P.O. BOX 8530
                       FALLS CHURCH, VA  22041


__ ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE AS THE RESULT
OF YOUR FAILURE TO APPEAR AT YOUR SCHEDULED DEPORTATION OR REMOVAL HEARING.
THIS DECISION IS FINAL UNLESS A MOTION TO REOPEN IS FILED IN ACCORDANCE
WITH SECTION 242B(c)(3) OF THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C.
SECTION 1252B(c)(3) IN DEPORTATION PROCEEDINGS OR SECTION 240(c)(6),
8 U.S.C. SECTION 1229a(c)(6) IN REMOVAL PROCEEDINGS.  IF YOU FILE A MOTION
TO REOPEN, YOUR MOTION MUST BE FILED WITH THIS COURT:

                       IMMIGRATION COURT
                       550 KEARNY ST., SUITE 800
                       SAN FRANCISCO, CA  94108

__ OTHER: _____
          _____

                            NMC
                       _____
                       COURT CLERK
                       IMMIGRATION COURT                    FF

CC: AGUILAR, JASON B.
    550 KEARNY STREET, SUITE 1000
    SAN FRANCISCO, CA,  94108
NMC

000055

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
SAN FRANCISCO, CALIFORNIA

| | | |
|---|---|---|
| Matter of: | ) | Date: April 13, 2006 |
| | ) | |
| **Ana Beatriz BIONCI,** | ) | File Number **A91-182-333** |
| | ) | |
| | ) | <u>In Removal Proceedings</u> |
| Respondent | ) | |
| | ) | |

Charges:    INA § 237(a)(2)(A)(iii) – Alien Convicted of an Aggravated Felony

Application:   Deferral of Removal Under the Convention Against Torture

<u>On Behalf of the Respondent:</u>
Christopher Todd, Immigration Law Clinic
University of Davis, School of Law
1 Shields Ave. TB-30
Davis, CA 95616-8821

<u>On Behalf of the DHS:</u>
Jason B. Aguilar
Office of the Chief Counsel
550 Kearny Street, Suite 1000
San Francisco CA 94108

## <u>DECISION OF THE IMMIGRATION JUDGE</u>

The order dated March 22, 2006 is **VACATED**.  The following decision is issued in its' place.

### I. Procedural History

Respondent, Ana Beatriz BIONCINI, is a native and citizen of Colombia who entered the United States at Miami, Florida on or about February 11, 1981 as a nonimmigrant visitor. Her status was adjusted to that of a lawful permanent resident on May 5, 1989, pursuant to section 245(A) of the Act. On April 28, 2003, Respondent was convicted of violating 21 U.S.C. § 846, Conspiracy to Distribute Cocaine. The Department of Homeland Security ("DHS") initiated proceedings against Respondent on January 28, 2005 by filing a Notice to Appear ("NTA") with the Court. Exhibit 1. The NTA charged Respondent with being removable under Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA" or "the Act") as an alien convicted of an aggravated felony. *Id.*

On May 16, 2005, Respondent submitted an application for asylum and withholding of removal. At a hearing on December 19, 2005, Respondent admitted the factual allegations contained in the NTA and conceded removability.   The Court directed Colombia as the country of removal.

A91-182-333                                1

Respondent also conceded that her federal drug conviction is an aggravated felony that renders her ineligible to apply for asylum. The Court also found that under *Matter of Y-L-*, 23 I&N Dec. 270 (A.G. 2002), Respondent's federal drug conviction constitutes a particularly serious crime, making her ineligible for withholding of removal pursuant to section 241(b)(3)(ii) of the Act.

The Court heard testimony on Respondent's application for protection under the Convention Against Torture ("CAT") on December 19, 2005 and February 15, 2006.

## II. Facts

### A.    Respondent's Testimony

Respondent testified that she was born in Cali, Colombia on June 30, 1954. She has six living siblings, four of whom live in Colombia. Both of Respondent's parents are deceased. Respondent is divorced. She has one son from her previous marriage, Peter, who is currently eighteen years old and lives in Mountain View, California with her ex-husband, George Bioncini. Respondent testified that she entered the United States in 1981, and that she lived in Miami, Florida for many years before moving to California. She further testified that since moving to the United States, she has visited Colombia three times to visit family and receive medical and dental care.

Respondent's declaration and testimony provided a detailed account of her drug abuse and drug trafficking activities. Respondent testified that she began using drugs in 1981, and was addicted to cocaine and marijuana for several years. She was arrested on drug charges on May 5, 1995. She pled guilty to one count of conspiracy to distribute a kilogram of cocaine with the intent to sell on June 5, 1998. Respondent was on supervised released from May 24, 1995 to January 16, 2004, and began her 30 month sentence at the Federal Correctional Institute in Dublin, California on January 16, 2004.

Respondent made a plea agreement with the U.S. government in exchange for a reduced sentence. As part of her plea, she agreed to assist the Federal Bureau of Investigation ("FBI") in their investigation of Colombian cocaine suppliers. *See also* Exhibits 3C-4 and C-5. Respondent debriefed FBI agents on all the people in her phone book. *See also* Exhibit 3C-2. According to Respondent's estimate, she gave the FBI the names and phone numbers of over forty people who were allegedly well-connected to the cocaine business in Colombia. Respondent testified that she never bought or sold drugs for the U.S. government as part of her role as an informant; however, she agreed to help them set up a person called Joe who was a restaurant owner connected to a Colombian cocaine supplier named Juan Molina. Respondent waited across the street from Joe's restaurant for four hours, but he never showed up. In addition, Respondent agreed to testify against Norberto Duarte, a United States citizen who was a co-defendant in Respondent's trial. While Mr. Duarte eventually made a plea agreement, a U.S. attorney told Respondent that her assistance was a substantial factor in his decision to plead guilty. Respondent believes that Mr. Duarte knew that she was going to testify against him. She also testified that Mr. Duarte has already been convicted, sentenced and released.

A91-182-333                                          2

Respondent testified that while she made a plea agreement with the United States government, she was afraid of debriefing them on Colombian cocaine suppliers from the beginning. *See also* Exhibit 3C-4. She testified that she fears returning to Colombia because she believes that certain people associated with drug cartels in Colombia, with whom she was involved when she was a trafficker, learned that she became an informant for the U.S. government. Respondent testified that her gravest fear stems from her relationship with three people in particular: Hernando Velazco ("Gordo"); Elias Giannakapolous ("the Greek"); and Felix Bernal.

Respondent testified that she knew of Gordo in the early 1970s when she was still living in Cali, Colombia. She testified that they ran in the same social circles, and that he was very popular in the disco scene because of his reputation for selling narcotics. Respondent testified that she did not have any contact with Gordo again until 1994 when she received a letter from him asking her to meet him in Los Angeles. She testified that he invited her to the World Cup soccer finals, and that he asked her to bring some marijuana. Respondent testified that he and another woman met her at the airport, and that she became immediately suspicious that she was being followed. Gordo took her to an apartment. Respondent testified that he refused to smoke her marijuana. She testified that after approximately 45 minutes, she was overcome with the feeling that the meeting was a set-up and therefore left. Respondent testified that Gordo subsequently called her almost everyday asking her for cocaine. She testified that she and Gordo never made any concrete cocaine deals, although she did connect him with a friend of hers, "El Conejo," who sold cocaine.

Respondent testified that she believed Gordo was working for the U.S. government. She testified that after she was arrested and debriefed the FBI, she read reports that Gordo made a plea agreement and became an informant. She also learned that he had spoken to the FBI on three occasions, during which time he allegedly provided the FBI with information about Respondent and her family. Respondent testified that Gordo returned to Cali in 2000. She testified that her sister and two friends told her that Gordo told people in the area that Respondent was a government informant. *See also* Exhibit 3A-2. Respondent's sister later sent her a newspaper article which states that Gordo was killed in the middle of the day in Cali. *See also* Exhibit 3E-1. Respondent testified that she attempted to learn more about the circumstances surrounding Gordo's death, but her sister was too afraid to get involved. She testified that she is afraid of the people who killed Gordo. Respondent does not know who killed Gordo, but she believes he was killed by someone from a drug cartel.

Respondent testified about her relationship with the Greek. She dated the Greek for approximately one year when she lived in Miami during which time she became familiar with his substantial drug trafficking operations. According to Respondent, the Greek purchased kilos of cocaine from Colombia which he shipped to Miami and Pacifica, California, where his were located operations. She testified that she believes that Alfonso Bejarano from Medellín, Colombia was one of the Greek's key Colombia suppliers, but she did not know exactly how he obtained his cocaine. Respondent also testified that two men who worked for the Greek, Solomon and Kasby, were co-defendants in her case. She testified that she assisted them, and that she often traveled with them to and from Miami to San Francisco. Respondent also frequently picked up the Greek's clients from the airport, drove them around and brought them out to lunch. She also brought Solomon and Kasby to the airport to pick up cocaine bound for California. Respondent testified that she and the Greek

A91-182-333                                    3

000058



ended their relationship in 1986, and that the last time she saw him was in 1988 when he asked her to meet him in Los Angeles. She testified that she never saw him with a gun, but he had the money and power to hire others to kill for him.

Respondent testified that she met Felix Bernal in the early 1990s through her friend Ruben from Cali. Ruben gave Felix her beeper number and after receiving a message from him, they met at a café in San Francisco. Respondent testified that as soon as they met, he offered to sell her kilos of cocaine, an offer she refused. He also unsuccessfully attempted to buy cocaine from her. Respondent testified that she left her first meeting with Felix feeling suspicious that he was an informant for the U.S. government. She also testified that she was very paranoid during this time due to her heavy drug use. Respondent testified that the two later dated for a brief period, and that when she learned of his violent temper, she distanced herself from him. According to Respondent, Felix was also suspicious of government informants, and he told her that if he found out someone was an undercover agent, he would not hesitate to kill that person. Respondent testified that she is afraid of Felix because of his violent temper and because he knew where she lived. Felix also knew her brother and her ex-husband. She testified that after her arrest, Felix called her husband and asked about her. Respondent does not know where Felix is, but she believes he was at one time in deportation proceedings.

Respondent testified that neither she nor anyone in her family have ever had any contact with the Colombian government regarding her involvement in drug trafficking. She further testified that nobody in her family in Colombia has ever been contacted by anyone from a drug cartel. According to Respondent, no one in her family has ever been threatened by anyone in Colombia. Similarly, during the eight years time Respondent was on supervised release in California, she never had any contact from anyone associated with drug cartels in Colombia, and that in general, she has never experienced any repercussions due to her cooperation with the U.S. government.

**B.    Professor Nagel's Testimony**

Professor Luz Estella Nagel, a scholar in international criminal law and international drug trafficking in Latin America provided testimony and submitted an affidavit in support of Respondent's CAT application. *See* Exhibit 3I-1. According to Professor Nagel, the Cali narcotraffickers are pervasive in the economic, social, and governmental spheres of Cali. She testified that the government of Colombia is corrupt, and that there are some government officials who work "hand-in-hand" with the narcotraffickers. She further testified that narcotraffickers' treatment towards informants is brutal, and that it is likely that Respondent's cooperation with the U.S. government is, or at least will be, known by the narcotraffickers. Professor Nagel testified that narcotraffickers would kill Respondent if they learned she was an informant. She also testified that there is no safe place for her in Colombia, and that the Colombian government is incapable of protecting her.

In terms of her own personal experience with narcotraffickers in Colombia, Professor Nagel testified that she has not had any encounters with drug cartels even though she has been very active in working with the U.S. and Colombian governments in identifying narcotraffickers. She testified

A91-182-333                                4



that she was afraid that individuals associated with drug cartels in Colombia would learn of her identity when she traveled there on her Colombian passport. Since marrying and changing her name, Ms. Nagel has visited Colombia three times. She testified that two of these times she was accompanied by bodyguards and that she was not harmed when she traveled without bodyguards.

III. Analysis

**A.    Credibility**

The Court has no reason on this record to doubt the Respondent's credibility. This finding, of course, extends only to facts in the Respondent's knowledge, not to beliefs or conclusions held by the Respondent.

**B.    Convention Against Torture**

Article 3 of CAT prohibits a signatory country from removing any person to a country where it is more likely than not that she would be tortured. 8 C.F.R. § 208.16(c)(2). Respondent has the burden of proof in her CAT application to establish that it is more likely than not she will be tortured if removed to Colombia. 8 C.F.R. § 208.16(c)(2); *Matter of J-E-*, 23 I&N Dec.291, 302 (BIA 2002). This standard requires that an applicant demonstrate a greater than fifty percent chance that she will be tortured if removed. *Hamoui v. Ashcroft*, 389 F.3d 821, 827 (9th Cir. 2004). Unlike asylum, an applicant for relief under CAT need not show a nexus to a protected ground. *Nuru v. Gonzales*, 404 F.3d 1207, 1224 (9th Cir. 2005). The Court must consider all evidence relevant to the possibility of future torture, including, but not limited to: past torture inflicted upon Respondent; evidence that she could relocate to another part of Colombia where she is not likely to be tortured; gross, flagrant, or mass violations of human rights; and other relevant information regarding conditions in Colombia. 8 C.F.R. § 208.16(c)(3). An alien's criminal convictions in the United States, however serious, are not a bar to deferral of removal under CAT. *See* 8 C.F.R. §§ 208.17(a).

Torture is defined as severe pain or suffering intentionally inflicted by or with the "consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). Acquiescence requires that the public official have awareness of such activity and thereafter breach his or her legal duty to intervene. 8 C.F.R. § 208.18(a)(7). "Acquiescence" by government officials does not require actual knowledge or willful acceptance; for relief under CAT, Respondent "need only prove the government is aware of a third party's torturous activity and does nothing to intervene to prevent it." *Ochoa v. Gonzales*, 406 F.3d 1166, 1172 (9th Cir. 2005). Torture does not include pain or suffering arising from, inherent in, or incidental to lawful sanctions. 8 C.F.R. § 208.18(a)(3). Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law. *Id.*

**A.    Drug-Related Violence in Colombia**

Respondent has submitted various articles and affidavits describing the activity of narco-traffickers and the prevalence of drug-related violence in Colombia to support her claim that it is

A91-182-333                    5

more likely than not that she will be killed by Colombia narcotraffickers. The Drug Enforcement Agency and the Colombian National Police believe there are more than 300 active drug smuggling organizations in Colombia today. *See* Exhibit 3D-11, "The Colombian Cartels," Frontline. Both guerilla and paramilitary groups engage in drug trafficking. *See* Exhibit 3D-1, "Civil Society Under Siege in Colombia," United States Institute of Peace (February 2004); United States Dep't of State, *Country Report on Human Rights Practices, Colombia- 2005 [hereinafter Country Report 2005].* The articles illustrate how Colombian drug cartels use brutality and violence to further their goals. Cartel members murder rival drug traffickers, buyers who fail to pay for cocaine, and other cartel members whose loyalty is suspect. *See, e.g.,* Exhibit 3D-5, "Leader of Colombian Cocaine Ring Extradited to United States," www.usinfo.state.gov (October 21, 2005). At least one cartel, the Norte Valle Cartel, relies on illegal armed groups to protect cartel members and cocaine distribution routes. *See id.* It is also clear from the submitted documentary evidence that drug related violence is very high in Cali, where Respondent is from. According to some reports, the dismantling of the Medellin Cartel in the late 1980s and early 1990s enabled the Cali Cartel to become the most powerful drug organization in the world. *See* Exhibit II.

While the record demonstrates that Colombian drug cartels are very powerful and dangerous organizations both within and outside of Colombia, and that drug-related violence is prevalent in Colombia, this evidence is nevertheless insufficient to show that Respondent is more likely than not to be tortured, or killed, by narcotraffickers upon return to Colombia. First, Respondent has never been tortured in the past nor has she ever been threatened by Columbian narcotraffickers. According to Respondent's own testimony, no one in her family has ever been threatened by anyone in Colombia. During the eight years Respondent was on supervised release in California, neither she nor anyone in her family was ever contacted, let alone threatened, by anyone associated with drug cartels in Colombia. In fact, she has never experienced any repercussions due to her cooperation with the U.S. government.

Second, Respondent testified that she fears "the people who killed Gordo." However, she does not know who killed him or why he was killed. She believes he was murdered by someone in a drug cartel in retaliation for his role as an informant for the U.S. government, but there is no evidence in the record that this is true. Gordo was a known drug dealer, and consequently associated with some very dangerous people. It is just as likely that he was killed by someone in a rival cartel, or because of a bad drug deal, or countless other reasons, such as owing a drug dealer or supplier money.

In addition, it is not clear that Respondent's collaboration with the U.S. government would even attract the attention of members of Colombian drug cartels. While Respondent assisted the U.S. government by identifying certain people in her phone book, she never testified against anyone in a Colombian drug cartel, nor did she ever arrange a drug sale between the U.S. government and a drug cartel member. Although she agreed to testify against Norberto Duarte, he was a U.S. citizen whose only connection to a Colombian drug cartel is that he may know "the Greek." Similarly, Respondent attempted to set up a restaurant owner; however, he never showed up and therefore there is no reason to believe that either he or any cocaine supplier he may be connected to would know of Respondent's participation. Lastly, Respondent is uncertain as to the whereabouts of both the Greek

A91-182-333                                    6

000061

and Felix Bernal, and therefore it is uncertain that they are even in Colombia.

In conclusion, the Court finds that the absence of any threats or harm to Respondent or her family greatly undermines her claim that she would be tortured in Columbia.

## B.    Government Acquiescence

Even if Respondent could demonstrate that it is more likely than not that she would be killed by narcotraffickers, she still has the burden of proving that the government would be aware of the drug cartel's "torturous activity and do[] nothing to intervene to prevent it." *Ochoa*, 406 F.3d at 1172. According to articles submitted by Respondent, public safety conditions in Colombia have improved. Police have been redeployed to areas from which they had been previously ousted by armed groups, and currently have a presence in every municipality. In 2001, the Colombian government developed "Plan Colombia," an integrated strategy to promote peace and combat the narcotics industry. *See* Exhibit 3J-1, "Plan Colombia: A Progress Report," Congressional Research Service (May 9, 2005). In this context, it has been working with the United States government to curb narcotrafficking. In addition, the leader of the Norte Valle Cartel as well as eight other influential members of the cartel, have recently been extradited to the United States to face racketeering and drug charges. *See* Exhibit 3D-5. While it is clear there are many criticisms of the United States government's drug policy in Colombia and Plan Colombia in general, the point is that the Government of Columbia is actively combating drug trafficking and drug traffickers, not acquiescing in their activities.

While it is Respondent's contention that the Colombian government is too corrupt to protect her, evidence in the record suggests that the government has taken an active role in combating corruption within its government. A specialized Anti-Corruption Task Force Unit has been established to investigate and prosecute public corruption crimes, and the Colombian government has recently enacted legislation to combat money laundering and related illegal financial flows associated with narcotics trafficking. *See* Exhibit 3D-4, U.S. Dep't of State, *International Narcotics Control Strategy Report* (2005).

## IV. Conclusion

The Court agrees with Respondent that Colombia a dangerous place due to drug trafficking and crime.. However, after considering all evidence relevant to the possibility of future torture, the Court finds that it is not more likely than not that Respondent will be tortured by or with the consent or acquiescence of the Government of Columbia. Respondent has therefore failed to meet her burden for protection under the Convention Against Torture.

## ORDER

In light of the foregoing, the Court will enter the following order:

A91-182-333                                       7

**IT IS HEREBY ORDERED** that Respondent's application for deferral of removal under the Convention Against Torture be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that Respondent be removed to Colombia.

_____
**Anthony S. Murry**
**Immigration Judge**

RECEIVED
DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

MAY 15 2006

BOARD OF
IMMIGRATION APPEALS
OFFICE OF THE CLERK

A91-182-333                                    8

000063

Page 1 of 1

FedEx | Ship Manager | Label 7927 4017 6240

FedEx Express

From: Origin ID: (415)846-9311
Christopher Todd
LAW OFFICE OF CHRISTOPHER TODD
1 MILLER AVENUE
PMB 113
MILL VALLEY, CA 94941

Ship Date: 12MAY06
ActWgt: 1 LB
System#: 3899513/INET2400
Account#: S *********

REF: Biochi/A91182333

Delivery Address Bar Code

BILL SENDER

SHIP TO: (800)898-7180

**Clerk's Office**
**Board of Immigration Appeal**
5107 Leesburg Pike
Suite 2000
**Falls Church, VA 22041**



**STANDARD OVERNIGHT**

TRK# 7927 4017 6240    FORM 0201

22041 -VA-US

IAD

**MON**
Deliver By:
15MAY06
A2

**NE LVLA**



U.S. Department of Justice
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB#1125-0005
**Notice of Entry of Appearance as Attorney or Representative Before the Board of Immigration Appeals**

---

I hereby enter my appearance as attorney or representative for, and at the request of, the following named person(s):

**NAME:** ANA BEATRIZ BIOCINI
(First)        (Middle Initial)        (Last)

**ADDRESS:** ICE Custody, Yuba County Jail
(Number and Street)        (Apt. No.)

MARYSVILLE, CA
(City)        (State)        (Zip Code)

DATE (mm/dd/yy): April 15, 2006

ALIEN NUMBER(S) (List lead alien number and all family member alien numbers, if applicable.)

A 91 182 333

---

Please check one of the following:

[✓] 1.    I am a member in good standing of the bar of the highest court(s) of the following state(s), possession(s), territory(ies), commonwealth(s), or the District of Columbia.

**Full Name of Court**                **State Bar No. (if applicable)**

CJT - New York                        n/a

JFS - CA                              41980

(Please use space on reverse side to list additional jurisdictions.)

I [✓] am not (or [ ] am - explain fully on reverse side) subject to any order of any court or administrative agency disbarring, suspending, enjoining, restraining, or otherwise restricting me in the practice of law and the courts listed above comprise all of the jurisdictions (other than federal courts) where I am licensed to practice law.

[ ] 2.    I am an accredited representative of the following qualified non-profit religious, charitable, social service, or similar organization established in the United States, so recognized by the Executive Office for Immigration Review pursuant to 8 C.F.R. § 1292.2 (provide name of organization):

[ ] 3.    I am a law student or law graduate, reputable individual, accredited official, or other person authorized to represent individuals pursuant to 8 C.F.R. § 1292.1 (explain fully on reverse side).

---

*I have read and understand the statements provided on the reverse side of this form that set forth the regulations and conditions governing appearances and representation before the Board of Immigration Appeals. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

| SIGNATURE OF ATTORNEY OR REPRESENTATIVE | EOIR ID# | PHONE NUMBER (with area code) | DATE (mm/dd/yy) |
|---|---|---|---|
| X | | 415 846 9311 / 530 752 6942 | 4/15/06 |

| NAME OF ATTORNEY OR REPRESENTATIVE (type or print) | ADDRESS [ ] Check here if new address |
|---|---|
| Christopher J. Todd / James F. Smith | UC DAVIS IMMIGRATION LAW CLINIC 1 SHIELDS AVE. TB-30 DAVIS, CA 95616 |

Form EOIR - 27
Rev. June 2005

RECEIVED DEPARTMENT OF JUSTICE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW BOARD OF IMMIGRATION APPEALS OFFICE OF THE CLERK MAY 15 2006

**Certificate of Service**

I _C, TODD_ mailed or delivered a copy of the foregoing on _5/12/06_ to the DHS
(Name)                                                                                    (Date-mm/dd/yy)

(U.S. Immigration and Customs Enforcement - ICE) at _550 Keary SF, CA_
(Number and Street, City, State, Zip Code)

X _____
Signature of Attorney or Representative

(Note: Alien may be required to sign Acknowledgement and Consent below.)

---

*The Privacy Act of 1974 requires that if the person being represented is or claims to be a citizen of the United States or an alien lawfully admitted for permanent residence, he/she must sign the portion below.*

**I HEREBY ACKNOWLEDGE THAT THE ABOVE-NAMED ATTORNEY OR REPRESENTATIVE REPRESENTS ME IN THESE PROCEEDINGS AND I CONSENT TO THE DISCLOSURE TO HIM/HER OF ANY RECORDS PERTAINING TO ME WHICH APPEAR IN ANY EOIR SYSTEM OF RECORDS.**

| NAME OF PERSON CONSENTING | SIGNATURE OF PERSON CONSENTING | DATE (mm/dd/yy) |
|---|---|---|
| ANA BEATRIZ BIOCINI | X _Ana Biocini_ | 4/15/06 |

**APPEARANCES** - An appearance shall be filed on a Form EOIR-27 by the attorney or representative appearing in each appeal or motion to reopen or motion to reconsider before the Board of Immigration Appeals (see 8 C.F.R. § 1003.38(g)), even though the attorney or representative may have appeared in the case before the Immigration Judge or the U.S. Citizenship and Immigration Services. When an appearance is made by a person acting in a representative capacity, his/her personal appearance or signature constitutes a representation that, under the provisions of 8 C.F.R. part 1003, he/she is authorized and qualified to represent individuals. Thereafter, substitution or withdrawal may be permitted upon the approval of the Board of a request by the attorney or representative of record in accordance with *Matter of Rosales,* 19 I&N Dec. 655 (1988). Please note that appearances for limited purposes are not permitted. *See Matter of Velasquez,* 19 I&N Dec. 377, 384 (BIA 1986). Further proof of authority to act in a representative capacity may be required.

**REPRESENTATION** - A person entitled to representation may be represented by any of the following:

    (1) Attorneys in the United States as defined in 8 C.F.R. § 1001.1(f).

    (2) Law students and law graduates not yet admitted to the bar as defined in 8 C.F.R. § 1292.1(a)(2).

    (3) Reputable individuals as defined in 8 C.F.R. § 1292.1(a)(3).

    (4) Accredited representatives as defined in 8 C.F.R. § 1292.1(a)(4).

    (5) Accredited officials as defined in 8 C.F.R. § 1292.1(a)(5).

**ADDITIONAL INFORMATION:**

(Please attach additional sheets of paper if necessary.)

**NOTE: THIS FORM MAY NOT BE USED TO REQUEST RECORDS UNDER THE FREEDOM OF INFORMATION ACT OR THE PRIVACY ACT. THE MANNER OF REQUESTING SUCH RECORDS IS CONTAINED IN 28 C.F.R. §§ 16.1 - 16.11 AND APPENDICES.**

Under the Paperwork Reduction Act, a person is not required to respond to a collection of information unless it displays a valid OMB control number. We try to create forms and instructions that are accurate, can be easily understood, and which impose the least possible burden on you to provide us with information. The estimated average time to complete this form is six (6) minutes. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, you can write to the Executive Office for Immigration Review, Office of General Counsel, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041.

1  CHRISTOPHER TODD, Attorney at Law
   IMMIGRATION LAW CLINIC
   University of California, Davis School of Law
2  One Shields Avenue TB-30
   Davis, CA 95616-8821
3  Tel.:   (530) 752-6942 or
           (415) 846-9311
4  Fax:    (530) 752-0822

5  Attorney for Respondent
   ANA BIOCINI
6

7  Assisted by: Dia Moua, Chad Greeson

8

9              UNITED STATES DEPARTMENT OF JUSTICE
          EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
10                    IMMIGRATION COURT
                  SAN FRANCISCO, CALIFORNIA
11

12

13  IN THE MATTER OF:              )  File No. 091-182-333
                                   )
14  ANA BIOCINI                    )  **MOTION TO RECONSIDER DECISION
                                   )  DENYING RESPONDENT'S
15  Respondent,                    )  APPLICATION FOR DEFERRAL OF
                                   )  REMOVAL UNDER THE CONVENTION
16  In Removal Proceedings         )  AGAINST TORTURE, 8 C. F. R. § 1003.23
                                   )  (b)(1)**
17                                 )
                                   )  Judge: Murry
18                                 )  Decision Date:  April 13, 2006
                                   )
19

20

21

22

23

24

25

26

27

28

**MOTION TO RECONSIDER DECISION DENYING RESPONDENT'S APPLICATION FOR DEFERRAL OF REMOVAL UNDER THE CONVENTION AGAINST TORTURE**

A motion to reconsider is based on legal grounds, and seeks a new determination based on alleged errors of fact or law. 8 U.S.C. § 1229a(c)(6) (removal proceedings); 8 C. F. R. § 1003.2(b)(1); *Ma v. Ashcroft*, 361 F.3d 553, 558 (9th Cir. 2004). The motion to reconsider must be accompanied by a statement of reasons and supported by pertinent authority. 8 U.S.C. § 1229a(c)(6)(C); 8 C. F. R. § 1003.2(b)(1); *Iturribarria v. INS*, 321 F.3d 889, 895–96 (9th Cir. 2003). Furthermore, a motion to reconsider may be made before the IJ and that motion may be reconsidered by another IJ who received the transferred case. 8 C. F. R. § 3.23; *Singh v. Bhalthal v. INS*, 170 F.3d 943 (9th Cir. 1999).

Ms. Biocini moves this court to reconsider its decision, issued April 13, 2005, denying her application for Deferral of Removal under the Convention Against Torture, 8 C. F. R. § 1003.23 (b)(1) ("CAT"). A copy of that decision is attached.

**I.    Errors of Fact**

The following facts referenced in the April 13, 2006 decision ("IJ Decision") are either inconsistent with the evidence or deserve further consideration.

1.    IJ Decision, 2 at ¶ 3. Following her 1998 plea agreement, Ms. Biocini provided substantial assistance to the U.S. government regarding cocaine trafficking. After her initial interview with the FBI, Ms. Biocini spent several days with federal agents reviewing an extensive list of narcotics contacts, many of which were high-level cocaine traffickers. Drug enforcement agents were particularly interested in Respondent's ties to Miguel and Gilberto Rodriguez-Orejuela, founding members of the Cali cartel (both of whom are facing drug-related charges in Florida). Following this series of debriefings, Ms. Biocini continued to cooperate with federal authorities. She met with federal agents and answered questions approximately nine times. In addition, she agreed to broker a deal for cocaine with a suspected Bay Area cocaine dealer. Ultimately, the suspected dealer failed to meet Ms. Biocini to discuss the matter further.

000068

Nevertheless, Ms. Biocini sacrificed her personal safety and well-being on the government's behalf. Ex. A1, page 7.

2.    IJ Decision, 2 at ¶ 3. Ms. Biocini played a direct role in Norberto Duarte's decision to forego a criminal trial and accept a plea agreement with the government. In reference to Ms. Biocini, the IJ states "a U.S. attorney told Respondent that her assistance was a substantial factor in his [Norberto Duarte's] decision to plead guilty." This statement is inaccurate. The government's Sentence Memorandum and Motion to Depart Pursuant to U.S.S.G. § 5k1.1 ("Sentencing Memo") addresses the sentencing judge and concludes that Ms. Biocini satisfied the criteria of providing substantial assistance to the United States. Furthermore, the government acknowledges that Ms. Biocini dedicated "numerous days with investigators and the Assistant United States Attorney in preparation for her anticipated testimony in the trial of Norberto Duarte, which was twice rescheduled and thus required Biocini to prepare twice to testify. Biocini from the start of her cooperation expressed an earnest willingness to act as a witness against any of the co-defendants in this matter. She made herself readily available for trial preparation and conducted herself professionally." Ex. C-2 (Sentence Memorandum, pp. 4-5). Ms Biocini also reviewed documents and listened to wiretapped conversations. According to the government, "Biocini's willingness to act as a witness in Duarte's trial had an impact on Duarte's ultimate decision to plea." Ex. C-2 (Sentence Memorandum, p. 5).

3.    Additionally, Ms. Biocini's cooperation continued well beyond Mr. Duarte's plea agreement -- until 2001. Ex. A-1.

4.    I.J. Decision, 3 at ¶ 3. While Ms. Biocini dated the Greek for approximately one year, she maintained a relationship with him from 1984-1988. During that time, Ms. Biocini witnessed numerous large-scale cocaine transactions. Ex. A-1.

5.    IJ Decision, 4 at ¶ 2. According to the Sentence Memo, Ms. Biocini was not considered a leader or an organizer as defined by the guidelines. The government's electronic interceptions and intelligence reports showed that Ms. Biocini "was a source where individuals who were interested could obtain cocaine. None of the evidence collected in the case supports

000069

the conclusion that Ms. Biocini gave directions or orders to anyone else, nor controlled how much profit they received." In essence, Ms. Biocini was a point of contact with drug traffickers and fellow users, not a drug trafficker herself. Ex. C-2, (Sentence Memorandum, p.2).

6.      IJ Decision, 6 at ¶ 4. Mr. Duarte was well acquainted with Steve Solomon and Steve Siegal – both former deliverymen for The Greek. Furthermore, Mr. Duarte was operating a sizeable cocaine trafficking operation in Northern California and Hawaii, making it highly unlikely that The Greek was Mr. Duarte's only connection to the Colombian cartel. Ex. A-1.

7.      IJ Decision, 2 at ¶ 2. Peter Biocini was born on June 14, 1988 and is currently a 17 year old minor. Ex. E-1.

## II.    Errors of Law

### A.    CAT Standard

Pursuant to Article III of the Convention against Torture, a state may not remove a person to another nation if there are "substantial grounds for believing that he would be in danger of being subjected to torture" in that nation. FARRA § 2242. Since the United States has signed, ratified, and codified CAT, "it [is] the policy of the United States not to expel . . . or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . ." FARRA § 2242(a) (codified at note to 8 U.S.C. § 1231); *Nuru v. Gonzalez*, 404 F.3d 1207, 1216 (9th Cir. 2005).

### B.    Definition of Torture

For an act to constitute torture, it must (1) cause severe physical any act by which severe pain or suffering; (2) be intentionally inflicted; (3) be inflicted for a proscribed purpose; (4) be inflicted by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arise from lawful sanctions. FARRA § 2242; 8 C. F. R. § 1208.18(a)(1); *Nuru*, 404 F.3d at 1217.

000070

Ms. Biocini provided substantial assistance to the U.S. government regarding cocaine trafficking. As a result, Ms. Biocini believes she will be killed for retribution by members of the drug cartels if removed to Colombia. Hence, Ms. Biocini has satisfied the five elements for torture as defined by CAT.

### C.    Burden of Proof

An applicant bears the burden of proof for CAT relief and must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C. F. R. § 208.16(c)(2); *Nuru*, 404 F.3d at 1216. Respondent carries her burden of proof by presenting "evidence establishing 'substantial grounds for believing that he would be in danger of being subjected to torture in the country of removal.'" *Kamalthas v. INS*, 251 F.3d 1279, 1284 (9th Cir. 2001). Thus, a record showing that a claimant has a 51 percent chance of being tortured entitles him one to CAT relief. *Khup v. Ashcroft*, 376 F.3d 898, 908 (9th Cir. 2004). A well-founded fear of torture does not necessarily satisfy the "more likely than not standard." *INS v. Cardoza-Fonesca*, 480 U.S. 421, 431 (1987). However, this standard requires a lesser quantum of proof than either the "clear and convincing" standard or the "beyond a reasonable doubt standard used in criminal proceedings. *In re J-E-*, 23 I. & N Dec. 291 (BIA 2002) (Rosenburg, J. and Espenoza, J., dissenting) (referencing *Matter of Patel*, 19 I & N Dec. 774, 783 (BIA 1988).

Moreover, the testimony of an applicant may be sufficient to sustain her burden of proof without additional corroboration. 8 C. F. R. § 208.16(c)(2). The Ninth Circuit has held that no further corroboration of credible testimony is required "when an alien credibly testifies to certain facts, those facts are deemed true, and the question remaining to be answered becomes whether these facts, and their reasonable inferences, satisfy the elements of the claim for relief." *Ladha v. INS*, 215 F.3d 889, 900 (9th Cir. 2000)

//

//

The IJ's found Ms. Biocini's to be a credible witness. In summary, Ms. Biocini testified to the following:

1.   Ms. Biocini's described in great detail her numerous connections to the illegal cocaine industry, both domestically and abroad.  Ex. A-1.

2.   One of Ms. Biocini's key contacts was Hernando Velasco (Gordo), who assisted the U.S. government in bringing criminal charges against her.  Ex. A-1.; Ex. E-3

3.   In his conversations with the FBI, Gordo expressed his fear about working for the U.S.  He also believed that his cooperation would jeopardize his personal safety and put his family at grave risk.  To protect his family, Gordo asked that his children be relocated from Cali, Colombia to the U.S.  According to FBI reports, a relocation fund was authorized for such a purpose.  Ex. E-3.

4.   Gordo was subsequently removed to Colombia.  After returning to Cali, Gordo publicly "outed" Ms. Biocini as a U.S. informant.  Ex. A-1.

5.   On July 9, 2004, armed assassins executed Gordo.  Ex. E-1

Ms. Biocini's testimony, Gordo's fear of retribution, and the circumstances surrounding his death all strongly implicate the Colombian drug cartels in Gordo's assassination.  Deeming these facts to be true, one can reasonably infer that the Colombian drug cartels assassinated Gordo.  Based on the credible testimony and evidence provided by Respondent, one can also reasonably infer that, like Gordo, Ms. Biocini will be killed if she returns to Colombia.  In light of Gordo's death and the other relevant evidence regarding the possibility of torture, Ms. Biocini has proven by a preponderance of the evidence that she will be tortured if removed to Colombia.

**D.    Relevant Evidence of Future Torture**

Pursuant to CAT, all evidence relevant to the possibility of future torture must be considered.  This includes, but is not limited to:  (1) evidence of past torture; (2) evidence that internal relocation is possible; (3) evidence of gross, flagrant, or mass human rights violations; and (4) other relevant information regarding country conditions.  *Kalmathas*, 251 F.3d at 1282.

000072

1   Additionally, CAT claims must be evaluated on an individual, case-by-case basis.  8 C. F. R. §
2   208.16(c)(3)(2001).

3       E.    **Evidence of Past Torture**
4
5       Ms. Biocini does not allege past instances of torture.  However, this factor alone cannot
6   logically justify a denial of relief.  A *per se* rule denying relief for CAT applicants without
7   evidence of past torture clearly ignores the language and the intent of the regulations
8   implementing CAT.  *In re J-E-*, 23 I. & N Dec. 291 (BIA 2002) (Rosenburg, J. and Espenoza, J.,
9   dissenting).  For CAT claims, *all evidence* relevant to the possibility of future torture must
10  beconsidered.  Therefore, a lack of past persecution alone does not bar Ms. Biocini's claim for
11  relief.

12      F.    **Internal Relocation**
13      "Evidence that an applicant can relocate to another part of the country of removal where
14  he or she is likely to be tortured" is relevant to the possibility of future torture.  *Kalmathas*, 251
15  F.3d at 1282.  Due to the power, pervasiveness, and reach of the drug cartels within Colombia,
16  Ms. Biocini cannot be safely relocated anywhere within the country.  Ms. Biocini's expert
17  witnesses both concluded that Ms. Biocini could not safely relocate to any part of Colombia
18  where she could escape retribution from the drug cartels.  Ex. I-1; I-3

19      G.    **Country Conditions Evidence**
20
21      Country conditions play a decisive role in determining whether an applicant is eligible for
22  relief under CAT.  The Ninth Circuit has held that country conditions "can play a decisive role in
23  granting relief under the Convention" *Kalmathas*, 251 F.3d at 1280, 1283; *see also, Nuru*, 404
24  F.3d at 1215.

25      As the IJ stated, Ms. Biocini submitted documentary evidence establishing that
26  "Colombian drug cartels are very powerful and dangerous organizations both within and outside
27  of Colombia, and that drug related violence is prevalent in Colombia," and particularly "high in
28  Cali, where Respondent is from."  IJ Decision, 5 at ¶ 3.  Nonetheless, on the basis of exhibits

Respondent's Motion to Reconsider
*Matter of Biocini*, A91182333

000073

submitted by Ms. Biocini, the IJ suggested that public safety conditions in Colombia have improved due to police deployment to areas previously occupied by paramilitary groups.

However, this conclusion sidesteps vital information concerning Colombia's instability and the adverse affect of police deployment throughout the country. Though the government has made progress in some superficial areas, the drug cartels and paramilitary forces maintain a stronghold on the country. Kidnapping, forced disappearance, human rights violations, political assassinations, and other forms of torture are still commonplace in Colombia. A 2005 report by International Narcotics Control Strategy Report (INCSR) for the Department of State states that "[d]espite impressive progress against narcotics trafficking during 2004, Colombia remains a major drug producing country." Ex. D-5. In addition, INCSR reports that "developed infrastructure like ports on both the Pacific and the Atlantic and the Pan American Highway, provide the narcotics terrorists with many options. The normal problems associated with narcotics trafficking are compounded in Colombia by the presence of various illegal armed groups that are fighting with government and involved in narcotics trafficking. *Id.* Furthermore, the INCSR reported that illegal armed groups still control areas in Colombia that have a high concentration of coca and opium cultivation and "their involvement in narcotics is a major source of violence and terrorism in Colombia." *Id.* Finally, although police have been deployed to areas formerly unoccupied by paramilitary groups, this change has not brought substantial changes for Colombian citizens.

Countless reports chronicle the corruption and abuse by members of the police and security forces within Colombia. In 2004, the U.S. Department of State has stated that "[s]ome members of the security forces continued to collaborate with the terrorist AUC, which committed serious abuses. Police, prison guards, and military forces mistreated detainees." Ex. D-4. Furthermore, despite unilateral cease-fires paramilitary groups continue to commit numerous political killings. In addition, counter-insurgency strategy utilized by Colombian security forces "frequently view civilians in conflict areas not as victims of guerrilla groups but as part of the enemy. This has led to the systematic abuse and stigmatization of groups deemed to be

000074

'sympathetic' to guerrillas, such as human rights defenders, peasant farmer leaders, trade unionists and other social activist, and civilian communities living in areas with a guerrilla presence deemed to be of military or economic importance." Ex. D-8.

Recent developments highlight Colombia's current problems. With presidential elections scheduled for May 28, 2006, current President Alvaro Uribe is facing accusations that the DAS (Colombia's intelligence/counterintelligence agency that investigates crimes and makes arrests) worked hand-in-glove with Colombian paramilitary groups to secure votes in the 2002 election campaign and to carry out a plot to kill several leftist Venezuelan leaders, including Hugo Chavez. *See* John Otis, *Despite Lead in Polls, Uribe's Image Takes Hit*, HOUSTON CHRONICLE, Apr. 22, 2006, *at* http://www.chron.com/disp/story.mpl/world/3811577.html. Furthermore, the sister of former Colombian president Cesar Gaviria was assassinated on April 27, 2006, apparently in a botched kidnapping attempt. Gaviria leads the main opposition party, the Liberal Party, and has been an outspoken critic of President Uribe. *See*, Sergio De Leon, *Colombian Police Seek Gaviria's Killers*, SAN JOSE MERCURY NEWS, April 28, 2006, at http://www.mercurynews.com/mld/mercurynews/news/breaking_news/14447199.htm.

In summary, Ms. Biocini has presented extensive evidence to support her claim for relief under CAT. Colombia has been and continues to be the world's leading producer of cocaine. Cocaine production has fueled the massive human rights violations and the political instability within the country, which continue into the present. The evidence submitted by Respondent — both historical and contemporary — documents gross, flagrant, and massive human rights violations in Colombia. Colombia also has a long history of political instability, abuse, and corruption. Moreover, Colombian drug cartels have developed a symbiotic relationship with various paramilitary groups. These groups carry out the cartels' dirty work by facilitating cocaine production and distribution, engaging in wide-spread terrorist activities, and influencing and infiltrating all branches of the Colombian government. Finally, Gordo, who was one of Ms. Biocini's contacts and who also became a U.S. informant, was killed by armed assassins after

000075

1   being returned to Colombia.  Thus, in light of all evidence relevant to the possibility of future

2   torture, Ms. Biocini has established her burden of proof for relief under CAT.

3       **H.    Other Relevant Evidence**

4

5       The Ninth Circuit stated that "[p]ersecutors are hardly likely to provide their victims with

6   affidavits attesting to their acts of persecution." *Bolanos-Hernandez v. I.N.S.* 767 F.2d 1277

7   1285-86 (9th Cir. 1984).  In *Bolanos-Hernandez*, the Ninth Circuit continued "whether it is

8   more likely than not that the alien would be subject to persecution may depend on whether the

9   threat is a serious one — whether there is reason to take the threat seriously.  What matters is

10  whether the group making the threat has the will or the ability to carry it out.  It is here that

11  general corroborative evidence, such as documentary evidence, may be most useful." *Id.*

12  (referencing *I.N.S. v. Stevic*, 467 U.S. 407 (1984)).

13      The IJ denied Ms. Biocini's request for relief in part because she did not identify exactly

14  who killed Gordo or exactly why he was killed.  Due to the internal corruption within the

15  Colombian government and the inadequacies of the Colombian law enforcement, this

16  information is simply not available.  In fact, attempting to acquire this type of information in

17  Colombia is extremely dangerous.  In her affidavit, Ms. Biocini's testified that her sister Patricia,

18  who lives in Cali, would not attempt to gather further information on Gordo because of the

19  danger it would create for her and her family.  Ex. A-1.

20      Nonetheless, Ms. Biocini submitted general corroborative evidence that proves, by a

21  preponderance of the evidence, that Gordo was a U.S. informant and that he was killed by

22  members of the drug cartel.  First, Gordo had a long history of illegal drug trafficking in

23  Colombia and abroad.  Second, after being arrested on drug-related charges, Gordo worked as an

24  informant for the U.S.  In fact, Ms. Biocini believes that Gordo was actively working with

25  federal authorities when he made contact with her in 1994.  Third, Gordo had previous violent

26  encounters with members of the Cali cartel.  On January 9, 1987 Gordo was kidnapped and held

27  for ransom by "El Conejo" for an alleged $60,000 drug debt.  Gordo had to pay this amount to be

28  released.  Additionally, El Conejo was one of Ms. Biocini's contacts.    Ex. E-5, p.3.; Ex. A-1.

000076

1   Fourth, the style of death and the manner in which it was carried out is synonymous with the

2   drug cartels. Gordo was brutally killed in broad daylight by the *emisarios de la muerte*

3   (emissaries of death), at close range, with repeated gunshots to the head and face by two men

4   who were stalking him outside a building in Cali. There was no witness to the actual murder.

5   However, there were reports that two men dressed from head-to-toe in black clothing fled the

6   scene by car and/or motorcycle. Ex. E-1. The most logical conclusion to draw from the style

7   and the manner of Gordo's death is that his assassination was not a random act of violence, but

8   rather a revenge killing carried out by organized terrorists working for the Colombian drug

9   cartels. Finally, before his death Gordo had publicly outed Ms. Biocini as a government

10  informant. The culmination of this evidence proves, more likely than not, that Gordo was killed

11  by the drug cartels because he was a U.S. informant.

12      The IJ also determined that Ms. Biocini's government cooperation would not attract the

13  attention of Colombian drug cartels. However, such a conclusion disregards essential evidence

14  submitted by Ms. Biocini. Norberto Duarte pled guilty in large part because Ms. Biocini agreed

15  to testify against him. Ms. Biocini met Mr. Duarte through her connections with the Greek's

16  deliverymen (i.e, Edgar Kasby, Gus, Larry and Steve Solomon, and Steve Siegel), several of

17  whom were named co-defendants in Respondent's criminal trial (Steve Solomon and Steve

18  Siegal). Ex. A-1. Thus, it is not a farfetched conclusion that "The Greek" learned of Ms.

19  Biocini's cooperation through one or more of his former associates. Furthermore, The Greek

20  was not Colombian and did not live in Colombia. However, The Greek had formed strong

21  relationships with members of both the Medellin and Cali cartels who supplied him with

22  considerable and consistent quantities of cocaine. Additionally, the IJ states that "Mr. Duarte's

23  only connection to the Colombian drug cartel is that he may know the Greek." However, Mr.

24  Duarte was operating a fairly large-scale cocaine distribution scheme in Northern California and

25  Hawaii, making it almost certain that his contacts to cocaine suppliers were more expansive than

26  simpiy "knowing" The Greek. Finally, the IJ states that Ms. Biocini is unaware of the

27  whereabouts of both The Greek and Felix Bernal and that it is uncertain they are even in

28  Colombia. Whether or not the The Greek or Bernal are in Colombia is immaterial. The

000077

appropriate question is whether these men have the power and influence within Colombia to cause future harm to Ms. Biocini. According to the evidentiary materials submitted in this case, the answer is a resounding yes.

Finally, the IJ also places undue emphasis on Professor Nagle's own personal experiences and improperly analogizes these experiences to Ms. Biocini's case. Ms. Nagle's three short-term visits to Colombia are wholly irrelevant as to whether Ms. Biocini will be tortured if removed to Colombia. Professor Nagle did not testify that she had numerous contacts with high-level cocaine traffickers. Ms. Nagle's trips to Colombia were voluntary and short-term, making it easier to move about the country unharmed. Moreover, on two of these three trips, Ms. Nagle had bodyguards and the direct cooperation of the United States government. If removed to Colombia, Ms. Biocini will not be so fortunate, and the duration of her stay will be permanent. In sum, shifting the inquiry from Ms. Biocini to the expert witness herself confuses the ultimate issue in this case – i.e., whether Respondent (not Professor Nagle) will be tortured if returned to Colombia.

## I.    Government Acquiescence

The Ninth Circuit has held that to qualify for relief under CAT, torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C. F. R. § 208.18(a)(1)(2002); *Zheng v. Ashcroft*, 332 F.3d 1186 (9th Cir.) . In *Zheng*, the Ninth Circuit further held that "acquiescence" by government officials does not require either actual knowledge or willful acceptance. Willful blindness or awareness by governmental officials is sufficient. *Id.* at 1197.

The IJ concluded that the Colombian government is "actively combating drug trafficking and drug traffickers, not acquiescing, in their activities" after the institution of Plan Colombia. However, substantial evidence submitted by Ms. Biocini shows that despite efforts by both the Colombian and U.S. governments, the "war on drugs" is far from over. First, the court states that "Plan Colombia" is "an integrated strategy to promote peace and combat the narcotics industry."

000078

But, exhibits Ex. D-6, J-4, J-6 show that Plan Colombia has failed to substantially curb narcotics production or improve human rights conditions within Colombia.

One of Plan Colombia major flaws is that it relies primarily on a military strategy to fight drug cultivation and trafficking. This strategy "ignores deep-rooted causes of the conflict and the human rights crises." Ex. J-4. Moreover, Colombia remains "the source of over 90 percent of the cocaine and 50 percent of the heroin entering the U.S. It is also a leading user of precursor chemicals and the focus of significant money laundering activity." Ex. D-5. Finally, a recent progress report on Plan Colombia states that "no effect has been seen with regard to price, purity, and availability of cocaine and heroin in the United States." Ex. J-1. The report further contends that guerilla groups do not seem to be any closer to a cease-fire and that the process of demobilization is proceeding without any legal framework. *Id.*

Relying on a handful of recent extraditions, the IJ concluded that the Colombian government is actively combating drug traffickers and drug trafficking, not acquiescing in their activities. IJ Decision, 7, ¶1. The evidentiary materials submitted by Respondent, outlining the history of Colombian drug cartels and paramilitary groups, simply do not support this overly-optimistic conclusion. The most recent wave of extraditions of cartel members has not resulted in any degree of permanent deterrence against the illegal narcotics industry in Colombia. Despite $4 billion dollars in U.S. aid through Plan Colombia, coca production increased 26% from 2004 to 2005. Furthermore, total Colombian coca acreage has increased 6% since 2000 before Plan Colombia began. *See*, Chris Kraul, *GOP Senator Questions White House Data on Coca Growth in Colombia*, L.A. TIMES, May 2, 2006, *at* http://www.latimes.com/news/nationworld/world/la-fg-colombia2may02,1,7369112.story.

As explained by the "hydra effect", once one cartel has been abolished through the capture of a key leader, this void will simply be filled by another individual or group. Ex. D-6. The "hydra effect" also appears in relation to attempts to demobilize the armed groups in Colombia. In a report exploring the demobilization of the paramilitaries, Amnesty International expressed grave concerns about the need for greater oversight of this process by the Colombian

000079

1  government. Amnesty International also reported that legislation passed to regulate this
2  demobilization process "fails to meet Colombia's international obligations on victim's right to
3  truth, justice and reparation . . . and will not guarantee that demobilized paramilitaries are not
4  simply reintegrated into the armed conflict." Most importantly, Amnesty International has found
5  that the "[p]aramiltarism has not been dismantled, it has simply been 're-engineered.'" Ex. D-8.
6  Similarly, Human Right Watch reported that demobilization effort is not very effective to the
7  dismantling of the illegal groups or their resources. Ex. J-6.

8        While agencies such as the Anti-Corruption Task Force Unit have been created to fight
9  issues such as corruption, the reports also indicate that corruption is still rampant and in
10 Colombia. In a 2006 report, Human Rights Watch reported that " [u]nits of the Colombian
11 military continue to tolerate, support and commit abuses in collaboration with members of
12 paramilitary groups. In 2005, there continued to be reports of abuses by members of the Army's
13 17th Brigade as well as by members of the armed forces operating in the region of Chocó." Ex.
14 J-6 at 2.

15 **III.    Argument or Aspect Overlooked**

16

17       By overlooking the expert witness testimony of Professor Lowell Gustafson, the IJ failed
18 to fully consider fundamental evidentiary support for Ms. Biocini's request for relief. Professor
19 Gustafson found that Respondent had a strong foundation for her fear that people in Colombia
20 would have the intent to harm her. Moreover, Professor Gustafson stated that even if the
21 Colombian government had the desire to protect her, it would not be able to provide adequate
22 security. Ex. I-3. Professor Gustafson also testified that despite the number of success by Plan
23 Colombia, Colombia remains a major producer of the world's cocaine — cocaine which
24 continues to flow into the US. In his affidavit, Professor Gustafson said that "[t]he continued
25 supply of cocaine has perhaps increased, as indicated by the falling prices of cocaine of rather
26 consistent quality." Ex. I-3, 3. Additionally, Professor Gustafson states that in 2005 "FARC was
27 held responsible for more killings than any time since President Uribe took office." *Id.* at 4.
28 Professor Gustafson also makes reference to the Colombian embassy, who has stated that as the

000080

1  Colombian government becomes stronger, the FARC and AUC also become stronger and more

2  sophisticated. *Id.* Most importantly, Professor Gustafson believes that if Respondent is deported

3  back to Colombia "the result will in my opinion likely result in her murder and perhaps the

4  murder of her family members." *Id.* at 5.

5

6
## IV.    Conclusion
7

8  For the reasons stated above, Respondent respectfully requests that this court reconsider its

9  decision of April 13, 2006 and grant the Respondent's application for deferral of removal under

10  the Convention Against Torture.

11

    Dated this May 5, 2006                         Respectfully Submitted,

12

13

14                                                  CHRISTOPHER TODD
                                                    Immigration Law Clinic, UC
15                                                  Davis School of Law
                                                    Attorney for the Respondent,
16                                                  Ana Biocini

17

18

19

20

21

22

23

24

25

26

27

28

000081

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
SAN FRANCISCO, CALIFORNIA



CHRISTOPHER TODD
IMMIGRATION LAW CLINIC- UC DAVIS SCHOOL OF LAW
ONE SHIELDS AVENUE TB-30
DAVIS          CA 95616-8821

IN THE MATTER OF          FILE A 91-182-333          DATE: Apr 6, 2006
*F-BIOCINI, ANA BEATRIZ
93061-011

__ UNABLE TO FORWARD - NO ADDRESS PROVIDED

X ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE.  THIS DECISION
IS FINAL UNLESS AN APPEAL IS FILED WITH THE BOARD OF IMMIGRATION APPEALS
WITHIN 30 CALENDAR DAYS OF THE DATE OF THE MAILING OF THIS WRITTEN DECISION.
SEE THE ENCLOSED FORMS AND INSTRUCTIONS FOR PROPERLY PREPARING YOUR APPEAL.
YOUR NOTICE OF APPEAL, ATTACHED DOCUMENTS, AND FEE OR FEE WAIVER REQUEST
MUST BE MAILED TO:     BOARD OF IMMIGRATION APPEALS
                       OFFICE OF THE CLERK
                       P.O. BOX 8530
                       FALLS CHURCH, VA   22041

__ ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE AS THE RESULT
OF YOUR FAILURE TO APPEAR AT YOUR SCHEDULED DEPORTATION OR REMOVAL HEARING.
THIS DECISION IS FINAL UNLESS A MOTION TO REOPEN IS FILED IN ACCORDANCE
WITH SECTION 242B(c)(3) OF THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C.
SECTION 1252B(c)(3) IN DEPORTATION PROCEEDINGS OR SECTION 240(c)(6),
8 U.S.C. SECTION 1229a(c)(6) IN REMOVAL PROCEEDINGS.  IF YOU FILE A MOTION
TO REOPEN, YOUR MOTION MUST BE FILED WITH THIS COURT:

                       IMMIGRATION COURT
                       550 KEARNY ST., SUITE 800
                       SAN FRANCISCO, CA  94108

__ OTHER: _____
          _____

                              _____
                                   NMC
                              COURT CLERK
                              IMMIGRATION COURT                    FF

   CC: AGUILAR, JASON B.
       550 KEARNY STREET, SUITE 1000
       SAN FRANCISCO, CA,  94108
NMC



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**SAN FRANCISCO, CALIFORNIA**

| | | |
|---|---|---|
| Matter of: | ) | Date: **MAR 2 3 2005** |
| | ) | |
| **Ana Beatriz BIOCINI,** | ) | File Number A91-182-333 |
| | ) | |
| | ) | <u>In Removal Proceedings</u> |
| Respondent | ) | |
| | ) | |

Charges:      INA § 237(a)(2)(A)(iii) – Alien Convicted of an Aggravated Felony

Application:    Deferral of Removal Under the Convention Against Torture

<u>On Behalf of the Respondent:</u>
Christopher Todd, Immigration Law Clinic
University of Davis, School of Law
1 Shields Ave. TB-30
Davis, CA 95616-8821

<u>On Behalf of the DHS:</u>
Jason B. Aguilar
Office of the Chief Counsel
550 Kearny Street, Suite 1000
San Francisco CA 94108

## DECISION OF THE IMMIGRATION JUDGE

### I. Procedural History

Respondent, Ana Beatriz BIOCINI, a native and citizen of Colombia, entered the United States at Miami, Florida on or about February 11, 1981 as a nonimmigrant visitor. Her status was adjusted to that of a lawful permanent resident on May 5, 1989, pursuant to section 245(A) of the Act. On April 28, 2003, Respondent was convicted of violating 21 U.S.C. § 846, Conspiracy to Distribute Cocaine. The Department of Homeland Security ("DHS") initiated proceedings against Respondent on January 28, 2005 by filing a Notice to Appear ("NTA") with the Court. Exhibit 1. The NTA charged Respondent with being removable under Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA" or "the Act") as an alien convicted of an aggravated felony. *Id.*

On May 16, 2005, Respondent submitted an application for asylum and withholding of removal. At a hearing on December 19, 2005, Respondent admitted the factual allegations contained within NTA and conceded removability. The Court directed Colombia as the country of removal. Respondent conceded that her federal drug conviction is an aggravated felony that renders her ineligible to apply for asylum. The Court also found that under *Matter of Y-L-*, 23 I&N Dec. 270 (A.G. 2002), Respondent's federal drug conviction constitutes a particularly serious crime, making her ineligible for withholding of removal pursuant to section 241(b)(3)(ii) of the Act.

A91-182-333          1

000083

The Court heard testimony on Respondent's application for protection under the Convention Against Torture ("CAT") on December 19, 2005 and February 15, 2006.

## II. Facts

### A.    Respondent's Testimony

Respondent testified that she was born in Cali, Colombia on June 30, 1954. She has six living siblings, four of whom live in Colombia. Both of Respondent's parents are deceased. Respondent is divorced. She has one son from her previous marriage, Peter, who is currently eighteen years old and lives in Mountain View, California with her ex-husband, George Biocini. Respondent testified that she entered the United States in 1981, and that she lived in Miami, Florida for many years before moving to California. She further testified that since moving to the United States, she has visited Colombia three times to visit family and receive medical and dental care.

Respondent's declaration and testimony provided a detailed account of her drug abuse and drug trafficking activities. Respondent testified that she began using drugs in 1981, and was addicted to cocaine and marijuana for several years. She was arrested on drug charges on May 5, 1995. She pled guilty to one count of conspiracy to distribute a kilogram of cocaine with intent to sell on June 5, 1998. Respondent was on supervised released from May 24, 1995 to January 16, 2004, and began a 30-month sentence at the Federal Correctional Institute in Dublin, California on January 16, 2004.

Respondent made a plea agreement with the U.S. government in exchange for a reduced sentence. As part of her plea, she agreed to assist the Federal Bureau of Investigation ("FBI") in their investigation of Colombian cocaine suppliers. *See also* Exhibits 3C-4 and C-5. Respondent debriefed FBI agents on all the people in her phone book. *See also* Exhibit 3C-2. According to Respondent's estimate, she gave the FBI the names and phone numbers of over forty people who were allegedly well-connected to the cocaine business in Colombia. Respondent testified that she never bought or sold drugs for the U.S. government as part of her role as an informant; however, she agreed to help them set up a person called Joe who was a restaurant owner connected to a Colombian cocaine supplier named Juan Molina. Respondent waited across the street from Joe's restaurant for four hours, but he never showed up. In addition, Respondent agreed to testify against Norberto Duarte, a United States citizen who was a co-defendant in Respondent's trial. While Mr. Duarte eventually made a plea agreement, a U.S. attorney told Respondent that her assistance was a substantial factor in his decision to plead guilty. Respondent believes that Mr. Duarte knew that she was going to testify against him. She also testified that Mr. Duarte has already been convicted, sentenced and released.

Respondent testified that while she made a plea agreement with the United States government, she was afraid of debriefing them on Colombian cocaine suppliers from the beginning. *See also* Exhibit 3C-4. She testified that she fears returning to Colombia because she believes that certain people associated with drug cartels in Colombia, with whom she was involved when she was a trafficker, learned that she became an informant for the U.S. government. Respondent testified that her gravest fear stems from her relationship with three people in particular: Hernando Velazco ("Gordo"); Elias Giannakapolous ("the Greek"); and Felix Bernal.

A91-182-333                              2

Respondent testified that she knew of Gordo in the early 1970s when she was still living in Cali, Colombia. She testified that they ran in the same social circles, and that he was very popular in the disco scene because of his reputation for selling narcotics. Respondent testified that she did not have any contact with Gordo again until 1994 when she received a letter from him asking her to meet him in Los Angeles. She testified that he invited her to the World Cup soccer finals, and that he asked her to bring some marijuana. Respondent testified that he and another woman met her at the airport, and that she became immediately suspicious that she was being followed. Gordo took her to an apartment. Respondent testified that he refused to smoke her marijuana. She testified that after approximately 45 minutes, she was overcome with the feeling that the meeting was a set-up and therefore left. Respondent testified that Gordo subsequently called her almost everyday asking her for cocaine. She testified that she and Gordo never made any concrete cocaine deals, although she did connect him with a friend of hers, "El Conejo," who sold cocaine.

Respondent testified that she believed Gordo was working for the U.S. government. She testified that after she was arrested and debriefed the FBI, she read reports that Gordo made a plea agreement and became an informant. She also learned that he had spoken to the FBI on three occasions, during which time he allegedly provided the FBI with information about Respondent and her family. Respondent testified that Gordo returned to Cali in 2000. She testified that her sister and two friends told her that Gordo told people in the area that Respondent was a government informant. *See also* Exhibit 3A-2. Respondent's sister later sent her a newspaper article which states that Gordo was killed in the middle of the day in Cali. *See also* Exhibit 3E-1. Respondent testified that she attempted to learn more about the circumstances surrounding Gordo's death, but her sister was too afraid to get involved. She testified that she is afraid of the people who killed Gordo. Respondent does not know who killed Gordo, but she believes he was killed by someone from a drug cartel.

Respondent testified about her relationship with the Greek. She dated the Greek for approximately one year when she lived in Miami during which time she became familiar with his substantial drug trafficking operations. According to Respondent, the Greek purchased kilos of cocaine from Colombia which he shipped to Miami and Pacifica, California, where his were located operations. She testified that she believes that Alfonso Bejarano from Medellín, Colombia was one of the Greek's key Colombia suppliers, but she did not know exactly how he obtained his cocaine. Respondent also testified that two men who worked for the Greek, Solomon and Kasby, were co-defendants in her case. She testified that she assisted them, and that she often traveled with them to and from Miami to San Francisco. Respondent also frequently picked up the Greek's clients from the airport, drove them around and brought them out to lunch. She also brought Solomon and Kasby to the airport to pick up cocaine bound for California. Respondent testified that she and the Greek ended their relationship in 1986, and that the last time she saw him was in 1988 when he asked her to meet him in Los Angeles. She testified that she never saw him with a gun, but he had the money and power to hire others to kill for him.

Respondent testified that she met Felix Bernal in the early 1990s through her friend Ruben from Cali. Ruben gave Felix her beeper number and after receiving a message from him, they met at a café in San Francisco. Respondent testified that as soon as they met, he offered to sell her kilos of cocaine, an offer she refused. He also unsuccessfully attempted to buy cocaine from her. Respondent testified that she left her first meeting with Felix feeling suspicious that he was an informant for the U.S.

A91-182-333                                    3

000085

government. She also testified that she was very paranoid during this time due to her heavy drug use. Respondent testified that the two later dated for a brief period, and that when she learned of his violent temper, she distanced herself from him. According to Respondent, Felix was also suspicious of government informants, and he told her that if he found out someone was an undercover agent, he would not hesitate to kill that person. Respondent testified that she is afraid of Felix because of his violent temper and because he knew where she lived. Felix also knew her brother and her ex-husband. She testified that after her arrest, Felix called her husband and asked about her. Respondent does not know where Felix is, but she believes he was at one time in deportation proceedings.

Respondent testified that neither she nor anyone in her family have ever had any contact with the Colombian government regarding her involvement in drug trafficking. She further testified that nobody in her family in Colombia has ever been contacted by anyone from a drug cartel. According to Respondent, no one in her family has ever been threatened by anyone in Colombia. Similarly, during the eight years time Respondent was on supervised release in California, she never had any contact from anyone associated with drug cartels in Colombia, and that in general, she has never experienced any repercussions due to her cooperation with the U.S. government.

**B.    Professor Nagel's Testimony**

Professor Luz Estella Nagel, a scholar in international criminal law and international drug trafficking in Latin America provided testimony and submitted an affidavit in support of Respondent's CAT application. *See* Exhibit 3I-1. According to Professor Nagel, the Cali narcotraffickers are pervasive in the economic, social, and governmental spheres of Cali. She testified that the government of Colombia is corrupt, and that there are some government officials who work "hand-in-hand" with the narcotraffickers. She further testified that narcotraffickers' treatment towards informants is brutal, and that it is likely that Respondent's cooperation with the U.S. government is, or at least will be, known by the narcotraffickers. Professor Nagel testified that narcotraffickers would kill Respondent if they learned she was an informant. She also testified that there is no safe place for her in Colombia, and that the Colombian government is incapable of protecting her.

In terms of her own personal experience with narcotraffickers in Colombia, Professor Nagel testified that she has not had any encounters with drug cartels even though she has been very active in working with the U.S. and Colombian governments in identifying narcotraffickers. She testified that she was afraid that individuals associated with drug cartels in Colombia would learn of her identity when she traveled there on her Colombian passport. Since marrying and changing her name, Ms. Nagel has visited Colombia three times. She testified that two of these times she was accompanied by bodyguards and that she was not harmed when she traveled without bodyguards.

### III. Analysis

**A.    Credibility**

The Court has no reason on this record to doubt the Respondent's credibility. This finding, of course, extends only to facts in the Respondent's knowledge, not to beliefs or conclusions held by the Respondent.

A91-182-333                                    4

**B.    Convention Against Torture**

Article 3 of CAT prohibits a signatory country from removing any person to a country where it is more likely than not that she would be tortured. 8 C.F.R. § 208.16(c)(2). Respondent has the burden of proof in her CAT application to establish that it is more likely than not she will be tortured if removed to Colombia. 8 C.F.R. § 208.16(c)(2); *Matter of J-E-*, 23 I&N Dec. 291, 302 (BIA 2002). This standard requires that an applicant demonstrate a greater than fifty percent chance that she will be tortured if removed. *Hamoui v. Ashcroft*, 389 F.3d 821, 827 (9th Cir. 2004). Unlike asylum, an applicant for relief under CAT need not show a nexus to a protected ground. *Nuru v. Gonzales*, 404 F.3d 1207, 1224 (9th Cir. 2005). The Court must consider all evidence relevant to the possibility of future torture, including, but not limited to: past torture inflicted upon Respondent; evidence that she could relocate to another part of Colombia where she is not likely to be tortured; gross, flagrant, or mass violations of human rights; and other relevant information regarding conditions in Colombia. 8 C.F.R. § 208.16(c)(3). An alien's criminal convictions in the United States, however serious, are not a bar to deferral of removal under CAT. *See* 8 C.F.R. §§ 208.17(a).

Torture is defined as severe pain or suffering intentionally inflicted by or with the "consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). Acquiescence requires that the public official have awareness of such activity and thereafter breach his or her legal duty to intervene. 8 C.F.R. § 208.18(a)(7). "Acquiescence" by government officials does not require actual knowledge or willful acceptance; for relief under CAT, Respondent "need only prove the government is aware of a third party's torturous activity and does nothing to intervene to prevent it." *Ochoa v. Gonzales*, 406 F.3d 1166, 1172 (9th Cir. 2005). Torture does not include pain or suffering arising from, inherent in, or incidental to lawful sanctions. 8 C.F.R. § 208.18(a)(3). Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law. *Id.*

**A.    Drug-Related Violence in Colombia**

Respondent has submitted various articles and affidavits describing the activity of narco-traffickers and the prevalence of drug-related violence in Colombia to support her claim that it is more likely than not that she will be killed by Colombia narcotraffickers. The Drug Enforcement Agency and the Colombian National Police believe there are more than 300 active drug smuggling organizations in Colombia today. *See* Exhibit 3D-11, "The Colombian Cartels," Frontline. Both guerilla and paramilitary groups engage in drug trafficking. *See* Exhibit 3D-1, "Civil Society Under Siege in Colombia," United States Institute of Peace (February 2004); United States Dep't of State, *Country Report on Human Rights Practices, Colombia- 2005* [*hereinafter* Country Report 2005]. The articles illustrate how Colombian drug cartels use brutality and violence to further their goals. Cartel members murder rival drug traffickers, buyers who fail to pay for cocaine, and other cartel members whose loyalty is suspect. *See, e.g.,* Exhibit 3D-5, "Leader of Colombian Cocaine Ring Extradited to United States," www.usinfo.state.gov (October 21, 2005). At least one cartel, the Norte Valle Cartel, relies on illegal armed groups to protect cartel members and cocaine distribution routes. *See id.* It is also clear from the submitted documentary evidence that drug related violence is very high in Cali, where Respondent is from. According to some reports, the dismantling of the Medellin

A91-182-333                                          5

Cartel in the late 1980s and early 1990s enabled the Cali Cartel to become the most powerful drug organization in the world. *See* Exhibit I1.

While the record demonstrates that Colombian drug cartels are very powerful and dangerous organizations both within and outside of Colombia, and that drug-related violence is prevalent in Colombia, this evidence is nevertheless insufficient to show that Respondent is more likely than not to be tortured, or killed, by narcotraffickers upon return to Colombia. First, Respondent has never been tortured in the past nor has she ever been threatened by Columbian narcotraffickers. According to Respondent's own testimony, no one in her family has ever been threatened by anyone in Colombia. During the eight years Respondent was on supervised release in California, neither she nor anyone in her family was ever contacted, let alone threatened, by anyone associated with drug cartels in Colombia. In fact, she has never experienced any repercussions due to her cooperation with the U.S. government.

Second, Respondent testified that she fears "the people who killed Gordo." However, she does not know who killed him or why he was killed. She believes he was murdered by someone in a drug cartel in retaliation for his role as an informant for the U.S. government, but there is no evidence in the record that this is true. Gordo was a known drug dealer, and consequently associated with some very dangerous people. It is just as likely that he was killed by someone in a rival cartel, or because of a bad drug deal, or countless other reasons, such as owing a drug dealer or supplier money.

In addition, it is not clear that Respondent's collaboration with the U.S. government would even attract the attention of members of Colombian drug cartels. While Respondent assisted the U.S. government by identifying certain people in her phone book, she never testified against anyone in a Colombian drug cartel, nor did she ever arrange a drug sale between the U.S. government and a drug cartel member. Although she agreed to testify against Norberto Duarte, he was a U.S. citizen whose only connection to a Colombian drug cartel is that he may know "the Greek." Similarly, Respondent attempted to set up a restaurant owner; however, he never showed up and therefore there is no reason to believe that either he or any cocaine supplier he may be connected to would know of Respondent's participation. Lastly, Respondent is uncertain as to the whereabouts of both the Greek and Felix Bernal, and therefore it is uncertain that they are even in Colombia.

In conclusion, the Court finds that the absence of any threats or harm to Respondent or her family greatly undermines her claim that she would be tortured in Columbia.

## B.    Government Acquiescence

Even if Respondent could demonstrate that it is more likely than not that she would be killed by narcotraffickers, she still has the burden of proving that the government would be aware of the drug cartel's "torturous activity and do[] nothing to intervene to prevent it." *Ochoa*, 406 F.3d at 1172. According to articles submitted by Respondent, public safety conditions in Colombia have improved. Police have been redeployed to areas from which they had been previously ousted by armed groups, and currently have a presence in every municipality. In 2001, the Colombian government developed "Plan Colombia," an integrated strategy to promote peace and combat the narcotics industry. *See* Exhibit 3J-1, "Plan Colombia: A Progress Report," Congressional Research Service (May 9, 2005).

A91-182-333                              6



In this context, it has been working with the United States government to curb narcotrafficking. In addition, the leader of the Norte Valle Cartel as well as eight other influential members of the cartel, have recently been extradited to the United States to face racketeering and drug charges. *See* Exhibit 3D-5. While it is clear there are many criticisms of the United States government's drug policy in Colombia and Plan Colombia in general, the point is that the Government of Columbia is actively combating drug trafficking and drug traffickers, not acquiescing in their activities.

While it is Respondent's contention that the Colombian government is too corrupt to protect her, evidence in the record suggests that the government has taken an active role in combating corruption within its government. A specialized Anti-Corruption Task Force Unit has been established to investigate and prosecute public corruption crimes, and the Colombian government has recently enacted legislation to combat money laundering and related illegal financial flows associated with narcotics trafficking. *See* Exhibit 3D-4, U.S. Dep't of State, *International Narcotics Control Strategy Report* (2005).

### IV. Conclusion

The Court agrees with Respondent that Colombia a dangerous place due to drug trafficking and crime.. However, after considering all evidence relevant to the possibility of future torture, the Court finds that it is not more likely than not that Respondent will be tortured by or with the consent or acquiescence of the Government of Columbia. Respondent has therefore failed to meet her burden for protection under the Convention Against Torture.

### ORDER

In light of the foregoing, the Court will enter the following order:

**IT IS HEREBY ORDERED** that Respondent's application for deferral of removal under the Convention Against Torture be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that Respondent be removed to Colombia.

_____
Anthony S. Murry
Immigration Judge

A91-182-333                    7

# CERTIFICATE OF SERVICE

File No. 091-182-333

On __5/8/06__, I served the following document(s): *Respondent's Motion to Reconsider (and Fee Waiver Request)* upon the parties in said action by placing a true and correct copy in a sealed envelope and each envelope addressed as follows:

US-ICE Office of Chief Counsel
550 Kearny Street, Ste. 1000
San Francisco, CA 94941

___   *By Facsimile Machine (Fax).* By personally transmitting a true and correct copy thereof via an electronic facsimile machine during regular business hours.

___   *By Mail.* I am readily familiar with the business practice for collection and processing of correspondence for mailing with the United States Postal Service and that this document, with postage fully prepaid, will be deposited with the United States Postal Service this date in the ordinary course of business.

___   *By Certified Mail.* I am readily familiar with the business practice for collection and processing of correspondence for certified mailing with the United States Postal Service and that this document, with postage fully prepaid, will be deposited with the United States Postal Service on this date in the ordinary course of business.

___   *By Overnight/Express Mail.* I am familiar with the business practice for the collection and processing for Overnight/Express Mail with the United States Postal Service and/or Overnight service provider. Such correspondence will be deposited with a facility regularly maintained by the United States Postal Service for receipt of express mail or other overnight service providers/entities (i.e., Federal Express, United States Parcel Service, etc.) For receipt of Overnight Mail on the same day in the ordinary course of business.

✓   *By Personal Service.* By personally delivering a true copy thereof to the office of the addressee above.

I declare under penalty of perjury that the foregoing is true and correct. Executed on __5/8/06__, in San Francisco, CA.

                                                                        M. Il Valley

Christopher J. Todd, Esq.

Respondent's Motion to Reconsider
*Matter of Biocini, A91182333*

16



# FEE WAIVER REQUEST
### AND DECLARATION IN SUPPORT OF REQUEST

Name: **Ana Biocini**             Date: October 6, 2005
A-Number: A#**91182333**

Application Form Number    ~~I-191~~ MOTION TO RECONSIDER
WITH IMMIGRATION JUDGE

I am **Ana Biocini** and I hereby submit my application for a fee waiver pursuant 8 C.F.R. 103.7 for the filing fee required for the attached application. I request the fee waiver because I am unable to pay the filing fee because of my financial circumstances as set forth below.

_____ **PUBLIC BENEFITS.**

Within the last 180 days, I qualified for and received the following federal means tested public benefit(s):

___ Food Stamps                    ___ Temporary Assistance to Needy Families
___ Medicaid/cal                   ___ Other: _____
___ Supplemental Security Income
___ Welfare

I submit the following item(s) as evidence:

**X** **INCOME.**

My monthly income is **$ 0** _____ which is at or below the poverty level contained in the most recent poverty guidelines revised annually by the Secretary of Health and Human Services.

I submit the following item(s) from as evidence:

▪ **I did not pay taxes for the last year because I did not make any money.**

_____ **AGE.**

I am elderly (aged 65 or older) at this time. I submit the following item(s) as evidence:

Granted
ASM
5/9/06

000091

____    **DISABILITY.**

I am disabled. I submit the following item(s) as evidence:

____    **DEPENDENTS.**

I have _____ dependents, aged _____ who I support financially.

I submit the following item(s) as evidence:

__X__    **SPECIAL SITUATION.**

I am in the following situation which requires humanitarian or compassionate consideration:

*I am currently incarcerated at the FCI Detention Center in Dublin, CA. I have been in detention since January 2004. My inmate number is 93061-011. Since this time, I have not received any income. Furthermore, I do not possess any outside income or assets to pay for the application fee.*

I submit the following item(s) as evidence:

  ▪

____    **OTHER.**

Other, explained below:

I submit the following item(s) as evidence:

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on _____ in Dublin, California.    _Ana B Biocini_
                                                    **Ana Biocini**

F:/Legal/IIEB Forms/Correspondence with INS/Fee Waiver Request/Fee Waiver Request – Computer Fillable Form    revised 2/24/04

6

# AR 93-94 have been deleted.

# Please see AR 91-92

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
SAN FRANCISCO, CALIFORNIA


CHRISTOPHER TODD
IMMIGRATION LAW CLINIC- UC DAVIS SCHOOL OF LAW
ONE SHIELDS AVENUE TB-30
DAVIS          CA 95616-8821


IN THE MATTER OF            FILE A 91-182-333      DATE: Apr 13, 2006
*F-BIOCINI, ANA BEATRIZ
93061-011


\_\_ UNABLE TO FORWARD - NO ADDRESS PROVIDED

[X] ATTACHED IS A COPY OF THE _Amended_ DECISION OF THE IMMIGRATION JUDGE.  THIS DECISION
IS FINAL UNLESS AN APPEAL IS FILED WITH THE BOARD OF IMMIGRATION APPEALS
WITHIN 30 CALENDAR DAYS OF THE DATE OF THE MAILING OF THIS WRITTEN DECISION.
SEE THE ENCLOSED FORMS AND INSTRUCTIONS FOR PROPERLY PREPARING YOUR APPEAL.
YOUR NOTICE OF APPEAL, ATTACHED DOCUMENTS, AND FEE OR FEE WAIVER REQUEST
MUST BE MAILED TO:    BOARD OF IMMIGRATION APPEALS
                      OFFICE OF THE CLERK
                      P.O. BOX 8530
                      FALLS CHURCH, VA  22041


\_\_ ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE AS THE RESULT
OF YOUR FAILURE TO APPEAR AT YOUR SCHEDULED DEPORTATION OR REMOVAL HEARING.
THIS DECISION IS FINAL UNLESS A MOTION TO REOPEN IS FILED IN ACCORDANCE
WITH SECTION 242B(c)(3) OF THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C.
SECTION 1252B(c)(3) IN DEPORTATION PROCEEDINGS OR SECTION 240(c)(6),
8 U.S.C. SECTION 1229a(c)(6) IN REMOVAL PROCEEDINGS.  IF YOU FILE A MOTION
TO REOPEN, YOUR MOTION MUST BE FILED WITH THIS COURT:

                      IMMIGRATION COURT
                      550 KEARNY ST., SUITE 800
                      SAN FRANCISCO, CA  94108


\_\_ OTHER: _____
_____

                              _NMC_
                         COURT CLERK
                         IMMIGRATION COURT                    FF

    CC: AGUILAR, JASON B.
        550 KEARNY STREET, SUITE 1000
        SAN FRANCISCO, CA,  94108
NMC

000095

 

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
SAN FRANCISCO, CALIFORNIA

| | | |
|---|---|---|
| Matter of: | ) | Date: April 13, 2006 |
| | ) | |
| **Ana Beatriz BIONCI,** | ) | File Number **A91-182-333** |
| | ) | |
| | ) | <u>In Removal Proceedings</u> |
| Respondent | ) | |
| | ) | |

Charges:    INA § 237(a)(2)(A)(iii) – Alien Convicted of an Aggravated Felony

Application:   Deferral of Removal Under the Convention Against Torture

<u>On Behalf of the Respondent:</u>
Christopher Todd, Immigration Law Clinic
University of Davis, School of Law
1 Shields Ave. TB-30
Davis, CA 95616-8821

<u>On Behalf of the DHS:</u>
Jason B. Aguilar
Office of the Chief Counsel
550 Kearny Street, Suite 1000
San Francisco CA 94108

## <u>DECISION OF THE IMMIGRATION JUDGE</u>

place.        The order dated March 22, 2006 is **VACATED**. The following decision is issued in its'

### *I. Procedural History*

Respondent, Ana Beatriz BIONCINI, is a native and citizen of Colombia who entered the United States at Miami, Florida on or about February 11, 1981 as a nonimmigrant visitor. Her status was adjusted to that of a lawful permanent resident on May 5, 1989, pursuant to section 245(A) of the Act. On April 28, 2003, Respondent was convicted of violating 21 U.S.C. § 846, Conspiracy to Distribute Cocaine. The Department of Homeland Security ("DHS") initiated proceedings against Respondent on January 28, 2005 by filing a Notice to Appear ("NTA") with the Court. Exhibit 1. The NTA charged Respondent with being removable under Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA" or "the Act") as an alien convicted of an aggravated felony. *Id.*

On May 16, 2005, Respondent submitted an application for asylum and withholding of removal. At a hearing on December 19, 2005, Respondent admitted the factual allegations contained in the NTA and conceded removability.   The Court directed Colombia as the country of removal.

A91-182-333                                    1

Respondent also conceded that her federal drug conviction is an aggravated felony that renders her ineligible to apply for asylum. The Court also found that under *Matter of Y-L-*, 23 I&N Dec. 270 (A.G. 2002), Respondent's federal drug conviction constitutes a particularly serious crime, making her ineligible for withholding of removal pursuant to section 241(b)(3)(ii) of the Act.

The Court heard testimony on Respondent's application for protection under the Convention Against Torture ("CAT") on December 19, 2005 and February 15, 2006.

## II. Facts

### A.   Respondent's Testimony

Respondent testified that she was born in Cali, Colombia on June 30, 1954. She has six living siblings, four of whom live in Colombia. Both of Respondent's parents are deceased. Respondent is divorced. She has one son from her previous marriage, Peter, who is currently eighteen years old and lives in Mountain View, California with her ex-husband, George Bioncini. Respondent testified that she entered the United States in 1981, and that she lived in Miami, Florida for many years before moving to California. She further testified that since moving to the United States, she has visited Colombia three times to visit family and receive medical and dental care.

Respondent's declaration and testimony provided a detailed account of her drug abuse and drug trafficking activities. Respondent testified that she began using drugs in 1981, and was addicted to cocaine and marijuana for several years. She was arrested on drug charges on May 5, 1995. She pled guilty to one count of conspiracy to distribute a kilogram of cocaine with the intent to sell on June 5, 1998. Respondent was on supervised released from May 24, 1995 to January 16, 2004, and began her 30 month sentence at the Federal Correctional Institute in Dublin, California on January 16, 2004.

Respondent made a plea agreement with the U.S. government in exchange for a reduced sentence. As part of her plea, she agreed to assist the Federal Bureau of Investigation ("FBI") in their investigation of Colombian cocaine suppliers. *See also* Exhibits 3C-4 and C-5. Respondent debriefed FBI agents on all the people in her phone book. *See also* Exhibit 3C-2. According to Respondent's estimate, she gave the FBI the names and phone numbers of over forty people who were allegedly well-connected to the cocaine business in Colombia. Respondent testified that she never bought or sold drugs for the U.S. government as part of her role as an informant; however, she agreed to help them set up a person called Joe who was a restaurant owner connected to a Colombian cocaine supplier named Juan Molina. Respondent waited across the street from Joe's restaurant for four hours, but he never showed up. In addition, Respondent agreed to testify against Norberto Duarte, a United States citizen who was a co-defendant in Respondent's trial. While Mr. Duarte eventually made a plea agreement, a U.S. attorney told Respondent that her assistance was a substantial factor in his decision to plead guilty. Respondent believes that Mr. Duarte knew that she was going to testify against him. She also testified that Mr. Duarte has already been convicted, sentenced and released.

A91-182-333                                   2

000097

Respondent testified that while she made a plea agreement with the United States government, she was afraid of debriefing them on Colombian cocaine suppliers from the beginning. *See also* Exhibit 3C-4. She testified that she fears returning to Colombia because she believes that certain people associated with drug cartels in Colombia, with whom she was involved when she was a trafficker, learned that she became an informant for the U.S. government. Respondent testified that her gravest fear stems from her relationship with three people in particular: Hernando Velazco ("Gordo"); Elias Giannakapolous ("the Greek"); and Felix Bernal.

Respondent testified that she knew of Gordo in the early 1970s when she was still living in Cali, Colombia. She testified that they ran in the same social circles, and that he was very popular in the disco scene because of his reputation for selling narcotics. Respondent testified that she did not have any contact with Gordo again until 1994 when she received a letter from him asking her to meet him in Los Angeles. She testified that he invited her to the World Cup soccer finals, and that he asked her to bring some marijuana. Respondent testified that he and another woman met her at the airport, and that she became immediately suspicious that she was being followed. Gordo took her to an apartment. Respondent testified that he refused to smoke her marijuana. She testified that after approximately 45 minutes, she was overcome with the feeling that the meeting was a set-up and therefore left. Respondent testified that Gordo subsequently called her almost everyday asking her for cocaine. She testified that she and Gordo never made any concrete cocaine deals, although she did connect him with a friend of hers, "El Conejo," who sold cocaine.

Respondent testified that she believed Gordo was working for the U.S. government. She testified that after she was arrested and debriefed the FBI, she read reports that Gordo made a plea agreement and became an informant. She also learned that he had spoken to the FBI on three occasions, during which time he allegedly provided the FBI with information about Respondent and her family. Respondent testified that Gordo returned to Cali in 2000. She testified that her sister and two friends told her that Gordo told people in the area that Respondent was a government informant. *See also* Exhibit 3A-2. Respondent's sister later sent her a newspaper article which states that Gordo was killed in the middle of the day in Cali. *See also* Exhibit 3E-1. Respondent testified that she attempted to learn more about the circumstances surrounding Gordo's death, but her sister was too afraid to get involved. She testified that she is afraid of the people who killed Gordo. Respondent does not know who killed Gordo, but she believes he was killed by someone from a drug cartel.

Respondent testified about her relationship with the Greek. She dated the Greek for approximately one year when she lived in Miami during which time she became familiar with his substantial drug trafficking operations. According to Respondent, the Greek purchased kilos of cocaine from Colombia which he shipped to Miami and Pacifica, California, where his were located operations. She testified that she believes that Alfonso Bejarano from Medellín, Colombia was one of the Greek's key Colombia suppliers, but she did not know exactly how he obtained his cocaine. Respondent also testified that two men who worked for the Greek, Solomon and Kasby, were co-defendants in her case. She testified that she assisted them, and that she often traveled with them to and from Miami to San Francisco. Respondent also frequently picked up the Greek's clients from the airport, drove them around and brought them out to lunch. She also brought Solomon and Kasby to the airport to pick up cocaine bound for California. Respondent testified that she and the Greek

A91-182-333                                        3

ended their relationship in 1986, and that the last time she saw him was in 1988 when he asked her to meet him in Los Angeles. She testified that she never saw him with a gun, but he had the money and power to hire others to kill for him.

Respondent testified that she met Felix Bernal in the early 1990s through her friend Ruben from Cali. Ruben gave Felix her beeper number and after receiving a message from him, they met at a café in San Francisco. Respondent testified that as soon as they met, he offered to sell her kilos of cocaine, an offer she refused. He also unsuccessfully attempted to buy cocaine from her. Respondent testified that she left her first meeting with Felix feeling suspicious that he was an informant for the U.S. government. She also testified that she was very paranoid during this time due to her heavy drug use. Respondent testified that the two later dated for a brief period, and that when she learned of his violent temper, she distanced herself from him. According to Respondent, Felix was also suspicious of government informants, and he told her that if he found out someone was an undercover agent, he would not hesitate to kill that person. Respondent testified that she is afraid of Felix because of his violent temper and because he knew where she lived. Felix also knew her brother and her ex-husband. She testified that after her arrest, Felix called her husband and asked about her. Respondent does not know where Felix is, but she believes he was at one time in deportation proceedings.

Respondent testified that neither she nor anyone in her family have ever had any contact with the Colombian government regarding her involvement in drug trafficking. She further testified that nobody in her family in Colombia has ever been contacted by anyone from a drug cartel. According to Respondent, no one in her family has ever been threatened by anyone in Colombia. Similarly, during the eight years time Respondent was on supervised release in California, she never had any contact from anyone associated with drug cartels in Colombia, and that in general, she has never experienced any repercussions due to her cooperation with the U.S. government.

**B.    Professor Nagel's Testimony**

Professor Luz Estella Nagel, a scholar in international criminal law and international drug trafficking in Latin America provided testimony and submitted an affidavit in support of Respondent's CAT application. *See* Exhibit 3I-1. According to Professor Nagel, the Cali narcotraffickers are pervasive in the economic, social, and governmental spheres of Cali. She testified that the government of Colombia is corrupt, and that there are some government officials who work "hand-in-hand" with the narcotraffickers. She further testified that narcotraffickers' treatment towards informants is brutal, and that it is likely that Respondent's cooperation with the U.S. government is, or at least will be, known by the narcotraffickers. Professor Nagel testified that narcotraffickers would kill Respondent if they learned she was an informant. She also testified that there is no safe place for her in Colombia, and that the Colombian government is incapable of protecting her.

In terms of her own personal experience with narcotraffickers in Colombia, Professor Nagel testified that she has not had any encounters with drug cartels even though she has been very active in working with the U.S. and Colombian governments in identifying narcotraffickers. She testified

A91-182-333                                4

that she was afraid that individuals associated with drug cartels in Colombia would learn of her identity when she traveled there on her Colombian passport. Since marrying and changing her name, Ms. Nagel has visited Colombia three times. She testified that two of these times she was accompanied by bodyguards and that she was not harmed when she traveled without bodyguards.

### III. Analysis

**A.    Credibility**

The Court has no reason on this record to doubt the Respondent's credibility. This finding, of course, extends only to facts in the Respondent's knowledge, not to beliefs or conclusions held by the Respondent.

**B.    Convention Against Torture**

Article 3 of CAT prohibits a signatory country from removing any person to a country where it is more likely than not that she would be tortured. 8 C.F.R. § 208.16(c)(2). Respondent has the burden of proof in her CAT application to establish that it is more likely than not she will be tortured if removed to Colombia. 8 C.F.R. § 208.16(c)(2); *Matter of J-E-*, 23 I&N Dec.291, 302 (BIA 2002). This standard requires that an applicant demonstrate a greater than fifty percent chance that she will be tortured if removed. *Hamoui v. Ashcroft*, 389 F.3d 821, 827 (9th Cir. 2004). Unlike asylum, an applicant for relief under CAT need not show a nexus to a protected ground. *Nuru v. Gonzales*, 404 F.3d 1207, 1224 (9th Cir. 2005). The Court must consider all evidence relevant to the possibility of future torture, including, but not limited to: past torture inflicted upon Respondent; evidence that she could relocate to another part of Colombia where she is not likely to be tortured; gross, flagrant, or mass violations of human rights; and other relevant information regarding conditions in Colombia. 8 C.F.R. § 208.16(c)(3). An alien's criminal convictions in the United States, however serious, are not a bar to deferral of removal under CAT. *See* 8 C.F.R. §§ 208.17(a).

Torture is defined as severe pain or suffering intentionally inflicted by or with the "consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). Acquiescence requires that the public official have awareness of such activity and thereafter breach his or her legal duty to intervene. 8 C.F.R. § 208.18(a)(7). "Acquiescence" by government officials does not require actual knowledge or willful acceptance; for relief under CAT, Respondent "need only prove the government is aware of a third party's torturous activity and does nothing to intervene to prevent it." *Ochoa v. Gonzales*, 406 F.3d 1166, 1172 (9th Cir. 2005). Torture does not include pain or suffering arising from, inherent in, or incidental to lawful sanctions. 8 C.F.R. § 208.18(a)(3). Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law. *Id.*

**A.    Drug-Related Violence in Colombia**

Respondent has submitted various articles and affidavits describing the activity of narco-traffickers and the prevalence of drug-related violence in Colombia to support her claim that it is

A91-182-333                                   5

more likely than not that she will be killed by Colombia narcotraffickers. The Drug Enforcement Agency and the Colombian National Police believe there are more than 300 active drug smuggling organizations in Colombia today. *See* Exhibit 3D-11, "The Colombian Cartels," Frontline. Both guerilla and paramilitary groups engage in drug trafficking. *See* Exhibit 3D-1, "Civil Society Under Siege in Colombia," United States Institute of Peace (February 2004); United States Dep't of State, *Country Report on Human Rights Practices, Colombia- 2005* [*hereinafter* Country Report 2005]. The articles illustrate how Colombian drug cartels use brutality and violence to further their goals. Cartel members murder rival drug traffickers, buyers who fail to pay for cocaine, and other cartel members whose loyalty is suspect. *See, e.g.,* Exhibit 3D-5, "Leader of Colombian Cocaine Ring Extradited to United States," www.usinfo.state.gov (October 21, 2005). At least one cartel, the Norte Valle Cartel, relies on illegal armed groups to protect cartel members and cocaine distribution routes. *See id.* It is also clear from the submitted documentary evidence that drug related violence is very high in Cali, where Respondent is from. According to some reports, the dismantling of the Medellin Cartel in the late 1980s and early 1990s enabled the Cali Cartel to become the most powerful drug organization in the world. *See* Exhibit I1.

While the record demonstrates that Colombian drug cartels are very powerful and dangerous organizations both within and outside of Colombia, and that drug-related violence is prevalent in Colombia, this evidence is nevertheless insufficient to show that Respondent is more likely than not to be tortured, or killed, by narcotraffickers upon return to Colombia. First, Respondent has never been tortured in the past nor has she ever been threatened by Columbian narcotraffickers. According to Respondent's own testimony, no one in her family has ever been threatened by anyone in Colombia. During the eight years Respondent was on supervised release in California, neither she nor anyone in her family was ever contacted, let alone threatened, by anyone associated with drug cartels in Colombia. In fact, she has never experienced any repercussions due to her cooperation with the U.S. government.

Second, Respondent testified that she fears "the people who killed Gordo." However, she does not know who killed him or why he was killed. She believes he was murdered by someone in a drug cartel in retaliation for his role as an informant for the U.S. government, but there is no evidence in the record that this is true. Gordo was a known drug dealer, and consequently associated with some very dangerous people. It is just as likely that he was killed by someone in a rival cartel, or because of a bad drug deal, or countless other reasons, such as owing a drug dealer or supplier money.

In addition, it is not clear that Respondent's collaboration with the U.S. government would even attract the attention of members of Colombian drug cartels. While Respondent assisted the U.S. government by identifying certain people in her phone book, she never testified against anyone in a Colombian drug cartel, nor did she ever arrange a drug sale between the U.S. government and a drug cartel member. Although she agreed to testify against Norberto Duarte, he was a U.S. citizen whose only connection to a Colombian drug cartel is that he may know "the Greek." Similarly, Respondent attempted to set up a restaurant owner; however, he never showed up and therefore there *is no reason to believe that either he or any cocaine supplier he may be connected to would know of* Respondent's participation. Lastly, Respondent is uncertain as to the whereabouts of both the Greek

A91-182-333                                        6

and Felix Bernal, and therefore it is uncertain that they are even in Colombia.

In conclusion, the Court finds that the absence of any threats or harm to Respondent or her family greatly undermines her claim that she would be tortured in Columbia.

**B.     Government Acquiescence**

Even if Respondent could demonstrate that it is more likely than not that she would be killed by narcotraffickers, she still has the burden of proving that the government would be aware of the drug cartel's "torturous activity and do[] nothing to intervene to prevent it." *Ochoa*, 406 F.3d at 1172. According to articles submitted by Respondent, public safety conditions in Colombia have improved. Police have been redeployed to areas from which they had been previously ousted by armed groups, and currently have a presence in every municipality. In 2001, the Colombian government developed "Plan Colombia," an integrated strategy to promote peace and combat the narcotics industry. *See* Exhibit 3J-1, "Plan Colombia: A Progress Report," Congressional Research Service (May 9, 2005). In this context, it has been working with the United States government to curb narcotrafficking. In addition, the leader of the Norte Valle Cartel as well as eight other influential members of the cartel, have recently been extradited to the United States to face racketeering and drug charges. *See* Exhibit 3D-5. While it is clear there are many criticisms of the United States government's drug policy in Colombia and Plan Colombia in general, the point is that the Government of Columbia is actively combating drug trafficking and drug traffickers, not acquiescing in their activities.

While it is Respondent's contention that the Colombian government is too corrupt to protect her, evidence in the record suggests that the government has taken an active role in combating corruption within its government. A specialized Anti-Corruption Task Force Unit has been established to investigate and prosecute public corruption crimes, and the Colombian government has recently enacted legislation to combat money laundering and related illegal financial flows associated with narcotics trafficking. *See* Exhibit 3D-4, U.S. Dep't of State, *International Narcotics Control Strategy Report* (2005).

### IV. Conclusion

The Court agrees with Respondent that Colombia a dangerous place due to drug trafficking and crime.. However, after considering all evidence relevant to the possibility of future torture, the Court finds that it is not more likely than not that Respondent will be tortured by or with the consent or acquiescence of the Government of Columbia. Respondent has therefore failed to meet her burden for protection under the Convention Against Torture.

### ORDER

In light of the foregoing, the Court will enter the following order:

A91-182-333                           7

**IT IS HEREBY ORDERED** that Respondent's application for deferral of removal under the Convention Against Torture be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that Respondent be removed to Colombia.

_____
Anthony S. Murry
Immigration Judge

000103