

**U.S. Department of Justice**
**Executive Office for Immigration Review**
**United States Immigration Court**

Matter of                                                    File A 91 182 333

```
                              )
                              )
BIOCINI, ANA BEATRIZ          )    In REMOVAL Proceedings
                              )
                              )
              Respondent      )        Transcript of Hearing
```

Before ANTHONY S. MURRY, Immigration Judge

Date: February 15, 2006        Place: San Francisco, California

Transcribed by FREE STATE REPORTING, INC., at Annapolis, Maryland

Official Interpreter:

Language:

Appearances:

> For the Department of
> Homeland Security:                For the Respondent:
>
> Peter S. Vincent                  Via Moia, et al.

1  (TAPE 3)

2  JUDGE FOR THE RECORD

3      This is Immigration Judge Anthony Murry, San Francisco,

4  California, it's February 15th, 2006, continued removal

5  proceeding in A 91 182 333.  The respondent, who is at the

6  Federal Correctional Institution, Dublin, California, is joining

7  us telephonically.  Respondent's counsel are present.  Peter

8  Vincent, on behalf of the Government.  Also telephonically, we

9  have a witness.

10  JUDGE TO MS. NAGLE

11      Q.  Professor Nagle, could you state your full name for the

12  record, please?

13      A.  Luz, L U Z, Estella, E S T E L L A, Nagle, N A G L E.

14      Q.  And professor, do you swear any testimony you give us

15  will be the full and complete truth?

16      A.  Yes, I do.

17  JUDGE TO MS. MOIA

18      Counsel?

19  MS. MOIA TO JUDGE

20      Okay.

21  MS. MOIA TO MS. NAGLE

22      Q.  Professor Nagle, can you hear me?

23      A.  Yes, I can.

24  JUDGE TO MS. NAGLE

25      Q.  It's the, the little --

000201




1  RESPONDENT'S REPRESENTATIVE #2 TO MS. MOIA

2      It's the little one right here.

3  JUDGE TO MS. NAGLE

4      Q.   -- microphone is where --

5  MS. MOIA TO RESPONDENT'S REPRESENTATIVE #2

6      Oh, that one.  All right.

7  JUDGE TO MS. NAGLE

8      Q.   That's what she's going to hear you through.  That's

9  fine.

10  RESPONDENT'S REPRESENTATIVE #2 TO MS. MOIA

11      Do you want to switch?

12  MS. MOIA TO RESPONDENT'S REPRESENTATIVE #2

13      I don't think we're going to have to switch.  But --

14  RESPONDENT'S REPRESENTATIVE #2 TO MS. MOIA

15      Okay.  Here's the little one right here.

16  MS. MOIA TO RESPONDENT'S REPRESENTATIVE #2

17      Okay.

18  MS. MOIA TO MS. NAGLE

19      Q.   Professor Nagle?

20      A.   Yes, I can hear you.

21      Q.   Okay.  Hi.  My name is Via.  We talked a little bit

22  through e-mail.

23      A.   Yes.

24      Q.   Okay.

25      A.   How are you doing?

000202



1        Q.    I'm good.  Professor Nagle, we've already submitted

2   your affidavit to the Court, and so in light of time and I know

3   that you have a prior engagement, so what we're going to do is,

4   basically, just get skip of the preliminary questions.  And I

5   just want to, to highlight some of the points in your affidavit,

6   and so I'm just --

7        A.    Okay.

8        Q.    -- to ask you a couple of questions about the Colombian

9   drug cartel and --

10       A.    Okay.

11       Q.    -- what you think might happen to Ana if she's sent

12  back to Colombia.

13       A.    Okay.  Go ahead.

14       Q.    Okay.  Professor Nagle, in your opinion, what do you

15  believe is the current relationship between the Colombian

16  government and the drug cartels in Cali, Colombia?

17       A.    Serkay Sumuric (phonetic sp.) relationship and these

18  have been in place since the cartel was powerful in Colombia.

19  There are certain individuals in congress who received more money

20  from the Cali cartel and there are certain attestations that even

21  some ministers of the actual government had received some money

22  from the Cali cartel.

23       Q.    Okay.  Thank you.  And Professor Nagle, as you've just

24  previously stated and in your affidavit, based on what you've

25  just described, what do you think is the likelihood of Ms.

A 91 182 333                    97              February 15, 2006



1  Biocini's cooperation being known among the drug cartels?

2      A.    It's very likely that it's known to people in Colombia.

3      Q.    Okay.  In your opinion and experience, if Ms. Biocini's

4  cooperation, cooperation has become known to the drug cartels,

5  what could possibly happen to her if she's deported back to

6  Colombia?

7      A.    She could be easily killed.

8      Q.    Okay.  And in your opinion, do you believe that there's

9  a location in Colombia that would be safe for Ms. Biocini?

10     A.    No.  That's really impossible.

11     Q.    Okay.  And do you believe that the Colombian government

12 would be able to provide any protection for Ms. Biocini from the

13 drug cartels?

14     A.    No.  They couldn't.  They can't even provide protection

15 for their own members.

16     Q.    Okay.  Thank you.

17 MS. MOIA TO JUDGE

18     That's all the questions I have, Your Honor.

19 JUDGE TO MR. VINCENT

20     Mr. Vincent, any questions?

21 MR. VINCENT TO JUDGE

22     Very briefly, Your Honor.

23 MR. VINCENT TO MS. NAGLE

24     Q.    Good afternoon, professor.  This is --

25     A.    Good afternoon.

A 91 182 333              98              February 15, 2006



1      Q.   It's a little hard testifying telephonically.  But as

2   you've probably surmised, I am an attorney with the United States

3   Government and I wanted to ask you a few questions.

4      A.   Go ahead.

5      Q.   If, if for any reason you don't understand one of my

6   questions, I would appreciating you letting me know, so that I

7   can ask it in a way that makes better sense to you.  Is that

8   understood?

9      A.   Yes.  Understood.

10     Q.   Professor, you're well-aware, are you not, that the

11  Colombian government is one of the most -- it was the largest --

12  one of the largest recipients of U.S. foreign aid?  Is that

13  correct?

14     A.   Yes, that's correct.

15     Q.   You'll well-aware that United States Government

16  provides monies to the government of the Colombia, specifically,

17  for the purpose of dealing with the narco terrorists or narco

18  problem in Colombia today.  Is that correct?

19     A.   Yes, that's correct.

20     Q.   And you're aware that the United States Government

21  along with the Colombian government work closely in identifying

22  individuals that are heavily involved in narco terrorism in

23  Colombia.  Is that correct?

24     A.   Yeah, that's correct.

25     Q.   You understand that the Colombian government is a

000205

1  major, major participant in assisting United States in

2  identifying those narco terrorists and in many cases bringing

3  them to the United States for ultimate trial.

4      A.    Yes.   When it's possible, because you also aware of the

5  fact that there is a lot of corruption within the Colombian

6  government.

7      Q.    That wasn't my question, professor.   I'll ask it again,

8  unless you can remember what the question was.

9      A.    Yes.

10      Q.    I'll ask it again.   You're well-aware that the

11  Colombian government is actively participating and coordinating

12  with the United States Government to bring to justice in the

13  United States major narco terrorists.

14      A.    Yes.   I'm aware of that.

15      Q.    You stated that it is very likely known that the

16  respondent in this Immigration hearing in someway spoke to

17  United, United States Government officials about the role of

18  other individuals located in the trade of cocaine in Colombia.

19  Is that correct?

20      A.    Yes, that's correct.

21      Q.    You've never spoken with anyone in Colombia that had

22  any specific knowledge about the respondent in this case.   Is

23  that correct?

24      A.    Yes, that's correct.

25      Q.    You never spoke to government officials in Colombia

A 91 182 333                    100              February 15, 2006



1  about the respondent, Ms. Biocini.  Is that correct?

2      A.   That is correct.

3      Q.   You never spoke to any members of illegal narco

4  terrorists groups, including the FARC, in Colombia about this

5  particular respondent.  Is that correct?

6      A.   That's correct.

7      Q.   Ma'am, you are of Colombian descent.  Is that correct?

8      A.   Yes, that is correct.

9      Q.   And you have worked closely both with the Colombian

10  government as well as the United States Government on issues

11  relating to narco terrorism.

12      A.   Yes, that's correct.

13      Q.   Now you ultimately -- strike that.  You have returned

14  to Colombia on a few occasions since gaining lawful permanent

15  residency or citizenship in the United States.  Is that correct?

16      A.   Yeah.  That's correct.

17      Q.   And, in fact, you travelled using a United States

18  citizen issued passport.  Is that correct?

19      A.   Yes.  In my United States name, as well.

20      Q.   And that name is a name that derives from the gentleman

21  that you married in the United States.  Is that correct?

22      A.   Yes, that's correct.

23      Q.   And prior to returning to Colombia -- strike that.

24  Were you ever in fear, ma'am, that individuals in Colombia might

25  know of your identity and might be aware of what sorts of things

000207




1  you were doing in the United States to help identify members of

2  narco terrorists groups?

3      A.   The first three years that I want back to Colombia,

4  yes, I was scared and concerned, and lately, when I have gone

5  under U.S. contract, I have had bodyguards with me.

6      Q.   And did you travel on those occasions during that three

7  year period under your maiden name or under the name that you

8  derived from your United States citizen spouse?

9      A.   Maiden name.

10     Q.   You were never harmed during that three period by

11  anyone in Colombia.  Is that correct, ma'am?

12     A.   Yeah.  That's correct.

13     Q.   Now again, going to a question I asked just a few

14  minutes ago, you have travelled under your married name to

15  Colombia, as well.  Is that correct?

16     A.   I only travel under my married name to Colombia.

17     Q.   And that married name appears in your United States

18  issued passport.  Is that correct?

19     A.   That's correct.

20     Q.   And when was the most recent trip that you took to

21  Colombia?

22     A.   December.

23     Q.   Of 2005?

24     A.   2005, yes.

25     Q.   Approximately, how many times did you travel to

A 91 182 333                    102              February 15, 2006



1  Colombia in the calendar year 2005?

2      A.    Let's see.  With the South Come (phonetic sp.) I travel

3  once.  I may have travelled three times last year.

4      Q.    I'm sorry.  Did you say three times, professor?

5      A.    Yes, sir.

6      Q.    And on those three occasions, how often were you

7  accompanied by bodyguards provided by the United States

8  Government or the Colombian government?

9      A.    Twice.

10     Q.    And so that means that on one occasion you travel

11  without bodyguards.  Is that correct?

12     A.    Yes.

13     Q.    And you suffered no harm during that one trip that you

14  travel without bodyguards.  Is that correct?

15     A.    That is correct.

16     Q.    Would you say that you, your -- strike that.  Would you

17  say that you, under at least your name that you used in Colombia

18  prior to getting married, were well-known to Colombian officials,

19  including government officials?

20     A.    I couldn't answer that.

21     Q.    You participated for a long time in assisting the

22  Colombian government deal with the narco terrorist issue.  Is

23  that correct?

24     A.    Yes.  That's correct.

25     Q.    Was your name ever published in the newspapers?



1     A.   In Colombia?  No.

2     Q.   Do you have any reason to believe that narco terrorists

3   in Colombia were aware of your participation in helping toward --

4     A.   I couldn't answer that.

5     Q.   You -- as far as you know, the respondent's name has

6   never appeared in Colombian newspapers.  Is that correct?

7     A.   Yes, that's correct.  I did research, and I didn't see

8   it.

9     Q.   And as far as you know, her name does not appear on any

10  sort of death lists that are periodically updated and published

11  by groups such as the FARC.

12  JUDGE TO MS. NAGLE

13    Q.   If you know, ma'am.

14  MR. VINCENT TO MS. NAGLE

15    Q.   If you know.

16    A.   I didn't do the research in that, and I couldn't answer

17  that.

18    Q.   Well ma'am, you stated that many members of, I believe,

19  you said the Colombian parliament or legislature are working hand

20  and hand with the narco terrorists in Colombia.  Is that correct?

21    A.   No.  That's not what I said.

22    Q.   Let me ask you.  As far as you are aware, are members

23  of the Colombian government working hand and hand with narco

24  terrorists in Colombia?

25    A.   Yes.

A 91 182 333                 104            February 15, 2006

000210



1      Q.   As far as you know, is it stated Colombian government

2   policy to assist the narco terrorists in their illegal activity

3   in Colombia?

4      A.   No.

5      Q.   Would you say, if you know, ma'am, that the vast

6   majority of Colombian government officials, in fact, are working

7   to identify and deter narco terrorism in Colombia?

8      A.   I couldn't say the vast majority of Colombian

9   officials.

10      Q.   Could you say the majority of Colombian officials?

11      A.   Yeah.  Some of them, yes.

12   MR. VINCENT TO JUDGE

13      No further questions, Your Honor.  Thank you.

14   JUDGE TO MS. MOIA

15      Any redirect?

16   MS. MOIA TO JUDGE

17      No, Your Honor.

18   JUDGE TO MS. NAGLE

19      Q.   Professor, let me just ask you one question really as,

20   as a favor to me, because we, we made an administrative problem

21   out of this, because I was, I was delayed.  I thought the case

22   had been pushed back to 2:00, it was pushed back to 1:00.  What

23   I'm going to ask the respondent's attorneys to do is think about

24   whether or not there any addition matters that they want to cover

25   with you, and ask if you could possibly be available at some

A 91 182 333                    105              February 15, 2006



1   later time, if they need to cover anything else.  On the one
2   hand, we've got your declaration in the record.  It's very
3   detailed, very thorough.  Both parties have had an opportunity to
4   question you today.  But what I'd like to do is just, in light of
5   the fact that we got started late, through no fault of the, the,
6   the attorneys, give them some time to think about whether there's
7   anything else they want to raise with you.  Could you be
8   available at some later date for additional testimony if they,
9   they thought that they needed to ask you some other questions?
10      A.   Yes, I can.  And if you all need me today I have -- I
11  think I gave you all my cell phone number, and you can reach me
12  at my cell phone number.
13      Q.   Yeah.  I don't think, I don't think later today --
14      A.   Okay.
15      Q.   -- is, is, is a good idea.  What I wanted to do is just
16  give them a few days to think about it --
17      A.   Okay.
18      Q.   -- and it may be that the combination of what they were
19  able to elicit today plus the detailed declaration will be
20  sufficient.  But I want to give them some time to think about it,
21  and if we need to reconvene, because they want to question you
22  further, we'll make arrangements that'll work with your schedule
23  and their schedule to do that.  But I just want to give them some
24  time to think about that.
25      A.   Yes.  I'll be happy to do that, sir.

A 91 182 333                 106              February 15, 2006

 

1       Q.    I, I greatly appreciate it.  And again, my apologies

2   for the delay.

3       A.    That's okay, and no problem.

4   JUDGE TO MS. MOIA AND MR. VINCENT

5       Any other questions from counsel, today?

6   MS. MOIA TO JUDGE

7       No, Your Honor.

8   MR. VINCENT TO JUDGE

9       None for the Government, Your Honor.

10  JUDGE TO MS. MOIA AND MR. VINCENT

11      Okay.

12  JUDGE TO MS. NAGLE

13      Q.    Professor, thank you so much.

14      A.    You're very welcome.  Have a nice day.

15      Q.    You, too.  Goodbye.

16  MS. NAGLE TO RESPONDENT'S REPRESENTATIVE #3

17      Thank you --

18  RESPONDENT'S REPRESENTATIVE #2 TO MS. NAGLE

19      Thank you.

20  MS. NAGLE TO RESPONDENT'S REPRESENTATIVE #3

21      -- professor.

22  MS. NAGLE TO RESPONDENT'S REPRESENTATIVE #2

23      You're welcome.  Bye.  Thank you very much.

24  MS. MOIA TO MS. NAGLE

25      You're welcome.


A 91 182 333                    107              February 15, 2006

1   JUDGE TO MS. NAGLE

2       Q.   All right.

3   JUDGE FOR THE RECORD

4       Let's go off the record for a minute.

5                           (OFF THE RECORD)

6                           (ON THE RECORD)

7   JUDGE FOR THE RECORD

8       Back on the record.  I just gave counsel for the respondent

9   an opportunity to talk among themselves.  The issue is this.

10  Professor Gustison (phonetic sp.) and, and the respondent are

11  still on the line.

12  JUDGE TO MS. BIOCINI

13      Q.   Ms. Biocini, you can still hear me.  Correct?

14      A.   Yes.  I hear you, Your Honor.

15      Q.   All right.

16  JUDGE FOR THE RECORD

17      The issue really is this.  Professor Gustison's declaration

18  is extremely detailed.  There is -- there's a really, honestly,

19  there's a narrow legal issue here, which is, in light of the

20  evidence, whether the respondent falls within the ambit of the

21  Torture Convention requirements.  And Mr. Vincent indicated that

22  he really didn't have any questions for Professor Gustison.

23  Professor Gustison's declaration is detailed.  And frankly,

24  there's no, no reason, that I can perceive, to question the, the

25  veracity or the bona fides of Professor Gustison.  If there is

A 91 182 333                    108            February 15, 2006




1   something that's not in the declaration that needs to be brought

2   out, as opposed to highlighting the most important points that

3   are in the declaration, but if there's something additional, it

4   makes sense to me to call him.  But if what needs to be done is

5   simply to highlight the most significant points, I -- we, we can

6   call him today or we can even make arrangements for another day

7   to call him.  Whichever works for counsel.  But the reality is,

8   I -- the Government doesn't have any questions, the declaration

9   is, is extremely detailed.  The question is really, really a

10  legal question because I don't think the facts are must in

11  dispute.

12  MR. VINCENT TO JUDGE

13      I, I, I would agree with that entire assessment, Your Honor.

14  JUDGE FOR THE RECORD

15      I mean it's clear on this record, the criminal history, Ms.

16  Biocini cooperation, that suggest the application of the legal --

17  the facts to the legal standard.  But I don't see much dispute

18  about the facts.

19  JUDGE TO RESPONDENT'S REPRESENTATIVES

20      But anyway, counsel, you tell me.

21  RESPONDENT'S REPRESENTATIVE #3 TO JUDGE

22      Well, Your Honor, we -- I mean, Mr. Vincent, actually, at

23  the, the last round of questioning was going into the, the actual

24  result, the, the actual situation on the ground in Colombia and

25  whether or not -- and what -- who's cooperating with whom, and,

A 91 182 333                        109                    February 15, 2006

000215

1  and what effect is U.S. help -- assistance have.  And that is --

2  that's pretty much what Professor Gustison would be talking to.

3  And, and it's -- there's a lot of detail on that in the

4  declaration.  So I don't know that we have much to add by going

5  at --

6  JUDGE TO RESPONDENT'S REPRESENTATIVE #3

7      Okay.

8  RESPONDENT'S REPRESENTATIVE #3 TO JUDGE

9      -- by, by testimony more.

10  JUDGE TO RESPONDENT'S REPRESENTATIVE #3

11      Okay.

12  JUDGE FOR THE RECORD

13      Well then, let's, let's take the declaration as Gustison's

14  testimony and I'll give it full weight, just as if he had

15  testified.  And as the Government indicated, no questions for

16  him.

17  JUDGE TO THE PARTIES

18      Now I'd be just as happy -- it sounds as if, since I

19  indicated to you, I'm going to do a written decision, you -- did

20  you want to submit something post this hearing?  You don't

21  actually have to decide that now.  Let's just figure out a

22  deadline for you decide whether you want to submit something

23  post-hearing.  And in addition, take a little bit -- think about

24  whether you want -- if there's anything else you want from

25  Professor Nagle, and you want me to setup another time with

A 91 182 333                    110              February 15, 2006



1   Professor Nagle, let me know that, too.  Today's Wednesday.  Can

2   you let my clerk know by Friday whether you're going to give a

3   submission and whether you want to talk to Nagle further and how

4   long it will take you to get the submission in?  Ms. Biocini and

5   I were just talking about the fact that her release date is March

6   2nd.  We try to finish the cases where people are in Federal

7   custody by the release date, but everybody recognizes that that's

8   a goal not necessarily -- that it can't be done, in every case

9   and it's more important that you folks have enough time to do

10  your submissions.

11  JUDGE TO MS. BIOCINI

12      Q.   And Ms. Biocini, just so you know.  I mean --

13      A.   Yes, Your Honor.

14      Q.   -- the -- if we're not able to get the case finished by

15  your release date, it's, it's really not as bad as, as, as

16  perhaps I've made it sound.  I mean you would have to come into

17  DHS custody and the facilities, because it's a county facility,

18  they're not as comfortable as the Federal facility, but you

19  wouldn't be in custody very long, even if we missed the precise

20  release date.  I'm going to be pushing to get you a decision as

21  soon as possible.

22      A.   Yeah.

23      Q.   And, and you wouldn't need to come to Court, because

24  the testimony I think is going to be pretty much done, unless we

25  hear, again, from Professor Nagle.  So it's not, it's, it's not

A 91 182 333                    111              February 15, 2006

000217



1  going to be that bad and it's not going to be that long.  We'll

2  endeavor to do everything we can to get it done by March 2nd.

3  But as I was --

4       A.   Yes, Your Honor.

5       Q.   -- but as I was saying to your attorneys, the most

6  important thing, instead of the March 2nd date, is, I want to

7  make sure that they're able to make all the arguments for you

8  that they think they ought to make.  Okay.

9       A.   Your Honor?

10      Q.   Yes.

11      A.   Um-hum.  Okay.  Then, and I agree, Your Honor.

12      Q.   Okay.

13      A.   Okay.

14  JUDGE TO THE PARTIES

15      So let's, let's do this.  Counsel, you just let my clerk,

16  May, know.  She's at 705 -- (415) 705-1033.  Let her know by

17  close of business Friday whether you want to submit anything else

18  and how much time you need to submit.  And I'm just going to rely

19  on your best judgement if it's past March 2nd, sobeit, if that's

20  what you think you need to get it done right, sobeit.  And also

21  let May know whether you want to talk to Nagle again or any other

22  witness, for that matter.  And we'll let the matter set out, keep

23  it off calendar for now.  Let us know by close by business Friday

24  on that, and we'll schedule accordingly.  We can just schedule by

25  telephone.

A 91 182 333                    112              February 15, 2006



1  MS. MOIA TO JUDGE

2      Okay.

3  RESPONDENT'S REPRESENTATIVE #2 TO JUDGE

4      Thank you.

5  JUDGE TO THE PARTIES

6      Okay.

7  JUDGE TO MR. VINCENT

8      Mr. Vincent, anything else today?

9  MR. VINCENT TO JUDGE

10      Nothing, Your Honor.  Thank you.

11  JUDGE TO RESPONDENT'S REPRESENTATIVES

12      Anything from respondent's counsel?

13  RESPONDENT'S REPRESENTATIVE #3 TO JUDGE

14      Nothing for the --

15  MS. MOIA TO JUDGE

16      No.

17  RESPONDENT'S REPRESENTATIVE #3 TO JUDGE

18      -- respondent --

19  RESPONDENT'S REPRESENTATIVE #2 TO JUDGE

20      No, Your Honor.

21  RESPONDENT'S REPRESENTATIVE #3 TO JUDGE

22      -- Your Honor.

23  JUDGE TO RESPONDENT'S REPRESENTATIVES

24      Okay.

25  JUDGE TO MS. BIOCINI

A 91 182 333                    113                February 15, 2006



1       Q.   Ms. Biocini, I think we're all done for today.   You

2    heard everything that we're going to do.   So we'll find out

3    Friday what the next steps are and then --

4       A.   Yes, Your Honor.

5       Q.   -- we'll -- I'll get started on a written decision, and

6    that'll do it.

7       A.   Oh, okay, Your Honor.

8       Q.   All righty.

9       A.   Okay.   Thank you so much.

10      Q.   You're welcome.   Goodbye.

11      A.   Okay.   Goodbye, Your Honor.

12      Q.   All right.

13   JUDGE FOR THE RECORD

14      Hearing --

15   UNIDENTIFIED PERSON TO UNIDENTIFIED PERSON

16      Proceedings --

17   JUDGE FOR THE RECORD

18      -- concluded.

19   UNIDENTIFIED PERSON TO UNIDENTIFIED PERSON

20      -- are --

21                          HEARING CLOSED

22

23

24

25

A 91 182 333                     114              February 15, 2006

000220




## CERTIFICATE PAGE

I hereby certify that the attached proceeding before JUDGE ANTHONY S. MURRY, in the matter of:

**BIOCINI, ANA BEATRIZ**

**A 91 182 333**

San Francisco, California

is an accurate, verbatim transcript of the cassette tape as provided by the Executive Office for Immigration Review and that this is the original transcript thereof for the file of the Executive Office for Immigration Review.

*Barbara Culliton*

Barbara Culliton, Transcriber

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, Maryland  21401
(301) 261-1902

**May 31, 2006**
(completion date)

By submission of this CERTIFICATE PAGE, the Contractor certifies that a Sony BEC/T-147, 4-channel transcriber or equivalent, as described in Section C, paragraph C.3.3.2 of the contract, was used to transcribe the Record of Proceeding shown in the above paragraph.



# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO VENUE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | )   Docket Number:  CR-95-0187-01-CRB |
| | ) |
| ANA BIOCINI | ) |
| AKA: ANA RACINES JARAMILLO | ) |

---

### PRESENTENCE REPORT

**Prepared for:**   The Honorable Charles R. Breyer
United States District Judge
San Francisco, CA

**Prepared by:**   Tess Lopez
United States Probation Officer
(415) 472-8255

**Assistant U. S. Attorney**
Barbara Silano
450 Golden Gate Avenue
San Francisco, CA 94102
(415) 436-7223

**Defense Counsel**
Robert Waggener (Retained)
214 Duboce Avenue
San Francisco, CA 94103
(415) 431-4500

**Sentencing Date:**   April 9, 2003 at 2:15 p.m.

**Offense:**   21 U.S.C. § 846 -Conspiracy to Distribute Cocaine (a Class A felony)
(Life imprisonment, 5 years supervised release, $4,000,000)

**Mandatory Minimum:**  __X__ Yes (10 years)

**Custodial Status:**   Arrested on May 8, 1995 and released May 25, 1995 on $100,000 bond

**Detainers:**   None

**Co-defendants:**   See attached.

Date Report Prepared:   February 6, 2003
Date Report Revised:   March 26, 2003

Ex 6   NDC:15

000222

2

**Identifying Data:**

| | |
|---|---|
| **Date of Birth:** | 6-30-54 |
| **Age:** | 48 |
| **Sex:** | Female |
| **Race:** | Hispanic |
| | |
| **SSN:** | 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 |
| **FBI:** | 773905RA6 |
| **U. S. Marshal #:** | ~~90920-011~~ 93061011 |
| **CII:** | A10184379U |
| **Other ID:** | DMV# A3245540 |
| | |
| **Education:** | Some College |
| **Dependents:** | One |
| **Citizenship:** | Columbia (legal resident) |
| | |
| **Legal Address:** | 100 N. Whisman Rd. #3114 |
| | Mountain View, CA 94043 |
| | |
| **Aliases:** | None |

3

### Co-Defendants to Docket No. CR 95-0187-FMS

| | |
|---|---|
| **MICHNA**, Christopher | Sentenced on May 6, 1998 to 87 months custody and 5 years supervised release. |
| **KARPINSKI**, Keith | Sentenced on May 13, 1998 to 72 months custody and 5 years TSR. |
| **JOHNSON**, Robert | Sentenced on July 8, 1998 to 30 months custody and 3 years TSR. |
| **SPROUL**, Allan | Sentenced on July 8, 1998 to 30 months custody and 3 years TSR. |
| **THOMPSON**, Steven | Sentenced on November 4, 1998 to one month custody and 3 years TSR. |
| **BUCKLEY**, Vincent | Sentenced on July 29, 1998 to 4 years probation, $2,000 fine |
| **SIMPSON**, Michael | Sentenced on July 8, 1998 to 3 years probation, $2,000 fine. |
| **HOWELL**, George | Sentenced on June 16, 1998 to 3 years probation, $2,000 fine. Probation violation on November 15, 1999, added 6 months in CCC. |
| **LEONE**, Danny | Sentenced on April 29, 1998 to 5 months custody and 3 years supervised release. |
| **SHANNON**, Tim | Sentenced on May 13, 1998 to 27 months custody and 3 years TSR, $2,000 fine. |
| **SIEGEL**, Stephen | Sentenced on February 16, 2000 to 30 months custody and 4 years TSR, $10,000 fine. |
| **TUCKER**, Joe | Deceased. |
| **KARPINSKI**, Zebulon | Sentenced on May 20, 1998 to 3 years probation, $2,500 fine. |
| **STURDEVANT**, David | Sentenced on May 20, 1998 to 3 years probation, $1,000 fine. |
| **LAZOR**, James | Sentenced on June 23, 1998 to 30 months custody, 3 years TSR |
| **DUARTE**, Norberto | Sentenced on May 23, 2000 to 26 months custody, 5 years TSR |

4

## PART A.    THE OFFENSE

### Charge(s) and Conviction(s)

1. On May 5, 1995, an eight count Indictment was filed in the Northern District of California.

2. Count One of the Indictment charges **Ana Beatriz Biocini**, Christopher Michna, Keith Karpinski, Robert Johnson, Allan Sproul, Steven Thompson, Vincent Buckley, Michael Simpson, George Howell, Danny Leone, Tim Shannon, James Lazor, Stephen Siegal, and Joe Tucker with violation of 21 U.S.C. §§ 846 and 2 - Conspiracy to Distribute Cocaine.  Count Two charges Michna, Keith Karpinski, and Johnson with violation of 21 U.S.C. § 841(a)(1) - Distribution of a Controlled Substance, to wit, Cocaine.  Count Three charges Keith Karpinski with violation of 21 U.S.C. § 841(a)(1) - Distribution of a Controlled Substance, to wit, Cocaine.  Count Four charges Siegel, Michna and Keith Karpinski with violation of 21 U.S.C. § 841(a)(1) - Distribution of a Controlled Substance, to wit, Cocaine.  Count Five charges Siegal, Michna, Keith Karpinski and Johnson with violation of 21 U.S.C. 841(a)(1) - Distribution of a Controlled Substance, to wit, Cocaine.  Count Six charges Lazor and Michna with violation of 21 U.S.C. § 841(a)(1) - Distribution of a Controlled Substance, to wit, Cocaine.  Count Seven charges Michna, K. Karpinski, Sproul, Z. Karpinsksi, Duarte, Studevant and Shannon with violation of 21 U.S.C. §§ 846 and 2 - Conspiracy to Distribute Marijuana.  Count Eight charges Michna with violation of 21 U.S.C. §§ 846 and 2 - Conspiracy to Distribute Ecstasy.

3. On March 4, 1997, a Superseding Indictment was filed in the Northern District of California adding Count Nine to the Indictment.  Count Nine charges K. Karpinski with violation of 21 U.S.C. § 846 - Conspiracy to Distribute Cocaine.

4. On June 5, 1998, the defendant pled guilty to Count One of the Superseding indictment charging her with Conspiracy to Distribute Cocaine in accordance with the terms of a written plea agreement which is ordered *sealed by the Court.  The matter was referred to the Probation Officer for a presentence investigation.*  Judgment and sentencing is set for April 9, 2003, at 2:15 pm.

5. The plea agreement is attached to this report for the Court's review.  The probation officer agrees with *the calculations set forth in the plea agreement.*

6. The defendant was arrested on May 8, 1995 and was released to pretrial supervision on May 25, 1995 under the standard conditions of release as well as the condition that she surrender her passport, submit to search and seizure, have no contact with co-defendants in this case, and that she not use public telephones.  She initially was under electronic monitoring and then under a curfew set by the court; however, those conditions have been removed.    Since her release under supervision, she submitted positive tests for marijuana in June 1995, July 1998, and April 1999.  As a result, her release conditions were modified on May 7, 1999 to include the condition that she participate in outpatient counseling.  On August 20, 1999, Ms. Biocini completed a 90 day intensive outpatient program at Centro de Libertad.

NDC:15

5

### The Offense Conduct

7.  The information below is based on the discovery provided by the Government and information provided by the defendant.

8.  In December of 1991, agents with the Federal Bureau of Investigations (FBI) commenced with an investigation into the distribution of narcotics controlled substances in the North Beach area of San Francisco, California. FBI agents intercepted wire, oral and electronic communications, and used confidential informants as part of the investigation. Investigating agents conducted electronic and physical surveillance and conducted controlled buys of cocaine on at least five occasions. Based on intelligence gathered, the investigation expanded to include the identification of distributors of cocaine, marijuana, and ecstasy and the suppliers of these controlled substances.

9.  Soon after the investigation commenced, investigating agents learned that many of the conspirators resided and conducted drug transactions out of Marin County, California. Further, the investigation revealed that members of the conspiracy transacted cocaine, marijuana and ecstasy. As a result of the investigation, the following individuals were indicted: **Ana Beatriz Biocini**, Christopher Michna, Keith Karpinski, Robert Johnston, Allan Sproul, Steven Thompson, Vincent Buckley, Michael Simpson, George Howell, Danny Leone, Tim Shannon, James Lazor, Stephen Siegel, Joe Tucker, Zebulon Karpinski, Norberto Duarte and David Sturdevant. The total amount of controlled substances transacted through the conspiracy was approximately 71 kilograms of cocaine and 205 grams of cocaine, 23 pounds of marijuana and 3,178 doses of ecstasy.

10. Other identified co-conspirators, some of whom were indicted, are as follows: Isidro Lopez, Jose Souza (federal charges filed in San Jose), Diane Dragoo (Marin County state case), Hani Selim, Matthew Heckman, John Kimak, James Hite, Stephen Soloman, Phil Christopherson, Pamela Shannon, William Ferguson and Clinton Graves.

11. During the investigation, agents determined that **Biocini** was the primary source for the cocaine and was also involved in the distribution of marijuana. Biocini is believed to have direct connections with a Columbian associate, Miguel Asseff, also known as Hernando Velasco. It is the government's position that **Biocini's** distributors were Duarte, Siegel and Dragoo, (who subsequently supplied controlled substances to Michna), all of whom resided in Marin County. Michna supplied K. Karpinski, who often shared the expense of purchasing cocaine with Johnston, both of whom also resided in Marin County. K. Karpinski supplied Sproul, Thompson, Buckley, Simpson, Howell, Leone, Shannon, Tucker and Sturdevant, all of whom mostly distributed controlled substances out of bars or restaurants located in the North Beach area of San Francisco and/or Marin County.

12. The conspirators primarily used public and private telephones to conduct drug transactions. As a result, telephones were tapped by investigating authorities for approximately eighteen months. Due to the large

NDC:15

6

number of co-defendants and lower level distributers in this case, the offense conduct will focus primarily on Ms. Biocini's activities with her suppliers and distributers.

13.    Co-defendant Stephen Siegel was interviewed by FBI agents on December 4, 1997. Siegel told agents that his first cocaine deal with **Biocini** took place in the Spring of 1988. All of Siegel's purchases from **Biocini** were in amounts of one kilogram or more. Siegel stated that he purchased approximately 50 kilograms of cocaine from **Biocini** beginning several months after their introduction in 1987. The first deal was in the amount of one kilogram. In those days, the price being charged by **Biocini** for one kilogram of cocaine was $14,000 to $15,000. Siegal was then "middeling" kilograms of cocaine between **Biocini** and Siegel's customers. **Biocini** lived in Sausalito, California. Siegel continued to purchase kilograms of cocaine from **Biocini** on a fairly regular basis, approximately one kilogram every five or six weeks. He purchased six to eight kilograms of cocaine from **Biocini** in 1988. At that time, Siegel also had another source for cocaine.

14.    In 1988/1989, Siegel recalled one instance in which he purchased **8-9 kilograms** of cocaine from **Biocini** in one transaction. Siegel and **Biocini** flew separately to the Los Angeles area where they met at the Red Lion Hotel in Irvine, California. The transaction involved three separate rooms for each of the parties to the transaction, Siegel, **Biocini** and a third party. *During an interview with agents, while acting as a cooperating witness,* **Biocini** acknowledged this transaction. According to Ms. **Biocini**, she was a witness to the circumstances surrounding the transaction, however indicated that the transaction was between Siegel and "the Greek."

15.    In 1989 and 1990, Siegel began purchasing cocaine exclusively from **Biocini** and his purchases increased to approximately one kilogram every two weeks. However, at one point, a major Columbian political figure was killed, after which **Biocini's** source for cocaine "dried up" for a period of months. Her price for kilograms of cocaine also increased significantly. He recalled that **Biocini** went to Columbia in June 1991. Siegel's major customer died in August 1991 and in September 1991, Siegel was arrested on drug charges. In 1991, Siegel purchased approximately four kilograms of cocaine from **Biocini**. Ms. **Biocini** denies having supplied Siegel with four kilograms of cocaine in 1991.

16.    On August 11, 1992, a confidential informant unsuccessfully attempted to purchase 15 kilograms of cocaine from Henry Puga. The informant told agents that he had been contacted on August 10, 1992 by "Henry". "Henry" asked if the informant was interested in buying multiple kilograms of cocaine. The informant told "Henry" that he was interested. "Henry" told the informant to go to the Holiday Inn, Room 229 on Bristol Street in Costa Mesa, California. On August 11, 1992 the informant met "Henry" at the Holiday Inn and "Henry" pulled a kilogram wrapped in tape with a black scorpion from a blue duffle bag and showed it to the informant. The informant cut into the cocaine and tested it. "Henry" then negotiated with the informant to buy 15 kilograms of cocaine for $300,000 later that day. The informant, who wore a concealed tape recorder, gave the tape to agents. Agents contacted the front desk at the hotel and learned that Henry Salvador was staying in room 229 and a deposit was made under the name of Henry Puga. At 5:00 p.m., Puga told the informant that he was unable to complete the narcotics transaction on that day. On August 16, 1992, the informant was contacted by Puga who stated that he was staying with his wife at the Bayshore Inn in Newport Beach, California. He told the informant that he was going to leave his hotel at 8:00 a.m.

NDC:15

000227

7

the next morning to pick up one kilogram of cocaine for the informant to sample. Agents observed Puga leave his hotel and travel to the Ramada Inn where he met with Hernan Jaramillo (**Biocini's** brother). Agents observed a white vehicle park outside of Jaramillo's hotel room. A *female identified as Biocini* exited Jaramillo's hotel room carrying a 12-inch by 8-inch by 4-inch package wrapped in green and white striped Christmas paper. **Biocini** then handed the package to the driver of the white vehicle. After **Biocini** and Jaramillo left the hotel, they met with the white vehicle and all of them returned to the hotel. Puga then contacted the informant and stated that he had one kilogram of cocaine at the hotel. The informant met with Puga and Jaramillo at the hotel room and was provided with one kilogram of cocaine. All of the subjects were arrested. **Biocini** was arrested for Conspiracy.

17. Upon completion of his parole in 1994, Siegel established contact with **Biocini**. **Biocini** told Siegel that she was told by Diane Dragoo (related case defendant charged in state case) not to sell kilograms of cocaine to Siegel. Siegel had met Dragoo as a prostitute sometime in 1991. Siegel introduced **Biocini** to Dragoo before he went to prison. As a result of the introduction, Siegal had an understanding with Dragoo that for any cocaine that she received from **Biocini**, Siegel would receive a commission. In September/October 1994, Siegel sold two kilograms of cocaine to Michna. Michna drove Siegel to the area of Marin Drive in Sausalito, California. Michna dropped off Siegel and Siegal walked to **Biocini's** residence and picked up a kilogram of cocaine and provided the cocaine to Michna. The second kilogram that Siegel sold to Michna was labeled with a tractor. He received a telephone call from Michna on December 8, 1994. Michna asked Siegel if he had any "Gucci's." These conversations were captured from wiretap surveillance. Siegel got back to Michna regarding his inquiry. Siegel stated that he placed a call from his residence to **Ana Biocini** to meet her at her residence. Siegel went to her home where he inspected three kilograms of cocaine in her dining room. **Biocini** told Siegel that she did not have the "Gucci" label but that she had a different kind of cocaine. At least two of the three kilograms were labeled with a red tractor. Siegel called Michna from **Biocini's** residence and Siegel told him to "get the one from the showroom floor". Siegel chose the best of the three kilograms of cocaine and brought it home for re-sale to Michna. Michna did not think the cocaine was of very good quality and had not yet paid for the cocaine. On December 9, 1994, Michna told Siegel that since the quality was not very good, he had to split **the kilogram** and did not yet have all of the money. Siegel went to **Biocini's** residence and provided her with partial payment for the cocaine. On December 10, 1994, Michna requested a second kilogram of cocaine from Siegel and Siegel contacted **Biocini** who would not sell additional kilograms until she received full payment for the previous one. On December 11, 1994, an FBI agent witnessed a second delivery of **one kilogram** of cocaine from **Biocini** to Siegel to Michna to Karpinski to Johnson. This transaction was also captured on wiretap.

18. Siegel told agents that the largest quantity of cocaine he had ever seen in **Biocini's** possession was two shopping bags, each filled with kilograms of cocaine. It is noted that Ms. **Biocini** denies having possessed shopping bags of cocaine. He recalled that some of the kilograms of cocaine which he bought from **Biocini** were either marked with a picture of a red tractor, kilograms wrapped in the shape of a football, marked with the word, "Reina" or wrapped in fiberglass packaging. He added that on some occasions, **Biocini's** brother, Hernan Jaramillo delivered the cocaine. Siegel knew that other customers of **Biocini's** were George Biocini, her ex-husband, Norberto Duarte, Mr. Rodriguez, and "Tyson". According to Siegel, **Biocini** had several contacts in the cocaine business, including Colombians in Colombia, Miami, Los Angeles, and the

NDC:13

000228

8

San Francisco Bay Area (including San Jose). At one point, possibly in 1987 or 1988, **Biocini** told Siegel that a member(s) of her family in Colombia was kidnaped as a result of a cocaine deal that **Biocini** had allegedly botched. A large amount of cocaine and $150,000 cash was seized. The defendant denies having made this statement. She told Siegel that their friend in common, Solomon, had been arrested with $180,000 of her cocaine. The defendant maintains that she knew about the transaction and arrest, however stated that it was not her cocaine, it belonged to "the Greek." During an interview with agents, while acting as a cooperating witness, **Biocini** acknowledged this transaction and noted that in about 1987, she was involved in a deal with her supplier and Steve Solomon which involved about ten kilograms and Solomon was arrested with the cocaine. According to Siegel, she asked Siegel to feign being someone of power who could intimidate/persuade the kidnappers to release her family members. As a result, Siegel spoke to someone in Colombia associated with the kidnaping to assist in the release of **Biocini's** family members. Siegel stated that **Biocini's** family member(s) were eventually released. At one point, **Biocini** pawned her car, possibly in an attempt to gather money to pay for the botched cocaine deal. The defendant noted that she never told Siegel that her family members were kidnaped, has never pawned her car and still owns the car she was using at that time.

19.   According to a DEA report dated February 23, 1979, co-defendant Norberto Duarte (Biocini's customer) is a well known Cuban drug trafficker who was residing in Miami, Florida. According to the information, Norberto Duarte was trafficking narcotics throughout Hawaii, Europe and South America. His associate of many years, Carlos Rodriguez has previously been investigated in the state of Colorado for aircraft drug smuggling. Rodriguez had an FAA pilot's license. Duarte and Rodriguez directed cocaine distribution activities with **Ana Biocini**. Intercepted telephone conversations also suggested that Duarte had access to various sources of cocaine, including his girlfriend, Dianne Dragoo , **Ana Biocini**, and Chris Michna.

20.   Sometime in 1993, Stephen Siegel introduced Dragoo, who later became a confidential source, to **Ana Biocini**. **Biocini** and Dragoo became friends and **Biocini** was willing to sell cocaine to Dragoo. Duarte learned of Dragoo's ability to obtain cocaine from **Biocini**, who was willing to "front" kilogram quantities of cocaine for up to one week. According to Dragoo, she obtained 10 kilogram deliveries of cocaine from **Ana Biocini** on two occasions. In August 1993, Dragoo obtained **10 kilograms** of cocaine from **Biocini**. This information was obtained from two confidential sources, as well as from Dragoo and Michna. **Biocini** admitted that she facilitated the transaction between her connection, Jose Luis Mesa "Coney" and Dragoo. Dragoo sold the kilograms, five at a time, to Michna within a two week span. Four of the kilograms were of such poor quality that Michna could not sell them and returned them to **Biocini**. Dragoo learned from **Biocini's** ex-husband, George that George had been delivering kilograms of cocaine from Los Angeles, California to Sausalito, California for **Ana Biocini**. Prior to using George, **Ana Biocini** used her brother Hernan to deliver cocaine. On several occasions, Dragoo purchased smaller amounts (one or more kilograms) of cocaine from **Biocini**. **Biocini** supplied Dragoo with such amounts approximately ten times. Dragoo, Duarte, and Rodriguez then distributed these kilograms to various customers including Dan Coscina, Chris Michna, Jonathon Wu, Laurie Van Woerkom, and Peter Combs. Dragoo delivered one to two kilograms at a time to Coscina from Duarte and Rodriguez. According to Dragoo, Duarte sold Wu ¼ kilogram of cocaine every four months.

NDC:15



9

21.   Dragoo indicated and documentation revealed, that from November 13, 1993 to November 15, 1993, Dragoo and Duarte traveled to Honolulu, Hawaii to deliver one kilogram of cocaine to Dan Coscina. On March 30, 1994, Dragoo and Duarte flew to Honolulu, Hawaii for a short layover to deliver two kilograms of cocaine. Dragoo carried the cocaine. One and a half kilograms of cocaine were delivered to Dan Coscina. Dragoo and Duarte then flew to Maui where Duarte delivered several ounces of cocaine to a second customer. The Hawaii Air travel summary shows four short trips by Dragoo to Hawaii between January and August 1994. Dragoo remembers the last trip for Duarte to Hawaii on August 25, 1994 to make delivery of one kilogram of cocaine. On October 14, 1994, Dragoo went to the airport in San Francisco to pick up Duarte and received a parking ticket while waiting for Duarte. They went to a restaurant where Duarte handed Dragoo an envelope for the two kilograms of cocaine. Dragoo was to give the envelope to **Biocini** for payment of the cocaine. Ms. **Biocini** indicated that she did not receive an envelope from Dragoo as payment for a Hawaiian transaction.

22.   During December 1994, Norberto Duarte, Carlos Rodriguez, and **Ana Biocini** were negotiating the shipment of cocaine into the Bay Area which was to be supplied to a customer connected to Duarte and Rodriguez who was to be in Nevada on January 28, 1995. Duarte and Rodriguez planned to meet the customer, Laurie Van Woerkom, in Nevada to negotiate the purchase of an undetermined quantity of cocaine. However, the completion of the transaction hinged upon **Ana Biocini's** ability to secure the financing of the cocaine shipment. In the meantime, Duarte and Rodriguez went on vacation to the Bahamas. Duarte and **Biocini** had several meetings and telephone conversations discussing the status of the operation; however, **Biocini** wasn't ready to finalize the deal. Consequently, Duarte and Rodriguez canceled their plans to meet with Van Woerkom. Ms. **Biocini** added that she does not know Van Woerkom and never had knowledge of the travels of Duarte and Carlos Rodriguez.

23.   In December 1994, **Biocini**, attended a holiday party at the apartment of Duarte's mother who resides in the apartment building owned by her son. At the party, Duarte asked **Biocini** if she could find two kilograms of cocaine for him and his friend, Carlos. For the next five months, **Biocini** attempted to get the cocaine through Biocini's Colombian supplier, yet she was unable to secure the cocaine prior to **Biocini's** arrest. Duarte admitted negotiating with **Biocini** for the purchase of two kilograms of cocaine in 1994.

24.   Ms. **Biocini** was arrested at her home without incident on May 8, 1995. No illegal drugs or weapons were seized during the arrest.

25.   Mr. Siegel stated that he has purchased approximately 50 kilograms of cocaine from **Biocini**. He also noted that he has seen **Biocini** with two shopping bags full of kilograms of cocaine. As noted above, Ms. **Biocini** denies this accusation. It is Ms. **Biocini's** position that she acted as a "middle person" between her supplier and Mr. Siegel and feels that he has inflated her involvement in the conspiracy. It is noted that Ms. Dragoo stated that she has purchased 10 kilograms of cocaine from **Biocini** on two occasions as well as smaller amounts on at least ten occasions.

NDC:15

10

**Victim Impact**

26.    None.

27.    **Adjustment for Obstruction of Justice:** There is no information to suggest that the defendant has impeded or obstructed the administration of justice in this case.

28.    **Adjustment for Acceptance of Responsibility:** Ms. Biocini wrote the following statement on her probation form: "I know I did wrong and my life wasn't going in the right direction. I thanks(sic) Pretrial Svcs (sic) and the government to encourage me to learn how is to live a life without drugs. I became a cocaine addicted late twenties. To be from Colombia and knew people from Colombia who was in drug business gave me access to use drugs for my self. I was addicted to cocaine and marijuana and I was using cocaine and marijuana everyday. I lose a lot of basic society and moral values while under the addiction of the cocaine and marijuana. My family principles lose values to me as well and only I want to have the daily doses of cocaine or marijuana to get stone. I was involved with people who used drugs, want drugs, sell drugs. I know I did wrong and I accepting the responsibilities of my acts."

**Offense Level Computation**

29.    The United States Sentencing Commission, Guidelines Manual, effective (January 25, 2003) was used pursuant to USSG §1B1.1 as there are no ex-post facto issues.

30.    **Base Offense Level:** The guideline for violation of 21 U.S.C. § 846 is found at USSG §2D1.1. Mr. Siegel stated that he has purchased approximately 50 kilograms of cocaine from Biocini. He also noted that he had seen Biocini with two shopping bags full of kilograms of cocaine. Dragoo stated that she purchased 10 kilograms of cocaine from Biocini on two occasions as well as smaller amounts on at least ten occasions. However, most of these amounts are not included in guideline calculations as there is no corroborative evidence and these amounts are viewed as estimates.

31.    When determining an appropriate amount of cocaine attributable to the defendant, the probation officer included the **10 kilogram** transaction in August 1993 between Biocini and Dragoo since this transaction was reported by four others and Biocini admits that she facilitated the transaction. She was also involved in the sale of **one kilogram** of cocaine between her brother, Hernan Jaramillo and Puga on August 17, 1992 and this transaction involved an informant, was under surveillance, and was captured on wiretap. The **one kilogram** transaction between Biocini and Siegel on December 8, 1994 is also attributed to the defendant since it was captured on wiretap and she acknowledges the transaction as part of the plea agreement. It is noted that Mr. Siegel was shown three kilograms of cocaine at Biocini's house, yet only purchased one of the kilograms. The **one kilogram** transaction on December 11, 1994 between Biocini and Siegel and then Michna is also attributable to the defendant as an agent witnessed part of the transaction and it was also captured on wiretap surveillance. Therefore, although it is evident that Ms. Biocini was trafficking much larger amounts of cocaine than she is being held accountable for, only the above noted thirteen kilograms of cocaine will be used for guideline calculations. According to USSG

NDC:15

000231



11

§2D1.1, USSG §2D1.1(c)(4), the base offense level for at least 5 kilograms, but less than 15 kilograms of cocaine is thirty-two.                                                                                    **32**

32.   **Specific Offense Characteristics:** According to USSG §2D1.1(b)(6), if the defendant meets the criteria set forth in subdivisions (1)-(5) of §5C1.2, (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases) and the offense level determined above is 26 or greater, decrease by two levels.  Ms. Biocini meets the criteria and a two level decrease is warranted under this section.                          **-2**

33.   **Victim Related Adjustment:**  None.                                                                      **0**

34.   **Adjustment for Role in the Offense:** According to USSG §3B1.1(a), if the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, increase by four levels.   The large amounts of cocaine noted above are not included in guideline calculations as there is no corroborative evidence and these amounts are viewed as estimates.  This information is relevant in assessing the defendant's role as a high level cocaine distributor as she, at times, distributed large amounts of cocaine.  Additionally, her involvement in cocaine sales extended over a lengthy period of time and an upward adjustment under this section may be warranted.  However, although Ms. Biocini had connections with Colombian drug lords and/or major drug suppliers, she may also be viewed as a "middle person".  She did not appear to significantly benefit from the sales and did not exercise decision making authority over others or have others working for her as an organizer or leader.  In light of the above, no adjustment is given under this section.                                                              **0**

35.   **Adjusted Offense Level (Subtotal):**  Thirty.                                                         **30**

36.   **Adjustment for Acceptance of Responsibility:**   The defendant has clearly demonstrated acceptance of responsibility for the offense conduct and a two-level reduction pursuant to USSG §3E1.1(a) is appropriate.                                                                                        **-2**

37.   However, she agreed to enter a guilty plea after jury selection in this case.  As she was not timely in notifying the government of her intention to plead guilty, she is not entitled to the additional one point decrease pursuant to USSG §3E1.1(b)(2).                                                                   **0**

38.   **Total Offense Level: Twenty-eight**                                                                   **28**

39.   **Chapter Four Enhancements:**  None.                                                                   **0**

## PART B.   DEFENDANT'S CRIMINAL HISTORY

NDC:15

000232



12

### Juvenile Adjudications

40.    None detected.

### Criminal Convictions

41.    None detected.

### Criminal History Computation

42.    The total of the criminal history points above is zero.    According to USSG Ch. 5, Pt. A, a defendant with zero criminal history points is assigned to **Criminal History Category I.**

### Other Criminal Conduct

43.    The defendant was arrested by Orange County Sheriffs on August 17, 1992 for Possession/Purchase For Sale of Narcotics and Transportation of Narcotics.   The Orange County Harbor Court indicated that no formal charges were filed and she was detained only.  This arrest involved her brother, Hernan Jaramillo and is outlined above.

### Pending Charges

44.    None.

## PART C.    OFFENDER CHARACTERISTICS

### Personal and Family Data

45.    Ana Biocini was born as Ana Jaramillo on June 30, 1954 in Cali, Colombia.  She is the third of eight children born to the union of Alberto Jaramillo and Stella Racines.  Her father, who worked for the family bus company in Colombia, died during heart surgery in 1995.  He was in his seventies.   The defendant's mother, a homemaker, age 73, resides with the defendant's older sister, Clara, in Cali, Colombia.  Clara, age 49, is a single mother.  Her sister Patricia, age 46, is a real estate agent who lives in Cali, Colombia.  Her sister Clemencia, age 45, resides in Richmond, California.  Her brother Rafael, age 50, is a sociologist in Bogota, Colombia.  Her brother Diego, age 44, is in the communications field in Bogota, Colombia.  Her youngest brother Felipe, age 33, is a taxi driver in Cali, Colombia and her brother, Hernan, age 41 sells advertising for a radio station and lives in Daly City, California.

46.    Ms. Biocini noted that she was raised in a very traditional family setting and her father was a strict disciplinarian.    Her father, who was a heavy drinker, physically abused her and beat her with a belt from age five to age sixteen.  He was also abusive toward her mother and her older brother.  She stated that her mother was the perfect mother and cared for the family.  Although the situation with her father

NDC:15

000233


created tension at home, she shared a positive relationship with her mother and all of her siblings. She enjoyed playing basketball and noted that she was one of the best players at school.

47.     The defendant left home in 1977 at age 23 and went to London, England to work as an Au Pair for two years. She returned to Colombia and worked for the government for one year. She then came to the United States in 1981 to live with a friend of the family. In 1988, she moved to California.

48.     Ms. Biocini married George Biocini in Lake Tahoe, Nevada on January 9, 1988. The couple separated in 1993 and divorced in 1994. Ms. Biocini reported that her relationship with her husband is volatile and he has been verbally abusive in front of their son. It is also noted that there were several reported instances of domestic violence and there was a restraining order in effect which prevented him from contacting the defendant except to arrange to see their son. They have a son Peter, age 14 who resides with Ms. Biocini in Mountain View, California. Peter had been attending counseling for depression as he had written troubling notes about suicide. The volatile situation has been very traumatic for Peter and he is receiving extensive counseling and treatment for severe emotional problems. The couple share joint legal custody and Ms. Biocini has physical custody of Peter. As noted above, George Biocini was involved in this offense; however, was not charged with any violations in this case. The defendant and her son reside in a three bedroom adequately furnished apartment in an affluent area of Mountain View, California.

49.     Ms. Biocini presently resides in Mountain View, California with her son.

**Physical Condition**

50.     Ana Biocini is a 48 year old Hispanic female who stands 5'0" tall and weighs 150 pounds. She has blue eyes and light brown hair. She enjoys good health and has never sustained any serious illnesses or injuries. She is not taking any medication.

**Mental and Emotional Health**

51.     Ms. Biocini visited a psychologist in San Francisco on a couple of occasions in 1994 or 1995 prior to her arrest. She also reportedly contacted the Department of Health and Welfare agency in San Rafael, California in the months prior to her arrest due to her depression over cocaine abuse. She was subsequently enrolled in vocational counseling and began taking computer classes, which improved her emotional outlook. At the time of the presentence interview in November 2002, Ms. Biocini was reportedly depressed and her attorney noted that she exhibited mood swings. Ms. Biocini indicated that she would contact pretrial services to inquire about mental health counseling; however, it does not appear that she is involved in counseling. She told the probation officer during a visit to her home on February 21, 2003 that she was under a great deal of stress as a result of this case and her personal life.

**Substance Abuse**



14

52. The defendant experimented with alcohol as a teenager and was getting drunk every weekend. In the late 1980's and throughout the 1990's, consuming a half bottle of whiskey per day. She describes herself as a very heavy drinker prior to her arrest. She no longer consumes hard liquor and presently consumes two glasses of wine twice per week. She admitted that she was an alcoholic when she was using cocaine; however, no longer feels that alcohol is a problem. The probation officer encouraged her to abstain from alcohol and noted that she will probably be required to do so as a condition of her supervised release.

53. With regard to drugs, Ms. Biocini tried marijuana and cocaine at age 31 and used the substances daily for approximately 15 years until her arrest in this matter. She stopped using marijuana for a while and then started using again, resulting in positive tests while under pretrial supervision in 1995, 1998, and 1999. She maintains that she has not used marijuana since 1999. She last used cocaine prior to her arrest. She has never tried other illegal substances. The defendant completed a 90 day residential treatment program at Centro de Libertad on August 20,1999 and attended AA meetings for one year. She has not attended AA meetings for the past two years. It appears that Ms. Biocini has not used illegal drugs in three years.

### Education and Vocational Skills

54. The defendant graduated from High School in Colombia in 1972 at age 18.

55. Ms. Biocini attended the San Mateo Regional Occupation Program from January 1996 to June 1997 and received a certificate in Computerized Accounting on June 10, 1997.

56. The defendant attended classes in Accounting and Web Design at Canada College in the San Mateo Community College District from 1997 to 2001. She has completed 27 units of credit and her cumulative G.P.A. is 3.06.

### Employment

57. **October 2001 to Present:** Ms. Biocini has been unemployed since October 2001; however, was enrolled in classes three days per week in computer chip design at Silicon Artists in Santa Clara, California from May 2002 through September 2002. Additionally, Ms. Biocini submitted verification of job applications and email responses from various companies to which she had applied. She presently receives $1,200 per month in unemployment compensation.

58. **1995 to 2001:** The defendant was employed as an accounting clerk for various companies for Accountemps in Redwood City, California. She submitted all of her pay stubs for this time period. She was released from her position as the workload decreased.

59. **September to December 1994:** The defendant participated in vocational rehabilitation training and education through the State of California Health and Welfare Agency.

NDC:15



15

**Financial Condition: Ability to Pay**

60.         NET WORTH

     **Assets**

        Checking account                                                          2,400

        <u>Unencumbered Assets</u>

          None
       <u>Equity in Other Assets</u>

          None
       **Total Assets**                                                            **<u>2,400</u>**

   **Unsecured Debts**

        Credit Cards                                                               6,000
        Dell Computers                                                            1,000

        **Total Unsecured Debts**                                       **<u>7,000</u>**

        **<u>NET WORTH</u>**                                                    **<u><4,600></u>**

  **MONTHLY CASH FLOW**

    **Income**

        Unemployment Compensation                              1,200
        Child Support                                                             750

    **Total Income**                                                             **<u>1,950</u>**

  **Necessary Living Expenses**

        Rent                                                                            800
        Utilities                                                                        100
        Groceries/supplies                                                      200
        Auto insurance                                                            50

NDC:15

16

| | |
|---|---|
| Car Payment | 450 |
| Credit Card Payments | 300 |
| **Total Necessary Expenses** | **1,900** |
| **NET MONTHLY CASH FLOW** | **50** |

61.    Due to the defendant's lack of financial assets, it does not appear that she is capable of paying a fine in this case.

## PART D.    SENTENCING OPTIONS

### Custody

62.    **Statutory Provisions:** Count One provides a minimum of ten years imprisonment and maximum term of life imprisonment. 21 U.S.C. § 841(b)(1)(A).

63.    **Guideline Provisions:** Based on a total offense level of 28 and a Criminal History Category of I, the guideline custody range is **78 to 97** months. Since the applicable guideline range is in Zone D of the Sentencing Table, the defendant must serve the minimum term in custody. USSG §5B1.1, comment (n.2).

### Supervised Release

64.    **Statutory Provisions:** The term of supervised release shall be at least 5 years. 21 U.S.C. § 841(b)(1)(A). Pursuant to 18 U.S.C. § 3583(d), the Court shall order, as an explicit condition of supervised release, that the defendant not commit another Federal, State, or local crime during the term of supervision, and that the defendant not unlawfully possess a controlled substance. The Court shall also order, as an explicit condition of supervised release, that the defendant refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days of release on supervised release and at least two periodic drug tests thereafter (as determined by the Court) for use of a controlled substance. The Court may further order any other condition it deems appropriate.

65.    **Guideline Provisions:** If a defendant is convicted under a statute that requires a term of supervised release, the term shall be at least that required by statute. USSG §5D1.2(b). Therefore, the term shall be at least 5 years. Pursuant to 18 U.S.C. §3583(d), the Court shall order, as an explicit condition of supervised release, that the defendant not commit another Federal, State, or local crime during the term of supervision, and that the defendant not unlawfully possess a controlled substance. The Court shall also order, as an explicit condition of supervised release, that the defendant refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days of release on supervised release and at least two periodic drug tests thereafter (as determined by the Court) for use of a controlled substance. The Court may further order any other condition it deems appropriate.

NDC:15

17

### Probation

66.   **Statutory Provisions:** The defendant is ineligible for probation. 21 U.S.C. § 841(b)(1)(A).

67.   **Guideline Provisions:** A sentence of probation is not authorized. USSG §5B1.1(b)(1)

### Fines

68.   **Statutory Provisions:** The maximum fine is $4,000,000. 21 U.S.C. § 841(b)(1)(A).

69.   **Guideline Provisions:** Based on the offense level of 28, the minimum fine is $12,500 and the maximum fine is $4,000,000. USSG §§5E1.2(c)(3).

70.   Subject to the defendant's ability to pay, pursuant to Guideline 5E1.2(I), the Court is required to impose a fine that is at least sufficient to pay the cost to the government of any imprisonment, probation, or supervised release. The most recent advisory from the Administrative Office of the United States Courts, dated June 3, 2002, indicates that there is a monthly cost of $1,848.02 for imprisonment, a monthly cost of $270.59 for supervision, and a monthly cost of $1,383.50 for community confinement.

### Restitution

71.   None.

### Denial of Federal Benefits

72.   **Statutory Provisions:** Under 21 U.S.C. § 862(a)(1)(A), the court may deny federal benefits for a period up to five years to an individual who has sustained a first conviction for distribution of a controlled substance. Such benefits include grants, contracts, loans, professional licenses, or commercial licenses, but do not include any retirement, welfare, social security, health, disability, veterans benefits, public housing or similar benefits, or any other benefit for which payment or services are required for eligibility.

73.   **Guideline Provisions:** The court may deny the eligibility for certain Federal benefits of any individual convicted of distribution or possession of a controlled substance. USSG §5F1.6.

## PART E.    FACTORS THAT MAY WARRANT DEPARTURE

74.   Presentation of information in this section does not necessarily constitute a recommendation for a departure.

75.   The Court may wish to consider whether the defendant's post-rehabilitative efforts, namely drug and alcohol counseling, vocational counseling, and motivation and success through education and employment are grounds for a departure for extraordinary acceptance of responsibility pursuant to USSG §5K2.0.

NDC:15

18

Respectfully submitted,

Tess Lopez
U. S. Probation Officer

Reviewed and Approved by:

_____

Sharon Alberts
Supervising U.S. Probation Officer

TMR/tmr

NDC:15

AO 245B (Rev. 9/00) - Judgment in a Criminal C...

# United States District Court
## Northern District of California

**F I L E D**

APR 2 9 2003

**RICHARD W. WIEKING**
CLERK U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

v.

ANA BEATRIZ BIOCINI

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number:    CR-95-0187-01 CRB

Robert Waggener
Defendant's Attorney

**THE DEFENDANT:**

[x]    pleaded guilty to count(s): 1 of the Indictment .
[ ]    pleaded nolo contendere to count(s) ___ which was accepted by the court.
[ ]    was found guilty on count(s) ___ after a plea of not guilty.

**ACCORDINGLY**, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21 U.S.C. §846 | Conspiracy to Distribute Cocaine | | I |

The defendant is sentenced as provided in pages 2 through _8_ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ]    The defendant has been found not guilty on count(s) ___.

[ ]    Count(s) ___ (is)(are) dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Defendant's Soc. Sec. No.:    4184

Defendant's Date of Birth:    1954

Defendant's USM No.:    ~~90920-0+1~~ 930610(I

Defendant's Residence Address:
100 N. Whisman Rd #3114
Mountain View, CA 94043

Defendant's Mailing Address:
100 N. Whisman Rd #3114
Mountain View, CA 94043

April 28, 2003
Date of Imposition of Judgment

Signature of Judicial Officer

Honorable Charles R. Breyer, U. S. District Judge
Name & Title of Judicial Officer

April 29, 2003
Date

I hereby certify that the annexed instrument is a true and correct copy of the original on file in my office.
ATTEST:
RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California
By____BARBARA ESPINOZA____
Deputy Clerk
Date    APR 3 0 2003

Ex T

AO 245B (Rev. 9/00) - Imprisonment

DEFENDANT:      ANA BIOCINI
CASE NUMBER:    CR-95-0187-01 CRB                    Judgment - Page 2 of 8

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of thirty (30) months .

[x]    The Court makes the following recommendations to the Bureau of Prisons:
       The defendant participate in the  intensive confinement camp program (ICC).

[ ]    The defendant is remanded to the custody of the United States Marshal.

[x]    The defendant shall surrender to the United States Marshal for this district.

       [x] at 12:00  on July 14, 2003 .
       [] as notified by the United States Marshal.

[ ]    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

       [ ] before _ on ___.
       [ ] as notified by the United States Marshal.
       [ ] as notified by the Probation or Pretrial Services Officer.

## RETURN

I have executed this judgment as follows:

Defendant delivered on 1/16/004 to CC2 DUBLIN
at DUBLIN , CA , with a certified copy of this judgment.

UNITED STATES MARSHAL

By SCHELIA A. Clark
Deputy U.S. Marshal

for WARDEN

000241

AO 245B (Rev. 9/00) Sheet 3 - Supervised Release

| | |
|---|---|
| DEFENDANT:      ANA BIOCINI | |
| CASE NUMBER:   CR-95-0187-01 CRB | Judgment - Page 3 of 8 |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of five (5) years .

While on Supervised Release you shall not commit another federal, state or local crime and shall not illegally possess a controlled substance.  Revocation of supervised release is mandatory for possession of a controlled substance.

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter.

[ ]      The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.  (Check if applicable.)

[x]      The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

Revocation of supervised release in mandatory for refusal to comply with drug testing imposed as a condition of supervision.  18 U.S.C. Sections 3565(b)(3) and 3583 (g)(3)

You shall pay the assessment imposed in accordance with 18 U.S.C. Section 3013, and shall immediately notify the probation officer of any change in your economic circumstances that might affect your ability to pay a special assessment, fine, restitution, or co-payments ordered by the Court.

If the judgment imposed a fine or a restitution obligation, it shall be a condition of supervision that you pay any such fine or restitution that remains unpaid at the commencement of the term of supervision in accordance with any Schedule of Payments set forth in the Criminal Monetary Penalties sheet of the judgment. In any case, the defendant shall cooperate with the probation officer in meeting any financial obligations

000242

AO 245B (Rev. 9/00)  Sheet 3 - Supervised Release

| DEFENDANT: | ANA BIOCINI | Judgment - Page 4 of 8 |
| CASE NUMBER: | CR-95-0187-01 CRB | |

## STANDARD CONDITIONS OF SUPERVISION

It is the order of the Court that the defendant shall comply with the following standard conditions:

1) The defendant shall not leave the judicial district or other specified geographical area without permission of the Court or the probation officer;

2) The defendant shall report to the probation officer as directed by the Court or the probation officer, and shall submit a truthful and complete written report within the first five days of each month;

3) The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) The defendant shall support his or her dependants and meet other family responsibilities, including but not limited to, compliance with the terms of any court order or administrative process pursuant to the laws of a state, the District of Columbia, or any other possession or territory of the United States, requiring payments by the defendant for the support and maintenance of any child or of a child and the parent with whom the child is living;

5) The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) The defendant shall notify the probation officer at least ten (10) days prior to any change in residence or employment;

7) The defendant shall consume no alcohol if sentenced to the special condition that the defendant is to participate in a drug/alcohol program;

8) The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substance, except as prescribed by a physician;

9) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

10) The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

11) The defendant shall permit a probation officer to visit the defendant at any time at home or elsewhere, and shall permit confiscation of any contraband observed in plain view by the probation officer;

12) The defendant shall notify the probation officer within seventy-two (72) hours of being arrested or questioned by a law enforcement officer;

13) The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court;

14) The defendant shall notify third parties of risks related to the defendant's criminal record, personal history, or characteristics, and shall permit the probation officer to make such notifications and/or confirm the defendant compliance with this notification requirement

000243

AO 245B (Rev. 9/00) Sheet 3 - Supervised Release

| | |
|---|---|
| DEFENDANT: **ANA BIOCINI** | Judgment - Page 5 of 8 |
| CASE NUMBER: CR-95-0187-01 CRB | |

## SPECIAL CONDITIONS OF SUPERVISION

1) The defendant is prohibited from possessing any firearms, ammunition, explosive devices, or components to make explosives, or instruction materials for the manufacturing of such devices and shall not posses any other dangerous weapons.

2) The defendant shall provide the probation officer access to any requested financial information.

3) The defendant shall participate in a drug/alcohol aftercare treatment program, which may include testing to determine whether she has reverted to the use of drugs or alcohol, as directed by the probation officer. The defendant is to pay part or all of the cost of this treatment, at an amount not to exceed sixty dollars ($60.00) per session, as deemed appropriate by the probation officer. Payments shall never exceed the total cost of urinalysis and counseling. The actual co-payment schedule shall be determined by the probation officer.

4) The defendant shall submit her person, residence, office, vehicle, or any property under his/her control to a search. Such a search shall be conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to such a search may be grounds for revocation. The defendant shall warn any residents that the premises may be subject to searches.

5) The defendant shall participate in a mental health treatment program, as directed by the probation officer. The defendant is to pay part or all costs of this treatment, at an amount not to exceed sixty dollars ($60.00) per session, as deemed appropriate by the probation officer. Payments shall never exceed the total cost of mental health counseling. The actual co-payment schedule shall be determined by the probation officer.

6) The defendant shall pay any special assessment, fine, or restitution that is ordered as part of this judgment.

7) The defendant shall not have contact with any co-defendant.

It is further ordered that the defendant pay to the United States a special assessment of $100, which shall be paid immediately.

AO 245B (Rev. 9/00) -Criminal Monetary Penalties

| | | |
|---|---|---|
| DEFENDANT: | ANA BIOCINI | |
| CASE NUMBER: | CR-95-0187-01 CRB | Judgment - Page 6 of 8 |

# CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments directly following the Monetary Penalties section.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| Totals: | $ 100.00 | $ -0- | $ -0- |

[ ]  The determination of restitution is deferred until __. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

[ ]  The defendant shall make restitution (including community restitution) to the following payees in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid in full prior to the United States receiving payment.

| Name of Payee | *Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
| Totals: | $ _ | $ _ | |

[ ]  If applicable, restitution amount ordered pursuant to plea agreement $ _

[ ]  The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 5, Part B may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

[ ]  The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

[  ]  the interest requirement is waived for the    [ ] fine and/or    [ ] restitution.

[  ]  the interest requirement for the    [  ]  fine and/or    [ ] restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

000245

AO 245B (Rev. 9/00) -Criminal Monetary Penalties

DEFENDANT:      ANA BIOCINI
CASE NUMBER:    CR-95-0187-01 CRB

Judgment - Page 7 of 8

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A  [x]  Lump sum payment of $100.00 due immediately.

   [ ]  not later than _____, or

   [ ]  in accordance with ( ) C, ( ) D, or ( ) E below; or

B  [ ]  Payment to begin immediately (may be combined with ( ) C,  ( ) D, or ( ) E below); or

C  [ ]  Payment in ____ (e.g. equal, weekly, monthly, quarterly) installments of $ _ over a period of __ (e.g., months or year(s)), to commence _ (e.g., 30 or 60 days) after the date of this judgment; or

D  [ ]  Payment in ____ (e.g. equal, weekly, monthly, quarterly) installments of $ _ over a period of __ (e.g., months or year(s)), to commence _ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E  [ ]  Special instructions regarding the payment of criminal monetary penalties:


Unless the court has expressly ordered otherwise in the special instruction above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court, the probation officer, or the United States attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

   [ ]  Joint and Several

| Case Number (including Defendant Number) | Defendant Name | Joint and Several Amount |
|---|---|---|
|  |  |  |

   [ ]  The defendant shall pay the cost of prosecution.

   [ ]  The defendant shall pay the following court cost(s):


Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, (8) costs, including cost of prosecution and court costs.

000246

AO 245B (Rev. 9/00) -Criminal Monetary Penalties

DEFENDANT:      ANA BIOCINI
CASE NUMBER:    CR-95-0187-01 CRB

Judgment - Page 8 of 8

[ ]   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, (8) costs, including cost of prosecution and court costs.

U.S. Department of Justice

Immigration and Naturalization Service

**Record of Deportable/Inadmissible Alien**

| Family Name (CAPS) | First | Middle | | Sex **F** | Hair **BRO** | Eyes **BLU** | Cmplxn **LGT** |
|---|---|---|---|---|---|---|---|
| **BIOCINI, Ana Beatriz** | | | | | | | |
| Country of Citizenship **COLOMBIA** | Passport Number and Country of Issue | **Case No: SFR0501001621** File Number **A091 182 333** | | Height **65** | Weight **150** | Occupation | |

U.S. Address
**IN I.C.E. CUSTODY**
**SAN FRANCISCO, CALIFORNIA 94111**

Scars and Marks
**See Narrative**

Date, Place, Time, and Manner of Last Entry
**02/11/1981, Unknown Time, MIA, NONIMMIGRANT VISITOR** | Passenger Boarded at

F.B.I. Number
**773905RA6** ☐ Single ☒ Married ☐ Divorced ☐ Separated ☐ Widower

Number, Street, City, Province (State) and Country of Permanent Residence

Method of Location/Apprehension
**CAP 511.2.1**

| Date of Birth **06/30/1954** **Age: 50** | Date of Action **01/28/2005** | Location Code **SFR/SFR** | At/Near **Dublin, California** | Date/Hour **01/28/2005 0000** |
|---|---|---|---|---|

City, Province (State) and Country of Birth
**CALI,OTHER - FOR COUNTRIES OTHER THAN US, COLOMBIA** | AR ☒ | Form: (Type and No.) | Lifted ☐ | Not Lifted ☐ | By **MARIO HUELGA**

NIV Issuing Post and NIV Number | Social Security Account Name **SAME,** | Status at Entry **Non-Immigrant** | Status When Found **IN INSTITUTION**

Date Visa Issued | Social Security Number **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** | Length of Time Illegally in U.S. **NOT APPLICABLE**

| Immigration Record **POSITIVE - See Narrative** | Criminal Record **None known** | |
|---|---|---|

Name, Address, and Nationality of Spouse (Maiden Name, if Appropriate) Nationality: **UNITED STATES**
**BIOCINI, George**
**CALIFORNIA** | Number and Nationality of Minor Children **CLAIMS ONE (1) USC**

Father's Name, Nationality, and Address, if Known Nationality: **COLOMBIA**
**JARAMILLO, Alberto** | Mother's Present and Maiden Names, Nationality, and Address, if Known **RACINES, Stella**

| Monies Due/Property in U.S. Not in Immediate Possession | Fingerprinted? Yes ☐ No ☒ | INS Systems Checks | Charge Code Word(s) **See Narrative** |
|---|---|---|---|

| Name and Address of (Last)/(Current) U.S. Employer | Type of Employment | Salary Hr. | Employed from/to |
|---|---|---|---|

Narrative (Outline particulars under which alien was located/apprehended. Include details not shown above regarding time, place and manner of last entry, attempted entry, or any other entry, and elements which establish administrative and/or criminal violation. Indicate means and route of travel to interior.)

**OTHER ALIASES KNOWN BY**
**JARAMILLO, ANA RACINES**
**JARAMILLO DE RIVERA, ANA**

**SCARS, MARKS AND TATTOOS**
**NONE VISIBLE/NONE INDICATED**

**MOTHER'S NATIONALITY**
**COLOMBIA**

**CHARGE CODE WORD(S)**
**R2A3**
**R2A3**

**Narrative Title: Record of Deportable/Excludable Alien**
**Narrative Created by HUELGA**

**BOP#: 93061-011          EPRD: 03/02/2006**

On January 11, 2005, Immigration and Customs Enforcement (ICE) encountered Subject pursuant to her incarceration at the Federal Correctional Institution (FCI) Dublin,

# AGGRAVATED FELON

Alien has been advised of communication privileges. _____ (Date/Initials)

**MARIO HUELGA**
**IMMIGRATION AGENT**
(Signature and Title of INS Official)

| Distribution: **File** **Statistics** **Agent** | Received: (Subject and Documents) (Report of Interview) Officer: **MARIO HUELGA** on: **January 28,** ~~19~~ **2005** at **1210** (time) |
|---|---|
| | Disposition: **Warrant of Arrest/Notice to Appear** |
| | Examining Officer: **DOW CLARK III** *Dow F. Clark* |

Form I-213(Rev.4/1/97)Y

000248

**U.S. Department of Justice**
Immigration and Naturalization Service

Continuation ___ for Form    I-213

| Alien's Name | File Number | Date |
|---|---|---|
| BIOCINI, Ana Beatriz | Case No: SFR0501001621<br>A091 182 333 | 01/28/2005 |

California.

Subject claims to be a 50 year-old divorced female, native and citizen of Colombia who entered the United States on or about February 11, 1981, at or near Miami, Florida, as a nonimmigrant visitor (B-2).
On May 1, 1989, Subject's status was adjusted to that of a lawful permanent resident pursuant to Section 245(A) of the Immigration and Nationality Act.
Subject claims to have one (1) USC child that is residing with his father in Mountain View, California.

On April 28, 2003, Subject was convicted in the United States District Court, Northern District of California (CR-95-0187-01 CRB) for the offense of CONSPIRACY TO DISTRIBUTE COCAINE, in violation of Title 21 United States Code, Section 846. Subject was subsequently sentenced to thirty (30) months incarceration.

Subject stated that her case and/or conviction were under appeal. A review of the United States District Court Records found that the Subject has NOT filed an appeal of her aggravated felony conviction(s).

Subject did express fear if returned to her country of origin/citizenship/nationality.

Subject claims no pending applications/petitions/ties/equities with the Service at this time.

Due to SUBJECT's AGGRAVATED FELONY conviction(s), she is being processed for a NOTICE TO APPEAR/WA.

| Signature<br>MARIO HUELGA | Title<br>IMMIGRATION AGENT |
|---|---|

Form I-831 Continuation Page (Rev. 6/12/92)

000249