1 | CHRISTOPHER TODD, Attorney at Law
IMMIGRATION LAW CLINIC
2 | University of California, Davis School of Law
1 Shields Avenue TB-30
3 | Davis, CA 95616-8821
Tel.:   (530) 752-6942 or
4 |         (415) 846-9311
Fax:    (530) 752-0822
5 |
Attorneys for Respondent
6 | ANA BIOCINI
7 | Assisted by: Dia Moua, Chad Greeson

**DETAINED ALIEN**

RECEIVED
DEPARTMENT OF JUSTICE

DEC 1 4 2005

EXECUTIVE OFFICE
IMMIGRATION REVIEW
IMMIGRATION COURT
SAN FRANCISCO, CALIFORNIA

8
## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
9
## IMMIGRATION COURT
## SAN FRANCISCO, CALIFORNIA (DUBLIN FCI)
10

11 | IN THE MATTER OF:                    File No.  A 091-182-333

12 | ANA BIOCINI                         **RESPONDENT'S SUBMISSION OF**
                                        **SUPPORTING DOCUMENTATION**
13 | Respondent.
                                        Date:   December 19, 2005
14 | In Removal Proceedings              Time:  1:00 P.M.
    _____/  Judge: Murry
15

16 |    The Respondent, Ana BIOCINI, through undersigned counsel, respectfully submits the
attached documentary evidence in support of her claim for deferral of removal under CAT and
17 | withholding of removal under INA 241(b)(3). A table of exhibits follows this page.

18 | Dated: December 13, 2005              Respectfully submitted,

19

20

21 |                                       CHRISTOPHER TODD
                                        Immigration Law Clinic, UC Davis School of Law
22 |                                       Attorneys for the Respondent
                                        Ana Biocini
23

24

25

26

27

28 | **RESPONDENT'S SUBMISSION OF SUPPORTING DOCUMENTATION**
*BIOCINI, A91-182-333*

**TABLE OF EXHIBITS**

I.      Expert Affidavits
        1. Declaration of Luz Nagle[1]
        2. CV of Luz Nagle
        3. Declaration of Lowell S. Gustafson
        4. CV of Lowell S. Gustafson

---

[1] Respondent will present a signed copy at the hearing.

**RESPONDENT'S SUBMISSION OF SUPPORTING DOCUMENTATION**
*BIOCINI*, A91-182-333



**CERTIFICATE OF SERVICE**

On December 13, 2005, I served the following document(s):*Respondent's Submission of Supporting Documentation* upon the parties in said action by placing a true and correct copy in a sealed envelope and each envelope addressed as follows:

Honorable Judge Murry
Office of the Immigration Judge
Executive Office for Immigration Review
550 Kearny Street, Suite 800 (8ᵗʰ Floor)
San Francisco, CA 94108

___ *By Facsimile Machine (Fax)* . By personally transmitting a true and correct copy thereof via an electronic facsimile machine during regular business hours.

___ *By Mail* . I am readily familiar with the business practice for collection and processing of correspondence for mailing with the United States Postal Service and that this document, with postage fully prepaid, will be deposited with the United States Postal Service this date in the ordinary course of business.

___ *By Certified Mail*. I am readily familiar with the business practice for collection and processing of correspondence for certified mailing with the United States Postal Service and that this document, with postage fully prepaid, will be deposited with the United States Postal Service on this date in the ordinary course of business.

_X_ *By Overnight/Express Mail*. I am familiar with the business practice for the collection and processing for Overnight/Express Mail with the United States Postal Service and/or Overnight service provider. Such correspondence will be deposited with a facility regularly maintained by the United States Postal Service for receipt of express mail or other overnight service providers/entities (i.e., Federal Express, United States Parcel Service, etc.) For receipt of Overnight Mail on the same day in the ordinary course of business.

___ *By Personal Service* . By personally delivering a true copy thereof to the office of the addressee above.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 13, 2005, in Davis, CA.

Christopher J. Todd, Esq.



**RESPONDENT'S SUBMISSION OF SUPPORTING DOCUMENTATION**
*BIOCINI*, A91-182-333



# EXHIBIT
# I-1




**Declaration in Support of the Asylum Petition of Ms. Ana Beatriz Biocini**
Professor Luz Estella Nagle
SSN 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

I, Luz Estella Nagle, declare as follows:

1. My name is Luz Estella Nagle; I am a resident of St. Petersburg, Florida.

2. Currently, I am a tenured Professor of Law at Stetson University College of Law in Gulfport, Florida, which is the oldest law school in the state of Florida, founded in 1900.

3. I teach the following courses to students in Stetson's J.D. curriculum and graduate law students in Stetson's LL.M. degree program in international business law: Latin American business law, international law, international criminal law, comparative international business law, and the Introduction to the U.S. Legal System for the orientation program for Stetson's foreign LL.M. students. I have also taught first year criminal law, international negotiation, international criminal mediation at Stetson's Summer Program in Granada, Spain, and regional trade in Stetson's Summer Program in Buenos Aires, Argentina. I have served as director of the Pinellas county government clinic for second and third year law students, and have participated as a coach and judge for various moot court competitions. In addition, I have served as the faculty adviser for law students enrolled in the concentration certificate program in international law.

4. I hold a Doctor of Laws degree from the Universidad Pontificia Bolivariana in Medellín, Colombia, a Juris Doctor degree from the College of William and Mary, a Master of Laws degree in comparative law from the University of California at Los Angeles School of Law, and a Master of Arts degree in Latin American studies from the University of California at Los Angeles, with



additional studies in international law at London University, and certificates in national security law from the Center for National Security Law at the University of Virginia.

5.  I am the recipient of several research grants and awards from Stetson University, including five summer research grants, the Hand Award for Faculty Scholarship (Stetson's highest faculty award), and the Dean's Award for Excellence in Service to the Law School.  In addition, I have received the Top Gun Award from the Military Law Section of the Florida Bar Association, and the Wings of the Americas Award from the United States Air Force *Aerospace Power Journal en Español* and the United States Air War College.

6.  I have been a visiting professor, lecturer, or distinguished visitor at the Florida State University School of Law, the Universidad de los Andes in Bogotá, Colombia, the Universidad de Antioquia and the Universidad Pontificía Bolivariana, both in Medellín, Colombia, the College of William and Mary School of Law, and the College of William and Mary Graduate School of Business.

7.  I am a member of a number of international law organizations including the Academia Mexicana de Derecho Internacional Privado y Comparado (Mexican Academy of Private International and Comparative Law), a member of the International Bar Association, serving as an officer on Committee 6 (international criminal law), a member of the Inter-American Bar Association, an Editor in the American Society of Comparative Law, and a member of the Colegio de Abogados de Medellín (a chapter of the Colombian College of Lawyers).



8. I have published extensively in the areas of international criminal law with particular emphasis on drug trafficking, money laundering, extradition, mutual legal assistance regimes, organized crime and institutional corruption, and comparative judicial systems and judicial reform in Latin America.

9. I have presented papers and have appeared as a panelist at numerous international legal conferences discussing international organized crime and institutional corruption in Latin America, the war on drugs in Latin America, human trafficking in Latin America, money laundering in Latin America, national security policy and United States foreign policy with regard to the Colombian guerrilla conflict and international drug trafficking, international terrorism and the United States response to global terrorism, and environmental law policy along the United States/Mexico border.

10. I have been a regular consultant for United States government agencies, including the Federal Bureau of Investigation, the Drug Enforcement Administration, and the United States State Department, and I have been involved as an adviser for activities sponsored by various non-government organizations, including the Center for Strategic and International Studies, the Center for International Policy, and the Center for National Security Law. I serve as an adviser to a federal judicial committee involved with judicial reform agendas in Latin America. I am also an editor for the U.S. Army's *Journal of Iberoamerican Security*.

11. I have served as a consultant and trainer for the Judge Advocate Office of the United States Southern Command and for the U.S. Army's Foreign Military Studies Office, training Colombia military officers and lawyers at the division

000256



command level in international humanitarian law, the law of war, and how to deal effectively with non-government organizations in zones of internal conflict.

12. I have served since 2003 as an External Researcher at the Strategic Studies Institute of the United States Army War College.

13. I am a consultant to contractors working under United States Agency for International Development grants in various rule of law/administration of justice projects in Colombia and elsewhere in Latin America, most recently training Colombian criminal law professors to teach trial skills under Colombia's newly implemented accusatory criminal justice system.

14. I have made a number of media appearances discussing international criminal law issues on CNN International, Radio Caracol Nacional (Colombia), TVOntario, the Telemundo network, BayNews 9, and BayNews 9 en Español, and I have been interviewed in a number of newspapers and journals, including the *American Bar Association Journal*, the *National Law Journal*, the *Richmond Times*, the *Tampa Tribune*, and the *St. Petersburg Times*.

15. I have given invited expert testimony in a number of court cases, including giving testimony in Florida state court on judicial procedure and the credibility of a Mexican court in a contested divorce and alimony case involving Mexican nationals; a child custody dispute involving improper rulings by the family court and judicial corruption in Cali, Colombia due to the permeation of the illegal drug enterprises in the court system (including the family courts); several cases before the United States Immigration Appeals Court involving asylum proceedings for Colombian nationals; criminal proceedings of accused Colombian drug traffickers



in United States District Court; a civil proceeding involving a United States government contractor in the wrongful death of an employee working in Colombia; and a multi-million dollar business contract dispute involving a Japanese automobile manufacturer and its distributor in Colombia.

16. Prior to becoming a law professor, I was a law specialist in Microsoft Corporation's Latin America Group, working on software piracy, copyright infringement, and software licensing agreements throughout Latin America.

17. Following law school at the College of William and Mary, I was a law clerk to the Supreme Court of Virginia for two years.

18. I was Of Counsel in the Colombian law firm of Arrubla, Devis & Tamayo, advising the firm on representation of Colombian clients seeking to do business in the United States.

19. From 1983 to 1986 I was a district judge in the municipality of Sabaneta, a suburb of Medellín, Colombia, where I was responsible for civil cases, including labor disputes, domestic relations, land disputes and contract disputes, and criminal cases including drug trafficking, crimes of violence, robbery, criminal conspiracies, fraud, and prosecution of corrupt government officials. Colombia's judges participate actively in both civil and criminal investigations. In the course of my work, I became aware that officials at all levels in the government had been corrupted by drug cartel money and that level of corruption made nearly impossible for me to do my job. Corruption within Colombia's justice system is well known and thoroughly documented internationally.

20. I can personally confirm from my own experience the level of brazen violence in



Colombia by my having survived three assassination attempts during the time I was on the bench, and from having investigated many murders that were drug-related, politically motivated, and/or carried out as acts of revenge or retribution.

21. I was forced to leave Colombia for the United States after receiving further death threats against me, and against my loved ones. For nearly six years I had no contact whatsoever with Colombians in the United States, and I did not feel safe traveling back to Colombia. However, because I had cut my ties cleanly from the Colombian government and had dropped out of sight in another country, I was able to start a new life in relative security, using my husband's name, traveling under a U.S. passport, and enjoying the protection attendant to United States citizenship. I am convinced that had I remained in Colombia I would have eventually been killed, or my family would have been harmed.

22. I am familiar with circumstances and grounds surrounding Ms. Biocini's asylum petition. Based on my knowledge of the situation in Colombia, Ms. Biocini's fear of such persecution or worse is well-founded and valid for the reasons described below. I have no doubt that repatriating Ms. Biocini to Colombia would constitute what is essentially a death sentence for her.

23. Ms. Biocini is a native of Cali, the main city of the Department of Valle de Cauca. Valle de Cauca is Colombia's most prominent and most notorious zone of narcotics manufacturing and trafficking. The situation of drug related violence in Cali is the same as that in Medellín with regard to drug trafficking organizations. The persecution and eventual dismantling of the Medellín Cartel in the late 1980s and early 1990s enabled the Cali Cartel to become the most powerful drug



organization in the world.  Whereas the Medellín Cartel was born from the lower "peasant" class and never accepted into the elite society of Medellín, the Cali Cartel grew from the elite class of that city.  The leaders were successful businessmen with strong political connections prior to forming the Cartel.  The political institutions in and around Cali have been intricately interwoven with drug enterprises.  Corruption versus intimidation of government officials proved the most effective method the Cali Cartel used to establish its hegemony.  Many government officials became very wealthy in a very short period when the Cartel was consolidating its power base.  Government officials in Cali, in fact, had little choice.  The only way to remain a government official in Cali and to climb the social and political ladder was and is to deal with the traffickers.

24.  In the process of bringing officials under its umbrella, the Cali Cartel established a covert and highly sophisticated intelligence network that many first world powers would envy.  Most taxi cab drivers, airport employees, hotel and restaurant workers, bankers, and businessmen are in the employ of Cali drug traffickers.  Almost nothing and no one goes unnoticed in Cali or in the Valle de Cauca.  The Cali narcotraffickers are so pervasive in the economic and social livelihood of Cali that to reject their influence or to inform against them is tantamount to a death sentence.  As such, traitors and informants are dealt with decisively and the government officials are either impotent to deter drug-related violence or are in direct or indirect collusion with the narcotraffickers' "enforcement" methods.

25.  Colombian narcotraffickers are particularly brutal toward informants, and Ms.

Biocini's cooperation with the U.S. government will come to the attention of Cali narcotraffickers, if it has not happened already. The fact that she was involved in drug trafficking operations over the course of several years is particularly problematic for her. Her connections extend from the West Coast of the U.S., to Florida, and back into Colombia. It is highly unlikely that her treachery against the narcotraffickers against whom she informed will go unpunished if she is forced to return to Colombia. Moreover, her family members will be equally at risk. The narcotraffickers routinely go after the family members of those who have cooperated with the government in order to set an example of intimidation and to terrorize into silence possible witnesses against their operations. Because of widespread collusion between the Colombian government and drug traffickers, there is no guarantee that Ms. Biocini or members of her family would be safe from reprisals by either the drug cartels or corrupt officials determined to maintain their own ongoing conspiracies with drug traffickers. One can assume that the Cartel is well aware of their cooperation with authorities. If someone becomes the target of drug cartel revenge or is branded as a whistleblower against political corruption, there is nowhere that person can hide.

26. Ms. Biocini faces almost certain retribution, and cannot even be certain that she will not be targeted here in the United States if she is granted asylum. The drug traffickers in Cali have a long reach. Were she to return to any other part of Colombia other than Cali, her life would still be in grave danger. No entity of the government would be capable of ensuring Ms. Biocini's security and right to live and move about freely. Colombia does not play by the same rules we in the

000261

United States take so for granted. Soldiers and police often moonlight as members of paramilitary units and contract out their services as "enforcers" to the drug cartels. They are able to carry out extreme violence with nearly total impunity. A prosecutor fighting the drug war one minute is taking bribes from the drug traffickers and guerrillas the next. No one can be sure who is in quiet collusion with the irregular forces or criminal organizations, and therefore no one is safe. There is no rule of law in Colombia, only farce, and to force Ms. Biocini back into such a situation constitutes a clear and present danger to her life.

27. Our criminal justice system in the United States is based on three principles of prevention, punishment, and rehabilitation. Ms. Biocini is clearly no innocent. She has made serious mistakes in judgment and was involved in a criminal enterprise. She cooperated with government authorities and has taken steps to turn her life around. She has been subjected to her punishment here in this country. But to send Ms. Biocini back to Colombia would surely defeat the third principle of our criminal justice system by denying her the opportunity to rehabilitate and become a productive member of our society. Rather than providing this opportunity for rehabilitation, her repatriation to Colombia will be little more than rendering a death sentence upon her.

Respectfully submitted,

Luz Estella Nagle



# EXHIBIT

# I-2

000263



# Luz Estella Nagle

Professor of Law
Stetson University College of Law
1401 61st Street South
Gulfport, Florida 33707
(727) 562-7814
nagle@law.stetson.edu
www.law.Stetson.edu/faculty/nagle

**TEACHING/RESEARCH INTERESTS:** Public and private international law, international criminal law, Latin American business law, national security law

## EDUCATION

**College of William and Mary School of Law**

| | |
|---|---|
| Williamsburg, Virginia | **Juris Doctor,** 1995 |
| Honors | Dorothea Buck Fellowship, 1994-95 |
| | Public Service Fund Fellowship, Summer 1994 |
| Activities | Guest Lecturer on doing business in Latin America, School of Business Administration, College of William and Mary |
| | Liaison for visiting Latin American judges and legal scholars |

**University of California, Los Angeles**

| | |
|---|---|
| Los Angeles, California | **Master of Arts,** Latin American studies, 1992 |
| | Emphasis in law, political science, and history |
| Honors | Graduated *magna cum laude* |
| Activities | Graduate Research Assistant to Professor Henry McGee, UCLA School of Law, August 1989 - August 1990 |
| | Participant/organizer, UCLA conference on environmental concerns along the U.S./Mexico border |

**UCLA School of Law**

| | |
|---|---|
| Los Angeles, California | **Master of Laws (LL.M.),** 1991 |
| | Emphasis in comparative law |
| Honors | Graduated third in class |
| Activities | Guest speaker, ABA National Security conference, "Strengthening the Rule of Law in the War Against Drugs and Narco-Terrorism," Washington, D.C., October 1990 |
| | Consultant for the Stella de Cuevas Foundation for Judicial Reform, Bogotá, Colombia, 1990-1991 |

**Universidad Pontificía Bolivariana
School of Law and Political Science**

| | |
|---|---|
| Medellín, Colombia | **Doctor of Laws (LL.D.),** 1981 |
| Honors | Graduated among the top five students |
| | Awarded full academic scholarship for final two years |
| Activities | Student Director of the legal aid clinic, fourth and fifth years |
| | Student body representative for first three years |

000264



## OTHER SIGNIFICANT COURSEWORK

**University of Virginia, Center for National Security Law**
Charlottesville, VA    Certificates, Summer Institute on National Security Law, 1999, 2004

**College of William and Mary School of Law**
Williamsburg, VA    Completed training for certification as a general mediator, 1994

**American Law Institute, Georgetown Law Center**
Washington, D.C.    Certificate, Program in American Law, Summer 1990

**University of London Institute of Advanced Legal Studies**
London, England    Seminar in Public International Law, September 1982

## FULL-TIME WORK EXPERIENCE

**Stetson University College of Law**                    August 1998 - present
St. Petersburg, Florida
**Professor of Law.** Courses taught: Latin American business law, international law, international criminal law, comparative business and financial law, regional trade, criminal law, Summer Orientation Program for first year J.D. students, Introduction to the American Legal System for entering foreign LL.M. students. Faculty Advisor: Specialization Certificate Program in International Law, LL.M. students in international trade and commerce, Hispanic Student Bar Association. Co-chair, CLE programs on Doing Business in Latin America, and Doing Business in Cuba. Committee work: Graduate LL.M. admissions, Co-chair, faculty recruitment, specialization certificate program, academic standards, admissions, and campus childcare.
**Honors Received:**
- **Homer & Dolly Hand Award,** Stetson's highest faculty award for scholarship, 2001.
- **Dean's Award,** Stetson University College of Law, for distinguished service as a member of the faculty, December 2000.
- **Recipient** of faculty summer research grants, 1999, 2000, 2001, 2002.
- **Recipient** of the High Profile Scholarship Grant, 2004.
- **Top Gun Award,** Florida Bar Association Military Law Section, June 2001, for work in the field of national security law.
- **Wings of the Americas Award,** United States Air Force Air War College, for best article in the United States Air Force *Aerospace Power Journal en Español*, 2001.

**Microsoft Corporation**                    October 1997- June 1998
Ft. Lauderdale, Florida
**Anti-Piracy Specialist.** Member of the Latin America Division's software anti-piracy team tasked with interdicting and litigating against software pirates and licensing infringements in Brazil, Argentina, and Chile.

000265



**Supreme Court of Virginia**                                August 1995 - August 1997
Richmond, Virginia
**Law Clerk.** Wrote case summaries and formulated assessments for Justices to use in deciding
whether to grant an appeal or requested relief; reviewed the facts and incidents of the cases before
the Court to ascertain compliance with the rules of appellate procedure; reviewed and researched
the precedent and proper applications of the law upon which the parties relied.

**National Association for Hispanic Elderly**               January 1987 - January 1988
Los Angeles, California
**Field Monitor/Project Coordinator.** Monitored a U.S. Department of Labor-funded job
training program for elderly minority workers at training sites in Los Angeles, Miami, New
Orleans, and San Diego.

**Republic of Colombia**                                    September 1983 - March 1986
Sabaneta, Colombia (a suburb of Medellín)
**District Judge.** Presided over civil and criminal cases, arbitrated labor disputes, directed judicial
investigations, coordinated police enforcement and drug interdiction operations, and investigated
and mediated domestic relations disputes.

## OTHER WORK EXPERIENCE

**Arrubla, Devis, Tamayo & Cia.**                           August 1995 – December 1999
Medellín, Colombia
**Of Counsel.** Advised the firm on international business transactions, American contract law, and
other matters pertaining to the Anglo-American legal system.

**National Center for State Courts**                        August 1994 - July 1995
Williamsburg, Virginia
**Consultant.** Spanish translator/interpreter and legal liaison for International Programs.
Translated seminar materials from English to Spanish, accompanied judges and court officials
from Latin America during extended visits to attend educational programs and training seminars.

**United States Attorney's Office**                         Summer 1994
Eastern District of Virginia, Norfolk Office
**Law Intern.** Conducted legal research, assisted the U.S. Attorneys with criminal cases, prepared
motions, and interviewed Spanish-speaking witnesses, wrote appellate brief for *U.S. v. Williams*,
1994 U.S. App. LEXIS 29661.

**Spirn, Tarley, Robinson & Tarley**                        September 1993 - May 1994
Williamsburg, Virginia
**Law Clerk.** Conducted legal research, drafted motions and complaints, and participated in client
interviews, depositions and court proceedings.

**Investigative Resources International, Inc.**             March 1989 – May 1990
Long Beach, CA                                              (part-time while in school)
**False Claims Investigator** and **Translator.** Investigated and interviewed witnesses and suspects
in cases involving insurance false claims and worker's compensation fraud.

**Industrias el Rebaño**                                    January 1981 - December 1985

000266



Medellín, Colombia
**Counsel.** On retainer for a livestock feed manufacturer, advised on matters regarding labor law, contract negotiations, distributor agreements, and commercial ventures.

## RELEVANT TEACHING / RESEARCH EXPERIENCE

- **Instructor,** teaching fifty Colombian law professors about the Anglo-American accusatory criminal court system, USAID/Checchi Human Rights Institute, Bogotá, Colombia, August 1-6, 2005.
- **Presenter/Lecturer,** on the US Patriot Act, to visiting Brazilian judges and prosecutors, International Partnership Program, University of Florida Levin School of Law, at the Federal Courthouse in Tampa, Florida, July 8, 2005
- **External Researcher,** Strategic Studies Institute, U.S. Army War College, 2004-present.
- **U.S. Speaker and Specialist Grant Recipient,** United States Department of State, presenting a lecture on the U.S. criminal justice system before a group of Venezuelan academics, law students, lawyers and judges in Caracas, Venezuela, via live teleconference from St. Petersburg, FL, January 22, 2004.
- **Professor,** teaching regional trade in the summer law program in Buenos Aires, Argentina, jointly sponsored by Stetson University, University of Tulsa Law School, Oklahoma City University School of Law, and the Universidad de Palermo, July-August 2004 and July 2005.
- **Guest Instructor,** University of Tampa, Institute of International Business, developed and taught in Spanish an international negotiation seminar for visiting MBA students from the Universidad San Ignacio de Loyola of Lima, Peru, November 2002, and November 2001.
- **Guest Lecturer,** Universidad de los Andes School of Law, post graduate law degree program, on the UN Convention on the International Sale of Goods, August 2002.
- **Professor,** summer program on international dispute resolution jointly sponsored by Stetson University and the University of Granada, in Granada, Spain, June 2002.
- **Guest Lecturer,** discussing the Microsoft antitrust case, Universidad de los Andes, post-graduate law program, Bogotá, Colombia, March 2001.
- **Professor,** Introduction to the U.S. System of Law and Legal Study pre-program for entering foreign students in Stetson's LLM in International Law & Business curriculum, August 1999, 2000, 2001, 2002, 2003.
- **Distinguished Lecturer, Colegio de Abogados de Medellín,** on U.S. corporations law, contracts, and arbitration/mediation, June 1995.
- **Guest Speaker,** College of William and Mary School of Business Administration, on doing business in Latin America and the political-legal climate in Latin American countries, Winter 1994, Winter 1995.
- **Lecturer,** Universidad Pontificía Bolivariana School of Law and Political Science, Colombian penal law and criminal procedure, 1981.

## PRESENTATIONS / INTERVIEWS

- **Panelist,** *Building a Safer World: Defining the U.S.-U.N. Relationship for the 21st Century,* People Speak Campaign Event, Stetson University College of Law, November 10, 2005.
- **Presenter,** *The Rule of Law and Democracy,* Midwest Association of Latin American Studies (MALAS) Annual Conference, St. Louis, Missouri, November 5, 2005.

000267



- **Panelist,** plenary session Democracy and Latin America, Midwest Association of Latin American Studies (MALAS) Annual Conference, St. Louis, Missouri, November 5, 2005
- **Guest Speaker,** *Courage, Dedication, and Conviction: One Woman's Journey,* University Lecture Series, University of South Florida, November 3, 2005.
- **Speaker,** on *The Use of Experts in Political Asylum Cases,* American Immigration Lawyers Association, Florida Chapter, Annual Meeting, St. Petersburg, September 30, 2005.
- **Co-Chair,** Panel on *Trafficking in Humans for Cheap Labour and Sex Tourism,* International Bar Association Annual Conference, Prague, September 28, 2005.
- **Interviewed,** for the *Galvis v. Occidental Petroleum* alien tort claims case, in "Foreign Fight," by John Gibeaut, *ABA Journal,* July 2005, page 29.
- **Co-Author,** "The Future of the Economic Analysis of Law in Latin America: A Proposal for ALACDE Model Law and Economics Civil and Commercial Codes," paper delivered to the IX[th] Congreso Latin America Law Economics Association, Boalt Hall Law School, June, 2005.
- **Panelist,** *Trafficking in Humans: Domestic and International Procedural Law,* sponsored by the Protection Project, Johns Hopkins University, Washington, D.C., April 18, 2005.
- **Interviewed,** "Redes chavistas chocan con leyes de EEUU," by Castro Ocando, *El Nuevo Herald (Miami Herald),* March 21, 2005, on the activities of pro-Chavez Venezuelan groups in South Florida.
- **Distinguished Lecturer,** speaking on Criminalization of Landmine Use by Illegal Armed Groups and International Law, *Distinguished Lecture Series,* College of William and Mary School of Law, Williamsburg, Virginia, March 21, 2005.
- **Presenter,** speaking on the use of landmines by illegal armed groups, at the conference *The Colombian Conflict and Iberoamerican Security,* organized by the Foreign Military Studies Office of the U.S. Army, Ft. Leavenworth, KS, in Santa Marta, Colombia, March 1, 2005.
- **Presenter,** speaking on the socio-economic background of defendants in Colombian maritime smuggling cases, *2005 Federal CJA and Central Florida Criminal Defense Lawyers' Seminar,* Orlando, Florida, January 28, 2005.
- **Instructor,** training seminar for the Fourth Brigade, First Division, Army of the Republic of Colombia, on compliance with international humanitarian law, respect for human rights, and achieving greater cooperation with non-government aid organizations working in zones of operational conflict, organized by the United States Southern Command Staff Judge Advocate, Medellín, Colombia, November 11, 2004.
- **Presenter,** *IV International Human Rights and Operational Law Seminar,* organized by the United States Southern Command Staff Judge Advocate, the U.S. Department of Defense, and the Colombian National War College as a training program for military staff officers, held at the Universidad Militar Nueva Granada, Bogotá, Colombia, October 7-8, 2004.
- **Panelist,** speaking on the environmental impact of illegal armed groups in the ongoing internal conflict in Colombia, at the symposium *Linking the Environment and Human Rights: A Global Perspective,* presented by the William & Mary Environmental Law & Policy Review, College of William & Mary School of Law, Williamsburg, VA, March 27, 2004.
- **Interviewed,** "Cleaning Up a Murder Capital: A City Redeemed?" by David Adams, *St. Petersburg Times,* Sep. 22, 2003, at 1A.
- **Moderator and Organizer,** Panel on Trafficking in Humans, International Bar Association Annual Convention, San Francisco, September 19, 2003.
- **Interviewed,** "A Year In, Uribe Racing to Reform," by David Adams, *St. Petersburg Times,* Aug. 4, 2003, at 1A.
- **Interviewed,** "Justice Rides in on Back of Military Aid," by David Adams, *St. Petersburg Times,* July 30, 2003, at 7A.

000268



- **Guest Speaker**, discussing the current status of *Plan Colombia*, Harvard-MIT Club of Bogotá, July 29, 2003.
- **Panelist**, Business Law Section, discussing multilateral mechanisms for combating international organized crime and corruption in Latin America, at the Inter-American Bar Association's 39th Annual Conference, New Orleans, June 20, 2003.
- **Panelist**, Military Law Section, discussing the application of the law of internal armed conflict and international humanitarian law in Colombia's guerrilla war, at the Inter-American Bar Association's 39th Annual Conference, New Orleans, June 20, 2003.
- **Commenter/Panelist**, Fourth Annual Conference *Legal and Policy Issues in the Americas*, discussing agendas to pursue for a new Center of Latin American Policy being funded at the University of Florida Levin College of Law, Gainesville, Florida, April 13-14, 2003.
- **Panelist**, discussing the Colombian military's progress with human rights programs, at *The Rule of Law in Colombia Conference*, Center for National Security Law and the United States Southern Command, Washington, D.C., April 10, 2003.
- **Panel Chair**, for break-out panel to discuss "What Kind of Security Environment Does/Should the Community Envision?," at the *Building Regional Security in the Western Hemisphere Conference*, Dante B. Fascell North-South Center, University of Miami, March 2-4, 2003.
- **Presenter**, *Trafficking in Humans*, CLE course sponsored by the Library of the United States Courts, Federal Courthouse, Tampa, Florida, February 21, 2003.
- **Panelist**, University of Tampa, *9/11 – Remembering, Reflecting, Responding*, on Homeland Security and Civil Liberties, September 13, 2002.
- **Interviewed**, "New President's Election Inspires Hope in Colombia," by David Adams, *St. Petersburg Times*, Aug. 21, 2002, 1A.
- **Interviewed**, Bay News 9 en Español, Tampa Bay news television station, on the new Stetson part time law program, August 30, 2002.
- **Interviewed**, CNN International, on the Colombian presidential election, May 27, 2002.
- **Interviewed**, "Colombia Asks: Is Uribe Peace or War?" by David Adams, *St. Petersburg Times*, May 23, 2002, 1A.
- **Guest Commentator** on political and legal affairs, Bay News 9 en Español, Tampa Bay news television station, ongoing.
- **Panelist**, International Bar Association's Conference: *The Alleged Transnational Criminal*, speaking on the UN Convention on Transnational Organized Crime, Miami, May 2002.
- **Panelist/Moderator**, on Identifying Local Resources for Chapter Projects, United Nations Association Florida Division's 47th Annual Convention, April 27, 2002.
- **Panelist**, on the civil reality of the Colombian crisis, North-South Center/Army War College Annual Conference *Colombia's Ambiguous War in Global and Regional Context: Insurgency, Transnational Crime, and Terror*, March 25, 2002.
- **Guest Lecturer**, *A Perspective on the Latin American Legal System*, Guest Lecturer Series, Florida State University School of Law, February 2002.
- **Panelist/Moderator/Organizer**, International Criminal Law Section, on human trafficking, International Bar Association Annual Conference, Cancun, Mexico, November 2001.
- **Panelist**, Family Law Section, discussing divorce proceedings in Latin American jurisdictions, for the family law panel, International Bar Association Annual Conference, Cancun, Mexico, November 2001.
- **Interviewed**, in Spanish, on United Nations campaign against terrorism, Univision Channel 62, Tampa, Florida, October 2001.
- **Interviewed**, on United Nations campaign against terrorism, WUSF radio, Tampa, Florida, October 2001.



- **Panelist**, National Seminar of International Private and Comparative Law, sponsored by Universidad Autónoma Metropolitana, Escuela Libre de Derecho y Academia Mexicana de Derecho Internacional Privado, on civil responsibility for damages transfronterizos , Mexico City, Mexico, October 2001.
- **Panelist**, discussing the United Nations response to international terrorism, United Nations Town Hall Meeting, University of Tampa, October 2001.
- **Participant** by invitation in a closed meeting between top policymakers to discuss the status of Plan Colombia and ongoing U.S. support, at the Center for Strategic and International Studies, Washington, D.C., September 7, 2001.
- **Guest Speaker**, on maritime drug interdiction agreements, Florida Bar Association Military Law Section Annual Top Gun Luncheon, MacDill Air Force Base, June 2001.
- **Interviewed**, on e-commerce opportunities and legal issues in Latin America, for current affairs program on the Telemundo broadcast network, Tampa, Florida, June 2001.
- **Guest Speaker**, United Nations Association of Tampa Bay, on fighting the war on drugs in Colombia, May 2001.
- **Interviewed**, United Nations film documentary, *It's All About the Money*, April 2001.
- **Panelist**, discussing the Colombian political crisis, Croft Institute for International Studies conference: *Plan Colombia and the War on Drugs*, University of Mississippi, April 2001.
- **Panelist**, Onshore, Offshore and Cross-Border: Regulating Global E-Commerce, American University Washington College of Law, on e-commerce in Latin America, March 2001.
- **Interviewed**, on radio program *Emisora Cultural Universidad de Antioquia*, discussing the elements and controversies of Plan Colombia, March 2001.
- **Keynote Speaker**, on Plan Colombia, Universidad de Antioquia, March 2001.
- **Speaker**, on issues regarding Colombian defendants in boat boarding and seizure cases, made to members of the Federal Bar Association, Stetson Law School, February 2001.
- **Panelist**, presentation on the judicial reform/rule of law component of Plan Colombia, University of Miami North-South Center/U.S. Army War College conference: *Implementing Plan Colombia: Strategic and Operational Imperatives*, Miami, January 2001.
- **Panelist**, on the Crisis in Colombia and Plan Colombia, ABA Tenth Annual National Security Law Conference: *A View of the Field*, December 2000, Washington, D.C.
- **Keynote Speaker**, Maryland District Judges Annual Conference, on the importance and value of being a judge, November 2000, Baltimore, Maryland.
- **Presenter**, United Nations Association of Tampa Bay, on landmine removal, October 2000.
- **Presenter**, Tampa Bay Women in International Trade, on e-commerce opportunities in Latin America, July 2000.
- **Interviewed (Spanish/English)**, Hola.com, on e-commerce in Latin America, April 2000.
- **Interviewed**, "U.S. Called "Pirates" in Cocaine Case," by Sarah Huntley, *Tampa Tribune*, March 8, 2000, at 1.
- **Guest Speaker**, Center for Strategic and International Studies, closed-door meeting among top policymakers to discuss the status of rule of mutual assistance initiatives for Colombia, Washington, D.C, February 2000.
- **Panelist**, International Criminal Law Symposium, Fordham University School of Law, January 2000.
- **Panelist**, Town Hall forum on Florida/Colombia relations, Orlando, Florida, January 2000.
- **Guest Expert**, on the Colombian crisis, TVOntario foreign affairs program *Diplomatic Immunity*, aired January 14, 2000.
- **Briefer**, Update on the Colombian Crisis, Center for Strategic and International Studies, Washington, D.C., December, 1999.

000270

 

- **Participant**, 1999 Summer Institute on National Security Law, Center for National Security Law, University of Virginia.  Attendance was by invitation only.
- **Distinguished Visitor**, lectured on narco-trafficking and human rights in Latin America, College of William and Mary School of Law, September 1997.
- **Panelist** on international criminal law and human rights at the *Third Annual International Law Symposium*, New York University Law School, April 1997.
- **Guest Speaker**, on the moral dilemmas of being a judge in Colombia, St. Thomas More Society, Richmond, Virginia, 1997.
- **Guest Speaker** on being a woman judge during the Drug War in Colombia, Metropolitan Richmond Women's Bar Association, 1996.
- **Panelist**, ABA National Security Law Conference: *Strengthening the Rule of Law in the War against Drugs and Narco-Terrorism*, Washington, D.C., 1990.

### OTHER ACTIVITIES

- **Foreign Consultant/Expert Witness**, on numerous civil and criminal cases involving matters of international law and international criminal law, and on numerous political asylum cases involving Colombian nationals.

### PUBLICATIONS

"Global Terrorism in Our Own Backyard: Colombia's Legal War against Illegal Armed Groups," 15-1 JOURNAL OF TRANSNATIONAL LAW AND CONTEMPORARY PROBLEMS (forthcoming);

"Legal Considerations in the Use of Antipersonnel Mines by Illegal Armed Groups: The Colombian Situation," JOURNAL OF IBEROAMERICAN SECURITY (2005) (forthcoming);

"Demobilization of Paramilitary Combatants in Colombia," U.S. Southern Command analysis position paper, 2005.

"Placing Blame Where Blame Is Due: The Culpability of Illegal Armed Groups and Narcotraffickers in Colombia's Environmental and Human Rights Catastrophes," 29 WM. & MARY ENVTL. L. & POL'Y REV. 1 (2004) [lead article];

"Colombian Asylum Seekers: What Practitioners Should Know About the Colombian Crisis," 18 GEO. IMMIGR. L.J. 441 (2004) [lead article];

"Entrevista con una experta sobre las extradiciones de Colombianos a EE.UU., politica contra el narcotrafico de Colombia, y otros temas," (Interview with an expert regarding extradition of Colombians to the United States, politics against narcotrafficing from Colombia, and other themes), *Money Laundering Alert lavadinero.com* website (October 13, 2003).

"The Challenges of Fighting Global Organized Crime in Latin America," 26 FORD. INT'L L.J. 1649 (2003);

000271



*Plan Colombia: Reality of the Colombian Crisis and Implications for Hemispheric Security*,
SHAPING THE REGIONAL SECURITY ENVIRONMENT IN LATIN AMERICA SERIES, Strategic
Studies Institute, U.S. Army War College, December 2002 [monograph];

"Antitrust in the International Telecommunications Sector: The United States Challenges
Mexico's Telmex Monopoly," 32 U. MIAMI INTER-AM. L. REV. 183 (2002) [lead article];

With Henry W. McGee, "Hacia un regimen de responsibilidad civil por daño ambiental
transfronterizo," 71 REV. JURIDICA U.P.R. 111 (2002);

"Ayuda no militar y la agenda de reforma judicial del Plan Colombia," AEROSPACE POWER
JOURNAL ESPAÑOL, Tercer Trimestre, 76 (October 2001), also available at
< http://www.airpower.maxwell.af.mil/apjinternational/apj-s/3trimes01/nagle.htm >;

"E-Commerce in Latin America: Business and Legal Challenges for Developing Enterprise," 50
AM. U. L. REV. 859 [lead article] (Fall 2001);

*The Search For Accountability and Transparency in Plan Colombia: Reforming Judicial
Institutions—Again*, IMPLEMENTING PLAN COLOMBIA SPECIAL SERIES, Strategic Studies
Institute, U.S. Army War College, May 2001 [monograph], also available at <
http://www.miami.edu/nsc/pages/IPCSeries/pcacount.PDF >;

"The Situation Within Colombia: A Pressure Cooker Spilling Over," published by the American
Bar Association Standing Committee on Law and National Security at
<http://www.abanet.org/natsecurity/nagle.html>;

"E-Commerce in Latin America," formerly published on the Purchasingsupersite.com website;

"United States Mutual Assistance to Colombia: Vague Promises and Diminishing Returns,"
23 FORD. INT'L L.J. 1235 (2000) [lead article];

"The Cinderella of Government: Judicial Reform in Latin America" 30 CAL. W. INT'L. L.J. 101
(2000);

"Colombia's Faceless Justice: A Necessary Evil, Blind Impartiality, or Modern Inquisition?"
61 PITT. L. REV. 881 (Summer 2000) [lead article];

"Maximizing Legal Education: The International Component," 29 STETSON L. REV. 1091 (2000);

Book Review: "Law Professors' Book Rates Courtroom Movies," 11 VLW 577 (*Virginia
Lawyers Weekly*, November 18, 1996);

With Henry W. McGee, "TLC y el control de residuos tóxicos en la guerra contra la
contaminación transfronteriza," Paper delivered at the Inter-American Bar Association
conference on Free Trade in Quito, Ecuador, 1995, and published in, 35 REV. D.P. 67
(1996) (Catholic University of Puerto Rico Law Review);

"Evolution of the Colombian Judiciary and the Constitutional Court," 6 IND. INT'L & COMP. L.
REV. 61 (1995);



"From Medellín to Marshall-Wythe in Search of the Rule of Law," WILLIAM AND MARY
LAWYER (1992 Annual Report), p. 22;

"The Rule of Law? or the Rule of Fear: Some Thoughts on Extradition in Colombia," 15 LOY.
LA. INT'L & COMP. L.J. 851 (1991);

ABA Standing Committee on Law and National Security, Center for National Security law,
University of Virginia School of Law, "A National Security Conference: Strengthening
the Rule of Law in the War Against Drugs and Narco-Terrorism," 15 NOVA L.J. 795, 818
(1991) (transcript of remarks made on October 11, 1990 in Washington, D.C.);

EL DERECHO AL DEPORTE Y EL DEPORTE EN EL DERECHO [THE RIGHT TO SPORTS AND SPORTS
LAW]. Medellín, Colombia: Universidad Pontificía Bolivariana, 1985.

Translator of legal documents from English into Spanish, including the *ABA Code of Judicial
Conduct,* sections of the *U.S. Constitution,* and handbooks on court procedure and ADR for use
in various Latin American court systems.

## CURRENT MEMBERSHIPS AND INTERESTS

**Elected Member,** Academia Mexicana de Derecho Internacional Privado y Comparado
**Elected Member,** L'Association Internationale de Droit Pénal (AIDP)
**Elected Member,** Colegio de Abogados de Medellín
**Member,** Editorial Board, *Journal of Iberoamerican Security,* a publication of the U.S. Army
**Member,** Tampa Chapter of the Committee on Foreign Relations
**Editor,** representing Stetson, to the American Society of Comparative Law
**Member,** International Bar Association, **Co-Chair** for Committee 6 (Criminal Law)
**Senior Member,** Inter-American Bar Association

**Languages:** English, Spanish, and Portuguese
**Interests** include politics, running, weight training, and paddleboarding

000273

# EXHIBIT
# I-3



I, the undersigned Lowell S. Gustafson, being first duly sworn on oath, do hereby state as follows:

1. I am a political scientist whose area of expertise is Latin America. I hold a tenured position at the rank of Professor in the Department of Political Science at Villanova University, where I have been teaching since 1986. I have a doctoral degree in Foreign Affairs from the University of Virginia, where I taught from 1984-1986 while my dissertation advisor served as U.S. ambassador to Peru. I am the author, contributing editor, or contributing co-editor of *The Sovereignty Dispute over the Falkland (Malvinas) Islands, Economic Development under Democratic Regimes: Neoliberalism in Latin America*, and *Economic Performance Under Democratic Regimes in Latin America in the Twenty-First Century*, along with other publications. I have traveled frequently to Latin America, including to Colombia with a Fulbright grant, and most recently to Central America in the summer of 2004. In October, 2005 I was in Mexico for a presentation of a book published by the University of Mexico. Another book that I have co-edited and to which I have contributed two chapters, "Security in Latin America: Democracies at Risk" is currently in publication. One of the chapters is on Colombian security problems.

2. Of course I cannot verify any of the facts in Ana Biocini's case. What I can do is to provide my opinion regarding how well her story hangs together and how well it resonates, given my knowledge about Colombia. Briefly, I believe that her case provides a significant amount of specific information and claims that are persuasive. Assuming the facts to be true, she has very good reason to fear that a) there are people in Colombia who likely would have the intent and the ability to physically harm her or kill her if she returns to that nation, and b) that the Colombian government has the desire but not the adequate ability to provide security to its citizens. Since people who remain active in Colombia's illegal drug trafficking believe that she has provided information about them to U.S. law enforcement officials, she has good reason to fear that they will torture and / or kill her and members of her family. If I were in her position, I would be very anxious to receive asylum.

3. Please let me briefly place her case in some perspective. Colombia and its predecessor state have long struggled with fragmentation and instability. After independence from Spain, Gran Colombia broke into three nations (Colombia, Venezuela, and Ecuador) within a few years. The problem continued within Colombia as well. This was due for many reasons, including geography. In southern Colombia, the Andes mountains break into three chains. The highland valleys and tablelands, where most of the population lives, are separated by tropical valleys of the Magdalena and Cauca rivers. Dense rainforest runs along the Pacific coast and swamps or semi-deserts along the Caribbean. Throughout its history and even today, transportation throughout Colombia has been difficult; this has been one reason for the weak Colombian state and a very strong tendency towards fragmentation within the nation. Large landowners in isolated regions often raised their own private armies that often successfully resisted the authority of the central state.

4. Political fragmentation and violence have long been problems as well. Two political

1

000275



parties, the Liberals and the Conservatives, spread themselves throughout the nation, often contending for power. The nation suffered six civil wars in the nineteenth century, with The War of a Thousand Days (1899-1902) costing about 100,000 lives. Political instability continued into the twentieth century. Following the assassination of Liberal populist candidate, Jorge Eliécer Gaitán, in 1948, a riot in Bogotá was followed by another civil way, causing about 200,000 deaths.

5. Exhausted, the two parties agreed to a National Front that ran from 1958 to 1974, in which power was largely shared by the two parties. However, extremes within each party chafed at the managed democracy and inability to further deeply held objectives. Inspired by the successes of the revolutionary left elsewhere, various leftist groups began campaigns. The Revolutionary Armed Forces of Colombia (FARC), the national Liberation Army (ELN) and the M-19 (April 19 Movement) formed in the mid to late 1960s. By the end of the century, they had effective control over about half of the nation's territory. These guerillas were often met by military and paramilitary opposition, with all of these groups becoming mixed to varying degrees with the country's enormous illegal drug trade.

6. Established in 1964 as the military wing of the Colombian Communist Party, the FARC is Colombia's oldest, largest, most capable, and best-equipped Marxist insurgency. The FARC is governed by a secretariat, led by Manuel Marulanda ("Tirofijo") and six others, including senior military commander Jorge Briceno (a.k.a. "Mono Jojoy"). The FARC is organized along military lines and includes several urban fronts. Approximately 9,000 to 12,000 armed combatants and several thousand more supporters, mostly in rural areas, fight for the FARC nationwide. In November 1985 when leftist guerillas stormed the Palace of Justice, the Supreme Court building, in Bogotá. In the ensuing battle between the military and guerrillas, over 100 died, including 11 Supreme Court justices. In February 2002, negotiations between the FARC and then President Andres Pastrana were terminated by the government following the FARC's hijacking a plane and kidnapping a Colombian Senator from the aircraft. The FARC later launched a large-scale mortar attack on the Presidential Palace where Alvaro Uribe, the current president, was being inaugurated. High-level foreign delegations— including the United States—attending the inauguration were not injured, but 21 residents of a poor neighborhood nearby were killed by stray rounds in the attack. Amnesty International claims that around 70,000 Colombian people have been murdered for political reasons in the last 20 years.

7. In addition to guerilla organizations, Colombia has suffered from various forms of illegal drug cartels. The situation has also been made complicated by the transition of guerillas groups to their own involvement in the drug trade, making profit as much or more of a motive for them than ideology. By the 1980s, the Untied States was involved in a war on drugs and calling for drug dealers to be extradited to the US. After great pressure was exerted in the 1980s and 90s on other Latin American nations such as Peru and Bolivia to reduce their production of coca and other crops that can be refined into illegal drugs, Colombia became home to much of the world's cocaine supply. The

2



Untied States has provided significant financial and military aid to Colombia to help it spray coca fields, destroy refineries, and interdict trafficking. Each year since 1988, the United States provided about $765 million in assistance to Colombia. President Clinton began *Plan Colombia* in 2000 and President George W. Bush has maintained this effort to help the Colombian government fight illegal drugs. The Bush administration has defined Colombia's guerilla / drug dealers as international terrorists. The proposed US aid to Colombia for 2005 - 06 remains about $742 million.

8. Plan Colombia has enjoyed a number of successes; due to spraying, the official amount of land in Colombia used for coca production has fallen from about 163,000 hectares in 2000 to some 86,000 in 2005. In 2004, about 150 tons of cocaine were seized in the country, a third more than in 2003, and 1,900 cocaine labs were destroyed, 40% more thanin 2002. Colombia's current president, Álvaro Uribe, has extradited 166 Colombians to face drug charges and probable prison sentences in the United States. This has taken considerable courage, since the "extraditables," as they are called, have ruthlessly opposed extradition whenever possible. Nevertheless, traffickers like Gilberto Rodríguez orejuela, the former head of the Cali drug cartel, have been sent to the US. The large Cali and Meddellin drug cartels have largely been broken as a result. However, the percentage of the world's cocaine from Colombia remains high. As the U.S. Department of State admits, "The US Drug Enforcement Agency estimates that more than 80% of the worldwide powder cocaine supply and approximately 90% of the powder cocaine smuggled into the United States is produced in Colombia. It is also a significant source of over 70% of the heroin consumed east of the Mississippi."[1] The continued supply of cocaine has perhaps increased, as indicated by falling prices of cocaine of rather consistent quality. A gram of cocaine in 1986 cost about $100, $48 in 2000, and $38 in 2003. Production may have moved further into the jungles of Colombia where they are hard to reach and which are under the control of guerilla and drug groups which jealously protect these lands. And this production, refining, and trafficking is being organized by some 82 mini-cartels or boutique cartels. The organization of the highly lucrative drug trade is very adaptable.

9. This protection has added to Colombia suffering from the world's highest murder and kidnapping rates, with all their resultant instability. Since 1996, a million of the nation's 43 million inhabitants have fled Colombia. In May 2004, the United Nations announced that Colombia's decades long drug war had created the worst humanitarian crisis in the Western Hemisphere. More than 2 million people have been forced to leave their homes, often fleeing one area in hopes that another might be more secure. Colombia now has the third largest displaced population in the world, with only Sudan and the Congo having more. So throughout much of its history up until now, the Colombian state has been unable to offer its citizens or its own officials an acceptable level of personal security.

10.  It has been argued that the increasing dollar-value of the drug-traffic added a component in Colombia's story that drove up the number of murders. A common view in Colombia is that the administration of Liberal Ernesto Samper Pizano (1994-1998) was deeply influenced by bribes, threats, and violence by the predominant drug cartels

---

[1] http://www.state.gov/r/pa/ei/bgn/35754.htm

000277

 

(Medellín and Cali), with increasing participation in that trade by the main guerrilla groups. During Mr Samper's government, the FARC began to operate in larger units. It inflicted several humiliating defeats on the armed forces, where small detachments were overwhelmed by forces of several hundred guerrillas, and some 500 police and troops were taken prisoner. Another Liberal president, Andrés Pastrana Arango (1998-2002), went so far as to grant in 1999 the largest rebel group, the FARC, a demilitarized zone the size of Switzerland (42,000 km2) and placed it under the FARCs administrative control. This arrangement ended in February 2002 as it became clear that the FARC had no particular intention to arrange a peace that would leave it stripped of resources. The violence against Colombian judges, political leaders, journalists, and common citizens did not abate due to Liberal reforms.

11. In the early 1990s, according to the Andean Commission of Jurists, a daily average of 10 people were killed in politically motivated violence. Of these, five were assassinated, four died in armed conflict (including guerrillas, members of the security forces and unarmed civilians), and one was killed in "social cleansing" operations. In 1992 the Andean Commission recorded 4,434 politically motivated killings: 2,178 were political assassinations, 1,560 were deaths in combat, 505 were "social cleansing" killings. The percentage of politically motivated killings has been rising, from about one per cent of all killings in the 1970s to more than 16 per cent in 1992. Between 1986 and 1993, over 20,000 people died in political violence. The killings have continued. In 2005, they are at the rate of 34 a day. In February of this year, FARC was held responsible for more killings than any time since President Uribe took office. As the Colombian embassy in Washington notes, even as the Colombian government has become stronger, "Unfortunately, the FARC and the AUC have also become stronger and increasingly sophisticated as a result of their involvement in drug and kidnapping activity. These groups now work in close collaboration with other international terrorist groups. In addition, they are shifting their tactics to create increased terror, including targeting urban areas of the country. Recent urban bombings illustrate this point."

| | Civilians Assassinated | | Civilians Kidnapped in Massacres | |
|---|---|---|---|---|
| **Perpetrators** | | | | |
| | FARC & ELN | AUC | FARC & ELN | AUC |
| 1997 | 531 | 78 | 126 (23) | 30 (6) |
| 1998 | 549 | 216 | 183 (26) | 111 (16) |
| 1999 | 910 | 743 | 146 (26) | 408 (61) |
| 2000 | 1,075 | 1,012 | 202 (36) | 701 (102) |
| 2001 | 1,060 | 1,028 | 158 (25) | 281 (42) |
| 2002 | 952 | 405 | 312 (35) | 59 (12) |

*Source: "Democratic Security and Defence Policy," Presidency of the Republic – Ministry of Defence, Republic of Colombia, 2003*

4



12. It is in this context that I place Ana Biocini's declaration, which provides a significant amount of detailed information that is persuasive. She says that she began to use cocaine in the mid 1980s and became addicted. She developed relationships with men who were active in drug trafficking, in which they involved her. She was arrested for her role in this trafficking in 1995 and cooperated with US officials, giving them information about a number of individuals in the trade. She says that she has nto used illegal drugs since then and has developed marketable skills. Her cooperation became known among those remaining active in the illegal drug trade. Others who have cooperated similarly have in fact been killed when they have returned to Colombia. She believes that the same may well happen to her should she be returned to Colombia. Unfortunately, her assessment is most likely correct. Whether or not the facts as she presents them are true is of course for the court to determine, as is the matter of whether or not she should be granted asylum. However, I am persuaded that if the court does not grant her asylum and sends her back to Colombia, it should do so expecting that the result will in my opinion likely result in her murder and perhaps the murder of her family members.

_Lowell S. Gustafson_                           December 10, 2005

| Lowell S. Gustafson | Date |
| --- | --- |

5



# EXHIBIT
# I-4



**Lowell S. Gustafson**
Professor
Department of Political Science
Villanova University
Vita

**Education**
BA, North Park College, 1977.
MA, University of Virginia, Foreign Affairs, 1981.
PhD, University of Virginia, Foreign Affairs, 1984.

**Employment**
University of Virginia, Department of Government and Foreign Affairs, Visiting
    Lecturer, 1984-86.
Villanova University, Department of Political Science, 1986 – present.

**Scholarship**
a. Books
1. *The Sovereignty Dispute over the Falkland (Malvinas) Islands,* Oxford University
   Press, 1988.
2. *The Religious Challenge to the State,* co-edited with Matthew Moen, Temple
   University Press, 1992.
3. *Economic Development under Democratic Regimes: Neoliberalism in Latin
   America,* Praeger Publishers, 1994.
4. *Thucydides' Theory of International Relations: A Lasting Possession,* Louisiana
   State University Press, 2000.
5. *Ancient Maya Gender Identity and Relations*, co-edited with Amelia M. Trevelyan,
   Greenwood Press, 2002.
6. *Economic Development under Democratic Regimes in Latin America in the Twenty-
   First Century,* co-edited by Lowell Gustafson and Satya R. Pattnayak, Edwin Mellen
   Press, Lewistown, New York, 2003.

b. Articles
1. "The Principle of Self-Determination and the Dispute about Sovereignty over the
   Falkland Islands," *Inter-American Economic Affairs, Volume* 37, Number 4, Spring
   1984, pp. 81-99.
2. "Is there any hope for Argentina?" *The World and I,* July 1990, pp. 124-129.
3. "Factionalism, Centralism, and Federalism," *Publius: The Journal of Federalism,*
   Volume 20, Number 3, pp. 163-176.
4. "Gender Relations and Political Legitimacy: Replacing Patrilineal with Ancestral
   Inheritance of Power in Ancient Mayan Society," *Community College Humanities
   Review,* Vol.20, No. 1, Fall 1999, pp. 4 – 30.

3



c. Book Chapters

1. "Challenge and Accommodation in Religion and Politics," co-written with Matthew C. Moen, in *The Religious Challenge to the State, Moen and Gustafson, eds.*

2. "Church and State in Argentina," in *The Religious Challenge to the State*, Moen and Gustafson, eds.

3. "Introduction," in *Economic Development under Democratic Regimes, Gustafson, ed.* "Restoring Argentina's Liberal Economic Development," in *Economic Development under Democratic Regimes.*

4. "Interdependence and World Order," in *Community, Diversity, and a New World Order*, edited by Kenneth W. Thompson, University Press of America, Lanham, 1994.

5. "Introduction," in *Thucydides' Theory of International Relations: A Lasting Possession*, edited by Lowell S. Gustafson, Louisiana State University Press, 2000.

6. "Thucydides and Pluralism," in *Thucydides' Theory of International Relations: A Lasting Possession*, edited by Lowell S. Gustafson, Louisiana State University Press, 2000.

7. "Introduction," with Amelia M. Trevelyan, in *Ancient Maya Gender Identity and Relations.*

8. "Shared Gender Relations: Early Mesoamerica and the Maya," in *Ancient Maya Gender Identity and Relations.*

9. "Mother-Father Kings," in *Ancient Maya Gender Identity and Relations.*

10. "The Problems of Democratic Consolidation in Latin America," in *Economic Development under Democratic Regimes in Latin America.*

11. "Latin American Democracy in Historical Perspective" in *Economic Development under Democratic Regimes in Latin America.*

12. "From Abundance to Bust: The Long Argentine Crisis," in *Economic Development under Democratic Regimes in Latin America.*

13. "Neoconning America: The Deliberate Use of Deception" in Hussain Imtiaz, Valdés Ugalde, José Luis, (Co-Editors.), *By other means, for other ends: Bush's re-election reassessed*, Universidad Iberoamericana, 2005.

d. Conference Proceedings

1. "Convergence and Challenge: Christian-Jewish Cultures and the Legacies of Columbus," in *Cofradia Internacional de Investigadores: Actas del Congreso BeresitII,* Toledo, Spain, 1993.

e. Fellowships

1. 1997, NEH Summer Institute, "The Maya World," Guatemala and Chiapas

2. 1995 Summer Seminar, "Democracy and Economic Development in Latin America," University of California, Santa Barbara, Director: David Rock.

3. 1993 Fulbright Summer "South America Today" program in Ecuador, Chile, Argentina, Uruguay, and Colombia.

4. 1989-90 National Endowment for the Humanities, research grant.

5. 1986 Fulbright Summer Research Grant.

6. 1983-1984 Thomas Jefferson Fellowship of the Ivy Foundation.

7. 1983-1984, Governor's Fellowship, University of Virginia.

4

000282



f. Conference Papers

1. "The Issue of Intervention in U.S. Policy Towards Latin America" presented to the South West Social Science Association convention in San Antonio, Texas, March 1986.
2. "The Consolidation of Democracy in Argentina since 1983" presented to the South East Latin American Studies Association Convention in Merida, Mexico, March 1987.
3. "Power and Foreign Policy: The Case of Argentina" presented to the International Studies Association, Washington, D.C., March 1987.
4. "U.S. Foreign Trade Policy Making" presented to the Northeast Political Science Association in Philadelphia, November 1987.
5. "Argentina and the Middle East" presented to the Latin American Studies Association convention in New Orleans, March 1988.
6. "Democracy and Foreign Policy in Argentina" presented to the International Studies Association convention in St. Louis, March 1988.
7. "Revolution in Latin America and Liberation Theology", presented to the American Political Science Association in Washington, D.C., September, 1988.
8. "A Realist Approach to International Political Economy," presented to the International Studies Association conference, March 28 -April I, 1989, London, England.
9. "Media Reaction in Latin America towards the U.S. Invasion of Panama," International Studies Association, Vancouver, March 19-23, 1991.
10. "Privatization and Competition in Argentine Political Economy, " Latin American Studies Association, Washington, D.C., April 3-7, 1991.
11. "Jewish Actors and Issues in Latin America," International Studies Association, Atlanta, Georgia, March 31 -April 4, 1992.
12. "Conflict in Biblical Politics," Social Science History Association,
13. October 14-16, 1994, Atlanta.
14. "Thucydides as a Pluralist," International Studies Association, 21-25 February 1995, Chicago.
15. "Latin American Perspectives on Sovereignty," International Studies Association, 21-25 February 1995, Chicago.
16. "Privatization and Oligarchy in Argentina," American Political Science Association, 31 August -3 September 1995, Chicago.
17. "Voegelin and Politics," Social Science History Association, 16-19 November 1995, Chicago.
18. "Religion and Democracy in the Middle East and Latin America; Comparing Christian Democracy with Islamic Democracy," Short Course, American Political Science Association, Washington D.C., August 27, 1997.
19. "Interstate Relations Among the Maya," International Relations Association, Minneapolis, March, 1998.
20. "Ancestry and Political Legitimacy Among the Ancient Mayans, "International Studies Association, Vienna, September, 1998.
21. "Gender and Politics Among the Ancient Maya," CISS / ISA Conference, Paris, France, August 9-10, 1999.
22. "Gender. Lineage, and Legitimacy," III Mesa de Estudios de Género: La condición

5

000283

de las mujeres y las relaciones de género en Mesoamérica prehispanica, 28 al 30 de abril 2003, Mexico City, Instituto Nacional de Antropología.

23. "Outcomes Assessment," presentation at Roundtable on Assessment and Political Science: Issues, Strategies, and Missing Links, American Political Science Association Convention, Philadelphia, August 28 – 31, 2003.

24. "Argentine Political Instability," Latin American Studies Association Annual Meeting, Las Vegas, October, 2004.

25. "From Racism to Humanism in Judeo-Christian Texts," Catholic Social Teaching on Racism, Conference Sponsored by the Office of Mission Effectiveness, Villanova University, November 19, 2004.

26. "Pan-Americanism and the Western Hemisphere Idea Updated," Latin American Studies Association, Puerto Rico, March 2006.

4. Special Recognition

1. *Thucydides* book nomination for Jervis-Schroeder Book Prize, sponsored by the Interdisciplinary Approaches to international History and Politics Section of the American Political Science Association.

2. *Thucydides* book nomination for the Warren F. Kuehl Award, sponsored by the Society for historians of American Foreign Relations.

3. Member, Delta Omicron Chapter of Phi Beta Delta, the International Scholars Honor Society.

**Service**

1. University Committees and Other University Service

a. Director, Graduate Liberal Studies Program, 2005 – present

b. Facilitator, Anthropology Working Group, 2002 - present.

c. Vital Mini-grant selection committee, 2003- present.

d. Presentation on "E-Portfolios at Villanova University," at *Pedagogical Uses of Electronic Portfolios*, sponsored by UNIT, 3-30-05, CEER 001

e. Discussant, Roundtable, *Catholic Social Teaching and Globalization*, organized by Office of Mission Effectiveness, November 6-7, 2003

f. Chair, Panel on Catholic Social Thought and Pre-Emptive Strikes, *Catholic Social Teaching on War and Peace: Pacem in Terris 40 Years Later*, Villanova conference sponsored by the Office on Mission Effectiveness, March 20, 2003.

g. Member Middle States Implementation Committee, 2002.

h. Chair, Faculty Task Force, Institutional Self-Study for Middle States Association Accreditation, 1998-2001.

i. President, Villanova Chapter of the American Association of University Professors, 2001 - present.

j. Chair, Faculty Senate, 1997-2000.

k. Faculty member, University Senate, 1997-99.

l. Member, Working Group on University Governance, Rules and Review Committee, *University Senate*, 1998-2000.

m. Faculty member, Executive Committee, University Senate, 1997-98. g. Member, Stewardship Committee, VP Gary Fenner, Chair, 1998.

000284



n.  Member, *Stewardship Committee, VP Gary Fenner, Chair, 1998.*
o.  Member, Villanova Quality Initiative Committee on Awards and Recognition, 1996.
p.  Member, Council for Cultural Diversity, 1995-97.
q.  Elected Member Representing the College of Arts and Sciences, Faculty Senate, 1990-96.
r.  Discussion Leader, Freshmen Orientation Week 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000.
s.  *Organized and / or participated in many discussions, debates, presentations on campus.*
t.  Taught teaching and technology seminar, sponsored by VITAL, May 13, 1999.
u.  Discussant, Theology Institute panel, June 24, 1998.
v.  Who's Who Committee, 1993 -94.

2. College Committees and Other College Services
a.  *Member, College Strategic Planning Committee, 1996-2001.*
b.  Member, Core Curriculum Social Science Committee, 1992-1995.
c.  Member, Part-Time Faculty Committee, 1995-96.
d.  Member, General Arts Committee, Fall Semester, 1990.
e.  Member, Outcomes Committee, Middle Atlantic Self-Study, 1989-90.
f.  Member, Internship Director Committee, 2000.

3. Department Committees and Other Department Service
a.  Department Chairperson, 1993 -2001.
b.  Chair, Graduate Committee, 1990 -93.
c.  Chair, Comparative Politics/Chinese Politics Search Committee, 1991.
d.  Chair, National Security Position Search Committee, 1989 -90.
e.  Elected Member, Faculty Evaluation Committee, 1990, 1991, 1992, 1993.
f.  Chair, Undergraduate Curriculum Committee, 1988 – 89.
g.  Wrote many letters of recommendation for students.

4. Professional Service
a. Participation in professional scholarly meetings.
Panels Organized
1.  Chair, "U.S. Policy in the Third World," North East International Studies Association, *Providence, Rhode Island, November 10-13, 1988.*
2.  Chair, "Realism: Classical Critiques and Current Applications," International Studies Association, London, March 28 -April 1, 1989.
3.  Chair and Discussant, "Critical Issues in International Political Economy," North East International Studies Association, Providence, Rhode Island, November 15-17,1990.
4.  Chair, *"Economic Development Under Democratic Regimes"*, Latin American Studies Association, Washington, D.C., April 4-6, 1991.
5.  Chair and Discussant, "International and Domestic Constraints: North and South, "Northeast International Studies Association, Newark, 11-13, November 1994.
6.  Chair, "Religion and Political Conflict," Social Science History Association, 16-19 November 1995, Chicago.

7

000285



7. Chair, "Thucydides as an Anti-realist," International Studies Association, Chicago, 21-25 February 1995.
8. Chair, "Non-Western, Pre-Westphalian International Systems," International Studies Association, Minneapolis, Minnesota, March 17 -21, 1998.
9. Discussant, "The Impact of Northeast Asia on the Policy Choices of Pacific Rim Developing States, "International Studies Association, Minneapolis, Minnesota, March 17 -21, 1998.
10. Co-Chair, "Preserving Humanity's Cultural Heritage," International Studies Association, Vienna, 16 -19 September, 1998.
11. Chair, "Gender Relations and Identity: Ancient and Contemporary Maya," International Studies Association, Paris, August 9 -10, 1999.
12. Discussant, "Development under Democratic Regimes," Latin American Studies Association, September 8, 2001.
13. Discussant, panel, Latin American Studies Association, Las Vega, October, 2004.
14. Presentation on "Hiring and Mission," Conference on Unity and Diversity, AAUP: Academic Freedom at Religiously Affiliated Colleges and Universities, March 13 – 16, 2003, San Diego, CA

b. Membership and Involvement in Professional Societies and Associations
1. Member, International Studies Association (ISA), Latin American Studies
2. Association (LASA), American Political Science Association (APSA).
3. Communications Director, Interdisciplinary Comparative Studies Section,
4. International Studies Association, 1997-99.
5. Treasurer, Religion and Politics Section, American Political Science
6. Association, 1997-98.
7. Head of Religion Section, Social Science History Association, 1994-95.
8. President, Northeast International Studies Association (NEISA), 1990-91.
9. Council Member, International Political Economy Section, International Studies
10. Association (ISA), 1989-92.
11. Program Chair, 1989 NEISA conference, Philadelphia.

c. Referee for Scholarly Journals
1. Referee for Harper Collins College Publishers.
2. Referee for Commonwealth.
3. Referee for Catholic Journal of Social Thought.
4. Referee for Louisiana State University Press.
5. Reviewer for 7th edition of Politics Among Nations: The Struggle for Power and Peace by Hans Morgenthau and Kenneth Thompson, 2005.
6. Reviewer for David Clinton, Editor, Realism in the Pre-and Post Cold War World, LSU Press, 2004.

d. Other Professional Service
1. Various public lectures.
2. Participation in a number of community groups, including as organizing web pages for some.

8

000286



3. "The Cultures of Globalization," Book Review for Journal of Catholic Social Thought, Vol 2 No 1, Winter 2005, 259 – 263.

4. Expert Witness, UNITED STATES DEPARTMENT OF JUSTICE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW of BENJAMIN CIFUENTES et al, PHILADELPHIA, PA, May 2005.

5. Expert Witness, UNITED STATES DEPARTMENT OF JUSTICE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW of Augusto Sanchez Ramirez, Newark, New Jersey, August, 2005.

6. Faculty Advisor, World Affairs Council of Philadelphia, Mock Intenational Court of Justice, February 2004 and 2005

7. Faculty Advisor, World Affairs Council of Philadelphia, Mock Committee on Foreign Relations, U.S. Senate, 2003, 2004.

8. Faculty Advisor, World Affairs Council of Philadelphia, Model U.N. Security Council, 2004, 2005.

9. Ancient Maya Gender, presentation to The Pre-Columbian Society, Museum of Archaeology and Anthropology, Univeristy of Pennsylvania, January 10, 2004

10. "Argentina," presentation to the United Nations Association of the United States of America, Greater Philadelphia Chapter, October 25, 2003.

9

000287

CHRISTOPHER TODD, Attorney at Law                              DETAINED ALIEN
IMMIGRATION LAW CLINIC
University of California, Davis School of Law
1 Shields Avenue TB-30
Davis, CA 95616-8821
Tel.:   (530) 752-6942 or
         (415) 846-9311
Fax:    (530) 752-0822

Attorneys for Respondent
ANA BIOCINI

Assisted by: Dia Moua, Chad Greeson

*RECEIVED DEPARTMENT OF JUSTICE DEC 8 2005 EXECUTIVE OFFICE IMMIGRATION REVIEW SAN FRANCISCO, CALIFORNIA*

### UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### IMMIGRATION COURT
### SAN FRANCISCO, CALIFORNIA (DUBLIN FCI)

IN THE MATTER OF:                      File No.  A 091-182-333

ANA BIOCINI                            **RESPONDENT'S SUBMISSION OF**
                                       **SUPPORTING DOCUMENTATION**
Respondent.
                                       Date:   Dec. 19, 2005
In Removal Proceedings.                Time:   1:00 P.M.
                                       Judge:  Murry
_____/

   The Respondent, Ana BIOCINI, through undersigned counsel, respectfully submits the attached documentary evidence in support of her claim for deferral of removal under CAT and withholding of removal under INA 241(b)(3).  A table of exhibits follows this page.

Dated: December 5, 2005.

                               Respectfully submitted,



                               _____
                               CHRISTOPHER TODD
                               Immigration Law Clinic, UC Davis School of Law
                               Attorneys for the Respondent

*RESPONDENT'S SUBMISSION OF SUPPORTING DOCUMENTATION*
*Biocini, A91-182-333*

Ex # 3

000288

TABLE OF EXHIBITS

A.  **Declarations**
   1.   Ana Biocini
   2.   Clemencia Jaramillo
   3.   Patricia Kluckhohn (Spanish originals with English translations)
   4.   Diego Jaramillo (Spanish originals with English translations)
   5.   Peter Biocini
   6.   George Biocini
B.  **Immigration Records**
   1.   Application for Asylum and for Withholding of Removal (I-589)
   2.   Notice to Appear
C.  **Criminal Records**
   1.   Sentence Monitoring Data as of 01/24/05
   2.   Sentence Memorandum
   3.   Defendant's Sentencing Memorandum
   4.   Transcript of Proceedings for 5K.1 Motion for Downward Departure
   5.   Plea Agreement
   6.   Judgment
   7.   Order Extending Self-Surrender
   8.   Criminal Indictment
   9.   Stipulation Modifying Pre-Trial Release
D.  **Country Conditions and Human Rights Violations:  Colombia**
   1.   United States Institute of Peace, *Special Report: Civil Society under Siege in Colombia* (February 2004)
   2.   Amnesty International, Report on Colombia (January 2002)
   3.   U.S. Department of State, *Country Reports on Human Rights Practices* (2004)
   4.   U.S. Department of State, *International Narcotics Strategy Report* (2005)
   5.   U.S. Department of State, *Leader of Colombian Cocaine Ring Extradited to the United States* (2005)
   6.   Sam Loan, *The Colombian Drug Trade:  An Examination of Policy, Politics, and War* (May 2004)
   7.   Amnesty International, Report on Colombia, *The Paramilitaries in Medellin: Demobilization or Legalization?* (last visited on December 4, 2005)
   8.   Torres, Mario and Natasha, Spin Watch, *Colombian Nightmares* ( July 16, 2005)
   9.   Charles P. Preston IV, *Drugs and Conflict in Colombia: A Policy Framework Analysis of* Plan Colombia, (December 2004)
   10.  Library of Congress – Federal Research Division, Country Profile: Colombia (December 2004)
   11.  PBS, Frontline, *Drug Wars: The Business: The Colombian Cartels* (last visited December 2005)
E.  **Hernando Velazco ("Gordo")**

*RESPONDENT'S SUBMISSION OF SUPPORTING DOCUMENTATION*
*Biocini, A91-182-333*

1.      Newspaper Article from El Caleño (July 9, 2004) (Spanish originals with English translations)
2.      Government's Response to the Defendant's Objections to the Presentence Investigation Report (Jan 29, 1996)
3.      Summary Report from 8/25/1995 FBI Interview with Mr. Velazco
4.      Summary Report from 2/15/1995 FBI Interview with Mr. Velazco
5.      Summary Report from 5/28/1998 FBI Interview with Mr. Velazco
6.      Judgment in a Criminal Case (2/21/1996)
7.      Indictment (4/8/1995)

F. **Felix Bernal Hernandez**
1.      Judgement in a Criminal Case (9/30/96)

G. **Ana Biocini – Background and Personal Information**
1.      Driver's License, Alien Registration Card, and Social Security
2.      Marriage Certificate
3.      Peter Alexander Biocini's Birth Certificate
4.      Package of Certificate of Achievements
5.      Employment History
6.      Resume

H. **Peter Biocini**
1.      Update letters from Dr. Chase Spangler, Kaiser Department of Psychiatry
2.      Letter from Robert Waggener regarding Peter Biocini's Mental condition

*RESPONDENT'S SUBMISSION OF SUPPORTING DOCUMENTATION*
*Biocini, A91-182-333*



# EXHIBIT
# A-1



## Declaration of Ana Biocini

### 1. Family Background

My name is Ana Biocini, and I was born in Cali, Colombia on June 30, 1954. I am now 51 years old. I have six living siblings: four brothers and two sisters. My parents and my older sister are deceased. I married my ex-husband, George Biocini on January 9, 1988. Our son, Peter, was born in Greenbrae, California on June 14, 1988. George and I later divorced in May of 1994. Peter is 17 years old and lives with his father in Mountain View, California.

### 2. Immigration Status Before Conviction

I was 24 years old the first time I came to the United States. I flew to Miami, Florida on February 11, 1981. I had a B-2 Visa at the time. In September 23, 1987, I became a Lawful Temporary Resident. I received my green card on May 1, 1989. I have only left the United States three times since 1981. The first trip out of the country was in December of 1989. My ex-husband George, Peter, and I flew to Cali to celebrate Christmas with my family. In August of 1991, Peter and I made a second visit to Colombia. During that trip, I also got medical and dental care. There are excellent doctors and dentists in Colombia and the treatment is much more affordable than in the United States. Finally, in January of 1992 Peter and I made our third trip to Colombia. The purpose of this visit was to spend time with my family and follow-up with my doctors.

### 3. Criminal History

I was arrested on May 5, 1995. I plead guilty to one count of conspiracy to distribute a kilogram of cocaine with the intent to sell on June 5, 1998. I was on supervised release from May 24, 1995 to January 16, 2004 (approximately 8 and ½ years). This is my first and only felony conviction. On January 16, 2004, I began my 30 month sentence at the Federal Correctional Institute in Dublin, California ("FCI-Dublin").

1

000292



### 4. My Son – Peter Biocini

My first priority has always been taking care of my son, Peter. When I found out I was pregnant, I felt like the happiest woman in the world. I immediately stopped smoking cigarettes, drinking, and using drugs. I took the best care of myself that I could. My maternal instincts took over, and I no longer felt driven by my drug addiction. George was very happy about the pregnancy, and we got married right away. Peter was born on June 14, 1988. My delivery went quickly and smoothly. The baby was born in less than three hours. My doctor was very proud of me and told me that Peter was born in record time. He said that the reason Peter's delivery went so well is because I took such good care of myself throughout the pregnancy.

George and I were thrilled to have Peter in our lives. We spent as much time with Peter as we could. George and I took him to meet with friend and family whenever we could. When he was a toddler, I also took him regularly to Gymboree and Montessori school where he could play and interact with other little boys and girls.

Peter was a very precious and precocious little boy. He was extremely gifted from a very young age. When he was 2 years old, Peter started identifying letters and words while watching me read. Not long after that, he began reading on his own. The teachers at his Montessori school were amazed at his abilities. They told me could Peter read, and that he was trying to teach his classmates how to read. At that time, Peter was only three years old. Peter continued to excel in school and behaved well at home until I was arrested. For the first 7 years of his life, Peter was a happy, remarkable, and gifted boy.

Unfortunately some time after I gave birth, I also began using drugs. I started hanging around with other people who were using drugs. Slowly, I became involved in my old lifestyle. I made a terrible mistake – a mistake that I regret most of all because of what it did to Peter. Before I knew it, I was being arrested. That is when my real nightmare began.

My arrest was a terribly traumatic experience for Peter. Around 6:00 A.M. on May 5, 1995, FBI and DEA agents raided our home. We awoke to a loud, crashing noise as the agents knocked down our doors and stormed our house. The agents arrested me. Then they looked all over our home for drugs, but no drugs were ever found. I remember

2



about 30 or more agents involved in my arrest. My son saw everything. Years later, Peter told me that he still remembers this event. Peter told me that he asked a special agent what was happening. The agent said, "Everything is going to be all right." Peter paused and said, "Mom, that agent was lying when he told me that. Since that day it's never been right again." According to Dr. Spangler, my arrest was the root cause of Peter's psychological disorders.

The agents separated me from my son, an interrogated me for over an hour. <u>They tried to get me to make a deal, but I refused.</u> The agents took me to jail, and they took me away from my son. I cannot imagine how awful it must have been for my little boy. His mother was taken away and he was held in custody. When I was arrested, Peter was going to school in Mill Valley. After my arrest, he had to abruptly change schools to Redwood City, to live with his father. Peter's world was upside down, and he had nothing familiar to cling to. Peter finished second grade in Redwood City.

This adjustment was extremely difficult for Peter. I was in jail until May 24, 1995 when George posted bond. George immediately got reports from Peter's teachers that he was having trouble in school. He couldn't pay attention during class and would not do his homework. The teacher knew he was capable and that there was a problem.

After I was released from jail, I wanted to see Peter more than anything. When I saw his face, my heart sank. Peter looked devastated. His looked tired, and anxious, and sad. For the next eight years, I was never separated from Peter. The last time I saw him was on January 16, 2004, when I self-surrendered.

During these eight years, Peter had many signs of severe depression and difficulty functioning at school. I was really worried about him. One day I went to his room in the morning to wake him from school. Peter had posted a note on his door that said: "Mom, I need help. I don't want to go to school. I am afraid. Please don't wake me up!" I was in total shock and scared to open the door. I thought something terrible had happened to my son. I was relieved when I found him awake and waiting for me. That day, I went with him to school and told his teacher what happened. After talking with him, the teacher recommended that I get Peter into psychiatric care as soon as possible. I took him to the emergency room at Kaiser Hospital. After that, Peter started seeing Dr. Spangler on a regular basis for treatment for severe anxiety and depression.

3



With medication and therapy, Peter's condition improved, but his problems at school were persistent. He could not focus on his homework or behave appropriately in class. I met with his teachers many times, hoping to figure out some way to make everything better for him. Immediately before I self-surrendered, Peter's condition worsened. Thankfully, the judge let me postpone my surrender date several times in order to help Peter adjust to my absence. I know that my sentence has been and continues to be very difficult for my son. I speak to Peter as often as I can. Every time I hang up the phone, I can't wait to talk to him again. I don't think Peter is seeing Dr. Spangler anymore, but he was seeing a counselor at school. Also, I think Peter has been recently diagnosed with ADD, and takes medicine to help him focus on his school work.

Despite his condition and my continuing legal struggle, Peter has found his niche. He loves computers. Peter has mastered several computer programming languages and operating systems. My son hopes to develop these skills into a career in computer science. I know that Peter has the ability to achieve his goals. But I am still worried about his mental health and how my situation affects him. Peter has told me on countless occasions that all he wants in life is to have his family back to normal. If we could be together as a family again, I know that Peter could truly achieve his goals. Peter is the most important person in my life. I cannot express how truly sorry I am to Peter, my family, my community, and this country for the mistakes I made. Drugs took away my ability to think rationally and understand the clear consequences of my actions. I sincerely regret the choices I made, and I pray for a second chance. I know if I am given that opportunity, I can prepare my son for the bright future that lies ahead of him.

### 5. Supervised Release – Employment and Education

During this period, I also worked as much as possible and took college-level classes to improve my job opportunities. From 1995 to 1997, I worked for Kolweiss Auto Parts in Redwood City as a sales associate. Starting in 1997, I worked as an independent contractor for Accountemps in Menlo Park, California. Through Accountemps, I gained valuable accounting experience at several Silicon Valley companies. To further my career, I took a number of courses at Cañada College in Redwood City, California. I completed my certificate for Computerized Accounting in

4



1999. At Cañada, I also completed courses in Web Design, Networking Essentials, Stock and Bond Investment, Fashion Industry Marketing, and Payroll and Business Taxes. After 9-11, the opportunities in accounting were fewer and fewer. I decided to start a new career. In 2002, I completed my certificate in Integrated Circuit Mask Design at Silicon Artists. Finally, in 2003, I worked as a Junior Accountant for Pacific Graduate School of Psychology.

### 6. Drug Abuse and Rehabilitation

I was raised in a very strict household. My father believed in military-style discipline, especially for me and my sisters. I grew up with a lot of pressure and anxiety because of my father. My father never sexually abused me, but physically abused me. I think this is the reason I wanted to escape from home and travel to other countries.

My first experience with drugs was in 1981 when I lived in Miami. I was by myself, felt rebellious, and didn't have to answer to anyone. At the time, I enjoyed drugs because they let me escape from my past. I first tried marijuana in at a party with some friends. The drug took away my anxiety and made me feel relaxed and calm. A friend of mine, Maria Helena Arias, introduced me to the Zalazar sisters, who were involved in the cocaine business. We were invited to many extravagant parties where cocaine was served for desert. As time went on, I began experimenting with the drug. Naturally, I came to know other people who used and sold cocaine. At first I used cocaine once a month, then it became twice a month, and eventually it was every weekend. I now know that I am prone to addiction, and I quickly became addicted to cocaine. I was young, single, and seduced by living "la vida loca" in the early 1980s. I could not resist the drugs or meeting the people who used them. I enjoyed the fast lifestyle – fancy cars, fine dining, yachts, exclusive discos, and other luxuries.

The reality, however, is that cocaine almost destroyed my life. I truly regret the mistakes I made during this time in my life. I should have thought about my future and my family. But the drugs took away my ability to think clearly. I know that this is not an excuse. I only mention it to give some context to my situation. I used drugs for many years. When I look back, I cannot believe how much cocaine changed me as a person. I

5

was so out of control and intoxicated, that I forgot the values and principles I learned as a child. But all of that changed for me in 1995.

I was arrested in May of 1995. I knew immediately that it was time to clean up my life forever. While on supervised release, I completed a 3-month rehabilitation program at the Liberty Center in Redwood City. I also attended Alcoholics Anonymous for several years as part of my rehabilitation. At FCI-Dublin, I voluntarily enrolled in an intensive drug treatment program. Nine months and 500 hours later, I completed the program. I am glad I had the opportunity to receive this treatment because it gave me the skills to stay clean. During this time I also stopped smoking cigarettes. Because of all of the positive changes I have made, I now I now feel as healthy as I have in years.

Words cannot explain the remorse I feel for what I have done. Going forward, I will not choose any path that leads me back to drugs. I will stay sober for me and – more importantly – my son. I want to thank the government and pre-trial services for encouraging me to get treatment for my addiction. After I finished the program, I promised God, Peter, my family, and myself that I would never use drugs again. I have not used cocaine since my arrest in 1995, and I am absolutely confident that I will never use it or any other illegal drugs in the future.

### 7. Government Cooperation

For a reduced sentence and to protect my family, I made a plea agreement with the U.S. government. I spent five days answering questions at the FBI office in San Francisco, beginning on June 5, 1998. During our first meeting, I told the agents and the U.S. attorney that I was afraid of debriefing them about Colombian cocaine suppliers. The U.S. Attorney said special visas would keep me and my family in the United States. This was a terribly difficult decision for me to make. I was crying constantly and breaking down mentally. This was the day I signed the plea agreement. It was only later that I realized the plea agreement did not mention anything about the special visas that were promised. I was in such shock at the time that I did not fully read the agreement before signing it. In addition, I was unable to discuss the immigration consequences of my plea with my attorney. Before making the agreement, the U.S. attorney and the FBI wanted me to debrief them on the people they found in my personal telephone book

6

000297



During my second meeting, nine special agents and the U.S. Attorney asked me questions. I felt very intimidated, I was embarrassed, and I could not stop crying. Special Agents Iverson, Gallindo, Kristie, and Stanton asked most of the questions. My attorney was only present on the first day. His advice was to accept complete responsibility for everything (even for things I did not do) to get on the government's good side. However, I did not take his advice. I answered the questions honestly and as best I could. During the first interviews, I told the agents about my experiences, prior relationships, and current contacts in the cocaine business.

The agents asked me a lot of questions about Steve Siegal, Diane Dragoo, Steve Solomon, and Norberto Duarte (co-defendants in my criminal case). The agents wanted me to review phone conversations that had been recorded. I debriefed the agents on all of the people in my telephone books, including political officials and cocaine suppliers from the Cali and Medellin cartels. The FBI was particularly interested in one of my contacts – a high-ranking Colombian politician with ties to Miguel and Gilberto Rodriguez-Orejuela and founders of the Cali cartel. I continued to debrief the government in San Francisco for the next three days.

After my first series of meetings, I met with special agents about nine more times from June of 1998 to 2001. The FBI asked me about a guy named Joe in my phone book. Joe owned several restaurants in the North Bay and got cocaine from a Colombian I knew named Juan Molina. The special agents wanted me to meet with Joe as part of a set-up. Agent Kristie told me that if I would help them, that they would return the favor the day of my sentencing. I was scared, but I agreed to help. I drove to Mill Valley and waited across the street from Joe's restaurant. I waited there for 4 hours, but Joe never walked by. The FBI agents had me under surveillance the entire time.

The U.S. Attorney later asked me to testify at Norberto Duarte's trial. I spent many days with the U.S. Attorneys and special agents answering questions and preparing for his trial. I cooperated by reviewing documents and listening to recorded telephone conversations. While shopping in a local supermarket, I ran into Agent Kristie. He told me that I was doing a good job helping the government. Mr. Duarte eventually made a plea agreement. The U.S. Attorney said that my assistance was a substantial factor in Mr. Duarte's ultimate decision to plead guilty.

7



In these meetings with the government, I gave over 40 names, numbers, and addresses for people who were well connected to the cocaine business in Colombia. Some of these people were directly linked to the Medellin or Cali cartels. Two of my contacts – Hernando Velazco and Felix Bernal – knew of my arrest. Both men also knew I was working for the U.S. government. I heard that Velazco and Bernal were later removed to Colombia, and I believe both men discussed my cooperation with others connected to the cocaine cartels in Colombia. Because of my connections and because I worked for the government, I now live in constant fear for my life.

### 8. Detention at FCI-Dublin

I have been in detention since January 16, 2004. I was supposed to be released on March 2, 2005, after a one year reduction for completing the drug abuse program. However, on January 28, 2005 I received a notice to appear for removal proceedings. I have been detained at FCI-Dublin since that time.

At FCI-Dublin, I did anything I could to get my life back on track. I completed the classes for High School Equivalency Certificate in four months. I took courses in Mediation, Pre-Employment Competencies, Job and Life Skills, and Stress Management. This summer of 2005, I completed a Microsoft Office XP 2002 course, which included Microsoft Word, Excel, and Power Point. On October 12, 2005, I completed a course in Adobe Photoshop 7.0, and I received an award for the best Photoshop Final Design Project in my class. I am currently taking a Photoshop Illustrator course.

With my family's support and new job skills, I am certain that I could quickly transition back into the job market and become a productive member of society.

### 9. Basis for Fear of Death

The information I provided to the government marks me for death in Colombia. If I return to Colombia, it will also put my immediate family in serious danger. My gravest fear stems from the relationships I had with the following three people: (a) Elias Giannakapolous; (b) Felix Bernal; and (c) Hernando Velazco.

*where are they?*

### 9(a). Elias Giannakapolous – The Greek

8



My friend Jim Jaramillo introduced me to Alfonso Bejarano in 1983. Bejarano was a Colombian from Medellín. Jim also told me that Bejarano was in involved in the cocaine business. He traveled a lot between Los Angeles, Miami, and Medellín. Everybody who knew him called him "El Doctór." Bejarano and I quickly became friends. I accompanied him to several parties and social events, where there was always plenty of cocaine. At one of these parties, Bejarano introduced me to Elias Giannakapolous ("The Greek"). On one occasion, I overheard Bejarano tell The Greek, "it's OK – you can trust her." The Greek and I began dating in 1985. He gave me with gifts and set me up with a beautiful apartment by Key Biscayne. He also gave me cocaine for my own personal use. As we grew closer, I learned how The Greek financed these luxuries: he bought, transported, and sold large quantities of cocaine.

It was five months into our relationship before The Greek told me about his business. I never learned the inside details of The Greek's cocaine operations, but I believe Bejarano was one of his key Colombian suppliers. The Greek purchased kilo quantities of cocaine from Colombia and had it shipped to Florida and California. The Greek then distributed the cocaine to his customers. He had two different cocaine operations. His first operation was in Miami, where he sold to local customers. He also used Miami as a base to buy small quantities of cocaine which he shipped to California. The Greek's second operation was in Pacifica, California. In the 1980s, cocaine was much cheaper in Miami than in California. The Greek told me he made $20,000 for every kilo he transported to California.

The Greek had four guys who worked closely for him: Edgar Kasby, Larry Solomon, Gus, and "The Peruvian." The Peruvian was a cocaine supplier and a middleman. Kasby, Solomon, and Gus were the pickup and delivery guys. I worked almost exclusively with Solomon and Kasby. The delivery guys made make weekly trips from Miami to San Francisco. Usually they carried 2-3 kilos with them per trip. I went along on several of these trips. That is how I met Steve Solomon and Steve Siegal (co-defendants in my criminal case).

The Greek slowly began by asking me to do small tasks for him. It was very difficult to say no to him. I loved The Greek, and I was addicted to cocaine. I would pick up his clients at the airport and show them around Miami. Later, The Greek asked

9

me to drive Solomon or Kasby to pick up the cocaine bound for California. After a pick-up, we would return to my apartment where Solomon or Kasby would re-package the cocaine for delivery. The Greek had developed a process for filling clothes hangers with cocaine. I don't know how it was done, but Solomon and Kasby would make the hangers and pack them into an overnight bag. They would then carry the bags on flights to San Francisco as carry-on luggage.

To run his operation in California, The Greek rented three apartments on the same floor in Pacifica. He used one apartment to store the cocaine, the second apartment for his employees to stay and sleep, and the third apartment to meet with customers. From 1984 to 1988, I witnessed many cocaine transactions in both Miami and San Francisco. I saw large suitcases packed full with kilo bricks of cocaine and large quantities of cash. On one occasion, I witnessed The Greek exchange a large suitcase full of coke for another suitcase (presumably filled with cash). On trips to San Francisco, The Greek would easily sell 30 kilos or more per week.

The Greek and I ended our relationship sometime in 1986. After Steve Solomon was arrested, The Greek disappeared for awhile. I heard from him again in 1988, and he asked me to meet him in Los Angeles. During that visit, The Greek exchanged large suitcases with Steve Siegal. That was the last time I saw him. Later, in 1995, I gave The Greek's number and address to Solomon and Siegal, who wanted to re-connect with him. I do not know if they ever did, but I am very afraid of what might happen. I never saw The Greek with a gun, but I know that he had the power and the money to contract with other people to kill for him. The Greek also knew my brother Hernan Jaramillo and my friend Jim Jaramillo.

### 9(b). Felix Bernal Fernandez

I learned from the DEA reports that Felix Bernal sold cocaine in the San Francisco area from the early 1990s. My friend Ruben from Cali gave Bernal my beeper number. I got a message from Bernal in November of 1993. We met at a *café* close to Union Square in San Francisco. As soon as we met, Bernal offered to sell me kilos of cocaine. He then asked me if I could get cocaine for him. I told him that I was not interested. Bernal pressed the issue and I felt irritated and embarrassed. I decided to

10

leave. I got a very weird feeling from Bernal from the first time I met him. I was suspicious of Bernal and thought he was working for the U.S. government. I also think I was under surveillance at that time.

A few days later, Bernal called me again. He was very charming and we began speaking more regularly. This eventually evolved into a brief, long-distance relationship in 1994. Bernal again asked me to get cocaine for him, and I told him I was not interested. Our relationship did not last long. When I learned of Bernal's violent temper, I began to distance myself from him. On more than one occasion, Bernal told me that "if anybody fucks with me, I will kill them." He told me that he wouldn't hesitate to kill a person if he found out they were an undercover agent.

I broke off our relationship. Bernal continued to call me until I was arrested, and he repeatedly asked me to get cocaine for him. Bernal also discussed a large shipment of cocaine he was working on with a friend in Los Angeles. I never negotiated any cocaine deals with Bernal. I am afraid of Bernal because of his violent temper and because he knew a lot about me and my family. Bernal had my telephone number and my beeper number, and he knew where I lived. Bernal knew my brother and my ex-husband George. After I was arrested, Bernal called George and asked about my arrest. When George told me that, I was convinced Bernal was an informant. During my arrest, one of the agents asked me cash that was confiscated from Bernal. Bernal said that it belonged to me. A second agent became angry and immediately told the first agent to stop talking. I was shocked by this question because I didn't know anything about any money. I realized, however, that Bernal was trying to set me up from the beginning.

### 9(c). Hernando Velazco – El Gordo

I met Hernando Velazco or "Gordo" in the early 1970s in Cali, Colombia. Gordo and I were not close friends, but we did run in the same social circles. In the mid-70s, Gordo was already well-known in Cali and had a reputation for selling narcotics. I met Gordo through my friends Alejandro Capete, Benito Lopez, German Villegas, and Daniel Miller.

In 1977, I left Colombia to work in London, England as an *au pair*. I wanted to learn English and had always dreamed of traveling in Europe. I also wanted to escape the

11



abuse and control of my father. From 1977, I didn't see or hear from Gordo again until I got a letter from him in 1994.

In his letter, Gordo said that he was traveling to Los Angeles, California. He had gotten my address from a common friend in Cali, Iliana Balcázar. Gordo wanted me to leave a message on his beeper. I noticed the number was from Los Angeles. I was so surprised to hear from him after so many years that I called. Gordo wanted to meet me in person. He had tickets to the World Cup soccer finals in Los Angeles and asked me if I wanted to go. Gordo also asked if I could bring him some marijuana to smoke. I agreed to bring it with me. Gordo told me that he had other things he wanted to discuss in person. I didn't know what this was about, but I was curious. I also wanted to know the latest news about people we both knew in Cali. So, several weeks later, I flew to Los Angeles.

Our first meeting did not go well. Gordo picked me up at the airport in a new, luxury car. A blond American woman who I did not know was driving the car. I immediately became suspicious. When I landed in Los Angeles, I felt like I was being followed. We drove to Gordo's apartment. When we got there, Gordo asked me to leave my carry-on luggage in the car. I did as he asked, but I grabbed the marijuana that he asked me to bring. We went up to his apartment, and I showed him the marijuana. Gordo became very agitated and told me he did not want to smoke. I thought this was strange, since he had asked me to bring it for him. I started feeling that the meeting was a set-up. I don't remember very much of our conversation, but after about 45 minutes, I decided to leave. I told Gordo good-bye, collected my bags, and got a taxi-ride to the airport.

I was furious after this meeting. I told myself I was not going to talk to Gordo any more. Gordo, however, was very persistent. He called me repeatedly, almost every day, sometimes 3 times a day. After a while I forgave him, and we started talking again. Gordo then began asking me to get cocaine for him. I told him that I did not have any connections for cocaine and told him to stop bothering me about it. Gordo then tried to get me involved in supposedly legitimate business deals (like real estate ventures around Lake Colima in Colombia), but none of these deals ever materialized. With Gordo, the conversation always returned to cocaine.

12



Gordo called me one time from San Francisco and wanted to meet. We met at a restaurant in the city and he introduced me to a man called "Cuko." Gordo and Cuko started talking about doing cocaine business in New York. I though Gordo was being very reckless talking about this in public. I suspected that special agents were listening to our conversation in the restaurant. We moved tables and continued our conversation. Gordo wanted to move 40 or more kilos per week from California to New York. I told Gordo that he should think about the consequences of this and the likelihood of getting caught. However, I listened to his idea. We finished our meeting and I told Gordo that I might have a connection for them.

I called my friend Jorge Luis Mesa or "El Conejo" to see if he was interested in dealing with Gordo. I met "Cone" in 1986 or 1987 through my friend Federico. Federico asked me to give Cone a place to stay for a few days after coming to the United States from Colombia. Cone was headed to California, where he planned on setting up a cocaine business. Cone stayed at my place for a few days, and we become good friends. Cone and I stayed in touch over time, and I visited him and his future wife on a couple of occasions. Cone made a lot of money selling cocaine. The last time I saw Cone was at his wedding party. Eight days later, he was arrested on drug-related charges. I lost contact with Cone after his arrest. I know that he served a 5 year sentence before he was deported back to Colombia. I had no contact with him until 1993. That is when I called Cone to put him in touch with Gordo.

Cone spoke with Gordo and told him that he needed collateral to do business. Cone wanted property in the United States or Colombia for collateral. The deal with Gordo stopped there. After our meeting, Gordo sent me documents about properties in Colombia. After I investigated these properties, I realized the documents were false. This was my limit with Gordo. I told him that I did not want to talk to him any more about the cocaine business. But Gordo would never give up. Looking back, I believe Gordo was calling me over and over again to set me up. I knew that Gordo couldn't be trusted and that he was a con artist, but for some reason I liked to gossip with him. I should have known better. Gordo and I did not make any concrete cocaine deals. I didn't trust Gordo, and I was becoming afraid of him.

*next page*

000304

I was arrested on May 5, 1995.  When I debriefed the government in 1998, I read FBI reports saying that Gordo was also arrested in August of 1995.  They also said that Gordo made a plea agreement and became an informant.  I wonder whether this is true – I suspect Gordo was working for the government all along.  I found out that Gordo talked to the FBI on August 25, 1995; February 15, 1996; and May 28, 1998.  In these interviews, he gave a lot of false information about me and my family.  However, I think Gordo was honest about one thing – the fear he had of working for the government.  Gordo told the agents that his cooperation would put him and his family in grave danger in Colombia.  The FBI understood this threat and planned to give Gordo enough money to have his two sons brought to the U.S.

Gordo returned to Cali sometime after 2000.  My friends in Cali told me that Gordo was around.  They also told me that Gordo was telling people I was a government informant.  I heard this from my sister Patricia, from my friend Iliana Balcázar, and from my old boyfriend, Benito Lopez.  My friends Capete, Villegas, and Miller were also in the cocaine business with Gordo.  Capete and Villegas were arrested in the United States and deported back to Colombia.  Villegas was arrested some time after I became an informant.  I believe Capete, Villegas, Miller and Gordo shared the same connections Cali cocaine suppliers.

Last summer, my sister Patricia told me that Gordo was assassinated.  Patricia got this information from a newspaper article in El Caleño.  Gordo was killed by two assassins in the middle of the day in Cali.  Patricia sent me a copy of the newspaper article to support my case.  I do not remember many of the details, but the article ends by saying that the police planned on conducting a thorough investigation.  But, these investigations never amount to much in Colombia.  My sister would like to find out more about Gordo, but she is very afraid of getting involved.  Getting involved in my case would put her and her family at risk.  Asking the wrong questions in Colombia can make you a walking target.  Assassinations and violence by cocaine cartels and their gangs is common in Colombia.  These Colombian drug cartels are ruthless and will seek revenge by whatever means necessary.  If I am removed to Colombia, I know will suffer the same fate as Gordo.  And I am also certain that the Colombian government cannot and will not do anything to protect me or my family.

14

This declaration is executed under penalty of perjury.

Date:        12-3- 2005

Location:    F C I    Dub/in.


Signature:   Ana B Bircini

15

# EXHIBIT

# A-2



November 30, 2005

Immigration Court
Honorable Judge Murry.

Your Honor:

I am, Clemencia Jaramillo, Ana Biocini's sister. It has been a long and difficult time since Ana has been convicted and sentenced that not only her, but the whole family has faced. Through the last ten years, we have seen how much, for good, Ana has changed her life around, educating herself, and then working, providing herself for a better and stable future.

Today, I am pretty much worry about her well being if she is deported to Colombia. It is well known that the Justice System in Colombia does not work as well as it does in the United States of America. In Colombia there is not protection, of any kind, even for Judges, police men or any one that tries to put an end on the war of drugs. It is a public notice that in the case of my sister, an informant, Hernando Velazco, was killed by the drug Cali Cartel's Mafia in his return and deportation from USA to Colombia. Before his death, I heard from my sister Patricia that he was telling others about my sister Ana, being the one, that incriminated the Cali's Cartel in her case. I fear for my sister life being punished by the drug Cali's Cartel if she is deported to Colombia. Knowing how the Justice System works in Colombia, I, we as a family, are concerned of her coming back to Colombia, living, uncertainly, in a country where there is not legal system that provides security for her well being.

Also, Our nephew, Peter Alexander will suffer from Ana, his mother, being deported. It will be dangerous for Peter to travel to Colombia as an American citizen, to see her, and spent time together. Foreigns are number one target for kidnapping in Colombia. It is a risk that we do not, or neither Peter Alexander, want to take. Peter Alexander will be isolated from his mother. This young man has gone through difficult times during all these years were sadness and uneasiness as mark his understanding to his mother's present situation. Putting them apart from each other will be devasting for him. Probably, having his mother around, will heal Peter, feeling ashamed from what his mother has done in the past. Ana has shown being capable of turning her life around, and I know that she is more than willing to make this work.

Your Honor, your considerations to these concerns are vital to my sister' immigration case. I, like our family, thank you for your courtesy to this letter.

Respectfully submitted,

Clemencia Jaramillo.



# EXHIBIT
# A-3

Your Honor,

I am very worried for my sister Ana Biocini, if she returns to Colombia, due to the association she had with Hernando Velasco in the federal case.

As the court is already aware, Hernando Velasco was deported after fulfilling his sentence and when he returned to Colombia he was brutally assassinated.

I was horrified when I saw the story in the newspaper El Caleño. Immediately I tried to inform my sister Ana Biocini about the horrible news.

Your honor, I have heard rumors about comments made by Velasco to friends in common, upon his return to Colombia, that my sister Ana Biocini made a deal with the Government to cooperate and are involved in drug trafficking and gave information against the individuals that lived in Colombia.

Please your honor, I do not want my sister to be deported to Colombia because I am scared that they would kill her.

But the most important issue your honor, is that they are gong to separate a mother from her only son. That son is a young 17 years old that needs to grow up having a complete family for his emotional, physical, and psychological well being.

I, your honor, am a mother of two sons and that is why I dare to beg of you to reconsider your decisions. It is true that we all make mistakes, but also is true that my sister Ana Bocini, changed her life in a positive way. In the last few years, she has not stopped suffering by the mere fact that she is thinking about the punishment she would receive, but the cruelest punishment would be to separate her from her only child and to not see him ever again.

Your honor, again I beg of you to pardon this mother that is willing to do anything to reunite with her only son.

Your honor, thank you for your understanding and consideration.

Sincerely,

Patricia Kluckhohn

"I, Martha Cornejo, declare and certify that I am competent to translate documents from English to Spanish and Spanish to English."

Martha Cornejo

Geckomail  Page 1 of 2

# UC**DAVIS**

dmoua@ucdavis.edu >> Check Mail | Compose | Addresses | Configure | Spam Filtering | Help/Info | New Login | L.

<< **Previous** (Fw: Ana Biocini's case...) **Next** >> (translation help...)

**This Message**
• Reply / Reply to All
• Forward
• Compose To
• Show Headers
• Delete
• Move to:
  ABAS Mentor   OK

**From:** "jaramilloheman@netzero.com" <jaramilloheman@netzero.com>
**Subject:** Fw: carta al juez Ana Biocini's case
**To:** dmoua@ucdavis.edu
**Cc:** jaramilloheman@netzero.com
**Date:** Wed, 30 Nov 2005 23:18:48 GMT

**Folders**
INBOX    1/32
ABAS Mentor
ASA schedule
Class
To Print
UCD-spam
gecko-trash
lsnc
outbox
t . prac

• Manage Folders

--------- Forwarded Message ---------
Immigration Court

Honorable Juez Murry

Su Señoría

Yo estoy muy preocupada por mi hermana Ana Biocini si ella regresa a Colombia, debido a la asociación que ella tuvo con Hernando Velasco en el caso federal.

Como la corte ya supo, Hernando Velasco fue deportado después que cumplió el tiempo en su sentencia y cuando él retornó a Colombia fue asesinado brutalmente.

Yo estaba horrorizada al ver la noticia en el periódico El Caleño. Inmediatamente traté de informarle a mi hermana Ana Biocini acerca de esta espantosa noticia.

Su Señoría, yo he oído rumores acerca de que Velasco dijo a amigos en común cuando él regreso a Colombia que mi hermana Ana Biocini hizo un acuerdo con el gobierno para cooperar y dar información en contra de personas que viven en Colombia que están envueltas en actividades de drogas.

Por favor su señoría, yo no quiero que mi hermana sea deportada a Colombia porque tengo miedo de que la puedan matar.

Pero lo más importante su señoría, es que van a separar a una madre de su único hijo para siempre. Ese hijo es apenas un adolescente de 17 años, que necesita terminar de crecer teniendo una familia completa para su bienestar emocional, físico y psicológico.

Yo, su señoría, soy madre de 2 hijos y por eso me atrevo a suplicarle que considere su decisión. Es verdad que todos cometemos errores, pero también es verdad que mi hermana Ana Biocini, cambió de manera positiva el rumbo de su vida, y no ha parado de sufrir ni un minuto durante los últimos años de solo pensar en el castigo que recibiría, pero el más cruel seria el de no volver a ver a su hijo para siempre.


Su Señoría, de nuevo le ruego le otorgue el perdón a esta Madre que está dispuesta a todo para reunirse nuevamente con su hijo.

Su Señoría, muchas gracias por su comprensión y su consideración

Sinceramente,

PATRICIA KLUCKHOHN

MSN Amor: busca tu ½ naranja http://latam.msn.com/amor/

**Attachments:**

1  No description  [TEXT/PLAIN] (Size: 2.235 KB)      Download   Display
2  No description  [TEXT/HTML] (Size: 3.979 KB)      Download   Display

000312



# EXHIBIT

# A-4

000313

Our family has been following very closely the case of our sister Ana Biocini and have become aware of events that have developed around her case that are of concern and have made us fear for the life of our sister.

As the Court is already aware, Mrs. Ana Biocini has been related to Mr. Hernando Velasco in a federal case. The Court is also aware that Mr. Velasco was deported upon fulfillment of his sentence and upon his return to Colombia was brutally assassinated.

The news was wildly distributed in the local newspaper, *El Caleño*, through which we were informed of the brutal way in which his death happened, due to the retaliation laws against the people that are suspect of cooperating with the federal government by providing information.

When we heard the story, we immediately tried to inform our sister Ana Biocini about this horrible news and we believe she has made the Court aware of this fact that will put her life at risk in the event that she returns to Colombia.

Your honor, we have become aware by rumors by some friends in common that Mr. Velasco said that our sister had made a deal with the Government to cooperate and give information against people that live in Colombia and are involved in drug activities.

Lastly, it is no secret to anybody about the series of retaliations and "vendettas" that have been appearing lately in cartels and we want to make the court aware and ask for its consideration due to the life of our sister, in the event that she gets deported to Colombia because they could possibly kill her.

Your honor, thank you for your compassion, and consideration.

Sincerely,

Diego Jaramillo Racines


"I, Martha Cornejo, declare and certify that I am competent to translate documents from English to Spanish and Spanish to English."


Martha Cornejo

000314



———— Forwarded Message ————
Bogotá D.C., noviembre 28 de 2005

INMIGRATION COURT

HONORABLE JUDGE MURRY

YOUR HONOR

En nuestra familia hemos seguido con mucha atención el desarrollo del caso de nuestra hermana ANA BIO
CINI y hemos visto con preocupación algunos acontecimientos que se han presentado alrededor de su caso
, que nos hacen temer por la vida de nuestra hermana.

Como es sabido por la Corte, la señora ANA BIOCINI estuvo relacionada con el señor HERNANDO VELAZ
CO en un caso Federal. Como también es de conocimiento de la Corte, el señor VELAZCO fue deportado a
l cumplir el tiempo de su sentencia y a su retorno a Colombia fue brutalmente asesinado.

La noticia tuvo amplia difusión en el periódico local EL CALEÑO, mediante el cual nos enteramos de la man
era tan brutal en que ocurrió su muerte, debido a la ley de venganza y ajusticiamiento con las personas que
se sospecha han tenido acuerdos de cooperación e información con el Gobierno Federal.

Cuando nos enteramos de la noticia, inmediatamente tratamos de informar a nuestra hermana ANA BIOCIN
I acerca de esta horrorosa noticia, y creemos que ella ha puesto en conocimiento de la Corte este hecho qu
e pondría el riesgo su vida en el eventual caso de su regreso a Colombia.

Su Señoría, nos hemos enterado por rumores de algunos amigos en común que el señor VELAZCO dijo qu
e nuestra hermana ANA BIOCINI había hecho acuerdos con el Gobierno para cooperar y dar información e
n contra de personas que viven en Colombia y están envueltas en actividades de drogas.

Por último, no es un secreto para nadie toda la serie de ajusticiamientos y "vendetas" que se viene presenta
ndo últimamente entre los Carteles y que queremos poner en conocimiento de la Corte para su consideraci
ón, ya que tememos por la vida de nuestra hermana en una eventual deportación a Colombia porque muy p
osiblemente la pueden matar.



Su Señoría, muchas gracias por su compasión y su consideración.

Sinceramente,

DIEGO JARAMILLO RACINES

c.c. 16.448.750



# EXHIBIT
# A-5



Your Honor Murry,

My life has been interesting the last few years. The reason I address you is to say everything I can about my situation, and that is the subject of this letter.

During the earlier parts of my childhood, I lived through a seemingly uneventful life. The lower parts of my childhood, such as my house being raided by law enforcement agents in the early morning, I would only become fully aware of when I was around 13 years of age. This event was the first time my mother was arrested, in 1995. I only can remember fragments of the aftermath. In my mind, images of sadness play out in my mind, of becoming angry and lashing out at friends and family; what I remember in those days was a constant feeling of alienation and despair. Alienated because my life was thrown into confusion, it was an experience in which everything fell to uncertainty, and I had felt completely disoriented; the world had completely betrayed my trust.

This depression hasn't left me since. I had little motivation for anything, I lost all ambition in my studies, I became extremely introverted and in social settings I was highly emotionally sensitive; this would lead me to always keep my distance. Even now I find it hard to shake off these emotional afflictions. It feels like I was robbed of my childhood.

In January 2004, my mother was incarcerated to serve her sentence, and by then I was a more aware of what had transpired in 1995. It was distressing that she was going again, though perhaps this time it wasn't as initially shocking as it was first time my mother was arrested. In the months after she was incarcerated a disconnection, an emerging separation between me and my mother had appeared beyond our physical separation. I talked to her on the phone but in my everyday life, despite her best efforts, she was absent the vast majority of the time. I always feel this division, but it would be especially apparent on the holidays, birthdays, and on other special occasions.

Before her incarceration, she had done all the right things for years, she was sober and she did not engage in any illegal activities, so why did she go? My experiences with the legal system had left me very frustrated. It is hard for me to write or visit my mom; the way the prison system works seems to be explicitly designed to be a completely humiliating experience. Every time she calls an automated message speaks "This call is from a federal prison. This is a prepaid call, you will not be charged for this call. This call is from: 'Ana', if you will accept the call, dial 5 now"; you can only accept the call when they say the very last part. The little things build up over time. And they give you maybe 30 seconds of lee-way after the 15 minutes; and we have to get used to



our conversation only being 15 minutes. And so all the information has to be just shortened to little sound bites; it is hardly a chance to connect with her. Plus there's the question lingering in your mind: "is someone monitoring the call?"

The years that were lost, the energy invested into this dilemma, we will never be able to recover that. I am scared though that more will be lost, that I could lose my mother to even more distance, and I am scared of what may happen to her if she gets deported to Colombia. This whole debacle makes me rather anxious, as I worry for the safety of my mother, and that she will remain just a voice on the other end of the telephone or if I won't even get to hear that voice; I do fear for her life. All I can hope for is that you take my positions on this matter into account and adequately weigh them when you render your final judgment.

This affidavit is executed under penalty of perjury.

Date:                              Location:

Sincerely,

Peter Biocini



# EXHIBIT

# A-6

Dear Judge Murry:

In 1995 the FBI told me personally that my son and I needed witness protection because our lives were at risk. I believe that this advice speaks large volumes about the situation that Peter, Ana, and I face.

Ana came back to the house sober, and was totally committed to obeying the rules and to provide a nurturing environment for Peter. I was familiar with due process as I understood it as a citizen of the United States, so upon signing the Bond Agreement I felt that despite this warning from the FBI, the risk would be for two years at the outset and then end upon conviction or acquittal Peter and I could continue to live our lives. We presumed that we would be respected with an awareness of the developments, the time lines, and any other pertinent information that had to do with our civil liberties, our safety, and our rights and obligations. Never in my wildest dreams did I expect to be in the dark, with no access to any of these facts for such a long period of time. At this time, Peter surely could feel the strain on both of his parents and it greatly affected our environment.

We lived in a two bedroom house rental. Peter's aunt slept in the living room. I worked, and stayed at the house. I provided a defense with the two handguns that I owned. The FBI said to me that I was involved in Ana's conspiracy, and that I was in the same room at her house where there were supposed drug trafficking conversation that they had recorded on tape. I asked them what language they were speaking in this conversation, when I was there was visiting my son. They were in Spanish, and I do not speak Spanish; also they had no record of me speaking Spanish in any of their tapes. They were highly displeased by this.

000321



Peter and I suffered greatly under the weight of this bond agreement. The lack of concern for our lives in spite of the suffering we went through, the feeling of having suffered in vain, that is the root of our depression. Please think about our sentence that we served from 1995-2002.

Ana has aid her debt to society, and she is not a drug king-pin. I'm certain that Peter needs his mother in his life, as well as there for his future. I respectfully ask that you give Peter and Ana this opportunity.

> Sincerely yours,
>
> George Biocini

This affidavit is executed under penalty of perjury.

Signature:

Date:

Location:

000322