

# EXHIBIT

# C-2



1   KEVIN V. RYAN (CSBN 118321)
    United States Attorney
2
    CHARLES B. BURCH (CSBN 79002)
3   Chief, Criminal Division

4   BARBARA BRENNAN SILANO (MASSBAR 055540)
    Assistant United States Attorney
5
    450 Golden Gate Avenue
6   San Francisco, Ca. 94102
    Tel: 415-436-7223
7
8   Attorneys for Plaintiff

9                   UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                   SAN FRANCISCO DIVISION

12   UNITED STATES OF AMERICA,          )    No. CR-95-0187 CRB
                                        )
13          Plaintiff,                  )
                                        )    SENTENCE MEMORANDUM
14      v.                              )
                                        )    **UNDER SEAL OF COURT**
15   ANA BEATRICE BIOCINI,              )
                                        )
16                                      )
          Defendant.                    )    SAN FRANCISCO VENUE
17   _____)

18
19      The United States of America, by Kevin V. Ryan, United States Attorney for the
20   Northern District of California, and by Barbara B. Silano, Assistant United States
21   Attorney for the Northern District of California, hereby submit this Sentencing
22   Memorandum and Motion to Depart Pursuant to U.S.S.G. § 5K1.1.

23                                      I.

24            SENTENCING GUIDELINES BASE OFFENSE LEVEL
              AND SUMMARY OF TERMS OF PLEA AGREEMENT

25   A. **Base Offense Level**

26      The government submits that the probation officer has correctly calculated the base

27   offense level for defendant Ana Biocini at a level 32.

28

SENTENCE MEMORANDUM

## B. Acceptance of Responsibility

Pursuant to the terms of the plea agreement, the government has agreed to recommend a two point reduction because of Ms. Biocini's acceptance of responsibility.

## C. Role in the Offense

In the plea agreement, the United States further agreed not to recommend a role adjustment for Biocini.

The electronic interceptions in the case along with the intelligence supplied in the debriefings of the defendants make it clear that Ms. Biocini was not an organizer or leader as defined by the guidelines. She was a source where individuals who were interested could obtain cocaine. None of the evidence collected in the case supports the conclusion that Ms. Biocini gave directions or orders to anyone else, nor controlled how much profit they received.

The facts underlying the charges are as follows: The defendant has admitted that from on or about 1990 up to and including May 8, 1995 in the Northern District of California, the defendant did knowingly and willfully combine, conspire, confederate and agree with Christopher Michna, Steven Siegel and others to distribute cocaine.

On December 8, 1994 at 4:33 p.m. Christopher Michna called Siegel and requested a kilogram of cocaine. On December 8, 1994 at 4:46 p.m., Siegel telephoned Michna from the residence of Ana Biocini and offered to bring Michna a kilogram of cocaine.

On December 8, 1994, Ana Biocini provided a kilogram of cocaine with a picture of a tractor on the front to Steven Siegel. On December 8, 1994, Steven Siegel took the kilogram of cocaine he had obtained from Biocini and delivered it to Christopher Michna.

## II.
## GUIDELINE CALCULATIONS

| | |
|---|---|
| Base Offense Level | 32 |
| Acceptance | -3 |
| Total Offense Level | 29 |

SENTENCE MEMORANDUM



**B.  <u>Criminal History</u>**

The defendant is a Criminal History Category I

**C.  <u>Safety Valve</u>**

The United States submits that the defendant has supplied all of the information concerning the offense to the government and has satisfied the criteria of U.S.S.G. § 5C1.2. She is therefore eligible for the limitation on minimum mandatory sentence and a two point reduction in her adjusted offense level.

Adjusted Offense Level                     27

Level 27 and Criminal History Category I carries a recommended sentence of 70-87 months.

**III.**

**DEPARTURE MOTION PURSUANT TO 5K1.1**

The United States submits that the defendant Ana Biocini has satisfied the criteria of providing substantial assistance to the United States.  Biocini did avail herself of an opportunity to plead guilty and agree to testify against one other defendant in the case, Norberto Duarte.   She also, ultimately, agreed to cooperate with the United States.   Her cooperation, however, came at a time when all others in the case, save Duarte, had entered pleas of guilty and approximately three years after her arrest.

According the FBI case agent most familiar with the investigation, Biocini first agreed to cooperate and provide information to the government on June 5, 1998 when she pled guilty to one count of possession with intent to distribute a kilogram of cocaine.

A condition in Biocini's plea was a downward departure recommendation for Biocini if she provided meaningful information concerning narcotics activity which could be used by the FBI in its investigations and for Biocini's testimony for the government against her co-defendants.

Biocini was formally interviewed by FBI agents for the first time on June 18, 1998. In this interview, Biocini was asked questions about several drug associates, some which were co-defendants. Biocini appeared to provide honest historical information about

SENTENCE MEMORANDUM

herself, how she became involved in drug trafficking and some of her most significant drug activities with various persons. She appeared to provide honest information about the criminal nature of her relationship to persons who were noted in personal indicia taken from Biocini as evidence from her home, such as telephone records, address books and other records. Biocini provided varying degrees of detail on about 25 different people in this interview with whom she claimed to either have had narcotics relations, or whom she heard were involved in narcotics trafficking.

Biocini provided substantial detail about her relationship with co-defendants Steven Siegel, Diane Dragoo and Norberto Duarte. Much of what Biocini provided in this and subsequent interviews about other of her criminal associates was either dated in nature, fragmented due to her weak recall of many details, and as such difficult to corroborate independently.

Most of the individuals Biocini identified as criminal associates she knew to live in the Miami, Florida area. FBI agents conducted documentary searches for pre-existing information about these persons and then when possible established leads to FBI offices with jurisdiction of areas where these persons were believed to be. In no instance was there an active investigation of any persons mentioned by Biocini. Biocini's information of the persons was simply too dated and fragmented to become of meaningful value in an active investigation.

Biocini was formally interviewed for information three times, between June 18, 1998 and November 17, 1999. Biocini's information simply could not be used to materialize an investigative matter.

Biocini did dedicate numerous days with investigators and the Assistant United States Attorney in preparation for her anticipated testimony in the trial of Norberto Duarte, which was twice rescheduled and thus required Biocini to prepare twice to testify. Biocini from the start of her cooperation expressed an earnest willingness to act as a witness against any of the co-defendants in this matter. She made herself readily available for trial preparation and conducted herself professionally. She reviewed documents to

SENTENCE MEMORANDUM

 

1  which he could provide first hand testimony and listened to a good number of wiretap
2  conversation to which he was a party and he provided what seemed to be truthful
3  information about the criminal nature of his relations with Biocini.  Biocini was a
4  difficult person to prepare as a witness by virtue of her tendency to recall different details,
5  and in different ways, concerning key events, dates, places, meetings, names and the like.
6  Her short attention span and her tendency to digress necessitated many hours to keep her
7  focused on the important details of her testimony.

8      In the opinion of the government, Biocini's willingness to act as a witness in Norberto
9  Duarte's trial had an impact on Duarte's ultimate decision to plea.

10     Biocini had several times expressed to FBI agents her desire to avoid prison time
11  entirely, and deportation, if she remained cooperative.  At no time were such assurances
12  ever suggested or explicitly made by agents to Biocini. In fact, she was clearly told that a
13  complete avoidance of prison time given the charges that she pled to was highly unlikely,
14  but that the government would provide to the court a fair recommendation of her
15  cooperation at time of sentencing.

16     During preparation for Steven Siegel's sentencing investigative records were
17  presented to Biocini which linked Siegel to a 1988 drug transaction in Los Angeles of
18  some 8 kilograms of cocaine.  By her own admission, the transaction involved Ana
19  Biocini and other suspects. Siegel minimized his involvement, contrary to what
20  documents suggested. Subsequently, after Biocini pled to charges against her and she
21  provided information to the government about the 1988 drug deal with Siegel and the
22  extent of his involvement.  Biocini further disclosed the identity of the supplier of the
23  cocaine in that drug deal, an individual who she knew to be well associated to both
24  Norberto Duarte and Siegel. Biocini provided sufficient detail about this drug supplier
25  which was corroborated with existing drug intelligence. She furnished information about
26  the manner in which the drug supplier associated with Siegel and advised that the 1988
27  drug deal in Los Angeles was negotiated between Siegel and the drug supplier.

28     Siegel was pointedly asked about the drug supplier by a case agent, both to establish

SENTENCE MEMORANDUM



1   his credibility and to add further corroboration to Biocini's information. Siegel denied
2   having any relations with the drug supplier and only went as far as alleging that he once
3   casually met this person at a social event.

4      The plea of guilty by Ms. Biocini enabled the Court to avoid a lengthy wiretap trial
5   where several of the conversations were in a foreign language.  Her plea of guilty, on the
6   eve of trial, did little to avoid the expense of time and effort necessary in preparation for
7   trial by the government, but was a certain convenience for the Court. Siegel, however,
8   would have been a highly impeachable witness due to his arrest record, and he could
9   provide no corroboration of the prior kilogram cocaine sales. Siegel's offer to testify must
10  be viewed in the context of the wiretap evidence clearly establishing that Siegel obtained
11  the cocaine from Biocini and delivered the cocaine to Michna, who, in turn, delivered it to
12  Keith Karpinksi, who sold it to a person co-operating with the government.

13     Accordingly, the United States moves this Court for a depart from the recommended
14  guideline range of 70-87 months pursuant to 5K1.1.  The United States has evaluated the
15  assistance of the defendant and recommends that the defendant be sentenced to the
16  custody of the Bureau of Prisons for a term of no less than sixty (60) months.

17

18  DATE:

                                Respectfully submitted,

19

20                                    KEVIN V. RYAN
                                  United States Attorney

21  **FILE COPY**

22                                    BARBARA BRENNAN SILANO
                                  Assistant United States Attorney

23

24

25

26

27

28

SENTENCE MEMORANDUM

# EXHIBIT
# C-3

000414



1  ROBERT WAGGENER - SBN: 118450
   Law Office of Robert Waggener
2  214 Duboce Avenue
   San Francisco, California 94103
3  (415) 431-4500

4  Attorney for Defendant
   ANA BIOCINI

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA              No.  CR 95 00187 CRB

12                  Plaintiff,            **DEFENDANT'S SENTENCING
                                          MEMORANDUM**
13           v.
                                          Date:   April 28, 2003
14  ANA BIOCINI,                          Time:   3:30 p.m.
                                          Ctrm.:  Hon. C. Breyer
15                  Defendant.
                                          [TO BE FILED UNDER SEAL]
16  _____/

17                          **INTRODUCTION**

18      Forty-eight year old Ana Biocini appears before the court for sentencing following her

19  conviction of one count of conspiracy to distribute cocaine (21 USC § 846), based upon a plea

20  agreement entered into on June 5, 1998.  Defendant has numerous objections to the factual

21  content of the Final Presentence Report and the sentencing recommendation by the United States

22  Probation officer, but there is no controversy as to the guideline offense level calculations and

23  criminal history computations set out and recommended in the report.[1]  The offense level

24  calculations in the Presentence Report are consistent with the quantity computations

25

26  _____

27      [1]The Addendum to the Final Presentence Report indicates "no factual objections to the
    Presentence Report by the defendant" which is simply not true.  An extensive letter objecting to the
28  factual content of the Presentence Report was presented to the probation officer and is attached hereto as
    Exhibit A.  Many of the same factual objections are repeated in this memorandum.

DEFENDANT'S SENTENCING MEMORANDUM

1    contemplated in the Plea Agreement, but are dramatically impacted by the 5K.1 motion filed by

2    the government which gives the court wide discretion regarding the ultimate sentence.

3         Defendant Biocini has a total offense level of 28, with a guideline range of 78-97 months.

4    Both the government and the probation officer are recommending a departure to 60 months.  Ms.

5    Biocini has no prior criminal record and has been afforded the benefits of the safety valve

6    provisions of the guidelines.  Defendant submits that the court should consider a much more

7    lenient sentence given its powers after the 5K.1 motion by the government, the extent of the

8    cooperation provided by the defendant and its dangers, and the compelling circumstances

9    regarding the defendant set out herein.  It is sincerely urged that Ms. Biocini be given a

10   probationary sentence under the overall circumstances, even though the underlying drug

11   distribution conduct is admittedly quite serious and extensive.

12        Defendant submits that the Final Presentence Report before the court presents an unfair

13   portrayal of the defendant's historical background and contains incorrect, irrelevant, unreliable

14   and inflammatory information which should be stricken by the court or amended or edited to

15   fairly and accurately represent the background of Ms. Biocini.  Obviously, the most important

16   objectives of the objections to the Presentence Report is to give the court a fair and accurate

17   factual basis upon which to sentence the defendant.  This court is in a difficult position of having

18   to comprehend and evaluate the defendant's relative position and culpability in a huge, dated

19   wiretap case, where the numerous convicted co-defendants have all been sentenced by other

20   judges.[2]  A major portion of this memorandum, the arguments regarding sentencing, and the

21   requested sentencing hearing, is therefore aimed at achieving a just and fair foundation for the

22   court to make its sentencing determination.

23        Because of the extensive factual disputes within the Presentence Report set out below,

24   defendant is requesting that a sentencing hearing be conducted where defendant can present

25   ──────────────────────

26       [2]The so-called "North Beach" wiretap case was initially assigned to the Honorable Judge Fern
Smith and she ruled on the majority of the wiretap litigation and sentenced the majority of the defendants

27   in the late 1990's.  Several factors led to the delay in the proceedings regarding Ms. Biocini but the
ultimate assignment of her case to this court was because Judge Smith was obviously no longer available

28   and this court was on "duty" when the assignment was made.

DEFENDANT'S SENTENCING MEMORANDUM        2

1  evidence and rebut the disputed factual contentions in the Presentence Report, expose the

2  unreliability of the information contested, and present or supplement affirmative evidence on

3  behalf of the defendant which should be considered by the court.

4       Here, defendant presents authorities in support of her request for a sentencing hearing and

5  specific objections to the factual content of the Presentence Report and the sentencing

6  recommendation, extensive information about the defendant's conduct in the eight years since

7  she was originally arrested, and facts and insights gained through the course of representing Ms.

8  Biocini which should be considered by the court in terms of the presented objections and the

9  ultimate sentencing decision.

10  **PRESENTENCE REPORT**

11       Present counsel was appointed to represent Ms. Biocini about four years after she had

12  entered a plea and has been steadily attempting to catch up in terms of the legal and factual

13  background of her case. Disagreements arose with the attorney who represented Ms. Biocini for

14  about six years through her plea and cooperation with the government. Reconstructing the

15  history of the case against the defendant and her background has been a substantial task.

16  Nonetheless, now having reviewed and researched the reports of the government, including the

17  original investigative reports and the later debriefing and cooperation documentation of Ms.

18  Biocini and others, and researching some of the background material of the case, there are

19  extensive corrections and objections to the report that are set out within this memorandum. The

20  number of factual objections are posed by this memorandum for a variety of different reasons.

21  There are some basic corrections and inaccuracies, as well as facts which have been omitted or

22  need to be added in order to give some context to the described conduct. One problem that exists

23  is that the factual material presently set out within the Presentence Report is largely based in

24  some instances on debriefings of cooperating defendants who have minimized their own

25  involvement and exaggerated that of others such as Ms. Biocini. A clear example of this

26  situation exists with co-defendants and/or co-conspirators Steven Siegel and Diane Dragoo,

27  further discussed below, who pleaded guilty and/or cooperated before Ms. Biocini and cast her in

28  an unfair light for their own benefit or protection. This is not to deny Ms. Biocini's criminal

DEFENDANT'S SENTENCING MEMORANDUM          3

000417

1   liability or to question the investigation by the government, but these cooperating individuals

2   have unfairly and inaccurately reported the drug distributing role, history, and accountability of

3   Ms. Biocini. In many ways, Ms. Biocini was an easy target, as will be seen below, because there

4   was no danger to "fingering" her; she posed no danger, there was no threat of retribution, and the

5   historical information was not easily disproved.

6          Information from the eventual debriefings of Ms. Biocini is referenced in the Presentence

7   Report and there are some noted disagreements by Ms. Biocini, but there are inaccuracies even in

8   the adopted material which has made its way into the report and the full extent of the factual

9   objections. The bottom line of the situation is that after moving to Miami around 1985,

10  Colombian-born Ana Biocini began to run with a very fast crowd and eventually associated with

11  a number of major narcotics vendors. Ms. Biocini made these contacts as a result of her own

12  cocaine addiction and basically getting caught up in the lifestyle. Once she moved to California

13  years later, Ms. Biocini used her connections and contacts to set up drug transactions between

14  various people, but it was not a situation where she was a major supplier. She was the classic

15  "middle person" who essentially brokered a couple of sizeable cocaine transactions but never

16  realized the tremendous financial gains inherent to big-time cocaine dealing and never became a

17  drug dealer by occupation. There were also occasions where Ms. Biocini transacted relatively

18  small quantities of cocaine and marijuana amongst her Northern California social group, and they

19  did likewise. When arrested, Ms. Biocini was basically a financially struggling drug addict and

20  young mother unable to capitalize on past connections to broker any transactions, and trying to

21  get some counseling and acquire some job skills. Ms Biocini's connections had and have long

22  since dried up, she has candidly exorcized her prior misconduct through her substantial

23  assistance to the government, and she has now completely turned her life around. The progress

24  made by Ms. Biocini during the eight years that she has now been out of custody on this case is

25  not adequately noted within the report and elaborations on some of her accomplishments and her

26  current situation are made herein and documented by attached exhibits.

27         In terms of the extensive objections, additions, and corrections noted below, an attempt is

28  made to be clear and specific as to page and paragraph number so they can be efficiently

DEFENDANT'S SENTENCING MEMORANDUM          4

000418

1   reviewed by the court. The editions, corrections, and objections set out are intended to balance

2   the Presentence Report, and the requested sentencing hearing is to flesh out and bolster the

3   factual contentions. A number of exhibits are attached to this memorandum (A-L) and will be

4   introduced herein.

5         **MEMORANDUM OF POINTS AND AUTHORITIES**

6        Federal Rule of Criminal Procedure 32 is the controlling statute regarding sentence and

7   judgment and the contents of a presentence report. According to Rule 32 (d)(2), the presentence

8   report must contain the following information:

9      (A)    The defendant's history and characteristics, including:

10           (i)    any prior criminal record;

11           (ii)   the defendant's financial condition; and

12           (iii)  any circumstances affecting the defendant's behavior that may be helpful

13              in imposing sentence or in correctional treatment;

14      (B)    Verified information, stated in a nonargumentative style, that assesses the
financial, social, psychological, and medical impact on any individual against whom the
offense has been committed; ...

15

16      (F)    any other information that the court requires.

17      *At the sentencing hearing,*

18      The court may, in its discretion, permit the parties to introduce testimony or other
evidence on the objection. For each matter controverted, the court must make

19      either a finding on the allegation or determination that no finding is necessary
because the controverted matter will not be taken into account in or will not effect

20      sentencing. The written records of these findings and determinations must be
appended to any copy of the presentence report made available to the Bureau of

21      Prisons. *Federal Rule of Criminal Procedure, Rule 32 (c)(1).*

22   Here, the defendant is requesting a sentencing hearing in order to introduce testimony and other

23   evidence regarding the objections noted herein and to present affirmative evidence on behalf of

24   the defendant.

25        The sentencing guidelines do not set out the precise manner in which disputes within a

26   presentence report must be resolved other than to state that they must be resolved in accordance

27   with Rule 32. The policy statement as to the resolution of disputed factors states that:

28

DEFENDANT'S SENTENCING MEMORANDUM     5

1       When any factor important to the sentencing determination is reasonably in
     dispute, the parties shall be given an adequate opportunity to present information

2       to the court regarding that factor.  In resolving any dispute concerning a factor
     important to the sentencing determination, the court may consider relevant

3       information without regard to its admissibility under the Rules of Evidence
     applicable at a trial, provided that the information is sufficient indicia of reliability

4       to support its probable accuracy.  *USSG §6A1.3*.

5  See, *United States v. Jordan*, 291 F3d 1091 (9th Cir. 2002); *United States v. Berry*, 258 F3d 971,

6  976 (9th Cir. 2001); see also, *United States v. Buckland*, 289 F3d 558, 569 (9th Cir. 2002) (en

7  banc).  Here, defendant submits the Presentence Report is rife with irrelevant, unreliable, and

8  inaccurate information and the court must resolve the presented issues as to the disputed

9  information.

### FACTUAL BACKGROUND

10

11  **A.    Background of Ms. Biocini**

12       Ms. Biocini's family background is summarily outlined in paragraphs 45 through 48 of

13  the Presentence Report.  She was born in Colombia and has seven brothers and sisters.  When

14  she was 23 years old, Ms. Biocini moved to London, England, to work as a nanny (see **Exhibit**

15  **B**, attached).  From there, she eventually moved to the Miami area when she was in her late 20's

16  and quickly got introduced to a faster lifestyle.  Holding down various forms of employment, she

17  was a single, attractive woman of Colombian heritage who was quickly embedded in the fast-

18  moving drug-ridden culture of the early 1980's.  It was at this time she was first introduced to

19  drugs, which eventually lead to 15 years of drug addiction.  In 1988, she moved to California and

20  the Bay Area and married George Biocini, who had his own substance abuse problems.  The

21  couple had one child, Peter, who is now 14 years old and lives with Ms. Biocini.  The couple

22  divorced in 1994.  Ms. Biocini was arrested on the present charges in May of 1995.  Her son was

23  six years old at the time.  Ms. Biocini has been out of custody on the present charges for now

24  close to eight years, under the supervision and monitoring of Pretrial Services with no significant

25  transgressions or violations.

26  **B.    The"North Beach" Investigation and Prosecution**

27       As outlined within the Presentence Report, the "North Beach" investigation began in

28  December of 1991 and eventually led to a wiretap targeting a drug distribution conspiracy in the

DEFENDANT'S SENTENCING MEMORANDUM     6

1    San Francisco and Marin county area. The phone line of Ms. Biocini was ultimately one of the

2    targets of the wiretap. There is no question that the investigation uncovered a sizeable ring of

3    drug distribution, distributors, and that Ms. Biocini was involved in drug distribution. The

4    dispute with the Presentence Report is Ms. Biocini's portrayed role within the report and the

5    description of her historical background with various drug dealers and distributors. The factual

6    disputes as to the actual role of Ms. Biocini are fully set out in the objections to "Offense

7    Conduct" in the Presentence Report (paragraphs 11-25), which are addressed below.

8    **C.    Ms. Biocini's Plea Agreement and Substantial Assistance**

9        Ms. Biocini entered a plea of guilty in June of 1998 and then provided substantial

10    assistance to the government. By her plea agreement, Ms. Biocini is precluded from moving for

11    a downward departure. The Sentencing Memorandum and 5K.1 motion filed by the government

12    discusses Ms. Biocini's cooperation and agreement and preparation to testify against her co-

13    defendant, Mr. Duarte, which ultimately contributed to his entry into a plea agreement. Ms.

14    Biocini completely and honestly disgorged her knowledge of the drug trade and her participation

15    in various major and minor drug transactions through the course of several debriefings with the

16    government. Although the government estimates she provided information as to 25 different

17    people going back to her days in the Miami area and the inherent acquired knowledge of drug

18    trafficking and distribution, Ms. Biocini estimates the number at closer to 40. While true that

19    most of the information was historical because Ms. Biocini had since moved to California,

20    married, and had a child, it certainly appears that Ms. Biocini was willing to, and tried to do

21    whatever she could in regard to substantially assisting the government. For that matter, she has

22    remained willing to assist them in any way she can.

23        The government recognizes Ms. Biocini's earnestness in her cooperation. Her

24    truthfulness actually exposed some of the inaccuracy and minimization of other cooperators in

25    the case such as Mr. Siegel and Ms. Dragoo. These individuals had jumped on the substantial

26    assistance boat at earlier stages and had conveniently made Ms. Biocini a centerpiece of their

27    cooperation. She was somebody who posed no danger to them and was an easy target because

28    there was no question that she was around when a lot of drug distribution took place. Simply

DEFENDANT'S SENTENCING MEMORANDUM          7

1  put, rather than fully accepting their own roles or responsibility or identifying some fairly

2  dangerous, well-connected drug distributors, it was easier to push blame on to Ms. Biocini.  She

3  had little recourse.  As noted below, Ms. Biocini was at various times the paramour or

4  acquaintance of some heavy distributors but she was not the drug source, manager, or supervisor

5  of transactions she assisted or knew about, and certainly received no financial gain or benefit.  By

6  the time she was arrested in this matter, Ms. Biocini barely had a positive balance in her checking

7  account.

8       Further discussion of Ms. Biocini's cooperation appears below, but one significant factor

9  to point out is the inherent and assumed danger of Ms. Biocini's cooperation, even if mainly

10  historical.  Ms. Biocini has disgorged information on dangerous, foreign and domestic drug

11  distribution rings and it is not a situation to be taken lightly.  She has placed herself, her child,

12  and her family in significant danger and the risk of injury should be given substantial weight by

13  the court.  Not a lot of detail of this information is exposed in the government's sentencing

14  memorandum, but there is no question that Ms. Biocini has put herself at substantial risk.

15  **D.    Post-Arrest Progress and Rehabilitation**

16       Since her arrest in 1995, Ms. Biocini, now 48 years old, has completely turned her life

17  around and has been a contributing, productive member of society.  Even prior to her arrest in

18  May of 1995, she sought vocational counseling and was trying to pull herself out of the hole she

19  had created.  (See **Exhibit D**, attached hereto.)  After her arrest, she participated in extensive

20  drug treatment classes and a residential drug treatment program.  (**Exhibit C**, attached hereto.)

21       Since 1995, Ms. Biocini has been steadily employed (See Résumé, **Exhibit F**, attached

22  hereto), achieved and been awarded numerous certificates and awards (**Exhibit E**. attached

23  hereto), and had a solid employment history (**Exhibit G**, attached hereto).  Representative pay

24  stubs from her various forms of employment are submitted for review by the court (**Exhibit H**,

25  attached hereto).

26  **E.    Additional Exhibits**

27       Ms. Biocini is a single mother with full custody of her 14-year old child.  The relationship

28  with her former husband, George Biocini, while initially supportive after her arrest, has since

DEFENDANT'S SENTENCING MEMORANDUM          8

1   deteriorated. The situation has declined to a point where Mr. Biocini has been arrested or

2   detained for several instances of domestic violence and Ms. Biocini has had to obtain restraining

3   orders from San Mateo County courts (**Exhibit I**, attached hereto).

4          Whether related to the domestic violence situation and the acrimony of the parents or not,

5   there is unfortunately also a very distressing situation with Ms. Biocini's son where he has

6   become depressed and expressed suicidal intentions (attachment **Exhibits J & K**). Ms. Biocini's

7   son has now been getting psychological counseling for close to a year (see representative

8   appointment slips attached hereto as **Exhibit L**).[3] Such a situation pulls at one's heartstrings,

9   particularly where a prison sentence could further separate Ms. Biocini from her son. Counsel

10  and the defendant are cognizant of our inability by plea agreement to move for a departure, but

11  that does not preclude discussion of the existing realities confronting Ms. Biocini.

### OBJECTIONS TO PORTIONS OF THE PRESENTENCE REPORT AND THE SENTENCING RECOMMENDATION

14  A.      **Page 5:11**

15         While true that Ms. Biocini was a primary contact for cocaine distribution, it is not true

16  that she was the primary source. Ms. Biocini did not have immediate access to large cocaine

17  amounts, but she did have contacts and associations with major vendors such as Miguel Asseff,

18  (aka Hernando Velasco, aka "Gordo"). With the persistent urging of both buyers and sellers, Ms

19  Biocini facilitated transactions, often reluctantly. Ms. Biocini did not have distributors working

20  under her supervision, but Messrs. Duarte and Siegel, in the course of the wiretap investigation,

21  did explore the contacts that she had in order to potentially broker or set up meetings between

22  buyer and seller. As further discussed below, Siegel's main drug connection was with Biocini's

23  former boyfriend, Elias Giannakopolous (aka "The Greek") from whom he purchased large

24  amounts of cocaine. In later years, Siegel tried to get Biocini to re-establish or facilitate contact

25  with that source.

26  _____

27       [3]The relationship between the Biocini's disintegrated to the point where Mr. Biocini cancelled
    the health insurance for his son and Ms. Biocini had to scramble to obtain coverage for the psychological
28  treatment and counseling for her son.

DEFENDANT'S SENTENCING MEMORANDUM            9

000423

1    Ms. Biocini was not a source of marijuana. Steve Thompson was the major marijuana

2    distributor among the players in the conspiracy. However, it is acknowledged that Biocini used

3    marijuana and had plenty of discussions and involvement in marijuana transactions. For

4    example, Ms. Biocini assisted in a transaction where "Gordo" purchased two pounds of

5    marijuana from the source, Steve Thompson. It is true that the government's investigation

6    established a chain of distribution in Marin County and the North Beach area of San Francisco,

7    but it is not correct to place Ms. Biocini at the top of that food chain with her own set of

8    distributors.

9    **B.    Page 6:13**

10    Defendant moves to strike this paragraph from the report. Co-defendant Steven Siegel

11    was indeed interviewed by the FBI in 1997 and provided information about Biocini's alleged

12    drug distribution. Information from Mr. Siegel is extensively relied upon in paragraphs 13-15,

13    17-18, and 22-23 of the report. However, with debriefings that have occurred with Ms. Biocini

14    and the review of their own intelligence information, the government now realizes that Siegel

15    minimized his own involvement in major cocaine distribution and blamed Biocini for what was,

16    in reality, his own connection with the major cocaine source known as "The Greek" and others.

17    [See government Sentencing Memorandum, page 5.]

18    During the late 1980s, Ms. Biocini was the mistress of the individual known as "The

19    Greek". Ms. Biocini knew "The Greek" from her former connections with the Miami area. "The

20    Greek" lived in Miami with his Costa Rican wife. Through their romantic trysts and from the

21    social contacts in the Miami area, Ms. Biocini knew that "The Greek" was a major cocaine

22    vendor and she benefitted from the generosities of his wealth. However, Siegel was buying

23    cocaine from "The Greek" on a regular basis and purchased six to eight kilograms of cocaine

24    from him in 1988. The purchase was from "The Greek", not Biocini, and this paragraph should

25    be deleted or substantially amended to reflect the true state of affairs.

26    **C..    Page 6:14**

27    Siegel purchased eight to nine kilos of cocaine from "The Greek" at the Red Lion Hotel

28    in Irvine, California in 1998/1999. In her debriefings, Biocini acknowledged that she was at that

DEFENDANT'S SENTENCING MEMORANDUM        10

1  hotel when that transaction took place in her capacity as the Greek's girlfriend, but the business

2  deal was between Siegel and "The Greek". Ms. Biocini was a witness to the circumstances

3  surrounding the transaction, not a direct participant or person who profited from the deal. The

4  statement in the report that Siegel purchased the cocaine from Biocini is simply not true.

5  **D.    Page 6:15**

6      Similar to the above, Siegel was not purchasing cocaine exclusively from Biocini in 1989

7  and 1990, and certainly not at the rate of one kilogram every two weeks. Siegel may well have

8  been purchasing large amounts of cocaine during that period of time, but it was not from Biocini

9  and may have been from "The Greek" or somebody else. Ms. Biocini herself married in 1988,

10  although for a time thereafter she did maintain a romantic friendship with "The Greek". Ms.

11  Biocini was not a part of "The Greek's" cocaine distribution network. The reference to a

12  Colombian political figure is complete fiction. Mr. Siegel is simply not a credible source as to

13  the references made in the Presentence Report. Siegel was arrested in September of 1991. This

14  paragraph indicates that Ms. Biocini was basically Siegel's supplier up to the time of his arrest

15  and that is simply not true. Ms. Biocini never supplied Siegel with four kilograms of cocaine in

16  1991. The last sentence in the paragraph is insufficient to register Ms. Biocini's total denial of

17  the entire paragraph. The whole paragraph should be stricken.

18  **E.    Page 6:16**

19      This material was not contained in the draft Presentence Report presented to counsel and

20  more importantly was never pursued as part of the present conspiracy charge against Ms. Biocini.

21  Even more significantly, although Ms. Biocini was arrested for the described activity, she was

22  never charged or convicted. In her substantial assistance to the government, Ms. Biocini

23  candidly discussed this 1992 activity, but it is not conduct which was part of the charged

24  conspiracy in this case or worthy of the lengthy discussion in the report. Realistically, the single

25  kilo transaction does not significantly impact the guideline computation, but it is particularly

26  curious how much test is devoted to this largely irrelevant incident, when the report contains

27  such scant discussion of Ms. Biocini's post-arrest rehabilitation.

28



**F.      Page 7:17**

Siegel did not introduce Ms. Biocini to Diana Dragoo until late 1993.  Mr. Siegel's contact with Ms. Biocini around that time was primarily for the purpose of seeing if Biocini could help him re-establish contact with "The Greek".  Through their contact, it is true that Ms. Biocini was eventually able to obtain a kilogram of cocaine which was provided to Siegel in late 1994, but again, this is a situation where she was able to contact a supplier who had the cocaine whom she then passed on to Siegel.  This one-kilo transaction is well documented in the government's evidence and the debriefings by the government, but contrary to Mr. Siegel's assertions, there was only one kilogram that was available and not three kilos from which Siegel could choose.  The one kilogram was obtained indirectly from a friend of Ms. Biocini, "Coney", who knew a Colombian living in Los Angeles who had a kilo available for sale and delivered it to Ms. Biocini.

**G.      Page 7:18**

Mr. Siegel never saw two shopping bags filled with kilograms of cocaine in the possession of Ana Biocini.  Again, this is a situation where Siegel is shifting the responsibility of major cocaine vendors, such as "The Greek", on to Ms. Biocini rather than tell the true story.

Ms. Biocini never told Siegel that members of her family in Colombia were kidnaped as a result of a cocaine deal, or that any large amount of cocaine and $150,000.00 in cash was seized.  Furthermore, Siegel was never asked to feign being someone of power who could intimidate and persuade kidnappers to release her family members.

Steve Solomon was in fact arrested in the Bay Area around 1987 with a large amount of cocaine.  This cocaine was seized as a result of a transaction between Mr. Solomon and "The Greek".  The Presentence Report notes Ms. Biocini's knowledge of this transaction, but inaccurately portrays her role and position with respect to the drug seizure.  In her debriefing, Ms. Biocini acknowledged her knowledge of "The Greek" having a San Francisco cocaine deliveryman known as "Gus", and the "The Greek's" regular distribution of cocaine to Steve Siegel and Steve Solomon.  What Ms. Biocini relayed to the agents was that she was aware that

DEFENDANT'S SENTENCING MEMORANDUM          12

1  "The Greek" and Steve Solomon were involved in a substantial cocaine transaction and that

2  Solomon was arrested with some of the kilograms. She went on to state the cocaine belonged to

3  "The Greek" and that "The Greek" had ultimately helped Mr. Solomon with the legal fees in his

4  case. At the time of Mr. Solomon's arrest, Ms. Biocini was in Miami, Florida. Ms. Biocini's

5  candid acknowledgment of the transaction is far different from the way it is currently portrayed

6  and the paragraph should be substantially edited, if not stricken. The last sentence of the

7  paragraph does not adequately reflect Ms. Biocini's objection to the content of the paragraph.

8  **H.     Page 8:19**

9       Granted that Norberto Duarte was well-known to the DEA as a Cuban drug trafficker

10  from Miami dating back to the late 1970's, Ms. Biocini did not meet the man until approximately

11  1993. It is simply not true that Duarte and Carlos Rodriguez directed cocaine distribution

12  activities with Ana Biocini. Certainly, in late 1994, Mr. Duarte enlisted the help of Ms. Biocini

13  in obtaining cocaine as is described in Paragraph 23 of the Presentence Report, but the illicit

14  relationship was entirely unsuccessful. As is well documented within the government's evidence

15  for four months, Biocini attempted to establish some contacts for a purchase of cocaine, but it

16  never happened. The report indicates that Duarte had access to various sources of cocaine such

17  as Diane Dragoo, but in order to give some context to some of the information that follows

18  within the report, it should be clarified that Ms. Dragoo was Duarte's girlfriend.

19  **I.     Page 8:20**

20       It was actually 1993 that Siegel introduced Diane Dragoo to Ana Biocini. Dragoo

21  implored Biocini to help her obtain cocaine and Biocini was able to establish contact with

22  another person she knew to be in the cocaine business, Jorge Luis Mesa (aka "Coney"). The 10

23  kilos of cocaine obtained by Dragoo in the summer of 1994 were delivered from Los Angeles by

24  a friend of "Coney". Ms. Biocini facilitated the transaction and it was then that Dragoo sold the

25  kilograms to Mr. Michna.

26       Ms. Biocini's husband, George Biocini, never got along with Diane Dragoo. George

27  Biocini never told Diane Dragoo that he had been delivering kilos of cocaine from Los Angeles

28

DEFENDANT'S SENTENCING MEMORANDUM          13

1   for Ana Biocini, and if she said so, it was not true. Ms. Biocini also did not use her brother ,

2   Hernan, to deliver cocaine.

3        Unquestionably, after 1993, Ms. Biocini and Ms. Dragoo were on friendly terms.  Aside

4   from the "Coney" transaction that was described above, drug transactions between Biocini and

5   Dragoo were of very small quantities and nowhere near the regular one or more kilograms of

6   cocaine described by Dragoo.  Although Ms. Dragoo describes two 10-kilogram deliveries of

7   cocaine from Biocini, there was only the one transaction which was from the connection

8   described above with "Coney".  There may well have been 10 gram quantity/personal use

9   transactions between Biocini (and Dragoo), but Dragoo is not telling the truth in terms of

10   distribution above and beyond that amount.  It was Duarte who was the well-known Cuban drug

11   trafficker and his former girlfriend, and Ms. Dragoo is not telling the truth putting Ms. Biocini at

12   the top of the distribution totem pole.  Dragoo was distributing kilo quantities that she obtained

13   from Mr. Duarte.

14   **J.**    **Page 9:21**

15        Ms. Biocini had nothing to do with cocaine distribution by Dragoo and Duarte in Hawaii.

16   Biocini was never given an envelope by Dragoo for payment of two kilos of cocaine relating to

17   any Hawaiian transaction.  *The entire paragraph should be stricken from the report.*

18   **K.**    **Page 9:22**

19        At a Christmas party in December of 1994, Duarte asked Ms. Biocini to use her contacts

20   because he wanted to purchase two kilos of cocaine.  Ms. Biocini attempted to establish a

21   connection for Mr. Duarte, but it never happened.  *This failure is obviously indicative of Ms.*

22   Biocini not being an immediate source of cocaine, and instead, of somebody who had cocaine

23   connections which had eventually faded away.

24        Ms. Biocini had no relationship at all with Ms. Van Woerkom or knowledge of the travels

25   of Duarte and Carlos Rodriguez.

26

27

28

*DEFENDANT'S SENTENCING MEMORANDUM*     14



**L.      Page 9:23**

This paragraph is simply a rehashing of the same information from the above paragraph and should either be incorporated in the previous paragraph or stricken. This was all one incident and should not be portrayed as two separate drug transactions.

**M.      Page 9:25**

This is a description of the allegations of major cocaine distribution by Ms. Biocini which have to now be re-evaluated in light of the above information. The paragraph simply repeats incorrect information and should be stricken.

**N.      Page 10:30**

Once again, this is simply a cumulative repetition of false information provided by Mr. Siegel and has no place in the report.

**O.      Page 10:31**

Ms. Biocini has acknowledged in her Plea Agreement that the base offense level should be calculated on the basis of at least five kilograms, but less than 15 kilograms of cocaine and therefore we are in agreement with the level 32 assessment. The extraneous, false references to Ms. Biocini trafficking larger amounts than she is being held accountable for should be stricken.

**P.      Page 11:34**

Again, for all the reasons stated, Ms. Biocini is not deserving of the characterization that she had a role as a high-level cocaine distributor. It is acknowledged that in the early 90's, she was present or aware when some of her drug dealing acquaintances conducted transactions. However, any distribution she later actually participated in was a matter of trying to contact a dealer to potentially sell to a customer. Plenty of times she turned down any such participation because she could not, and did not, have the means to make it happen.

Indicative of her simple role is Ms. Biocini's lack of financial gain or substantial assets. She did not possess the accoutrements of a major trafficker and her fast life in the drug world was a product of her romantic liaisons and personal drug craving and addiction.

000429



1  **Q.**      **Page 13:51**

2        In the months before her arrest in 1995, Ms Biocini was in the depths of depression based

3  on her cocaine use and contacted the Department of Rehabilitation Health and Welfare agency in

4  San Rafael to seek counseling. Eventually she was sent to counseling sessions, was able to obtain

5  funding for job training, and began to take computer training classes. Ms. Biocini has continued

6  to pursue her goal of working in the computer field, no small task for a person beginning that

7  quest when she was forty years old.

8  **R.**      **Page 14:54-56**

9        In addition to her courses at Cañada College, Ms. Biocini has also received training and

10  certification in silicon chip design.  There are also certificates for computerized accounting and

11  parenting courses completed by Ms. Biocini, all of which are being presented to the court.  Ms.

12  Biocini has been steadily trying to educate and improve herself since her release.  In addition to

13  rearing her child in a challenging situation over the substantial period of time this case has

14  loomed over her head, she has been impressively productive and positive.

15  **S.**      **Page 14:57-59**

16        Six years of steady employment for a variety of solid Silicon Valley businesses are

17  summarized in a couple of sentences.  Further documentation of Ms. Biocini's steady

18  employment in responsible positions is being forwarded herewith

19              **SENTENCING RECOMMENDATIONS BY THE**
                **PROBATION OFFICER AND GOVERNMENT**
20

21        For different reasons and rationales, both the probation officer and the government are

22  recommending a 60-month sentence for Ms. Biocini.  It is submitted that the defendant is

23  deserving of a far more lenient sentence by the court.  The 60-month recommended sentence is

24  completely out of proportion with the relative culpability of the other defendants involved in this

25  case, the degree of cooperation by the defendant and its inherent dangers, and the defendant's

26  positive rehabilitative efforts.  As it reads now, Ms. Biocini's Presentence Report completely

27  overstates or falsely states her drug distribution activity and role, and contains relatively little

28  information as to the significant accomplishments she has made since the time of her arrest.  The

DEFENDANT'S SENTENCING MEMORANDUM          16



1    defendant has no choice but to request a sentencing hearing to present an accurate factual

2    foundation to a court which unfortunately (or fortunately) is reviewing the factual material of the

3    "North Beach" investigation for the first time.  It is submitted that a probationary sentence for

4    Ms. Biocini is entirely reasonable and that the court should ultimately exercise its substantial

5    powers following a 5K.1 motion by the government to achieve that result.

6                                      **CONCLUSION**

7            For the foregoing reasons, defendant request this court impose the sentence recommended

8    by this memorandum.

9    Dated: April 25, 2003

                                    Respectfully submitted,

10

11

12                                  ROBERT WAGGENER
                                    Attorney for Defendant
13                                  ANA BIOCINI

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S SENTENCING MEMORANDUM            17



1                 <u>**PROOF OF SERVICE BY HAND DELIVERY**</u>

2        I, ROBERT WAGGENER, declare:

3        I am over the age of eighteen years and not a party to the within action. My business

4 address is 214 Duboce Avenue, San Francisco, California 94103.

5        On April 25, 2003, I caused the foregoing **DEFENDANT'S SENTENCING**

6 **MEMORANDUM** to be personally served on the following:

7 Barbara Silano                                     **HAND DELIVERY**
    Assistant United States Attorney

8 Office of The United States Attorney
    450 Golden Gate Avenue - 11th Floor

9 San Francisco, CA 94102

10 Tess Lopez                                           **HAND DELIVERY**
     United States Probation Officer

11 United States Probation Office
     155 North Redwood Drive - Suite 100

12 San Rafael, CA 94903

13        I declare under penalty of perjury under the laws of the State of California that the

14 foregoing is true and correct.

15

16 Dated: April 25, 2003

17                              Robert Waggener

18

19

20

21

22

23

24

25

26                                            C:\Data\FD\Sentencing Memo.ab.wpd

27

28

DEFENDANT'S SENTENCING MEMORANDUM



# EXHIBIT
# C-4

 
PAGES 1 - 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | NO. CR 95-00187 CRB |
| VS. ) | |
| ) | COPY |
| ANA BIOCINI, ) | |
| ) | |
| DEFENDANT. ) | |
| _____ ) | |

SAN FRANCISCO, CALIFORNIA
MONDAY, APRIL 28, 2003

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

FOR PLAINTIFF:
    KEVIN V. RYAN
    UNITED STATES ATTORNEY
    450 GOLDEN GATE AVENUE, BOX 36055
    SAN FRANCISCO, CALIFORNIA 94102
    BY: **JONATHAN HOWDEN, ESQ.**
    **ASSISTANT UNITED STATES ATTORNEY**

FOR DEFENDANT:
    LAW OFFICES OF ROBERT WAGGENER
    214 DUBOCE AVEMUE
    SAN FRANCISCO, CALIFORNIA 94103
    BY: **ROBERT WAGGENER, ESQ.**

ALSO PRESENT:
    TESS LOPEZ
    UNITED STATES PROBATION OFFICER

    JEFFREY IVERSON
    AGENT, FEDERAL BUREAU OF INVESTIGATION

REPORTED BY:
    **SAHAR MCVICKAR, RPR**
    **OFFICIAL REPORTER, U.S. DISTRICT COURT**
    **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

(COMPUTERIZED TRANSCRIPTION BY ECLIPSE)

*Sahar McVickar, RPR - Official Court Reporter, U.S.D.C.*
*(415) 626-6060*



1   MONDAY, APRIL 28, 2003                        2:15 P.M.

2                        P R O C E E D I N G S

3           THE CLERK:  CR 95-1287, THE UNITED STATES OF AMERICA

4   VERSUS ANA BIOCINI.

5           COUNSEL, PLEASE STATE YOUR APPEARANCE FOR THE

6   RECORD.

7           MR. WAGGENER:  GOOD AFTERNOON, JUDGE.

8           ROBERT WAGGENER APPEARING FOR MS. BIOCINI, WHO IS

9   PRESENT.

10          THE PROBATION OFFICER:  TESS LOPEZ FROM PROBATION.

11          THE COURT:  DO WE KNOW WHERE MS. SILANO IS?

12          MR. WAGGENER:  I'VE BEEN HERE FOR ABOUT TEN MINUTES,

13  AND I HAVEN'T SEEN HER.

14          THE COURT:  ALL RIGHT.

15          LET ME ASK A QUESTION -- WELL, MAYBE I SHOULD WAIT.

16          IF SHE'S NOT THERE, WE'LL TAKE ANY REPRESENTATIVE

17  FROM THE UNITED STATES ATTORNEY'S OFFICE.

18          SEE WHETHER MR. RYAN IS THERE.

19          THE COURT:  DID MS. SILANO HAVE THIS CASE IN THE

20  BEGINNING?

21          MR. WAGGENER:  YES.

22          THE PROBATION OFFICER:  UM-HMM.

23          THE COURT:  IS THE AGENT HERE?

24          WHY DON'T YOU COME ON UP, AND MAYBE YOU CAN ANSWER

25  SOME QUESTIONS.

*Sahar McVickar, RPR - Official Court Reporter, U.S.D.C.*
*(415) 626-6060*

1    *AGENT IVERSON:*  I'D BE HAPPY TO, YOUR HONOR.

2    *THE COURT:*  IDENTIFY YOURSELF.

3    *AGENT IVERSON:*  GOOD AFTERNOON.

4    MY NAME JEFF IVERSON, I-V-E-R-S-O-N.

5    *THE COURT:*  THANK YOU.

6    YOU'RE AN AGENT WITH THE BUREAU --

7    *AGENT IVERSON:*  I AM, I'M WITH THE FBI, FORMERLY THE

8    CASE AGENT FROM WAY BACK WHEN, MANY YEARS AGO.

9    *THE COURT:*  WELL, YOU KNOW, THIS IS JUDGE SMITH'S

10   CASE; ONE OF THE POSSIBILITIES I HAVE IS SIMPLY TO AWAIT HER

11   RETURN.  I DIDN'T KNOW WHETHER THAT WAS FAIR TO HER, TO TELL

12   YOU THE TRUTH.

13        *MR. WAGGENER:*  IS SHE COMING BACK?

14        *THE COURT:*  SHE WILL BACK IN SEPTEMBER OR OCTOBER.

15   BUT ON THE OTHER HAND, I THINK THERE'S AN INTEREST -- I'M SURE

16   THAT SHE WOULD NOT PARTICULARLY WANT ME TO DELAY THE SENTENCING

17   ANY FURTHER, ESPECIALLY SINCE IT WILL BE ON HER PLATE.

18        *AGENT IVERSON:*  WE'RE COMING TO OUR EIGHT-YEAR

19   ANNIVERSARY SINCE THE DATE OF ARREST ON MAY 8TH 1995.

20        *THE COURT:*  YEAH.  I THINK PART OF THE PROBLEM IN

21   SENTENCING TODAY IS THE FACT THAT IT'S THE EIGHTH-YEAR

22   ANNIVERSARY.  I DON'T KNOW THAT IT'S HELPED BY CELEBRATING THE

23   EIGHT AND A HALF YEAR OR NINTH YEAR CELEBRATION; THAT'S PART OF

24   THE PROBLEM.

25        I DON'T KNOW WHETHER YOU CAN ANSWER MY QUESTION OR

1    WHETHER MS. SILANO CAN, MY QUESTION IS, WHAT HAPPENED BETWEEN

2    -- I HAVE NUMBER OF QUESTIONS, BUT MAYBE YOU KNOW THE ANSWER TO

3    -- MR. DUARTE, WHO SEEMS TO BE THE LAST -- NORBERTO DUARTE --

4            *AGENT IVERSON:*  CORRECT.

5            *THE COURT:*  -- WHICH IS THE INDIVIDUAL THAT THE

6    DEFENDANT ASSISTED IN CONNECTION WITH THE MATTER, WAS SENTENCED

7    ON MAY 23RD, 2000, THREE YEARS AGO.

8            *AGENT IVERSON:*  THAT SOUNDS RIGHT.

9            *THE COURT:*  TWO YEARS, ELEVEN MONTHS, OR SO.  WHAT

10   HAPPENED WITH THIS CASE FOR THREE YEARS?  I MEAN, THAT WOULD

11   HAVE BEEN THE NORMAL LOGICAL TIME TO SENTENCE.  YOU MAY NOT

12   HAVE THE ANSWER.

13           *AGENT IVERSON:*  I KNOW THE PARTIAL ANSWER.

14           *THE COURT:*  WHAT IS THE PARTIAL ANSWER?

15           *AGENT IVERSON:*  THERE WAS SOME DELAY.

16           *MR. WAGGENER:*  SURE.

17           *AGENT IVERSON:*  IF I'M SPEAKING OUT OF TURN, LET ME

18   KNOW.

19           MS. BIOCINI HAD DECIDED, IT SEEMS TO ME, I DON'T

20   KNOW HOW MANY YEARS AGO IT WAS, BUT DECIDED THAT SHE WAS GOING

21   TO COOPERATE WITH THE GOVERNMENT.  THERE WAS A PERIOD OF TIME

22   WHEN WE WERE DEBRIEFING MS. BIOCINI, AND SOME OF THE

23   INFORMATION SHE GAVE US WAS OF SOME INTEREST, OR CONCERNED

24   EVENTS THAT WERE GOING ON, I THINK, IN MIAMI.  AND THERE WAS

25   SOME, YOU KNOW, SOME OPPORTUNITY GIVEN TO SEE IF THAT WOULD

1   COME TO FRUITION.

2           AND THEN, AT ONE POINT, THERE WAS -- WE WERE READY

3   FOR SENTENCING, I THINK -- WE THOUGHT WE WERE READY FOR

4   SENTENCING, I THINK THAT WAS CLOSE TO TWO YEARS AGO, AND THEN

5   DISCOVERED THAT THERE HAD NOT BEEN A PRE-SENTENCE REPORT

6   ORDERED AND COMPLETED YET.  SO THAT DELAYED IT, I THINK, FOR

7   PROBABLY ABOUT ANOTHER YEAR, YEAR AND A HALF.  AND THOSE ARE

8   ROUND FIGURES.

9           *MR. WAGGENER:*  AT SOME POINT, THAT'S WHEN I GOT

10  INVOLVED, JUDGE.  THERE WAS -- MS. BIOCINI HAD EXPRESSED SOME

11  CONCERNS ABOUT HER RELATIONSHIP WITH MR. BASO *(PHONETIC)*, WROTE

12  SOME LETTERS TO JUDGE PATEL.

13          JUDGE PATEL DEEMED IT APPROPRIATE THAT SHE HAVE A

14  NEW LAWYER, SO I GOT THE CALL, AND THAT'S WHEN I GOT INVOLVED.

15          *THE PROBATION OFFICER:*  THE CASE WAS ORIGINALLY

16  REFERRED TO PROBATION.  IT WAS DUE FOR SENTENCING WHEN REFERRED

17  IN OCTOBER OF 2001, SO IT MUST HAVE BEEN REFERRED IN AUGUST OF

18  2001.

19          *THE COURT:*  AUGUST OF 2001?  I MEAN, IT'S NOW ALMOST

20  MAY 2003.

21          *MR. WAGGENER:*  WELL, MS. SILANO ALSO GOT

22  TRANSFERRED.

23          *THE PROBATION OFFICER:*  UM-HMM, WHICH WAS AN ISSUE

24  FOR A TIME.

25          *THE COURT:*  SEEMS SHE'S STILL BEING TRANSFERRED.

1      *MR. WAGGENER:*  SO SHE WAS IN ANOTHER OFFICE.

2           IT WAS STEVE GRUEL'S CASE FOR A WHILE, HE DIDN'T

3  KNOW ANYTHING ABOUT THE CASE -- WELL, HE KNEW LITTLE ABOUT THE

4  CASE.  WE SORT OF UNDERSTOOD THAT MS. SILANO WAS GOING TO COME

5  BACK.  SHE EVENTUALLY CAME BACK TO THIS OFFICE.  THE CASE WENT

6  BACK ON HER DESK SO --

7      *THE COURT:*  WELL, YOU SEE ALL, THIS CREATES A

8  TREMENDOUS DILEMMA FOR A JUDGE, I MEAN, I THINK FOR EVERYBODY,

9  ABSOLUTELY FOR EVERYBODY, BECAUSE THE ONE THING THAT HAPPENS IN

10 THE PASSAGE OF TIME IS -- THE PASSAGE OF TIME IS THAT ANY

11 NUMBER OF THINGS START, IN A SENSE, UNRAVELING AND BECOME VERY

12 DIFFICULT TO ASCERTAIN, YOU KNOW, THINGS LIKE WELL, WHAT REALLY

13 HAPPENED, YOU KNOW, IN THE EIGHT YEARS OR THE PRECEDING YEARS

14 PRECEDING THE INDICTMENT, WHICH ARE THE RELATIVE FACTS IN A LOT

15 OF THIS.  SO YOU'RE LOOKING BACK I GUESS, WHAT -- HOW MANY

16 YEARS ARE WE LOOKING BACK?

17     *AGENT IVERSON:*  WE INDICTED ON MAY 7TH, 1995, AND WE

18 MADE THE ARRESTS ON MAY 8TH, 1995.

19     *THE COURT:*  SO MAY 7TH, 1995 FOR CONDUCT THAT

20 OCCURRED WHEN?

21     *THE PROBATION OFFICER:*  IN THE INDICTMENT IT SAYS

22 FROM ON OR ABOUT A TIME UP TO AND INCLUDING MAY 5TH, 1995.

23     *THE COURT:*  GOING BACK, ESSENTIALLY WHAT WERE YOU

24 LOOKING AT?

25     *AGENT IVERSON:*  THE MEAT OF THE EVIDENCE WE

000439

1  DEVELOPED WAS WE HAD WIRETAPS.  THERE WERE A LONG SERIES OF

2  WIRETAPS AND MS -- THE WIRETAPS IN MS. BIOCINI'S RESIDENCE AND

3  OTHER PHONES THAT SHE WAS USING I BELIEVE BEGAN SOMEWHERE

4  AROUND DECEMBER OF 1994 AND CONCLUDED IN MAY OF 1995.

5           *THE COURT:*  SO WE'RE REALLY TALKING ABOUT ALMOST,

6  BASICALLY NINE -- NINE YEARS AGO.

7           *MR. WAGGENER:*  I THINK THE INVESTIGATION ITSELF

8  BEGAN WITH '91 OR '92 AND ALL THE STUFF THAT PRECEDED THE

9  WIRETAP.

10           *THE COURT:*  AND THEN ANOTHER THING; YOU HAVE ALL

11  THESE EVENTS THAT -- TO TRY TO FIGURE OUT WITH SOME DEGREE OF

12  ACCURACY FOR SENTENCING PURPOSES WHAT HAPPENED.  THAT IS ONE

13  SET OF PROBLEMS.

14           THE SECOND SET OF PROBLEMS IS THAT LOOKING AT -- I

15  NOW HAVE IN FRONT OF ME ALL THE DEFENDANTS AND THEIR SENTENCES,

16  AND SO YOU START WITH CHRISTOPHER --

17           *AGENT IVERSON:*  MICHNA.

18           *THE COURT:*  AND HE WAS SENTENCED TO 87 MONTHS.  AND

19  THEN YOU GO -- AND I THINK THAT APPEARS TO BE -- THAT APPEARS

20  TO BE THE MOST SEVERE SENTENCE IN TERMS OF CUSTODY.

21           *AGENT IVERSON:*  THAT'S CORRECT, YOUR HONOR.  I THINK

22  HE SUBSEQUENTLY GOT A RULE 35 MOTION.

23           *THE COURT:*  OH, HE DID?  SO WHAT DID HE END UP WITH?

24           *THE PROBATION OFFICER:*  I HAVE NO IDEA.

25           *AGENT IVERSON:*  BARBARA MAY KNOW.  MS. SILANO MAY

1  KNOW BETTER.  I REALLY DON'T REMEMBER, IT WAS SOMEWHERE, I WANT

2  TO SAY AROUND THREE OR FOUR YEARS, SOMEWHERE IN THAT RANGE

3  MAYBE FIVE YEARS.

4              **THE COURT:**  OKAY.

5              SO THEN WE HAVE MR. KARPINSKI DID 72 MONTHS.  DID HE

6  SERVE THE 72 MONTHS?

7              **AGENT IVERSON:**  HE SERVED, AND HE'S BEEN RELEASED.

8              **THE COURT:**  SO IS -- HE'S GONE?  HE'S DONE HIS TIME

9  AND IS FINISHED?

10             **AGENT IVERSON:**  AS HAVE THEY ALL, YOUR HONOR.

11             **THE COURT:**  AS HAVE THEY ALL.

12             AND THEN YOU HAVE 30 MONTHS.  AND THEN YOU HAVE

13  OTHER PEOPLE.  AND EVEN MR. DUARTE WAS 26 MONTHS, AND HE'S

14  PROBABLY SERVED.

15             **AGENT IVERSON:**  I'M SURE.

16             **THE PROBATION OFFICER:**  MEAZE *(PHONETIC)*, HE'S ON

17  SUPERVISION.

18             **THE COURT:**  YOU RAN INTO HIM?

19             **AGENT IVERSON:**  I RAN INTO HIM IN A STORE.

20             **MR. WAGGENER:**  WAS THERE A RULE 35 FOR DUARTE?

21             **THE PROBATION OFFICER:**  I DON'T THINK SO.

22             **THE COURT:**  SO, OF COURSE, YOU HAVE PEOPLE WHO HAVE

23  ALL BEEN SENTENCED, AND SOMEWHERE IN THE -- MS. BIOCINI WOULD

24  FALL IN TERMS OF CULPABILITY AND HER INVOLVEMENT, AND SO FORTH,

25  IN THE RANGE OF PEOPLE.

1    **AGENT IVERSON:**  WELL, SHE WAS ALWAYS LISTED AS THE

2    LEAD DEFENDANT.  SHE WAS ALWAYS BELIEVED BY US, AND WE ALWAYS

3    FELT, OF COURSE, THAT THE EVIDENCE SHOWED THAT SHE WAS THE

4    PRINCIPLE SUPPLIER TO THIS GROUP, SO SHE WAS THE LEAD

5    DEFENDANT.

6          **THE COURT:**  DID YOU BELIEVE THAT IN TERMS OF THE

7    FINANCE THAT -- IN TERMS OF THE MONEY THAT SHE WAS THE LEAD

8    RECIPIENT OF THE WEALTH OF THIS OPERATION, EVERYTHING, OTHER

9    THAN SIMPLY A CONDUIT FOR SOME PORTION OF IT?

10          DID SHE HAVE A LIFESTYLE THAT SUGGESTED THAT SHE WAS

11   -- I KNOW SHE WAS THE LEAD, BECAUSE ONE WAY YOU MIGHT DEFINE

12   THE LEAD IS THAT EVERYTHING GOES THROUGH HER, THAT SHE IS AT

13   THE TOP OF THE PINNACLE BETWEEN, I GUESS, THE SUPPLIER AND, I

14   DON'T KNOW, WHAT WERE THESE OTHER PEOPLE?  WERE THEY DEALERS AS

15   WELL?

16          **MR. WAGGENER:**  SORT OF SUB-TO-SUB DISTRIBUTORS.

17   ONCE THEY GOT AN AMOUNT -- SHE'S --

18          **THE COURT:**  SHE'S RIGHT THERE.

19          **THE PROBATION OFFICER:**  THERE IS THE CHART PROVIDED

20   BY THE GOVERNMENT TO ME MANY YEARS AGO, YOUR HONOR, WHEN I WAS

21   DOING JIM LAZOR'S CASE IN 1998.

22          **AGENT IVERSON:**  IT WAS OUR BELIEF THAT MS. BIOCINI

23   HAD THE HIGHEST AND MOST DIRECT ACCESS TO THE, MORE TO THE

24   ORIGINAL SOURCES IN COLUMBIA.  AND, IN FACT, WE INTERCEPTED

25   CALLS FROM MS. BIOCINI TO COLOMBIA TO CONTACTS IN COLUMBIA



1    CONCERNING DRUG DEALS.

2         **THE COURT:**  IN TERMS OF BENEFIT FROM THIS OPERATION,

3    DID YOU HAVE A FEELING THAT SHE WAS THE CHIEF BENEFICIARY?

4         **AGENT IVERSON:**  WELL, SHE CERTAINLY DID NOT HAVE A

5    LIFE -- SHE DID NOT LIVE LAVISHLY, THAT'S FOR SURE.  SHE LIVED

6    IN A REASONABLY, BY RELATIVE STANDARDS, A REASONABLY MODEST

7    APARTMENT IN SAUSALITO, DID NOT DRIVE A FANCY CAR, AND, I MEAN

8    CERTAINLY DID NOT LIVE OPULENTLY.

9         **THE COURT:**  WHAT THE SITUATION WITH YOUR SON?

10        **THE DEFENDANT:**  MY SON HAS A -- IS HAVING A

11   PSYCHOLOGICAL PROBLEMS, EMOTIONAL PROBLEMS.  YOU KNOW, HE'S IN

12   COUNSELOR SINCE, LIKE --

13        **MR. WAGGENER:**  ABOUT 16 MONTHS.

14        **THE DEFENDANT:**  YEAH, 16 MONTHS.  UH-HUH.  AND, YOU

15   KNOW, SO --

16        **THE COURT:**  HOW OFTEN DOES HE GO?

17        **THE DEFENDANT:**  HE'S IN A VERY DELICATE POSITION.

18        **THE COURT:**  HOW OFTEN DOES HE GO TO COUNSELING?

19        **THE DEFENDANT:**  AT THE BEGINNING, HE START TO GO

20   EVERY WEEK.  BUT NOW HE'S GOING, LIKE, TWO TIMES A MONTH.  BUT

21   SOMETIMES HE'S REALLY, YOU KNOW, GOING MORE OFTEN.  AND HE'S --

22        **MR. WAGGENER:**  HE SEES THIS REGULAR GUY WITH KAISER.

23   IT WAS A MONTH, IT SOUNDS LIKE.

24        THERE IS ALSO THE SCHOOL; SHE SINCE MOVED TO

25   MOUNTAIN VIEW, AND SO THE SCHOOL, THEY HAVE SOME RESOURCES

---

*Sahar McVickar, RPR - Official Court Reporter, U.S.D.C.*
*(415) 626-6060*

1  THERE.  SO HE GET SOME COUNSELING.

2          **THE COURT:**  IS HE LIVING AT HOME?

3          **THE DEFENDANT:**  YES.

4          **THE COURT:**  WHAT IS GOING TO HAPPEN TO HIM WHEN YOU

5  ARE SENTENCED?  WHO IS GOING TO TAKE CARE OF HIM?  WHAT PLANS

6  HAVE YOU MADE, WHAT ARRANGEMENTS HAVE YOU MADE TO TAKE CARE OF

7  HIM?

8          **THE DEFENDANT:**  I DON'T HAVE ARRANGEMENTS YET.

9          **THE COURT:**  WELL, I'M A LITTLE --

10         **MR. WAGGENER:**  WELL, THE SITUATION --

11         **THE COURT:**  YEAH?

12         **MR. WAGGENER:**  I'M SORRY.  I DIDN'T MEAN TO CUT YOU

13 OFF.

14              **(ASSISTANT U.S. ATTORNEY JONATHAN HOWDEN**

15                    **ENTERS COURTROOM.)**

16         **THE COURT:**  MR. HOWDEN IS HERE FROM THE GOVERNMENT.

17         **MR. HOWDEN:**  THANK YOU, YOUR HONOR.

18         **MR. WAGGENER:**  IT'S SOMETHING THAT I'VE DISCUSSED

19 WITH HER MANY TIMES.  AND ULTIMATELY, I'M GOING TO BE ASKING

20 FOR A STAY SO SHE KNOWS WHAT SHE'S UP AGAINST AND WHO SHE'S

21 GOING TO HAVE TO DEAL WITH.  HER BROTHER IS HERE, HERNAN.  AND

22 HE HAS BEEN OF ASSISTANCE TO MS. BIOCINI, BUT IT'S A PROFOUND

23 PROBLEM.

24         **THE COURT:**  WILL HE BE ABLE TO TAKE CARE OF THE SON?

25 SOMEBODY HAS TO.

*Sahar McVickar, RPR - Official Court Reporter, U.S.D.C.*
*(415) 626-6060*

| | |
|---|---|
| 1 | **MR. WAGGENER:**  THE HUSBAND IS. |
| 2 | **THE COURT:**  I UNDERSTAND THE PROBLEM WITH THE |
| 3 | HUSBAND. |
| 4 | **MR. WAGGENER:**  YEAH. |
| 5 | **THE COURT:**  BUT HERE YOU HAVE A 14 YEAR OLD WHO HAS |

5    **THE COURT:**  BUT HERE YOU HAVE A 14 YEAR OLD WHO HAS

6    SERIOUS PSYCHOLOGICAL PROBLEMS AND ADJUSTING PROBLEMS, AND HIS

7    MOTHER IS ABOUT TO GO OFF TO PRISON.

8         NOW, WHETHER SHE GOES THIS WEEK OR NEXT MONTH OR IN

9    TWO OR THREE MONTHS, YOU KNOW IT WILL HAPPEN.  IT WILL HAPPEN.

10   SOMEBODY HAS TO BE IN A POSITION TO COME IN AND TAKE CARE OF

11   HER SON.

12        I GET THE SENSE IN A WAY, IN PART, AND IT MAY NOT BE

13   ACCURATE, BUT I KNOW THAT YOU HAVE ATTEMPTED TO GET A JOB, AND

14   YOU'VE DONE A LOT TO TRY TO GET A JOB, BUT YOU DON'T HAVE A

15   JOB, AND YOU HAVEN'T HAD A JOB FOR TWO YEARS.  I KNOW YOU HAVE

16   MADE CONSIDERABLE EFFORTS TO TRY TO GET A JOB, AND UNTIL 2000

17   YOU HAD EMPLOYMENT.  YOU HAD ALL SORTS OF JOBS, AND SO FORTH.

18        AND I KNOW THAT THERE IS A DOWNTURN IN THE ECONOMY,

19   BUT I GET A SENSE OF UNREALITY ABOUT THIS.  MAYBE THE WHOLE

20   THING IS UNREAL, OR MAYBE IT'S VERY REAL, BUT, YOU KNOW, IT'S

21   LIKE A CASE DISAPPEARED FOR A NUMBER OF YEARS OR, AT LEAST, IT

22   WAS PUT ON SOMEBODY'S SHELF, AND NOTHING HAPPENED.

23        I THINK THAT THAT, IN PART, IS THE RESPONSIBILITY OF

24   THE GOVERNMENT, I DON'T THINK IT'S UP TO THE DEFENDANT TO MOVE

25   THE CASE ALONG TO SENTENCING.  IT JUST HAPPENS THAT IT'S NOT,

1    IN MY VIEW, RESPONSIBILITY OF THE DEFENDANTS TO MOVE IT ON TO

2    SENTENCING.  BUT IT WASN'T -- AND IT SORT OF SAT FOR A NUMBER

3    OF YEARS.  I KNOW THAT THE AGENCY HAS BEEN VERY HELPFUL IN

4    CONNECTION, VERY FORTHCOMING IN CONNECTION WITH PROVIDING

5    INFORMATION TO THE -- TO THE PROBATION DEPARTMENT, AND SO

6    FORTH, BUT I DON'T EVEN THINK IT'S THE AGENCY'S PROBLEM TO TRY

7    TO GET PEOPLE SENTENCED.

8            I MEAN, IT MAY MAKE THE AGENCY'S WORK EASIER OR NOT,

9    I DON'T KNOW, BUT IT'S THE GOVERNMENT.  AND WHEN I SAY "THE

10   GOVERNMENT," IT'S THE UNITED STATES ATTORNEY'S RESPONSIBILITY

11   TO GET CASES ADJUDICATED AND RESOLVED.  AND THAT JUST WASN'T

12   DONE HERE.

13           I THINK THAT THAT, IN A SENSE, HAS CONTRIBUTED TO

14   THE DEFENDANT'S FALSE SENSE THAT THERE IS NOTHING THAT IS EVER

15   GOING TO HAPPEN, "NO JUDGMENT DAY, AND THEREFORE," YOU KNOW,

16   "I'M NOT GOING TO MAKE PLANS FOR MY SON.  AND MAYBE BECAUSE I

17   DON'T KNOW WHAT'S GOING TO HAPPEN IT'S HARD TO MAKE PLANS IN

18   THE ABSTRACT," YOU KNOW, "NOT KNOWING I'M GOING TO GO TO JAIL

19   NEXT WEEK OR NEXT MONTH OR I AM NOT GOING TO GO TO JAIL AT

20   ALL," YOU KNOW?

21           IT'S HARD TO LOOK AT A CASE WHERE A PERSON IS

22   RESPONSIBLE FOR A VERY LARGE QUANTITY OF NARCOTICS, LEGALLY

23   RESPONSIBLE, LEGALLY RESPONSIBLE, AND GIVING HER EVERY BENEFIT

24   OF THE DOUBT KNOCKING IT DOWN TO AN AMOUNT THAT EVEN THE

25   DEFENSE WOULD ARGUE IS AN APPROPRIATE CHARGEABLE AMOUNT, NOT TO

1   BELIEVE THAT YOU WOULD THEN GO TO JAIL WHEN ALL THESE OTHER --

2   A LOT OF OTHER PEOPLE WENT TO JAIL IN THIS PROCEEDING.  AND SHE

3   CERTAINLY DID HAVE A KEY ROLE.  MAYBE IT COULD HAVE BEEN MADE

4   BY SOMEBODY ELSE, BUT IT WAS A KEY ROLE IN THIS CONSPIRACY, YOU

5   KNOW?

6          ON THE OTHER HAND, THAT'S ALL ON ONE SIDE.  ON THE

7   OTHER SIDE IS THE FACT THAT SHE -- IF SHE DID BENEFIT

8   FINANCIALLY, SHE WAS BELOW IT, PROBABLY OF THESE TRANSACTIONS.

9   SOMEBODY GOT A LOT OF MONEY, OR APPEARED TO GET A LOT OF MONEY.

10  I DON'T THINK WAS THE DEFENDANT, AS FAR AS I CAN TELL.  IT

11  WASN'T HER.  AND OF COURSE, WE HAVE TO FIGURE OUT WHAT TO DO,

12  WHAT TO DO.

13          I DON'T THINK THE ANSWER IS WE'LL JUST PUT HER ON

14  PROBATION.  I THINK THAT THAT -- WHILE THE DELAYS HAVE BEEN

15  CONSIDERABLE, AND WHILE SHE DOES HAVE CERTAIN CONCERNS, SEEMS

16  TO ME THAT THAT WOULD JUST TURN THE DRUG LAWS ON THEIR TAIL.

17          I MEAN, YOU CAN'T DEAL WITH -- WHATEVER QUANTITY YOU

18  WANT TO STIPULATE TO AND SAY THAT IT'S A PROBATIONARY OFFENSE,

19  WHATEVER AMOUNT, I THINK THERE IS ALSO ANOTHER PROBLEM, AND

20  AGAIN, IT'S HIGHLIGHTED BY THIS SENTENCING AND BY THE

21  DEFENDANT'S CONDUCT, WHICH IS SHE DECIDES TO COME IN AND

22  COOPERATE THE EVE OF HER TRIAL, AS I UNDERSTAND THE FACTS, THE

23  EVE OF HER TRIAL, AFTER SOME, WHAT, TWO OR THREE YEARS OF

24  PRE-TRIAL WORK?  AND THAT'S FINE, THAT'S GOOD, WHICH SHE DID.

25          BUT THE REASON YOU HAVE THESE, AND I'M NOT TALKING



1  TO YOU, BECAUSE I'M SURE THAT YOU'RE AWARE OF IT, BUT THE

2  REASON YOU HAVE THE 5(K)(1) DEPARTURES AND THE GOVERNMENT'S

3  DISCRETION IN THE MATTER IS TO ENCOURAGE PEOPLE TO COME IN

4  EARLY RATHER THAN LATE.  SHE COMES IN ABOUT AS LATE AS YOU CAN,

5  ABOUT AS LATE AS YOU CAN, NOT QUITE AS LATE AS YOU CAN.  AND

6  OTHER PEOPLE HAVE COME IN EARLIER.  SO SHE COMES BACK AND SAYS

7  "WELL, THESE OTHER PEOPLE WHO CAME IN AND GOT FAVORABLE

8  CONSIDERATION AND PUT THE FINGER ON ME AND INFLATED MY ROLE,"

9  AND SO FORTH AND SO ON, "THAT'S ALL INACCURATE, AND IT OUGHT TO

10 BE DISREGARDED.  AND BY THE WAY, I COULD HAVE GIVEN YOU

11 INFORMATION ABOUT THEM."

12         YEAH, THAT'S RIGHT, YOU COULD HAVE.  AND MAYBE IT

13 WOULD HAVE BEEN DIFFERENT.  AND ARGUABLY, MAYBE IT WOULD HAVE

14 BEEN ACCURATE WHERE THE OTHER INFORMATION WAS INACCURATE.  BUT

15 THE FACT OF THE MATTER IS, WHEN YOU SIT BACK AND WAIT TILL YOU

16 SEE HOW ALL THE CARDS ARE BEING PLAYED, THAT HAS ITS

17 CONSEQUENCES.  IT HAS ITS CONSEQUENCES.  OTHERWISE, WHATEVER WE

18 HAVE DESIGNED AS A SYSTEM DOESN'T WORK.  IT WON'T WORK.  AND

19 THE SYSTEM IS DESIGNED TO REWARD PEOPLE WHO COME IN EARLY AND

20 NOT TO REWARD PEOPLE WHO COME IN LATE.

21         SO HER DECISION, HER ELEVENTH-HOUR DECISION, IT'S

22 GREAT TO HAVE THAT, IT'S IMPORTANT AND HELPFUL, BECAUSE HAD SHE

23 BEEN CONVICTED, SHE WOULD HAVE GOTTEN, VIRTUALLY, I THINK,

24 CLOSE TO A LIFE SENTENCE, AN EXTREMELY LONG SENTENCE.

25         WOULDN'T SHE HAVE?

1          **MR. WAGGENER:**  WELL --

2          **THE COURT:**  IF SHE WAS CHARGED WITH BEING PART OF

3    THIS CONSPIRACY, IF, IN FACT, SHE HAD GONE TO TRIAL AND THEY

4    WOULD HAVE ESTABLISHED A CONSPIRACY, WHAT DO YOU THINK HER

5    SENTENCE WOULD HAVE BEEN?

6          **MR. WAGGENER:**  I DON'T THINK IT WOULD BE --

7    CERTAINLY, SHE'S FACING A MANDATORY MINIMUM OF TEN, BUT SHE'S

8    GOT NO CRIMINAL HISTORY.  THERE IS ALL KINDS OF ARGUMENTS IN

9    TERMS OF ACTUAL QUANTITY SHE WOULD BE RESPONSIBLE FOR.

10         **THE COURT:**  WHERE DO YOU THINK IT WOULD HAVE COME

11   OUT IF SHE HAD GONE TO TRIAL AND NOT ADMITTED ANYTHING, AND THE

12   GOVERNMENT PROVED WHATEVER THEIR CASE WAS?

13         **MR. WAGGENER:**  HAVING LOOKED AT THE TRIAL BRIEFS AND

14   WHERE THE -- THE PARAMETERS OF THE TRIAL, IT WOULDN'T HAVE BEEN

15   REAL FAR FROM WHERE IT IS NOW, I THINK, BECAUSE A LOT OF THE

16   STUFF, FOR INSTANCE, THE KILO TRANSACTIONS THAT ARE MENTIONED

17   WITHIN THE PRE-SENTENCE REPORT, ETCETERA, THOSE WEREN'T PART OF

18   THE CONSPIRACY IN THE CASE.  THAT WAS OUTSIDE THE CONSPIRACY.

19   SO THAT WASN'T -- WELL --

20         **THE COURT:**  WELL, TRUE ENOUGH, THAT YOU MIGHT HAVE

21   HAD A PROBLEM WITH THE RELEVANT CONDUCT AND --

22         **MR. WAGGENER:**  I AGREE.

23         **THE COURT:**  I MEAN, WASN'T SHE FACING, PUTTING IT

24   ANOTHER WAY, WASN'T SHE FACING, ESSENTIALLY, A, YOU KNOW, WHAT,

25   20 YEARS?  WASN'T SHE FACING THAT, REALISTICALLY, WHETHER YOU

000449

1    CAN KNOCK IT OUT AND BE SUCCESSFUL, AND SO FORTH?

2         **MR. WAGGENER:**  I'D SAY IT'S MORE IN THE AREA OF 15.

3    A BIG CHUNK OF TIME.

4         **THE COURT:**  A BIG CHUNK OF TIME, AND NOW WE'RE

5    DEALING WITH SENTENCES THAT ARE ROUGHLY ONE-THIRD OF THAT.

6    THAT IS A VERY -- I MEAN, THAT, IN AND OF ITSELF, IS A MAJOR

7    CONCESSION FOR A PERSON WHO PLEADS.  I MEAN, THAT IS A BIG

8    PIECE OF CHANGE WHERE, I MEAN, THE GUIDELINES, IF YOU LOOK AT

9    IT AND SAY, "OKAY, MAYBE 10 PERCENT, 20 PERCENT OFF, BEST

10   SCENARIO 30 PERCENT OFF; THIS IS TWO-THIRDS OFF.  THAT IS A

11   PRETTY BIG REDUCTION THEN AND THERE.

12         NOW, I'M NOT WEDDED TO ANY PARTICULAR NUMBER, BUT

13   I'M JUST SAYING THAT I SEE A SENSE OF UNREALITY ABOUT IT, OF A

14   FAILURE TO DEAL WITH ALL OF HER CIRCUMSTANCES.  MAYBE, YOU KNOW

15   -- AND IT STARTED EARLY ON, AND IN SOME SENSE IT CONTINUES

16   TODAY -- WHY HADN'T SHE GOTTEN OUT AND GONE OUT AND GOTTEN SOME

17   TYPE OF A JOB AS A WAITRESS OR A CLERK IN THE LAST TWO YEARS?

18         **MR. WAGGENER:**  ACTUALLY --

19         **THE COURT:**  HAS SHE?

20         **MR. WAGGENER:**  YEAH.  SHE HAS GOTTEN RECENT

21   CERTIFICATION AND BEEN TO SCHOOL ON CHIP DESIGN AND BEEN DOING

22   THAT FOR, LIKE, THE LAST 6 MONTHS.  IF THAT WAS -- IF THAT

23   WASN'T WITHIN THAT PASSAGE, THEN THAT'S MY MISTAKE.

24         **THE COURT:**  DO YOU MEAN SHE'S GONE TO SCHOOL?  BUT I

25   MEAN, HAS SHE GOTTEN A JOB SOMEWHERE?  SHE'S BEEN ON WELFARE.

000450

1   AND DIDN'T SHE COMPLETE THOSE CLASSES IN SEPTEMBER OF LAST

2   YEAR, THE COMPUTER CHIP?

3           *MR. WAGGENER:*  HOLD ON ONE SECOND.

4           *THE DEFENDANT:*  I FINISHED THE CERTIFICATION IN

5   SEPTEMBER.

6           *THE COURT:*  BUT SINCE THEN, HAVE YOU GOTTEN A JOB?

7           *THE DEFENDANT:*  I WORKING TO GET A JOB.

8           *THE COURT:*  YOU'RE TRYING TO GET A JOB?

9           *THE DEFENDANT:*  AND I WAS HAVING APPOINTMENTS WITH

10  THE ALTERRA *(PHONETIC)* COMPANY.

11          *MR. WAGGENER:*  I CAN ACTUALLY SHOW YOU.  SHE'S GIVEN

12  ME --

13          *THE COURT:*  MR. WAGGENER, MY QUESTION IS ACTUALLY A

14  PRETTY SIMPLE ONE, WHICH IS DOES SHE NOW HAVE A JOB?  IN THE

15  LAST 6 MONTHS HAS SHE HAD A JOB?

16          *MR. WAGGENER:*  NO.

17          *THE COURT:*  NO.  SO I THINK THAT THERE IS A SENSE OF

18  -- IN MY VIEW -- YOU KNOW, I'VE GOT A VIEW, AND MAYBE IT

19  DOESN'T SEEM TO COMPORT WITH HER VIEW.  MY VIEW IS THAT IF

20  PEOPLE HAVE THESE KINDS OF TROUBLE, YOU KNOW, THEY HAVE TO TAKE

21  WHATEVER STEPS ARE NECESSARY TO WHAT I CALL "REGULARLIZE" THEIR

22  LIVES.  THEY HAVE TO GO GET A JOB.  IT MAY BE A LOUSY JOB, IT

23  MAY BE A JOB THAT SHE HATES, BUT, YOU KNOW, TO SIMPLY NOT GET

24  IT --

25          *MR. WAGGENER:*  WELL --

*Sahar McVickar, RPR - Official Court Reporter, U.S.D.C.*
*(415) 626-6060*

1    **THE COURT:**  IT STRIKES ME THAT SHE'S OUT THERE IN

2    HER MIND -- IN MY VIEW, SHE'S OUT THERE JUST, YOU KNOW, HOPING

3    THAT MAYBE TO THE PASSAGE OF TIME, TO THE DISINTEREST OF THE

4    GOVERNMENT, IN PART, THAT NOTHING WILL HAPPEN.

5          **MR. WAGGENER:**  WELL, I UNDERSTAND THAT'S YOUR VIEW,

6    JUDGE, BUT --

7          **THE COURT:**  BASED UPON EVERYTHING THAT YOU'VE GIVEN

8    ME, I MEAN, THE LAWYERS AND WHAT IS IN THE REPORT.

9          **MR. WAGGENER:**  I UNDERSTAND, BUT YOU'VE ALSO GOT THE

10   SITUATION WHERE THE WHOLE THING WITH THE HUSBAND BLEW UP A YEAR

11   AND A HALF AGO.  SHE HAD TO FIND A NEW LIVING SITUATION, THAT'S

12   WHEN THE SON STARTED HAVING THE PROBLEMS AND HAVING THE

13   COUNSELING ISSUES.  AND THEN THE ECONOMY GOES IN THE TOILET.

14         **THE COURT:**  RIGHT, BUT LOOK AT THIS, MR. WAGGENER,

15   THE SON GOES TO HIGH SCHOOL.  I HAVE TO -- WE HAVE THAT HE'S

16   OUT OF THE HOME IN THE MORNING, ISN'T HE?  DOES HE GO TO

17   SCHOOL?

18         **MR. WAGGENER:**  SURE.  GOES TO MOUNTAIN VIEW HIGH

19   SCHOOL.

20         **THE COURT:**  SO YOU GET SOME PART-TIME JOB.  I DON'T

21   KNOW, IS IT SO IMPOSSIBLE TO GET ANY TYPE OF JOB IN ANYTHING,

22   GET TO WORK?

23         **THE DEFENDANT:**  I WAS WORKING ALSO TO GET, YOU KNOW,

24   BECAUSE I HAD A CHIP CERTIFICATE, AND I WAS, YOU KNOW, FLYERS,

25   YOU KNOW, I TRYING EVERY WAY, YOU KNOW TO DO -- TO FIND A JOB.

1         **THE COURT:**  I KNOW YOU'VE TRIED TO GET A JOB IN THE

2   FIELD OF YOUR EXPERTISE.

3         **THE DEFENDANT:**  I WAS WORKING WITH ALTERRA COMPANY,

4   THAT THEY ARE TO DESIGN CHIPS.  AND THEY SUPPOSED TO CALL ME

5   NEXT WEEK FOR A POSITION IS AVAILABLE THERE.  SO, YOU KNOW, I

6   REALLY --

7         **MR. WAGGENER:**  YOU'VE BEEN TRYING.

8         **THE DEFENDANT:**  I TRYING SO HARD TO GET A JOB.  AND

9   ALSO, I WAS DOING -- I WAS WORKING IN ACCOUNTING FOR -- SINCE,

10  SINCE 1997, BUT I JUST START WORKING ALSO IN ANOTHER COMPANY

11  SINCE 1995, SINCE 1995 TO THE 2001.  AFTER THE 911 IS WHEN I

12  GET LAID OFF.

13        SO BUT I TRYING TO GET A JOB AS AN ACCOUNTANT AND

14  THEN I -- I LEARNED ANOTHER SKILL TO GIVE ME AN OPPORTUNITY,

15  YOU KNOW, TO TRY IN ANOTHER FIELD SO TO GET A JOB.  AND THAT IS

16  WHY -- THAT IS WHAT I, YOU KNOW, I DID.  AND I WORKING SO HARD

17  TO LOOKING FOR TWO POSITIONS RIGHT NOW TO GET A JOB AS AN

18  ACCOUNTANT OR AS A --

19        **THE COURT:**  WHAT GRADE IS YOUR SON?

20        **THE DEFENDANT:**  PARDON?

21        **THE COURT:**  WHAT GRADE IS YOUR SON?

22        **MR. WAGGENER:**  FOURTEEN, PROBABLY A FRESHMAN.

23        IS HE A FRESHMAN IN HIGH SCHOOL?

24        **THE DEFENDANT:**  I WANT THE JUDGE TO LOOK WHAT I'M

25  DOING RIGHT NOW.  THAT WAS MY FIRST CHIP --

*Sahar McVickar, RPR ~ Official Court Reporter, U.S.D.C.*
*(415) 626-6060*

000453

1    **MR. WAGGENER:** WHAT GRADE IS YOUR SON IN?

2    **THE DEFENDANT:** MY SON IS IN NINTH GRADE.

3    **MR. WAGGENER:** FRESHMAN IN HIGH SCHOOL.

4    **THE COURT:** WHERE DOES HE GO TO SCHOOL?

5    **MR. WAGGENER:** IS IT MOUNTAIN VIEW HIGH SCHOOL?

6    **THE DEFENDANT:** YES.

7    **THE COURT:** WELL, WHAT DOES HE -- I THOUGHT OF ONE

8    WAY TO RESOLVE ALL OF THE ISSUES THAT YOU RAISED, MR. WAGGENER,

9    IS THAT I'M WILLING, FOR SENTENCING PURPOSES, TO EITHER

10   DISREGARD THE MATTERS THAT YOU TAKE ISSUE WITH THE GOVERNMENT,

11   I THOUGHT I WOULD DISREGARD THOSE ASSERTIONS IN THE

12   PRE-SENTENCE REPORT. I THINK THAT I COULD HAVE AN EVIDENTIARY

13   HEARING.

14        OR, ON THE OTHER HAND, I COULD SIMPLY STATE FOR THE

15   RECORD THAT I'M CHOOSING TO DISREGARD THOSE ISSUES WITHOUT

16   FINDING THAT YOUR RIGHT AND THE GOVERNMENT IS WRONG OR THE

17   PRE-SENTENCE REPORT IS INACCURATE, SIMPLY TO STRIKE THEM FROM

18   MY CONSIDERATION; I THINK I HAVE THAT RIGHT TO DO THAT, AND

19   THAT'S WHAT I PROPOSE TO DO.

20        WHERE THE PARTIES HAVE COME IN AS I UNDERSTAND IT,

21   ESSENTIALLY, IS TO FIND THAT THE -- LET ME GET MY --

22        THE DEFENDANT'S CRIMINAL HISTORY CATEGORY IS 1, AND

23   THE OFFENSE LEVEL IS 28. AS TO THAT, I THINK THERE IS NO

24   DISPUTE; IS THAT CORRECT?

25        **MR. WAGGENER:** NO, THAT'S TRUE.

1    **THE COURT:**  OKAY.  THAT WOULD GIVE A RANGE OF 78 TO

2    97 MONTHS.

3         THE GOVERNMENT IS PREPARED TO MAKE A 5(K)(1) MOTION;

4    IS THAT CORRECT?

5         **MR. HOWDEN:**  THAT'S CORRECT, YOUR HONOR.

6         **THE COURT:**  AND THAT'S BASED UPON SUBSTANTIAL

7    ASSISTANCE?

8         **MR. HOWDEN:**  THAT'S CORRECT.

9         **THE COURT:**  AND YOU HAVE OUTLINED THAT IN THE --

10        **MR. HOWDEN:**  IN THE SENTENCING MEMO.

11        **THE COURT:**  AND I'M GRANTING THAT MOTION.  AND I

12   THINK THE ISSUE IS, THEN, HOW FAR DO I DOWNWARDLY DEPART BASED

13   ON SUBSTANTIAL ASSISTANCE?

14        AGAIN, I FIND THAT THROUGH THE PASSAGE OF TIME, IT

15   MAY BE THAT THE SUBSTANTIAL ASSISTANCE BECAME LESS VALUABLE TO

16   THE GOVERNMENT.  THE FBI AGENT -- AND BY THE WAY, I THOUGHT THE

17   FBI DID A SUPERB JOB IN THE MATTER, WAS HAMPERED, I THINK --

18   THE ASSISTANCE WAS SOMEWHAT REDUCED BY THE PASSAGE OF TIME BY

19   THE FACT THAT THE EVENTS WERE SOMEWHAT STALE.  AND THAT

20   PRESENTED A PROBLEM WHICH PROBLEM I DON'T THINK SHOULD BE

21   VISITED UPON THE DOORSTEP OF THE DEFENDANT, NECESSARILY,

22   BECAUSE I UNDERSTAND THAT THERE WAS SOME ASSISTANCE THAT SHE

23   WAS RENDERING EVEN POST MR. --

24        **MR. WAGGENER:**  DUARTE.

25        **THE COURT:**  MR. DUARTE.

*Sahar McVickar, RPR - Official Court Reporter, U.S.D.C.*
*(415) 626-6060*

000455

1    **MR. WAGGENER:** THAT'S TRUE. AND THAT IS THE POINT I

2    WAS GOING TO RAISE.

3    I DON'T MEAN TO INTERRUPT YOU.

4    **THE COURT:** NO, GO AHEAD.

5    **MR. WAGGENER:** I'M -- I WASN'T THERE, WHICH IS A

6    WHOLE OTHER PART OF THIS, BUT AS I UNDERSTAND IT, THROUGH HER

7    CONNECTIONS, ASSOCIATION, HER COLUMBIAN HERITAGE, SHE KNEW A

8    BUNCH OF PEOPLE IN MIAMI, PEOPLE IN THE DRUG BUSINESS. AND

9    LONG AFTER MR. DUARTE HAD PLED, THERE WERE DEBRIEFINGS AND

10   DISCUSSIONS WITH MS. BIOCINI, IN TERMS OF WHO THESE PEOPLE

11   WERE, HOW THEY OPERATED, WHAT THEY WERE DOING.

12   I THINK AT SOME POINT THERE WAS SOME CONSIDERATION

13   GIVEN TO WHETHER OR NOT TO ACTIVELY USE MS. BIOCINI TO EXPLORE

14   THOSE THINGS, IN OTHER WORDS, TO BE AN ACTIVE INFORMANT AND

15   CONTACT PEOPLE ASK SET THINGS UP. I COULD BE WRONG, BUT I

16   THINK THAT'S WHAT I TALKED ABOUT WITH MS. SILANO AT ONE POINT.

17   ULTIMATELY, A DECISION WAS MADE NOT TO DO THAT, BUT

18   IT WASN'T FOR A LACK OF WILLINGNESS ON MS. BIOCINI'S PART OR A

19   COMPLETE SORT OF ADHERENCE TO THE CONCEPTS OF SUBSTANTIAL

20   ASSISTANCE IN THE SENSE THAT SHE DID WHAT SHE COULD, TALKED TO

21   THEM ABOUT WHAT SHE KNEW AND WHO THESE PEOPLE WERE AND WAS

22   WILLING TO DO WHAT SHE COULD, BECAUSE SHE UNDERSTOOD HOW THAT

23   COULD BENEFIT HER.

24   IN TERMS OF HER SUBSTANTIAL ASSISTANCE, THAT WENT

25   WELL BEYOND IN CASE IN TERMS OF THE NORTH BEACH INVESTIGATION

1  AND THOSE PEOPLE.  AND, YOU KNOW, ONE THING I WOULD POINT OUT,

2  JUST TO REFER BACK TO SOMETHING YOU MENTIONED IN TERMS OF SORT

3  OF THE EXPOSURE OR THE PROPORTION OF HER EXPOSURE, YOU KNOW,

4  MR. DUARTE HAD A PRETTY SERIOUS EXPOSURE, TOO, IF HE WENT TO

5  TRIAL, AT LEAST A TEN-YEAR MANDATORY MINIMUM, I BELIEVE, IF NOT

6  MORE THAN THAT.

7          AND HE WAS THE LAST TO HAVE PLED, COME FORWARD.  AND

8  HE RECEIVED THE SENTENCE THAT'S ON THERE, SO I SAY THAT JUST IN

9  THE SENSE OF PROPORTION FAULT.  BUT -- AND SHE WAS IN A

10  POSITION -- YOU HAVE THESE HISTORICAL ANTECEDENTS, ALL OF THIS,

11  TO HAVE POTENTIALLY -- WELL, SHE CERTAINLY GAVE THEM

12  INTELLIGENCE INFORMATION, IN TERMS OF THE PEOPLE SHE KNEW OF OR

13  HAD BEEN IN CONTACT WITH OR HEARD OF, OR WHATEVER, BUT NO

14  ACTIVE INVESTIGATION OUT OF FLORIDA EVER WAS BEGUN IN THE SENSE

15  OF HER INVOLVEMENT.

16          **THE COURT:**  MR. HOWDEN, DO YOU WISH --

17          **MR. HOWDEN:**  THERE IS NOT A LOT THAT I CAN ADD AT

18  THIS JUNCTURE.  I WILL SAY THAT I BELIEVE MS. SILANO HAS

19  ACCURATELY CHARACTERIZED THE DEFENDANT'S ASSISTANCE IN HER 5(K)

20  MOTION FOR THE COURT.  AND WE'LL REST ON WHAT SHE HAS

21  REPRESENTED THERE.

22          **THE COURT:**  WELL, MR. WAGGENER, DO YOU HAVE ANYTHING

23  ELSE TO ADD?

24          **MR. WAGGENER:**  ONE CONSIDERATION IN TERMS OF -- I

25  TALKED TO MS. SILANO, AND I THINK THAT OTHER DEFENDANTS IN THE

1    CASE -- I DON'T KNOW THE FULL DETAILS OF THEIR SENTENCING, SOME

2    OF WHICH ARE UNDER SEAL, OF COURSE, WAS THE POSSIBILITY OF BOOT

3    CAMP OR THE INTENSIVE CONFINEMENT CENTER.  I THINK THAT SOME OF

4    THE SENTENCES THAT WERE HANDED OUT -- MAYBE EVEN MS. LOPEZ MAY

5    KNOW ABOUT THIS, AS WELL, SUCH THAT 30 MONTHS OR LOWER SO THAT

6    THERE WAS THE POSSIBILITY OF GOING TO BOOT CAMP AND THE

7    INTENSIVE CONFINEMENT CENTER, AS IT'S OTHERWISE KNOWN, SO AS TO

8    MINIMIZE THE AMOUNT OF TIME IN CUSTODY.  AND THEN --

9          *THE COURT:*  DO WOMEN GO TO BOOT CAMP?

10          *THE PROBATION OFFICER:*  I HAVE NEVER HAD THAT

11   EXPERIENCE, YOUR HONOR.  THAT'S NOT TO SAY THAT THEY'RE NOT

12   ALLOWED.  I JUST HAVE NOT HAD THAT EXPERIENCE.

13          *THE COURT:*  DO YOU KNOW?

14          *MR. HOWDEN:*  I DON'T, YOUR HONOR.

15          *THE COURT:*  DON'T SEE WHY NOT.

16          *MR. WAGGENER:*  I THINK THAT THEY DO.  I THINK THAT

17   THERE IS A COMPONENT OF BOOT CAMP, BUT I DON'T HAVE ALL THAT

18   INFORMATION.  I DON'T KNOW FOR SURE.

19          *THE PROBATION OFFICER:*  I HAVE IT.  I MEAN, I COULD

20   GET IT IN THE OFFICE.

21          *THE COURT:*  WE'RE GOING TO RECESS FOR TWO MINUTES.

22   I THINK I CAN FIND IT.

23              (BRIEF RECESS TAKEN BETWEEN 3:20 AND 3:22

24              P.M.)

25          *THE PROBATION OFFICER:*  YOUR HONOR, DOES THAT

*Sahar McVickar, RPR - Official Court Reporter, U.S.D.C.*
*(415) 626-6060*

1   MATERIAL COVER IF SHE WAS SENTENCED -- LET'S SAY SHE IS

2   SENTENCED TO 60 MONTHS AND SERVES 30, CAN SHE THEN GO TO THAT

3   PROGRAM?

4         THE COURT:  IT ACTUALLY IS A POSSIBILITY.

5         THE PROBATION OFFICER:  OKAY.

6         THE COURT:  HOWEVER, ONE REQUIREMENT OF THE PROGRAM,

7   ACCORDING TO THE FLYER, IS THE PERSON BE A UNITED STATES

8   CITIZEN.

9         THE PROBATION OFFICER:  OH.

10        THE COURT:  NOW, I DON'T KNOW WHETHER SHE'S A LEGAL

11  RESIDENT.

12        MR. WAGGENER:  SHE IS CERTAINLY A LEGAL RESIDENT.

13  SHE IS NOT A UNITED STATES CITIZEN.

14        THE COURT:  HOWEVER, I DON'T KNOW THAT THAT -- THAT

15  MAY OR MAY NOT BE AN ISSUE.  I HAVE NO CONTROL.  I HAVE NO

16  CONTROL OVER THE PROGRAM.  IT LOOKS TO ME AS IF SHE WOULD

17  SATISFY ALL THE REQUIREMENTS.  SO THEN THAT ONE --

18        MR. WAGGENER:  WELL --

19        THE COURT:  I KNOW THIS, I DON'T THINK -- I THINK I

20  HAVE TO JUDGE MY SENTENCE BASED UPON HOW I VIEW THE GUIDELINES

21  AND HOW I VIEW THE SUBSTANTIAL ASSISTANCE AND ALL THE

22  CIRCUMSTANCES THAT GO INTO THE SUBSTANTIAL ASSISTANCE TO THE

23  GOVERNMENT.  THOSE ARE THE FACTORS THAT I HAVE TO CONSIDER.

24        AND I DON'T THINK I WOULD SET A PARTICULAR SENTENCE

25  BASED UPON WHAT IS -- WHAT WOULD OR WOULD NOT BE AVAILABLE TO

000459

1   HER.  I THINK I HAVE TO SET THE SENTENCE, AND THEN EITHER SHE

2   QUALIFIES OR DOESN'T BASED UPON THAT CRITERIA.

3          I THINK MS. LOPEZ IS RIGHT, I THINK, ACTUALLY, I

4   COULD SENTENCE HER TO MORE THAN 30 MONTHS, AND THE BUREAU OF

5   PRISONS COULD THEN TRANSFER HER WHEN SHE COMES WITHIN 24 MONTHS

6   OF HER PROJECTED RELEASE DATE.

7          ONE OF THE ELIGIBLE -- IS THAT IF THE BUREAU OF

8   PRISONS TRANSFERS HER WITHIN 24 MONTHS OF THE PROJECTED RELEASE

9   DATE AS LONG AS SHE'S SENTENCED TO 60 MONTHS OR LESS, THAT'S

10  HOW THAT WORKS.

11         SO BUT I DON'T THINK THAT'S THE CRITERIA.  I THINK

12  THE CRITERIA, I THINK, HAS TO BE WHERE -- IN LIGHT OF THE

13  5(K)(1) DEPARTURE, WHERE DOES ONE SET THE VALUE OF HER

14  SUBSTANTIAL ASSISTANCE?  IN THAT REGARD, I THINK I CAN VIEW

15  WHAT HAS HAPPENED TO WHETHER SHE WAS OF SUBSTANTIAL ASSISTANCE,

16  WHICH THE GOVERNMENT HAS CANDIDLY AND FORTHRIGHTLY ARGUED THAT

17  SHE WAS.

18         I THINK I CAN LOOK AT THE SENTENCES GIVEN TO OTHER

19  CO-DEFENDANTS, ESPECIALLY THE SENTENCE THAT IS GIVEN TO THE

20  INDIVIDUAL WHO THIS DEFENDANT PROVIDED SUBSTANTIAL ASSISTANCE

21  IN THE PROSECUTION, NORBERTO DUARTE, 26 MONTHS IN CUSTODY FOR

22  HIS INVOLVEMENT.  OF COURSE, INVOLVEMENTS ARE DIFFERENT, AND I

23  UNDERSTAND THAT, BUT IN TRYING TO INTERPRET THE VALUE OF

24  SUBSTANTIAL ASSISTANCE, I THINK I WOULD TAKE THAT INTO

25  CONSIDERATION.

000460

1          **MR. WAGGENER:**  ONE FURTHER FACTOR TO TAKE INTO

2    CONSIDERATION IS THE DANGER TO HER, WHICH I TOUCHED UPON IN MY

3    MEMO.  THE FACT OF THE MATTER IS, HAVING READ COPIES OF THE

4    DEBRIEFINGS, AND THE INFORMATION THAT SHE HAS PROVIDED RELATES

5    TO SOME PEOPLE THAT ARE VERY HIGH UP AND ARE VERY POTENTIALLY

6    DANGEROUS, WHETHER THEY'RE CARTEL MEMBERS, CARTEL CONNECTED,

7    WHATEVER IT MAY BE.  AND THAT, YOU KNOW, THAT FACING THAT RISK,

8    I HAVE IT RIGHT HERE IN FRONT OF ME, JUDGE, 5(K) AND THE

9    CONSIDERATIONS, THAT IS SOMETHING THAT CAN BE TAKEN IN ACCOUNT

10   AND WEIGHED BY THE COURT BECAUSE, YOU KNOW, AS I UNDERSTAND IT,

11   SHE -- IF IT EVER CAME OUT IN TERMS OF WHAT SHE HAS HAD TO SAY

12   AND WHAT SHE HAS EXPOSED, BE IT INTELLIGENCE INFORMATION, OR

13   OTHERWISE, SHE HAS FAMILY MEMBERS IN COLOMBIA, SHE OBVIOUSLY

14   HAS FAMILY MEMBERS THAT ARE HERE, THAT IS A VERY REAL DANGER TO

15   HER.

16          **THE COURT:**  YEAH.  AND I AGREE WITH THAT.  AND

17   THAT'S 5(K)(1) PAREN (A), PAREN, PAREN (4) PAREN.  AND I DO

18   FIND THAT THERE IS A SIGNIFICANT DANGER TO THE DEFENDANT AND TO

19   HER FAMILY IN CONNECTION WITH COOPERATION THAT HAS BEEN

20   PROVIDED.

21          ANYTHING FURTHER?

22          **MR. WAGGENER:**  JUST IF I COULD CLARIFY SOMETHING FOR

23   MS. BIOCINI.  OBVIOUSLY, HER AND I SPENT A LOT OF TIME

24   TOGETHER, IN TERMS OF THOSE FACTUAL PORTIONS THAT ARE WITHIN

25   THE REPORT.  I JUST WANT TO MAKE IT CLEAR TO MS. BIOCINI, IN

1    TERMS OF THE LEGAL RANGE OF THE COURT THE WAY I DESCRIBED IT,

2    WHAT THE JUDGE IS PREPARED TO DO AS TO THE MATERIAL THAT WE

3    OBJECTED TO AND THE HISTORICAL INFORMATION, PARTICULARLY AS TO

4    MS. DRAGU *(PHONETIC)* AND MS. SEGAL THAT WE PUT OUT IN THE

5    SENTENCING MEMORANDUM IS TO DISREGARD THAT INFORMATION FOR

6    PURPOSES OF THE SENTENCING.

7         ***THE COURT:***  THAT'S CORRECT.  AS TO EACH MATTER TO

8    WHICH YOU HAVE RAISED AN OBJECTION, THE COURT IS EITHER

9    ACCEPTING YOUR CHARACTERIZATION OR ADVISING THE PARTIES THAT

10   I'M NOT GOING TO CONSIDER THOSE OBJECTED TO FACTS FOR PURPOSES

11   OF SENTENCING.

12        ***MR. WAGGENER:***  SO THAT IS HOW THAT IS RESOLVED.

13        THAT DOES LEAVE ANOTHER ISSUE WHICH COMPLICATES THE

14   PRE-SENTENCE REPORT ITSELF, BECAUSE THE PRE-SENTENCE REPORT

15   ITSELF IS THE MOST IMPORTANT DOCUMENT WHICH AFFECTS HER

16   SENTENCING DOWN THE ROAD, OR HER DESIGNATION, HER SECURITY

17   STATUS, HER OPPORTUNITY FOR EDUCATIONAL OR EMPLOYMENT PROGRAMS

18   WITHIN THE BUREAU OF PRISONS.

19        I UNDERSTAND THE REMEDY AS IT APPLIES TO THE

20   ULTIMATE SENTENCE, BUT IN TERMS OF HOW IT TRAILS HER, I THINK

21   THAT IS SOMETHING THAT IS A WHOLE OTHER ISSUE.  THAT IS WHY I

22   ASKED ABOUT STRIKING THE THINGS FROM THE REPORT ITSELF.

23        THERE IS NO QUESTION THAT IS THE MAIN DOCUMENT THE

24   BUREAU OF PRISONS LOOKS AT AND ANYBODY WHO HAS TO MEASURE HER

25   SUPERVISED RELEASE DOWN THE ROAD.

1          *THE COURT:*  WELL, I GUESS ONE THING I COULD DO IS ON

2     THE PRE-SENTENCE REPORT THAT IS FORWARDED TO THE BUREAU OF

3     PRISONS I COULD REDACT ANY PORTION THAT -- TO WHICH I HAVE NOT

4     CONSIDERED FOR PURPOSES OF SENTENCING.

5          *THE PROBATION OFFICER:*  YOUR HONOR, FOR OUR PURPOSES

6     THEY --

7          *THE COURT:*  WHAT WOULD YOU LIKE ME TO DO?

8          *THE PROBATION OFFICER:*  FOR THE PROBATION

9     DEPARTMENT'S PURPOSES, IT IS IMPORTANT FOR THE SAFETY, WHAT

10    PEOPLE SAID ABOUT HER AS FAR AS HER LEVEL OF CULPABILITY, AND

11    ALL OF THAT.  IT'S A OFFICER SAFETY ISSUE THAT I THINK NEEDS TO

12    BE IN THE FILE.

13         *THE COURT:*  WELL, I THINK THAT, THEN, IT SHOULD BE

14    IN THE FILE.  IT SHOULD BE LEFT, AND THE COURT WILL MAKE THAT

15    STATEMENT, SIMPLY THAT I HAVEN'T -- THAT THE DEFENSE HAS

16    OBJECTED --

17         *THE PROBATION OFFICER:*  I DO HAVE THAT IN THERE.

18         *THE COURT:*  PARDON?

19         *THE PROBATION OFFICER:*  I DO HAVE THAT -- IN MANY

20    CASES I PUT THAT THE DEFENDANT DISAGREES WITH THIS STATEMENT.

21         *THE COURT:*  YEAH, AND THE COURT MAKES NO FINDING.

22    IT'S THERE, I UNDERSTAND THAT, BUT I DON'T THINK -- BY THE WAY,

23    WHAT IS THERE IN THE REPORT WOULD, SAY, DISQUALIFY HER FROM

24    PARTICIPATING, FOR EXAMPLE, IN THIS PROGRAM?

25         *MR. WAGGENER:*  I THINK THAT IT MIGHT.

*Sahar McVickar, RPR - Official Court Reporter, U.S.D.C.*
*(415) 626-6060*

1      **THE PROBATION OFFICER:**  I'M SORRY; HOW IS THAT?

2      **MR. WAGGENER:**  IN TERMS OF THE WEIGHT, THE

3  CONNECTIONS THE SEVERITY OF SOME -- THE NATURE OF THE SOME OF

4  THE ALLEGATIONS.

5      **THE PROBATION OFFICER:**  THERE IS NO ROLE ENHANCEMENT

6  OR WEAPONS MENTIONED.  I CAN'T THINK OF ANYTHING THAT WOULD

7  PROHIBIT HER PARTICIPATING IN PROGRAMS OR HOLD HER BACK IN ANY

8  WAY.

9      **MR. WAGGENER:**  WELL --

10     **THE COURT:**  I THINK SHE MIGHT RATHER HAVE IT IN THE

11  FORM I'M SUGGESTING, TO HAVE A HEARING WHERE IF I THINK THAT

12  THE EVIDENCE IS -- WARRANTS SPECIFIC FINDINGS -- I DON'T KNOW,

13  SOMETIMES IT'S HARD TO GO BACK AND RECREATE WHAT HAPPENED

14  EIGHT, TEN, NINE YEARS AGO.

15     **MR. WAGGENER:**  WELL, SOME OF THE THINGS --

16     **THE COURT:**  I MEAN, THE FACT OF THE MATTER IS,

17  MR. WAGGENER, SHE'S BEEN OUT OF CUSTODY NOW FOR HOW MANY YEARS?

18     **MR. WAGGENER:**  EIGHT.

19     **THE COURT:**  EIGHT YEARS.  SHE HASN'T GOTTEN INTO ANY

20  TROUBLE.  SHE IS NOT GOING TO WALK AROUND LIKE SHE'S A DANGER

21  TO THE COMMUNITY.  SHE HAS STAYED WHAT I WOULD SAY "CLEAN,"

22  OTHER THAN THERE HAVE BEEN SOME MARIJUANA ISSUES, SMALL ISSUES.

23  AND, YOU KNOW, I'LL MAKE MY RECOMMENDATIONS ACCORDINGLY.  AND I

24  JUST THINK THIS IS ABOUT AS GOOD AS IT GETS.

25     I DON'T KNOW THAT -- YOU'RE CERTAINLY NOT ENTITLED

000464

1  TO A PRE-SENTENCE REPORT THAT WOULDN'T BE AN ACCURATE ONE, NOR

2  ARE YOU ASKING FOR ONE.  BUT YOU'RE ASKING FOR DETERMINATIONS.

3  I JUST DON'T KNOW WHAT ELSE WE CAN DO.  AND I THINK THE

4  PROBATION DEPARTMENT IS RIGHT; THEY HAVE A RESPONSIBILITY TO

5  BRING THE ISSUES TO THE ATTENTION -- INCLUDE IT IN THE

6  PRE-SENTENCE REPORT.

7           I WILL HAVE HER VOLUNTARILY SURRENDER.  SHE'S BEEN

8  LIVING EVIDENCE OF NOT BEING A DANGER TO THE COMMUNITY.  YOU

9  KNOW EXCLUDING HER FROM A PROGRAM BASED UPON THE FACT THAT

10 THERE IS SOME ASSOCIATIONS THAT SHE HAD EIGHT YEARS AGO, SHE

11 OBVIOUSLY TRAVELED WITH A CROWD THAT WAS A PRETTY DANGEROUS

12 CROWD.  WELL, WE CAN'T -- I MEAN, THAT IS THE REALITY OF IT.

13 THAT WAS -- THAT IS WHY SHE IS HERE TODAY.

14         **MR. WAGGENER:**  THAT'S TRUE.

15         **THE COURT:**  I DON'T THINK WE CAN MAKE IT THAT WHICH

16 IT IS NOT.

17         **MR. WAGGENER:**  WELL, A COUPLE OTHER THINGS TO

18 CONSIDER.  ONE IS YOU'VE INDICATED A VOLUNTARY SURRENDER; I

19 THINK IT PROBABLY MAKES THE MOST SENSE TO LET HER GET THROUGH

20 THE SUMMER, THE BEGINNING OF THE SCHOOL YEAR, SO SHE'LL HAVE

21 HER SON IN HIGH SCHOOL, MAKE ARRANGEMENTS WHATEVER HAS TO BE

22 DONE.

23         **THE COURT:**  THAT MAY OR MAY NOT MAKE SENSE.  I DON'T

24 KNOW, I DON'T NECESSARILY KNOW.

25         I THINK WHAT I WOULD LIKE TO DO IS, I MAY PUT THAT

1    OVER FOR A FURTHER DETERMINATION.  I MIGHT SEE SOMEBODY COME IN

2    WITH A PLAN -- I WOULD LIKE TO SEE WHAT IS GOING TO HAPPEN TO

3    THE YOUNG MAN AND FIND OUT WHAT HE IS DOING IN THE SUMMER.  I

4    WOULD LIKE TO KNOW MORE THAN I KNOW PRESENTLY.  BELIEVE ME, I

5    WILL DO WHAT IS NECESSARY TO MAKE SURE IT ALL MAKES SOME SENSE.

6    BUT, YOU KNOW, YOU'RE COMING TODAY, AND UNDERSTANDABLY SO,

7    HAVING NO PLANS, SO I DON'T KNOW.

8         I'M NOT GOING TO AGREE TO A NO-PLAN PLAN.  I'M GOING

9    TO WAIT AND SEE WHAT PLANS ARE AND TRY TO FIGURE OUT WHAT TO

10   DO.  BUT I WILL HAVE HER VOLUNTARILY SURRENDER.  I MAY SET IT

11   FOR A STATUS CONFERENCE BEFORE HER VOLUNTARY SURRENDER DATE.

12        *MR. WAGGENER:*  COUPLE OF OTHER THINGS, JUST IN TERMS

13   OF THE ULTIMATE AMOUNT OF TIME, YOU KNOW.

14        OBVIOUSLY, PROBATION, YOU'VE INDICATED, IS NOT

15   AVAILABLE, OR NOT GOING TO BE CONSIDERED BY THE COURT; A TERM

16   OF MONTHS BELOW THAT OF MR. DUARTE WOULD BE WHAT I'D ASK FOR.

17   AND I KNOW THAT MS. BIOCINI HAS PREPARED A LETTER THAT SHE

18   WOULD LIKE TO ADDRESS THE COURT HERSELF IN TERMS OF HER

19   SITUATION.

20        *THE COURT:*  OKAY.

21        MS. BIOCINI?

22             **(CLERK HANDS COURT LETTER FOR REVIEW.)**

23        *THE COURT:*  OKAY.  THANK YOU.

24        DO YOU WISH TO -- MR. HOWDEN, DO YOU WANT TO READ

25   THE LETTER?

1    *MR. HOWDEN:*  I'D LIKE TO READ IT, YES, YOUR HONOR.

2    *THE COURT:*  OKAY.

3    **(COUNSEL REVIEWS LETTER.)**

4    *MR. HOWDEN:*  THANK YOU, YOUR HONOR.

5    *THE COURT:*  OKAY.

6    DOES ANYONE -- WELL, MS. LOPEZ -- YOU'RE READING IT.

7    **(PROBATION OFFICER REVIEWS LETTER.)**

8    *THE COURT:*  ANYTHING FURTHER?

9    I WANT THAT FILED.

10    *MR. WAGGENER:*  NONE.

11    *MR. HOWDEN:*  NO, YOUR HONOR.

12    *THE COURT:*  OKAY.

13    I NOTE THAT YOU HAVE BEEN LIVING WITH THIS PROBLEM

14   FOR A LONG PERIOD OF TIME.  I THINK THAT THAT HAS BEEN, IN A

15   SENSE, PUNISHMENT IN AND OF ITSELF.  I DO THINK, HOWEVER, THAT

16   WHILE I BELIEVE THE GOVERNMENT SHOULD HAVE BROUGHT THIS TO OUR

17   ATTENTION EARLIER, DEPENDING ON YOUR VIEW, AND SO FORTH, IT WAS

18   A MATTER THAT YOU COULD HAVE ACCELERATED THE SENTENCING OF AND

19   TRIED TO BRING ABOUT A BIT MORE CERTAINTY IN YOUR LIFE THAN

20   YOU'VE CHOSEN TO DO.

21    HOWEVER, AS WITH ANY DAY OF JUDGMENT, IT HAS NOW

22   COME TO THAT.  AND I BELIEVE THAT ACTUALLY SENTENCING YOU AND

23   HAVING YOU THEN ORGANIZE YOUR LIFE AROUND YOUR SENTENCE AND

24   YOUR LIFE AFTER YOUR SENTENCE WILL PROBABLY BE OF SOME BENEFIT

25   TO YOU TO GET THIS BEHIND YOU.

1        ALL OF YOUR CO-DEFENDANTS HAVE GOTTEN IT BEHIND

2    THEM.  HOW THEY'VE ENDED UP, WHAT THEY ARE, HOW THEY'RE DOING,

3    I DON'T KNOW.  BUT IT'S BEEN A LONG TIME IN COMING, AND I THINK

4    THAT YOU HAVE TO COME TO TERMS WITH IT.

5        THEREFORE, THE SENTENCE IS AS FOLLOWS:  PURSUANT TO

6    THE SENTENCING REFORM ACT OF 1984 -- OH, WELL, I THINK I HAVE

7    TO SAY THIS:  THE REQUEST GRANTED, THE 5(K)(1) DEPARTURE, THE

8    COURT FINDS THAT THE ADJUSTED OFFENSE LEVEL PREVIOUSLY SET AT

9    28 --

10       **THE PROBATION OFFICER:**  UM-HMM, CORRECT.

11       **THE COURT:**  -- IS REDUCED TO 19.

12       PURSUANT TO THE SENTENCING REFORM ACT OF 1984, IT IS

13   THE JUDGMENT OF THE COURT THAT THE DEFENDANT, ANA BIOCINI, IS

14   HEREBY SENTENCED TO THE CUSTODY OF THE BUREAU OF PRISONS FOR A

15   TERM OF 30 MONTHS.  IT IS RECOMMENDED THAT THE DEFENDANT

16   PARTICIPATE IN THE INTENSIVE CONFINEMENT CENTER PROGRAM, AND IT

17   WILL BE THE RECOMMENDATION OF THE COURT THAT YOU DO SO.

18       UPON THE RELEASE FROM CUSTODY, THE DEFENDANT SHALL

19   BE PLACED ON SUPERVISED RELEASE FOR A TERM OF FIVE YEARS.

20   WHILE ON SUPERVISED RELEASE, YOU SHALL NOT COMMIT ANOTHER

21   FEDERAL, STATE, OR LOCAL CRIME AND SHALL NOT UNLAWFULLY POSSESS

22   A CONTROLLED SUBSTANCE, AND SHALL ABIDE BY THE STANDARD

23   CONDITIONS THAT HAVE BEEN ADOPTED BY THIS COURT.

24       YOU SHALL COMPLY WITH THE FOLLOWING SPECIAL

25   CONDITIONS:

000468

1    FIRST, YOU ARE PROHIBITED FROM POSSESSING FIREARMS,

2  AMMUNITION, EXPLOSIVE DEVICE, OR COMPONENTS TO MAKE EXPLOSIVES,

3  OR INSTRUCTION MATERIALS FOR THE MANUFACTURING OF SUCH DEVICES

4  AND SHALL NOT POSSESS ANY OTHER DANGEROUS WEAPONS.

5    TWO, YOU SHALL PROVIDE TO THE PROBATION OFFICER

6  ACCESS TO ANY REQUESTED FINANCIAL INFORMATION.

7    THREE, YOU SHALL PARTICIPATE IN A DRUG/ALCOHOL

8  AFTER-CARE TREATMENT PROGRAM, IF DEEMED NECESSARY BY THE

9  PROBATION OFFICER, WHICH MAY INCLUDE RESIDENTIAL TREATMENT AND

10  TESTING TO DETERMINE WHETHER YOU HAVE REVERTED TO THE USE OF

11  DRUGS OR ALCOHOL AS DIRECTED BY THE PROBATION OFFICER.

12    YOU ARE TO PAY PART OF THE ALL THE COST OF TREATMENT

13  IN AN AMOUNT NOT TO EXCEED $60 PER SESSION, AS DEEMED

14  APPROPRIATE BY THE PROBATION OFFICER.  PAYMENTS SHALL NEVER

15  EXCEED THE TOTAL AMOUNT OF URINALYSIS AND COUNSELING.  AND THE

16  ACTUAL CO-PAYMENT SCHEDULE SHALL BE DETERMINED BY THE PROBATION

17  OFFICER.  AND YOU SHALL PROVIDE ACCESS TO REQUESTED FINANCIAL

18  INFORMATION, IF SO DIRECTED.

19    YOU SHALL SUBMIT YOUR PERSON, RESIDENCE, OFFICE, OR

20  VEHICLE UNDER YOUR CONTROL TO A SEARCH CONDUCTED BY A PROBATION

21  OFFICER AT A REASONABLE TIME AND IN A REASONABLE MANNER BASED

22  UPON A REASONABLE SUSPICION OF CONTRABAND OR EVIDENCE OF A

23  VIOLATION OF CONDITION OF SUPERVISION.  FAILURE TO SUBMIT TO A

24  SUCH A SEARCH MAY BE GROUNDS FOR REVOCATION.

25    YOU SHALL WARN OTHER RESIDENTS THE PREMISES MAY BE

000469

1  SUBJECT TO SEARCHES PURSUANT TO THIS CONDITION.  YOU SHALL

2  PARTICIPATE IN AN MENTAL HEALTH TREATMENT PROGRAM, IF DEEMED

3  NECESSARY BY THE PROBATION OFFICER.

4         YOU ARE TO PAY PART OR ALL THE COST OF THIS

5  TREATMENT AT AN AMOUNT NOT TO EXCEED $60 PER SESSION, AS DEEMED

6  APPROPRIATE BY THE PROBATION OFFICER.  PAYMENTS SHALL NEVER

7  EXCEED THE TOTAL COST OF MENTAL HEALTH COUNSELING.  THE ACTUAL

8  COPAYMENT SCHEDULE SHALL BE DETERMINED BY THE PROBATION

9  OFFICER.  YOU ARE TO PAY ANY SPECIAL ASSESSMENT THAT IS ORDERED

10 AS PART OF THIS JUDGMENT.

11        YOU SHALL NOT HAVE ANY CONTACT WITH ANY

12 CO-DEFENDANTS IN THE CASE.  THE COURT FINDS YOU DO NOT HAVE THE

13 ABILITY TO PAY A FINE, AND NO FINE SHALL BE ORDERED.  IT IS

14 FURTHER ORDERED THAT YOU PAY TO THE UNITED STATES A SPECIAL

15 ASSESSMENT OF $100, WHICH SHALL BE DUE IMMEDIATELY.

16        NOW, LET'S TALK ABOUT SURRENDER.  YOU CAN VOLUNTARY

17 SURRENDER, THE QUESTION IS WHEN.

18        *MR. WAGGENER:*  CAN I MAKE THIS SUGGESTION JUDGE --

19        *THE COURT:*  YEAH, GO AHEAD.

20        *MR. WAGGENER:*  I'M GOING TO BE IN A TRIAL TILL

21 MAY 16TH.  THE END OF THAT WEEK, I CAN MEET WITH MS. BIOCINI,

22 OBVIOUSLY TALK TO HER ABOUT A PLAN, AND GET YOU SOMETHING THAT

23 NEXT WEEK, IF YOU WANT TO SET A STATUS CASE MANAGEMENT

24 CONFERENCE DURING THAT FOLLOWING WEEK, IN TERMS MAKING THAT

25 DECISION OR THAT CALL.

1    **THE COURT:**  YES, I WOULD LIKE TO SEE A PLAN.  I

2    WOULD LIKE TO SEE WHAT YOU'RE GOING TO DO WITH YOUR CHILD,

3    THAT'S WHAT I WANT TO SEE.  I WANT IT TO BE WELL THOUGHT OUT.

4    I WANT TO SEE A PLAN FOR WHAT YOU'RE GOING TO DO

5    THIS SUMMER, WHAT HE IS GOING TO DO THIS SUMMER.  I WANT TO SEE

6    A PLAN OF WHAT WOULD HAPPEN IN THE PLAN.

7    **MR. WAGGENER:**  WE'RE GOING TO TALK ABOUT IT.

8    YOU DON'T HAVE TO SAY IT RIGHT NOW.

9    **THE COURT:**  RIGHT.

10   **MR. HOWDEN:**  IF I MAY, IN THE NORMAL COURSE OF

11   EVENTS, I WOULD BE ASKING THAT THE DEFENDANT BE REMANDED NOW AT

12   SENTENCING.  I'M NOT ASKING FOR THAT.  I'VE LISTENED TO SOME OF

13   THE ISSUES THAT THE COURT IS WRESTLING WITH; IT IS MY SENSE,

14   BASED ON WHAT I HAVE HEARD HERE TODAY, THAT THE SOONER THE

15   DEFENDANT FOCUSES ON A PLAN AND CREATES A PLAN AND PRESENTS IT

16   TO THE COURT, THE BETTER OFF EVERYONE WILL BE.

17   AND IT SEEMS TO ME THAT PART OF THAT PLAN OUGHT TO

18   INCLUDE WHEN SHE IS GOING TO SURRENDER.  AND AGAIN, I THINK THE

19   SOON SOONER, THE BETTER, IN ORDER TO FORCE THE ISSUE.

20   **THE COURT:**  I THINK SO, TOO.  I MEAN, I THINK SO

21   TOO.

22   I THINK YOU SHOULD OPERATE ON THE ASSUMPTION THAT

23   IT'S GOING TO BE THIS SUMMER, NOT SEPTEMBER, BUT THIS SUMMER,

24   AND MAKE SOME PLANS.

25   YOU KNOW, I WOULD LIKE -- YOU KNOW, ONE THING THAT

*Sahar McVickar, RPR - Official Court Reporter, U.S.D.C.*
*(415) 626-6060*

000471

1    MAY MAKE IT -- I'LL TELL YOU WHAT I THINK WOULD BE THE THING

2    THAT WOULD CONVINCE ME WHEN TO DO IT MORE THAN ANYTHING ELSE,

3    IS TO CHECK WITH THE BUREAU OF PRISONS AND FIND OUT ABOUT THE

4    AVAILABILITY OF THE ICC.   THEY HAVE A PROGRAM.   MAYBE MS. LOPEZ

5    CAN --

6          WHY DON'T YOU FIND OUT WHEN SHE WOULD BE AVAILABLE?

7    EXPLAIN, JUST SORT OF ADVISORY, AND SO FORTH, AND SEE WHEN SHE

8    CAN GO INTO A PROGRAM THAT -- WHETHER IT MAY BE SOMEWHAT OF A

9    LONG WAIT OR NOT.   THAT MAY HAVE SOME BEARING.

10          *THE PROBATION OFFICER:*   THE ONE QUESTION THAT THEY

11   MAY ASK IS IS SHE A LEGAL RESIDENT.   I THOUGHT IT WAS

12   UNDERSTOOD FROM THE AGENT THAT THERE WAS SOME ISSUE THAT THIS

13   DEFENDANT MAY QUALIFY AS A DEPORTABLE OFFENSE.

14          IS THAT RIGHT?

15          *AGENT IVERSON:*   I HAVE TO LOOK INTO THAT ANSWER,

16   BECAUSE THEY MAY WANT TO KNOW.

17          *THE DEFENDANT:*   I HAVE MY PERMANENT RESIDENCE IN

18   THIS COUNTRY, SO I NO ILLEGAL.

19          *MR. WAGGENER:*   NO, SHE SAID LEGAL RESIDENT.

20          IMMIGRATION AND DEPORTATION IS CERTAINLY AN ISSUE.

21   AND THERE WERE NO PROMISES AS PART OF THE PLEA AGREEMENT.   AND

22   THAT IS SOMETHING THAT MS. SILANO AND I WILL TALK ABOUT.   AND

23   THAT HAS TO DO WITH THE 5(K) ISSUE.

24          *THE COURT:*   WELL, YOU MIGHT BE ABLE TO SAY THAT IN

25   LIGHT OF HER COOPERATION -- IT DOESN'T SEEM -- NO ONE IS GOING

000472

1    TO PRESS ON THE ISSUE OF HER DEPORTATION, LET THE BUREAU OF

2    PRISONS ASSUME THAT SHE IS GOING TO BE HERE.  LET'S GIVE HER

3    EVERY POSSIBLE BREAK IN THAT REGARD, WHATEVER HAPPENS DOWN THE

4    ROAD, OKAY?

5            SO I'LL SEE YOU BACK HERE -- HOW LONG YOU THINK IT

6    WILL TAKE, MS. LOPEZ?

7            **THE PROBATION OFFICER:**  I COULD JUST MAKE THE PHONE

8    CALL AND PROBABLY HAVE THE INFORMATION AFTER THE --

9            **MR. WAGGENER:**  I'M IN THIS MURDER CASE, JUDGE.

10           **THE COURT:**  CAN I SEE YOU BACK HERE MAY -- I THINK

11   YOU PROBABLY SHOULD TALK TO YOUR CLIENT SOONER THAN -- WELL,

12   LET'S DO IT BEFORE MAY 30TH.

13           **MR. WAGGENER:**  MAY 21ST, YOUR REGULAR CALENDAR, IS

14   ON WEDNESDAYS.

15           **THE COURT:**  YEAH.

16           **MR. WAGGENER:**  MAYBE AT THE END OF THE CALENDAR.  I

17   JUST DON'T WANT ANY 5(K) ISSUES TO --

18           **THE COURT:**  WELL, THERE'S NOTHING MORE TO SAY, IS

19   THERE?

20           **MR. WAGGENER:**  IF THERE IS SOMETHING TO SAY AS A

21   RESULT OF THAT, I'LL LET THE CLERK KNOW.

22           **THE COURT:**  YEAH, MAY 21ST.

23           **THE PROBATION OFFICER:**  ONE SUGGESTION I HAD IS THE

24   NORMAL TIME TO SURRENDER IS 60, AND IN SOME CIRCUMSTANCES IT'S

25   BEEN 90 DAYS; I WOULD JUST RECOMMEND THE COURT SET A DATE 90

000473

1   DAYS OUT AND HAVE HER SURRENDER.  I DON'T KNOW WHETHER THE

2   COURT IS INCLINED TO GO BEYOND THAT, ANYWAY.

3          **THE COURT:**  MAYBE THAT'S A BETTER WAY OF DOING IT.

4          **MR. WAGGENER:**  WHY DON'T WE SET THE 90 DAYS, AND

5   I'LL SEE WHAT MY PLAN IS.

6          **THE COURT:**  I CAN CHANGE THAT.

7          **THE PROBATION OFFICER:**  RIGHT.

8          **THE COURT:**  OKAY.  WHY DON'T WE DO THAT.  THAT

9   INTRODUCES A SENSE OF REALITY RATHER THAN SIMPLY POSTPONING THE

10  UNREALITY OF THIS CIRCUMSTANCE.

11         SO I WILL SEND A -- THIS IS WILL BE MY ORDER:  I

12  WILL SET THE SURRENDER DATE FOR -- WELL, ON OR BEFORE

13  SEPTEMBER 2ND.  IN THE EVENT THAT A PROGRAM BECOMES AVAILABLE,

14  AN ICC PROGRAM BECOMES AVAILABLE BEFORE THAT DATE, I WANT

15  MS. BIOCINI TO GO INTO IT.

16         **THE PROBATION OFFICER:**  WELL, IT COULD BE THAT THEY

17  HAVE ONE OPEN NOW.

18         **THE COURT:**  WELL, OTHER THAN TODAY.

19         **MR. WAGGENER:**  AFTER MAY 21ST.

20         **THE COURT:**  SHE HAS TO MAKE SOME ARRANGEMENTS FOR

21  HERSELF.  I DEFINITELY WANT HIM TO COMPLETE THE SCHOOL YEAR

22  WITH HER HOME.  THE SCHOOL YEAR WILL BE OVER THE BEGINNING OF

23  JUNE, RIGHT?

24         **THE DEFENDANT:**  JUNE 14.

25         **THE COURT:**  SO NOT BEFORE JUNE 14, BUT ANYWHERE IN

*Sahar McVickar, RPR - Official Court Reporter, U.S.D.C.*
*(415) 626-6060*

1  JUNE OR JULY.

2          **THE DEFENDANT:**  CAN I ADDRESS SOMETHING TO THE

3  COURT?  HE'S GOING TO TAKE GEOMETRY FOR THE SAME SCHOOL IN THE

4  SUMMER.

5          **THE COURT:**  WELL, YOU MAY HAVE TO HAVE SOMEBODY LIVE

6  IN THE HOUSE, LIVE WITH HIM, UNDERSTAND?  YOU'RE GOING TO BE

7  GONE FOR TWO AND A HALF YEARS, SO YOU MAY HAVE TO HAVE SOMEBODY

8  LIVE WITH HIM, ALL RIGHT?

9          **THE PROBATION OFFICER:**  YOUR HONOR, I THINK THE WAY

10  IT WORKS IS THAT I CALL UP THE BUREAU OF PRISONS, AND THEY SAY,

11  FINE, THAT SHE IS ELIGIBLE FOR THE PROGRAM.  AND THEN IT'S KIND

12  OF AN ONGOING "NOW A BED IS AVAILABLE."  SO I THINK THAT THEY

13  NEED KIND OF A DATE.

14          **THE COURT:**  WELL, WE'VE GIVEN THEM THE DATE THAT SHE

15  BE -- THE DATE I WILL TELL THEM IS FROM JUNE 14TH ON.

16          **THE PROBATION OFFICER:**  OKAY.

17          **THE COURT:**  SHE IS AVAILABLE JUNE 14TH ON -- JUST

18  SAY HER SON'S IN SCHOOL, AND THE JUDGE WANTS HER TO TAKE CARE

19  OF HER SON TILL JUNE 14TH.  AND SHE IS ON -- AND SHE'LL

20  VOLUNTARILY SURRENDER.

21          **THE PROBATION OFFICER:**  SO THE DATE SHOULD BE

22  JUNE 14TH.

23          **THE COURT:**  I DON'T WANT HER TO HAVE TO SURRENDER,

24  IF SHE'S NOT GOING TO GO INTO THE PROGRAM.  THEY'LL SAY, "WELL,

25  HAVE HER COME INTO TO JAIL, AND THEN WE'LL GIVE HER THE FIRST

000475

1    AVAILABLE DAY," OR SOME OTHER DAY. I'D RATHER NOT DO THAT.

2              **THE PROBATION OFFICER:** THERE MIGHT BE A DAY OR TWO

3    OF PROCESSING INVOLVED IN THAT, BUT OTHER THAN THAT --

4              **THE COURT:** THAT'S FINE. MY RECOLLECTION IS THEY

5    HAVE THE PERSON SURRENDER TO THE FACILITY WHERE THEY HAVE A

6    PROGRAM.

7              IN HER CASE IT MAY BE SOMEWHAT UNUSUAL. I DIDN'T

8    EVEN KNOW THAT WOMEN ARE -- THEY OUGHT TO BE AVAILABLE -- IT

9    OUGHT TO BE AVAILABLE TO WOMEN. BUT I COULD BE TOLD, "I'M

10   SORRY, WE DON'T EVEN DO THAT." BUT LET'S FIND OUT.

11             I'LL SEE YOU BACK HERE, ANYWAY.

12             **MR. WAGGENER:** THE 21ST.

13             **THE COURT:** I WANT TO -- BACK HERE -- WELL, NO, I

14   DON'T NEED TO IF YOU NEED TO -- I'M GOING TO DO THE JUDGMENT

15   AND COMMIT NOW, AND IT'S GOING TO BE SEPTEMBER 2ND. IF -- I

16   DON'T KNOW HOW TO DEAL WITH IT IF, IN FACT, WE GET A DATE

17   EARLIER.

18             **THE PROBATION OFFICER:** I THINK THAT THEY MIGHT SAY

19   "WELL, YOU TELL ME WHAT THE SURRENDER DATE IS, AND I CAN TELL

20   YOU WHETHER OR NOT THERE WILL BE A BED AVAILABLE." I THINK WE

21   HAVE TO GIVE THEM A DATE.

22             **THE COURT:** MAYBE I SHOULD -- I'LL GIVE A SURRENDER

23   DATE, THEN -- INSTEAD OF SEPTEMBER 2ND, I'LL GIVE A SURRENDER

24   DATE IN JULY.

25             **MR. WAGGENER:** JUDGE, COULD WE JUST KEEP IN

1  SEPTEMBER --

2            **THE COURT:**  NO, I'D RATHER NOT.  I'M TRYING TO

3  ACCOMPLISH A PARTICULAR THING, WHICH IS THE PROGRAM.  AND I

4  DON'T WANT TO BE --

5            **MR. WAGGENER:**  OKAY.

6            **THE COURT:**  IF IT TURNS OUT THAT I HAVE TO CHANGE

7  DATES, I COULD DO THAT.  BUT I HAVE THIS SENSE THAT I'M NOT

8  HELPING ANYBODY.

9            **MR. WAGGENER:**  WELL, ALL RIGHT.  AND I'LL PUT --

10 MS. BIOCINI PUT -- WHAT I'M HEARING YOU SAYING IS THAT YOU'LL

11 LISTEN TO WHAT I HAVE TO SAY IF THERE IS SOME COMPLICATION WITH

12 THAT.

13           **THE COURT:**  YEAH.

14           JULY 14TH.

15           **MR. WAGGENER:**  OKAY.

16           **THE PROBATION OFFICER:**  YOUR HONOR, IF SHE IS NOT

17 ELIGIBLE, I'LL LET YOU KNOW RIGHT AWAY.

18           **THE COURT:**  RIGHT.

19           IF NOT -- IF SHE IS NOT ELIGIBLE, THEN LET'S COME

20 BACK HERE ON MAY 21ST IN THE AFTERNOON FOR FURTHER PROCEEDINGS.

21           **MR. WAGGENER:**  OKAY.

22           **THE COURT:**  ON THE SURRENDER, OKAY?

23           **THE PROBATION OFFICER:**  WOULD THAT BE AT 2:15, YOUR

24 HONOR?

25           **THE COURT:**  YEAH.

1    MR. WAGGENER: ONE MINOR MATTER, JUDGE. SHE -- HER

2    FAMILY AND RELATIVES WANT TO GO TO THE EASTERN DISTRICT OVER

3    THIS WEEKEND. THEY'RE GOING TO -- THEY WANT TO GO TO YOSEMITE.

4    COULD YOU GIVE ME AN ORDER?

5         THE COURT: YES. SHE'LL BE PERMITTED TO TRAVEL TO

6    THE EASTERN DISTRICT FOR THE NEXT WEEK.

7         THE PROBATION OFFICER: SHE NEEDS TO JUST NOTIFY

8    PRE-TRIAL, OF COURSE.

9         MR. WAGGENER: I'LL TELL THEM RIGHT NOW.

10        THE COURT: OKAY. THANK YOU VERY MUCH.

11        MR. HOWDEN: THANK YOU, JUDGE.

12        AGENT IVERSON: THANK YOU, YOUR HONOR.

13        THE COURT: THANK YOU 3:54.

14              (PROCEEDINGS ADJOURNED AT 3:54 P.M.)

15

16              ---oOo---

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, SAHAR MCVICKAR, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.  THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

SAHAR MCVICKAR, RPR - OFFICIAL COURT REPORTER

APRIL 28, 2003