# EXHIBIT
# D-3





# Colombia

## Country Reports on Human Rights Practices - 2004
Released by the Bureau of Democracy, Human Rights, and Labor
February 28, 2005

Colombia is a constitutional, multiparty democracy. In 2002, voters elected independent candidate Alvaro Uribe president and selected a bicameral legislature with a mix of Liberal, Conservative, and independent members. Internal armed conflict continued between the Government and terrorist groups, particularly the Revolutionary Armed Forces of Colombia (FARC), the National Liberation Army (ELN), and the United Self-Defense Forces of Colombia (AUC). The conflict caused the deaths of between 3,000 and 4,000 persons during the year, including combat casualties, political murders, and forced disappearances. The civilian judiciary is largely independent of the executive and legislative branches; however, it was overburdened, inefficient, and subject to intimidation and corruption.

The civilian-led Ministry of Defense is responsible for internal and external security and oversees both the police and the armed forces, including the army, air force, and navy. The National Police shared law enforcement duties with the Administrative Department of Security (DAS) and the Prosecutor General's Corps of Technical Investigators (CTI). The police are responsible for order and security in urban areas. The armed forces are responsible for national defense and security in rural areas, and support the police in urban areas when called upon. Although civilian authorities generally maintained effective control of the security forces, there were instances in which members of the security forces committed human rights abuses. Police and military forces continued to take steps to improve their human rights record; however, some members of the security forces violated human rights in defiance of government policy.

The country has a diverse market-based economy and a population of approximately 44 million. Crude oil, coal, coffee, and cut flowers are the country's principal legal exports. Drug trafficking has created a large illicit economy. Economic growth for the year was estimated at 3.8 percent, while inflation measured 5.5 percent. Income distribution was highly skewed, with 59 percent of the population living in poverty. Unemployment fell to 11.7 percent and per capita gross domestic product rose to $2,015.

Although serious problems remained, the Government's respect for human rights improved in some areas. While nongovernmental organizations (NGOs) claimed that the security forces' share had increased, the percentage of total human rights abuses reported attributed to security forces was low; however, some members of the security forces continued to commit serious abuses, including unlawful and extrajudicial killings and forced disappearances. Some members of the security forces continued to collaborate with the terrorist AUC, which committed serious abuses. Police, prison guards, and military forces mistreated detainees. Conditions in the overcrowded and underfunded prisons were harsh, and prisoners frequently relied on bribes for favorable treatment. There were allegations of arbitrary arrests and detentions, and prolonged pretrial detention remained a fundamental problem. Impunity remained at the core of the country's human rights problems. The civilian judiciary was inefficient, severely overburdened by a large case backlog, and undermined by corruption and intimidation. Despite prosecutions and convictions of some members of the security forces, no high-ranking officers were convicted of human rights offenses.

The authorities sometimes infringed on citizens' privacy rights. Three journalists were killed during the year, and journalists continued to work in an atmosphere of threats and intimidation, primarily from terrorist groups, but also in some instances from corrupt local officials. Journalists practiced self-censorship to avoid reprisals. There were some restrictions on freedom of movement within narrowly defined geographic areas, generally because of security concerns.

Violence and instability displaced at least 137,000 civilians during the year, and the total number of internally displaced persons (IDPs) may have exceeded 2 million, including 800,000 children. There were reports that members of the security forces harassed members of human rights groups. Violence and extensive societal



discrimination against women, child abuse, and child prostitution remained serious problems. Trafficking in women and girls for the purpose of sexual exploitation was a problem. Extensive societal discrimination against indigenous persons and minorities continued. Child labor was a widespread problem.

Despite a unilateral cease-fire declared by the AUC to facilitate demobilization negotiations with the Government, paramilitaries continued to commit numerous political killings--including of labor leaders. Paramilitaries often kidnapped and tortured suspected guerrilla sympathizers prior to executing them. Paramilitaries interfered with personal privacy in areas where they exercised de facto control, forcibly displaced thousands of innocent civilians, and engaged in military operations that endangered civilian lives. Paramilitaries also threatened and attacked human rights workers and journalists who criticized their illegal activities and continued to employ child soldiers. Despite paramilitary cease-fire violations committed throughout the year, the overall level of paramilitary violence continued to decline.

FARC and ELN terrorists were responsible for a large percentage of civilian deaths attributable to the internal armed conflict. Guerrillas, particularly the FARC, committed hundreds of intentional illegal killings and killed and injured hundreds of civilians in random terrorist bombings and landmine incidents. The FARC also continued to kidnap, torture, and murder off-duty members of the public security forces. The FARC engaged in a concerted campaign to destabilize municipal governments by killing local officials and threatening to execute others. The FARC and ELN kidnapped hundreds of civilians to help finance subversion and put political pressure on the Government. Guerrillas caused mass displacements both intentionally and as by-products of military offensives and engaged in widespread recruitment of child soldiers. The FARC and ELN announced a policy of strategic cooperation to combat the security forces and declared that neither group would enter peace negotiations with the Government. FARC and ELN terrorists threatened and attacked human rights activists. They also engaged in widespread recruitment of minors and used female conscripts as sex slaves.

During the year, there were significant improvements in several human rights indicators. Killings decreased by 16 percent, terrorist massacres by nearly 50 percent, killings of trade union leaders by 25 percent, kidnappings by 42 percent, and according to government figures, forced displacements by over 37 percent. In November and December, government negotiators succeeded in demobilizing nearly 3,000 fighters from 5 separate AUC paramilitary blocs. Hundreds of municipal officials returned to their municipalities after the Government established a permanent police presence in every urban center in the country.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary and Unlawful Deprivation of Life

Political and unlawful killings remained an extremely serious problem, and there were periodic reports that members of the security forces committed extrajudicial killings. The National Police registered 19,010 killings during the year, a 16 percent decrease from 2003 and the lowest number of killings in 18 years. The city of Medellín, once notorious for its high murder rates, registered a 40 percent decline in killings to their lowest level in 25 years.

The Jesuit-founded Center for Popular Research and Education (CINEP), a prominent local human rights NGO, claimed there were at least 382 political murders and extrajudicial killings, committed by all actors, during the first 6 months of the year. The Government's Presidential Program for Human Rights reported that 238 persons died in 43 massacres, committed by illegal armed groups, through November, a 49 percent decrease in the number of victims from 2003.

According to CINEP, state security forces were responsible for 124 extrajudicial killings during the first 6 months of the year. For example, according to local NGO Reinciar, on July 26, army soldiers killed Mauricio Tote, a member of the now-defunct leftist Patriotic Union (UP) political party, in Popayan, Cauca Department. Most of the incidents cited by CINEP were under investigation by military or civilian authorities at year's end. Civilian courts tried an increasing number of cases of military personnel accused of human rights violations (see Section 1.e.). Investigations of past killings proceeded slowly.

Through August, the Office of the Inspector General (Procuraduria) had charged 19 members of the Armed Forces with human rights offenses. As in the previous year, the Office continued to refer all cases involving human rights violations to the Prosecutor General for criminal investigation.

On May 16, the Inspector General's Office ordered the symbolic dismissal from the Armed Forces of retired army Lieutenant Colonel Jorge Plazas, who was ruled responsible for participating in forced disappearances,



kidnapping for ransom, and obstruction of justice. In 2002, Plazas was sentenced to 40 years in prison by a civilian criminal court after being convicted for the 1998 kidnapping and murder of a prominent businessman. In July 2003, he escaped from a military detention facility in Bogota and was still at large at year's end.

As of September, the Human Rights Unit of the Prosecutor General's Office (Fiscalia) had issued preventive detention orders for nine members of the Armed Forces for human rights violations or paramilitary collaboration. However, for various reasons, including lack of resources for investigations, lack of protection for witnesses and investigators, lack of coordination between government entities, and, in some cases, obstruction of justice by individuals, impunity continued to be widespread.

On March 19, a patrol from the army's Boyaca Battalion killed seven policemen and four civilians in an ambush in the municipality of Guaitarilla, Nariño Department. The criminal investigation was assigned to the military justice system, and the Inspector General's Office opened a parallel disciplinary investigation. On August 30, the Inspector General's Office charged five officials with negligence and official misconduct. On December 15, the Superior Military Tribunal reversed a September 10 decision by military investigators to close the criminal case and ordered that the case be investigated further.

On April 10, members of the army's Sixth Brigade killed a family of five in the municipality of Cajamarca, Tolima Department, during a military operation against the FARC. The soldiers admitted to firing mistakenly on the civilians. In November, the Supreme Council of the Judiciary (CSJ) reversed an earlier decision taken in June and granted the civil justice system jurisdiction over the case. The investigation continued at year's end.

On August 5, soldiers from the army's 18th Brigade shot and killed three trade union members outside a home near Saravena, Arauca Department. In September, the Prosecutor General's Office ordered their arrest and asked the Army to formally suspend the soldiers until the case was resolved. The investigation continued at year's end.

On August 28, a small group of leftist legislators denounced an alleged plot to assassinate leftist politicians and labor leaders known as "Operation Dragon." The plot allegedly involved members of the military. An investigation by the Prosecutor General's Office was ongoing at year's end.

On August 31, two policemen were killed in a "friendly fire" incident in Floridablanca, Santander Department when an elite government antikidnapping unit (GAULA) of the Army mistakenly attacked police during an antinarcotics operation. The Prosecutor General's Office, with the support of the military justice system, opened an investigation that continued at year's end.

The Procuraduria and the military penal justice system continued separate investigations into the 2002 deaths of Florentino Castellanos and his 9-year-old son during a military operation near the town of Cantagallo, Bolivar Department.

The Office of the Prosecutor General continued to gather evidence against eight members of the army's Ninth Brigade, including a colonel and a captain, for the 2002 killing of a FARC deserter.

On January 30, a court sentenced army Sergeants Sandro Fernando Barrerro and Humberto Blandon to 40 years in prison for the 2000 kidnapping and murder of Uberney Giraldo and Jose Evelio Gallo, demobilized ELN guerrillas associated with the political Socialist Renewal Movement.

On January 22, the Prosecutor General's Office ruled there was insufficient evidence to charge Brigadier General Alvaro Velandia with involvement in the 1987 murder of M-19 guerrilla Nydia Erika Bautista. By year's end, there was no ruling on the Office of the Inspector General's appeal of a decision by the Council of State to overturn the Inspector General's order that the military dismiss the general.

There continued to be credible reports that some members of the security forces cooperated with illegal paramilitaries in violation of orders from civilian leaders, including the President, and the military high command (see Section 1.g.). Such collaboration often facilitated unlawful killings and sometimes may have involved direct participation in paramilitary atrocities. For example, according to Amnesty International (AI), the May 19 paramilitary massacre of 11 peasant farmers in the municipality of Tame, Arauca Department, took place during large-scale military operations in the area.

Impunity for military personnel who collaborated with members of paramilitary groups remained a problem. However, there was progress in several cases related to military collusion with paramilitaries. For example, on September 16, the Prosecutor General's Office arrested Captain Ruben Blanco for "lending counsel and security to individuals linked to paramilitary groups," after paramilitary chief Elkin Casarrubia was found hiding



Colombia

in Blanco's home in Medellin.

The criminal trial of former Brigadier General Jaime Uscategui continued during the year. On October 6, the Criminal Chamber of the Supreme Court, citing security concerns, agreed to transfer the case from Villavicencio, Meta Department, to Bogota. The trial in absentia of former army colonel Hernan Orozco, who testified against Uscategui in an earlier military trial, also continued.

On September 14, the Inspector General's Office upheld administrative sanctions against three military officers--retired Rear Admiral Rodrigo Quinones, Captain Oscar Eduardo Saavedra, and Captain Camilo Martinez--for failing to prevent the 2001 paramilitary massacre of 27 persons in the village of Chengue, Sucre Department. The Inspector General also upheld the dismissal of two noncommissioned officers (NCOs), Rafael Euclides Bossa and Ruben Dario Rojas, for providing weapons to the paramilitaries who committed the massacre.

On December 27, the Inspector General's Office absolved retired Navy Rear Admiral Rodrigo Quinones of responsibility for the 2000 paramilitary massacre in the El Salado neighborhood of Las Ovejas, Bolivar Department, in which 38 persons were killed. The Inspector General's Office ordered the dismissal of Captain Hector Martin Pita and a symbolic 50-day suspension of retired Colonel Carlos Alberto Sanchez for their negligence in the case.

On April 12, the Office of the Inspector General ordered the 90-day suspension of Colonel Rafael Alfonso Hani for his failure to protect adequately the civilian population near Buga, Valle del Cauca Department, from paramilitaries atrocities while he commanded the army's Palace Battalion in the city during 1999.

On July 26, the Administrative Tribunal of Cundinamarca Department ruled that the Government should pay approximately $20 million (50 billion pesos) to 120 families of victims of the 1999 paramilitary massacre near La Gabarra, Norte de Santander Department, because both the police and army failed to take measures to prevent it.

On March 4, the Prosecutor General's Office closed its case against General Rito Alejo del Rio for lack of evidence. Del Rio had been arrested by the Prosecutor General's Office in 2001 for his alleged role in the formation of paramilitary groups in the Uraba region of Antioquia Department in the mid-1990s.

On August 12, the Inspector General's Office recommended that 8 members of the Army be tried criminally and convicted for participation in the deaths of 10 persons in Huila Department between 1993 and 1994. Those under investigation included Colonel Jose Ancizar Hincapie and Captain Enrique Bernardo Camacho.

The Inter-American Commission on Human Rights continued to broker a settlement of the UP party's 1996 complaint that charged the Government with "action or omission" in the murders of nearly 3,000 UP and Communist Party members in the 1980s and 1990s. Negotiations between the Government and UP representatives continued at year's end.

On July 21, the Inter-American Court of Human Rights found that the Government shared responsibility for the murders of 19 merchants by paramilitaries in Puerto Boyaca, Boyaca Department, in 1987. The ruling obligated the Government to fulfill 23 conditions, including publicly recognizing its responsibility for the murders, paying $6.5 million (16.25 billion pesos) in compensation to the victims' relatives, and reopening the criminal investigation.

Paramilitaries committed numerous political and unlawful killings, primarily in areas they disputed with guerrillas and generally in the absence of a strong government presence. According to CINEP, paramilitaries were responsible for at least 304 such killings during the first 6 months of the year. Paramilitaries targeted journalists (see Section 2.a.), human rights activists (see Section 4), labor leaders (see Section 6.a.), indigenous leaders (see Section 5), local politicians, and others who threatened to interfere with their criminal activities or showed leftist sympathies. For example, on August 3, suspected paramilitaries in Valledupar, Cesar Department, killed Fredy Arias, spokesman and human rights coordinator for the Kankuamo indigenous tribe (see Section 4).

Continuing a trend that began in 2002, paramilitaries committed fewer large-scale massacres than in previous years. According to the Presidential Program for Human Rights, 13 persons died in paramilitary massacres as of August, compared with 18 in 2003, 54 in 2002, and 281 in 2001. However, the Colombian Commission of Jurists (CCJ) blamed paramilitaries for far more massacres, reporting that paramilitaries killed at least 46 persons in massacres through August. For example, on April 18, after several days of threats, paramilitaries reportedly raided the community of Bahia Portete, La Guajira Department, where they tortured and killed at least four members of the indigenous Wayuu tribe, and abducted several others, including children. More than 600 Wayuu sought refuge across the border in Venezuela (see Section 2.d.).

Colombia

Paramilitaries killed many persons they suspected of collaboration with the FARC. For example, in March, paramilitaries killed seven persons in Cravo Norte, Arauca Department and six persons in Tame, Arauca, in May, because they believed they were FARC collaborators. On October 2, suspected paramilitaries killed Yorbelis Restrepo, a member of the Peace Community of San Jose de Apartado in the latest of many incidents of paramilitary violence perpetrated against the San Jose community. Paramilitaries, as well as some government officials, claimed the community was a front organization for the FARC.

On September 17, presumed paramilitaries killed academic and sociologist Alfredo Correa in Barranquilla, Atlantico Department. Three months earlier, government authorities detained Correa on charges of rebellion and collaboration with the FARC. The charges later were dropped for lack of evidence, and Correa was released a few days before his death. The investigation into this killing continued at year's end (see Section 1.d.).

Paramilitaries also killed persons to protect criminal activities. For example, paramilitaries were suspected of killing Carlos Javier Sabogal, the former governor of Meta Department; Euser Rondon, the former mayor of Meta's El Dorado municipality; and former member of Congress Nubia Sanchez. On September 14, their bodies were discovered in an abandoned car in Cundinamarca Department. Sabogal, Rondon, and Sanchez had accused Meta Governor Edilberto Castro of corruption (see Section 3).

There were reports that paramilitaries continued to commit "social cleansing" killings of prostitutes, drug users, vagrants, and the mentally ill in city neighborhoods they controlled.

Guerrillas, particularly the FARC, committed hundreds of unlawful killings. According to CINEP, guerrillas were responsible for 135 unlawful killings during the first 6 months of the year. The Presidential Program for Human Rights reported that, as of November, the FARC killed at least 99 persons in massacres, although another 118 persons were killed in massacres in which the perpetrators remained unidentified.

Among those primarily targeted by guerrillas were local elected officials, candidates for public office (see Section 3), religious leaders (see Section 2.c.), alleged paramilitary collaborators, and members of the security forces. The FARC also continued its attempts to assassinate President Uribe.

Many FARC atrocities were related directly to drug trafficking activities. For example, on January 5, the FARC killed eight coca pickers in the municipality of Pensilvania, Caldas Department, for failing to pay FARC taxes. On June 15, the FARC killed 34 coca pickers who allegedly worked for rival paramilitary drug traffickers in the municipality of La Gabarra, Norte de Santander Department. On August 11, the FARC killed another 10 peasants in the Catatumbo region of Norte de Santander Department, presumably over their coca crop.

FARC massacres of members of the public security forces included the July 22 killings of 13 soldiers on a road between Huila and Putumayo Departments and the August 2 killings of 9 members of the police in the municipality of Trujillo, Valle del Cauca Department.

The FARC also killed persons it suspected of collaboration with government authorities or paramilitaries. For example, on July 10, the FARC's Ninth Front killed seven men in San Carlos for allegedly supporting paramilitaries. On September 13, the FARC killed three men in El Libano, Tolima Department, for alleged collaboration with paramilitaries. On December 31, the FARC killed 17 persons, including 4 children, near Tame, Arauca Department, allegedly for being paramilitary supporters.

On August 30, troops captured Jorge Eliecer Martinez "Jeronimo Aljure," a suspected leader of the FARC's 56th Front. Martinez was accused of killing 3 foreign-born indigenous rights activists and at least 69 others. The case continued at year's end.

FARC deserters reported that guerrilla leaders threatened to execute fighters who attempted to desert.

b. Disappearances

Forced disappearances--many of them politically motivated--continued to be a problem. The law specifically defines forced disappearance as a crime. CINEP reported 65 cases of forced disappearance during the first 6 months of the year, and accused the security forces of direct responsibility for 17. The U.N. Working Group on Enforced or Involuntary Disappearances reported in 2003 that there had been at least 1,114 forced disappearances since 1981, 850 of which remained unresolved.

On November 3, the Prosecutor General's Office charged three members of the National Police with the forced



disappearance and subsequent death of Ruben Suarez, who disappeared from a police station in Susa, Cundinamarca Department, on April 20. The three also were suspected of stealing $80,000 (200 million pesos) that Suarez was carrying when he was detained.

Paramilitaries were responsible for most forced disappearances. According to CINEP, paramilitaries committed at least 48 forced disappearances during the first 6 months of the year, compared with 130 in 2003. Paramilitaries often abducted persons suspected of collaboration with guerrillas; almost all of these persons were presumed dead (see Section 1.a.). For example, on June 22, paramilitaries forcibly kidnapped and killed four members of the indigenous Wayuu tribe near the town of Maicao, La Guajira Department, for allegedly collaborating with the FARC. Authorities later confirmed that the four had been killed.

Although the number of kidnappings continued to decline, kidnapping, both for ransom and for political reasons, remained a serious problem. According to the Presidential Program for Human Rights, there were 1,250 kidnappings through November, a reduction of approximately 42 percent from the 2,200 kidnappings reported in 2003. GAULAS and other elements of the security forces freed 201 hostages in the first 8 months of the year. However, the Free Country Foundation reported that, despite government efforts, through February, at least 6 persons died in captivity. The government-affiliated Fund for the Defense of Personal Liberty (FONDELIBERTAD) provided assistance to approximately 600 friends and relatives of kidnapping victims.

The Free Country Foundation reported that paramilitaries were responsible for 120 kidnappings through August, or 10 percent of all kidnappings in which a perpetrator was identified. Paramilitaries kidnapped both for ransom and as an expression of power and influence. For example, on June 27, paramilitaries kidnapped former Senator Jose Gnecco and his family in La Guajira Department. Paramilitary leader Rodrigo Tovar "Jorge 40" later released Gnecco after President Uribe excluded Tovar from ongoing peace negotiations with the Government and ordered his arrest. The press reported that Gnecco, a member of a prominent regional family, owed Tovar money.

On July 24, members of the Armed Forces rescued 23 laborers kidnapped by paramilitaries in the municipality of El Desastre de San Diego, Cesar Department.

Kidnapping continued to be an unambiguous, standing policy for both the FARC and the ELN. The Free Country Foundation reported that guerrillas were responsible for approximately 31 percent of kidnappings reported during the first 8 months of the year in which a perpetrator was identified. According to the Foundation, through August, the FARC had kidnapped 213 persons, and the ELN kidnapped 92 persons.

Kidnapping for ransom remained a major source of revenue for both the FARC and ELN. The Free Country Foundation reported that, as of August, there had been 529 kidnappings for ransom during the year, approximately 52 percent of all kidnappings. In addition, the FARC purchased kidnapping victims from common criminals and then negotiated ransom payments with families.

On February 14, members of the ELN posing as paramilitaries kidnapped a man from his home in Casablanca, Tolima Department. A ransom payment was negotiated and paid, but the victim was not freed. Police later arrested members of a criminal gang in Bogota that negotiated on behalf of the ELN. Gang members volunteered that the Casablanca kidnapping victim was killed in spite of the ransom payment. His body had not been recovered by year's end.

On August 31, the ELN kidnapped a computer technician in Bagado, Choco Department. He was released on September 29, after his company paid a ransom of approximately $5,000 (12 million pesos).

On December 24, the FARC's Ninth Front kidnapped eight national tourists at a spa in San Rafael, Antioquia Department. The FARC threatened the families, which prevented the kidnappings from being reported until the following day. By year's end, only one of the hostages had been released.

At least 223 children were kidnapped during the year. On February 10, for example, the FARC kidnapped a 9-year-old girl from a school bus in Candelaria, Valle del Cauca Department. They released her on February 21.

On July 14, after receiving an undisclosed ransom from former Senator Jaime Losada, the FARC released his sons, Jamie Felipe and Juan Sebastian, who were kidnapped from their apartment in Neiva, Huila Department in 2001. Their mother remained in FARC captivity at year's end.

The FARC committed many politically motivated kidnappings, which it then used to discredit the Government or pressure it into a so-called "humanitarian exchange." For example, on February 25, 50 members of the FARC dressed in GAULA uniforms kidnapped 3 persons and injured 4 others during an attempted mass kidnapping

000542

conducted at 2 residential buildings in Neiva, Huila Department, where many politically influential persons resided. On August 21, the FARC kidnapped Arquimedes Vitonas, the indigenous mayor of Toribio municipality, Cauca Department, and on August 26, in cooperation with the ELN, kidnapped Orlando Hernandez, the indigenous mayor of Ricaurte, Narino Department. The military rescued Hernandez on September 6 (see Sections 3 and 5). The FARC also kidnapped members of the public security forces for political reasons. According to the Presidential Program of Human Rights, through November, the FARC had kidnapped 11 members of the public security forces. On December 31, the FARC kidnapped three more police officers in Sipi, Choco Department.

The ELN also kidnapped for political reasons. For example, on July 25, members of the ELN kidnapped Misael Vacca, Roman Catholic Bishop of Yopal, Casanare Department, allegedly because they wanted him to carry a political message to the Government. Vacca was released 3 days later (see Section 2.c.). On October 6 in Ciudad Bolivar, Antioquia Department, ELN terrorists kidnapped a woman and her nephew who rumors incorrectly identified as relatives of President Uribe.

On October 11, the Superior Tribunal of Bogota sentenced the members of the ELN Central Command to 39 years in prison for the 1999 hijacking of a passenger airline in Bucaramanga, Santander Department, and the kidnapping of all 46 passengers.

The FARC continued to hold political hostages taken in previous years, including former presidential candidate Ingrid Betancourt; former Senator Jorge Eduardo Gechem; former members of Congress Orlando Bernal, Luis Eladio Perez, and Consuelo Gonzalez; Congresswoman Gloria Polanco; former Governor of Meta department Alan Jara; 12 former regional legislators from Valle del Cauca Department; and at least 4 foreign-born persons. The FARC released several proof-of-life videos during the year, which stirred debate over the possibility of an exchange of hostages for imprisoned members of the FARC. The hostages' families, national and international NGOs, foreign governments, and prominent public figures pressured the Government to cede to FARC demands for an exchange.

On August 18, the Government announced it had sent a message to the FARC on July 23 offering to release 50 FARC members imprisoned for rebellion if the FARC would release its political prisoners. The Government added that released FARC members would have the option of relocating to a "friendly" country or joining the Government's reinsertion program. The FARC rejected the Government's offer. On December 2, the Government unilaterally released 23 members of the FARC imprisoned for rebellion as a sign of good faith intended to bring about a reciprocal gesture from the FARC. On December 17, the Government announced it would not extradite imprisoned FARC commander Ricardo Palmera "Simon Trinidad" to a third country if the FARC released 63 political hostages by December 30. The FARC rejected the Government's offer.

The FARC killed numerous hostages during the year. For example, on September 29, the parents of Daniela Vanegas identified the body of their 15-year-old daughter, who had been kidnapped by the FARC in October 2003 while on her way to school in Bogota. On December 8, the FARC killed Roman Catholic priest Javier Francisco Montoya after kidnapping him in the town of Novita, Choco Department (see Section 2.c). There were numerous reports that guerrillas tortured kidnapping victims (see Sections 1.c. and 1.g.).

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Constitution and criminal law prohibit such practices; however, there were reports that the police, military, and prison guards sometimes mistreated and even tortured detainees. Members of the military and police accused of torture are tried in civilian, rather than military, courts (see Section 1.e.). CINEP asserted that as of June 30 the security forces were responsible for 75 incidents of torture.

On April 23, 10 soldiers allegedly threatened and tortured 3 peasants in Cunday, Tolima Department. The Office of the Prosecutor General continued to investigate accusations publicized in 2002 by the Committee in Solidarity with Political Prisoners (CSPP) that members of the Cali GAULA collaborated with paramilitaries in abducting and torturing individuals suspected of involvement in kidnappings.

CINEP reported that, as of June 30, paramilitaries were responsible for at least 44 cases of torture. For example, on January 31, paramilitaries abducted and tortured Ines Pena, a member of the Popular Women's Organization, in Barrancabermeja, Santander Department. She was released a short time later. Many victims of paramilitary killings, such as 11 peasants killed in May in Tame, Arauca Department, showed signs of torture.

Guerrillas also committed acts of torture. The bodies of many persons kidnapped and subsequently killed by guerrillas showed signs of torture, and former guerrilla hostages reported severe deprivation, denial of medical attention, and physical and psychological torture during captivity (see Section 1.b.). The Ministry of Defense

000543


reported that guerrillas tortured, mutilated, and killed captured soldiers and police (see Section 1.g). CINEP reported 5 cases of torture by guerrillas as of June 30.

With the exception of new facilities, prison conditions remained harsh, especially for prisoners without significant outside support. Many of INPEC's 8,906 prison guards and administrative staff were poorly trained or corrupt. Severe overcrowding and dangerous sanitary and health conditions were serious problems. Private sources continued to supplement most prisoners' food. INPEC spent an average of approximately $1.50 (3,870 pesos) per day per inmate on food, education, and health care. The high-security prison in Valledupar, Cesar department, was the only penitentiary in the country certified as meeting international standards. Five other facilities were built to the standards, but INPEC decided it would be too costly to fund the auditing and certification processes for them. In other facilities, inmates paid to eat, drink, sleep on a mattress, wash clothes, or make telephone calls, and many were forced to pay protection money to fellow inmates or corrupt prison guards. According to INPEC, overcrowding was the prison system's most serious problem. As of September, the country's prisons and jails held 68,240 inmates, almost 30 percent over their intended capacity of 49,645. According to the National Human Rights Ombudsman's Office, the increasing severity of overcrowding resulted from aggressive government security policies that added inmates at nearly six times previous annual rates. On October 18, local press reported that the medium- and high-security prisons in Valledupar, La Dorada, and Giron faced water shortages, affecting approximately 5,000 inmates. During the year, inmates at the Dona Juana Prison in La Dorada, Caldas Department went on a hunger strike to protest the lack of water.

The Government sometimes failed to prevent deadly violence among inmates. INPEC reported at least 38 violent deaths among inmates during the year, not including suicides. There were five major prison riots between January and August, in which at least seven inmates were injured. Riots were motivated principally by inmates' attempts to force changes in administrative policies. For example, inmates rioted at Bellavista prison in Medellin when INPEC officials attempted to transfer many of them to alleviate overcrowding. The Office of the Prosecutor General continued to investigate allegations that some prison guards routinely used excessive force and treated inmates brutally.

Male and female prisoners were separated in facilities that held both men and women. There also were dedicated women's prisons. Conditions at women's prisons were similar to those at men's. According to the Criminal Procedure Code, no one under the age of 18 may be held in a prison; juveniles were held in separate facilities operated by the Colombian Family Welfare Institute (ICBF).

There were no separate facilities for pretrial detainees, who made up nearly 60 percent of prison inmates. According to INPEC, 30,356 pretrial detainees were held in overcrowded police jails. Failure on the part of many local military commanders and jail supervisors to keep mandatory detention records or follow notification procedures made accounting for all detainees difficult (see Section 1.d.).

Incarcerated members of illegal armed groups who refused to renounce terrorist affiliations were held separately from members of rival groups and the general prison population. Authorities generally granted incarcerated leaders of these groups substantial autonomy to organize their respective prison wings and structure daily activities. To facilitate conditions for negotiations, the Government allowed some incarcerated leaders to use special communications equipment to maintain contact with terrorists still at large.

Fifty-three prisoners escaped during the year, 13 while on 72-hour passes, 24 because of faulty security, 2 in prison breaks with outside assistance, and 1 from a prison work detail. On November 3, former army Major Cesar Maldonado, who was convicted in 2002 of the attempted murder of former union leader and member of Congress Wilson Borja, escaped from a military prison. As a result, on November 5, the military dismissed four officers responsible for prison security, one of whom was under arrest and facing charges at year's end. Retired Lieutenant Colonel Jorge Plazas, who escaped from the same facility in July 2003 while serving a 40-year sentence for kidnapping and murder, remained at large (see Section 1.a.). In October, FARC commander Hernando Buitrago "Julian" escaped from his cell at the headquarters of the Prosecutor General's Office in Bogota. In November, six agents from the Corps of Technical Investigators (CTI) were dismissed and subsequently arrested in connection with the escape. The International Committee of the Red Cross (ICRC) continued to have routine access to most prisons and police and military detention centers. However, the FARC and ELN continued to deny the ICRC access to police and military hostages (see Sections 1.b. and 1.g.).

d. Arbitrary Arrest or Detention

The Constitution prohibits arbitrary arrest and detention; however, there were allegations that authorities detained citizens arbitrarily.

The 125,000 members of the National Police are under the jurisdiction of the Ministry of Defense. The National Police includes special units that focus on intelligence, narcotics, kidnapping and extortion, and rural policing.

000544


On February 12, the Government completed its reinstallation of police forces in all of the country's 1,098 municipalities. Police are authorized to execute arrest warrants and detain suspects "caught in the act" or fleeing the scene of a crime. DAS agents have broad intelligence gathering, law enforcement, and immigration control function, as do members of the CTI.

Police, DAS, and CTI officials executed arrest warrants issued by prosecutors based on probable cause. Law enforcement officials also arrested criminals caught in the act or fleeing the scene of a crime. Members of the Armed Forces detained members of illegal armed groups captured in combat but were not authorized to execute arrest warrants. On August 30, the Constitutional Court rejected an antiterrorism law that would have granted the military broader powers to arrest and detain terrorist suspects (see Section 1.f.). Law enforcement authorities must promptly inform suspects of the reasons for their arrest and bring suspects before a senior prosecutor within 36 hours of their detention. Prosecutors must rule on the legality of detentions within 72 hours. These requirements were enforced in practice. In the case of most felonies, detention prior to the filing of formal charges cannot exceed 180 days, after which a suspect must be released. In cases of crimes deemed particularly serious, such as homicide or terrorism, authorities are allowed up to 360 days to file formal charges before a suspect must be released. Habeas corpus is available to address cases of alleged arbitrary detention.

Individuals accused of lesser or unintentional crimes have access to bail; bail is generally not available for serious crimes such as murder, rebellion, or narcotics trafficking. The law prohibits incommunicado detention. Suspects have the right to prompt access to counsel of their choice, and public defenders from the Office of the Human Rights Ombudsman assist indigent defendants.

Prominent human rights NGOs complained that the Government arbitrarily detained hundreds of persons, particularly social leaders, labor activists, and human rights defenders. According to CINEP, the security forces arbitrarily detained over 495 persons during the first 6 months of the year. Many of these detentions took place in highly conflictive areas where the military was involved in active hostilities against terrorist insurgents. For example, on July 11, members of the Army detained Edinson Palomino Banguero, local president of the Sintraova labor union, for 11 hours at a police station in the town of Arauquita, Arauca Department.

On June 7, sociologist Alfredo Correa was detained on charges of rebellion and collaboration with the FARC in Barranquilla. He was released due to lack of evidence days before presumed paramilitaries killed him on September 17 (see Section 1.a.).

The Government and prominent local NGOs frequently disagreed about how to define an "arbitrary" detention; the Government characterized detentions based on compliance with legal formalities, while NGOs typically applied other criteria.

According to INPEC, there were 30,284 pretrial detainees (nearly 60 percent of prison inmates) held in overcrowded police jails. Failure on the part of many local military commanders and jail supervisors to keep mandatory detention records or follow notification procedures made accounting for all detainees difficult (see Section 1.c.). Trial delays were caused by large numbers of detainees, financial constraints, and staff shortages.

The Government stated it did not hold political detainees, although some prominent NGOs considered captured guerrillas to be detained for political reasons.

Paramilitaries and guerrillas, particularly the FARC and the ELN, continued to take hostages for ransom. The FARC and ELN also kidnapped politicians, prominent citizens, and members of the security forces to use as political pawns in a prisoner exchange (see Section 1.b.).

e. Denial of Fair Public Trial

The Constitution provides for an independent judiciary, and the Government generally respected this provision in practice; however, the suborning and intimidation of judges, prosecutors, and witnesses was a serious problem. The judicial system was also extremely overburdened. The administrative chamber of the CSJ reported that, as of October 2003, the civilian judiciary--including the criminal justice system--suffered from a backlog of at least 102,000 cases. These backlogs led to large numbers of pretrial detainees (see Section 1.c.). Impunity remained the greatest challenge to the credibility of the Government's commitment to human rights.

Judicial authorities frequently were subjected to threats and acts of violence. According to the National Association of Judicial Branch Employees, numerous judicial branch employees received threats against their lives, and some judges and prosecutors assigned to small towns worked out of departmental capitals because of security concerns. There were reports that judicial workers were killed during the year. For example, on


August 11, unknown assailants shot and killed Ronaldo David Redondo, a former superior court judge and La Guajira Department magistrate, in front of his home in the departmental capital of Riohacha. The crime was under investigation at year's end. On November 13, gunmen shot and killed state attorney Mario Canal on a highway near the city of Popayan, Cauca Department. Canal had been investigating crimes allegedly committed by captured FARC leaders. Witnesses, who were even more vulnerable to intimidation, often lacked faith in the Government's ability to protect them and refused to testify.

The civilian justice system is composed of four functional jurisdictions: Civil, administrative, constitutional, and special. The civil is the largest jurisdiction and handles all criminal, civil, labor, agrarian, and domestic cases involving nonmilitary personnel. In small towns, a single "all-purpose" judge rules on all cases. Specialized *circuit courts* within the civil jurisdiction try cases involving particularly sensitive crimes, such as narcotics trafficking and terrorism. The Supreme Court is the highest court within the civil jurisdiction and serves as its final court of appeals. In addition to hearing appeals from lower courts, the Supreme Court has original jurisdiction in trials of the President, cabinet ministers, heads of independent government agencies, admirals and generals, and magistrates of the Supreme Court, Council of State, Constitutional Court, and CSJ.

The administrative jurisdiction of the civilian justice system is divided into 27 judicial districts with an equal number of tribunals. Administrative actions such as decrees and resolutions may be challenged in the administrative jurisdiction on constitutional or other grounds. The Council of State is the highest court in the administrative jurisdiction and serves as the final court of appeals for complaints arising from administrative acts.

The Constitutional Court, which is charged with "safeguarding the integrity and supremacy" of the Constitution, is the sole judicial body that encompasses the constitutional jurisdiction of the civilian justice system. It rules on the constitutionality of laws, presidential decrees, and constitutional reforms. The Constitutional Court also may issue advisory opinions on the constitutionality of bills not yet signed into law, and randomly reviews the decisions of lower courts on "tutelas," or writs of protection of fundamental rights, which can be filed before any judge of any court at any stage of the judicial process as a legal defense of last resort. Courts must rule on the validity of a tutela within 10 days. Approximately 195,000 tutelas were before the Constitutional Court for possible review at the end of the year.

The special jurisdiction of the civilian justice system consists of the Justices of the Peace program, designed to encourage alternative dispute resolution at the municipal level, which has been implemented in less than 1 percent of the country's municipalities, and the indigenous jurisdiction, which grants indigenous leaders the right to exercise judicial functions on indigenous reservations in accordance with traditional laws (see Section 5.). The CSJ is responsible for the administration and discipline of the civilian justice system. The CSJ is divided into two chambers: Administrative and disciplinary. The administrative chamber supervises the civilian justice system's budget and determines its organization. The disciplinary chamber disciplines judicial officials and resolves conflicts of jurisdiction, such as those between the civilian and military justice systems.

The Supreme Court, the Council of State, the Constitutional Court, and the CSJ are coequal supreme judicial bodies that sometimes issued conflicting rulings and frequently disagreed about jurisdictional responsibilities.

The Office of the Prosecutor General is tasked with investigating criminal offenses and prosecuting the *accused. Its* human rights unit, which included 11 satellite units in 7 regional capitals, specialized in investigating human rights crimes. The unit's 43 prosecutors–30 in Bogota and 13 throughout the rest of the country–were handling 1,469 cases at year's end.

During the year, Prosecutor General Luis Camilo Osorio created a new internal affairs unit to rid the office of corruption, required officials in especially sensitive positions to submit to polygraph examinations, and summarily dismissed employees suspected of corruption.

The Office of the Inspector General, also known as the Public Ministry, investigates allegations of misconduct by public employees, including members of the state security forces. The Inspector General's Office referred all cases of human rights violations received during the year to the human rights unit of the Prosecutor General's Office.

The civilian justice system is an independent branch of government that uses a Napoleonic legal system *incorporating some accusatorial elements. On August 31, the President signed a new Criminal Procedure Code. The new Code changes the roles of judges, prosecutors, investigators, and defense attorneys, as well as the presentation of evidence in an accusatory criminal justice system. It was scheduled to begin its staggered implementation in the judicial districts of Bogota, Armenia, Pereira, and Manizales in January 2005.

A criminal case begins with a preliminary investigation that can last up to 180 working days. If evidence is found linking a particular individual to a crime, the case moves into a formal investigative stage in which prosecutors have a maximum of 360 working days to file formal charges. Once formal charges are filed, the Government has 35 working days to bring a case to trial. Trials are open to the public. Judges question witnesses directly and determine the outcome of all trials. There are no juries.

An accused is presumed innocent until proven guilty and has the right to timely consultation with counsel. Attorneys from the Office of the Human Rights Ombudsman (see Section 4) served as public defenders and are required to represent indigent defendants; however, the Office was overburdened severely. Defendants have the right to be present at proceedings against them, review relevant government evidence, present witnesses and evidence on their own behalf, and confront and question prosecution witnesses. However, most evidence continued to be presented in writing, and judges generally relied on written records, rather than oral argument, to determine guilt or innocence. Defendants have the right to appeal a conviction to a higher court.

The military justice system consists of the Supreme Military Tribunal, which serves as the court of appeals for all cases tried in military courts, and 44 military trial courts. The civilian Supreme Court serves as a second court of appeals for cases in which sentences of 6 or more years in prison are imposed.

The military judiciary may investigate and prosecute active duty military and police personnel for crimes "related to acts of military service." The Military Penal Code specifically defines torture, genocide, massacre, and forced disappearance as crimes unrelated to military service. Serious violations of human rights were considered unrelated to military service and were handled by the civilian justice system. The Military Penal Code specifically excludes civilians from military jurisdiction, and civilian courts must try retired military and police personnel, even for service-related acts committed before their retirement.

The Military Penal Code denies commanders the power to impose military justice discipline on their subordinates and extends legal protection to service members who refuse to obey illegal orders to commit human rights abuses.

Military judges preside over courts-martial without the assistance of a jury. Counsel may represent the accused and call witnesses, but the majority of fact-finding takes place during the investigative stage. Military trial judges issue rulings within 8 days of a court-martial hearing. Representatives of the civilian Inspector General's Office are required to be present at courts-martial.

Criminal procedure within the military justice system is similar to that within the civilian justice system, with the exception that the military justice system has incorporated many accusatorial elements. Defendants are considered innocent until proven guilty and have the right to timely consultation with counsel. A Constitutional Court ruling forbids military attorneys from undertaking defense counsel duties. Defendants must retain counsel at their own expense or rely on public defenders from the Ombudsman's Office.

On August 4, Minister of Defense Jorge Alberto Uribe dismissed the Director of Military Justice, General Jose Camelo, reportedly because of delays in the investigation of high-profile cases. In December, Brigadier General Luis Fernando Puentes took over as Director of Military Justice.

In the first 8 months of the year, the CSJ ruled on eight jurisdictional disputes between the civilian and military justice systems, assigning seven cases to the civilian system and one case to the military justice system. The Ministry of Defense reported—and the Prosecutor General's Office confirmed—that military and police personnel charged by civilian prosecutors routinely were suspended from their duties and placed on half-pay. Officers and NCOs were removed from command duties. Twenty members of the military and 25 police officers were suspended as of August for human rights violations or collaboration with paramilitaries.

The Government did not hold political prisoners, although, as of August, it held approximately 3,917 prisoners accused of rebellion or aiding and abetting insurgency. The Government provided the ICRC access to these prisoners.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions, and the Government generally respected these prohibitions in practice; however, there were exceptions.

Except in exigent circumstances, the law requires government authorities to obtain a warrant signed by a senior prosecutor to enter a private home without the owner's consent. The Ministry of Defense continued training public security forces in legal search procedures that comply with constitutional requirements and human rights

000547


standards.

Government authorities generally need a judicial order to intercept mail or monitor telephone conversations, even in prisons. However, government intelligence agencies investigating terrorist organizations sometimes monitored telephone conversations without judicial authorization; such evidence could not be used in court. On August 30, the Constitutional Court struck down a government-backed antiterrorism statute on a procedural technicality. The statute contained provisions that would have authorized government authorities to intercept private communications without judicial authorization in cases related to terrorism. The evidence would have been admissible in court.

In November, the Inspector General's Office upheld on appeal its 2003 decision to order the dismissal from the armed forces of Colonel Mauricio Santoyo, the former commander of the Medellin GAULA. Santoyo had presided over the illegal wiretapping of the telephone lines of over 2,000 individuals and NGOs between 1997 and 2000.

A key component of the Government's "Democratic Security Strategy" to combat terrorism and restore order throughout the country was a network of civilian informants--some paid--who identified terrorist activists and sympathizers. Many national and international human rights groups criticized the network as vulnerable to abuse and a threat to privacy and other civil liberties.

The Government did not prohibit membership in most political organizations; however, membership in private organizations that espoused or carried out acts of violence--such as the AUC, FARC, and ELN--was illegal.

Paramilitaries and guerrillas routinely interfered arbitrarily with the right to privacy. Both groups forcibly entered private homes, monitored private communications, engaged in forced displacement (see Section 1.g.) and conscription, and punished family members for alleged wrongdoing by individuals. The FARC, which employed large numbers of female combatants, prohibited pregnancies among its troops and ordered mandatory implantation of intrauterine devices and forced abortions.

g. Use of Excessive Force and Violations of Humanitarian Law in Internal and External Conflicts

The country's 40-year-old internal conflict--among government forces, a right-wing paramilitary movement, and two leftist insurgent groups--continued. The internal armed conflict, and the narcotics trafficking that both fueled it and prospered from it, were the central causes of violations of human rights and international humanitarian law. Government security forces generally abided by international humanitarian law and respected human rights. The Human Rights Ombudsman's Office reported that 2 percent of complaints it received about violations of human rights and international humanitarian law implicated members of the security forces. However, some members of the security forces violated human rights (see Sections 1.a., 1.b., 1.c., and 1.d.).

On November 6, the Air Force killed a 9-year-old girl and injured two others when it strafed a residence it mistakenly believed housed FARC guerrillas. The Air Force was still investigating the incident at year's end.

On May 25, the Administrative Tribunal of Arauca ordered the Government to pay approximately $870,000 (2 billion pesos) to the families of 17 persons killed in the Air Force bombing of the village of Santo Domingo, Arauca Department, in December 1998. The civilian criminal trial of the helicopter pilot, co-pilot, and navigator continued at year's end.

The Government, including military authorities, followed an open-door policy toward the ICRC, allowing free and safe passage to members of impartial humanitarian organizations, even in conflict zones.

On October 24, the Government completed the destruction of its remaining 6,784 undeployed antipersonnel landmines. The Government destroyed over 21,000 landmines between June 2003 and October.

Some members of the public security forces--principally enlisted personnel and NCOs, but also some more senior officials--collaborated with or tolerated the activities of illegal paramilitaries. Evidence suggested there were tacit nonaggression pacts between local military officers and paramilitary groups in some regions, and some members of the security forces actively assisted or sought the assistance of paramilitary groups. However, the military substantially increased offensive actions against paramilitary groups. According to the Ministry of Defense, the security forces captured 4,772 paramilitaries during the year, a 50 percent increase from 2003, and killed 558 paramilitaries in combat, compared with 346 in 2003. Paramilitaries lost significantly more combatants per confrontation with the security forces than did the FARC or ELN.

Paramilitaries were responsible for numerous violations of international humanitarian law and human rights. Although estimates varied, there were approximately 12,000 paramilitary fighters in the country. The largest and most influential paramilitary organization was the terrorist AUC, which operated as a loose confederation of disparate paramilitary groups.

Formal negotiations between the Government and AUC leaders regarding conditions for paramilitary demobilization continued during the year.

In January, the Organization of American States agreed to verify the paramilitary peace process and established six regional offices that employed several dozen international and national staff. On July 1, the Government formally established a concentration zone in the village of Santa Fe de Ralito, Cordoba Department, where paramilitary leaders could negotiate with government authorities without fear of arrest. In November and December, 2,827 fighters from 5 separate blocs surrendered their arms to government authorities. Among the demobilized were senior AUC commanders Salvatore Mancuso and Hernan Hernandez.

Critics from across the ideological spectrum, including major domestic and international human rights groups, expressed concerns about the legitimacy of the paramilitary demobilization process, the real motivations of the paramilitaries, and the potential for impunity for confessed human rights abusers.

The AUC's December 2002 unilateral cease-fire remained in effect; however, it was not perfectly observed, and some dissident paramilitary groups never agreed to a cessation of hostilities. Power struggles for leadership and control of drug trafficking resources provoked internecine warfare among paramilitary groups. For example, on September 19, fellow paramilitaries allegedly killed AUC Centauros Bloc Commander Miguel Arroyave. Arroyave controlled large swaths of valuable drug trafficking territory in the eastern plains where clashes between several paramilitary blocs caused sharp increases in violence.

Most paramilitary cease-fire violations affected innocent civilians. For example, the Government reported that paramilitaries were responsible for 390 killings of civilians since the December 2002 cease-fire declaration. As of September, the Office of the Human Rights Ombudsman had received complaints about 342 alleged violations of the paramilitary cease-fire in 11 departments, including reports of massacres, kidnappings, selective killings, displacements, robberies, and the recruitment of children. The CCJ claimed there had been at least 1,899 violations of the paramilitary cease-fire since December 2002 (see Sections 1.a, 1.b., and 2.d.).

Despite paramilitary cease-fire violations, the overall level of paramilitary violence continued to decrease. Paramilitaries committed fewer selective killings, particularly of vulnerable groups such as trade unionists, fewer massacres, and forcibly displaced fewer civilians. According to CINEP, paramilitaries were responsible for the deaths of 304 civilians through June, a negligible decrease from 2003.

Combat between paramilitaries and guerrillas led to many civilian deaths. For example, on November 25, media reports claimed eight civilians were killed during clashes between paramilitaries and the ELN in Choco Department. U.N. High Commissioner for Refugees (UNHCR) warned that this area was at high risk of paramilitary-guerrilla clashes.

Although the overall number of forced displacements caused by paramilitaries fell, paramilitaries continued to forcibly displace civilians residing along key drug and weapons transit corridors or suspected of harboring sympathies for guerrillas. For example, on April 18, paramilitaries displaced 600 members of the indigenous Wayuu tribe in Bahia Portete, La Guajira Department. Paramilitaries also prevented or limited the delivery of foodstuffs and medicines to towns and regions considered sympathetic to guerrillas, straining local economies and increasing forced displacement (see Section 2.d.).

Although paramilitaries continued to employ child soldiers (see Section 5), paramilitary groups turned over at least 70 minors to government authorities during the year, either as signs of good faith or as conditions of formal demobilization. For example, on December 18, 26 minors demobilized with the AUC's Calima Bloc.

The 12,500 member FARC and the 2,500 member ELN--both terrorist organizations--declined in numerical strength during the year because of strong pressure from the military that caused high numbers of guerrilla casualties and led to thousands of guerrilla desertions. In many areas of the country, the two guerrilla groups worked together to combat government forces or paramilitaries. On January 11, the ELN announced it would work more closely with the FARC to resist the Government's "Plan Colombia" military offensive. In October, the FARC proposed closer coordination between the two terrorist groups.

The FARC and ELN violated international humanitarian law by committing unlawful killings, kidnapping civilians and military personnel, torturing captives, displacing populations, and recruiting child soldiers (see Sections


1.a., 1.b., 1.c., 2.d., and 5.).

Guerrillas were responsible for a large percentage of civilian deaths related to the internal conflict. Combat between guerrillas and state security forces caused numerous civilian casualties. For example, on July 7, an elderly woman was injured during a FARC attack against the security forces in Narino Department. CINEP attributed at least 144 civilian deaths to the FARC and ELN as of June 30.

According to the Ministry of Defense, guerrillas committed 709 terrorist acts during the year. For example, in May, 14 persons were killed and 93 injured when the FARC, in commemoration of the 40th anniversary of its founding, detonated bombs in the cities of Medellin, San Carlos, and Apartado, Antioquia Department. The largest bombing occurred on May 22, when the FARC bombed a popular Apartado nightclub, killing 5 and injuring 93. On August 8, the FARC detonated a bomb during a festival in Medellin, injuring 35. Guerrillas also detonated bombs attached to motorcycles, bicycles, animals, and human cadavers.

Guerrillas used landmines to defend static positions such as base camps and drug labs and as indiscriminate weapons of terror. According to the Vice President's Office, between 70,000 and 100,000 landmines were deployed nationwide, and there were 1,155 registered landmine incidents during the year, a 23 percent increase over 2003. Guerrillas were responsible for over 75 percent of landmine incidents, which killed at least 182 persons. Thirty-six percent of landmine victims were civilians.

Guerrillas failed to respect the injured and medical personnel. Both the FARC and the ELN frequently executed wounded prisoners, threatened and harassed doctors and nurses, and killed enemy combatants receiving medical care. For example, in February, the FARC kidnapped a nurse from her car in Armenia, Quindio Department.

Guerrillas forcibly displaced peasants to clear key drug and weapons transit routes and remove potential government or paramilitary collaborators from strategic zones. Guerrillas also imposed de facto blockades of communities in regions where they had significant influence. For example, the FARC blockaded the towns of San Carlos and San Luis in Eastern Antioquia, and, on July 10, killed seven displaced residents of San Carlos who returned to the city without the FARC's authorization.

According to government figures, attacks against public infrastructure decreased in almost all areas. Large-scale military operations and a permanent police presence in every municipality resulted in a 42 percent decrease in terrorist attacks through November. Most attacks on infrastructure affected roads, electrical towers, and oil pipelines. The Government recorded 116 attacks on electrical towers and 66 on oil pipelines through August, representing decreases of 64 and 17 percent, respectively. An increased military presence and quicker military reactions to threats against the pipeline reduced attacks against the Cano Limon-Covenas pipeline--the country's largest--by 50 percent, to 17. Attacks against communications towers, bridges, and aqueducts fell by approximately 90 percent, 77 percent, and 67 percent, respectively. However, attacks on public highways increased by 27 percent, to 138.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for freedom of speech and of the press, and the Government generally respected these rights in practice. However, journalists regularly practiced self-censorship to avoid retaliation and harassment by criminals, members of illegal armed groups, and corrupt local officials.

The National Television Commission continued to oversee television programming, although it did not censor substantive content.

The Government did not use libel laws to suppress criticism or engage in direct or indirect censorship of the media. In March, prosecutors formally dropped libel charges filed in June 2003 against newspaper columnist Roberto Posada for publicly insinuating that prominent businessman Pedro Juan Moreno had links to paramilitaries. The media's reliance on government advertising revenues may have reduced its criticism of government actions and policies.

National and international NGOs reported that media representatives regularly practiced self-censorship because of threats of violence from illegal armed groups and common criminals. At least 4 journalists went into voluntary exile during the first 9 months of the year, joining 20 who left the country in 2002 and 2003.



Colombia

The security forces generally did not subject journalists to harassment, intimidation, or violence; however, there were exceptions, as well as reports of threats and violence against journalists by corrupt local officials. On February 4, for example, unidentified gunmen attacked journalist Oscar Alberto Polanco as he departed the television station where he worked in Cartago, Valle del Cauca Department. Polanco had used his television show to criticize corrupt local government officials and institutions. In February, Barrancabermeja radio journalist Garibaldi Lopez reportedly received threatening phone calls from persons identifying themselves as friends of local government officials he had denounced for corrupt practices. In September, print journalist Cristian Herrera left the country after receiving threatening phone calls from unidentified persons warning him to stop reporting on violence, petty crime, and corruption in Cucuta, Norte de Santander Department. In June, local police had allegedly threatened Herrera after he and a photographer were discovered photographing a prisoner transfer at the city's airport. Herrera also reported being threatened on other occasions by the city's mayor and police chief. In December, the mayor was arrested for suspected links to paramilitaries.

During the year, journalists were intimidated, threatened, kidnapped, and killed by members of illegal armed groups. According to information gathered by the Colombia Foundation for Press Freedom, as of November, 3 journalists were killed, at least 2 kidnapped, 1 tortured, and at least 37 threatened with death.

Paramilitaries threatened, kidnapped, and killed journalists. On January 28, two paramilitaries kidnapped and tortured Ines Pena, a television announcer and a member of the Popular Women's Organization in Barrancabermeja, Santander Department, and warned her to stop producing her television program (see Section 1.c.). On September 9, radio journalist Luis Alberto Castano fled the city of Libano, Tolima Department, after learning that paramilitaries planned to kill him. In September, investigative journalist Claudia Julieta Duque reported receiving telephone threats after investigating possible irregularities in the criminal trial of AUC leader Carlos Castano and alleged paramilitaries Juan Pablo Ortiz and Edilberto Antonio Sierra for their roles in the 1999 murder of prominent journalist Jaime Garzon. On March 10, Castano, who had been tried in abstentia, was sentenced to 38 years in prison. Sierra and Ortiz were acquitted for lack of evidence. On October 15, the bodies of Milton Delgado and Milton Rosero, who hosted local television programs about social issues, were found along a roadway near the municipality of Florida in Valle del Cauca Department.

Guerrillas also threatened, kidnapped, and killed journalists. For example, presumed guerrillas from the ELN's Carlos German Velasco Front posted a notice on the door of a radio station in Cucuta, Norte de Santander Department, identifying journalists Olga Lucia Cotamo, Angela Echeverri, and Fernando Fonseca as military objectives for allegedly sympathizing with government policies. On October 10, members of the FARC's Jacinto Matallana Mobile Column kidnapped television correspondent Luis Carlos Burbano and photographer Mauricio Mesa in the municipality of La Divina Pastora, on the border of Nariño and Putumayo Departments. The FARC, which had accused Burbano and Mesa of espionage, released both journalists the following day after reviewing the team's recorded video footage.

In October, the FARC kidnapped a journalist and cameraman from Canal Caracol in Santiago, Putumayo Department.

The International Federation of Journalists operated an office in Bogota to monitor violence against the media and provide assistance to local journalists. The InterAmerican Press Association also ran its own rapid action unit in Bogota to help the Prosecutor General's Office investigate crimes against journalists. The Ministry of Interior operated a program for the protection of journalists that provided protection to 20 media representatives during the year. The Ministry of the Interior also supported an alerts network organized for journalists by providing a small number of radios and an emergency telephone hotline.

The Government did not restrict access to the Internet.

The Government did not restrict academic freedom. However, paramilitary groups and guerrillas maintained a presence on many university campuses to generate political support for their respective causes and undermine support for their adversaries through both violent and nonviolent means. Paramilitaries killed and threatened university professors and students they suspected of leftist sympathies. For example, on September 17, presumed paramilitaries killed Alfredo Correa, a university professor in Barranquilla. The Department of Administrative Security had arrested Correa on June 17 after an informant identified him as a member of the FARC's Caribbean Front. He had been released in early September after prosecutors concluded there was insufficient evidence to prosecute him.

Guerrillas also killed, threatened, and kidnapped academics and their family members for financial and political reasons. For example, on September 8, the FARC kidnapped biology professor Margarita Escobar and five university students who were conducting field research near the municipality of Urrao, Antioquia department. All six were released on September 12 after the FARC announced that it had verified their academic credentials. Regional government authorities alleged the kidnapping was financially motivated. In July, the body of

000551



Bernardo Ernesto Velez was discovered near Canas Gordas, Antioquia Department. Velez, the brother of Education Minister Cecilia Velez, had been kidnapped by the FARC in 2001.

Guerrillas used university campuses to plan, prepare, and carry out terrorist attacks.

Both paramilitaries and guerrillas regularly threatened and killed public school teachers, especially at the high school level. According to the Presidential Program for Human Rights, through November, 57 teachers were killed and 16 kidnapped.

Paramilitaries and guerrillas targeted teachers because of their vocal opposition to forced recruitment of children by illegal armed groups; their pedagogical, labor, and community leadership; and their alleged dissemination of political propaganda in the classroom. Paramilitaries were responsible for most of these abuses. For example, on February 27, presumed paramilitaries killed teacher Ernesto Rincon, a leader in the local teachers union, in the municipality of Caldas, Boyaca Department. On May 7, presumed paramilitaries killed public school teacher and principal Jesus Alberto Campos in the city of Tame, Arauca Department. On May 18, unidentified individuals killed Isabel Toro after torturing her near the city of Yopal, Casanare Department. On May 26, members of the FARC killed a local teacher in San Andres, Antioquia Department. In April and May, in Tame, Arauca Department, the FARC killed two teachers. Threats and harassment caused many professors and students to adopt lower profiles and avoid discussing controversial topics. Some academics went into voluntary exile.

In conjunction with FECODE and the Ministry of Education, the Presidential Program for Human Rights launched a special initiative to protect at-risk teachers. The program charges regional committees with investigating specific threats against teachers and, in some cases, facilitating at-risk teachers' relocation, with continued employment as educators, within the country.

b. Freedom of Peaceful Assembly and Association

The Constitution provides for freedom of assembly and association, and the Government generally respected these rights in practice. Freedom of association was limited in practice by threats and acts of violence committed by illegal armed groups against labor unions, indigenous groups, and NGOs (see Sections 4, 5, and 6.a.).

c. Freedom of Religion

The Constitution provides for freedom of religion, and the Government generally respected this right in practice.

Although there is no official state religion, most citizens were Roman Catholic, and the Roman Catholic Church retained a de facto privileged status. Accession to a 1997 public law agreement with the State is required for non-Roman Catholic religions to minister to their adherents in public institutions, such as schools and hospitals, and to perform marriages recognized by the State. When deciding whether to grant accession to the 1997 agreement, the Government considers a religion's total membership, its degree of popular acceptance within society, and other relevant factors, such as the content of the organization's statutes and its required behavioral norms. At year's end, 13 non-Roman Catholic religious bodies, including the Evangelical Council of Churches (CEDECOL), an umbrella organization of hundreds of small evangelical churches, were granted accession. No non-Christian religious group was a signatory to the 1997 public law agreement.

Roman Catholicism was taught in public schools, but students had the option of opting out of sectarian religious instruction.

Protestant churches complained that new zoning laws showed de facto favoritism toward Roman Catholicism, since most Roman Catholic cathedrals were constructed before zoning laws were instituted and were therefore were exempt from the laws' requirements.

On November 25, a team of prosecutors and investigators raided a small Taoist commune in a mountainous rural region of Santander Department based on information provided by eight former commune members that the commune's leadership was engaged in illegal activities. The commune's leaders claimed the government raid was part of a larger plot to close down the community. The community's insularity and isolation in a region with a significant guerrilla presence complicated efforts to gather accurate information concerning the allegations. The Government's investigation was ongoing at year's end.

There were isolated reports of anti-Semitism, including graffiti painted on the exterior walls of synagogues and



anti-Semitic statements in pamphlets published by small xenophobic organizations.

Both paramilitaries and guerrillas harassed, threatened, and sometimes killed religious leaders and activists, although generally for political, rather than religious, reasons. The Presidential Program for Human Rights reported that illegal armed groups made numerous threats against priests and other religious workers, killed seven priests, and kidnapped three others. Nearly all these killings were attributed to leftist guerrillas, particularly the FARC. For example, in December the FARC kidnapped and killed Roman Catholic priest Javier Francisco Montoya near the town of Novita, Choco Department.

On July 25, members of the ELN kidnapped Misael Vacca, the Roman Catholic Bishop of Yopal, Casanare Department. The ELN attempted to justify the kidnapping by claiming it had a political message for him to deliver to the Government. Vacca was released 3 days later following an army rescue operation that cut his captors off from the ELN commanders who allegedly prepared the message. Vacca had been involved in peace efforts between the Government, ELN, and right-wing paramilitary groups in Casanare.

There was no ruling in the criminal trial of FARC commander John Fredy Jimenez and hired gunman Alexander de Jesus Zapata for the 2002 killing of Isaias Duarte, the Roman Catholic Archbishop of Cali. In October, paramilitary Jimmy Matutte was sentenced to 32 years in prison for his involvement in the 1999 murder of Catholic priest Jose Luiz Maso and Spanish aid worker Inigo Egulluz Telleria.

According to the CEDECOL, as of September 30, illegal armed groups had killed 18 evangelical church leaders. The FARC was responsible for 11 of these killings. For example, on September 4, three suspected FARC guerrillas opened fire during a prayer service in the Christian and Missionary Alliance Church of Puerto Asis, Putumayo Department. The gunmen killed 3 and wounded 14 others, including 2 children. The FARC inhibited the right to free religious expression in areas it controlled, forcing the closure of hundreds of evangelical churches, particularly in the southwestern part of the country.

For a more detailed discussion, see the 2004 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The Constitution provides for these rights, and the Government generally respected this right in practice; however, there were exceptions. In areas where counterinsurgency operations were underway, police and military officials sometimes imposed curfews or required civilians to obtain safe-conduct passes. Paramilitaries and guerrillas continued to establish illegal checkpoints on rural highways, although a larger and more visible government security presence along major highways cut kidnappings at illegal checkpoints by 43 percent and led to a major increase in intercity vehicular traffic.

The Social Solidarity Network (RSS), the Government's displaced persons service agency, registered 137,315 displaced persons during the year, down from 219,469 in 2003 and 422,977 in 2002. The Consultancy for Human Rights and Displacement (CODHES), a human rights NGO specializing in displacement issues (see Section 4), estimated a smaller decrease in displacements, with 205,500 persons displaced during the first 9 months of the year, compared with 230,000 in 2003. Various explanations were advanced to explain the decline in displacements. The Government noted a larger state security presence throughout the country and a decrease in paramilitary violence related to the Government's ongoing negotiations with the country's largest paramilitary organization. CODHES and other NGOs asserted, however, that instead of displacing peasants, paramilitaries and guerrillas were forcibly preventing displacements. CODHES included as displaced persons coca producers who migrated in response to government drug eradication efforts, which substantially increased CODHES figures.

The RSS had registered more than 1,565,765 displaced persons since 1995; UNHCR estimated that more than 2 million persons in the country had been displaced at one time or another.

Precise numbers of IDPs were difficult to obtain, since both NGOs and the Government reported that some persons were displaced more than once and many did not register with the Government or NGOs. The FARC and ELN discouraged IDPs from registering with the Government through force, intimidation, and disinformation, and guerrilla agents sometimes masqueraded as IDPs to sow doubt and discontent among the displaced population. Most IDPs were rural peasants displaced to large cities such as Bogota. According to the UNHCR, 22 percent of IDPs were indigenous or Afro-Colombian, which was proportionate to their percentage of the overall population. Paramilitaries and guerrillas continued to use forced displacement to gain control over strategic or economically valuable territory, weaken their opponents' base of support, and undermine government control and authority.

000553


The Government was unable to provide sufficient humanitarian assistance to the displaced, despite statutes and court rulings requiring it to do so. Many IDPs lived in unhygienic conditions with little access to health care and educational or employment opportunities. Government assistance for the displaced was provided principally through the RSS, the ICBF, and the Ministry of Social Protection. The ICRC provided substantial emergency humanitarian assistance to the displaced: Assistance was provided for the first 90 days following a displacement, after which the Government and other organizations were expected to assist, which did not always occur in practice.

The Constitution provides for the granting of asylum and refugee status in accordance with the 1951 U.N. Convention Relating to the Status of Refugees or its 1967 Protocol, and the Government has established a system for providing assistance to refugees. In practice, the Government provided protection against refoulement, the return of persons to a country where they feared persecution. The Government cooperated with the U.N. High Commissioner for Refugees and other humanitarian organizations in assisting refugees and asylum seekers. The Government reserves the right to determine eligibility for asylum, based upon its own assessment of the nature of an applicant's claim. According to the Government, 237 recognized refugees resided in the country at the end of the year, and 34 persons sought refugee status. The Government approved 18 refugee cases involving 20 individuals. The Government refused 14 requests and 6 were still pending at year's end. The Government reported that no applications for asylum were filed during the year.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The Constitution provides citizens with the right to change their government peacefully, and citizens exercised this right in practice through periodic, generally free and fair elections held on the basis of nearly universal suffrage. Active duty members of the Armed Forces and police may not vote, and civilian public employees, although eligible to vote, are not allowed to participate in partisan politics; however, legislation passed in November will allow them, beginning in 2006, to participate in partisan politics (including the right to vote) during the 4 months immediately preceding a national election.

In 2002, voters elected a bicameral legislature with a mix of independents and members of the traditional Liberal and Conservative parties. In the 2002 presidential election, voters elected Alvaro Uribe, a dissident Liberal running as an independent. Both elections were generally free and fair, in spite of a concerted campaign by terrorist organizations, such as the FARC and AUC, to disrupt or manipulate the outcome.

Political parties generally operated without government interference. Parties that fail to garner 50,000 votes in a general election automatically are dissolved but can reincorporate at any time by presenting 50,000 signatures to the National Electoral Commission (CNE). However, political reforms approved in November that will take effect in 2006 raised the vote threshold that parties must meet to retain formal status and gain access to government funds. The Liberal and Conservative parties have long dominated politics, but the election of President Uribe as an independent in 2002 and the success of center-left candidates in regional elections suggested the political arena was widening.

The country suffered from endemic corruption and graft in both the public and private sectors, exacerbated by drug trafficking revenues that made corruption as effective a tool as violence for illegal armed groups and large drug trafficking organizations.

According to the Colombian Confederation of Chambers of Commerce "Confecamaras," estimates of income lost to corruption varied between $2.5 million (5.75 million pesos) and $5 million (11.5 million pesos) annually. The World Bank estimated that corruption in government procurement cost the country $480 million (1.1 trillion pesos) annually. Government and private sector analysts agreed that a black market of illegal commissions governed incentives for many business transactions.

The Government continued its Presidential AntiCorruption Program in alliance with the World Bank and 31 public institutions and NGOS. The alliance continued to examine the absence of genuine governance caused by corruption to design appropriate policies. Confecamaras managed programs promoting entrepreneurial and public ethics through corporate centers in the country's main cities.

The Program encouraged the drafting of municipal and departmental transparency pacts, which are public agreements between elected officials and their constituents to implement efficiency and anticorruption programs. Such pacts were signed in the municipalities of Ibague, Tolima Department; Manizales, Caldas Department; and Pasto, Narino Department. The Program also established voluntary committees of private citizens to serve as monitors for the effective implementation of transparency pacts and developed a Culture of Lawfulness teaching module for the public schools. According to a July 2003 Transparency International survey, citizens considered Congress to be the country's most corrupt public institution.


Corruption related to illegal armed groups was a serious problem. For example, on June 24, Ramiro Suarez, mayor of Cucuta, Norte de Santander Department, was detained by the Prosecutor General's Office for alleged ties to paramilitary groups.

On December 23, the Prosecutor General's Office issued an arrest warrant for Casanare Department Governor Miguel Angel Perez for allegedly receiving $217,000 (500 million pesos) from paramilitary chief "Martin Llanos" to finance his 2003 political campaign.

On March 31, the President of the Senate granted a team from the CTI—the investigative branch of the Prosecutor General's Office—access to the office of the Senate's Human Rights Committee. The warrant-based search was based on allegations that committee staff sold fabricated death threats used by purchasers to bolster petitions for asylum in foreign countries.

The Constitution and laws permit public access to government information. The Constitution allows all persons to access public documents. The Administrative Code addresses the right to access public documents and the right to review government information. The Code also provides for the right to consult public documents and receive expedited copies, unless the information relates to defense or national security and could be used to intimidate or embarrass private citizens.

In 2003, the GOC launched the "Colombia Online" program, which focuses on transparency, efficiency, and clarity in government procurement practices. Increased Internet use helped create a climate of greater transparency by making public the terms of reference of bidding processes and eliminating onerous registration fees.

There were no prohibitive fees to access government information, and there were no reports of serious abuses of the public information system. However, small-scale graft, in which low-level officials insisted on bribes to speed up access to information, was a problem.

Paramilitaries sometimes threatened local officials. For example, on December 2, Evelio Munoz, the mayor of Florencia, Cauca Department, and his 19-member cabinet fled to the departmental capital of Popayan as a result of threats from paramilitaries.

The FARC continued to threaten and commit acts of violence against government officials. The assassination of President Uribe remained a FARC priority. During the first 10 months of the year, 12 former mayors, 1 serving mayor, 1 former governor, and 18 serving city council members were killed. On January 21, suspected FARC operatives killed Marcos Ataya, the former mayor of Arauca City, Arauca Department. On August 27, members of the FARC killed Luis Alberto Zorro, mayor of the town of Chameza, Casanare Department. On August 22, the FARC kidnapped the indigenous mayor of Toribio, Cauca Department (see Sections 1.a. and 1.b.). On December 28, in its seventh attempt against his life, the FARC planted a bomb outside the office of Julio Acosta, Governor of Arauca Department.

On October 28, 12 members of the FARC's Teofilo Forero Mobile Column raided the offices of the City Council of Neiva, Huila Department. The assailants killed a guard but were unable to reach council members gathered inside the building.

Scores of other local officials throughout the country resigned because of threats from the FARC. More than 30 mayors who left office in January fled the country or were preparing to do so because of looming death threats. The Office of the Human Rights Ombudsman reported that at least 300 mayors conducted business from regional capitals via telephone and messenger because they were not safe in their own towns. In the first 3 months of the year, 32 city council members were displaced to capitals from their local offices. The Ministry of Interior operated a program for the protection of vulnerable populations that provided protection to 424 mayors, former mayors, and council members during the year.

The FARC continued to hold several dozen politicians hostage to pressure the Government into a prisoner exchange (see Section 1.b.).

There were 5 women—including the Minister of Foreign Affairs—in the 13-member cabinet, 11 women in the 102-member Senate, and 20 women in the 166-member House of Representatives, including its new President. There were 2 women on the 23-member Supreme Court, 2 women on the 13-member CSJ, and 1 woman on the 9-member Constitutional Court.

A quota law requires that women be placed in at least 30 percent of nominated government posts, and the Government must report to Congress each year on the percentage of women in high-level government



positions.

There were four indigenous Senators, two of whom occupied seats reserved for indigenous persons, and one indigenous member of the House of Representatives. There were no indigenous cabinet members and no indigenous persons on any of the nation's high courts.

There were two Afro-Colombian Senators and three Afro-Colombian members of the House of Representatives. There were no Afro-Colombian cabinet ministers and no Afro-Colombians on any of the nation's high courts.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A wide variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights conditions in the country. Government officials were cooperative and responsive to their views, although they often differed with NGO analyses of the human rights situation and government compliance with human rights standards.

Over 60,000 human rights and civil society NGOs were registered in the country, although most existed only on paper. The most prominent domestic human rights NGOs included CCJ and the Jose Alvear Restrepo Lawyers' Collective, both of which focused on defending human rights through legal analysis and case work; CINEP, which managed the country's largest and most influential database of human rights violations; the Permanent Committee for the Defense of Human Rights (CPDDH), which provided support and assistance to victims of human rights violations and worked to organize civil society to defend human rights and promote a peaceful resolution to the country's armed conflict; CSPP, which focused on the rights and treatment of persons detained for politically motivated crimes, particularly left-wing subversion; ASFADDES, the country's leading voice in demanding justice for the disappeared; CODHES, which advocated policies designed to prevent displacement and defended the rights of the displaced; the Association for Alternative Social Promotion (MINGA), which sought to promote respect for human rights through education, research, lobbying, and legal assistance; the Permanent Assembly of Civil Society for Peace, which served as a forum for regional and national NGOs to discuss key themes in the agenda for peace and nonviolent alternatives to the armed conflict; and the Free Country Foundation, which provided psychological, legal, and public relations assistance to kidnap victims and their families and lobbied the Government for better antikidnapping efforts. The Truth for Colombia group was a relatively new association of small human rights NGOs that generally supported the Government's antiterrorism security policies

Local human rights NGOs had an influence that far exceeded their membership or resources. By sharing information among themselves and disseminating it to international human rights organizations and the media, they raised the country's human rights profile and contributed to significant levels of international attention.

The Government and prominent local NGOs tended to differ in their analysis of a serious and complex human rights situation. In particular, government statistics and evaluations of the human rights situation often contrasted with NGO statistics and analyses. These drastically divergent understandings of the human rights situation deepened already profound mutual suspicions.

Discrepancies between government and NGO statistics partially could be explained by differences in terminology and methodology. For example, the Government defined a massacre as the intentional killing of four or more persons at the same time and place, while NGOs defined a massacre as the deaths of three or more persons. CINEP strictly followed legal conventions that define "human rights violations" as crimes that only can be committed by the State or state-sponsored actors, which led it to attribute, directly or indirectly, all "human rights violations" to the Government. The Government, on the other hand, defined human rights violations to encompass crimes by all illegal armed groups, whether paramilitaries or guerrillas, as well as the State. The Government based its data on information reported to government authorities, supplemented by press reports and confirmable NGO statistics. NGOs, on the other hand, relied primarily on citizen complaints and press reports, which in some cases were difficult to substantiate. The differing reporting techniques resulted in a government tendency to underreport violations and an NGO tendency to overreport violations.

Although the Government generally did not interfere with the work of domestic human rights NGOs, some NGOs claimed criticisms made by the President put them at risk for retaliation by paramilitaries. Many domestic NGOs also contended that the Government arrested human rights activists arbitrarily, particularly in highly conflictive areas (see Section 1.d.).

The Government asserted that many self-declared human rights activists actually were engaged in criminal

000556



activities that supported terrorism. For example, on February 18, authorities arrested Luz Perly Cordoba, the secretary general of the agricultural workers union FENSUAGRO and human rights director of the Arauca Peasants Association (ACA), for rebellion and criminal conspiracy. She was carrying a false identity document with a substituted photograph at the time of her arrest (see Section 6).

The Government, through the Ministry of Interior and Justice and the DAS, allocated approximately $570,000 (1.25 billion pesos) to its program for the protection of human rights activists and many other vulnerable populations. The Government provided protection to over 29 human rights activists during the year and bulletproofed 9 additional offices and residences.

According to the CCJ, 13 human rights activists were killed and 2 forcibly disappeared during the year; most of these killings were attributed to paramilitaries. On August 3, for example, suspected paramilitaries killed Fredy Arias, spokesman and human rights coordinator for the Kankuamo indigenous tribe, in Valledupar, Cesar Department (see Sections 1.a. and 5). Arias had spoken frequently about the human rights crisis affecting his indigenous community. On October 6, suspected paramilitaries killed Ana Teresa Yance, a community leader in Medellin's working class Comuna 13 neighborhood, a former FARC militia stronghold.

On May 4, four armed, masked men forcibly entered the offices of the Permanent Assembly of Civil Society for Peace, an umbrella organization of domestic NGOs, inventoried the office, and stole a cell phone and petty cash. Similar forced entries also occurred on October 18 and November 10, when armed intruders attempted to take information stored on the Assembly's computer system. There were no suspects in any of the incidents at year's end.

There were no new developments and none were expected in the Prosecutor General's investigation of the 2002 killing of Jose Rusbell, a member of the Joel Sierra Human Rights Committee in Arauca department.

The Government generally did not interfere with the work of international human rights and humanitarian NGOs. Representatives of international human rights groups visited the country and held meetings with local human rights groups and individuals in various regions of the country without government interference. These international delegations sometimes received active government protection. The larger international NGOs, such as AI, Human Rights Watch, and the Washington Office on Latin America (WOLA), devoted equal attention to government forces, guerrillas, and paramilitaries. International NGOs criticized the Government not only for some direct violations of human rights, but also for high levels of impunity and its failure to sever effectively links between the military and paramilitaries.

On May 27, in a speech in the city of Apartado, Antioquia Department, President Uribe implicitly criticized both Peace Brigades International and the Fellowship of Reconciliation for allegedly "obstructing justice." On June 16, during remarks to an audience of national police, Uribe explicitly criticized AI for failing to denounce immediately the FARC's massacre of 34 peasants the previous day. AI later denounced the atrocity and explained that it had waited to "verify the facts." Uribe and other government officials subsequently held a variety of meetings with international and local NGOs to reinitiate dialogue and increase trust; however, with limited success.

On October 17, the Danish NGO Association Rebellion allegedly donated $8,500 (18 million pesos) to the FARC. The Government complained to Danish authorities and asked for the extradition of the organization's members. The Government of Denmark reportedly was conducting an investigation at year's end.

The Government cooperated with international governmental organizations. The UNHCR, the International Organization for Migration (IOM), the International Labor Organization (ILO), the United Nations High Commissioner for Human Rights (UNHCHR), ICRC had an active presence in the country and were allowed to carry out their work without government interference.

In March, UNHCHR opened its third regional office in Bucaramanga, Santander Department. The UNHCHR monitored and analyzed the national human rights situation and provided advice and assistance on human rights protection. The UNHCHR's mandate in the country runs through the end of President Uribe's term in 2006.

In its human rights report for 2003, published in March, the UNHCHR once again issued 27 recommendations for improving the human rights situation in the country. Twenty-four of the recommendations were directed at the Government and the independent Prosecutor General's Office (see Section 1.e.). The UNHCHR and local NGOs reported that the Government had not fully complied with most of the recommendations by the end of the year. Throughout the year, the Government met with UNHCHR and local NGOs to discuss additional measures to comply with the recommendations. UNHCHR acknowledged progress on several of the

000557



recommendations, including establishing offices of the Inspector General and Human Rights Ombudsman throughout the country and improving the Early Warning System.

The National Human Rights Ombudsman, who reports to the Inspector General (see Section 1.e.), is elected by the House of Representatives from a list of three candidates submitted by the President to serve a 4-year term overlapping those of two presidents. The Office has the constitutional duty to ensure the promotion and exercise of human rights. In addition to providing public defenders for the indigent (see Section 1.e.), the Ombudsman's 34 regional offices served as a channel for complaints of human rights violations. The Ombudsman's Bogota Office was the headquarters of a national Early Warning System (SAT) designed to alert public security forces of impending human rights violations, particularly large-scale massacres.

Volmar Antonio Perez served as Ombudsman by appointment of the President until August, when the House of Representatives elected him to a full term as Ombudsman. The office, with international assistance, continued to provide training to regional ombudsmen and conducted public education on human rights. Despite the Ombudsman's successes, resource constraints meant the office generally was underfunded and understaffed, limiting its ability to effectively monitor human rights violations or prevent their occurrence.

In their role as human rights defenders, regional ombudsmen were under constant threat from illegal armed groups. For example, on April 2, the military uncovered a FARC threat against Rafael Caro, the human rights ombudsman for La Guajira Department.

The Government's Presidential Program for Human Rights and International Humanitarian Law, which operated under the authority of the Vice President, coordinates national human rights policy and actions taken by government entities to promote or protect human rights. It is the Government's primary interlocutor with domestic and international NGOs and with foreign governments on human rights issues. The Program publishes a regular Human Rights Observer magazine that provides analyses of major human rights issues and the human rights situation in disparate regions of the country.

Both the Senate and House of Representatives have legally mandated human rights committees. The committees serve as fora for discussion of human rights issues but have no authority to draft legislation. They therefore lack prestige and have added little of substance to the national human rights debate.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The Constitution specifically prohibits discrimination based on race, sex, religion, disability, language, or social status; however, in practice, many of these provisions were not enforced

Women

The law prohibits domestic violence, including spousal abuse; however, it remained a serious problem. The Institute for Legal Medicine and Forensic Science reported 22,271 cases of domestic violence against women in 2003, but noted that only a small percentage of these cases were brought to its attention. The law provides legal recourse for victims of domestic violence. Judicial authorities may remove an abuser from the household and require therapy or reeducation. According to the Ministry of Justice and Interior, 1,290 persons were charged criminally for domestic violence during the year; 256 were convicted. The law stipulates that the Government must provide victims of domestic violence with immediate protection from physical or psychological abuse. Through its "Make Peace" program, the Colombian Family Welfare Institute (ICBF) provided safe houses and counseling for victims; however, its services were dwarfed by the magnitude of the problem. In addition to fulfilling traditional family counseling functions, the ICBF's 531 family ombudsmen were assigned a total of 18,686 domestic violence cases in 2003. The Human Rights Ombudsman's Office conducted regional training workshops to promote the application of domestic violence statutes.

The law prohibits rape and other forms of sexual violence, including by a spouse; however, it remained a serious problem. In 2003, the Institute for Legal Medicine and Forensic Science reported 8,666 cases of suspected sex crimes, including rape, but noted that, like cases of domestic violence, only a small percentage of such crimes were reported. Paramilitaries and guerrillas raped, sexually abused and, in some cases, sexually mutilated women and children for allegedly fraternizing with the enemy, working as prostitutes, having sexual relations outside of marriage, or violating imposed codes of conduct or restrictions on dress. The Penal Code provides for sentences of between 4 and 40 years for crimes against sexual freedom and human dignity, including rape, sex with a minor, sexual abuse, induction into prostitution, and child pornography. The maximum sentence for violent sexual assault is 15 years; the minimum sentence is 8. For acts of spousal sexual violence, the law mandates sentences of 6 months to 2 years and denies probation or bail to offenders who disobey restraining orders. The ICBF provided support to victims of sexual violence.

000558



In October, AI reported that women and girls in the country were subjected to a continuum of violence ranging from domestic violence to violence related to the internal armed conflict. AI accused all parties to the conflict of abusing women, but especially paramilitaries and guerrillas.

Prostitution, which is legal in designated "tolerance zones," was widespread and remained a serious problem exacerbated by a poor economy and internal displacement. Sex tourism existed to a limited extent, especially in coastal cities such as Cartagena and Barranquilla, where marriage and dating services were often fronts for sexual tourism.

Trafficking in women for sexual exploitation continued to be a problem (see Section 5, Trafficking).

There were no laws prohibiting sexual harassment, and it remained a pervasive problem.

The Constitution prohibits discrimination against women and specifically requires authorities to ensure adequate and effective participation by women at decision-making levels of public administration. However, discrimination against women persisted. Women faced hiring discrimination, were disproportionately affected by unemployment, and had salaries that were generally incompatible with their education and experience. Government unemployment statistics indicated that the unemployment rate for women was 16.5 percent, compared with 5 percent for men. Female workers in rural areas were most affected by wage discrimination and unemployment.

Despite an explicit constitutional provision promising additional resources for single mothers and government efforts to train them in parenting skills, women's groups reported that single mothers continued to face serious economic and social problems. According to a 1997 Constitutional Court ruling, a woman's decision to bear a child cannot be considered just cause for firing her if she is pregnant or the mother of a child under 3 months of age. There were no published reports of such firings during the year.

NGOs, such as the Popular Women's Organization in Barrancabermeja, Santander Department, and the Women's Path to Peace, in Medellin, Antioquia Department, worked on women's issues, particularly peace initiatives.

Children

The Constitution imposes an obligation on the family, society, and the State to protect children, foster their development, and ensure their ability to exercise fully their rights; however, these obligations were not fulfilled completely. The Children's Code describes these rights and establishes the services and programs designed to enforce the protection of minors. The ICBF oversees all government child protection and welfare programs and also funds nongovernmental programs that benefit children.

The Constitution stipulates that the State must provide a free public education for children between the ages of 6 and 15; however, the National Department of Statistics (DANE) estimated that 75 percent of children between ages 6 and 15 attended school. By law, a primary education is universal, compulsory, and free. The Government covered the basic costs of primary education, although many families faced additional expenses such as matriculation fees, books, school supplies, and transportation costs that often were prohibitive, especially for the rural poor.

The law requires the Government to provide medical care to children, and boys and girls had equal access to such care. However, medical facilities were not universally available, especially in rural areas.

Child abuse was a serious problem. The National Institute for Legal Medicine and Forensic Sciences reported 7,844 cases of child abuse in 2003. According to the Association Against Child Abuse, less than 5 percent of child abuse cases were reported to government authorities. Although final statistics were unavailable for the year, the National Institute for Legal Medicine and Forensic Sciences estimated that of the 8,666 cases of suspected sex crimes reported to it in 2003, 70 percent involved the sexual abuse of children, the vast majority under them under 14. The ICBF estimated that 25,000 children were victims of sexual exploitation, and it provided assistance, both directly and through other specialized agencies, to more than 14,400 of them during the year.

According to UNICEF, an estimated 35,000 adolescents worked as prostitutes, in spite of legislation prohibiting sex with minors and the employment of minors for prostitution. Children also were trafficked for sexual exploitation (see Section 5, Trafficking).



Persons under 18 are prohibited from serving in the public security forces; however, both paramilitaries and guerrillas used child soldiers. In October, the IOM estimated that between 6,000 and 11,000 children in the country were members of illegal armed groups; UNICEF reported that the number was as high as 14,000. The Ministry of Defense estimated that 40 percent of FARC members were minors and that most guerrilla fighters had joined the FARC ranks as children. Both paramilitaries and guerrillas forcibly recruited minors as combatants.

Although many minors were recruited forcibly, a 2002 study by UNICEF found that 83 percent of child soldiers volunteered. Limited educational and economic opportunities and a desire for acceptance and camaraderie increased the appeal of service in armed groups. Nevertheless, many children found membership in guerrilla and paramilitary organizations difficult, and the Ministry of Defense reported an increase in the number of minors deserting illegal armed groups. At least 529 children surrendered to state security forces during the year. Illegal armed groups frequently threatened children to thwart them from leaving terrorist ranks. For example, in October, three former child soldiers described how the AUC forced them to march several days to an isolated training camp, where they were told they would be tortured and their families killed if they tried to escape. FARC child deserters also reported that local guerrilla commanders threatened to kill their families should they desert or attempt to do so. A reinsertion program for former child soldiers administered by the ICBF provided assistance to 505 children during the year. The remaining 24 children received assistance from their indigenous communities.

Paramilitary groups released some child soldiers as a prelude to demobilizations negotiated with the Government (see Section 1.g.).

Child labor was a problem (see Section 6.d.).

According to UNHCR, 74 percent of all IDPs were women and children (see Section 2.d.). The Human Rights Ombudsman's Office estimated that 15 percent of displaced children attended school. Displaced children especially were vulnerable to physical abuse, sexual exploitation, and recruitment by criminals.

Trafficking in Persons

The law prohibits trafficking in persons; however, there were reports that persons were trafficked to, from, or within the country.

The Criminal Code provides for prison sentences of between 10 and 15 years and fines of up to 1,000 times the monthly minimum wage. These penalties, which are even more severe than those for rape, can be increased by up to one-third if there are aggravating circumstances, such as trafficking of children under the age of 14. Additional charges of illegal detention, violation of the right to work in dignified conditions, and violation of personal freedom also may be brought against traffickers. Police actively investigated trafficking offenses and some traffickers were prosecuted, although limited resources hindered prosecutions. Between 2000 and July, the Prosecutor General's Office opened 280 investigations into trafficking cases, of which 41 cases resulted in arrests and 25 went to trial.

A government advisory committee composed of representatives of the Presidency, the Ministry of Foreign Affairs, the Ministry of Interior and Justice, the DAS, the Office of the Inspector General, the Office of the Prosecutor General, the Office of the Human Rights Ombudsman, the National Registrar's Office, the National Police, the ICBF, the Presidential Program for Human Rights, and Interpol met every 2 months to discuss trafficking in persons. The committee prepared information campaigns, promoted information exchange between government entities, and encouraged closer cooperation between the Government and Interpol.

The Government cooperated with foreign counterparts on investigations and successfully freed victims in solo and joint operations. During the year, the DAS worked with its counterparts to capture a Spanish trafficker in the coffee region who subsequently was extradited to Spain and sentenced to 18 years in prison. To protect citizens trafficked to other countries, government foreign missions provided legal aid and social welfare assistance. The Ministry of Foreign Affairs and Missions abroad worked closely with the IOM to repatriate victims. In addition, IOM provided antitrafficking training to consular officers. During the year, IOM received information regarding 141 cases of trafficking in persons. Information concerning 9 of these cases came from diplomatic missions overseas.

The country was a source for trafficking in persons, primarily for sexual purposes, and principally to Europe and Asia. Destination countries with large numbers of victims included Spain, Japan, and Hong Kong. Victims also were trafficked to the United States and other Latin American countries. According to the DAS, an estimated 45,000 to 50,000 women worked overseas as prostitutes. Many of them were trafficking victims. The vast

000560



majority of trafficking victims were young women, although children and young men were also at risk. Female trafficking victims were at a high risk for sexually transmitted diseases, unwanted pregnancies, and forced abortions.

Many traffickers disclosed the sexual nature of the work they offered but concealed information about working conditions, clientele, and compensation. Others disguised their intent by portraying themselves as modeling agents, offering marriage brokerage services, or operating lottery or bingo scams with free trips as prizes. Recruiters reportedly loitered outside high schools, shopping malls, and parks to lure adolescents into accepting nonexistent jobs abroad. Most traffickers were well-organized and linked to narcotics or other criminal organizations. Internal trafficking--largely a result of the armed conflict--also was a problem.

The IOM strengthened government institutions involved in antitrafficking efforts and assisted trafficking victims. Specifically, the IOM trained 2,982 officials in 38 regional training sessions on trafficking issues and provided victims with job training and employment opportunities through 13 regional projects that directly benefited 936 persons. The IOM also helped victims obtain necessary medical and psychological care. The Hope Foundation, an antitrafficking NGO, provided educational information, social support, and counseling to trafficking victims. In February, with the support of the IOM, the Foundation launched an information campaign to assist travelers in Bogota's International airport. The Rebirth Foundation also provided assistance to trafficking victims, particularly children.

The IOM continued its major antitrafficking public relations campaign that included placing large posters in airports, foreign consulates, and travel agencies, and running professionally produced public service announcements on television.

Persons with Disabilities

There was no discrimination against persons with disabilities in employment, education, access to health care, or in the provision of other state services. There is no law mandating access to public buildings for persons with disabilities. The law provides persons with physical disabilities access to voting stations. The social security fund for public employees cannot refuse to provide services for children with disabilities, regardless of the costs involved.

National/Racial/Ethnic Minorities

Approximately 22 percent of the population was of African origin. Afro-Colombians are entitled to all constitutional rights and protections; however, they faced significant economic and social discrimination. Seventy-four percent of Afro-Colombians earned less than minimum wage. Choco, the department with the highest percentage of Afro-Colombian residents, had the lowest per capita level of social investment and ranked last in terms of education, health, and infrastructure. It also continued to experience some of the country's worst political violence, as paramilitaries and guerrillas struggled for control of the department's key drug and weapons smuggling corridors.

The Government had yet to implement the provisions of the 1993 law designed to benefit Afro-Colombians by expanding public services and private investments and providing for collective titles to some Pacific coastal lands.

Indigenous People

The Constitution gives special recognition to the fundamental rights of indigenous people, who comprise approximately 2 percent of the population.

By law, indigenous groups have perpetual rights to their ancestral lands. Traditional Indian authority boards operated approximately 545 reservations as municipal entities, with officials selected according to indigenous traditions. However, approximately 200 indigenous communities had no legal title to lands they claimed, and illegal armed groups often violently contested indigenous land ownership. The National Agrarian Reform Institute (INCORA) administered a program to buy back lands declared to belong to indigenous communities.

The Constitution provides for special criminal and civil jurisdictions within indigenous territories based on traditional community laws (see Section 1.e.). However, these jurisdictions were subject to manipulation and often rendered punishments that were much more lenient than those imposed by regular civilian courts. The law permits indigenous communities to educate their children in traditional dialects and in the observance of cultural and religious customs. Indigenous men are not subject to the national military draft.

000561



Indigenous leaders complained about the occasional presence of government security forces on indigenous reservations and asked that the Government consult with indigenous authorities prior to taking military action against paramilitaries and guerrillas in such areas. The Government was respectful of such requests but stated that for security reasons, it could not provide advanced notice of most military operations.

The Ministry of Interior and Justice, through the Office of Indigenous Affairs, is responsible for protecting the territorial, cultural, and traditional rights of indigenous people. Ministry representatives resided in all regions of the country and worked with other governmental human rights organizations and NGOs to promote indigenous interests and investigate violations of indigenous rights.

Despite special legal protections and government assistance programs, indigenous people continued to suffer discrimination and often lived on the margins of society.

Members of indigenous communities continued to be victims of all sides in the internal conflict. According to the Presidential Program for Human Rights, 85 indigenous people were killed during the year, at least 15 by paramilitaries, 12 by the FARC, and 2 by the ELN. For example, on February 27, paramilitaries killed three indigenous people in the port city of Buenaventura, Valle del Cauca Department. On March 10, the FARC killed three indigenous members of the Embera Chami tribe in Mistato, Risaralda Department. On August 3, paramilitaries killed indigenous leader and human rights defender Freddy Arias in the city of Valledupar, Cesar Department (see Section 4). On December 7, the FARC killed three leaders of the Embera Katio tribe in the city of Apartado, Antioquia Department. On September 8, the FARC released Arquimides Vitonas and Gilberto Munoz, indigenous leaders in the community in Toribio, Cauca Department, who had been kidnapped on August 23 after venturing into a FARC-controlled area (see Sections 1.b. and 3). The Ministry of Interior operated a protection program that provided protection to 32 indigenous leaders during the year.

The UNHCHR strongly criticized threats and violence against indigenous communities and characterized government investigations of human rights violations against indigenous groups as inadequate. The National Organization of Indigenous Persons (ONIC) reported many incidents in which illegal armed groups forcibly recruited indigenous people or obligated them to collaborate, restricted indigenous people's freedom of movement, blockaded indigenous communities, or accused indigenous people of sympathizing with their adversaries.

Section 6 Worker Rights

a. The Right of Association

The Constitution provides for the right to organize unions, except for members of the armed forces, police, and persons performing "essential public services" as defined by law, and the Government respected this right in practice. However, violence against union members and antiunion discrimination remained obstacles to joining unions and engaging in trade union activities, and the number of unions and union members continued to decline. According to the National Labor College (ENS), a Medellin-based NGO that collects, studies, and consolidates information on organized labor, there were 2,357 unions registered in the country at the end of the year, with 856,099 members, or approximately 4 percent of the labor force.

The Labor Code provides for automatic recognition of unions that obtain 25 signatures from potential members and comply with a registration process; however, this process was slow and sometimes took years. The Government can compel trade unions to provide interested third parties with relevant information on their work, including books, registers, plans, and other documents. The ILO Committee of Experts considered this amendment to be inconsistent with freedom of association, since it believed that only an administrative authority should conduct investigations when there are reasonable grounds to believe that an offense has been committed.

Labor leaders continued to be targets of attacks by illegal armed groups, primarily for political reasons. According to the ENS, as of August 31, 3 union members were kidnapped, 2 disappeared, 276 were threatened with death, 2 survived attempts on their lives, and 47 were killed. By comparison, 62 trade union members were killed during the same period in 2003. Of those killed, all but one were members of unions affiliated with the United Workers Central (CUT), the country's largest and most left-leaning labor federation. The Ministry of Social Protection asserted that 24 of the 47 trade unionists were killed because of trade union activity, while the others were targeted for political activities or died in personal disputes. The ENS, on the other hand, noted a stronger correlation between trade unionists' deaths and their labor activism, noting that 16 of those killed were board members or union or federation directors who were involved in labor disputes at the time they were killed.


While noting that killings of trade union leaders had declined, the ILO Committee of Experts nonetheless noted what it called a "persistent climate of violence" in the country. Violence against trade unionists was limited generally to regions contested by multiple illegal armed groups. According to the ENS, 66 percent of trade unionist killings occurred in 5 of the country's most conflictive departments: Arauca, Atlantico, Antioquia, Magdalena, and Valle del Cauca. Illegal armed groups disproportionately targeted educators, who represented approximately one-third of the organized work force. According to the ENS, 20 teachers were killed and 254 received death threats during the first 8 months of the year (see Section 2.a.).

In 70 percent of incidents of violence against trade union members, the ENS was unable to determine which illegal armed group was responsible. Based on available information, the ENS attributed 37 percent of these crimes to paramilitaries. The CUT claimed that paramilitaries were responsible for 97 percent of the violence against its members through April. On April 15, alleged paramilitaries killed Carlos Alberto Chicaiza, a leader of SINTRAEMSIRVA, a local government workers union affiliated with the CUT, while he was traveling from Cali to Palmira, Valle del Cauca Department. On July 15, two unidentified gunmen killed Carmen Elisa Nova, a leader of the CUT-affiliated SINTRAHOSPICLINICAS, a medical workers union, in Bucaramanga, Santander Department. On September 7, the Office of the Prosecutor General arrested Lieutenant Juan Pablo Ordonez and soldiers Oscar Saul Cuta and Jhon Alejandro Hernandez of the Army's 18th Brigade for the August 5 killing of labor leaders Jorge Prieto, Leonel Goyeneche, and Hector Alirio Martinez. The Office of the Prosecutor General previously had issued warrants for the arrest of all three labor leaders on suspicion of membership in the ELN. The soldiers alleged the three trade union members had been shot in a skirmish; however, a forensic examination conducted by the Office of the Prosecutor General concluded they likely were executed.

Guerrilla groups killed, kidnapped, and threatened trade union members for political and financial reasons. For example, on June 23, the FARC's 34th Front released Luis Carlos Herrera, vice president of a government workers union in Antioquia, after the departmental government agreed to launch a development project in a FARC-controlled area.

Some labor leaders alleged the Government attempted to marginalize trade unions by arbitrarily arresting trade union members on suspicion of engaging in terrorist activity. According to the ENS, as of August 31, security forces had arbitrarily detained 51 trade unionists, including Luz Perly Cordoba, Secretary General of FENSUAGRO, an agricultural workers union in Arauca department. Authorities arrested Cordoba on February 18 and charged her with rebellion and subversion for alleged ties to the FARC's Northeast Bloc. On August 6, the Office of the Inspector General ruled there was sufficient evidence to proceed to trial against Cordoba. On March 29, a judge dismissed charges against Hernando Hernandez, former president of the National Oil Workers Union (USO), stating there was insufficient evidence to proceed to trial. Hernandez had been charged with rebellion and subversion for alleged ties to the ELN.

Union leaders contended that perpetrators of violence against workers operated with virtual impunity. There were few successful prosecutions of crimes against trade union members. A major obstacle to bringing cases to trial was witnesses' reluctance, for personal security reasons, to testify or come forward with information. Prosecutors and judicial investigators frequently were subject to threats, intimidation, or coercion by illegal armed groups. According to the Ministry of Social Protection, approximately 70 percent of cases involving the killings of trade unionists since 1994 remained in the preliminary investigative stage despite a regulation requiring cases to be brought to trial or closed within 2 years. Action on 18 percent of cases was suspended due to lack of evidence. Approximately 4 percent of cases had been brought to trial. In January, however, authorities arrested Adolfo Hickly for his suspected involvement in the 2002 killing of Adolfo Munera, a leader of SINALTRAINAL, a food and beverage workers union, in Barranquilla, Atlantico Department. Several labor organizations continued to pursue civil suits against alleged authors of paramilitary antilabor violence. For example, SINTRAMINERGETICA's 2003 civil suit in a foreign court against the Drummond Company, which operated a large coalmine in Cesar Department, alleged that the company ordered or acquiesced in local paramilitaries' killings of three union activists.

During the year, the Government and the country's three principal labor federations finalized development of a work plan for the Inter-Institutional Commission for the Promotion and Protection of Worker's Human Rights. The Commission is charged with preventing human rights violations against union members and promoting and protecting freedom of association, collective bargaining, and the right to strike.

To improve the security of particularly vulnerable union leaders, the Government increased resources devoted to the Ministry of Interior and Justice's protection program for trade union leaders. During the year, the program secured 19 union headquarters and residences, and, since 1999, has provided protection to 5,681 union members and activists. Although trade union leaders acknowledged the benefits of the program, they still complained that its resources were insufficient to protect the large number of threatened trade unionists adequately. The Executive Council of the CUT also complained that labor unions were not given an adequate voice in the administration of the program. The Presidential Program for Human Rights established a program to relocate at-risk teachers (see Section 2.a.).

000563


The Constitution prohibits antiunion discrimination. However, a number of long-standing ILO criticisms of the Labor Code challenged the scope and effectiveness of this provision. Specifically, the ILO criticized: The requirement that government officials be present at assemblies convened to vote on a strike call; the legality of firing union organizers from jobs in their trade once 6 months have passed following a strike or dispute; the requirement that candidates for trade union offices belong to the occupation that their unions represent; the prohibition of strikes in a wide range of public services that are not necessarily essential; the Government's power to intervene in disputes through compulsory arbitration when a strike is declared illegal; and the power to dismiss trade union officers involved in an unlawful strike.

b. The Right to Organize and Bargain Collectively

The Constitution provides for workers' right to organize and bargain collectively, and the Government respected this right in the private sector; however, collective bargaining had not been implemented fully in the public sector. High unemployment, a large informal economic sector, traditional antiunion attitudes, and violence against trade union leaders made organizing unions difficult. Weak union organization and a requirement that trade unions represent a majority of a company's workers to negotiate on their behalf limited workers' bargaining power in all sectors. There are no special laws or exemptions from regular labor laws in export processing zones. Labor law applies in the country's 15 free trade zones, and its standards were enforced.

Collective pacts between individual workers and their employers were not subject to collective bargaining and were used by employers to complicate and discourage labor organization.

The growing prevalence of workers' cooperatives further diminished collective bargaining. Workers' cooperatives are required to register with the Superintendent of Economic Cooperatives, which places the number of such cooperatives at 1,500 and the number of associated workers at 150,000. Workers' cooperatives are obligated to provide compensation at least equivalent to the minimum wage and the same health and retirement benefits as other workers receive. Government investigations revealed irregularities or abuses in 75 percent of workers' cooperatives. Investigators discovered that most cooperatives engaged in subcontracting and, in some cases, that private sector employers had forced workers to form cooperatives and were themselves managing the cooperatives' day-to-day operations. The Government has the authority to fine violators but has no recourse to shut down repeat offenders. In practice, nominal fines assessed by the Government did little to dissuade violators. In September, the Government rescinded specific tax breaks enjoyed by workers' cooperatives.

The Constitution provides for the right to strike, and workers exercised this right in practice; however, members of the armed forces, police, and persons executing "essential public services" as defined by law were not permitted to strike.

Before staging a legal strike, public sector unions must negotiate directly with management and accept mediation if they cannot reach an agreement. The law prohibits the use of strikebreakers. Legislation that prohibits public employees from striking is still in effect, although it often was overlooked. By law, public employees must accept binding arbitration if mediation fails.

Various high profile strikes occurred during the year. On April 22, the USO declared a "political strike" to protest government plans to restructure Ecopetrol, the country's state-owned oil company. The strike, which lasted 35 days, was declared illegal by the Government on the basis of a 1995 Constitutional Court decision ruling that all hydrocarbon sector employees perform "essential public services." Approximately 250 USO workers were dismissed for participating in the strike. As part of the settlement, a voluntary arbitration tribunal was established to determine on a case-by-case basis whether dismissed workers should be reinstated.

c. Prohibition of Forced or Compulsory Labor

The Constitution prohibits slavery and any form of forced or compulsory labor, including by children, and there were no reports that such practices occurred in the formal sector.

Paramilitaries and guerrillas practiced forced conscription (see Section 5). There were some reports that guerrillas and paramilitaries used forced labor, including child labor, in areas outside full government control (see Section 6.d.).

d. Prohibition of Child Labor and Minimum Age for Employment

The Constitution prohibits the employment of children under 14 in most occupations, and the Labor Code prohibits the granting of work permits to children under 18; however, child labor remained a significant problem,



particularly in the informal sector. According to the DANE, nearly 15 percent of children were employed. In October 2003, a National Committee for the Eradication of Child Labor, which included officials from the Ministries of Social Protection, Education, and Communications, as well as representatives of unions, employer associations, and NGOs, implemented the Government's 2003-06 Third National Plan to Eradicate Child Labor. The Action Plan includes specific goals and strategies to protect children by updating information on child labor, strengthening the education system, actively searching for child workers and removing them from the workplace, and improving cooperation and coordination at the departmental and municipal levels.

The Government has ratified ILO Convention 182 but has not deposited the instrument of ratification with the ILO, pending review of an ILO-prepared legal opinion on whether the Government can be held responsible for forced conscription of child soldiers by illegal armed groups (see Section 5).

The 1989 decree that established the Minors Code categorically prohibits the employment of children under 12 and strictly limits work by children ages 12 and 13. It also requires exceptional conditions and the express authorization of the Ministry of Labor to employ children between 12 and 17. Children under 14 are prohibited from working, with the exception that those ages 12 and 13 may perform light work with the permission of their parents and appropriate labor authorities. Children ages 12 and 13 may work a maximum of 4 hours a day, children ages 14 and 15 a maximum of 6 hours a day, and children ages 16 and 17 a maximum of 8 hours a day. All child workers are prohibited from working at night or performing work where there is a risk of bodily harm or exposure to excessive heat, cold, or noise. Children are prohibited from working in a number of specific occupations, including mining and construction; however, these requirements largely were ignored in practice, and 5 percent of working children possessed the required work permits.

According to a recent report released by parastatal company Mineros de Colombia, between 200,000 and 400,000 children worked in illegal gold, clay, coal, emerald, limestone, and other mining operations. Children also worked extensively in agriculture, primarily on subsistence family farms. According to DANE, approximately 200,000 children worked as coca pickers or in other aspects of the illegal drug trade. The legal minimum age for work was inconsistent with completing a basic education, and only 38 percent of working children attended school.

Although there were no reports of forced child labor in the formal economy, several thousand children were forced to serve as paramilitary or guerrilla combatants (see Sections 1.f. and 5), prostitutes (see Section 5), or coca pickers. The Minors Code provides for fines ranging from 1 to 40 minimum monthly salaries for violations of child labor laws. If a violation is deemed to have endangered a child's life or threatened his or her moral values, sanctions also can include the temporary or permanent closure of the guilty establishment. In the formal sector, the Ministry of Social Protection enforced child labor laws through periodic inspections.

The Ministry had inspectors in each of the country's 32 departments and the national capital, responsible for certifying and conducting repeat inspections of workplaces that employed children; however, the system lacked resources and covered 20 percent of the child labor force employed in the formal sector of the economy.

The National Committee for the Eradication of Child Labor conducted training on legislation and enforcement for approximately 600 public officials in 7 departments and created an information system on child labor to better measure and understand the problem. The Government, the major labor federations, and media representatives published articles, broadcast documentaries, and launched other outreach programs to delegitimize child labor. UNICEF continued a program to encourage children to leave the workforce and return to school.

e. Acceptable Conditions of Work

The Government sets a uniform minimum wage every January that serves as a benchmark for wage bargaining. The monthly minimum wage, set by tripartite negotiations among representatives of business, organized labor, and the Government, was approximately $140 (358,000 pesos). Because the minimum wage is based on the Government's target inflation rate, the minimum wage has not kept up with real inflation. The national minimum wage did not provide a decent standard of living for a worker and family. An estimated 47 percent of workers earned wages that were insufficient to cover the costs of the Government's estimated low-income family shopping basket.

The Labor Code provides for a regular workday of 8 hours and a regular workweek of 48 hours. The Code stipulates that workers are entitled to receive premium compensation for additional hours worked and for work performed on Sundays. The law requires employers to provide premium pay for work performed between the hours of 10 p.m. and 6 a.m.

000565

Legislation provides comprehensive protection for workers' occupational safety and health, which the Ministry of Social Protection enforced through periodic inspections. However, a lack of government inspectors, poor public safety awareness, and inadequate attention by unions resulted in a high level of industrial accidents and unhealthy working conditions. The Social Security Institute reported 148,835 work-related accidents through the first 8 months of the year, resulting in 363 deaths. Workers in the informal sector sometimes suffered physical or sexual abuse.

The Labor Code provides workers with the right to remove themselves from a hazardous work situation without jeopardizing continued employment. However, unorganized workers, particularly those in the agricultural sector, often continued working in hazardous conditions because they feared losing their jobs if they criticized abuses.

000566