# EXHIBIT
# D-4

000567




## International Narcotics Control Strategy Report   -2005
Released by the Bureau for International Narcotics and Law Enforcement Affairs
March 2005

**Table of Contents**

Introduction

>      Legislative Basis for the INCSR
>      Presidential Determination

Policy and Program Developments

>      Overview for 2004
>      Next Steps
>      Demand Reduction
>      Methodology for Estimating Illegal Drug Production
>      Worldwide Illicit Drug Cultivation
>      Worldwide Potential Illicit Drug Production
>      Parties to the 1988 UN Convention

USG Assistance

>      Department of State (INL) Budget
>      International Training
>      International Law Enforcement Academies (ILEAs)
>      Drug Enforcement Administration
>      United States Coast Guard
>      U.S. Customs and Border Protection

Chemical Controls

>      Summary
>      Background
>      Major Chemical Source Countries
>      Major Drug Countries

South America

>      Argentina
>      Bolivia
>      Brazil
>      Chile
>      Colombia
>      Ecuador
>      Paraguay
>      Peru
>      Uruguay
>      Venezuela

000568



Canada, Mexico and Central America

    **Belize**
    **Canada**
    **Costa Rica**
    **El Salvador**
    **Guatemala**
    **Honduras**
    **Mexico**
    **Nicaragua**
    **Panama**

The Caribbean

    The Bahamas
    Cuba
    Dominican Republic
    Dutch Caribbean
    Eastern Caribbean
    French Caribbean
    Guyana
    Haiti
    Jamaica
    Suriname
    Trinidad and Tobago

Southwest Asia

    Afghanistan
    Bangladesh
    India
    Nepal
    Pakistan
    Sri Lanka

Southeast Asia

    Australia
    Burma
    Cambodia
    China
    Hong Kong
    Indonesia
    Japan
    Laos
    Malaysia
    Mongolia
    North Korea
    Palau
    The Philippines
    Singapore
    South Korea
    Taiwan
    Thailand
    Vietnam

Europe and Central Asia

    Albania

000569

Table of Contents 

Armenia
Austria
Azerbaijan
Belarus
Belgium
Bosnia and Herzegovina
Bulgaria
Croatia
Cyprus
Czech Republic
Denmark
Estonia
Finland
France
Georgia
Germany
Greece
Hungary
Iceland
Ireland
Italy
Kazakhstan
Kyrgyz Republic
Latvia
Lithuania
Macedonia
Malta
Moldova
Netherlands
Norway
Poland
Portugal
Romania
Russia
Slovakia
Slovenia
Spain
Sweden
Switzerland
Tajikistan
Turkey
Turkmenistan
Ukraine
United Kingdom
Uzbekistan

Africa and the Middle East

Angola
Benin
Egypt
Ghana
Jordan
Iran
Israel
Kenya
Lebanon
Morocco
Mozambique
Namibia

000570



Nigeria
Saudi Arabia
Senegal
South Africa
Swaziland
Syria
Tanzania
Togo
Tunisia
Uganda
United Arab Emirates

2005

000571




U.S. DEPARTMENT of STATE

### International Narcotics Control Strategy Report  -2005
Released by the Bureau for International Narcotics and Law Enforcement Affairs
March 2005

**Introduction**

**Legislative Basis for the INCSR**

The Department of State's International Narcotics Control Strategy Report (INCSR) has been prepared in accordance with section 489 of the Foreign Assistance Act of 1961, as amended (the "FAA," 22 U.S.C. § 2291). The 2005 INCSR, published in March 2005, covers the year January 1 to December 31, 2004 and is published in two volumes, the second of which covers money laundering and financial crimes. It is the 19th annual report prepared pursuant to the FAA. In addition to addressing the reporting requirements of section 489 of the FAA (as well as sections 481(d)(2) and 484(c) of the FAA and section 804 of the Narcotics Control Trade Act of 1974, as amended), the INCSR provides the factual basis for the designations contained in the President's report to Congress on the major drug-transit or major illicit drug producing countries initially set forth in section 591 of the Kenneth M. Ludden Foreign Operations, Export Financing, and Related Programs Appropriations Act, 2002 (P.L. 107-115) (the "FOAA"), and now made permanent pursuant to section 706 of the Foreign Relations Authorization Act, Fiscal Year 2003 (P.L. 107-228) (the "FRAA").

Section 706 of the FRAA requires that the President submit an annual report no later than September 15 identifying each country determined by the President to be a major drug-transit country or major illicit drug producing country. The President is also required in that report to identify any country on the majors list that has "failed demonstrably . . . to make substantial efforts" during the previous 12 months to adhere to international counternarcotics agreements and to take certain counternarcotics measures set forth in U.S. law. U.S. assistance under the FY 2004 FOAA may not be provided to any country designated as having "failed demonstrably" unless the President determines that the provision of such assistance is vital to the U.S. national interests or that the country, at any time after the President's initial report to Congress, has made "substantial efforts" to comply with the counternarcotics conditions in the legislation. This prohibition does not affect humanitarian, counternarcotics, and certain other types of assistance that are authorized to be provided notwithstanding any other provision of law.

The FAA requires a report on the extent to which each country or entity that received assistance under chapter 8 of Part I of the Foreign Assistance Act in the past two fiscal years has "met the goals and objectives of the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances" (the "1988 UN Drug Convention"). FAA § 489(a)(1)(A).

Although the Convention does not contain a list of goals and objectives, it does set forth a number of obligations that the parties agree to undertake. Generally speaking, it requires the parties to take legal measures to outlaw and punish all forms of illicit drug production, trafficking, and drug money laundering, to control chemicals that can be used to process illicit drugs, and to cooperate in international efforts to these ends. The statute lists action by foreign countries on the following issues as relevant to evaluating performance under the 1988 UN Drug Convention: illicit cultivation, production, distribution, sale, transport and financing, and money laundering, asset seizure, extradition, mutual legal assistance, law enforcement and transit cooperation, precursor chemical control, and demand reduction.

In attempting to evaluate whether countries and certain entities are meeting the goals and objectives of the 1988 UN Drug Convention, the Department has used the best information it has available. The 2004 INCSR covers countries that range from major drug producing and drug-transit countries, where drug control is a critical element of national policy, to small countries or entities where drug issues or the capacity to deal with them are minimal. The reports vary in the extent of their coverage. For key drug-control countries, where considerable information is available, we have provided comprehensive reports. For some smaller countries or entities where only sketchy information is available, we have included whatever data the responsible post could provide.

The country chapters report upon actions-including plans, programs, and, where applicable, timetables-toward fulfillment of Convention obligations. Because the 1988 UN Drug Convention's subject matter is so broad and availability of information on elements related to performance under the Convention varies widely within and among countries, the Department's views on the extent to which a given country or entity is meeting the goals and objectives of the Convention are based on the overall response of the country or entity to those goals and objectives. Reports will often include discussion of foreign legal and regulatory structures. Although the Department strives to provide accurate information, this report should not be used as the basis for determining legal rights or obligations under U.S. or foreign law.

Some countries and other entities are not yet parties to the 1988 UN Drug Convention; some do not have status in the United Nations and cannot become parties. For such countries or entities, we have nonetheless considered actions taken by those countries or entities in areas covered by the Convention as well as plans (if any) for becoming parties and for bringing their legislation into conformity with the Convention's requirements. Other countries have taken reservations, declarations, or understanding to the 1988 UN Drug Convention or other relevant treaties; such reservations, declarations, or understandings are generally not detailed in this report. For some of the smallest countries or entities that have not been designated by the President as major illicit drug producing or major drug-transit countries, the Department has insufficient information to make a judgment as to whether the goals and objectives of the Convention are being met.

Unless otherwise noted in the relevant country chapters, the Department's Bureau for International Narcotics and Law Enforcement Affairs (INL) considers all countries and other entities with which the United States has bilateral narcotics agreements to be meeting the goals and objectives of those agreements.

Information concerning counternarcotics assistance is provided, pursuant to section 489(b) of the FAA, in sections entitled "FY 2003-2004 Fiscal Summary and Functional Budget" and "Other USG Assistance Provided."

**Major Illicit Drug Producing, Drug-Transit, Significant Source, Precursor Chemical, and Money Laundering Countries**

Section 489(a)(3) of the FAA requires the INCSR to identify:

> (A) major illicit drug producing and major drug-transit countries,

> (B) major sources of precursor chemicals used in the production of illicit narcotics; or

> (C) major money laundering countries.

These countries are identified below.

**Major Illicit Drug Producing and Major Drug-Transit Countries**

A major illicit drug producing country is one in which:

> (A) 1,000 hectares or more of illicit opium poppy is cultivated or harvested during a year;

000573

 
(B) 1,000 hectares or more of illicit coca is cultivated or harvested during a year; or

(C) 5,000 hectares or more of illicit cannabis is cultivated or harvested during a year, unless the President determines that such illicit cannabis production does not significantly affect the United States. FAA § 481(e)(2).

A major drug-transit country is one:

(A) that is a significant direct source of illicit narcotic or psychotropic drugs or other controlled substances significantly affecting the United States; or

(B) through which are transported such drugs or substances. FAA § 481(e)(5).

The following major illicit drug producing and/or drug-transit countries were identified and notified to Congress by the President consistent with section 706(1) of the Foreign Relations Authorization Act, Fiscal Year 2003 (Public Law 107-228):

**Afghanistan, The Bahamas, Bolivia, Brazil, Burma, China, Colombia, Dominican Republic, Ecuador, Guatemala, Haiti, India, Jamaica, Laos, Mexico, Nigeria, Pakistan, Panama, Paraguay, Peru, Venezuela, and Vietnam.**

**Major Precursor Chemical Source Countries**

The following countries have been determined to be major sources of precursor or essential chemicals used in the production of illicit narcotics:

**Argentina, Brazil, Canada, China, Germany, India, Mexico, the Netherlands, and the United States.**

Information is provided pursuant to section 489 of the FAA in the section entitled "Chemical Controls."

**Major Money Laundering Countries**

A major money laundering country is defined by statute as one "whose financial institutions engage in currency transactions involving significant amounts of proceeds from international narcotics trafficking." FAA § 481(e)(7). However, the complex nature of money laundering transactions today makes it difficult in many cases to distinguish the proceeds of narcotics trafficking from the proceeds of other serious crime. Moreover, financial institutions engaging in transactions involving significant amounts of proceeds of other serious crime are vulnerable to narcotics-related money laundering. This year's list of major money laundering countries recognizes this relationship by including all countries and other jurisdictions, whose financial institutions engage in transactions involving significant amounts of proceeds from all serious crime. The following countries/jurisdictions have been identified this year in this category:

**Antigua and Barbuda, Australia, Austria, the Bahamas, Brazil, Burma, Canada, Cayman Islands, China, Colombia, Costa Rica, Cyprus, Dominica, the Dominican Republic, France, Germany, Greece, Guernsey, Haiti, Hong Kong, Hungary, India, Indonesia, the Isle of Man, Israel, Italy, Japan, Jersey, Lebanon, Liechtenstein, Luxembourg, Macau, Mexico, Nauru, the Netherlands, Nigeria, Pakistan, Panama, Paraguay, Philippines, Russia, Singapore, Spain, Switzerland, Taiwan, Thailand, Turkey, Ukraine, United Arab Emirates, United Kingdom, United States, Uruguay, and Venezuela.**

Further information on these countries/entities and United States money laundering policies, as required by section 489 of the FAA, is set forth in Volume II of the INCSR in the section entitled "Money Laundering and Financial Crimes."



**Presidential Determination**

White House Press Release
Office of the Press Secretary
Washington, DC
September 16, 2004

**Presidential Determination No. 2004-47**

**Memorandum for the Secretary Of State: Presidential Determination on Major Drug Transit or Major Illicit Drug Producing Countries for FY05**

Pursuant to section 706(1) of the Foreign Relations Authorization Act, Fiscal Year 2003 (Public Law 107-228) (FRAA), I hereby identify the following countries as major drug-transit or major illicit drug producing countries: **Afghanistan, The Bahamas, Bolivia, Brazil, Burma, China, Colombia, Dominican Republic, Ecuador, Guatemala, Haiti, India, Jamaica, Laos, Mexico, Nigeria, Pakistan, Panama, Paraguay, Peru, Venezuela, and Vietnam.**

The Majors List applies by its terms to "countries." The United States Government interprets the term broadly to include entities that exercise autonomy over actions or omissions that could lead to a decision to place them on the list and, subsequently, to determine their eligibility for certification.

A country's presence on the Majors List is not necessarily an adverse reflection of its government's counternarcotics efforts or level of cooperation with the United States. Consistent with the statutory definition of a major drug-transit or drug-producing country set forth in section 481(e)(5) of the Foreign Assistance Act of 1961, as amended (FAA), one of the reasons that major drug-transit or illicit drug producing countries are placed on the list is the combination of geo-graphical, commercial, and economic factors that allow drugs to transit or be produced despite the concerned government's most assiduous enforcement measures.

Pursuant to section 706(2)(A) of the FRAA, I hereby designate Burma as a country that has failed demonstrably during the previous 12 months to adhere to its obligations under inter-national counternarcotics agreements and take the measures set forth in section 489(a)(1) of the FAA. Attached to this report is a justification (statement of explanation) for the determination on Burma, as required by section 706(2)(B).

I have removed Thailand from the list of major drug-transit or major illicit drug producing countries. Thailand's opium poppy cultivation is well below the levels specified in the FRAA; no heroin processing laboratories have been found in Thailand for several years, and Thailand is no longer a significant direct source of illicit narcotic or psychotropic drugs or other controlled substances significantly affecting the United States; nor is it a country through which such drugs or substances are transported.

In contrast to the Government of Haiti's dismal performance last year under the Aristide regime, the new Interim Government of Haiti (IGOH), headed by Prime Minister Latortue, has taken substantive—if limited—counternarcotics actions in the few months it has been in office.

Nevertheless, we remain deeply concerned about the ability of Haitian law enforcement to reorganize and restructure sufficiently to carry out sustained counternarcotics efforts.

The decreased use of MDMA (Ecstasy) among young people in the United States is a hopeful sign, but we continue to place priority on stopping the threat of club drugs, including MDMA, of which The Netherlands continues to be the dominant source country. The Government of The Netherlands is an enthusiastic and capable partner, and we commend its efforts. We continue to be concerned, however, by obstacles to mutual legal assistance and extradition from The Netherlands. There is a need to work more deliberately to disrupt the criminal organizations responsible for the production and trafficking of synthetic drugs.


Specifically, we urge enhanced use of financial investigation, including full exploitation of anti-money laundering statutes and financial investigators to identify and dismantle trafficking organizations, and to seize and forfeit the assets acquired from the drug trade.

While the vast majority of illicit drugs entering the United States continue to come from South America and Mexico, we remain concerned about the substantial flow of illicit drugs from Canada. I commend Canada for its successful efforts to curb the diversion of precursor chemicals used in methamphetamine production.

We are now working intensively with Canadian authorities to address the increase in the smuggling of Canadian-produced marijuana into the United States; however we are concerned the lack of significant judicial sanctions against marijuana producers is resulting in greater involvement in the burgeoning marijuana industry by organized criminal groups. Canada has expressed concern to us about the flow of cocaine and other illicit substances through the United States into Canada. United States and Canadian law enforcement personnel have collaborated on a number of investigations that have led to the dismantling of several criminal organizations. The two governments will continue to work closely in the year ahead to confront these shared threats.

Nigeria put measures in place to increase the effectiveness of the National Drug Law Enforcement Agency, and also arrested a trafficker wanted by the United States, which met the agreed-upon interdiction targets. However, Nigeria must take significant and decisive action to investigate and prosecute political corruption, which continues to undermine the transparency of its government. President Obasanjo took steps to address corruption at the G-8 meetings in Sea Island, Georgia, by entering into a Compact to Promote Transparency and Combat Corruption. Positive transparent measures will in turn benefit Nigeria's counternarcotics efforts, the rule of law, and all democratic institutions.

Despite good faith efforts on the part of the central Afghanistan government, we are concerned about increased opium crop production in the provinces.

We are deeply concerned about heroin and methamphetamine linked to North Korea being trafficked to East Asian countries. We consider it highly likely that state agents and enterprises in North Korea are involved in the narcotics trade.

While we know that some opium poppy is cultivated in North Korea, reliable information confirming the extent of opium production is currently lacking. There are also clear indications that North Koreans traffic in, and probably manufacture, methamphetamine. In recent years, authorities in the region have routinely seized shipments of methamphetamine and/or heroin that had been transferred to traffickers' ships from North Korean vessels. The April 2003 seizure of 125 kilograms of heroin smuggled to Australia aboard the North Korean-owned vessel "Pong Su" is the latest and largest seizure of heroin pointing to North Korean complicity in the drug trade. Although there is no evidence that narcotics originating in or transiting North Korea reach the United States, we are working closely with our partners in the region to stop North Korean involvement in illicit narcotics production and trafficking.

We appreciate the efforts of China, Hong Kong, Taiwan, and others in the region to stop the diversion of pseudoephedrine and ephedrine used to manufacture methamphetamine. However, considering the growing methamphetamine problem in North America and Asia, additional collaborative efforts to control these precursor chemicals are necessary.

You are hereby authorized and directed to submit this report under section 706 of the FRAA, transmit it to the Congress, and publish it in the Federal Register

GEORGE W. BUSH

**Annual Presidential Determinations of Major Illicit Drug-Producing and Drug-Transit Countries**


**Statement by the Press Secretary**

President Bush has authorized the Secretary of State to submit to Congress the annual report listing major illicit drug-producing and drug-transit countries (known as the "Majors List"). The same report contains Presidential determinations of the countries that have "failed demonstrably to make substantial efforts" during the previous 12 months to adhere to international counternarcotics agreements and take the counternarcotics measures specified in U.S. law.

As in previous years, this year's certification determinations required the President to consider each country's performance in areas such as reducing illicit cultivation, interdiction, and law enforcement cooperation; extraditing drug traffickers; and taking legal steps and law enforcement measures to prevent and punish public corruption that facilitates drug trafficking or impedes prosecution of drug-related crimes. The President also had to consider efforts taken by these countries to stop production and export of, and reduce the domestic demand for, illegal drugs.

In his report, the President identified as major drug-transit or major illicit drug-producing countries: **Afghanistan, The Bahamas, Bolivia, Brazil, Burma, China, Colombia, Dominican Republic, Ecuador, Guatemala, Haiti, India, Jamaica, Laos, Mexico, Nigeria, Pakistan, Panama, Paraguay, Peru, Venezuela,** and **Vietnam.**

The President removed Thailand from the list of major drug-transit or major illicit drug-producing countries. Thailand's opium poppy cultivation is well below the levels specified in Section 706(1) of the Foreign Relations Authorization Act, FY 2002-2003(P.L.107-228)(the FRAA); no heroin processing laboratories have been found in Thailand for several years, and Thailand is no longer a significant direct source of illicit narcotic or psychotropic drugs or other controlled substances significantly affecting the United States; nor is it a country through which are transported such drugs or substances.

The President also reported to Congress his determination that Burma failed demonstrably, during the previous 12 months, to adhere to its obligations under international counternarcotics agreements and to take the measures set forth in U.S. law.

The President noted that, in sharp contrast to the Government of Haiti's dismal performance last year under the Aristide regime, the New Interim Government of Haiti headed by Prime Minister Latortue, has taken substantive—if limited—counternarcotics actions in the few months it has been in office. The President remains concerned, however, about the ability of Haitian law enforcement to reorganize and restructure sufficiently to carry out sustained counternarcotics efforts.

The President cited decreased use of MDMA (ecstasy) among young people in the United States as a hopeful sign, but continues to place priority on stopping the threat of club drugs, including MDMA, of which the Netherlands continues to be the dominant source country. He characterized the Government of the Netherlands as an enthusiastic and capable partner, and commended its efforts. He continues to be concerned, however, by obstacles to mutual legal assistance and extradition from the Netherlands and cited a need to work more deliberately to disrupt the criminal organizations responsible for the production and trafficking of synthetic drugs. Specifically, he urged enhanced use of financial investigations, and anti-money laundering statutes to identify and dismantle trafficking organizations.

While the vast majority of illicit drugs entering the United States continues to come from South America and Mexico, the President expressed his continuing concerns about the flow of illicit drugs from Canada. He commended Canada for its successful efforts to curb the diversion of precursor chemicals used in methamphetamine production, and noted that we are now working intensively with Canadian authorities to address the increase in the smuggling of Canadian-produced marijuana into the United States; however, we are concerned the lack of significant judicial sanctions against marijuana producers is resulting in greater involvement in the burgeoning marijuana industry by organized criminal groups.

The President reported that, although Nigeria arrested a trafficker wanted by the United States; met

000577


the modest, agreed upon interdiction targets; and put measures in place to increase the effectiveness of the National Drug Law Enforcement Agency; counternarcotics efforts continue to be undermined by pervasive corruption. He said Nigeria must take significant and decisive action to investigate and prosecute political corruption, and to increase transparency if it is to combat corruption effectively.

Despite good faith efforts on the part of the central Afghanistan Government, the President reported his concerns about the increased opium crop production and the Government's lack of capacity to prevail in the provinces.

The President expressed deep concerns about heroin and methamphetamine linked to North Korea being trafficked to East Asian countries; the high likelihood state agents and enterprises in North Korea are involved in the narcotics trade; and that there are clear indications that North Koreans traffic in, and probably manufacture, methamphetamine.

<u>2005</u>


the launch of PRIDE in 2003; 4) an INL-funded judicial reform intensive training program for prosecutors and defenders, preceded by Digital Video Conferences with the University of the Pacific; 5) an INL-funded seminar for judges on DNA Forensic Technology; 6) a workshop for Chilean authorities on how to investigate Intellectual Property Rights crimes; 7) a DOJ-funded course on cybercrime for prosecutors, law enforcement and government officials from five countries; 8) a public affairs section grant to Fundacion Paz Ciudadana to implement ADAM (Arrestee Drug Abuse Monitoring); 9) five CHIPRED representatives participated in a voluntary visitor program on managing drug abuse prevention programs; 10) one IVP on the Financial Intelligence Unit; 11) two U.S. speakers on drugs in the workplace and drug courts; 12) INL-funded support of the police to provide equipment for counternarcotics operations; 13) two IVPs on drug prevention and drug prosecution; 14) a series of radio programs on drug prevention recorded and distributed to more than 80 radio stations; 15) continued discussions towards updating the 1900 U.S./Chile extradition treaty; 16) three USCG resident courses on maritime law enforcement and security.

**The Road Ahead.** In 2005, the U.S. Government will continue to support Chilean efforts to combat the narcotics-related problems listed above. The U.S. plans to continue to provide capacity-building assistance to the on-going criminal justice system reform. Efforts to enhance the counternarcotics capabilities of both the Carabineros and the Investigations Police pursuant to the Letter of Agreement will also continue.

**Colombia**

**I. Summary**

Despite impressive progress against narcotics trafficking during 2004, Colombia remains a major drug producing country. The country's Public Security Forces prevented hundreds of tons of illicit drugs from reaching the world market through interdiction, spraying of coca and poppy crops, and manual eradication. A record 178 metric tons of cocaine were captured through the efforts of Colombia's police and military forces. The U.S.-supported Anti-Narcotics Police Directorate (DIRAN) sprayed a record 136,555 hectares of coca and 3,060 hectares of opium poppy during the year. Manual eradication accounted for the destruction of an additional 10,991 hectares of coca and 1,497 hectares of opium poppy. Colombia's military forces are beginning the second year of "Plan Patriota," a major offensive in the former demilitarized zone ("zona de despeje"), the heart of territory historically controlled by the Revolutionary Armed Forces of Colombia (FARC). The FARC continues to use the drug trade as its major financing source. The paramilitary United Self Defense Forces (AUC), also largely financed by the drug trade, continues to challenge the FARC for control of key coca and poppy cultivation areas throughout the country, in spite of also being involved in an ongoing peace process with the Colombian Government. The AUC reached an agreement with the government to demobilize its fighters (estimated by the AUC itself to be 20,000) by December 2005. Thus far over 4,600 AUC militants have demobilized. Colombia is a party to the 1988 UN Drug Convention.

**II. Status of Country**

Colombia is the source of over 90 percent of the cocaine and 50 percent of the heroin entering the U.S. It is also a leading user of precursor chemicals and the focus of significant money laundering activity. Developed infrastructure like ports on both the Pacific and the Atlantic and the Pan American Highway, provide the narcotics terrorists with many options. The normal problems associated with the narcotics trafficking are compounded in Colombia by the presence of various illegal armed groups that are fighting with the government and involved in narcotics trafficking. These groups include the Revolutionary Armed Forces of Colombia (FARC), the United Self Defense Forces of Colombia (AUC), and, to a lesser extent, the National Liberation Army (ELN). They control areas within Colombia with high concentrations of coca and opium poppy cultivation, and their involvement in narcotics is a major source of violence and terrorism in Colombia. Drug use in Colombia is increasing and Colombia has a very active demand reduction program. The judicial system is transitioning to an oral accusatorial system, in which the roles and responsibilities of the judges, prosecutors, and criminal investigators are changed. A criminal case has a confidential investigatory stage where evidence is collected and then a charging and trial stage by the judge and an oral public trial with witnesses is conducted. To date, as the transition has begun in Bogota and

000579

three other municipal regions, the new system has proven to be efficient and effective. A total of 10,727 prosecutors, judges and criminal investigators received intensive training in the new accusatory system by the end of 2004. The system is expected to be nationwide by 2008.

### III. Country Actions Against Drugs in 2004

**Policy Initiatives.** In 2004, President Uribe initiated a program to give land expropriated from narcotics traffickers to landless campesinos (peasants). In a September press conference, President Uribe announced that asset seizure and forfeiture would be applied to small farms as well as large ones. Since the announcement, the police and courts have taken preliminary steps to implement the process as a deterrent to growing illicit crops and as a complement to government eradication programs.

**Demand Reduction.** The Colombian government lacks a national Demand Reduction Strategy. The Ministry of Social Protection is currently conducting a comprehensive survey of school age drug use, funded by the Organization of American States, the results of which will be announced by the end of March 2005. The OAS will then work with the Government of Colombia (GOC) to develop a national Demand Reduction Strategy. Meanwhile, the USG continues to work with various non-governmental organizations (NGOs) to prevent drug use.

**Culture of Lawfulness.** The USG continues to support respect for law and civic responsibility. The Culture of Lawfulness (COL) program currently teaches more than 6,000 ninth-grade students the importance of lawfulness in society and is developing a curriculum for integration into various Colombian National Police (CNP) training programs. The U.S. National Strategy Information Center (NSIC) develops curricula and implements the program with funding from a grant from the Narcotics Affairs Section (NAS) of the U.S. Embassy in Bogota. This program receives active support from the highest levels of the GOC, including President Uribe. In 2004, the COL program expanded beyond its initial trial schools in Bogota and Medellin to include other major cities.

**Port Security.** The USG is party to a three-way agreement with the DIRAN and private seaport operators. DIRAN provides police to work with port officials to prevent narcotics from being exported. The port authorities work to improve their own security and fund the DIRAN units, and the USG provides coordination, technical assistance, and training. During 2004, over 1.26 metric tons of narcotics were captured in the four principal Colombian ports. The USG works separately with DIRAN and Airport Police to prevent Colombia's international airports from being used as export points for drugs. In 2004, U.S. Customs provided scanners that were installed at major airports to check incoming baggage for contraband.

Elements of Colombia's private sector are active participants in a Business Anti-Smuggling Coalition (BASC) program, an initiative of the U.S. Department of Homeland Security. This program seeks to increase the effectiveness of law enforcement offices by enhancing private sector security programs in their efforts to deter narcotics smuggling in commercial cargo shipments and conveyances. Hundreds of Colombian companies, organized into BASC chapters, participate in the program to eliminate the infiltration of drugs into legitimate commercial shipments to U.S. markets.

**Environmental Safeguards.** Since 2001, the DIRAN has processed approximately 5,500 complaints of crop damage by spray planes. Some 2,725 complaints were processed in 2004 alone. Since the complaints tracking program began in 2001, 12 complaints of accidental spraying food crops or pastureland have been verified and compensation paid, with four more claims in the process of completion. To date, the program has paid less than U.S. $20,000 in total compensation for damaged crops.

Regarding claims of health damage, during the past 10 years there has not been a single case verified by the Colombian National Institute of Health of adverse health effects from the aerial spray program. The spray program follows all laws and regulations of the Colombian Environmental Management Plan. The program has also been favorably reviewed by the U.S. Environmental Protection Agency.


**Extradition and Mutual Legal Assistance.** The number of drug-related extraditions from Colombia to the United States has increased significantly over the years. So far in President Uribe's administration, extraditions have increased dramatically with 173 Colombian nationals and 8 non-nationals extradited (total: 181 extraditions) by the end of 2004.

On December 3, Colombia extradited Gilberto Rodriguez Orejuela to the United States. Rodriguez Orejuela was the head of the Cali Cartel and is one of the most important drug trafficking figures ever extradited from Colombia to the United States. . On December 31, 2004, Colombia extradited FARC leader Juvenal Ovidio Ricardo Palmera Pineda, alias "Simon Trinidad," to the U.S. on drug trafficking and terrorism charges.

There is no bilateral mutual legal assistance treaty between the U.S. and Colombia, but the two countries rely on mutual legal assistance provisions in multi-lateral agreements and conventions, such as the OAS Convention on Mutual Legal Assistance, to effectuate cooperation. During 2004, 75 mutual legal assistance requests were submitted and over 35 responses have been received.

**Demobilization.** During President Uribe's administration, over 4,600 militants belonging to illegal armed groups have demobilized, individually or collectively, including AUC leader Salvatore Mancuso. Mancuso is wanted in the United States on narcotics trafficking charges. The Colombian government presently does not have an established mechanism to prosecute demobilized AUC members accused of drug trafficking or other serious crimes, such as murder or kidnapping. However, legislation has been introduced in the Colombian Congress to rectify this gap.

**Public Security.** During 2004, the Colombian government finished establishing a police presence in the 158 municipalities that had not had public security at the beginning of the Uribe Administration. There are now police in every one of the 1098 municipalities in the country, helping to close down illegally armed groups' mobility corridors. Entire FARC fronts have reportedly been forced to live off the land, thereby contributing to their increasing desertion rates—which for the FARC are up by one third. Other security indicators were very positive in 2004: homicides down by 15 percent, massacres down by 48 percent, kidnapping down by 35 percent, overall terrorist attacks down by 42 percent, the number of Internally Displaced Persons down by 41 percent.

**Law Enforcement Efforts.** The DIRAN broke all interdiction records in 2004, with over 75 metric tons of processed cocaine (HCl) and coca base seized and 150 HCl laboratories destroyed. In addition, combined public forces (Army, Navy, Air Force, and Police) seized a total of 178 metric tons of cocaine HCl/coca base and destroyed 200 HCl laboratories. DIRAN also conducted numerous joint operations with the Colombian military against high-value narcotics terrorist targets.

The CNP's Carbineros (EMCAR) reported impressive final results for CY2004. Last year, EMCAR Squadrons captured 275 narcotics trafficking and 1,639 guerrillas (815 FARC/ELN & 824 AUC). The squadrons also captured 3,127 common criminals. They seized 1,655 weapons, 8.47 metric tons of coca base, 46,600 gallons of liquid precursors and 142.5 metric tons of solid precursors. Overall, EMCAR Squadrons and the new Municipio CNP units were largely responsible for the significant improvement in public security throughout rural Colombia.

**Kingpin or "Cabecillas" Group.** In August, the DIRAN established a permanent Task Force to target the "Cabecillas," or the leadership of the narcotics terrorist organizations. Special police teams have been assigned to gather intelligence against some 300 Cabecillas, and the DIRAN created an intelligence fusion center to analyze intelligence and participate in operational planning. Since the group was formed, four special operations have been conducted, resulting in the capture of nine leadership targets.

**Operations "Mapale" I and II.** DIRAN worked closely with the Colombian Navy (COLNAV), the Colombian Marines (COLMAR), Colombian Air Force (COLAF), and the U.S. Drug Enforcement Administration (DEA) in two major operations executed in Colombia's southwest Pacific coast area. Operations Mapale I and Mapale II were conducted against both FARC and AUC narcotics trafficking infrastructure and base camps, in order to disrupt and dismantle cocaine and heroin laboratories associated with these organizations, as well as against the Norte del Valle Cartel (NVC) operating near the Pacific Coast of Colombia.

 

These operations destroyed 21 HCL/base labs, seized 12 metric tons of coca paste, 27 metric tons of coca leaves, 7 speedboats, and 150 metric tons of precursor chemicals.

**High-Value Targets.** On January 2, 2004, Juvenal Ovidio Ricardo Palmera, alias "Simon Trinidad," commander of the FARC Caribbean Front and a member of the FARC senior command, was captured in Ecuador and deported to Colombia. Simon Trinidad, the most senior FARC commander ever captured, was extradited to the United States on December 31st.

On February 10, Omaira Rojas Cabrera alias "Anayibe Rojas Valderrama", alias "Sonia," the chief of finances for the FARC Southern Bloc, was captured in a U.S.-supported dawn air assault. The extradition request for "Sonia" is pending before the Colombian Supreme Court.

**Corruption.** The GOC does not encourage or facilitate illicit production or distribution of narcotic or psychotropic drugs or other controlled substances or related money laundering. The GOC has enacted appropriate legislation to combat money laundering and related illegal financial flows associated with narcotics trafficking, and established a unit made up of officials of the Ministries of Justice and Finance that tracks the illegal flow of money. Allegations of corruption within the Office of the Prosecutor General (Fiscalia) are now being vigorously pursued by a special internal commission (an inspector general-like unit).

Corruption is more a problem in regional departments than at a national level. A specialized Anti-Corruption Task Force Unit has been established to investigate and prosecute public corruption crimes. Corruption clearly plays a major role in the continued diversion of precursor chemicals. Rogue Colombian policemen allegedly collaborate, and on occasion they have been implicated in the illicit importation, transportation, and/or diversion of controlled chemicals (see separate section on Chemical Control). Colombia is party to the Inter-American Convention Against Corruption. Colombia has also signed and is in the process of ratifying the UN Convention Against Corruption.

**Agreements and Treaties.** Colombia is a party to the 1988 UN Drug Convention, and the GOC's national counternarcotics plan of 1998 meets the strategic plan requirements of that convention. Recent reforms have generally brought the GOC into line with the other requirements of the convention. In September 2000, Colombia and the United States signed an agreement formally establishing the Bilateral Narcotics Control Program. This effort provides the framework for specific counternarcotics project agreements with the various Colombian implementing agencies.

Colombia and the U.S. are signatories to the OAS Convention on Mutual Legal Assistance. The GOC and the USG are also parties to a Maritime Shipboarding Agreement signed in 1997, providing faster approval for shipboarding in international waters and setting guidelines for improved counternarcotics cooperation with the Colombian Navy and the U.S. Coast Guard.

In August of 2004, Colombia became a party to the UN Convention against Transnational Organized Crime, along with the protocol on trafficking in persons.

**Cocaine.** Based on the most recent CNC cultivation estimates, along with the DEA coca yield and laboratory efficiency data, Colombia had the potential to produce 460 Metric Tons (MT) of 100 percent pure cocaine base/HCl from locally grown coca plants. This was a 21 percent decrease from the previous year. Based on average purities of bulk seizures in the United States, this equates to approximately 560 metric tons of "export quality" cocaine HCl.

**Heroin.** According to the latest USG estimates based on new opium yield data, Colombia had the potential to produce 7.8 metric tons of 100 percent pure heroin. Based on average purities of bulk seizures in the United States, this equates to approximately 10 metric tons of "export quality" heroin.

**Synthetic Drugs.** The availability and consumption of Ecstasy in Colombia are steadily rising. The majority of Ecstasy found in Colombia is brought from Europe in powder form and locally pressed into pills. There has been no evidence of Ecstasy being smuggled from Colombia to the United States, and it is believed that most—if not all—is for local consumption. Actual Colombian production of Ecstasy is believed to be very limited, as only two laboratories have been discovered



to date. The Colombian National Police have active investigations into Ecstasy trafficking organizations, and take part in the multi-national program against synthetic drugs, Operation Aquarius.

**Drug Flow/Transit.** Cocaine is transported by road, river and small civilian aircraft from the Colombian Source Zone to the Colombian Transit Zone north and west of the Andes Mountains. Primary transportation nodes include the larger airports, clandestine airstrips, and seaports from which small go-fast type vessels can transport cocaine. A smaller, but growing cocaine smuggling method is to use small civilian aircraft from clandestine airstrips in eastern and southeastern Colombia to fly cocaine to Brazil, Suriname, or Guyana. From these countries the cocaine is either consumed locally, as in Brazil, or transferred to maritime vessels for shipment to the United States or Europe.

Colombia's coastal regions are major transshipment points for bulk maritime shipments of cocaine and marijuana. The vast majority of the drugs shipped from the coastal regions originate from production areas in the south central portion of the country as well as other less prolific growing areas in the northern third of Colombia. Most shipments are organized by well-established trafficking organizations, which are based in Cali, Medellin, Bogota, and elsewhere.

Go-fast boats are then regularly used to on/off-load drugs onto fishing vessels or other "mother" ships at sea. Go-fast boats also transport drugs to Central American and Caribbean transshipment countries, using refueling ships to extend their range. Fishing vessels and commercial cargo ships continue to be used to transport large quantities of drugs via both Atlantic and Pacific routes. Fishing vessels usually travel to Mexico or other transshipment countries, while cargo ships can go directly to the United States or Europe. The drugs are hidden in container cargo, bulk cargo, or hidden compartments built into ships.

Cocaine is also transported from Colombia to the United States and other countries via commercial air cargo or concealed aboard commercial aircraft. The use of "mules" (couriers) traveling as passengers on commercial airlines is frequent, though the quantities of cocaine transported in this manner are relatively small.

Heroin is often concealed in the lining of clothing or secreted within the lining of luggage. There is also ingestion by airline passengers, or "swallowers." The CNP/Airport Interdiction Group has experienced great success in identifying and arresting "swallowers" at the international airports in Bogota, Cali, and Medellin. There are also significant quantities of heroin being shipped from Colombia's Pacific Coast, particularly from Buenaventura. There are increasing instances of heroin shipments being combined with cocaine shipments on go-fast boats departing from the Atlantic coast.

Colombian heroin transportation organizations use trafficking routes through Venezuela, Argentina, Ecuador, Panama, and Mexico to move heroin to the United States. In many cases, couriers depart from Colombia through the international airports in Bogota, Medellin, Cali, and to a lesser extent, Barranquilla, and then transit one or more countries before arriving in Mexico. From Mexico, the heroin is typically transported across the border into the United States and transported by courier to its final destination.

## IV. U.S. Policy Initiatives and Programs

**U.S. Policy Initiatives.** The U.S.-supported aerial eradication spray program had another banner year. Some 136,133 hectares of coca and 3060 hectares of poppy were sprayed by the DIRAN during 2004, surpassing last year's record numbers. Closer intelligence coordination and more intensive utilization of the Colombian Army's (COLAR) U.S.-supported Counternarcotics Brigade, which provides on-the-ground security for eradication operations has resulted in a dramatic reduction in the number of hostile fire impacts on our spray aircraft. In addition to enhancing security, this measure has helped to sustain the operational tempo of eradication operations by reducing time lost to repair damaged aircraft. During the year only one spray aircraft was lost, with no fatalities.


The USG constructed a satellite imagery laboratory and trained counternarcotics police to operate the equipment and analyze data collected to improve coca field detection and mapping. This facility, in conjunction with the intelligence fusion center, has greatly increased the ability of the counternarcotics police to locate illicit crops.

The Plan Colombia Helicopter Program (PCHP), consisting of UH-1N, UH-1H II, UH-60, and K-MAX helicopters, continued to provide dedicated support to the Counternarcotics Brigade and, when available, provided other support to human rights-certified COLMIL and Public Security Forces. In 2004, PCHP aircraft flew 19,600 hours, carried 30,110 passengers, transported 2,148,389 pounds of cargo and conducted 110 medical evacuation missions for both military and civilian personnel. This year the program lost one UH-1H II and suffered extensive damage to a UH-1N. Operational highlights include participation in four high value target (Cabecilla) missions, including one resulting in the capture of Omaira Rojas Cabrera, alias "Sonia." In April 2004, the Embassy's country team developed a nationalization plan. The plan laid out an aggressive timeline for the completion of both pilot and maintenance personnel training. The plan's objectives were met for 2004, and the majority of resources are in place to meet 2005 objectives.

U.S. Customs and Border Protection provides training and technical assistance to improve the ability of border control agencies in Colombia to combat money laundering, contraband smuggling and commercial fraud. Several Customs disciplines support the national effort in the region through Plan Colombia. To date $1.3 million in training and technical assistance has been provided through the program.

The USG supports DIRAN's aviation unit (ARAVI), comprised of 20 fixed-wing and 62 rotary-wing aircraft. In addition to counternarcotics missions, ARAVI has, with Embassy approval, used USG-supported assets for humanitarian missions, targeted intelligence gathering, antiterrorism, antikidnapping, and public order missions. The USG also helped ARAVI reach an agreement with the Colombian Air Force (COLAF) to train ARAVI pilots at the Bogotá-based COLAF simulator, thereby eliminating the need to send ARAVI pilots to the United States for instrument training. The USG has initiated in-country high-altitude training for ARAVI and has worked with ARAVI to explore possibly reintroducing the use of night vision goggles in 2005.

The Air Bridge Denial (ABD) program completed 16 months of operations. ABD operations in 2004 contributed to the destruction of thirteen aircraft, the capture of three aircraft in Colombia and eight others in Central America, and the seizure of almost three metric tons of cocaine.

USG and GOC joint efforts are having a major impact on illicit agriculture. To encourage farmers to abandon the production of drug crops, INL funding apportioned to USAID has supported the cultivation of over 60,000 hectares of legal crops and completed 874 social and productive infrastructure projects. More than 50,000 families in 17 Departments have benefited from these programs.

In addition to combating drug production and trafficking, INL funding apportioned to USAID is assisting Colombians in areas that have been most ravaged by the drug trade. For example, the USG has improved the delivery of public services in 35 municipalities, including the delivery of potable water and sewage treatment. To date, the USG has provided non-emergency support for over two million Colombians internally displaced by narcotics terrorism, including aid for over 2,000 former child soldiers. A total of seven peaceful-coexistence centers have been created in small municipalities to provide onsite administrative and legal assistance, educational opportunities, and a neutral space for community meetings, discussions, and events. Additionally, the GOC's presence in rural areas was expanded by the creation of 37 Justice Houses, which offer access to justice and peaceful conflict resolution.

The USG has entered into an agreement with the GOC to provide a laboratory for soil and water analysis in support of the aerial spray program. NAS has also entered into a similar agreement with the Colombian National Institute of Health on a laboratory for blood and urine analysis in support of public health monitoring for potential chemical poisoning from agricultural chemicals.

The USG, through the Justice Sector Reform Program and rule of law assistance, is helping in the



reform and strengthening the criminal justice system in Colombia. DOJ and USAID have provided training, technical assistance, and equipment to enhance the capacity and capabilities of the Colombian system and to make it more transparent to the public at large.

**The Road Ahead.** The GOC, with substantial USG support, has had significant successes since its Plan Colombia was instituted in late 1999. If the effort is sustained and assistance bolstered for the next few years, the trend of decreased cultivation and increased interdictions will continue. That, combined with the improving governance and decreasing criminality, and general economic and developmental improvement, should cripple the illicit drug producing industry and reduce the flow of drugs into the U.S. and diminish the power and influence of narcotics trafficking organizations.

Colombia, bravely led by President Alvaro Uribe, has demonstrated the political will to deal with the scourge of narcotics terrorism. Success in Colombia will increasingly hinge on maintaining the political will, combined with USG assistance, to solidify the gains already made and to lock in long-term results. The benefits of our efforts in Colombia are not limited to law enforcement and counternarcotics successes. Democracy, economic stability, respect for the rule of law and human rights, and security have all been enhanced by Colombian and U.S. counternarcotics programs in Colombia.

***Colombia Statistics***
***(1995–2004)***

|  | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |
|---|---|---|---|---|---|---|---|---|---|
| **Coca** | | | | | | | | | |
| Potential Harvest (ha) | — | 113,850 | 144,450 | 169,800 | 136,200 | 122,500 | 101,800 | 79,500 | 67,200 |
| Eradication (ha) | 136,555 | 132,817 | 122,695 | 84,251 | 47,371 | 43,246 | — | 19,000 | 5,600 |
| Estimated Cultivation (ha) | — | 246,667 | 267,145 | 254,051 | 183,571 | 167,746 | — | 98,500 | 72,800 |
| HCl: Potential (mt) | — | 460 | 571 | 839 | 580 | 520 | 435 | 350 | 300 |
| **Opium** | | | | | | | | | |
| Potential Harvest (ha) | — | — | — | 6,500 | 7,500 | 7,500 | 6,100 | 6,600 | 6,300 |
| Eradication (ha) | 3,060 | — | 3,371 | 2,583 | 9,254 | — | — | 6,972 | 6,028 |
| Estimated Cultivation (ha) | — | — | TBD | 9,083 | — | — | — | 13,572 | 12,328 |
| **Cannabis** | | | | | | | | | |
| Potential Harvest (ha) | 5000 | 5000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Eradication (ha) | — | — | — | — | — | — | — | — | — |
| Estimated Cultivation (ha) | 5000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Potential Yield (mt) | 4,000 | 4,150 | 4,150 | 4,150 | 4,150 | 4,150 | 4,150 | 4,150 | 4,150 |




| Seizures | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Heroin (mt) | .687 | 0.5 | 0.77 | 0.78 | 0.572 | 0.504 | 0.317 | 0.261 | 0.183 |
| Opium (mt) | .835 | — | 0.11 | 0.002 | — | 0.183 | 0.100 | 0.120 | 0.036 |
| Cannabis (mt) | — | 126.1 | 76.9 | 36.6 | 46 | 65 | 69 | 136 | 235 |
| Base/Basuco (mt) | 28.3 | 31.1 | 30 | 26.70 | — | 9.00 | 29.30 | 10.00 | 17.50 |
| Cocaine HCl (mt) | 138.6 | 114.0 | 94 | 57.30 | 69.00 | 22.73 | 54.70 | 34.00 | 23.50 |
| Total HCl/Base (mt) | 164.9 | 145.1 | 124 | 80.00 | 69.00 | 31.73 | 84.00 | 44.00 | 41.00 |
| Total Arrests | 63,791 | — | 15,868 | 15,367 | 8,600 | — | 1,961 | 1,546 | 1,561 |

## Ecuador

### I. Summary

Sharing porous borders and a contiguous seacoast with Colombia and Peru, Ecuador is a major transit country for illicit drugs and chemicals. The violent conflict in Colombia complicates drug interdiction on Ecuador's northern border but drug seizures in the northern border area increased in 2004 thanks to improved police and military activity. Most drugs leave Ecuador by sea. Ecuadorian authorities are seeking to improve port cargo inspections. Three of Ecuador's public ports met ISPS standards on time. The use of advanced inspection technology increased in 2004. Cocaine seizures through November 2004 were at levels substantially below those of 2003, while seizures of heroin and precursor chemicals continued at a high level. Uneven implementation of the new criminal procedures code, a faulty judicial system and conflicting laws hamper prosecutions. The USG provides equipment, infrastructure and training to help improve counternarcotics performance.

Ecuador is a party to and has enacted legislation to implement the provisions of the 1988 UN Drug Convention.

### II. Status of Country

Weak public institutions, widespread corruption and a poorly regulated financial system make Ecuador vulnerable to organized crime. Border controls of persons and goods are undependable. Much of the population lives in poverty. Scanty government presence in a large portion of the country contributes to lawlessness. The National Police (ENP) and military forces are inadequately equipped and trained.

There is no evidence that significant illicit crops or drugs are produced in Ecuador. However, coca base, cocaine hydrochloride and heroin from Colombia and Peru are distributed internationally through Ecuador's sea and airports in volumes ranging from a few hundred grams to multi-ton loads. Detected shipments of drugs via international mail and messenger services continued to increase in 2004. The USG is helping the Government of Ecuador (GOE) to strengthen the rule of law and to improve civil security.

### III. Country Actions Against Drugs in 2004

Ecuadorian laws implementing the 1988 UN Drug Convention include criminalization of the production, transport, and sale of controlled narcotic substances; the import, transport and/or use of precursor chemicals without an appropriate permit from the Ecuadorian National Drug Council (CONSEP); any attempt to conceal the profits from narcotics trafficking activities; the intimidation or corruption of judicial and public authorities in respect to drug crimes; and illicit association related to drug trafficking and profiteering.



# EXHIBIT
# D-5



SEARCH enter keyw

Advanced S

Español | Français | Русский | عربي | 中文 | سى .

K5

You Are In: USINFO > Regions > Americas > Andean Region > Colombia

## Leader of Colombian Cocaine Ring Extradited to United States

### Jairo Aparicio Lenis faces racketeering, drug charges, U.S. Justice Dept. says

The leader of the North Valle Cartel, one of Colombia's most powerful cocaine trafficking rings, has been extradited by Colombia to the United States where he faces racketeering and drug charges, the U.S. Department of Justice announced.

In an October 21 press release, the Justice Department said Jairo Aparicio Lenis arrived in Florida the previous day. He has been charged by a federal grand jury along with eight other leaders of the Norte Valle Cartel with violations of the U.S. Racketeer Influenced and Corrupt Organizations Act and with distributing cocaine, knowing and intending that it would be imported unlawfully into the United States.

The Justice Department said the Norte Valle Cartel operated in the Norte Valle del Cauca region of Colombia, the cities of Cali and Buenaventura, Colombia, and in Mexico and the United States.

U.S. Attorney General Alberto Gonzales said the extradition of Aparicio "demonstrates the commitment of the United States and Colombia to work together to end the flow of illegal drugs. Together with our allies abroad, we will continue pursuing those who would bring illegal drugs into this country, regardless of where they may be."

The following is the text of the press release:

FOR IMMEDIATE RELEASE
FRIDAY, OCTOBER 21, 2005
(202) 514-2008

WWW.USDOJ.GOV
TDD (202) 514-1888

DEFENDANT IN COLOMBIAN NORTE VALLE DRUG CARTEL

EXTRADITED TO THE UNITED STATES

WASHINGTON, D.C. -- A leader of the North Valle Cartel, one of Colombia's most powerful cocaine trafficking organizations, has been extradited by Colombia to the United States to face racketeering and drug charges, the Department of Justice announced today.

Jairo Aparicio-Lenis arrived in Florida yesterday and was transferred to Washington, D.C., where he has been charged by a federal grand jury along with eight other leaders of the Norte Valle Cartel.  The April 29, 2004 indictment charges the cartel leaders with violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) and with distributing cocaine knowing and intending that it would be unlawfully imported into the United States.

Aparicio-Lenis is scheduled to make an initial appearance today before U.S. Magistrate Judge Deborah Robinson at 1:30 P.M. at U.S. District Court in the District of Columbia.

"The extradition of Jairo Aparicio-Lenis demonstrates the commitment of the United States and Colombia to work together to end the flow of illegal drugs," said Attorney General Alberto R. Gonzales.  "Together with our allies abroad, we will continue pursuing those who would bring illegal drugs into this country, regardless of where they may be."

According to the indictment, Aparicio-Lenis was a member of the Norte Valle Cartel, responsible for laundering the cartel's cocaine proceeds.  The cartel operated in the Norte Valle del Cauca region of Colombia, the cities of Cali and Buenaventura, Colombia, as well as Mexico and the United States.  Between 1990 and the present, the cartel allegedly exported more than 1.2 million pounds of cocaine -- worth over $10 billion -- from the Pacific coast of Colombia through Mexico to the United States.  The Norte Valle Cartel conducted financial transactions which laundered millions of dollars in drug proceeds.

The Norte Valle Cartel allegedly used brutality and violence to further its goals.  Members of the cartel used murder as an accepted practice to eliminate rival drug traffickers, buyers who failed to pay for cocaine, and cartel members whose loyalty was suspect.  In order to protect its distribution routes and cocaine laboratories, the cartel employed the services of the Autodefenses Unidas de Colombia (AUC), an illegal armed group in Colombia that has been listed as a Foreign Terrorist Organization by the U.S. State Department.  The cartel also relied on the AUC to provide personal protection for cartel members and associates.

"Today's extradition of Jairo Aparicio-Lenis is another crippling

blow to the Norte Valle Cartel, ending its reign of terror, fear, drug trafficking and violence," said DEA Administrator Karen P. Tandy. "As one of the cartel's chief money launderers, Aparicio-Lenis enabled the cartel to flourish with millions of dollars in blood money with which to carry out its deadly destruction. Now, through his extradition, he will face justice on American soil."

The indictment alleges that the Norte Valle Cartel bribed and corrupted Colombian legislators. Cartel members knowingly engaged in courses of illegal conduct designed to hinder honest government in order to protect cocaine shipments, to prevent the arrest and prosecution of Cartel members, and to block legislation in Colombia permitting the extradition of narcotics traffickers to the United States for prosecution.

If convicted, Aparicio-Lenis faces a maximum sentence of up to life imprisonment on the cocaine-importation charges and 20 years in prison for the RICO charge.

This RICO case is the result of cooperation among U.S. Attorneys' Offices nationwide -- including the Southern District of New York, the Eastern District of New York, and the Southern District of Florida -- and the Justice Department's Narcotic and Dangerous Drug Section (NDDS) of the Criminal Division. The investigation that led to the indictment was the product of extensive cooperation between Colombian law enforcement authorities and the Drug Enforcement Administration, the Federal Bureau of Investigation, U.S. Immigration and Customs Enforcement (ICE) at the Department of Homeland Security, and the Internal Revenue Service, acting under the Organized Crime Drug Enforcement Task Force (OCDETF).

The charges contained in the indictment are merely accusations, and the defendant is presumed innocent unless and until proven guilty.

Created: 21 Oct 2005 Updated: 21 Oct 2005

Page Tools: ⌨ Printer friendly version    ⌧ E-mail this article

⌂ BACK TO TOP

USINFO delivers information about current U.S. foreign policy and about American life and culture. This site is produced and maintained by the U.S. Department of State's Bureau of International Information Programs. Links to other Internet sites should not be construed as an endorsement of the views contained therein.

HOME | WHAT'S NEW | ABOUT USINFO | SITE INDEX | CONTACT US | PRIVACY
TOPICS | REGIONS | RESOURCE TOOLS | PRODUCTS

