

# EXHIBIT
# D-7

**Previous**

**TABLE OF CONTENTS**

# Colombia

# The Paramilitaries in Medellín: Demobilization or Legalization?

## INTRODUCTION

On 25 November 2003 television viewers in Colombia watched as over 860 paramilitaries belonging to Medellín's Cacique Nutibara Bloc (*Bloque Cacique Nutibara*, BCN), laid down their arms in a highly-staged ceremony in front of Colombian and foreign dignitaries. The apparent neutralization of the BCN appeared to vindicate the government's decision to officially begin talks with the Self-Defence Forces of Colombia (*Autodefensas Unidas de Colombie*, AUC), to which most paramilitary groups belong, including the BCN, following the announcement of the AUC's unilateral ceasefire in December 2002.

The Medellín ceremony marked the first of a series of large-scale demobilizations of AUC-linked paramilitary groups around the country. Through these demobilizations, the government has claimed that more than 8,000 paramilitaries – out of a total of 10,000-20,000, *depending on the source quoted – have thus far been removed from the conflict, and that all remaining paramilitary combatants will be demobilized by the end of 2005.*

All parties to Colombia's 40-year-old armed conflict – the security forces, army-backed paramilitaries and guerrilla groups – have committed serious human rights abuses and shown a blatant disregard for international humanitarian law. But in recent years most killings, "disappearances", and cases of forced displacement and torture have been and are still attributed to paramilitary groups.(1) Terror tactics are routinely employed to break perceived or imagined links between civilian communities and guerrilla groups and to silence those campaigning for socio-economic rights or justice in cases of human rights violations.

Although Amnesty International has repeatedly called on successive Colombian governments to disband such groups and break the links that exist between them and the security forces, any demobilization process must not disregard international norms on the right of victims to truth, justice and reparation, nor introduce mechanisms that could guarantee impunity for human rights abusers. Any demobilization of members of illegal armed groups must also ensure that combatants are effectively removed from the conflict and not simply "recycled" or "redefined" into new armed, yet legal, structures. Amnesty International believes that the current paramilitary "demobilization" process – and the Justice and Peace Law approved by Congress on 21 June 2005 to regulate the process – disregards these fundamental principles.

To assess whether the paramilitaries have truly demobilized and paramilitary structures dismantled, and whether international norms of truth, justice and reparation are being applied in the demobilization process, Amnesty International visited Medellín, Colombia's second city and the capital of the department of Antioquia, on four occasions – in November 2003, April and October 2004, and February 2005. Medellín was chosen as a case study because the BCN demobilization process was much earlier – November 2003 – than those that are currently taking place in other parts of the country, which did not begin until the end of 2004. This makes the effectiveness and legitimacy of the BCN demobilization easier to gauge.

During these visits, Amnesty International held interviews with a range of individuals, organizations and institutions, including Vice-president Francisco Santos; Sergio Caramagna, head of the OAS Mission to Support the Peace Process in Colombia (*Misión de Apoyo al Proceso de Paz en Colombia*, MAPP-OEA); the Office of the Colombian government's High Commissioner for Peace (*Alto Comisionado para la Paz*); the Office in Colombia of the UN High Commissioner for Human Rights; the Office of the Procurator General (*Procuraduría General de la Nación*); the Human Rights Ombudsman (*Defensor del Pueblo*); human rights non-governmental organizations (NGOs); the police; and witnesses and victims of human rights violations. These *in situ* visits have enabled Amnesty International to closely track the paramilitary demobilization "experiment" in Medellín and therefore provide some useful pointers to the national paramilitary demobilization process itself. (2) Some of the names of those mentioned in the report have been changed in order to protect their identities.

Amnesty International reports and campaigns to end all human rights violations and breaches of international humanitarian law, regardless of the identity and affiliation of the perpetrators. Most Amnesty International reports and actions on Colombia highlight abuses committed by all the parties to the conflict – the Colombian security forces, the paramilitaries and guerrilla groups. Sometimes Amnesty International addresses particular actors.(3) Given the significance of the

000644

current paramilitary demobilization process on issues such as truth, justice and reparation, and on impunity, this report examines cases of abuses committed by the paramilitaries, acting either alone or in conjunction with the security forces. There is abundant evidence that other actors, including the guerrilla, are responsible for committing serious abuses against the civilian population. Amnesty International will continue to document these abuses, to condemn them, and to call for those responsible to be held accountable.

## 1: PARAMILITARISM: SELF-DEFENCE OR STRATEGY OF TERROR?

The systematic violation of human rights and international humanitarian law has been the tragic hallmark of Colombia's internal armed conflict. All sides have persistently demonstrated scant regard for the most fundamental principles of human rights and international humanitarian law. In the last 20 years, the conflict has cost the lives of at least 70,000 people, the vast majority of them civilians killed out of combat, while more than 3 million people have been internally-displaced since 1985, with more than 280,000 in 2004 alone. Tens of thousands of other civilians have been tortured, "disappeared" and kidnapped. The vast majority of non-combat politically-motivated killings, "disappearances", and cases of torture have been carried out by army-backed paramilitaries.

### The Guerrilla

The armed opposition groups – known in Colombia as guerrillas or insurgents – emerged in the 1950s, during *La Violencia*, a bloody virtual civil war which pitted Conservatives against Liberals. During this period, armed groups linked to the Liberal and Communist Parties were driven into remote parts of the country. These armed groups were the nucleus of what became the largest armed opposition movement of the past 50 years and which was consolidated in 1966 as the *Fuerzas Armadas Revolucionarias de Colombia* (FARC), Revolutionary Armed Forces of Colombia. The FARC have an estimated 20,000 combatants. The other main guerrilla group still in existence is the *Ejército de Liberación Nacional* (ELN), National Liberation Army, with an estimated 4,000 combatants.

The guerrillas created extensive strongholds in many rural areas where they effectively determined local government policies and exercised significant control over the local population. In addition to military targets, the guerrilla often attacked the rural estates of wealthy landowners; extortion and kidnapping became common practices. Since the 1990s, the FARC have increased attacks in urban areas, and civilians have increasingly borne the brunt of guerrilla attacks in these areas. They have been responsible for repeated and serious breaches of international humanitarian law, including kidnapping, hostage-taking and the killing of civilians. The FARC have also carried out disproportionate and indiscriminate attacks which have resulted in the death of numerous civilians. For its part, the ELN continues to be responsible for numerous kidnappings and the selective killings of civilians.

### The security forces' counter-insurgency strategy

The Colombian security forces have over time adopted a counter-insurgency strategy which has primarily focused on undermining what they perceive to be the civilian population's support for the guerrilla. This counter-insurgency strategy – honed in over 40 years of conflict with the guerrilla – frequently views civilians in conflict areas not as victims of guerrilla groups but as part of the enemy. This has led to the systematic abuse and stigmatization of groups deemed to be "sympathetic" to the guerrilla, such as human rights defenders, peasant farmer leaders, trade unionists and other social activists, and civilian communities living in areas with a guerrilla presence deemed to be of military or economic importance.

The use of armed civilians as auxiliary forces has been an integral part of this counter-insurgency strategy. In 1965, the government promulgated Decree 3398 – which became permanent with Law 48 in 1968 – which allowed the military to create groups of armed civilians to carry out joint counter-insurgency operations. These groups were often promoted as "self-defence" groups designed to protect local communities against the guerrillas. But their activities were broader – they joined counter-insurgency "search and destroy" operations in areas where the population was considered sympathetic towards the guerrillas.

The armed forces, particularly military intelligence, played an active role in coordinating and setting up paramilitary structures. A series of military operational manuals issued in the 1960s encouraged the creation of paramilitary structures. In 1969, the *Reglamento de EJC 3-10, Reservado, de 1969*, EJC-3 Order, Restricted, 1969, stated that the armed forces should organize "self-defence committees" which "are a military-type organization made up of civilian personnel in the combat zone, which are trained and equipped to undertake operations against guerrilla groups that threaten an area or to operate in coordination with combat troops".

Many local political and economic elites, particularly landowners and agro-industrialists, at best tolerated and at worst supported the creation of civilian "self-defence" groups by the army. The justification for this support was that such self-defence groups were needed to prevent the guerrilla from extorting local businesses – enforced through kidnapping – in areas where there was little or no armed state presence. In many areas, paramilitary structures were created by the army at the behest of and with financing from local landowners.

For decades, paramilitaries have often been used by landowners to remove peasants from land they wished to expropriate or develop. They have also proved useful to resolve labour conflicts, mainly through the use of terror against trade union,

000645

rural and community leaders. The relationship between the economic elites and paramilitaries often increased during periods of labour disputes. Paramilitaries were also used by local politicians to eliminate political opponents and to control social protest by targeting activists and peasant leaders. Their relationship with paramilitaries was brokered by the security forces which coordinated paramilitary activity and ensured that attacks could be framed in the context of the counter-insurgency strategy. Military intelligence reports and security force officials would often label these activists or their organizations as subversive in advance of paramilitary attacks.

**Security forces, landowners and drug-traffickers**

In the 1980s the promotion of paramilitary structures by the armed forces gained increasing support from local economic elites, including the traditional landed classes and drug-traffickers who were laundering drugs monies by acquiring land. Efforts by the government of President Belisario Betancur (1982-1986) to initiate peace talks with guerrilla groups in the mid-1980s heightened concern that any peace agreement would have entailed land and other socio-economic reforms. This dynamic strengthened the alliance between the traditional economic elites and the armed forces and spurred on the development of paramilitary structures under the coordination of the armed forces. Subsequently, drug-trafficking organizations joined this alliance. The armed forces could now count on significant economic support and human resources for the creation and promotion of paramilitary armies.

### Drug-trafficking

The cocaine trade emerged in the late 1970s and 1980s. Colombia accounts for most of the world's supply of cocaine. During those decades, two drug syndicates accounted for most of the country's trafficking in cocaine – the Medellín and Cali cartels. The cocaine trade penetrated the police, army, justice system, political parties, and civilian state bodies. The trade unleashed a bloodbath of violence, which affected all levels of society. The cartels employed a motley crew of hired guns to protect their business. These groups of *sicarios* (assassins) were the precursors to many of the paramilitary groups which emerged in the 1980s and 1990s. Drug-traffickers laundered their profits through a variety of means, including through the purchase of land. Many became well-known landowners and agro-industrialists. These "entrepreneurs" used hired guns, or the self-defence groups set up by the army – who often served as private enforcers for the drug-traffickers – to attack civilians suspected of assisting the guerrilla or who owned land coveted by drug barons. While drug-trafficking has invariably helped finance the parties to the conflict, it is not the root cause of the conflict, which precedes by many years the emergence of cocaine trafficking in Colombia.

In 1981, drug-traffickers created Death to Kidnappers (*Muerte a Secuestradores*, MAS), a death squad which sought to retaliate against the kidnapping by M-19 guerrillas of Martha Nieves Ochoa, whose brothers were members of the Medellín cartel. Pablo Escobar, head of the Medellín cartel, and Fidel Castaño Gil, who became a paramilitary leader in the 1980s, were linked to MAS. It provided the model for army-backed paramilitarism in later years. The MAS acronym was even adopted by the security forces to provide cover for paramilitary operations carried out by members of the armed forces in different parts of the country.

In the early 1980s, military units in the Magdalena Medio region of central Colombia pioneered a paramilitary strategy. The MAS became the name employed by the self-defence groups created by the Bárbula Battalion in Puerto Boyacá and other military units operating in the region. Disciplinary investigations by the Office of the Procurator General (*Procuraduría General de la Nación*)(4) established that the creation of the MAS was agreed in a meeting between members of the army and local cattle-ranchers on 6 August 1982 on the Sebastopol ranch in Puerto Olaya.(5) The Brigade XIV of the army, created in 1983 and with jurisdiction in the Magdalena Medio, became instrumental in the expansion of paramilitarism.

The Magdalena Medio paramilitary groups initially brought together the army, landowners, and local politicians. Many civilians were armed and, operating initially under the name of MAS, carried out a series of operations in close coordination with the security forces. These groups were responsible for widespread abuses, including killings and "disappearances". The MAS paramilitary structure subsequently began to be referred to as a "self-defence" group and provided a model for the creation of paramilitaries in other parts of the country. High-ranking military officers actively encouraged the replication of this paramilitary model in other parts of the country. An investigation by the Office of the Procurator General in 1983 concluded that 59 active members of the army and police, including the commander of the Bárbula Battalion and the second in command of the Bomboná Battalion, based in Puerto Berrío, participated in MAS. All were absolved of involvement by the military justice system.

By 1985, drug-traffickers, who had laundered funds by purchasing land in the Magdalena Medio region, began large-scale funding of the self-defence groups. By 1986, self-defence groups and death squads using the MAS and other names were operating in departments such as Antioquia, Boyacá, Caquetá, Córdoba, Cundinamarca, Meta, Putumayo and Santander.

In that year, according to the testimony of a leading paramilitary to judicial investigators, the Brigade XX of the army and the *Batallón de Inteligencia y Contrainteligencia "Brigadier General Charry Solano"*, Intelligence and Counter-intelligence Battalion "Brigadier General Charry Solano", organized a meeting to coordinate paramilitary structures – which were still technically legal – at the national level. At this meeting the *Junta Nacional de Autodefensa*, National Self-Defence Group Council, was set up to promote paramilitary groups and coordinate intelligence work with the army at the national level.

**Paramilitarism: a national phenomenon**

000646

Case 3:08-cv-00885-SI   Document 1-21   Filed 02/08/2008   Page 5 of 30

Colombia: The Paramilitaries in Medellín: Demobilization or Legalization?   Amnesty Int... Page 4 of 29

From small local groups intended to augment the military's capacity to protect farms and rural communities from guerrilla attack, by the late 1980s the paramilitary organizations had become powerful military structures capable of coordinated action throughout the country.

In 1989, in response to an increase in killings attributed to such self-defence groups, fears about the growing dangers of "narco-terrorism", and the assassination in August of that year of presidential candidate Luis Carlos Galán by paramilitaries linked to drug-traffickers, President Virgilio Barco suspended Decree 3398 and outlawed the use of armed civilians in army operations. He also promulgated Decree 1194 which criminalized the promotion, financing, and membership of paramilitary groups. But after a period of relative decline paramilitarism, backed by the security forces and financed by drug-traffickers and economic interests, continued to grow, largely due to the failure of successive governments to bring to justice high-ranking military officers responsible for sponsoring paramilitarism.

By the start of the 1990s, paramilitary groups, with a variety of names and organized along similar lines to the Puerto Boyacá self-defence groups, and linked to the army, drug-traffickers, landowners and local business and political figures, were active in many parts of the country. For example, Los Tangueros, one of the many paramilitary groups created and led by Fidel Castaño and his brothers Carlos and Vicente, and which operated initially in Córdoba Department, carried out many massacres of civilians across north-west Colombia.

### Examples of Paramilitary Massacres

**"Disappearance" of 19 tradespeople and La Rochela massacre:** On 18 October 1987, 19 tradespeople were abducted and "disappeared" by paramilitaries in Cimitarra, Santander Department. The "disappearances" were planned in the offices of the paramilitary organization *Asociación Campesina de Ganaderos del Magdalena* (ACDEGAM), Peasant Farmer Association of Cattle-Ranchers of Magdalena, under the orders of former General Farouk Yanine Díaz, then director of the Military Cadet School(6). On 18 January 1989, 12 members of a judicial commission investigating the "disappearance" were killed in La Rochela, department of Santander. The killings had reportedly been planned by ACDEGAM leaders, including Ramón Isaza (see below for biography of Ramón Isaza).(7)

**Honduras and La Negra:** On 4 March 1988, 21 workers at the Honduras and La Negra banana plantations near the town of Currulao in the Urabá region of Antioquia Department were killed by some 30 heavily-armed and masked men. Fidel Castaño and 11 other civilians were convicted *in absentia* in June 1991 and sentenced to 20 years imprisonment for their part in the Urabá massacre.

**Pueblo Bello:** On 14 January 1990, 60 paramilitaries entered the community of Pueblo Bello, municipality of Turbo, department of Antioquia, where they abducted 43 civilians. According to information presented to the Inter-American Commission on Human Rights (IACHR),(8) the paramilitaries passed unhindered through at least one military checkpoint in San Pedro de Urabá, Córdoba Department; two other army and police checkpoints were reportedly not operating on the night of the abductions. Those abducted were reportedly taken to the Santa Mónica farm in Córdoba Department, where they were tortured and killed. Fidel Castaño and nine other paramilitaries were sentenced *in absentia* to prison sentences of 12-30 years on 26 May 1997 for their part in the massacre. At the time of writing this report, only three paramilitaries had been detained and were in prison for their role in the massacre, although as many as 60 people were implicated.(9)

**Mapiripán:** Over 100 armed and uniformed paramilitaries occupied the remote village of Mapiripán, department of Meta, between 15 and 20 July 1997. During this time various witnesses, including the mayor of Mapiripán, confirmed that as many as 30 residents were abducted, tortured and killed by the paramilitaries. The paramilitaries painted slogans on the village walls identifying themselves as *Autodefensas Campesinas de Córdoba y Urabá* (ACCU), Córdoba and Urabá Self-Defence Groups, and the *Autodefensas Campesinas de Colombia* (ACC), Peasant Self-defence Groups of Colombia. Criminal investigations have implicated several paramilitaries and senior military commanders in the massacre.

**Naya:** Paramilitaries were reportedly responsible for the killing of at least 32 peasant farmers in the Alto Naya area of Buenos Aires and Timba municipalities on 11 April 2001. The paramilitaries apparently entered the area immediately after detachments of the army's Brigade III left the area. The *Bloque Calima*, which operated in the area where the massacre was committed, demobilized in December 2004.

**Bahía Portete:** On 18 April 2004, paramilitaries reportedly raided the indigenous community of Bahía Portete, in the department of La Guajira, whose inhabitants are members of the indigenous Wayúu people. They killed at least 12 people. They are reported to have tortured a number of adults before killing them. Several of the victims were dismembered. The paramilitaries also abducted several people, including three young girls. Their whereabouts, and whether they are dead or alive, remains unknown. More than 500 Wayúu sought refuge across the border in Venezuela.

Fidel Castaño and his brother Carlos were also instrumental in the creation of a death squad known as People Persecuted by Pablo Escobar (*Perseguidos por Pablo Escobar*, PEPES). The PEPES was formed in 1993 and financed in part by the Cali drug cartel and reportedly supported by sectors of the army, the police and the US Drugs Enforcement Agency (DEA). It waged a fierce and bloody campaign against Medellín drug baron Pablo Escobar, including the killing of his associates and lawyers. Pablo Escobar was killed in December 1993, following an operation reportedly carried out jointly by Colombian police and US agents.

000647

Case 3:08-cv-00885-SI    Document 1-21    Filed 02/08/2008    Page 6 of 30

Colombia: The Paramilitaries in Medellín: Demobilization or Legalization?    Amnesty Int... Page 5 of 29

Through the Córdoba and Urabá Self-Defence Groups (*Autodefensas Campesinas de Córdoba y Urabá*, ACCU), which they commanded, the Castaño brothers began efforts in 1994 to bring together disparate paramilitary groups operating in the north-west of Colombia. ACCU was set up with assistance from business, especially cattle ranchers and banana growers, and members of the now defunct Medellín drug cartel. ACCU operated in coordination with the army's Brigade XVII, based in Urabá, department of Antioquia, and other military units when it operated in areas outside the Brigade XVII's jurisdiction.

In 1997, Carlos and Vicente Castaño – the leaders of the paramilitaries following Fidel's "disappearance" – created the United Self-Defence Forces of Colombia (*Autodefensas Unidas de Colombia*, AUC). The AUC brought together under a single command most of the until then disparate paramilitary groups in the country. Salvatore Mancuso, a former landowner, emerged as the AUC's military supremo, while Carlos Castaño became the paramilitary group's "political" leader. The AUC maintained strong links with drugs-trafficking and in the late 1990s Carlos Castaño claimed that 70% of AUC revenue came from the drug trade.

## Attempts to legalize Paramilitarism

Since paramilitary groups were outlawed in 1989 there have been repeated efforts to again legalize them. This process was promoted by the security forces whose counter-insurgency strategy depended on the use of terror tactics by the paramilitaries against the civilian population as a means to starve guerrilla forces of their potential civilian support base.

In May 1991 the Ministry of Defence issued Order 200-05-91, based on recommendations of US military experts, which regulated the creation of intelligence networks. These networks could employ retired military personnel to undertake intelligence work. The order stipulated that instructions imparted to agents were not to be recorded in writing. In the early 1990s, at least one of these intelligence networks was subject to criminal investigations for its responsibility in the killing of around 100 civilians, including human rights defenders, trade unionists, and community leaders in Barrancabermeja, department of Santander.

Decree 2535 of 1993 authorized the use by civilians of weapons which had been restricted for the use of the armed forces, while Decree 356 of 1994 created the *Servicios especiales de vigilancia y seguridad privada*, Special vigilance and private security services, known as the CONVIVIR groups. These were charged with the provision of security in high risk areas.

The CONVIVIR project sought to create legal paramilitary structures to maintain control over areas from which the guerrilla had been expelled or which could face future guerrilla attack and where an open large security force or paramilitary presence was no longer necessary. Many paramilitary groups emerged and assumed the CONVIVIR name, while licensed CONVIVIR groups operated in close coordination with paramilitaries and the armed forces in committing human rights violations against civilians.

As evidence mounted of the responsibility of CONVIVIR groups in serious human rights violations and the transformation of illegal paramilitary groups into CONVIVIR structures, in 1997 the Constitutional Court ruled, through decision C-296 of 1997, that the issuing of restricted weaponry to civilians and specifically to CONVIVIR groups was unconstitutional. Following the ruling many CONVIVIR groups were simply integrated directly into the AUC.

## The "paramilitarization" of Colombia

The army-backed paramilitary strategy – based on the systematic violation of human rights and the imposition of political, economic and social control over areas they control – has involved a three-stage process, including:

· **Incursion:** The aim is to militarily "liberate" areas of guerrilla influence through the use of systematic violence. This phase is marked by high levels of human rights violations against civilians, especially forced displacement, torture, killings and "disappearances". The consolidation of paramilitarism in areas of guerrilla influence or of strategic or economic interest is often preceded by army intelligence operations. Paramilitaries arrive in an area in possession of "death lists" of people military intelligence have labelled as subversive. Paramilitary incursions of this type often take place in the wake of large-scale security force operations – such as the Mariscal and Orión security force operations in Medellín in 2002 – or are carried out in conjunction with the armed forces themselves.

· **Consolidation:** During this phase, the local population is "co-opted" and terrorized into submission through the killing of those perceived as a threat, such as human rights defenders, trade unionists, and social activists. Businesses are "taxed" and local officials "co-opted" into providing financial and political support. The paramilitaries purchase land vacated by displaced communities at rock-bottom prices or simply appropriate the land.

· **Legitimization:** This phase involves income generation through the purchase of legal businesses. The paramilitaries create foundations and cooperatives to promote productive projects, engage in community work especially in poor neighbourhoods, and seek to control local, regional and national electoral and political processes. Human rights violations decline as opposition to the paramilitary strategy has been neutralized.

000648

In this final phase the paramilitaries no longer need to maintain a large-scale overt military presence in areas over which they and the security forces have control. Instead, paramilitaries remain "in the shadows" in case of any future attack by guerrilla forces, although threats against and killings and "disappearances" of civilian "opponents" continue. The creation of legalized security enterprises and intelligence-related collaboration with the security forces are encouraged to take the place of "traditional" paramilitary structures.

In Medellín, Amnesty International has observed a process which clearly reflects this three-phase strategy. As this report will show, the paramilitary project has entered a "legitimization phase" which includes the transformation of paramilitary forces into private security or civilian informer structures akin to the CONVIVIR groups which emerged in the 1990s.

By 2003, AUC-linked paramilitary groups were present in over 25 of the country's 32 departments and in over 380 of its 1,098 municipalities, and its number of combatants had increased dramatically from a reported 3,000 in 1995. The paramilitary advance forced the FARC and ELN to withdraw from many areas they had dominated for decades.

In many areas of the country, the paramilitaries can claim to control, either through co-option or threats of violence, a significant number of local mayors' offices, governorships, the judicial apparatus, the health and education system, public contracts, business cooperatives and other economic concerns, private security firms, and the criminal economy, including drug-trafficking, extortion, the illegal trade in gasoline, prostitution, and gambling rackets.

Paramilitarism is thus not simply a counter-insurgency strategy, but a phenomenon that encompasses mechanisms of political and social control and the promotion of an economic model based on the concentration of land and large-scale agricultural, mining and infrastructure projects. This policy has been built on the back of widespread and systematic violation of human rights, including mass displacement. This large-scale displacement of civilians has facilitated the illegal expropriation of land through which paramilitarism aims to launder the considerable wealth built up as a result of its reliance on drug-trafficking.

A "peace process" which does not take into account paramilitarism's corrosive influence on society, and the role of the security forces and economic and political elites in the development, coordination and funding of paramilitarism, will do little to resolve this crisis.

## 2. POLITICAL ACCOMMODATION WITH PARAMILITARISM

The notion of a peace or demobilization process between the government and paramilitaries is a seemingly contradictory concept given the long-standing and close links between the security forces and paramilitaries, and the fact that the *raison d'être* of paramilitarism is the defence of the Colombian state and the *status quo* against real or perceived threats. Amnesty International has called on successive Colombian governments to disband paramilitary groups and to break the *links that persist between these groups and the security forces*, but has insisted that any process respect victims' rights to truth, justice and reparation.

President Alvaro Uribe Vélez began talks with the paramilitaries soon after his inauguration in August 2002. The government amended the law to allow talks with illegal armed groups without the need to grant them political status.(10) Previous legislation had been instrumental in facilitating the unsuccessful peace talks with the FARC initiated in the late 1990s. President Uribe named Luis Carlos Restrepo as High Commissioner for Peace with responsibility for the negotiations. As a precondition for talks the government insisted that the paramilitaries declare a ceasefire, stop killing civilians and end drug-trafficking.

The AUC thus announced a ceasefire on 1 December 2002. But it has persistently failed to abide by it, with more than 2,300 killings and "disappearances" attributed to paramilitaries since December 2002 by Colombian human rights *organizations*. Official statistics suggest the figure is much lower. Amnesty International also continues to document human rights violations committed by paramilitary forces in close coordination with the security forces, while there is no indication that the AUC's links with drug-trafficking have been ended. The AUC, for its part, has insisted throughout the negotiation process that none of its members will accept extradition to the United States or spend even one day in prison.(11)

In contrast to previous talks with guerrilla groups, such as those between the government of President Andrés Pastrana and the FARC, which took place between 1998 and 2002, there has been virtually no involvement of Colombian civil society and the international community, with the exception of the OAS, in the paramilitary negotiations. This reflects the deep rooted scepticism and concern of civil society and most foreign governments with the process.

### The Santa Fe de Ralito agreements

On 15 July 2003 in Santa Fe de Ralito, Tierralta Municipality, Córdoba Department, the government and most AUC-linked paramilitary groups signed the Santa Fe de Ralito I agreement, which marked the start of formal talks. Under the terms of the agreement the AUC:

· agreed to demobilize all their combatants by the end of 2005;
· would concentrate its leadership and troops in specific locations;

000649

· expressed its commitment to the self-declared unilateral ceasefire; and
· supported government efforts to fight drug-trafficking.

In April 2004, the talks were almost derailed after the "disappearance" or killing of Carlos Castaño. Rumours and speculation are rife as to the identity of his killers if he is dead or his whereabouts if still alive. The truth is shrouded in mystery. Salvatore Mancuso assumed the public leadership of the AUC following Carlos Castaño's "disappearance". Vicente Castaño remains a highly influential leader within the AUC, especially after the death or "disappearance" of his brother, Carlos Castaño. The formal leadership of the AUC was assumed by Ramón Isaza on 2 February 2005 following Salvatore Mancuso's demobilization.

On 13 May 2004, the government and the AUC signed Sante Fe de Ralito II. This agreement set up a 368 km2 "placement zone" (zona de ubicación) in Santa Fe de Ralito. The zone was set up "to facilitate the consolidation of the process of dialogue between the national government and the [AUC]; to contribute to the enhancement and verification of the ceasefire; to move towards defining a timetable for the concentration and demobilization of [AUC] members; to allow for an exchange between the negotiating table and all the national and international sectors; [and] to facilitate citizen participation [...] [in the] process".

The zone would concentrate those paramilitary leaders who, because they were under investigation or had arrest warrants pending for human rights violations or drug-trafficking, could not benefit from Decree 128, which grants pardons to members of illegal armed groups not under investigation for such offences.(12) These paramilitaries will now be subject to the provisions in the Justice and Peace Law (see Chapter 4). Although the army was charged with securing the perimeter of the zone they would not be present within it. Moreover, the agreement did not establish security guarantees for civilians living inside the zone. The Santa Fe de Ralito placement zone would serve as the centre for the government-AUC dialogue.

Aside from the BCN – which demobilized in November 2003 under a separate yet linked process – more than 8,000 paramilitaries from 13 paramilitary groups have reportedly demobilized since Santa Fe de Ralito II: Bloque Bananero (25 November 2004), Autodefensas del Sur del Magdalena (4 December 2004), Autodefensas Unidas de Cundinamarca (9 December 2004), Bloque Catatumbo led by Salvatore Mancuso (10 December 2004), Bloque Calima (18 December 2004), Bloque Córdoba (18 January 2005), Bloque Sur Oeste Antioqueño (30 January 2005), the Frente Mojana (2 February 2005), the Bloque Héroes de Tolová, led by BCN paramilitary leader Diego Fernando Murillo Bejarano, also known as "Don Berna" or "Adolfo Paz" (15 June 2005), the Bloque Héroes de Montes de María (14 July 2005), the Bloque Libertadores del Sur (30 July 2005), the Bloque Héroes de Granada (1 August 2005), also led by "Adolfo Paz", and the Autodefensas Unidas de Meta y Vichada (6 August 2005).

However, the Bloque Bananero (BB) apparently emerged as a distinct paramilitary unit only months prior to the demobilization. The Bloque Elmer Cárdenas (BEC) reportedly remains in the area in which the BB supposedly operated. It is not clear if BEC troops were redeployed to the area or Bloque Bananero members simply began to refer to themselves as members of the BEC. Regardless, Amnesty International continues to document cases of human rights violation by paramilitaries in a number of areas where they have supposedly demobilized.

**The demobilization mechanism**

The mechanism put in place for the physical demobilization of paramilitary troops has not been rigorous and has been open to abuse. First, the paramilitary group which is demobilizing hands over a list of its members and inventory of weaponry to the government. This process was blatantly abused in the case of Medellín. Here, the evidence suggests that the list provided by the BCN included many common criminals and omitted many of the group's leaders, especially those who faced criminal investigations for human rights violations.(13)

Second, the paramilitaries are moved to a concentration area, where their identities are verified by the Registraduría Nacional del Estado Civil (National Registrar of Civil Status) through fingerprinting, photographs and dental records. At this stage the authorities also determine whether the individual is under investigation or has an outstanding arrest warrant for crimes which cannot be pardoned under Decree 128. This information is based on the database of the Office of the Attorney General (Fiscalía General de la Nación) and the state intelligence services.(14) But in December 2004 the Office of the Procurator General revealed that over 160 BCN members were pardoned under Decree 128 although it later emerged they were under investigation for non-pardonable offences, including human rights violations.(15)

Third, a decision is taken as to whether a paramilitary combatant can benefit from Decree 128 or has to be sent to the Santa Fe de Ralito placement zone, depending on whether the individual is under investigation or has an outstanding arrest warrant for human rights offences. But only a few hundred paramilitaries, many of them leaders, have been identified as being under investigation or having arrest warrants pending for human rights violations. Some of these have been sent to the zone, including Mancuso, who is now officially demobilized. The thousands of others who demobilized – many of whom are likely to have been involved in human rights violations – have been granted benefits under Decree 128. They have thus been free to return home or have been sent to reinsertion centres to facilitate their reintegration into civilian life. However, if any are implicated in human rights violations by investigations at a later date they could technically lose the benefits under Decree 128 and would have to submit themselves to the system set up by the Justice and Peace Law.

000650

Case 3:08-cv-00885-SI   Document 1-21   Filed 02/08/2008   Page 9 of 30

Colombia: The Paramilitaries in Medellín: Demobilization or Legalization? Amnesty Int... Page 8 of 29

But given the weakness of the Justice and Peace Law this appears highly unlikely (see Chapter 4).

**Some of the AUC Commanders negotiating in Santa Fe de Ralito**

**Vicente Castaño Gil ("El Profe")** is Carlos Castaño's older brother and a member of the AUC high command. He is facing charges of homicide and terrorism. Judicial investigations have linked him to the killings of, among others, congressional representative Octavio Sarmiento Bohórquez on 1 October 2001 in Tame Municipality, Arauca Department; Alfredo Colmenares Chía, a former member of Congress from Arauca killed in Bogotá on 8 October 2001, and the attempt on the life of trade union leader and now congressman Wilson Borja on 15 December 2000. On 1 June 2005, the government announced that Vicente Castaño would officially demobilize.

**Gabriel Salvatore "El Mono" Mancuso Gómez** led the *Bloque Catatumbo* until it demobilized in December 2004 and assumed the leadership of the AUC following Carlos Castaño's "disappearance" and until he demobilized at the end of 2004. He has at least ten arrest warrants outstanding against him related to cases of killings and massacres, including the 1997 massacre in El Aro, municipality of Ituango, Antioquia Department, carried out in coordination with the Brigade IV of the army. Mancuso has been sentenced to 40 years imprisonment for his part in the massacre. He is also wanted for his part in the killing of two brothers in the community of San Antonio de Palmito, Sucre Department, in 1996.

**Diego Fernando Murillo Bejarano ("Don Berna", "Adolfo Paz")** is allegedly responsible for kidnappings in Medellín, carried out in association with the AUC. He is suspected of involvement in the killing of CINEP human rights workers Mario Calderón and Elsa Alvarado, and the killing of departmental legislator Orlando Benítez on 10 April 2005 in Valencia, Córdoba Department. He played a prominent role in the PEPES, was linked to *La Terraza* gang in Medellín, and is a commander of the *Bloque Pacífico*, *Bloque Calima*, *Bloque Héroes de Tolová*, the BCN, and the *Bloque Héroes de Granada*.

**Ramón Isaza Arango ("El Viejo")** is a veteran paramilitary leader in the Magdalena Medio region of central Colombia. At least three arrest warrants have been issued against him. In 2000 the Office of the Attorney General summoned him to stand trial *(llamó a juicio)* on charges of paramilitarism. He assumed the official leadership of the AUC following Mancuso's demobilization.

**Iván Roberto Duque ("Ernesto Baez")** is the political commander of the *Bloque Central Bolívar*. He was sentenced in 2005 to 67 months in prison on charges of conspiracy to commit a crime *(concierto para delinquir)* in relation to acts of intimidation against inhabitants of the municipality of Aguadas in Caldas Department in 2001. In 1997 he was sentenced to 13 years in prison for his part in the killing of a local councillor in Puerto Boyacá and a massacre in the department of Santander. He was previously an adviser for ACDEGAM, a paramilitary group created in 1982 in Puerto Boyacá, Magdalena Medio, and is the only paramilitary negotiator to have served time in prison.

**Rodrigo Tovar Pupo, ("Jorge Cuarenta", "El Papá Tovar")** is second-in-command of the *Bloque Norte* and commands paramilitary units which operate in northern departments including Magdalena, La Guajira and Cesar. He is implicated in the kidnapping of former senator José Gnecco on 28 June 2004. Arrest warrants have been issued against him in relation to paramilitarism, arms smuggling, kidnapping and killings. In March 2004, the Office of the Attorney General announced that Rodrigo Tovar Popa was facing six criminal investigations related to charges of killings, kidnapping and conspiracy to commit a crime *(concierto para delinquir)*, including the abduction and killing of seven members of the *Cuerpo Técnico de Investigación de la Policía Judicial* (CTI), Criminal Investigation Unit of the Judicial Police, on 9 March 2000 in La Paz, Cesar Department, and the killing of Marilis Hinojosa, a judge from Becerril Municipality, on 27 January 2003.

**"Hernán Hernández"** is a commander of the *Bloque Calima* which was demobilized in December 2004. He demobilized with the *Bloque Bananero* on 25 November 2004 in the Urabá region of Antioquia Department. The *Bloque Calima* carried out the April 2001 Naya massacre of over 30 people between the departments of Valle del Cauca and Cauca Department.

**Carlos Mario Jiménez ("Javier Montañez", "Macaco")** is a military commander of the *Bloque Central Bolívar*. An arrest warrant has been issued against him on charges of conspiracy to commit a crime ("*concierto para delinquir*"). "Macaco" has been implicated in the killing of the former human rights ombudsman of the department of Norte de Santander on 12 February 2001 in Cúcuta.

But not even the investigations into human rights violations allegedly committed by those in Santa Fe de Ralito are proceeding. The Office of the Attorney General has no authority to enter the zone to investigate since arrest warrants against those in the zone have been suspended. Evidence could thus be lost and those responsible for some of the most brutal and widespread human rights violations in Colombia's history might never be brought to justice.

**The role of the OAS Verification Mission**

On 23 January 2004, the Colombian government and the General Secretariat of the Organization of American States (OAS) signed an agreement to set up the Mission to Support the Peace Process in Colombia, *Misión de Apoyo al Proceso de Paz en Colombia* (MAPP/OEA), which was authorized by the OAS Permanent Council on 6 February 2004.(16)

MAPP/OEA is entrusted to oversee the placement zone and to ensure that those paramilitary groups which demobilized

000651

and whose leaders reside in the zone provide an inventory of weapons, war materiel and munitions. It is also responsible for verifying the commitments made under the agreement and for ensuring compliance with the ceasefire at national level.

The MAPP/OEA mission has proved controversial. Former OAS Secretary General and ex Colombian president César Gaviria took the lead in the initiative which, according to the press, has received little political and financial support from the OAS Member States. This possibly reflects the scepticism of the international community, especially in relation to the AUC's failure to comply with the ceasefire. Many foreign governments have said they will not support the demobilization process, either politically or financially, until a legal framework which conforms to international norms on truth, justice and reparation is in place.

The MAPP/OAS mandate is to verify the ceasefire, the demobilization of paramilitaries and the handover of weapons. It also has a role in assisting with the reinsertion of paramilitaries into civilian life. But it is not mandated to publicly comment on the government's demobilization strategy unless requested to do so by the government. As such, it cannot comment on issues of truth, justice and reparation.(17) Nor has it the power to sanction paramilitaries who fail to abide by the demobilization or ceasefire agreements. In short, the mission is severely curtailed in its ability to affect change or act as a genuine and effective aide to the process. This risks giving legitimacy to a process which is seriously flawed.

### 3. THE RIGHT OF VICTIMS TO TRUTH, JUSTICE AND REPARATION

Human rights abusers have all too often acted with impunity. Not only are the victims subjected to terrible suffering, the suffering goes unacknowledged, and the perpetrators walk free to commit further abuses. The right of victims to truth, justice and reparation must form the backbone of efforts to resolve the conflict. Truth, justice and reparation play a key role in ensuring against repetition of human rights abuses. They are essential components of a just and lasting peace and of a future in which human rights are respected and protected.

Numerous international human rights instruments recognize the importance of the right of victims to truth, justice and reparation. These instruments, which include treaties to which Colombia is a party, contain provisions that cover issues of relevance to truth, justice and reparation. For example, the Universal Declaration of Human Rights, the International Covenant of Civil and Political Rights and the International Convention on the Elimination of All Forms of Racial Discrimination all contain articles concerning the right to an effective remedy, which in a broad definition includes the right to truth, justice and reparation. Under the UN Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment state parties must ensure that victims of torture obtain redress. Similarly, the Inter-American Convention to Prevent and Punish Torture obliges state parties to guarantee suitable compensation for victims of torture. State parties to the Convention on the Rights of the Child must "take all appropriate measures to promote physical and psychological recovery and social reintegration" of child victims of torture. The American Convention on Human Rights includes the right to judicial protection against acts that violate fundamental rights.

The Rome Statute of the International Criminal Court (ICC) – to which Colombia is a party – makes clear that the most serious of crimes must not go unpunished. It also contains provisions allowing the Court to order a convicted person to provide reparation in the form of compensation, restitution, rehabilitation, satisfaction, guarantees of non-repetition, and any other type of reparation the Court deems appropriate. It is also a norm of customary international law applicable in both international and non-international armed conflicts that "[a] state responsible for violations of international humanitarian law is required to make full reparation for the loss of injury caused."(18)

Victims' rights are also recognized in the UN Declaration of Basic Principles of Justice for Victims of Crime and Abuse of Power adopted by the General Assembly resolution 40/34 of 29 November 1985 and the Commission on Human Rights Resolution (2004/34) on "The right to restitution, compensation and rehabilitation for victims of grave violations of human rights and fundamental freedoms". International guidelines on truth, justice and reparation have also been developed through the UN Basic Principles and Guidelines on the right to a remedy and reparations for victims of gross violations of international human rights law and serious violations of international humanitarian law(19) and the UN Principles for the protection and promotion of human rights through action to combat impunity.(20)

#### Truth

According to the UN Principles for the protection and promotion of human rights through action to combat impunity "[s]tates must take appropriate action to give effect to the right to know".(21) To guarantee everyone's inalienable right to an effective remedy, victims of abuses of human rights and international humanitarian law and their families must be able to learn the truth. Revealing the truth is also indispensable to preserve a nation's collective memory: a state has a duty to remember. Victims and their families have a right to know the truth about what happened to them and their relatives, including the right to know the whereabouts of those who have been killed or "disappeared". Without truth there is a risk of repetition.

The 2004 IACHR Colombia report states: "the right to truth should not be restricted through legislative or other measures. The IACHR has established that the existence of factual or legal impediments, such as adopting amnesty laws, in access to information about the facts and circumstances surrounding the violation of a fundamental right, and that stand in the way of initiating the judicial remedies in the domestic jurisdiction, are incompatible with the right to judicial protection provided

for at Article 25 of the American Convention. The process aimed at determining the truth requires the free exercise of the right to seek and receive information, the formation of investigative commissions, and the adoption of the measures needed for authorizing the judiciary to undertake and complete the respective investigations".(22)

The report also states that "[…] [t]he Inter-American Commission and the Inter-American Court have stated that societies affected by violence have, as a whole, the unwaivable right to know the truth of what happened as well as the reasons why and circumstances in which the aberrant crimes were committed, so as to prevent such acts from recurring. Society as a whole has the right to learn of the conduct of those who have been involved in committing serious violations of human rights or international humanitarian law, especially in the case of mass or systematic violations; to understand the objective and subjective elements that helped create the conditions and circumstances in which atrocious conduct was perpetrated, and to identify the legal and factual factors that gave rise to the appearance and persistence of impunity; to have a basis for determining whether the state mechanisms served as a context for punishable conduct; to identify the victims and the groups they belong to as well as those who have participated in acts victimizing others; and to understand the impact of impunity".(23)

## Justice

States have an obligation to investigate violations of human rights and international humanitarian law and to bring those responsible to justice. They should be brought to court and tried under procedures which conform to international standards for a fair trial. This implies full and impartial judicial investigation and court proceedings which ensure cross-examination of the accused as part of the process to establish their degree of responsibility, as well as the possibility that families of the victims might be allowed access to this cross-examination. Punishments should be commensurate with the gravity of the offence, but the death penalty and other cruel, inhuman or degrading punishments should not be imposed.

The IACHR report states that "[t]he states are under an obligation to combat impunity by all legal means available, since it fosters the chronic repetition of human rights violations and the total defencelessness of the victims and their next-of-kin. In the Inter-American system, this obligation of the States is reflected in Articles XVIII and XXIV of the American Declaration and Articles 1(1), 2, 8, 25 of the American Convention. Pursuant to these provisions and their authoritative interpretation, the Member States of the OAS have the duty to organize the government apparatus and all the structures through which government authority is exercised so that they are capable of legally ensuring the free and full exercise of human rights, and to prevent, investigate, prosecute, and punish their violation. This obligation is independent of whether the perpetrators of the crimes *are state agents or private individuals*." (24)

## Reparation

Victims of human rights violations and abuses and their families have a right to effective remedy. The state has a duty to make reparation to the victims and their relatives and to seek redress from the perpetrator. The UN Basic Principles and Guidelines on the right to a remedy and reparation for victims of international human rights and humanitarian law distinguishes five forms of reparation: restitution,(25) compensation,(26) rehabilitation,(27) satisfaction(28) and guarantees of non-repetition. At the collective level, states have a duty to publicly acknowledge their responsibility and should adopt measures to restore victims' dignity and promote the duty of remembrance.

The 2004 IACHR report on the demobilization of paramilitaries in Colombia states that "[…][t]he victims of crimes committed during an armed conflict have the right to adequate reparation for the harm suffered, which should take the form of individual measures of restitution, compensation, and rehabilitation, measures of satisfaction generally, and guarantees of non-repetition, making it possible to re-establish their *status quo ante* [the state of affairs that existed previously], without discrimination".(29)

According to the Principles for the protection and promotion of human rights through action to combat impunity under guarantees of non-recurrence included in the right to reparation, "unofficial armed groups directly or indirectly linked to the state" must be disbanded. Particularly during peace processes, states should adopt appropriate measures to: "(a) Retrace organizational structures, by firstly identifying agents and showing their position, if any, in the administration, particularly in the army or police forces, and by secondly determining the covert links which they maintained with their active or passive masters, belonging particularly to intelligence and security services or, in the event, to pressure groups. The information thus acquired shall be made public; (b) Thoroughly investigate intelligence and security services with a view to redirecting their activities; (c) Secure the cooperation of third countries which might have contributed to the creation and development of such groups, particularly through financial or logistical support; (d) Draw up a reconversion plan to ensure that members of such groups are not tempted to join the ranks of organized crime."

In the case of Colombia, this underlines the importance of fully investigating and uncovering the economic, political and institutional – including state institution and security force – links to paramilitary forces and the degree of their responsibility in supporting paramilitarism and complicity in human rights violations committed by paramilitaries. It also underlines the importance of uncovering and exposing individuals, companies, politicians and other sectors of civil society who finance or otherwise support paramilitary activities.

## 4. THE LEGAL FRAMEWORK: CONTRACTS OF IMPUNITY

000653

Any legal framework for the demobilization of paramilitaries or guerrillas must respect international standards on the right of victims to truth, justice and reparation. The current paramilitary demobilization process has been governed by Law 782 of December 2002, which modified Law 418 of 1997. Law 782 removed the legal requirement that peace negotiations can only be carried out with armed groups that have been granted political status and allows amnesties and pardons for members of armed groups who are considered to have committed "political and related crimes". Law 782 has been implemented through Decree 128 of 2003. The Justice and Peace Law will be applied to members of illegal armed groups who wish to demobilize but are not eligible to benefit from Decree 128.

### Decree 128: an inadequate legal instrument

Most paramilitaries and guerrillas who have demobilized under the present government, either individually or collectively, have done so on the basis of Decree 128, promulgated on 22 January 2003, and which regulates Law 782. Article 13 of Decree 128 grants legal and economic benefits to members of armed groups who have demobilized. These benefits include "pardons, conditional suspension of the execution of a sentence, a cessation of procedure, a resolution of preclusion of the investigation or a resolution of dismissal". Article 21 excludes from these benefits those "who are being processed or have been condemned for crimes which according to the Constitution, the law or international treaties signed and ratified by Colombia cannot receive such benefits." Such crimes are defined in Law 782 as "[...] atrocious acts of ferocity or barbarism, terrorism, kidnapping, genocide, and murder committed outside combat". Only combatants under investigation or sentenced for the illegal carrying of arms and membership of an illegal armed group can benefit from Decree 128.

Decree 128 also set up the Committee for Laying Down Arms (*Comité Operativo para la Dejación de Armas*, CODA). CODA verifies that the individual is in fact a member of an illegal armed group and is genuine in his or her desire to demobilize. It also provides the demobilized combatant with identification papers which certifies his or her status.

Decree 128 has served to consolidate impunity in Colombia:

1. Articles 13 and 21 infer, *contrario sensus*, that those who are not under investigation or have not been tried will have a right to these legal benefits even though they may have committed or participated in serious human rights abuses. But given the endemic nature of impunity in Colombia, most paramilitary members – and guerrillas for that matter – are not formally under judicial investigation for violations of human rights or international humanitarian law, and are even less likely to have been tried or convicted for such offences.

2. Only limited checks are carried out into an individual combatant's possible implication in crimes which are not pardonable under Decree 128. There is no requirement to initiate investigations into individual combatants suspected of human rights abuses, unless they are already under judicial investigation. But if a member of an armed group is under investigation for the illegal carrying of arms or membership of an illegal armed group, that investigation is terminated and the combatant becomes eligible for benefits under Decree 128.

3. Members and leaders of paramilitary and guerrilla groups can receive benefits under Decree 128 even though their group might continue to be responsible for human rights violations and breaches of international humanitarian law. Since Decree 128 allows for individual, as opposed to collective, demobilization of illegal combatants, it does not contribute in any way to the effective dismantling of paramilitary or guerrilla structures.

4. A paramilitary who is demobilizing is not required to provide information on the group to which they belonged (eg, assets or past crimes). The only information an individual must divulge is name, fingerprint and dental records.

On 21 November 2003, the government promulgated Decree 3360 which eliminated the need for illegal combatants who wish to demobilize as a group to be certified by the CODA as proof of membership of a group. Article 1 of Decree 3360 states that paramilitary membership of a demobilized individual is proved by a list produced by the leaders of the group. The BCN demobilization was the first to take place under the provision of Decree 3360. The application of Decree 3360 has made it even more difficult to verify whether or not those demobilizing are effectively members of an illegal armed group or are responsible for human rights violations. The weaknesses of this system allowed many non-paramilitary criminals in Medellín to pass themselves as demobilized paramilitaries, which enabled them to benefit from Decree 128.

The IACHR report on Colombia states that "[...] the IACHR has consistently established that while the adoption of provisions aimed at granting an amnesty to persons responsible for the crime of taking up arms against the state may be a useful tool in the context of effort to achieve peace, amnesty laws as well as similar legislative measures that impede or consider concluded the investigation and prosecution of crimes of international law impede access to justice and render ineffective the obligation of the states party to respect the rights and freedoms recognized in the Convention and to ensure their free and full exercise."(30)

### Justice and Peace Law: impunity for human rights abusers

Most paramilitary leaders are under investigation or have arrest warrants pending for human rights abuses.(31) They

cannot benefit from Decree 128. The government has thus sought to create a legal instrument to "encourage" commanders to demobilize by significantly reducing prison time they might serve for the offences detailed in Law 782. An attempt in 2003 and 2004 to pass such legislation through Congress failed after the bill was withdrawn following criticism for its failure to take into account victims' rights to truth, justice and reparation.

In line with commitments made in the London (July 2003) and Cartagena Declarations (February 2005),(32) the government must enact legislation to contribute to the demobilization of paramilitaries that conforms to international standards on truth, justice and reparation. Interior Minister Sabas Pretelt de la Vega presented a revised bill to the international community meeting in Cartagena.(33) The bill was hailed as an improvement on previous versions of the bill in respect to its provisions on truth, justice and reparation. But the bill presented to Congress by the Interior Minister the following day (Justice and Peace Bill) was significantly weaker in this respect than the version presented to the international community.

There was further confusion when the government's High Commissioner for Peace, Luis Carlos Restrepo, and Vice-president Francisco Santos expressed public support for another bill presented to Congress by Senator Armando Benedetti, which was even weaker on issues of truth, justice and reparation. The government and some legislators introduced a series of changes to the Interior Minister's bill, mainly using text from the Benedetti bill, and presented this to Congress on 3 March 2005 as the official government bill on the demobilization of illegal armed groups. The bill was finally approved by Congress on 21 June 2005 and ratified by President Uribe on 22 July 2005.(34)

The Justice and Peace Law bears little resemblance to the bill presented to the international community. As the Office in Colombia of the UN High Commissioner for Human Rights stated in a letter to the Colombian Congress: "In view of the Office, most of the changes [to the then bill] appear inadvisable since they do not conform to international principles and norms on the right of victims of serious crimes in accordance with international law".(35)

The law is geared more towards demobilizing individual combatants rather than guaranteeing the effective dismantling of paramilitary structures. But the demobilization will not succeed unless paramilitarism's political, economic and criminal stranglehold on many parts of the country is dismantled and replaced with the rule of law. This can only be guaranteed if the paramilitaries are compelled to fully cooperate with the judicial authorities and reveal information about the offences they and other combatants have committed, the economic assets they have acquired as a result of their illegal paramilitary activities, and the role played by the security forces and other state agents and private actors in human rights violations.

But the government has persistently resisted efforts to investigate those responsible for financing and supporting paramilitarism. In reference to the Justice and Peace Bill, the Interior Minister stated that "it is the law which should promote an acknowledgement of the offences committed but without incriminating third parties nor creating a bloodbath in the country. That would be intolerable and the government does not support it".(36)

Amnesty International is concerned that the real aim of the Justice and Peace Law is not only to guarantee the impunity of paramilitaries implicated in human rights violations – including war crimes and crimes against humanity – by failing to ensure that they are subject to full and impartial judicial investigations, but also that their security force backers and others responsible for sponsoring their illegal activities will not be identified and held accountable.

The demobilization will also fail to end human rights abuses if measures are not introduced to ensure that combatants are effectively demobilized. The new law does not address this issue. As Chapter 7 of this report shows, there is strong evidence that paramilitary structures are remaining intact after "demobilization" and that demobilized combatants, both paramilitaries and guerrillas, are being "recycled" into the conflict, mainly as paid military informants.

The law formally acknowledges the right of victims to truth, justice and reparation, but raises serious concerns that it will guarantee the impunity of those responsible for human rights abuses:

1. It makes no reference to an armed conflict. The law should recognize the applicability of international humanitarian law (IHL) and the possibility of prosecutions for specific violations of IHL. The law should, therefore, also acknowledge the jurisdiction of the International Criminal Court (ICC) in investigating human rights violations.(37)

2. Article 11 could allow combatants to demobilize individually regardless of whether or not the group to which they belong is still active. According to the Office in Colombia of the UN High Commissioner for Human Rights, "mechanisms of transitional justice should only be applied within processes of negotiation, dialogue and agreements with illegal armed groups that have previously agreed with the government to demobilize and dismantle". (38)

3. Article 17 states that an individual can, but is not compelled to, provide information on offences they have committed to qualify for the benefits under the law. There are no effective incentives for them to collaborate fully with the judicial authorities. Article 25 states that if, after a demobilized combatant is granted benefits, subsequent judicial investigations reveal their responsibility in offences committed prior to demobilization they could lose these benefits. But it will have to be proved that the demobilized combatant had "intentionally" failed to provide judicial investigators with such information. This will prove practically impossible.

4. Article 34 states that only 20 judicial investigators will be assigned to the National Unit of the Office of the Attorney General for Justice and Peace (*Unidad Nacional de Fiscalía para la Justicia y la Paz*), which will be created to investigate the hundreds of combatants that are likely beneficiaries of the law. Article 18 introduces strict time limits (60 days) for investigating each case making it difficult to undertake full and impartial investigations.

5. Article 30 stipulates sentences of five to eight years for non-pardonable offences, including human rights abuses. Article 32 states that time spent in the placement zone (with a maximum of 18 months) will count towards the sentence. Sentences could thus be lower than stated in the law. These sentences might not even be served in prisons since Article 31 allows the government to decide where sentences will be served. Official statements suggest sentences could be served in "agricultural colonies" in areas traditionally controlled by paramilitaries including on land they may have expropriated through violence. International treaties ratified by Colombia state that those guilty of human rights abuses should receive sentences that are commensurate with the gravity of the offence. For example, the Inter-American Convention to Prevent and Punish Torture "[t]he States Parties shall ensure that all acts of torture and attempts to commit torture are offences under their criminal law and shall make such acts punishable by severe penalties that take into account their serious nature" (Article 6).

6. The legislation makes no provision for the participation of victims and their families in any part of the judicial process, except at the stage of reparation after the sentencing of an offender. Victims and their families will only be eligible for reparation for offences for which the perpetrator has been sentenced (Article 23). Moreover, Article 46 implies that the onus of seeking reparation lies with the victim not the state. Therefore, if the victim fails to present a claim, for example, because they are unaware of the case, then there will be no reparation. Only the perpetrators' illicitly obtained funds will be subject to reparation payments, not their total wealth. But after laundering, identifying such illicit funds might prove difficult. Some paramilitaries might not even have illicitly-obtained assets from which to make reparations.

The Justice and Peace Law has also granted political status to the paramilitaries by defining their activities as sedition, which is classed as a political offence under Colombian law. According to Colombia's 1991 Constitution, those guilty of political offences cannot be extradited. The Office in Colombia of the UN High Commissioner for Human Rights has criticized the legislation for defining as a political offence "a form of behaviour which is clearly located in the sphere of common delinquency, since [...] those organizing such groups or who become part of them are not doing so to suppress or substitute the institutional organization of the state, of which they declare to be its defenders and protectors, nor to prevent its free functioning, but to satisfy their particular illegitimate interests".(39)

The Justice and Peace Law has been criticized by a number of inter-governmental organizations. In a statement issued on 27 June 2005, the Office in Colombia of the UN High Commissioner for Human Rights stated that the legislation "does not meet the recommended essential elements [...] required to establish transitional justice which, in order to serve as an instrument for sustainable peace, includes incentives and offers benefits for illegal armed groups which demobilize and end hostilities, while at the same time adequately guaranteeing the right of victims to truth, justice and reparation".

On 12 July 2005, the UN Working Group on Enforced or Involuntary Disappearances stated that it "remains extremely concerned because said law could, juridically and in practice, lead to the granting of significant benefits [...] to persons who have committed the serious conduct of enforced disappearance, without ensuring their contribution, prior to receiving said benefit, to clearing up the corresponding case".

The IACHR issued a statement on 15 July 2005: "Regarding the Law of Justice and Peace in Colombia, the IACHR notes that the determination of the historical truth regarding what happened during the last few decades of the conflict does not appear as an objective. Nor does the determination of who has sponsored paramilitarism or of the degree of involvement of different participants in the perpetration of crimes against the civilian population by action, omission, collaboration or acquiescence."

Another recent law further heightens concern that the government is creating conditions which could guarantee impunity for human rights violators. Law 906 of 2004 provides the Attorney General with powers to close investigations into criminal acts, possibly including cases of human rights abuses, when it is considered that prosecution would not be opportune (*Principio de Oportunidad*), for example, when the accused collaborates to prevent the commission of further crimes or provides essential information for the dismantling of an organized criminal group. This law also enables the Attorney General to close investigations into criminal investigations that have remained at a preliminary stage for at least four years. Many investigations into serious human rights violations have remained frozen at a preliminary stage as a result of threats and attacks against witnesses, judicial investigators or relatives of victims seeking justice or because judicial officials are unable or unwilling to carry out effective investigations.

The peace process is failing to respect victims' rights nor will it guarantee that human rights will be protected in the future. Instead, the government appears to be engaged in a process to negotiate contracts of impunity. These will benefit not only the paramilitaries responsible for human rights violations, but also their political, economic and military backers and, possibly in the future, members of guerrilla forces responsible for human rights abuses.

## 5. THE ARMED CONFLICT IN MEDELLÍN

Medellín, the capital of Antioquia Department, is situated in north-west Colombia. It is Colombia's second largest city, with a population of over 2 million, and is a major commercial and industrial centre. It is a city of sharp contrasts. Some of Colombia's wealthiest landowners and industrialists live in the city and the surrounding municipalities. These affluent inhabitants share the city with the street children and indigents with nowhere to live. The city is surrounded by poor hillside neighbourhoods in the peripheries. Many of these outlying areas lack basic public amenities, such as water, electricity and sanitation.

In the 1980s, Medellín became synonymous with the cocaine trade, and the ensuing violence resulted in the city having the highest per capita murder rate in the world. The presence of armed criminal gangs, many of whom were co-opted by drug-traffickers and army-backed paramilitary groups operating in the city, and of guerrilla militias, have ensured that, although killings have fallen since the 1980s, violence in Medellín remains a serious problem.

### Comunas and Barrios of Medellín

Medellín is divided administratively into 16 comunas (districts), which are sub-divided into 249 official barrios (neighbourhoods). There are also five corregimientos (rural neighbourhoods).

This report focuses primarily on some of the poorest barrios in Comunas I, III in the north-east, and VII and XIII in the west, where political violence has been especially acute in recent years. These poor barrios are mostly located in the peripheries of Medellín. The following are mentioned in the report:

**Comuna I (Popular):** Santo Domingo Sabio, Popular, Granizal, Villa de Guadalupe, San Pablo, La Esperanza.
**Comuna III (Manrique):** La Cruz, La Honda.
**Comuna VII (Robledo):** López de Mesa, Robledo, Olaya Herrera.
**Comuna XIII (San Javier):** El Pesebre, Blanquizal, Juan XXIII-La Quiebra, San Javier, Veinte de Julio, Belencito, El Corazón, Las Independencias, Nuevos Conquistadores, El Salado, Eduardo Santos, Antonio Nariño.

There is a long history of attempts by illegal armed groups to co-opt and recruit criminal gangs operating in the poor neighbourhoods of Medellín. These criminal gangs have proved useful to the illegal armed groups – they possess local knowledge, they know who lives in their neighbourhoods; are in an ideal position to target and eliminate those civilians who may oppose the presence of a particular armed group; and are able to prevent the infiltration of the "enemy" in their area of control by intercepting strangers who enter the neighbourhood. Furthermore, members of criminal gangs are often viewed as expendable – many gang members are involved in a violent criminal lifestyle in which death is common. In 2000 it was estimated that there were around 8,000 youths linked to criminal gangs in Medellín.(40)

**The guerrilla militias**

The first guerrilla militias emerged in Medellín in the 1980s, including the M-19, followed in subsequent years by other militia groups, such as the Milicias Populares del Pueblo para el Pueblo, Popular Militias of the People for the People, the Milicias Independientes del Valle del Aburrá, Independent Militias of the Valle del Aburrá, and the Milicias Metropolitanas, Metropolitan Militias. For their part, the FARC militias – known as the Milicias Bolivarianas – established a presence mainly in the west of the city and ELN militias in the north-east.

In the mid-1990s another militia group emerged, initially in the Veinte de Julio barrio – the Comandos Armados Populares (CAP), Popular Armed Command. They included dissident ELN members and former members of the Milicias Populares del Pueblo para el Pueblo.

In 1994 an alliance between the FARC, the ELN and a number of independent militia groups led to the creation of the Bloque Popular Miliciano, Popular Militia Bloc. This helped to further consolidate the presence of guerrilla forces in different parts of Medellín.

The militias – made up mostly of youths, including children – were responsible for dispensing "justice" in the poor neighbourhoods by carrying out "social cleansing" operations against petty criminals, drug addicts and members of criminal gangs. Those who refused to stop their activities were either forced to leave the neighbourhood or killed. The militias also "taxed" local businesses in return for "protection" and kidnapped wealthy businesspeople to fund their activities. They were also responsible for mediating family disputes and settling local conflicts. Some militia members even "hired" the criminal gangs to steal for them. Disputes between the militias and the criminal gangs were frequently resolved through violence.

The government of President César Gaviria (1990-1994) began negotiations with several of Medellín's militia groups, including the Milicias Populares del Pueblo para el Pueblo, the Milicias Independientes del Valle del Aburrá, and the Milicias Metropolitanas. A peace agreement was signed on 26 May 1994. Some 800 militia members demobilized as a result.

Many demobilized militia members were incorporated into a new security structure, the Cooperativa de Seguridad y Servicios a la Comunidad (COOSERCOM), Security and Community Service Cooperative, run by Metroseguridad, a Medellín-based, state-owned security-related company. COOSERCOM provided armed security to the neighbourhoods in

000657

which it operated and cooperated with the security forces in combating militias that had not demobilized. COOSERCOM operated in several neighbourhoods of *Comuna I.*

The demobilization enabled militia forces linked directly to the FARC and ELN to consolidate their presence in the poor neighbourhoods of Medellín. These militia groups attacked COOSERCOM and began to take control of those areas previously controlled by the *Milicias Populares del Pueblo para el Pueblo.* Around 280 COOSERCOM members were killed as a result of these attacks and internal conflicts. Some were killed by the security forces as reprisal. The government disbanded COOSERCOM in 1996, after allegations that some of its members were implicated in human rights abuses.

The creation of COOSERCOM formed part of efforts by city authorities in the 1990s to involve civilians in guaranteeing their own security. These included the development of *Frentes de Seguridad,* Security Fronts. Coordinated by the police they served as communal neighbourhood security systems. Private security firms were given a role complementing their work. (41) As part of these efforts, the national government set up the CONVIVIR in the mid-1990s; by 1997 seven CONVIVIR groups were operating in Medellín.(42)

**A common purpose: drug cartels, criminal gangs, and paramilitaries**

In the 1980s, the drugs trade in the ruthless Medellín cartel headed by Pablo Escobar. The Medellín cartel launched a violent campaign of terror against those it perceived as a threat to its activities, including those politicians, police officers, and judicial and state officials it could not co-opt, as well as trade unionists and other social and human rights activists. The Medellín cartel's campaign of violence was marked by car bombs and assassinations, and the use of armed criminal gangs to carry out assassinations. The ferocity of this violence led many commentators to refer to it as "narco-terrorism".

The criminal gangs served a dual purpose – members of these gangs helped "market" drugs in the city and worked as paramilitary "hired guns" to help the cartel and its government, state, security force and business backers settle criminal and political scores. Community leaders, students and unemployed youths in the poor neighbourhoods on the peripheries of Medellín were also targeted by "death squads" made up of gunmen (often from the criminal gangs) employed by the drug-traffickers, paramilitaries, the business community and the police.

As pressure mounted to extradite drug-traffickers to the United States, and following the killing of presidential candidate Luis Carlos Galán in August 1989, a *Bloque de Búsqueda,* Search Bloc, made up of police from outside the city – due to fears that many local police were in the pay of the drug cartels – was drafted in to dismantle the Medellín cartel. Hundreds of members of the *Bloque* were killed by Escobar's gunmen in the ensuing search for the drug baron. Escobar surrendered after cutting a deal with the authorities, but in July 1992 escaped from prison. After the escape, attacks on police in Medellín escalated. In a three-month period over 60 police officers were killed by gunmen reportedly employed by Pablo Escobar. The police took their revenge by indiscriminately killing youths in the poor neighbourhoods. The PEPES (see Chapter 1) began a similar campaign of violence against Escobar associates. Pablo Escobar was eventually killed in a gun battle with the authorities in December 1993.

**The *Bloque Metro* and the *Bloque Cacique Nutibara***

The *Bloque Metro* (BM), Metro Bloc, emerged as a strong military presence in Medellín from 1998, although BM graffiti appeared in parts of the city as early as 1995 after Carlos Castaño announced the AUC's intention of taking control of Medellín. The BM's military operations were led by Carlos Mauricio García Fernández, alias "Rodrigo Franco" or "Doble Cero", a former army officer, principal military tactician for the AUC, and a leading figure in the PEPES. By 2000, the BM had co-opted many of Medellín's criminal gangs. By 2001 it was the dominant paramilitary group in the city.(43) In 2002 the BM claimed it controlled 70% of the city, while a press article claimed the BM controlled 30% of Medellín's hillside barrios.(44)

*On 29 June 1996, paramilitaries reportedly entered the corregimiento of Altavista next to Comuna XIII and killed 16 youths, mostly community activists. Months before the security forces had reportedly threatened local inhabitants accusing them of subversion and threatening a paramilitary incursion. The massacre was reportedly used to justify the positioning of a military contingent in the area.*

*On 29 April 1998, Edgar Durango, Luis Pineda, Miguel Guerra Jhones, Moisés Antonio Quiroz, Henry Rodríguez Rivera and Rubén Darío Sepúlveda Benítez were killed after they had been reportedly abducted by members of the Pacheli gang, which had links to the paramilitaries, and the police in El Pinal, municipality of Bello.*

The BCN – led by Diego Fernando Murillo Bejarano, alias "Don Berna" or "Adolfo Paz" – emerged soon after following a struggle for power with the BM. "Don Berna" had also been a leading figure in the PEPES and – through a criminal organization known as *La Oficina* – took over Pablo Escobar's drug-trafficking business following the latter's death. "Don Berna" was also the driving force behind *La Terraza,* one of the most feared criminal gangs in Medellín with close links to the paramilitaries,(45)and acted as a go-between between the AUC and the gang. Following an internal dispute with criminal associates, "Don Berna" sought refuge with Carlos Castaño in the mid-1990s. During this period he reinvented himself as a paramilitary with the alias of "Adolfo Paz" and, with Carlos Castaño's and the AUC's blessing, sought to

000658

challenge "Doble Cero" and the BM for control over Medellín.

A violent confrontation between the BCN and the BM resulted in numerous casualties. Information received by Amnesty International suggests that gang members operating for the BM were told to join the BCN or be killed. Many transferred their allegiance to the BCN. (46)

The dispute between "Don Berna" and "Doble Cero" revolved around the latter's objections of what he saw as the increasing power drug-traffickers were assuming within the AUC, including in Medellín under "Don Berna". In September 2002, "Doble Cero" withdrew the BM from the AUC. After 18 months of conflict, "Doble Cero" announced on 26 April 2004 that he was deactivating the military wing of the BM. "Doble Cero" was killed in Santa Marta, department of Magdalena, in May 2004 by unidentified gunmen.

The BCN, with the direct support or acquiescence of the security forces, continued efforts to root out the militias from the *barrios*. Unlike paramilitary units in rural areas which, by the late 1990s, relied on large numbers of heavily-armed trained contingents, the BCN in Medellín operated through criminal gangs which acted at the behest of the BCN as BCN franchises. In return they continued their criminal activity in areas they controlled. This structure proved invaluable to the BCN as it only had to maintain a limited number of military cadres in the city while it maintained a more formal military structure in rural areas.

By portraying politically-motivated killings as criminal acts committed by delinquents, the authorities could deny the presence of paramilitaries in the city. But those living in the *barrios* were often clear that these killings had been carried out by paramilitaries.

## 6. THE CONSOLIDATION OF PARAMILITARISM IN MEDELLÍN

By late 2001 the paramilitaries had consolidated their presence in several parts of the city. But a strong militia presence in the west of the city, notably in the poor *barrios* of *Comunas* VII and XIII, and in the north-east, principally *Comunas* I and III, prevented the paramilitaries from gaining control of these areas. These were areas of strategic military importance for the guerrilla. ELN militias in the north-east gave access to the city to ELN guerrillas in the *Oriente Antioqueño*, the eastern part of the department of Antioquia. FARC militia forces in the west gave access to the city to FARC guerrillas in the north-west of the country.

For the paramilitaries, control of these areas was essential not only to root out guerrillas from their remaining strongholds in the city but also to control important access routes to the city. The west of the city is the focus of major road developments, while the north-east provides access to Medellín's industrial hinterland in the *Oriente Antioqueño*, an area set for large-scale industrial development. The area provides access to one of the airports serving the city. It is also an area earmarked for large-scale tourist-related development projects.

Years of conflict between militias and the security forces combined with high rates of crime – especially killings and kidnappings – had tarnished the image of a city eager to develop its economic potential. The security forces and the paramilitaries thus sought to wrest control of these strategic areas from the militia and to establish military and socio-political control, ostensibly to make the city more attractive to outside investment. In a communiqué issued in June 2003 the BCN stated that they had partly been responsible for a fall in homicides in Medellín and that this ensured "the necessary climate so that investment, particularly foreign, which is fundamental if we do not want to be left behind by the engine of globalization, returns, is encouraged, and productive and long-term employment can be generated".

### Mariscal and Orión: Security force operations pave the way for paramilitaries

Security force operations launched in *Comunas* VII and XIII, in the centre-west, in 2002 ended guerrilla control in these areas and allowed paramilitaries to fill this void.

**Operation Mariscal** was launched on 21 May 2002. The army, police, *Cuerpo Técnico de Investigación de la Policía Judicial* (CTI), Criminal Investigation Unit of the Judicial Police, the air force, and the *Departamento Administrativo de Seguridad* (DAS), Civilian Intelligence Department, participated in the military assault against FARC, ELN and CAP units in *Comuna* XIII, mainly in the poor *barrios* of Veinte de Julio, El Salado, Las Independencias, Nuevos Conquistadores, San Javier and El Corazón. The security forces employed helicopter gunships, tanks and heavy machine guns in the attack, which resulted in nine civilian deaths. Several members of the security forces were injured or killed during the attack in combat with the guerrilla militia. *Operación Mariscal* was suspended at around 3pm that same day.

**Operation Orión** was launched at midnight on 16 October 2002, soon after President Alvaro Uribe took office on 7 August 2002. The operation involved more than a thousand members of the security forces, including the army, police, and the CTI. It affected the poor *barrios* of Belencito, El Corazón, Veinte de Julio, El Salado, Las Independencias and Nuevos Conquistadores in *Comuna* XIII, and parts of *Comuna* VII. The security forces reportedly strafed the area from a helicopter gunship and employed armoured vehicles.

During *Operación Orión*, which continued into December 2002, over 350 people were detained. At the time of writing this

report, only 54 still faced charges of rebellion; the rest did not go to trial or were absolved. Many were detained without judicial warrant. During combats with guerrilla forces one civilian was killed by the security forces, four "disappeared" and 38 were injured, including several minors. At least four members of the army and police were killed and 14 injured. Ten guerrilla members were reportedly killed.

The security forces were reportedly often accompanied by paramilitaries or followed closely by them as they penetrated further into *Comuna XIII*. As the security forces secured areas, paramilitaries entered in their wake. On 13 November paramilitaries summoned the residents of Las Independencias to a meeting where they reportedly referred to their links with the police and warned that people with links to the guerrilla should leave the area. In a meeting on the same day elsewhere in Las Independencias, AUC paramilitaries reportedly said they were there to control the area and prevent the guerrilla entering. In advance of the meeting military units which were operating in the area withdrew and returned subsequently.

As the security forces advanced they set up numerous checkpoints at the entrance to different *barrios*, and although residents were subjected to stringent controls at these checkpoints paramilitary operations continued unhindered. By November the paramilitary presence in *Comuna XIII* was becoming more blatant. Increasing reports were being received of human rights violations committed by unidentified gunmen or paramilitaries.

*15-year-old Carlos Alberto Castaño Norena was killed on 12 November 2002 reportedly by a paramilitary group coordinated by an army corporal operating in Las Independencias. According to reports, the corporal had recruited youngsters in the barrio to collaborate with the army and had armed them with knives. Carlos Alberto's family reportedly criticized the corporal for arming youngsters. On 12 November Carlos Alberto was reportedly held temporarily in Belén police station. Carlos Alberto's body was found nearby the next day. The corporal was reported to have told the family to abandon the area, while the Office of the Attorney General reportedly told the family not to implicate the corporal in its testimony.*

*On 29 November 2002 Arles Edison Guzmán was reportedly abducted by paramilitaries in Veinte de Julio. His whereabouts remain unknown. On the same day Oscar Alejandro Morales Tangarife was abducted in the same barrio by alleged paramilitaries. He had been wounded during Operación Orión and detained by the police who reportedly ordered him to report regularly to the security forces on his release. His body was subsequently found in a mass grave in a place known as San Javier La Loma (on the border of the corregimiento of San Cristóbal and Comuna XIII).*

Following *Operación Orión* and up to August 2003 at least 46 people "disappeared" in *Comuna XIII*. By August 2003 there were reports of several mass graves in areas on the outskirts of the city or outside the city limits including La Cruz, Santo Domingo, San Juan con Niquitao and La Laguna, municipality of Guarne. According to information received by Amnesty International, in November 2003 at least 11 bodies were uncovered in San Javier La Loma. Several of the bodies were of people reportedly abducted by paramilitaries.

On 1 December 2002 Juan Fernando Vargas Rendón was reportedly abducted by paramilitaries in Belencito in *Comuna XIII*. His body was found in a mass grave on 5 August 2003 in the San Javier La Loma area. Despite the discovery of this mass grave, information received by Amnesty International in October 2004 suggested that judicial investigators had not yet undertaken a full search of this area.

**Paramilitaries consolidate their presence**

To consolidate their position in *Comuna XIII* paramilitaries, in coordination with the security forces, sought to silence potential voices of dissent. Despite the AUC ceasefire announced in December 2002, Amnesty International continues to record cases of human rights violations attributed to paramilitaries in Medellín. In particular, paramilitaries have threatened, forcibly displaced and killed local community leaders or others they accused of links with militia groups. Many of those targeted had been briefly detained during *Operación Orión* or other security force operations and had been released due to lack of evidence. Witnesses to human rights violations or relatives of victims of human rights violations committed by the security forces were also targeted. Those who refused to collaborate with the paramilitaries were also subjected to threats and attacks by paramilitaries.

*Jhon Alejandro Bran Ruiz was killed on 22 September 2003 after reportedly being abducted the day before by paramilitaries in Las Independencias in Comuna XIII. He was reportedly killed between the barrios of Robledo and El Pesebre in Comunas VII and XIII. The paramilitaries were able to take him out of Las Independencias despite reportedly passing a police post and the area being heavily-militarized. Jhon Alejandro had allegedly refused to collaborate with paramilitaries in his barrio.*

*Paramilitaries have often appropriated the homes of those they have threatened. In March 2003, Fernando Sánchez, a former president of the Junta de Acción Comunal (JAC), Community Action Council, in Comuna VII was threatened by paramilitaries who accused him of being a guerrilla. Two weeks later he was forced to abandon the area and his home was allegedly occupied by paramilitaries. The JAC was reportedly under paramilitary control and Fernando was threatened after he refused to collaborate with them.*

000660

By mid-2003 the paramilitaries had control over large parts of *Comuna XIII*. The IACHR issued a press release on 27 June 2003 following the visit of its Rapporteur to Colombia that same month. It stated that the IACHR had expressed concern over the possible "consolidation of paramilitary groups who would continue to commit serious crimes in Comuna XIII." In a press interview, the Rapporteur also stated that in *Comuna XIII* the IACHR had observed "the presence of paramilitary groups in the area and, of course, of the security forces. There is a police station, roadblocks, everything. And the Commission [...] received reports of violations, disappearances, threats against the inhabitants of the Comuna by paramilitary groups."(47)

Having secured control of *Comunas* XIII and VII in the west of the city prior to the demobilization of the BCN, the paramilitaries sought to penetrate the north-east districts of Medellín. Consequently, in 2003 a number of security force operations were initiated in north-eastern areas of Medellín in coordination with paramilitaries.

On 12 January 2003, the Brigade IV of the army, Metropolitan Police, DAS, CTI, and judicial investigators attached to security force units launched a large-scale operation – *Operación Estrella VI* – into a number of areas in the north-east of the city, including La Honda and La Cruz in *Comuna III*. La Honda and La Cruz are poor *barrios* created by land invasions mostly by forcibly displaced people from the Urabá region of north-west Antioquia who had been repeatedly threatened by paramilitary incursions since 2002. The communities possessed a strong community leadership which had established the *Movimiento Social de Desplazados de Antioquia* (MOSDA), Social Movement of Displaced People of Antioquia, to campaign for improved living conditions and provision of services such as water, electricity and sanitation.

During *Estrella VI* over 100 people were detained, including MOSDA leaders who were accused of subversion and homicide. These detentions were reportedly not based on full and impartial criminal investigations but on information from paid informants.

*The persecution of MOSDA activists by paramilitaries continued after Estrella VI. At 12:30pm on 11 March 2003 masked gunmen reportedly entered MOSDA activist Antonio José Carvajal's house in Comuna XIII and abducted him. His family informed the police who took three hours to arrive despite Antonio José Carvajal's house being reportedly very near to a police post. Later that afternoon, the gunmen allegedly returned to the house and ordered Antonio José Carvajal's family to hand over his identity papers. The men threatened the family when they discovered the abduction had already been reported to the police. Shortly before his "disappearance" Antonio José Carvajal had reportedly fled La Cruz after the security forces had raided his house three times. His whereabouts remain unknown.*

Paramilitary activity and repeated close coordination between police from San Blas police station – which serves La Honda and La Cruz – and paramilitaries has reportedly increased since the BCN demobilization. On 27 May 2004, members of the *Comando Elite Antiterrorista* (CEAT), Anti-Terrorist Elite Commando of the police, entered the two *barrios* accompanied by two informers, one of them hooded. They entered a meeting in La Honda being held by the human rights group *Colectivo de Derechos Humanos Semillas de Libertad* (CODEHSEL), Coalition of Human Rights Organizations Seeds of Liberty, and other human rights organizations. The informers pointed out several people who were then detained without a warrant. According to witnesses the informers accompanying the police are former FARC guerrillas who have told witnesses that they are now working for the AUC. Since May 2004 these former guerrillas have been patrolling the area jointly with members of *La 30*, a criminal gang linked to paramilitaries. Members of these patrols are armed and identify themselves as paramilitaries. These paramilitaries have also been seen operating jointly with the police. At the end of May 2004 these paramilitaries stated that they had a list of 20 women who had to abandon La Cruz and La Honda because they were "militia collaborators".

By early 2005 paramilitaries were able to establish a permanent presence in La Honda and La Cruz. According to information received by Amnesty International, in February 2005 police maintained a daily presence in the two areas together with a group of some 30 unidentified gunmen, although not all were present at any one time. These gunmen patrol the area at night and reportedly present themselves as members of a local private security operation.

*Photo Caption*
The community school in La Honda. The sign reads "Settlement of internal refugees for peace and human rights. Welcome. February 14 2003. ©Amnesty International

The consolidation of a paramilitary presence in the La Cruz and La Honda areas had been hampered by the presence in these communities of various local and international human rights NGOs. For this reason, Colombian and foreign human rights activists accompanying these communities have faced repeated threats and attempts to open legal proceedings against them on the basis of spurious information from military intelligence.

**The abduction of Juan Carlos Giraldo Cano**

In 2001, Juan Carlos Giraldo Cano was detained in *Comuna* XIII in an operation by the security forces and accused of offences such as illegal possession of weapons and murder. He was held for 12 days by the judicial police before being released without charge.

On 30 November 2002, at 7pm, two paramilitaries abducted Juan Carlos in Las Independencias. He heard one of the

000661

paramilitaries speak on a walkie-talkie: *"Tenemos uno de los gordos"*, "we have one of the big ones"; a voice replied *"Traigalo para el corral"*, "Bring him to the ranch". He was forced into a taxi and driven towards a place called "El Botadero" near Nuevos Conquistadores. The taxi passed three checkpoints on the way – two army checkpoints in El Salado and Veinte de Julio, and a police checkpoint in an area known as "La Canalización". The taxi was allowed through even though it was reported that civilians passing through the El Salado checkpoint were submitted to rigorous checks. When the taxi arrived in "El Botadero" Juan Carlos was forced out of the vehicle and saw four paramilitaries wearing ACCU armbands and one uniformed CTI agent, armed with a mini-Uzi.

The paramilitaries beat Juan Carlos while the CTI agent watched. They were joined by five more paramilitaries wearing armbands and another CTI agent. Another taxi arrived and two other people who had been abducted were forced out of this vehicle. Juan Carlos recognized them as residents of Las Independencias. Referring to one of these two people, one of the paramilitaries said: *"Este es el hijo-de-puta de la foto de la Fiscalía"*, "This is the son-of-a-bitch in the photograph of the Attorney General".

One of the paramilitaries approached Juan Carlos and put a gun to his forehead and ordered him to tell them where the militia were. He then fired a shot into the air by Juan Carlos's ear. Juan Carlos and the other two abductees were then forced into a truck and driven towards the *corregimiento* of San Cristóbal. One of the paramilitaries said to another: *"Cuando mi cabo me dijo que me vistiera de civil pensé que iba a hacer inteligencia. No que me mandaba para acá"*, "When my corporal ordered me to dress in plainclothes I thought I was going to be doing intelligence work, not that he was going to send me here".

On the outskirts of *Comuna* XIII, the truck passed by a police vehicle. Although the paramilitaries were heavily-armed and their weapons visible the police reportedly took no action. After heading off the main road and following a dirt track the truck arrived at a farm. A large number of paramilitaries were in the farm wearing paramilitary armbands. Juan Carlos also reported seeing soldiers wearing uniforms bearing army battalion insignia.

Juan Carlos and the other two abducted men were forced out of the truck and told not to run or they would be shot. One of the paramilitaries asked another for a machete: *"¿Vamos a enterrar la gente entera?"*, "Are we going to bury the people whole?". One of the abducted men tried to flee and was shot in the back. Juan Carlos heard the paramilitaries issue an order for several holes to be dug for *"estos tres y seis más que traen ahora"*, "these three and six more they are bringing now". Juan Carlos and the other man still alive were forced to the ground. The other abducted man was shot dead. Juan Carlos was shot twice, in the hand and in the face, and pretended to be dead. As he lay still he saw the paramilitaries hacking one of the bodies. Juan Carlos grabbed one of the paramilitaries who was standing over him. In the struggle the paramilitary was shot and Juan Carlos threw himself into the surrounding undergrowth and hid while the paramilitaries opened fire, injuring Juan Carlos again.

With the help of a passing taxi, Juan Carlos managed to escape from the area and spent two weeks recovering in a health centre elsewhere in the city. After reporting his case to the Human Rights Ombudsman (*Defensor del Pueblo*), he fled to Bogotá where he presented his case to human rights officials in the Office of the Vice-President. On 24 March 2004 he made a statement in the Colombian Congress and was subsequently forced to flee to Venezuela.

After his appearance in Congress, Juan Carlos' family was allegedly kept under surveillance by unidentified individuals, while paramilitaries in the area reportedly began asking about his whereabouts. The family was finally forced to abandon their home for fear of their safety.

## 7. THE DEMOBILIZATION OF THE *BLOQUE CACIQUE NUTIBARA*

The successful consolidation of paramilitarism in many of Medellín's poorer neighbourhoods by 2003 made the city the ideal scenario for the first large-scale demobilization of AUC-linked paramilitaries since it would help give credibility to the national paramilitary demobilization process. Over 860 BCN combatants under the command of "Don Berna" began to demobilize at a televised ceremony on 25 November 2003.

The combatants were submitted to a three-week "rehabilitation course" in La Ceja Municipality, where they concentrated between 26 November and 16 December. They were given legal, psycho-social and medical assistance and some were enrolled in *Convivencia y Seguridad Ciudadana* (coexistence and citizen security) classes which included training in community leadership and the law. During this time their criminal records were checked by the judicial authorities to ensure there were no criminal investigations pending against them, before they received a *de facto* amnesty under Decree 128 and allowed to return home.

But the process raised serious concerns over whether combatants were effectively being removed from or "recycled" into the conflict. The fact that most demobilized paramilitaries would simply be allowed to return to their homes following a short rehabilitation course heightened concerns that paramilitaries would continue criminal operations on their return.

Prior to its demobilization the strength of the BCN was estimated at over 2,000 combatants, but just over 860 actually demobilized. Many of the rest are thought to have continued to work in rural areas. From the outset, therefore, it was clear that the demobilization would not affect the BCN's military capacity. In September 2003 a large contingent of BCN troops left Medellín for the *Oriente Antioqueño* where the *Bloque Héroes de Granada*, Héroes de Granada Bloc, operates.

(48) According to information received by Amnesty International the Héroes de Granada Bloc is a former BM unit which is now under BCN command.

Amnesty International also received reliable reports that in advance of the demobilization paramilitaries were recruiting unemployed youths to pose as paramilitaries for the demobilization ceremony. These reports raised concerns that only a small percentage of the BCN was actually demobilizing. As the government's High Commissioner for Peace admitted: "street delinquents were mixed in 48 hours before [the demobilization process began] and included within the group of combatants to be demobilized".(49)

Despite the high number of human rights violations committed by the BCN and its predecessor, the BM, most of those paramilitaries who demobilized benefited from Decree 128. The absorption of many former BM members in the BCN ranks may also have provided an escape from prosecution for many individuals who could deny involvement in human rights violations committed by the BM which had operated for a much longer period.

Although some paramilitaries were facing criminal investigations these were not related to paramilitarism but to common crimes. The IACHR found that of the 360 facing legal proceedings "only one of them implicated in the investigation of crimes related to alleged human rights violations."(50)

The short space of time which judicial authorities were given to verify the criminal record of each demobilized combatant meant that it was unlikely that each could be subjected to a full and impartial judicial review. Many of those who participated in the demobilization ceremony on 25 November 2003, although possibly responsible for serious offences including human rights violations, would thus not be subject to criminal proceedings.

**The paramilitaries post-demobilization: hiding in the shadows**

An indication that the paramilitaries continued acting militarily was reflected by several killings that took place around the time of the demobilization in La Ceja. On 14 December 2003 paramilitaries reportedly abducted Jhon Freddy Morales Ocampo, a local farmer. The next day his family found his body with signs of torture in a local morgue. Paramilitaries had reportedly been threatening the family to surrender their farmland in La Ceja.

In Medellín, human rights violations committed by paramilitaries also continued during the demobilization process. On 1 December 2003 paramilitaries reportedly killed Carlos Mario Sepúlveda, Diego Alexander Ortiz Mazo, Ever Humberto Pérez Salas, Marcela Zuluaga Quintero and Wilson Alberto Castañeda Morales who were in a bar at the time of the attack in the *barrio* of Antonio Nariño in *Comuna* XIII; four other people were injured.

Following the demobilization, paramilitary structures in the city remained essentially intact and human rights violations reportedly committed by paramilitaries continued to be reported in the city. On 7 January 2004, Uriel Enrique Paniagua was reportedly abducted, tortured, mutilated and killed by paramilitaries in an area known as La Loma in *Comuna* XIII.

The National Human Rights Ombudsman documented several cases of human rights violations committed by paramilitaries following the demobilization process.(51) On 14 January 2004, alleged BCN paramilitaries entered the *barrio* of Popular in *Comuna* I and forced several families to leave the area. The next day, according to the same report, paramilitaries killed Neftaly Andrés Peña Correa in Parts in the neighbouring municipality of Bello. Norley de Jesús González was reportedly shot dead by paramilitaries on 27 March 2004. Norley had been detained during *Operación Orión* and accused of subversion. Despite the fact that members of the police were in the vicinity at the time of the killing they made no apparent effort to apprehend the culprits. Norley had been released from prison in February 2004.

After the demobilization it became increasingly important for the paramilitaries to disguise their continued presence in the city. This was facilitated by the fact that, as noted above, the presence of highly-trained paramilitary cadres in Medellín had always been limited. The BCN's military strength in Medellín had always been reinforced by the criminal gangs they had co-opted and which operated under the coordination of BCN commanders. Whilst the BCN's co-option of criminal gangs was nothing new it did offer very useful benefits:

- Demobilization would not impact on the BCN's military strength since its military cadres in Medellín had been limited and, furthermore, a large number of BCN troops had been redeployed to the *Oriente Antioqueño* in advance of the demobilization.

- The use of criminal gangs meant that the continued paramilitary presence in the city could be hidden. Paramilitary actions could more easily be dismissed as the actions of common criminals, at least to outside observers if not to civilians living in areas of paramilitary control where the presence of paramilitaries was deliberately made obvious to instil a greater sense of fear. The BCN took on an amorphous form, hiding in the shadows but assuming concrete form when a clear political or military message had to be conveyed.

By hiding their continued presence in the city behind criminal gangs, the BCN sought to give credibility to their

000663

demobilization. This would allow them to embark on the next phase of their strategy: their transformation into a legal socio-political force in the city.(52)

By the second half of 2004 paramilitary control in many poor neighbourhoods was increasingly covert. In reference to the paramilitary presence in Medellín, an observer commented in August 2004 that: "today their control is more subtle; there are no hooded patrols armed with assault weaponry. It is an invisible control which is carried out through threats, with hidden small arms, with forced displacement from the neighbourhoods".(53)

This reflects information received by Amnesty International indicating that while in early 2003 paramilitaries had patrolled the *barrios* of *Comuna* XIII in uniform and armed with assault weapons, following the demobilization paramilitaries did so in plainclothes. But in May 2004 Amnesty International was informed that 150 paramilitaries in Veinte de Julio, Eduardo Santos, Belencito and El Salado were patrolling in military-style uniforms and wearing AUC armbands at night, but wore plainclothes during the day.

Since the paramilitaries gained control over many parts of the city, and are no longer in military dispute with guerrilla militias, the number of reported killings in the city fell by 40 per cent in 2004. The Medellín municipal government under Mayor Sergio Fajardo has suggested that this sharp decrease has been the result of the BCN demobilization.(54)

The establishment of paramilitary control in strategic parts of the city has brought with it increased control of criminal gangs by one dominant armed group. But the Medellín ombudsman (*personero municipal*) in his 2004 human rights report questions the assumption that the fall in killings is a result of the demobilization and asks whether it is in fact a result of the paramilitary's "social, economic and political-military control that [the BCN] was able to consolidate before its demobilization and that it has maintained subsequently".

According to the Medellín ombudsman's 2004 report, the increase in killings with knives from one in 11 in 2003 to one in every six people killed in the city in 2004 "could point to a trend towards disguising political killings as criminal murders or as a strategy to cover up the responsibility of armed groups that exercise social control over the neighbourhoods and who are committed to ensure the reduction of killings in the city".(55)

Leaders in *Comuna* XIII and in the north-east of the city have lodged repeated complaints about an increase in killings with knives, bludgeoning weapons or through asphyxiation, rather than killings with firearms, the traditional weapon of urban paramilitaries.

What is evident is that the security of the civilian population is conditioned by the dominant armed group. While killings may have fallen, they are still being carried out to ensure that the civilian population does not challenge paramilitary control. Similarly, in areas where the guerrilla are the dominant group, killings have fallen when there is no rivalry for control over a territory. In these guerrilla-held areas, civilians are also punished for stepping out of line.

**Private security: recycling paramilitaries into the conflict**

In November 2003, Colombian national press reports reported that 200 posts had been made available to "demobilized" members of the BCN to work in a *Zonas Seguras* private security programme which was being coordinated by the Municipality of Medellín and which sought to privatize security arrangements in a number of neighbourhoods in the city. The attempt to integrate demobilized combatants in security structures recalled the creation of COOSERCOM in the mid-1990s. The *Zonas Seguras* programme was abandoned following criticism from Amnesty International and other human rights organizations.

However, Amnesty International continues to be concerned that, given the lack of an adequate legal framework and the failure of Decree 128 to combat impunity, there are no guarantees to ensure that demobilized paramilitaries who might be responsible for serious human rights violations are not being "recycled" into the conflict by being integrated into security-related employment, including private security firms, where they will often be armed and thus able to exert power in those areas in which they operate. Prior to the demobilization it was standard practice for the paramilitaries to demand money for security services from tradespeople and residents. Two years after the demobilization this continues to be a serious concern.

Since the demobilization, reports from officials, NGOs and local residents indicate that paramilitaries are increasingly being employed in security-related jobs in licensed firms and in the unregulated informal sector. These reports suggest that the BCN has been promoting the creation of neighbourhood security bodies (*comités comunitarios de seguridad*) which would be run by demobilized BCN combatants, and has sought to control *Mesas Barriales de Convivencia* (Neighbourhood Security Committees). Groups identifying themselves as paramilitary have reportedly secured contracts from JACs to provide security in some *barrios*.

According to local community organizations and residents interviewed by Amnesty International in February 2005, there has been an increase in the number of private security firms operating in the informal sector. Often those employed in these firms wear no identification. In several *barrios*, such as Picacho (*Comuna* VI) Moravia (*Comuna* III), Popular and Santo Domingo Sabio (*Comuna* I), El Salado and Juan XXIII-La Quiebra (*Comuna* XIII), and Belén (*Comuna* XVI)

000664

Individuals identifying themselves as paramilitaries continue to charge local businesses and often local residents for security services. Those who refuse to pay are threatened and often forced to abandon their homes. In *Comuna* VI reports suggest that the paramilitaries have been charging inhabitants protection money to operate as *"cooperativas de vigilancia"*, "security cooperatives". In El Pesebre in *Comuna* XIII, reports suggest that paramilitaries have set up a *"cooperativa de seguridad"*, "security cooperative".

In the centre of Medellín some of the private security firms are known as CONVIVIR. A witness described their activities: "Although the police is the body of law enforcement, it is the CONVIVIR which decides who should be detained and who should not. As a result, the link between paramilitaries and the police is evident to the majority of youths". In another part of the city, local residents alleged that a gang linked to paramilitaries has been given a contract to provide security to a school. The development of these security structures highlights the concern Amnesty International raised in November 2003 – that paramilitaries are being recycled into the conflict through their incorporation into private security firms.

On 31 July 2002 then President Andrés Pastrana issued Decree 1612 which contains provisions permitting the arming of bodies providing security. Decree 1612, and planned legislation which may allow civilians to bear assault weaponry, raises concerns about the lack of guarantees to prevent demobilized paramilitaries who may be complicit in human rights violations from re-arming themselves and operating in private security firms. There are no restrictions preventing them from carrying firearms while working for private security firms.

The use of demobilized combatants in private security activities is likely to increase following a speech by President Uribe to private security companies on 28 July 2005 in which he asked them for cooperation in the fight against crime. In response, the private security sector proposed the use of demobilized combatants in security-related activities. As a result, in August the Ministry of Interior and Justice announced plans to create a "civic guard" (*guardia cívica*) made up of demobilized paramilitaries and guerrillas. These would provide unarmed security in parks, large public events, and shopping centres.

Concerns that demobilizing paramilitaries could be reintegrated into the conflict were further heightened by Decree 2767, promulgated on 31 August 2004. The decree expands the economic benefits enjoyed by demobilized members of illegal armed groups under Decree 128. It allows the Ministry of Defence to pay a demobilized combatant for their "collaboration" with the security forces. According to the government, between August 2002 and April 2005, more than 1,100 demobilized paramilitaries and guerrillas have been paid for information and related intelligence activities in the country as a whole. More than 760 were paid to act as armed "guides" during military operations. This puts in doubt government claims that the aim of the demobilization is to remove combatants from the conflict.

An agreement signed on 10 December 2003 between the government and the BCN committed Metroseguridad to support a *"red de información"*, information network, to logistically support the operation and equipping of a preventative information network which should be set up to issue early warnings to protect the demobilized paramilitaries and the areas to which they have returned."(56) However, there are no guarantees in place to ensure that this "information network" has not and is not being used by the demobilized paramilitaries as a mechanism to gather intelligence on local human rights defenders and community activists.

Amnesty International has repeatedly expressed its concern about the use of civilians in counter-insurgency activities, for example, as regards the network of civilian informers created by President Uribe soon after coming to office. (57) The use of former paramilitaries in intelligence gathering is particularly dangerous since it could replicate the circumstances that originally led to the creation of paramilitary groups.

### The political rehabilitation of the paramilitaries

The return to Medellín of the demobilized paramilitaries from La Ceja was accompanied by the setting up of a network of centres where demobilized paramilitaries could congregate and the creation of an NGO – *Corporación Democracia*, Democracy Corporation. (58) Among those who demobilized were middle-ranking BCN commanders who, having avoided any criminal prosecution for paramilitary-related human rights violations carried out by the BCN, emerged into public life as the leaders of *Corporación Democracia*. It is headed by Giovanny Marín, a political leader of the BCN who demobilized in November 2003. In April 2005, it was revealed that Giovanny Marín would stand in the March 2006 congressional elections.

*Corporación Democracia* has thus provided a vehicle for a number of BCN commanders to participate actively on the political scene without fear of prosecution. This has raised concerns that the paramilitaries' socio-political exercise in community control will be legitimized as they seek to co-opt and take control of community organizations and political representation in the poor neighbourhoods of the city. It is legitimate for demobilized combatants to participate in politics so long as it can be guaranteed that they are not implicated in human rights abuses nor that their political activities are being backed by violence and other crimes. The failure to implement a legal framework for the demobilization which guarantees the right of victims to truth, justice and reparation, and the continued presence of an active paramilitary structure in Medellín, strongly suggests that such guarantees cannot be forthcoming.

There is also evidence that the operation of an organized paramilitary structure in Medellín continues through the forced

000665

recruitment of minors. On 15 August 2004, four paramilitaries reportedly took eight 13-14 year-olds from their homes in El Salado. They were reportedly taken away to undergo military training. Some 27 other similar cases had been reported in the area by August 2004. According to information received by Amnesty International from witnesses in El Salado, paramilitaries had entered schools in the area in August 2004 and attempted to recruit schoolchildren to join paramilitary structures. According to a recent report from the Human Rights Ombudsman, there is evidence that BCN paramilitaries are recruiting youths in return for 700,000 pesos a month (around USD 300 ). (59)

With the paramilitary project firmly in control in Medellín, and efforts to legitimize itself as a political project relatively advanced, the civilian population is still being exposed to constant threats and attacks, since its security depends on the whims of the dominant military force in the area. The rule of law cannot be guaranteed in a city in which any attempt to question or challenge the control of paramilitary forces can and is being met with political violence.

## 8. HUMAN RIGHTS DEFENDERS: KILLINGS AND THREATS CONTINUE

Despite attempts to camouflage politically-related killings, many threats and killings are intended to send a clear message to the community not to challenge paramilitary control. Killings of individuals accused of being guerrilla collaborators often bear a political message.

Human rights defenders, who threaten to expose the reality of the human rights crisis in the city and the links which exist between the paramilitaries and the security forces, are at particular risk since they continue to pose a serious challenge to the ability of paramilitaries to consolidate their control unhindered. Their work clearly has to be silenced.

### Asociación de Mujeres de Las Independencias

María del Socorro Mosquera, Mery del Socorro Naranjo and Teresa Yarce, members and associates of the Asociación de Mujeres de las Independencias, (AMI), the Women's Association of Las Independencias, were first detained by the security forces on 12 November 2002 and held without charge for nine days. They had previously denounced cases of human rights violations in Comuna XIII during Operación Orión, including killings carried out by paramilitaries in areas under army control. Although they were released on 21 November 2002, criminal investigations against them for guerrilla-related activities reportedly continued.

In the same month, Luz Dary Ospina, president of AMI, was forced to leave her home in Las Independencias as a result of paramilitary death threats. Her husband and children remained in the house, but in subsequent months were subjected to repeated raids and threats and other forms of intimidation by the security forces and unidentified gunmen. Luz Dary had repeatedly denounced violations of human rights since Operación Mariscal.

Teresa Yarce was shot dead on 6 October 2004 in a street near her home in Las Independencias by a gunman recognized by witnesses as a paramilitary. At the time, Teresa Yarce was with one of her daughters, and her colleague Mery del Socorro Naranjo.

*Photo Caption*
Teresa Yarce, killed by a reported paramilitary in October 2004 ©Private

Teresa Yarce had condemned the fact that public funds earmarked for public services were allegedly being siphoned off to pay two paramilitaries who were appearing on the payroll as public services workers. A few weeks before she was killed she had reportedly escaped a paramilitary attempt to abduct and kill her. Teresa Yarce was killed hours before she was due to testify to judicial authorities against a local paramilitary leader who had been detained.

About three hours after Teresa Yarce was shot, a known member of a paramilitary group operating in Comuna XIII reportedly approached Mery del Socorro Naranjo when she was in her family's home in Las Independencias and told her that the paramilitaries were celebrating Teresa's death and saying that they were now "going to kill the other two" ("después van las otras dos"), believed to refer to Mery del Socorro Naranjo and María del Socorro Mosquera.

### CODEHSEL

Human rights NGOs which form part of CODEHSEL and other human rights organizations in Medellín have faced increasing threats to their security. CODEHSEL has played an active role in exposing the paramilitary presence in the city and providing support to communities facing human rights violations, including in La Honda and La Cruz.

In September 2004, CODEHSEL members reported that they were being kept under surveillance by unidentified individuals. Some of these individuals have reportedly approached witnesses and identified themselves as AUC. Surveillance of human rights defenders have often preceded serious human rights violations against them. On 1 December 2004, a CODEHSEL member entering Bellavista Prison in Medellín to visit detainees was reportedly threatened by paramilitaries who referred to him by name and said to him: "You lot are the envoys of Mono Jojoy and you are coming here to train these guerrillas." (60)

000666

The threats have been accompanied by attempts, reportedly coordinated by the army, to initiate legal proceedings on charges of subversion against CODEHSEL members. Attempts to present the work of CODHESEL as subversive are not new. In the late 1990s the security forces attempted to implicate CODEHSEL in legal proceedings on charges of subversion.

In the context of these threats, on 30 March 2005 Alejandro Quiceno, a human rights worker with *Fundación Sumapaz*, Sumapaz Foundation, a member of CODEHSEL, was detained by the CEAT. His detention was reportedly based on the evidence of two informants. Judicial investigators allege that *Fundación Sumapaz* is linked to the *Ejército Revolucionario del Pueblo* (ERP) Revolutionary People's Army. During his detention, CEAT investigators reportedly stated that the link between human rights NGOs and the guerrilla was obvious. At the time of writing Alejandro Quiceno is still in detention facing charges of rebellion.

### Neighbourhood NGOs and Community Action Councils

The paramilitaries continue to threaten members of community NGOs based in the poor *barrios* and to discredit the legitimacy of their work. Members of well-established NGOs or other organizations providing assistance to communities have been forced to displace from neighbourhoods the paramilitaries control or have been threatened to such an extent that they are no longer able to continue with their work. Elected members of the *Juntas de Acción Comunal* (JAC), Community Action Councils, have also been threatened as paramilitaries seek to co-opt these bodies in order to promote their socio-political agenda in the *barrios*:

- In July 2004, a representative from CONVIVAMOS, an NGO which operates in a number of *barrios* in the city, was reportedly summoned by paramilitaries, threatened, and ordered not to continue participating in community activities. The NGO met with municipal authorities who arranged a meeting with *Corporación Democracia*, which reportedly gave assurances that no military action would be taken against its leaders.

- On 28 July 2004, two gunmen entered the home of María López, a youth leader from *Comuna VII*. One of the gunmen reportedly identified himself as a member of the DAS and the other as AUC. They said they were looking for María, threatened her mother, tied her up and locked her in the bathroom. After searching the house the gunmen left. This incursion followed a series of threats against youth organizations, apparently by paramilitaries.

Paramilitaries have sought to become a political actor in their own right by ensuring that they remove those elected community representatives opposed to their presence and supplant them with their own candidates or to use recognized local leaders to collaborate with them. The IACHR has stated that the paramilitaries "seek to legitimate their influence in the community organizations known as *juntas de acción comunal* and to maintain their control over everyday activities in the *comunas* by the use of violence, extortion, and intimidation."(61)

In some parts of the city community leaders were reportedly ordered to leave the area because *Corporación Democracia* wished to present its own candidates to the JACs and other community organizations. In a *barrio* in *Comuna* VIII, the paramilitaries reportedly threatened the JAC president to resign or be killed. In another *barrio* in *Comuna* VIII the BCN reportedly told the newly elected leaders that *"le vamos a acompañar para evitar corrupción"*, "we are going to accompany you to avoid corruption". In October 2004 paramilitaries convened a meeting of residents from El Salado, where they ordered that members of a local committee dealing with sanitation issues be changed.

One president of a neighbourhood JAC in *Comuna* XIII was summoned to a meeting by paramilitaries a month after his election in April 2004. The gunmen identified themselves as AUC and told him that they required his support as President of the JAC. He was told that he should inform the community not to denounce their presence to the security forces if they saw them in the area in uniforms or with radios. When he refused the community leader was told that he was the only leader in *Comuna* XIII who was not collaborating with them. The paramilitaries informed him that their intention was to rid the area of delinquents.

According to reports received by Amnesty International, in October 2004 members of the JAC in La Cruz in *Comuna* III were threatened by paramilitaries identifying themselves as members of the BCN. Paramilitaries stated that members of the JAC and other residents in the area who they said had links with the guerrilla would be killed. On 7 November 2004, Jesús Estrada, a community leader in La Cruz, was abducted by five hooded gunmen while he was in a public billiards bar at 8:20pm. At the time of his abduction it is reported that police agents had withdrawn from the area despite the fact that since May they had maintained a permanent presence in the area near the billiards bar. Jesús Estrada's body was found the next day in a morgue in Llanaditas in *Comuna* VIII together with the body of an unidentified individual the gunmen reportedly abducted from his home in La Honda the previous day.

In *Comuna* XVI, a community leader has since early 2005 been threatened for allegedly blocking demobilized paramilitaries from taking control of the local JAC and the *Mesa Barrial de Convivencia*.

### CONCLUSIONS AND RECOMMENDATIONS

The paramilitary demobilization in Medellín and elsewhere has lacked transparency and effective oversight, especially on issues of verification and the application of international norms on truth, justice and reparation. Paramilitary violence continues, in Medellín and in the country as a whole. More than 2,300 killings and "disappearances" across the country have been attributed to the paramilitaries since they declared a ceasefire in December 2002. Paramilitary structures and control in Medellín also remain intact.

Human rights organizations and community groups in Medellín have expressed concern about the growing influence of now-legal political and social paramilitary-linked groups in the city. It is legitimate for demobilized combatants to organize politically and seek to gain influence through the ballot box. But guarantees must be in place to ensure those seeking elected office have been thoroughly investigated by the judicial authorities to ensure they are not implicated in human rights violations and that threats and violence are not being used as a political tool.

The recently approved Justice and Peace Law, which aims to regulate the demobilization process, will do little to secure an end to human rights abuses. It fails to meet Colombia's international obligations on victims' right to truth, justice and reparation; threatens to strengthen the already chronic levels of impunity which exist in Colombia; and will not guarantee that demobilized paramilitaries are not simply reintegrated into the armed conflict.

An effective demobilization must bring to justice those responsible for backing paramilitarism militarily, politically and financially, and include efforts to uncover the full responsibility of the security forces and others in the formation and coordination of these groups. Decree 128 and the Justice and Peace Law will reinforce the strategy of impunity by preventing full and impartial judicial investigations into human rights violations by paramilitaries and the responsibility of those who have actively or otherwise supported them.

Paramilitarism has not been dismantled, it has simply been "re-engineered". Since many areas of Colombia have now been wrested from guerrilla control, and paramilitary control established in many of these, there is no longer a need to have large numbers of heavily-armed uniformed paramilitaries. Instead, the paramilitaries are beginning to contribute to the security forces' counter-insurgency strategy as "civilians". The increasing participation of paramilitaries in private security firms – both regulated and illegal – the failure to legislate against the participation of armed demobilized paramilitaries in licensed private security firms, as well as the recent idea mooted by the government to create a "civic guard" made up of demobilized combatants, without effectively ensuring that none of them are implicated in human rights violations, and the government's network of civilian informants and Decree 2767, will only serve to ensure that paramilitaries will be "recycled" and "legalized" into structures which may prove more palatable to domestic and international public opinion.

But unless concrete measures are put in place to ensure that demobilized paramilitaries are not simply reintegrated into the conflict, a legal framework created to ensure that the right of victims to truth, justice and reparation is fully respected, and high-ranking security force personnel and others responsible for promoting paramilitarism brought to justice, the phenomenon of paramilitarism in Colombia is likely to continue as strong as ever before.

**Amnesty International calls on the Colombian government to implement a legal framework for the demobilization of paramilitaries which fully respects international standards on victims' right to truth, justice and reparation, including:**

- The right of victims and their relatives to know the whole truth about human rights violations and abuses and to participate fully at all stages of the legal process.

- An explicit rejection of amnesties for human rights violators, the imposition of sentences commensurate with the gravity of the offence, and the application of procedural benefits only to paramilitaries not responsible for serious human rights violations and who demobilize as part of a group which has ceased to violate human rights. Legislation must recognize the applicability of IHL, prosecutions for specific violations of human rights and IHL, and the jurisdiction of the International Criminal Court (ICC).

- Concrete and effective measures to ensure that victims and their relatives, including women and girls who suffered sexual abuse in the context of the armed conflict, receive full reparation as prescribed in international standards, including *restitution, compensation, rehabilitation, satisfaction and guarantees of non-repetition.*

- Benefits for those not responsible for human rights violations must be conditional on full collaboration with the judicial authorities, full disclosure of information about the group's assets, structure and membership, complete handover of assets accrued during the individual's participation in the group, total compliance with the ceasefire at the individual and group level, and payment of reparations to the victims. The benefits should comply with international standards on victims' right to truth, justice and reparation.

- Measures to ensure that demobilized combatants are not "recycled" into the conflict, including banning their use of

000668

weapons and employment in the security forces and private security companies, and excluding them from membership of civilian informer networks, until such time that guarantees can ensure that those who might be responsible for serious human rights violations are not being "recycled" in this way.

**Amnesty International calls on the Colombian government to take all the necessary measures to end impunity, break the links between paramilitaries and the security forces, and guarantee the safety of civilian sectors at particular risk, including:**

- Implement a comprehensive human rights policy that complies fully with its international obligations, and UN and other international bodies' human rights recommendations.

- Ensure full and impartial investigations into violations of human rights and international humanitarian law and ensure that those individuals and sectors responsible for supporting paramilitarism – militarily, politically and economically – are brought to justice, and that members of the security forces implicated by judicial or disciplinary investigations in such cases or in collusion with paramilitarism should be suspended from duty until such time that their responsibility or innocence has been determined.

- Reverse proposals which drag civilians further into the conflict and "recycle" paramilitaries, such as the civilian informer network and Decree 2767, which authorizes paid collaboration with the security forces.

- End its campaign to undermine and discredit the legitimate work of human rights defenders, trade unionists and other social activists, many of whom have been the subject of mass arrests, arbitrary detentions, and raids on their offices and homes.

- Withdraw its objection under Article 124 of the Rome Statute which allows Colombia to reject the jurisdiction of the ICC to investigate war crimes for a period of seven years.

**Amnesty International calls on the international community:**

- Not to provide political and economic support to the demobilization process until the Colombian government implements a legal framework for the demobilization of illegal armed groups which fully conforms to international standards on the right of victims to truth, justice and reparation.

- To urge the Colombian government to fulfil the above recommendations and closely monitor its efforts to fulfil these recommendations and those made by the UN High Commissioner for Human Rights and other inter-governmental bodies.

********

(1) This has been documented in numerous Amnesty International reports, including Colombia: Laboratory of War: Repression and Violence in Arauca (AI Index: AMR 23/004/2004) and Colombia: Scarred Bodies, Hidden Crimes – Sexual Violence against Women in the Armed Conflict (AI Index: AMR 23/040/2004).

(2) During these visits, Amnesty International also collected information on paramilitary demobilizations elsewhere in the country.

(3) See Colombia: Letter for the attention of Mr Manuel Marulanda, Revolutionary Armed Forces of Colombia – People's Army (AI Index: 23/124/2002).

(4) The role of the Office of the Procurator General is to carry out disciplinary investigations into allegations of misconduct, including human rights violations, by public officials, such as members of the security forces.

(5) NCOS, SAGO, Terre des Hommes France, Commission of the Churches on International Affairs, International Confederation of Free trade Unions, Commissie Rechtvaardigheid en Verde, Tras los Pasos Perdidos de la Guerra Sucia, Ediciones NCOS, Brussels, 1995, p. 90.

(6) See Colombia Nunca Más. Crímenes de Lesa Humanidad Zona 14a 1966...,Volume 1, Annex, http://www.derechos.org/nizkor/colombia/libros/nm/z14I/anexo.html.

(7) See Colombia Nunca Más. Crímenes de Lesa Humanidad Zona 14a 1966...,Volume 1, Annex, http://www.derechos.org/nizkor/colombia/libros/nm/z14I/anexo.html.

000669

Case 3:08-cv-00885-SI    Document 1-21    Filed 02/08/2008    Page 28 of 30

Colombia: The Paramilitaries in Medellín: Demobilization or Legalization? Amnesty ...    Page 27 of 29

(8) IACHR Report N° 41/02, Admissibility, Petition 11.748, José Del Carmen Álvarez Blanco Et Al. (Pueblo Bello), Colombia, 9 October 2002.

(9) See Colombia Nunca Más. Crímenes de Lesa Humanidad Zona 14a 1966…,Volume 1, Annex, http://www.derechos.org/nizkor/colombia/libros/nm/z14l/anexo.html.

(10) See Chapter 4 for an examination of the legal framework for the negotiations with paramilitaries.

(11) Under Colombian law members of illegal armed groups accused of "political" offences such as rebellion and sedition cannot be extradited. Drug-trafficking offences, however, are extraditable. The United States has issued extradition requests against a number of key paramilitary negotiators on drug-trafficking charges.

(12) See Chapter 4 for an examination of Decree 128.

(13) See Chapter 7 for an examination of the BCN demobilization process.

(14) The Office of the Attorney General was set up by the 1991 Constitution to investigate and prosecute all crimes committed in Colombia, including human rights violations and abuses.

(15) El Espectador, 14 December 2004.

(16) Resolution CP/RES 859 (1397/04). In its resolution, the Permanent Council invited the Inter-American Commission on Human Rights (IACHR) to provide advisory services to the MAPP/OAS Mission.

(17) The agreement signed between the Colombian government and the OAS states that "the Mission will not intervene in the internal affairs of Colombia, nor will it issue judgments on the legal or political decisions that are within the remit of the sovereignty of the Colombian State."

(18) Jean-Marie Henckaerts and Louise Doswald-Beck, Customary International Humanitarian Law, 2 volumes, Volume I. Rules, Volume II. Practice (2 Parts), Cambridge University Press, 2005.

(19) The Commission on Human Rights adopted the Basic Principles on 19 April 2005.

(20) E/CN.4/Sub.2/1997/20/Rev.1, annex II

(21) Principle 4, E/CN.4/Sub.2/1997/20/Rev.1, annex II.

(22) IACHR, Report on the Demobilization Process in Colombia, OEA/Ser.L/V/II.120 Doc. 60, 13 December 2004, paragraph 17, OEA/Ser.L/V/II.120 Doc. 60, paragraph 16.

(23) OEA/Ser.L/V/II.120 Doc. 60, paragraph 18.

(24) OEA/Ser.L/V/II.120 Doc. 60, paragraph 21.

(25) According to the Basic Principles on Reparation (Article 22), "Restitution should, whenever possible, restore the victim to the original situation before the violations of international human rights or humanitarian law occurred. Restitution includes: restoration of liberty, legal rights, social status, family life and citizenship; return to one's place of residence; and restoration of employment and return of property."

(26) For physical and mental harm, lost opportunities, material damages and loss of earnings, moral damage and costs required for legal assistance, and medical, social and psychological services.

(27) Including medical and psychological care as well as legal and social services.

(28) Among the measures to be taken for satisfaction under Article 25 of the Basic Principles on Reparation are "[a]n official declaration or a judicial decision restoring the dignity, reputation and legal and social rights of the victim and of persons closely connected with the victim" and an "[a]pology, including public acknowledgement of the facts and acceptance of responsibility".

(29) OEA/Ser.L/V/II.120 Doc. 60, paragraph 29.

(30) OEA/Ser.L/V/II.120 Doc. 60, paragraph 24.

(31) See box on page 14.

000670

(32) The Colombian government, the G24 group of donor countries, the Inter-American Development Bank and the United Nations met in London in July 2003 and Cartagena in February 2004 to discuss, among other things, implementation by the Colombian government of the human rights recommendations of the Office in Colombia of the UN High Commissioner for Human Rights. Both meetings concluded with a declaration in which the Colombian government committed itself to comply with these recommendations.

(33) The Cartagena meeting was attended by high-level representatives of the governments of Argentina, Brazil, Canada, Chile, the USA, Japan, Mexico, Norway, Switzerland, the EU and its Member States, the European Commission, the UN system, the CAF, the IDB, the IMF, the World Bank and the Colombian government.

(34) Law 975 of 2005.

(35) Letter to Legislators from the First Commissions of the Senate and House of Representatives: Observations on the "Justice and Peace" Draft Law, 30 March 2005, DRP/175/05.

(36) Semana, 21 February 2005.

(37) Since Colombia has invoked article 124 of the Rome Statute, it does not recognize the ICC's competence with regard to war crimes for a period of seven years. As a result, cases of war crimes committed in Colombia cannot be investigated by the ICC. The ICC can, however, investigate cases defined as crimes against humanity.

(38) Letter to Legislators from the First Commissions of the Senate and House of Representatives: Observations on the "Justice and Peace" Draft Law, 30 March 2005, DRP/175/05.

(39) Letter to Legislators from the First Commissions of the Senate and House of Representatives: Observations on the "Justice and Peace" Draft Law, 30 March 2005, DRP/175/05.

(40) Juan Carlos Vélez Rincón, "Conflicto y Guerra: la lucha por el orden en Medellín", Estudios Políticos, January-June 2001.

(41) See Juan Carlos Vélez Rincón "Conflicto y Guerra: la lucha por el orden en Medellín", Estudios Políticos, January-June 2001.

(42) Ibid.

(43) Actualidad Colombiana, 31 March to 14 April 2004.

(44) El Tiempo, 7 July 2003.

(45) In a letter dated 29 November 2000 members of La Terraza admitted that they had participated in several high-profile killings under the orders of Carlos Castaño. Whilst Don Berna has denied being linked to La Terraza, Carlos Castaño indicated in his biography Mi Confesión that Don Berna had been the main go-between between the AUC and La Terraza.

(46) Media reports suggest that several hundred paramilitaries were killed in confrontations between the BCN and BM. According to press reports, on 9 August 2002, 24 BM paramilitaries were ambushed and killed in Segovia Municipality, Antioquia Department, by the army after they had been tricked into believing that they were going to participate in a military operation. The army argued that the paramilitaries had been killed in combat. This version of events proved useful in justifying certification for US military aid from the US administration that year. The killing of the paramilitaries was also seen as a punishment of the BM for its dissidence and its criticisms of the role of drug-trafficking in the AUC.

(47) El Colombiano, 26 September 2003.

(48) The Bloque Héroes de Granada reportedly demobilized on 1 August 2005.

(49) Semana, 25 September 2004.

(50) Report of the Inter-American Commission on Human Rights on the process of demobilization in Colombia, 2004.

(51) Defensoría del Pueblo, Seguimiento al cese de hostilidades prometido por las Autodefensas Unidas de Colombia como signo de su voluntad de paz para el país, 24 September 2004.

(52) See next chapter for an examination of BCN efforts to create a socio-political movement.

(53) Eduardo Pizarro quoted in a report written by the Personería de Medellín: Balance de la Situación de derechos humanos en Medellín durante 2004.

000671

(54) See Personería de Medellín, Balance de la Situación de derechos humanos en Medellín durante 2004.

(55) Personería de Medellín, Balance de la Situación de derechos humanos en Medellín durante 2004.

(56) Peace Agreement between the National Government and the Demobilized Combatants from the Cacique Nutibara Bloc of the United Self-Defence Forces of Colombia, 10 December 2003.

(57) The informer network created by the government requires civilians to compile and pass on intelligence information on illegal armed groups to the security forces. According to government figures, this network involved more than 2.5 million people by August 2004. See Amnesty International report - Security at What Cost? The Government's Failure to Confront the Human Rights Crisis (AI Index: AMR 23/132/2002).

(58) Before the demobilization paramilitaries had operated from a number of headquarters in different areas of the city known as Oficinas (Offices). Following the demobilization many of these Oficinas reportedly continued to operate, while other similar structures were reportedly set up to "represent" the interests of the demobilized. These structures assumed similar functions as those of the Oficinas, such as coordinating the payment of protection money for security-related services.

(59) El Tiempo, 31 May 2005.

(60) Mono Jojoy is a FARC commander.

(61) Report of the Inter-American Commission on Human Rights on the process of demobilization in Colombia, 2004.

**Previous**