# EXHIBIT
# D-8



# SpinWatch

**Colombian nightmares**
Date: Monday, July 18 @ 06:56:05 EST
Topic: United Nations

**PoliticalAffairs.Net**

By **Marlo** and **Natasha Torres**

16 July, 2005

"Welcome to Talking Point. I'm Bridget Kendall and today we're bringing you a very special program from Bogotá, the capital of Colombia, in Latin America. Colombia has got a reputation for violence and attempts by the government to battle against left wing guerrilla insurgents on the one hand and right wing paramilitary groups on the other are complicated by the fact that both armed groups are thought to be deeply embroiled in drugs trafficking and production." -BBC Talking Point, 2004.

This is the image of Colombia that the BBC presents to the world. It creates the illusion that this 'democratic' Colombian government battles against fascists, communists, and drug cartels. Nothing could be further from the truth. This is an oppressive regime that uses these lies as a smokescreen. The BBC has collaborated.

The main Colombian magazine, Semana presents the same picture. It boasts that the Colombian president – President Uribe – is "an expert in negotiation," who "studied the peaceful resolution of conflicts at Harvard," and is "an excellent administrator," who 'reduced the number of State employees in the Antioquian region from 14,000 to 5,700 people.' His martial spirit materialises at military parades and beauty pageants; the national flag is swirling behind him and the national anthem is playing; his eyes fill with tears as he gazes into the neoliberal future. "Hard hand; big heart" is his slogan – his call to battle – in the crusade against the terrorism that he and his associates create.

The president appeared in person in one of the Colombian Big Brother reality shows. The prettiest contestant reached orgasm. 'It's a privilege', she gasped. A nice young man salutes. Three of them line up in the garden under the stars, place their hands on their hearts, and scream to the heavens, 'Thank you, señor presidente, for believing in us.'

But President Uribe is Big Brother. He has roots in drug traffic and death squads. In 1991, the U.S. Department of External Affairs reported that he 'worked for the Medellin cartel' and was 'a close personal friend' of the infamous drug lord, Pablo Escobar. Between 1995 and 1997 – in his role as governor of the Antioquian region – he recruited hundreds of paramilitaries. CINEP – the main Colombian human rights research organisation – blames these paramilitaries for 939 political assassinations and the torture of 94 dissidents. The British Council on the other hand awarded him a scholarship to study law in England. He is also a senior associate member of Saint Antony's College, Oxford. These British institutions have cleaned his international image. They collaborate with this murderous regime.

His government refuses to fund the social services until there is peace. Instead his regime funds the Armed Forces and paramilitaries and maximises profits through murder, political oppression, and mass detentions. His Minister of Defence boasted that 125,778 dissidents were rounded up in his first year of office. On the 1st of May, this year, eight members of his riot police formed a circle and kicked a 15 year old child to death in the centre of the capital, in broad daylight, in front of his companions.




His regime decrees that paramilitaries – death squads – should be immune from prosecution. The one condition is that none of these assassins denounces the politicians and businessmen that hire them. More than 5,000 paramilitaries have been relocated in the main cities and 'zones of rehabilitation' that coincide with oil installations and mineral resources. Local populations live in dread. The government has also recruited millions of paid informants. Neighbours are supposed to report 'suspicious behaviour' in mobile police stations – 'denunciation centres' – that are placed at strategic points in the cities. There are soldiers and police everywhere. They have total impunity. The main message of this regime is that you must murder or spy or die. This neoliberal government has privatised the right to live.

In spite of – or rather because of - these careful precautions, Colombian human rights statistics are horrendous. CINEP attributed 1,339 political assassinations to the Armed Forces and paramilitaries in 2003. Amnesty International claims that around 70,000 Colombian people have been murdered for political reasons in the last 20 years. Compared to the statistics that the Intercongregational Commission for Justice and Peace produced – 9,000 political assassinations in Argentina in 8 years of dictatorship, 2,666 political assassinations in 17 years of dictatorship in Chile – this 'democratic' Colombian State that has murdered 70,000 political opponents in 20 years has transcended all notions of horror.

Few of us denounce the regime because all of us are afraid. In that sense, we are part of the system; we spread the plague; we collaborate in the massacres. The power of the State is in the silence that it imposes on us.

The Colombian Ministry of Trade boasts that the nation exported around 3.4 billion dollars of oil and oil products, 1.4 billion dollars of coal, 800 million dollars of coffee, 700 million dollars of flowers, 400 million dollars of bananas, 200 million dollars of sugar and 80 million dollars of emeralds in 2003. It also produced around 2 billion dollars of minerals and its total exports were around 13 billion dollars. It has the largest open cast coal mine, and the biggest gold reserves, and is the main source of emeralds on the planet.

But the population suffers. The main Colombian citizens' rights group reports that around 18.9 million Colombians suffer from hunger, 16.7 million don't have access to doctors, 1.6 million children can't attend school. More than 50,000 young Colombian women have been sold in brothels around the world. UNICEF adds that more than a million Colombian children suffer from hunger, that around 25,000 Colombian children prostitute themselves, and that 5,000 Colombian children are murdered every year. Eduardo Galeano – the Uruguayan dissident – asked the billion dollar question: 'How many are denied the sun and the salt?'

**Why?**

The main reason for these human rights tragedies is that the transnationals use the Armed Forces and the paramilitaries to maintain control of the oil and mining regions. Father Giraldo, the head of CINEP, describes the process: 'Paramilitaries ordered the inhabitants to lie down in the streets, identified Juan Camacho – member of the local union of small miners – pumped seven bullets into him, decapitated him, played football with his head, and stuck the skull on a stake that faced the mines.' Two million people have fled for their lives. Thousands beg in the streets of the cities. Others live in squalor.

British petroleum – BP–Amoco – drains around a billion dollars of oil every year from the Casanare region and has used British mercenaries to train the police to 'control' the local population. The editor of a regional paper reports that all dissidents have been assassinated or silenced. There are secret mass graves. To criticise BP is an act of suicide.

Occidental has drained more than 800 million barrels of oil from the Arauca region, has dumped 5 billion barrels of contaminated water into a region of mysterious forests and sacred lakes, and has reduced the Guahibo people to malnutrition, alcoholism, and prostitution.



The U'wa people attempt to explain that, 'Oil is the blood of Mother Earth; if She dies we all die,' but no-one ever listens.

The Colombian conglomerates also drain blood. The Ardilla Lulle group had around three billion dollars, the Sarmiento Angulo group had around 7.5 billion, the Santo Domingo group around eight billion, and the Antioqueno group had around 11.5 billion dollars in fixed assets, in 2002. The Ardilla Lulle group produces the soft drinks. The Santo Domingo group makes all the beer.

The Antioqueno group controls national production of coffee, chocolate, textiles, and construction materials. Antioquia has been the centre of colonisation since the Spanish Conquest 500 years ago. First they stole the gold. Then the 'paisas' created monopolies of Colombian tobacco, cotton, textiles, flowers, coffee, drugs, fashion, based on horrific levels of violence. The Colombian president is from the same region and culture and represents the same ruthless interests.

The conglomerates have their own banks and finance companies, lend at impossible rates of interest to their desperate clients, bankrupt local businesses, and squeeze millions of Colombian families into hunger, homelessness, and helplessness. Two conglomerates – Ardilla Lulle and Santo Domingo – own the two main television and radio channels. These stations promote the products of the conglomerates and hide the horror of the regime in an endless stream of improbable soap operas and manufactured dreams. They are crucial in the selling and marketing of the nation and people: in the creation of this monster with a human face.

The Colombian drug lords earn billions of dollars. In the 1980s, Pablo Escobar – head of the Medellin cartel – ordered his child assassins to bump off the local policemen. His kids assassinated 120 cops in three months. Pablo murdered all the politicians that dared to oppose him, detonated 120 car bombs in the capital, blew a passenger plane out the sky, bombed the offices of the 'secret' police. These tactics paid off. A United Nations commission calculated that the cartels accumulated around 32 billion dollars between 1982 and 1998. Escobar's mum has always maintained that her son was 'a born businessman.' The chief of his hit men – Otoniel Gonzalez Franco – has been released from prison.

The United States Armed Forces use the Colombian Armed Forces against their own people. They train them in methods of oppression – assassinations and disappearances, massacres and mutilations, mass detentions and diabolical tortures – that are designed to annihilate the artificial threats of 'communism' and 'drugs' and 'terrorism' that these methods are designed to create. The U.S. creates conflicts inside – rather than between – countries, in order to maximise the sale of arms, and in order to legitimise their use. They use the myth of nationalism in order to clear the mutilated conscience of their soldiers, to use poor people to kill other poor people, in order to maintain control of natural resources. In the 1960s, President J. F. Kennedy called this 'the Alliance for Progress.' In the 1980s, the Colombian government, the Armed Forces, the drug cartels, and associations of ranchers and banana producers contracted British and Israeli mercenaries to train paramilitaries in the same aims and methods: to target political dissidents and to maximise profits. These death squads slaughtered around 266 union leaders and 1,336 members of labour unions in the 1990s. Last year, paramilitaries assassinated 17 leaders and 61 members of the main Colombian union.

The United States Congress also donates billions of dollars in military aid. United Technologies and Textron of Texas charged around 300 million dollars for the helicopters that their mercenaries use to fumigate drug plantations. The herbicide has poisoned and decimated rural populations and crops in Colombia, indigenous people and Nature. These measures have succeeded. The U.S. and Colombian cartels and armed groups have more control than ever over cocaine and heroin production and distribution and the prices of their commodities in the United States are lower than ever.

But that is beside the point. The principle purpose of the U.S. bases on Colombian soil is to control and cull the local population and to defend international oil installations and pipelines and mines. This trail of blood leads to the lovely seaside snap that appears in Semana magazine in December 2004. President Uribe is blushing, the sun is smiling, and so is President Bush. They are happy, and why

000676




not? The president of the most psychopathic nation on the planet is mumbling this sweet, memorable, magical sentence – 'Uribe is my amigo' – and promising his kindred spirit billions more dollars of military aid and arms.

Can it get any worse than that?

**Political resistance**

The FARC and the ELN are the main armed resistance to the oppression of the regime. They represent the sadness of the Colombian people. The FARC protects small farmers. The ELN targets transnational oil installations and mines. In 1964, the United States and Colombian Armed Forces dropped bombs and napalm on Marquetalia. The local population hid in the forest. 18 children died in one raid. Prisoners were slaughtered. This is the origin of the FARC and the ELN. Camilo Torres – priest and professor of social science – enlisted. Colombian soldiers shot him dead on his first mission.

In 1985, the FARC formed its own political faction – the Union Patriotica – that proposed to redistribute the land and nationalise the oil and mineral resources. The two main political parties – the Liberals and the Conservatives – ordered the army, police and paramilitaries to erase all trace of the U.P. In Segovia, Antioquia, in 1988, paramilitaries butchered 43 suspected Union Patriotica supporters – and their children – in one hour. The local river literally ran with blood. The murders continue. More than 5,000 of them – and their children and friends - have been assassinated to date. It is genocide. The intention is to annihilate all opposition to – and traces of - the atrocities of this regime.

Paramilitaries murdered the last editor of the communist newspaper – 'Voz' – but the present editor battles on. An act of god saved his life three years ago. The transmission from the main radio station, RCN, blocked the signal that was supposed to detonate the bomb that the paramilitaries had placed inside the premises. The bomb had enough power to blow up half the street. The newspaper organises an annual fair to discuss political and human rights issues and subsidise publication. In 2004, one of their comrades summed up the courage of the Colombian resistance: 'They have killed a lot of us. They want to kill us too. They probably will. But there are always more of us. There are always more.'

**Cultural resistance**

Last December, the Embera people fled from their mountain refuge in the North-west of Colombia after a hydroelectric power station flooded their land. The program was sponsored by the World Bank. Embera leaders were murdered by paramilitaries. The daughter of one of these dead heroes explained that: 'The Embera people feel the death of the river like the murder of a brother or sister. The dam has poisoned the fish and brought a plague of flies and disease. The sacred forest is dead'. Embera women have been pressured into prostitution. Their children wander barefoot through the cold, hard streets of the capital. One more indigenous culture has been decimated. How sad and terrible is that?

This is one more episode in more than 500 years of rape, torture, massacre, marginalisation, annihilation. Spanish murderers – 'paramilitaries' – rounded up the local people, set their dogs on them, tore them to shreds, desecrated their tombs, melted down the gold. Millions of indigenous people have been slaughtered to build Colombian cities and settlements and roads, ranches and plantations, oil installations and mines, missions and schools. Nature and Life have been mutilated and erased.

International bonanzas in natural resources – the theft of gold, dye, wood, furs, rubber, quinine, oil, titanium and uranium from indigenous land – have pushed these people from the coastal regions to the tops of the highest mountains; government troops have driven them from the sacred rivers and waterfalls and lakes and fertile regions into the murky depths of the rain forests. In Guatemala, in the 1970s, U.S.-trained troops tracked down the indigenous people – the Mayas - tied their hands behind

000677

their backs, tore out their entrails, and plunged wooden stakes into their hearts. Like vampires. For a couple of dollars you can visit the ruins of their temples. It's a tourist's paradise.

More than 800 U.S. soldiers and 18 thousand Colombian soldiers and billions of dollars of U.S. aid – fighter planes, helicopters, rocket launchers, cluster bombs, tanks, machine guns – are currently being used to fumigate the rain forests and flush out the FARC guerrilla group. The FARC have melted into the mist and the transnationals have gained control of the Northern Putumayo region that is rich in precious metals and – of course – oil! International companies privatise biological resources. There are plans to build a Panamerican transportation route through this natural paradise in order to drain the last drop of blood and cash. National Geographic magazine plans to record the genetic code of the indigenous people. Is this the end?

First the indigenous people fought fire with fire. The Caribe people fought like tigers against the Spanish murderers. U'wa leaders leapt to their deaths off the cliffs. Less than a hundred years ago, Quinton Lame tried to form an independent indigenous republic and initiated a series of land occupations. His resistance was crushed. Their latest proposals are based on the laws of Nature - on the right to plant their own seeds and to bring up their own children on their own land – on resistance to 'the globalisation of alienation'. How long can they hold out?

Portugal, France, Holland and England transported about 150,000 people from Africa to Colombia to supplement indigenous labour. Indigenous people had almost been decimated. Less than one in five black people survived the slave ships. Most of them slaved in the gold mines and plantations. The rich colonial families rented the others out as labourers and prostitutes. In 1578, the regime declared that rebel slaves should be castrated or executed. But hundreds of them escaped to form 'palenques' – independent black communities – that shared the land between their members.

Black culture ebbs and flows around the Caribbean region. Haiti is the centre of voodoo. Their priests channel the power of the Catholic saints through the medium of dolls to penetrate the minds of their enemies. Cuba is the main source of salsa music: a fusion of African rhythms and social conscience and the North American 'big band' sound. The Panamanian singer, Ruben Blades criticises mindless middle class consumerism: 'Drowned in debt to maintain their status, in their wedding receptions and their cocktail lounges.' The Colombian composer, Joe Arroyo stands up for his black brothers and sisters in his album, Rebellion.

Jamaica is the centre of reggae music and Rastafarianism. The Rastafarians see the African continent in terms of Zion - the Promised Land – that has been robbed and raped by Europeans. The U.S. activist, Malcolm X inspires black resistance in the region because - as he said - 'Black is beautiful'. In the Colombian territories of San Andres and Choco, black culture and resistance is represented in the dignity and sensuality and beauty of the inhabitants.

Colombian cities are ruled with a rod of iron. The North of Bogotá is a transnational hell of high rise apartments, MacDonald, Coca-cola, Cable TV. The Colombian middle class operates in a mental state that alternates between blissful ignorance and cold indifference; somewhere between cynicism and hedonism. Privatisation and corruption has demolished hospitals, schools, and human rights, in return for an IMF 'loan' of five billion dollars and a national 'debt' of around 33 billion dollars of arms and bribes. At night in the capital, the police bundle homeless people into their blinded vans, shoot them in the head or chest, and dump their dead bodies on the slopes beneath Monserrate, the main church. The Colombian Church is cold and indifferent. In Barranquilla, in the 1980s, hundreds of street people were murdered – and chopped up - inside the Universidad Libre. Their organs and limbs were sold to the medical students at cut-throat prices.

Districts such as Cazuca in the South of the capital are recruitment camps for paramilitaries. Last year, a local hit man was sentenced to 28 years in prison for the assassination of 37 people, including his 14 year old ex-girlfriend. He was indignant. 'I killed at least 137,' he insisted.

The Colombian government is not quite as democratic as the BBC claims. A weary farmer that we meet on a dusty road in the middle of nowhere sums up the current state of affairs:



"I worked hard all my life to build my farm. It was beautiful. I had horses, cattle, chickens, fish. Then the guerrilla arrived and robbed me. Next, the paramilitaries. Last of all, the Armed Forces. They forced me to leave forever. They did such terrible things that I can't talk about it. I have nightmares every night. They robbed me of all my illusions. But now I'm happy. My wife remembers our beautiful farm and cries herself to sleep. But no, not me. I'm happy. Every drop of air I breathe - or water I drink or morsel of bread - tastes good. Because I am alive. Finally I understand what life means. And how beautiful it is."

This article comes from SpinWatch
http://www.spinwatch.org

The URL for this story is:
http://www.spinwatch.org/modules.php?name=News&file=article&sid=1266

# EXHIBIT
# D-9

000680



# DRUGS AND CONFLICT IN COLOMBIA:
# A POLICY FRAMEWORK ANALYSIS OF *PLAN COLOMBIA*

Charles P. Preston IV

Major Paper submitted to the Faculty of the
Virginia Polytechnic Institute and State University
in partial fulfillment of the requirements for the degree of
Master in Public and International Affairs

Joseph L. Scarpaci, Jr., PhD., Chair
Alnoor Ebrahim, PhD.

December 2, 2004
Blacksburg, Virginia

Keywords: Colombia, *Plan Colombia*, Drugs, Conflict,
Public Policy Analysis, Narco-Trafficking

Copyright 2004, Charles P. Preston IV



# DRUGS AND CONFLICT IN COLOMBIA:
## A POLICY FRAMEWORK ANALYSIS OF *PLAN COLOMBIA*

Charles P. Preston IV

## (ABSTRACT)

Drug cultivation and trafficking combine with a complex civil war that endangers the internal security of Colombia and the legitimacy of the Colombian government. The geo-narcotics problem centered in Colombia adversely impacts not only the social and economic situation in Colombia, but also the regional stability of the entire Andean region and Latin America. The influence of drug trafficking extends throughout South America and the Caribbean into the United States and Europe. Past policies to address the instability in Colombia failed to produce significant results. *Plan Colombia*, a joint initiative of the Colombian and the US governments, was developed in response to a deteriorating situation in Colombia. A public policy of the Colombian government, funding for *Plan Colombia* is provided as a high priority of United States foreign policy. *Plan Colombia* is the foundation for implementation of a broad range of programs addressing security, drug production and trafficking, the peace process, social development, economic development and democratization. From a US policy perspective, *Plan Colombia* seeks to curb drug trafficking at its production sources and promote stability in Colombia.

This paper evaluates *Plan Colombia* using the policy analysis framework presented by James Anderson (2000) in *Public Policymaking*. Anderson's framework entails systematically examining public policy using a five-stage process that includes identification, formulation, adoption, implementation, and evaluation. I focus on the evaluation of five broad goals found in *Plan Colombia*; these goals encompass the programs listed above. This paper concludes that progress has been made towards achieving four of the five goals of *Plan Colombia*. Improvements in illicit drug production, government legitimacy and control, and the economy have been significant. Progress toward democratization and social development is less dramatic, but still evident. The peace process is the only goal lacking significant progress. The results from a US perspective are mixed: while the Colombian government has been stabilized, it is not clear that there has been a reduction in the flow of illicit substances. Future research should consider prioritization of the objectives of *Plan Colombia* and long-term versus short-term policy outcomes. Security aspects and social development are both priorities of *Plan Colombia* that at times can be seen in opposition to one another; the appropriate balance of support provided to each requires further analysis.

000682



**Table of Contents**

List of Figures............................................................................vii

List of Tables............................................................................viii


**Chapter 1: Introduction**...........................................................1

    Colombia: A Nation in Conflict.............................................1

    US National Interest............................................................3

    Colombia's Importance to the Andean Region and Beyond...............4

**SECTION I.   PROBLEM BACKGROUND**

**Chapter 2: Colombia Perspective**...............................................6

  The Beginnings: Pre-Spanish Conquest to Civil Strife (    -1946)..............6

*La Violencia* to Narco-Insurgency (1946-1999).............................8

     *La Violencia*..............................................................8

     Insurgent Organizations.................................................9

     FARC (*Fuerzas Armadas Revolucionarias Colombianas*)...............10

     ELN (*Ejercito de Liberacion Nacional*)................................10

     Paramilitary Groups (autodefensas or 'self-defense groups')...............11

     Narco-Trafficking Organizations.........................................12

Narcotics Trafficking and Increasing US Involvement.......................13

US Involvement: Hegemony or Cooperation?...............................13

**Chapter 3: The US War on Drugs**...............................................16

  Nixon to Reagan..........................................................16

  Bush-Clinton-Bush.......................................................18

**SECTION II.  METHODOLOGY OF ANALYSIS: ANDERSON'S MODEL**

**Chapter 4: Systematic Policy Analysis**..........................................23

  Anderson's Conceptual Framework......................................24

000683

Methodology for Analysis of *Plan Colombia*..................................................25

**Chapter 5: *Plan Colombia*.........................................................................28**

Problem Identification and Agenda Setting.....................................................28

Formulation and Adoption............................................................................28

Elements of *Plan Colombia*.........................................................................31

Funding of *Plan Colombia*..........................................................................34

International Support for *Plan Colombia*.......................................................36

Goals of *Plan Colombia*.............................................................................38

SECTION III.  IMPLEMENTATION AND EVALUATION OF PLAN COLOMBIA

**Chapter 6:  Implementation and Evaluation of Goal 1**

(*to reduce the production and distribution of illegal

drugs and dismantle terrorist organizations*).........................................43

Implementation of Goal 1.............................................................................43

Illicit Crop Reduction/Eradication..........................................................43

Alternative Farming............................................................................45

Counter Narcotics and Interdiction.........................................................47

US Military Involvement and Counter Insurgency.......................................49

Evaluation of Goal 1....................................................................................50

Results of Illicit Crop Reduction/Eradication.............................................50

Alternative Farming Assessment............................................................54

Interdiction Results............................................................................55

Drugs: Supply vs. Demand...................................................................57

Results of Counter Narcotics and Combat Operations..................................59

**Chapter 7:  Implementation and Evaluation of Goal 2**

(*To build and strenthen public institutions and increase

the state presence throughout Colombia*).............................................64

Implementation of Goal 2.............................................................................64

The Colombian Armed Forces................................................................64

The Colombian National Police..............................................................66

000684

Judicial Reform....................................................................................67

Evaluation of Goal 2.............................................................................69

    The Colombian Armed Forces...........................................................70

    The Colombian National Police..........................................................71

    Judicial Reform..............................................................................75

## Chapter 8:  Implementation and Evaluation of Goal 3

    *(To improve the economy)*...............................................................79

Implementation of Goal 3.......................................................................79

    International Assistance.....................................................................79

    Oil and Natural Resources.................................................................79

    Legitimizing the Economy.................................................................80

Evaluation of Goal 3.............................................................................81

## Chapter 9:  Implementation and Evaluation of Goal 4

    *(To advance the peace process)*...........................................................84

Implementation of Goal 4.......................................................................84

    Pastrana's Peace Plan......................................................................84

    New Strategies under President Uribe, May 2002-December 2004....................86

Evaluation of Goal 4.............................................................................86

## Chapter 10:  Implementation and Evaluation of Goal 5

    *(To advance democratization and social development)*...............................90

Implementation of Goal 5.......................................................................90

    Human Rights................................................................................90

    Internal and External Displacement......................................................90

    The Role of NGOs..........................................................................94

Evaluation of Goal 5.............................................................................96

    Human Rights................................................................................96

    Internal Displacement......................................................................99

    NGOs........................................................................................100

v



**Chapter 11:  Conclusions** ...............................................................................103

Colombian Public Policy Perspective.....................................................103

US Foreign Policy Perspective................................................................106

A Successful Policy Overall....................................................................107

Public Policy Analysis and *Plan Colombia*.............................................110

References.............................................................................................113

Vita......................................................................................................122

vi



## List of Figures

Figure 1.1    Geopolitical Map of Colombia and North Andean Region.....................3

Figure 3.1    Andean Potential Coca Base Production 1995-2000...........................20

Figure 3.2    Andean Net Coca Cultivation 1991-2000.......................…..................21

Figure 5.1    The Putamayo Department and Coca Cultivation Density in Colombia.....34

Figure 5.2    Total US Aid for Plan Colombia, 2000 $US Millions.........................35

Figure 5.3    Assistance to Colombia, 2000 $US Millions...................................36

Figure 6.1    Coca Cultivation in Colombia and Andean Region 2000-2002...............51

Figure 6.2    Coca Cultivation in Colombia 1991-2003.......................…................52

Figure 6.3    Coca Cultivation in Bolivia, Colombia and Peru 1990-2003.................53

Figure 6.4    Coca Cultivation in Bolivia, Colombia and Peru 1988-2002..................54

Figure 6.5    17 Month Comparison Operational Results against Insurgents...............59

Figure 6.6    17 Month Comparison Operational Results against Paramilitaries...........60

Figure 6.7    Quarterly number of people killed and injured in conflict events...........61

Figure 6.8    Quarterly number of attacks by group.........................................62

Figure 6.9    Quarterly number of clashes by group.........................................62

Figure 7.1    State Police Presence in Rural Municipalities Aug 2002 – Dec 2003.......72

Figure 7.2    State Control through 'Town Soldiers' Program 2002-2006 (proj.)..........73

Figure 7.3    Terrorist Acts and Kidnappings: 2002-2003 Trends...........................73

Figure 7.4    Kidnapping Comparison by Group for 12 months 2002 and 2003...........74

Figure 8.1    Colombian vs. Latin American GDP and Inflation Trends 1999-2005.......82

Figure 8.2    GDP Growth and Unemployment Trends 2000-2003.........................82

Figure 9.1    Voluntary Demobilization of FARC, ELN and AUC in 12 months,

              2002 and 2003..................................................................87

Figure 10.1   Internal Displacement Regions of Colombia 2001.............................92

Figure 10.2   Internal Displacement in Colombia, 1985 to third trimester of 2003.........92

Figure 10.3   External Displacement from Colombia to Panama,

              Venezuela and Ecuador 2003.................................................93

Figure 10.4   Quarterly number of civilians killed in attacks by group 1988-2003.........98

Figure 10.5   Internally Displaced Persons in Colombia 1995-2003........................100

000687



**List of Tables**

Table 5.1    Strategic Elements of *Plan Colombia*............................................32

Table 6.1    Coca Cultivation (Hectares) in Bolivia, Colombia and Peru 1994-2003.......54

Table 6.2    Counter Narcotics Results Colombia 2003-2004.................................56

Table 6.3    Counter Terrorism Results for 5-month period, 2003 and 2004...............60

Table 7.1    Crime Reduction Results for 5-month period, 2003 and 2004.................75

Table 11.1   Progress Toward Five Goals of *Plan Colombia*...............................104

000688

## Chapter 1: Introduction

Drugs and conflict in Colombia have a direct bearing on the security of not only Colombia and the Andean region, but also of the United States, the Western Hemisphere and the entire globe. As a conventional geopolitical issue, the dilemma may be conceptualized as one of geo-narcotics. A relatively new and complex phenomenon, geo-narcotics involves drug production, consumption-abuse, trafficking, and money laundering (Griffith 1998). The dynamic interaction of these factors, combined with a protracted civil war, undermines legitimate governments in Colombia and poses enormous challenges to national, regional and hemispheric stability. *Plan Colombia* is a public policy initiative of the Colombian government that seeks to address the underlying problems associated with geo-narcotics and to improve the security situation in Colombia. Although *Plan Colombia* is an initiative of the Colombian government, the plan is greatly dependent upon US support and foreign aid.

One useful conceptual framework for analyzing public policy was developed by James Anderson. In *Public Policy Making*, Anderson incorporates a scientific policy studies approach that has three basic aims: (1) to explain the adoption of public policy; (2) to objectively assess causes and consequences of public policy; and (3) to develop explanations about public policies and their politics (Anderson 2000, 2). The conceptual framework offered for analyzing public policy process is reduced to five separate, but sequential and easily identifiable stages. The purpose of this paper is to evaluate *Plan Colombia* applying a systematic policy-process analysis framework similar to that developed by James Anderson in *Public Policy Making*.

Colombia: A Nation in Conflict

The Andean region that is now Colombia has known social and political conflict since the time of Spanish conquest in the early 16th century, well before Simon Bolivar won Gran Colombia's independence from Spain in 1819 (Smith 2004, 23). However, the social, political and economic inequities that are a legacy of colonial past bear only part of the responsibility for current problems. A brief history providing the background to the current situation in Colombia will be presented in Section I of this paper. Briefly, Colombia has

1

000689



evolved through (and despite) a complex combination of factors that seek to destroy the state from within. Historian David Bushnell describes modern Colombia, admittedly through the eyes of a foreigner, in this fashion:

> *For better or for worse, Colombia does not exist as a nation in the world today. The people and territory known as Colombian have not arrived at this status by an easy path; they have been torn by social, cultural, political, and regional antagonisms and misunderstandings (Bushnell 1993, viii).*

A series of political-party wars between 1948 and 1957 that cost the lives of tens of thousands of Colombians deepened the "tears" described by Bushnell. An intractable left-wing guerilla insurgency followed that plunged the nation into a more complex civil conflict during the 1960s. Demand for drugs by the North Atlantic nations increased in the 1960s and 1970s and provided quick cash to Colombian traffickers and their counterparts across the world. This illicit and informal economy, exacerbated by the on-going guerilla insurgency, threatened and still threatens every aspect of civil society. Unemployment soared to 20% in the second half of the 1990's and 64% of people subsisted below the poverty line (Velez et al. 2003, 91). Illicit crop cultivation and drug production fueled an illegal economy providing funding for the guerilla insurgency as well as for paramilitary organizations.

National and bilateral counter-narcotics efforts aim to destroy the illicit crops (and sometimes legal crops as well) that are often the only source of income for peasant farmers. At the same time, the ongoing conflict between the guerilla insurgents, the para-militaries and the government forces often results in civilian casualties. These factors contribute to the widespread and frequent displacement of peasant populations from the rural areas of the country. This tends to fuel urbanization and in other cases cause out migration into neighboring Andean nations. The refugee problem serves to further complicate social problems increasing unemployment and poverty.

Past Colombian governments made little headway in combating the problems facing the nation. While the Samper (1994-1998) and the Pastrana (1998-2002) administrations made ineffective efforts to improve the situation, focusing on peace initiatives with the insurgents, the Colombian people became impatient with the lack of

2

000690

results (Livingstone 2004). The situation worsened with the geo-narcotics phenomenon growing and fueling the conflict. *Plan Colombia* represented a new strategy (developed by the Pastrana administration and embraced by President Uribe (2002-  )) designed to concurrently combat the insurgency and narco-traffickers and to improve the security and socio economic condition of Colombia.

<u>US National Interest</u>

Colombia has become increasingly important to the US over the years from both economic and strategic security perspectives. In 2003, Colombian two-way trade with the United States exceeded $US 10 billion annually and direct US investment in Colombia is over $US 4 billion (Embassy of Colombia 2004). Only three nations, Egypt and Israel and most recently Iraq, receive more annual US funding than Colombia (Isacson 2004). Colombia is rich in natural resources and is the tenth largest supplier of oil to the US (Marcella 2003, 3). Colombia is located in relative proximity to the United States and is a strategically important actor in the hemisphere, bordering four other Andean nations, two oceans and Panama with its important canal (Figure 1.1).



**Figure 1.1: Geopolitical Map of Colombia and North Andean Region**
(CIA Fact book http://www.cia.gov/cia/publications/factbook/geos/co.html (04/20/04))

3

Colombia has a population of 43 million and the Colombian diaspora in the US is more than 2.5 million and growing with the increasing violence (Marcella 2003, 3). In 2001, 800,000 Colombian emigrants were searching for new homes in other Latin American nations, Europe, the US, and Canada (Manwaring 2001, 11).

Colombian drug production, specifically cocaine, is responsible for approximately 90% of the cocaine entering the United States (Marcella 2003, 4). This trafficking contributes to 52,000 American deaths each year attributed to the illicit drug trade in the US, not to mention the estimated $US 10 to $US 500 billion per year associated with health care, legal costs, crime and accidents (Manwaring 2001, 12). Unfortunately, David Bushnell is likely correct when he claims "Colombia is the least studied of the major Latin American countries, and probably the least understood" (Bushnell 1993, vii). This relative ignorance concerning the situation in Colombia is reason enough to re-evaluate current policies directed towards that nation. The previous short-term low intensity counter narcotics effort by the US in Colombia has evolved into a long-term commitment with global implications for transnational security and democracy, especially in light of the global war on terrorism.

Colombia's Importance to the Andean Region and Beyond

In many respects, Colombia negatively affects the Andean region and the world not through its strength but through its weakness as a nation state. Unfortunately, the situation in Colombia represents a broader global trend. In a recent speech to the Johns Hopkins School of Advanced International Studies (SAIS), US Secretary of State Colin Powell explained that, "we used to worry almost exclusively about the power of states. Today we also have to worry about the weakness of states..." (Powell 2004). This weakness is manifested in Colombia by a historic lack of state authority resulting in an inability to prevent or control illegal activities. Links to international illegal arms trafficking, money laundering, organized crime and terrorism can all be found in Colombia. Social strife, corruption, unemployment, poverty and human rights violations are rampant in Colombia, undermining political legitimacy and adversely influencing neighboring nations. In addition to producing a high percentage of the cocaine entering the United States, Colombia produces 70% of the world's total output (Marcella 2003, 4). The influence of

4

000692



the Colombian drug trade spills over and contributes to violence, corruption and related social strife throughout the Andean region, Central America and the Caribbean and, indirectly, throughout the world. The most affected nations are those of the northern Andean region, depicted in Figure 1, and Bolivia. The lucrative drug trade reduces reliance on legal international trade. Colombia's instability jeopardizes existing free trade agreements as well as potential future agreements (e.g. the Free Trade Area of the Americas, Andean Free Trade Agreement). Furthermore, environmental degradation resulting from both from cocaine laboratory by-products and deforestation as new coca crops are planted, as well as chemical runoff from eradication programs, is a major international concern. Finally, the insurgent organizations responsible for most of the security problems in Colombia now represent a potential threat that must be addressed as part of the international global war on terror. A more detailed discussion of the historical background of the problems in Colombia and the impact of these problems on the US is contained in Section I of this paper.

Section I of this paper begins with a brief history of Colombia followed by an overview of the US "War on Drugs." This background material provides an understanding of the origins of geo-narcotics problem in Colombia. Section I identifies the first stage in Anderson's analysis framework, 'problem identification.' Section II describes the methodology and conceptual framework used to analyze *Plan Colombia*. Section II reviews the processes (which Anderson terms 'agenda setting' and 'formulation and adoption of policy') through which *Plan Colombia* was developed and ultimately approved. Section II concludes with a presentation of the major elements of the plan and its five overarching goals. Section III is the main body of this paper. It uses the Anderson model to evaluate the implementation of *Plan Colombia* with respect to each of the five goals. Section III is divided into five separate chapters corresponding to each of the five goals. Following the evaluation of each of the five goals, I draw some conclusions in an overall evaluation of *Plan Colombia* as a public policy of Colombia and as a foreign policy of the US, and the usefulness of Anderson's systematic policy analysis framework.

5

000693



# SECTION I.  PROBLEM BACKGROUND

*(Colombia's History and the US War on Drugs:*
*Identifying the Problem and Setting the Agenda)*

## Chapter 2:  Colombian Perspective

### The Beginnings:  Pre-Spanish Conquest to Civil Strife (    -1946)

A discussion of the current situation in Colombia is not complete without a brief look at the
origins of the problems facing the country.  To some extent, the origins may be traced all
the way back to the pre-Columbian Indians of the Andean region.  Witnessing the great
human migration from Asia across the Bearing land bridge down the North American
continent through the Isthmus of Panama, pre-Columbian Colombia might well have
served as 'gateway' to the rest of South America (Safford 2002).  The Indians settled in
this region as small, disjointed tribes separated by the formidable Andean mountain ranges
dividing what is now Colombia into three unique geographic regions.  Eventually these
indigenous tribes became associated (by related dialect) predominantly into a large group
called the Chibcha; the most notable tribes of which were the Taironas and Muiscas
(Bushnell 1993).  Insomuch as the former were the more advanced technologically, the
Muiscas occupied a wider territorial range that included mountainous regions of present
day Bogotá.

Experts speculate that there was wide use of coca throughout the Indian nations of
South America; however, the use in by pre-Columbian Indians in the region that is now
Colombia was not extensive (Livingstone 2004).  There is evidence of traditional use of the
indigenous coca plant for ritual festivities, although historians point out that most pre-
Columbian coca use was restricted by the Chibcha and use was more prevalent in the
Andean basin that is now Peru, Bolivia, and Ecuador (Safford 2002).  In any event, the
coca leaf use was widely used years after the Spanish conquest, by (a decreasing
population of) Colombian Indians and the early peasant class, especially laborers and pack
carriers along the Andean ranges (Lloyd 1913).  This early use of coca leaves led to
widespread cultivation and use of the plant that early American physician W. G. Mortimer

6

called the "Divine Plant of the Incas," and plays an integral role in the complex problems of the modern nation (Mortimer 1901).

Spanish conquest and subsequent rule over New Granada is another root cause of modern day civil strife. In the 1500s, conquistadors subdued the native tribes with brutal methods that would be considered genocide in this century, all in the name prosthelytizing, finding gold and claiming new territory for Spain (Clawson 2004). Although enslavement of indigenous Indians was not the norm in New Granada, there were other exploitive measures. The system of *ecomienda* was a legally binding form of legal servitude provided in exchange for protection (Bushnell 1993). The Spanish conquest and subsequent rule established social, political and economic inequities that would forever shape the region.

In the third century of colonial rule, as gold production declined, Spain's interest in New Granada eventually began to diminish. Social structure evolved into a small upper class ruling over a vast lower class that was engaged in a subsistence economy (Bushnell 1993). A new Hispanic mestizo (mixed Indian and Spanish) population and an influx of African slaves (Safford 2004) replaced a once large indigenous Indian population. In fact, today original indigenous Indians only comprise 1.7 % (701,860) of the modern population in Colombia (Livingstone 2004, 209). Eventual mixing of races resulted in a complex social order that included whites of European ancestry at the top with libres (free blacks, mulattoes and mestizos) and Indians in the middle and African slaves at the bottom. The inequitable class system that began because of Spanish conquest and rule is reflected in modern Colombian society and the lower class in rural areas continues its reliance on subsistence farming now supplemented by coca cultivation.

Partly due to rivalry between the new world Creole elites and the old world Spaniards, New Granada eventually broke ties with Spain (Bushnell 1993). Under leadership of Venezuelan-born Simón Bolívar, New Grenada won independence from Spain in 1819 (Simons 2004). Eleven years later, the attempt to maintain the vast territories of Gran Colombia under a central rule ultimately failed and eventually the territory became Colombia (1863). After two civil wars and the loss of Panama at the turn of the century, Colombia maintained a relative peaceful existence until its bloody struggle of the mid 20th century, *La Violencia* (Bushnell 2003).

7




### *La Violencia* to Narco-Insurgency Colombia (1946-1999)

Civil war has bedeviled Colombia for years, which might come as a surprise when one considers that over the last century the nation has normally enjoyed two-party civilian governments and democratic elections (Ruiz 2001). Scholars and experts debate the root causes of the strife in this troubled Andean nation. Noted in the discussion above, authors point to back to the Spanish conquest and resulting inequitable distribution of power and wealth while others blame communist insurgents or the appeal of lucrative drug trafficking. Still others argue over whether a weak and ineffectual central government is the cause or the result of conflict (Marcella 2001). In any event, in the past, civil conflict has taken center stage in Colombia and government policies to improve security and socio-economic conditions have been ineffective. The most recent 50 years of conflict begins just before the midpoint of last century with arguably the bloodiest period of conflict seen in Colombia: *La Violencia*.

### *La Violencia*

The long-standing two-party system in Colombia traces its origins to the end Spanish colonial period and the beginning of the independent New Grenada. The two parties did not vary much in terms of ideology until they became more polarized in the late 19th century. As Bushnell describes it, the parties "were among the few unifying forces in a nation sorely fragmented geographically and culturally" (Bushnell 1993, 94). As the nation developed and began to debate the role of the church in politics as well as limits of central government power, the two parties developed identifiable and opposing political agendas. However, both the parties were controlled by a strictly structured and elitist liberal and conservative party leadership. This oligarchic system perpetuated inequality and provided a means of social control by the wealthy over the peasant class (Bushnell 1993). Emerging as a champion of the poor, populist leader and liberal candidate Jorge Gaitan had a significant following that challenged, or threatened the fledgling conservative presidency in 1946. Tensions mounted between the two parties throughout the nation and violence erupted on 9 April 1948, the day Gaitan was assassinated. This act of government-sponsored violence is often referred to as the *Bogotazo*, or more commonly by Colombians, *El nueve de abril* (Bushnell 1993). The period of ensuing violence was characterized by

8

class conflict, bitter partisan rivalry, revenge, religious persecution, and simple but widespread banditry. The majority of the elite stayed in the relative safety of urban centers while most of the violence took place in the rural countryside. After the deaths of some 200,000 Colombians, the government was overthrown in a 'mild' military coup in 1957 and a liberal-conservative power sharing arrangement known as the National Front was established (Bushnell 1993). Although the national economy prospered in the aftermath, the consensus democracy did little to relieve the vast inequities between the classes, and proved unable to deal with a developing guerilla insurgency that would bring more civil strife to Colombia.

## Insurgent Organizations

Colombia has experienced armed conflict among the nation's army, leftist guerilla movements, and right-wing paramilitary groups for more than four decades. The current conflict traces its roots back to the middle of the 20th century when, inspired by the success of Fidel Castro and the Cuban revolution, several insurgent organizations began operating in the wake of *La Violencia*. Currently, the dominant of these groups is the Marxist-based Revolutionary Armed Forces of Colombia, or FARC, which represents the largest insurgent force in South America (Carpenter 2003). The FARC formed in 1964 as the paramilitary wing of the Colombian Communist Party. The other significant left-wing guerrilla organization is the National Liberation Army, or ELN, which also began operating in 1964. Right-wing paramilitary organizations sprung up in opposition to the guerrillas. Wealthy landowners funded these paramilitaries to protect their illicit crops from the guerillas. In the mid to late 1990's most of these paramilitary groups consolidated under the umbrella of the United Self Defense Forces of Colombia, or AUC (Crandall 2002). Several other insurgent organizations disbanded, became legitimate political parties, or merged with the major organizations cited here. Both left-wing and right-wing groups are now motivated and largely supported by narco-trafficking and engage in indiscriminate acts of terror such as kidnapping for ransom as well as targeted assassinations of government officials. In essence, these organizations have filled a "vacuum of authority" in the absence of legitimate state control, especially in the rural areas of Colombia (Fajardo 2003, 30). Descriptions of the major insurgent organizations follow.

9

000697



### FARC (*Fuerzas Armadas Revolucionarias Colombianas*)

The Revolutionary Armed Forces of Colombia dominate and at least partially still control an area equivalent to half the size of the state of South Carolina within Colombia (the size of Texas, New Mexico, Arizona, and Arkansas combined), and are the largest insurgent force in South America (Carpenter 2003). Ted Galen Carpenter, the Vice President for Defense and Foreign Policy Studies at the Cato Institute, estimates that the FARC had some 3,000 fighters in 1985 and at least 20,000 strong in 2003 (Carpenter 2003, 63). There is now clear evidence of narco-trafficking supporting the guerilla movement—at an estimated $US 500 to $US 600 million year (Carpenter 2003, 72).

The FARC's original aim was to spread a Marxist ideology that envisioned agrarian peasant reform. There was strong support and influence for the FARC from the Soviet Union and Soviet client states. The loss of Soviet support with the demise of the Soviet Union led the FARC to embrace the lucrative drug trade and, in the process, shifted the movement's support base and focus (DEA Report 2002). The FARC remains the largest and most capable adversary in the government's ongoing struggle against the trinity of guerrilla insurgents, paramilitaries, and narco-trafficking organizations. Furthermore, by virtue of FARC's political and military power, it is one of the major players in Colombia's often-failed peace process, a major component of *Plan Colombia*. As part of the Pastrana administration's ill-conceived attempts at securing peace, a large area of the country was ceded to FARC; a conciliatory gesture that served to provide safe haven for insurgent training, uninhibited planning, refitting and rehabilitating combat units and furthermore strengthened the FARC's resolve and unwillingness to disarm peacefully.

### ELN (*Ejército de Liberación Nacional*)

The other major insurgent movement in Colombia is the National Liberation Army or ELN. Its roots are traced back to radical students greatly influenced by Castro and the Cuban Revolution. While much smaller in number than the FARC, the ELN is even more radical and controls much of the northeastern region of Colombia where an important oil pipeline is located. The continual sabotage this pipeline by ELN terrorists has had a significant perverse impact on the legitimate economy in Colombia (DEA Report 2002). The ELN has also been a factor in the Colombian peace process, negotiating a 'free zone' similar to

000698

the one granted the FARC. Additionally, the ELN, much like the larger guerilla movement, has become involved in narco-trafficking, exploiting the economic benefits of the lucrative drug trade. Narcotics trafficking money is perhaps viewed as a more legitimate source of income than kidnapping for ransom in the eyes of a violence-weary public.

## Paramilitary groups (autodefensas or 'self-defense groups')

Right-wing paramilitary organizations developed in response to the leftist insurgent movements. The best known and largest of these paramilitary groups is the United Self-Defense Forces of Colombia or the AUC. It is estimated that the AUC alone comprises more that 8,000 fighters (Carpenter 2003, 74). Colombian paramilitary organizations are supported largely by wealthy plantation or ranch owners who seek protection from leftist guerillas; protection that the central government was unable or unwilling to provide. There is also much evidence that, in the past as well as more recently, the national government (military) outsourced many 'assignments' to the paramilitary organizations. For many years, the perception, especially in international human rights organizations, was that there was not a clear difference between the military and the paramilitaries. They both carried out operations against the guerilla insurgents in an indiscriminate manner, dealing ruthlessly with any civilians that accommodated the guerilla movements. Only now, with a more capable and professional Colombian Army, has the government begun holding the paramilitaries accountable for civilian atrocities and vigilante violence against the guerillas and their supporters. The membership in the paramilitary organizations increased dramatically in the past decade, growing rapidly in the wake of former President Pastrana's failed peace initiatives that gave up control of large areas of rural land to the FARC and ELN. In large areas of the country, in the absence of any legitimate government presence, the AUC has been the most significant counter-weight to the FARC and ELN.

It is unclear whether the insurgents or the paramilitaries could survive today without the drug trade. The insurgent movements began as Soviet-supported, Marxist-oriented organizations combating Colombian government authority and policy, similar to insurgent movements in El Salvador and Nicaragua. Whether or not the original Marxist goals of the insurgent organizations survive, it is clear that the drug trade is now the

11

primary source of revenue for their insurgency. It is probable that, at least initially, neither the FARC nor the ELN were directly involved in the burgeoning Colombian drug trade (Crandall 2002). This is different from the paramilitaries, many of which started as protection forces (described above) in collusion with the major drug cartels (Livingstone 2004). However, documents uncovered in recent military operations indicate that even the guerilla forces are now are extensively involved in drug production and trafficking, further blurring the lines between the insurgency, paramilitary and narcotics trade (Carpenter 2003). Drug money is the primary means by which these movements increased the size and effectiveness of their respective operations and objectives. Between 1994 and 1998, the FARC and the AUC quickly filled the vacuum created by the dismantling of the Medellín and Cali drug cartels. In fact, many cite the dismantling of these cartels as having added fuel to the conflict (Tickner (2) 2003). In addition to the drug trade, there are other significant sources of income for the insurgents. These include kidnapping of political officials and wealthy landed elites, as well as "protection taxes" on local farmers. Additionally, sources now suggest that in response to increased and more effective counter narcotics measures, these insurgent organizations are seeking diverse forms of money laundering that include legitimate capital investment and even the use of humanitarian organizations (McCarthy 2004).

<u>Narco-trafficking Organizations</u>

Drug trafficking organizations comprise another component of the volatile and complex political/ideological/organizational mix existing in the rural countryside, and to a lesser extent in the urban areas of Colombia. These organizations tend to form alliances with the most powerful regional force, whether it is one of the leftist groups or one of the paramilitary organizations (Livingstone 2004). The narco-trafficking organizations are not as centralized as they were before the destruction of the monopolistic drug cartels (Medellín and Cali) during the 1990's. It is now estimated that there are more than 300 families that control the Colombian drug trade that provides more than 80% of the world's cocaine and nearly 66% of the heroin consumed in the US (Carpenter 2003, 72). Even though decentralized, these organizations continue to play a significant role in the ongoing

12



civil war and contribute to the overall national instability and insecurity, especially in the rural regions of the country.

Narcotics Trafficking and Increasing US Involvement

Over the last thirty years, drug production and trafficking has become the most destabilizing factor in the Andean Region, with Colombia now serving as the epicenter of the problem. Addressed succinctly by a past Commander in Chief of the US Southern Command, the spillover effects of the drug problem in Colombia are a "corrosive force without precedent, relentlessly eroding the foundations of democracy in the region, corrupting public institutions, poisoning youth, ruining economies, and disrupting the social order" (Wilhelm 2000, 1). Capitalizing on minimal government control and presence in rural provinces, insurgent and counter insurgent forces, 'symbiotically linked' to drug trafficking organizations, are able to operate with impunity (Mason 2003). The next chapter addresses the US response to the drug problem in Latin America with a focus on foreign policy development and direct involvement with Colombia. However, prior to this discussion, it is useful to view past and future US involvement in the region from the perspective of Colombia and Latin America.

US Involvement: Hegemony or Cooperation?

The US played a dominant role in Latin American politics long before the geo-narcotics problem and the insurgency in Colombia. Beginning in 1823 when President James Monroe proclaimed a "sphere of influence" in the Western Hemisphere, the US has preserved this Monroe Doctrine through both cooperative and coercive foreign policy measures throughout Latin America (Livingstone, 2004). In the later half of the 20th century, the US stepped up its involvement in Colombia through social development programs like President Kennedy's Alliance for Progress. The US also increased military support during the 1960s to fight the leftist guerilla insurgency (Fajardo 2003). Kennedy's intervention would set the stage for, and have interesting parallels to, US involvement in Colombia during the last quarter of the 20th century under the auspices of the US war against drugs.

13

000701

The demise of the Soviet Union in the early 1990s ended the bipolar world of international politics and triggered a revamped US foreign policy. No longer did communist-backed insurgents represent a threat to US national security. Narcotics trafficking was quickly becoming the next major foreign policy issue. Arlene Tickner, a leading expert on Colombia and associate professor at the Universidad de los Andes in Bogotá writes, "The Cold War's end saw drugs replace communism as the primary threat to the United States national security in the Western Hemisphere" (Tickner (1) 2003, 79). However, many Colombians, as well as other Latin Americans did not see narcotics production and trafficking as a significant domestic issue; these were seen as largely a "Yankee problem" (Carpenter 2003, 23). In fact, possession and cultivation of many drugs, to include cocaine, is still legal in several South American nations, to include possession in Colombia despite US attempts to influence domestic laws (Housego 2004).

As discussed previously, the use of coca leaves as a stimulant is part of the culture of the Andean region. The extension of coca use from local consumption to the production of cocaine for export now constitutes a significant component of the Colombian economy (Thoumi 2002). Thousands of Colombians are involved in the drug trade, from peasant coca farmers to cocaine transporting 'mules.'[1] These Colombians would argue that US-sponsored drug eradication and interdiction deprive what they see as a legitimate way to earn a living (Molano 2004). Furthermore, many in the international community (and in Colombia) were and still are convinced that the US-supported counter narcotics effort is merely an excuse for continued US dominance in the region (Tickner (2) 2003). Others argue that the US ultimately has designs on Colombia's natural resources, especially oil fields in the northern regions. In fact, Murillo (2004) terms the relationship Colombia has developed with the United States as "love-hate." He argues that while many Colombians (especially the middle class) embrace their powerful northern neighbor, many politicians and, especially those Colombians in intellectual circles, are highly critical and suspicious of Washington's intent (Murillo 2004). These critics of US involvement in Colombia point to the funding under *Plan Colombia* for more robust protection against insurgent (ELN)

---

[1] Mules are individuals who risk their lives for personal monetary gain by transporting cocaine internally. Generally, 1 kilo of cocaine is swallowed in as many as 40-50 small plastic containers or condoms for 24 hours or more (Molano 2004, 155).

14

000702



attacks on the northern Colombian oil pipeline as proof of their allegations and it is no secret that the US seeks to reduce dependence on Mid East oil (Bolivar 2003).

As the sole remaining superpower, United States' influence is clearly dominant in much of the world, particularly in the Western Hemisphere. Supporters of US foreign policy in Colombia argue that US policy is borne of a legitimate regional security concerns and both offered and received in a spirit of welcome cooperation (Marcella 2003). It appears to be clear to most Colombians that the government of Colombia must regain control over the rural countryside in order to provide security for its population and to improve their socio economic condition. As witnessed by the election of President Uribe in 2002, many, if not most, Colombians agree with this assessment (Murillo 2004). With respect to oil, the attacks on the Colombian oil infrastructure significantly detract from a productive and legitimate economy (Bolivar 2003). This harms the Colombian economy far more than the marginal impact on the US economy in regards to reduction in Colombian oil exports. Despite media reports, US funding for *Plan Colombia* is a result of Colombian policy development (USDOS 2003). As will be discussed in the next section, *Plan Colombia* was a Colombian-designed public policy measure and funding (a majority of which was non-military) was requested by the Colombian government. With this in mind, US influence can be seen as both hegemonic and cooperative.

15

000703

1    CHRISTOPHER TODD, Attorney at Law            DETAINED ALIEN
     IMMIGRATION LAW CLINIC
2    University of California, Davis School of Law
     1 Shields Avenue TB-30
3    Davis, CA 95616-8821               RECEIVED
     Tel.:    (530) 752-6942 or      DEPARTMENT OF JUSTICE
4           (415) 846-9311
     Fax:    (530) 752-0822             DEC 1 4 2005
5
     Attorneys for Respondent
6    ANA BIOCINI                 IMMIGRATION REVIEW
                             SAN FRANCISCO, CALIFORNIA
7    Assisted by: Dia Moua, Chad Greeson

8           **UNITED STATES DEPARTMENT OF JUSTICE**
          **EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
9                  **IMMIGRATION COURT**
          **SAN FRANCISCO, CALIFORNIA (DUBLIN FCI)**
10

11    IN THE MATTER OF:           File No.  A 091-182-333

12    ANA BIOCINI                **RESPONDENT'S WITNESS LIST &**
                             **MOTION FOR TELEPHONE**
13    Respondent.             **TESTIMONY**

14    In Removal Proceedings       Date:  December 19, 2005
     _____/    Time:  1:00 P.M.
15                                   Judge: Murry

16        The Respondent intends to call the following witness to testify in her removal proceeding.
17    Respondent respectfully moves this court to allow this witness to testify by telephone.

18    Witness:       Luz Estella Nagle
                Professor of Law
19              Stetson University College of Law
                1401 61st Street South
20              Gulfport, Florida 33707
                (727) 562-7814

21    Dated: December 13, 2005           Respectfully submitted,
22
23
24
25                                CHRISTOPHER TODD
                               Immigration Law Clinic, UC Davis School of Law
26                                Attorneys for the Respondent
                               Ana Biocini
27
28

**CERTIFICATE OF SERVICE**

On December 13, 2005, I served the following document(s):*Respondent's Witness List & Motion for Telephone Testimony* upon the parties in said action by placing a true and correct copy in a sealed envelope and each envelope addressed as follows:

Honorable Judge Murry
Office of the Immigration Judge
Executive Office for Immigration Review
550 Kearny Street, Suite 800 (8th Floor)
San Francisco, CA 94108

___ *By Facsimile Machine (Fax).* By personally transmitting a true and correct copy thereof via an electronic facsimile machine during regular business hours.

___ *By Mail.* I am readily familiar with the business practice for collection and processing of correspondence for mailing with the United States Postal Service and that this document, with postage fully prepaid, will be deposited with the United States Postal Service this date in the ordinary course of business.

___ *By Certified Mail.* I am readily familiar with the business practice for collection and processing of correspondence for certified mailing with the United States Postal Service and that this document, with postage fully prepaid, will be deposited with the United States Postal Service on this date in the ordinary course of business.

_X_ *By Overnight/Express Mail.* I am familiar with the business practice for the collection and processing for Overnight/Express Mail with the United States Postal Service and/or Overnight service provider. Such correspondence will be deposited with a facility regularly maintained by the United States Postal Service for receipt of express mail or other overnight service providers/entities (i.e., Federal Express, United States Parcel Service, etc.) For receipt of Overnight Mail on the same day in the ordinary course of business.

___ *By Personal Service.* By personally delivering a true copy thereof to the office of the addressee above.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 13, 2005, in Davis, CA.

RECEIVED
DEPARTMENT OF JUSTICE

DEC 1 4 2005

EXECUTIVE OFFICE FOR REVIEW
IMMIGRATION COURT
SAN FRANCISCO, CALIFORNIA

*Christopher J. Todd, Esq.*




## Chapter 3:  The US War on Drugs

Nixon to Reagan

President Nixon declared the "War on Drugs" in 1971, but in reality, the United States had been dealing with the problem of illicit drugs since just after the turn of the century, even prior to the prohibition of alcohol (Crandall 2002, 25).  During the late 1960s and the early 1970s as part of the counterculture movement, there was a growing acceptance of a drug culture by the American youth.  This led to an increased focus on the drug problem. However, most of the effort was centered on treatment issues and the 'drug war' remained largely political rhetoric.  During the administrations of Presidents Ford and Carter, international counter narcotics efforts were generally focused on eradication measures in Mexico, but political pressure was mounting for similar eradication efforts in Colombia, Peru and Bolivia (Carpenter 2003).

With the dawn of a conservative era under the Reagan administration, the 'drug war' gained a momentum that has lasted through the remainder of the 20th century and into the 21st.  In the words of Carpenter, even prior to Reagan taking office, a grassroots campaign began to create a national "unprecedented anti-drug hysteria" (Carpenter 2003, 18).  For the next twenty years, the decriminalization and legalization movements were marginalized by a more aggressive approach to the war on drugs.  It became clear early in the Reagan presidency that the war on drugs would become more militarized.  In 1982, Reagan delivered a speech in the Rose Garden where he stated, "We're taking down the surrender flag...and running up a battle flag" (Carpenter 2003, 19).  This aggressive posture toward the supply side was reflected in new foreign policies focusing on drug interdiction and eradication.

The major components of the Reagan war on drugs, as implemented in Colombia and elsewhere in Latin America, combined eradication projects with crop substitution strategies and interdiction of trafficking routes.  It is important to note that even though much of the efforts were 'militarized' that the objectives in Colombia were deemed 'counter narcotics' and not 'counter insurgency.'  Maintaining this distinction was critical to maintaining support of a public wary of possible US involvement in a counter insurgency that could 'Vietnamize' the situation in Colombia (Simons 2004).  (This

16

potential of Vietnamization was also a major concern of international governments critical
of US 'hegemonic' involvement in Latin America.) However, the Reagan era
conservatives in the waning years of the Soviet Union also began to recognize a blurring of
objectives that is reflected in this statement by the US President:

> *The link between the governments of such Soviet allies as Cuba and Nicaragua and*
> *international narcotics trafficking and terrorism is becoming increasingly clear.  These*
> *evil twins- narcotics trafficking and terrorism- represent the most insidious and dangerous*
> *threats to the hemisphere today (Reagan in Livingstone 2004, 150).*

These strategies, sometimes ambiguously articulated, were pursued throughout the
remainder of the 20th century and remained the basic approach to the war on drugs until
very recently in a post 9/11 world.  Many experts in the United States view these collective
efforts as a complete failure.  In their view, these policies have escalated internal civil wars
and increased violence, particularly in Colombia (Crandall 2002, Carpenter 2003).
Furthermore, other authors believe that the underlying rationale for the policies is to
perpetuate a self-serving, imperialistic and hegemonic US agenda (Livingstone 2004,
Simons 2004).  The widespread acceptance of this viewpoint by the media, academia,
human rights organizations, and mainstream religious denominations is highlighted in a
2003 report by the independent NGO Project Counseling Service (PCS), an international
consortium of Canadian and European NGOs.  The agency suggests that the negative spin
on US involvement in Latin America results in significant political opposition to continued
funding of programs by the United States (PCS 2003).

US anti-drug policies directed towards Latin American countries were not always
well received during the Reagan years.  Both Bolivia and Peru largely ignored US requests
preferring not to "militarize" their counter narcotics efforts (Carpenter 2003).  At the same
time, it was becoming increasingly apparent in Washington that many Latin American
leaders (Noriega in Panama, for example) had extremely close ties to drug traffickers.
These leaders refused to pursue policies that would undermine the lucrative drug trade,
potentially offending political allies (Carpenter 2003).  Many of these Latin American
officials blamed the problem on the United States and its inability to curb the demand side.

17

000707

The debate in the 1980's between Latin American nations and the United States over the best approach to counter drug efforts did much to promote tension and suspicion between the hemispheric allies; a tension that, in many ways, remains even today.

President Reagan escalated the drug war by signing National Security Decision Directive (NSDD) 221 that declared drug trafficking to be a threat to security of the United States (Carpenter 2002). After the signing of this document, the United States intensified military and intelligence efforts internationally in an attempt to 'win' the war on drugs. Counter narcotics mission 'Operation Blast Furnace' conducted by the United States in Bolivia for four months in 1986 is an excellent example of this increased emphasis on military efforts. Opponents of the war on drugs claimed that this operation, involving modern US military equipment including 160 Blackhawk helicopters, was a prototype mission foreshadowing future US strategy for the Andean region (Crandall 2002, 31). However, there was significant public support for the war on drugs; by 1988, 48% of Americans thought that the drug issue was the greatest foreign policy challenge, and 68% thought it should take priority over fighting communism (Crandall 2002, 32). Increasing US support for Colombia during the 1980s and 1990s as part of the "Andean Regional Initiative" reflected this growing concern. Both the elder Bush and Clinton administrations were determined to fight the drug problem by attacking the source: narcotics production in Peru, Colombia, and Bolivia.

Bush-Clinton-Bush

The first Bush administration showed no interest in demilitarizing the war on drugs or shifting focus from the supply side. The newly created Office of National Drug Control Policy (more commonly known as the White House "Drug Czar") was focused on reducing the amount of drugs entering the US. Reflecting this policy was Operation Just Cause, which removed Manual Noriega—linked to the narcotics trade, from power in Panama in 1989. That same year, President Bush signed the 'Andean Regional Initiative,' a policy that not only provided funding but also expanded military aid to all Andean nations and permitted US military personnel to accompany Latin American combat units on routine patrols (in secure areas) for training and advising responsibilities (Carpenter 2003).

18

The wisdom of an increasing militarization of the drug war was debated among senior US military strategists. Some did not believe that drug interdiction was as vital to national security as politicians made it out to be. On the other hand, most military decision makers realized that an increased role in counter narcotics efforts meant continued funding at a time when military budgets were declining in the wake of the Cold War. Some academics, including Carpenter and Livingstone, have claimed that the Pentagon interest in the war on drugs was directly due to concerns over budgets and the need to find a new threat to justify funding levels (Carpenter 2003, Livingstone 2004).

The Clinton administration brought little change in US drug policies toward Latin America, and Colombia specifically. Support for counter narcotics efforts and regional aid was maintained, albeit in a less publicized manner. In Colombia, these continuing efforts led to the high-profile death of drug kingpin Pablo Escobar in 1993, ironically an event that while precipitated by US and Colombian agents, was indirectly arranged by the Cali cartel (Livingstone 2004). Moreover, by 1996, the two most powerful drug cartels in Colombia, the Medellín and the Cali cartels, were virtually destroyed. There was an overall increase in military support to Colombia, although the effectiveness of this increase was limited by the restraints placed on the roles and missions that US military personnel could undertake. Throughout the Clinton years, military efforts, which included sophisticated intelligence and surveillance using Air Force Airborne Warning and Control System (AWACS) aircraft, did little to curb the overall narcotics problem despite the successes noted above. According to Carpenter (2003), drug exports did not decline, drug producers and traffickers became more decentralized, and regional security was further destabilized. Furthermore, as the US military was becoming more actively engaged in the war on drugs, including an increased presence along the border with Mexico, relationships with our Latin American neighbors were not improving. The United States became increasingly skeptical of corrupt Latin American officials whose rhetoric against drugs was much stronger than their actions. During the Clinton presidency, economic sanctions were leveled at Colombia and the Samper (1994-1998) administration for failing to fully cooperate with the US-led war on drugs (Simon 2004).

There has been considerable political debate over the appropriate American policy toward the Andean region in general and Colombia in particular. This debate started well

19

000709

before the development of *Plan Colombia* in 1999, and continues today. Arguably, there have been some successes in the war on drugs. However, at the end of the second Clinton administration counter narcotics policies did not appear to have lasting positive impacts with respect to reduction in narcotics trafficking (supply) or reducing the drug demand domestically. Many argued that these policies were, in fact, counter productive. In spite of the escalating war on drugs from 1995 to 2000, Figures 3.1 and 3.2 both depict negative (i.e. increasing) cocaine production trends in Colombia from 1995 to 2000, prior to the implementation of *Plan Colombia*.



**Figure 3.1: Andean Potential Coca Base Production 1995-2000**
(US Department of State in DEA Intelligence Division Report, March 2002)

20

000710



**Figure 3.2: Andean Net Coca Cultivation 1991-2000**
(US Department of State in DEA Intelligence Division Report, March 2002)

These figures clearly show that Colombia needed to become the focus of US regional counter narcotics strategies. It is interesting to note that prior to 1995 Peru and Bolivia produced more coca than Colombia. However, with increased counter narcotics efforts in Peru and Bolivia, Colombia quickly became the leading producer and by 1998 Colombian production surpassed the combined total production of both the other two nations[2] (Marcella 2003, 32).

A shift in US counter narcotics focus to Colombia is evident in the drastic increase of foreign aid to Colombia over a twenty-year period. In 1983 the US provided $US 3.49 million; in 1991, $US 126 million; and in 2000, $US 850 million (Crandall 2002, 32). This increased funding for counter narcotics efforts produced mixed results. Interdiction of drug supply routes intensified, narco-trafficking organizations were successfully targeted more frequently and fumigation of illicit crops increased. These efforts began to stem production

---

[2] It should be noted that the increase in narcotics production and trafficking from 1994-1998 could also be linked to a reduction in US foreign assistance to Colombia during a time of 'deteriorating relationships' between the two nations attributed to a loss of mutual trust during the Samper administration (Crandall 2002, 5).

21



in Colombia but provided little impact in terms of reduced availability of cocaine as evidenced by no increase in street price of cocaine in the United States. In 2000, the United States had 3.5 million people addicted to cocaine and the vast majority of their drug supply originated in Colombia. The total number of deaths in the United States related to drug trafficking and drug use was near 52,000 in 2000 (Marcella 2001, 1-4). Furthermore, the security situation in the Andean region, specifically in Colombia, continued to deteriorate. From both US and Colombian perspectives, there was a clear, immediate need to refocus and retool the strategies employed against the narco-traffickers in Colombia.

Before recent strategic shifts, which included the development and adoption of *Plan Colombia*, the Colombian government was fighting an up-hill battle against a deteriorating security situation and the US was losing the war on drugs. To make matters worse, both the insurgent forces and the opposition paramilitary forces in Colombia were beginning to exploit the drug trade as a funding source. To remain idle in the face of this deteriorating situation was not an option. Recognizing the critical nature of the problem, during the last year of his administration, President Clinton signed up to support the most ambitious counter drug initiative to date, *Plan Colombia*.

22

000712



## II.  METHODOLOGY OF ANALYSIS: ANDERSON'S MODEL

### *(and formulation of Plan Colombia)*

### Chapter 4:  Systematic Policy Analysis

The approaches to the study of public policy are nearly as varied as the policies themselves. James Anderson (2000) summarizes several techniques for studying the public policy-making process.  He notes there are many useful models and theories that should be drawn upon to facilitate an understanding and evaluation of the policy-making process.  Anderson argues that narrowly analyzing policy using one approach is shortsighted.  His systematic policy-process approach focuses on "objective explanation" of policy and political behavior rather than seeking rigorous adherence to a single theoretical approach. Although his contention that objective explanation is possible may be overly optimistic if not naïve, Anderson's approach does provide a framework for tackling complex social phenomena.

The utility in Anderson's approach is that it enables students of domestic and foreign policy to gain a better understanding of the interactions of public officials and private citizens in the public policy process.  Anderson defines his policy approach like this: "A relatively stable, purposive course of action followed by an actor or set of actors in dealing with a problem or matter of concern" (Anderson 2000, 4).  His methods focus on "analysis rather than advocacy" and stresses the evaluation of outputs and outcomes of policy implementation *though a scientific approach that incorporates both quantitative and* qualitative methodology (Anderson 2000, 2).

Critical to policy analysis is an understanding of various categories of public policy. Anderson explains the difference between substantive and procedural polices and discusses various policy categories such as distributive, regulatory, self-regulatory, and redistributive.  He describes the importance of both material and symbolic policies and the difference between policies involving public and private goods. Here it is important to understand that many public policies, and most certainly *Plan Colombia*, fall into more

23

than one category. Furthermore, in addition to *Plan Colombia* being a Colombian national policy, support for the plan and its objectives also represents US foreign policy.

Anderson outlines a flexible approach to the study of policy blending both theoretical and practical methodologies. This flexibility allows for a thorough, objective, and wide ranging analysis of policy. In the analysis of *Plan Colombia*, this approach proves particularly helpful. Analysis of *Plan Colombia* is challenging due to its complexity, its controversial nature, the scale of its implementation, and the scope of its impact upon Colombia, the Andean region, and the US. Anderson's approach allows the consideration of a myriad of issues intertwined with implementation and evaluation of *Plan Colombia*. These issues include the length of implementation; funding sources; international perceptions of US hegemonic involvement accompanied by demands for transparency and accountability of implementing agencies; and Colombia's poor record on human rights and persistent social economic problems. These factors serve to make *Plan Colombia* a difficult policy to analyze without a systematic and holistic approach. Moreover, while programs implemented to achieve a goal may show statistically high outputs, these outputs in some cases have both positive and negative consequences. The flexibility inherent in Anderson's methodology is useful in addressing these contradictory results in the overall evaluation of *Plan Colombia*.

Anderson's Conceptual Framework

Anderson's systematic approach to analyzing public policy is conceptually framed in five stages that he views "...as a sequential pattern of activities or functions that can readily be distinguished analytically..." (Anderson 2000, 30). These five stages are:

1- Problem Identification and Agenda Setting

2- Policy Formulation

3- Policy Adoption

4- Implementation (administration)

5- Evaluation

24

Anderson's mechanistic model and general approach make it very useful in studying public policy; however, its linear design is not universally accepted or applicable to all public policy. Other approaches involve analyzing policy from the perspective of political systems, group theory, elite theory, institutionalism, and rational choice. All of these approaches have merit and utility in public policy analysis and Anderson's generalizations may appear to lead to an over-simplification of the complex processes represented by *Plan Colombia*. His process, however, is a flexible one that seeks to accommodate more theoretical approaches as appropriate throughout each analytical stage.

Flexibility is the cornerstone to Anderson's approach to the study of public policy. My attraction to the model is that it allows the analyst to emphasize certain stages of over others, according to the policy in question. Flexibility reduces the temptation to use a rigid methodological approach and narrow conceptual framework and forcing such an approach in the evaluation of *Plan Colombia* would serve to confuse rather than clarify. While the development and implementation of *Plan Colombia* do not necessarily fit neatly into the linear dimensions of policy process as described by Anderson, his basic framework allows for an understanding and description of *Plan Colombia* as a public policy. Although every aspect of the 'policy process' is important, and each will be addressed, my focus is predominantly on implementation and evaluation of policy. With this in mind, I offer four broad objectives for my analysis.

### Methodology for Analysis of *Plan Colombia*

Using the Anderson conceptual framework outlined above, there are four overarching objectives I wish to accomplish in this analysis of *Plan Colombia* as a public policy initiative. Those objectives are:

➢ To outline the historical background of the geo-narcotics **problem** and to analyze the **formulation** and **adoption** of *Plan Colombia* in response to that problem.

➢ To assess the **implementation** and administration of *Plan Colombia*.

25

000715



> ➢ To **evaluate** the specific outcomes of *Plan Colombia* both from the perspective of Colombian public policy goals and US foreign policy goals.

> ➢ To **assess** whether or not *Plan Colombia* is an effective public policy for Colombia and whether support for *Plan Colombia* is an effective foreign policy for the US.

The historical background of the problem prior to the development and adoption of *Plan Colombia* was addressed in Chapter 1, Section I of this paper, based on a review of the pertinent literature. The historical summary highlighted the most important aspects of the decades-old political conflict in Colombia tracing how a Marxist-Leninist insurgency ultimately evolved into a civil war funded by narcotics production and trafficking. Chapter 4 that follows addresses the first three stages of Anderson's systematic policy framework: problem identification/ agenda setting, formulation and policy adoption. It also summarizes the content of *Plan Colombia* and identifies the five broad public policy goals found in the document itself. The salient point of Sections I and II of this paper is that the nation's instability caused by geo-narcotics phenomena led to the formation and adoption of a formal policy (*Plan Colombia*) supported mutually by the US and Colombian governments as a foreign and domestic policy, respectively.

Section III of the paper focuses on the implementation and evaluation of *Plan Colombia* from both Colombian and US perspectives. I trace the implementation of specific programs to the five broad goals found in the original policy. My research into the implementation of the plan included a review of the effectiveness in the implementation of counter narcotics programs, counter insurgency strategies, institutional reform, peace initiatives, and social development initiatives. Research also addressed US military tactical assistance to the Colombian Army and the Colombian National Police. In Section III, I describe the implementation of programs based on this research.

Anderson explains that policy assessment is closely tied to implementation and may be considered "more of an art than a science" (Anderson 2000, 261). Measuring the outcomes and impacts of *Plan Colombia* is most effectively accomplished through an assessment of each of the five overarching goals established by *Plan Colombia*. Under Anderson's policy analysis framework, this task is appropriately labeled "evaluation." To

26



make a thorough evaluation of *Plan Colombia*, I use both quantitative and qualitative measures to analyze policy results. This analysis directly follows the discussion of program implementation for each goal. The evaluation of progress towards each goal focuses on outputs and outcomes. Each of five goals is analyzed in this fashion: program implementation followed by evaluation of results.

The analysis of each goal is presented in a separate chapter and is based on detailed examination of available resources. These sources include; literature covering US and Colombian history and policy initiatives, both Colombian and US Government reports, independent NGO/IGO reports and assessments, journal articles, and finally news articles. Using the information extracted, I assess whether or not each one of the primary goals of *Plan Colombia* has been attained, either in full or in part. In assessing the attainment of the goals, I specifically address any unintended consequences (positive and/or negative) of the implementation to date. Without addressing unintended consequences, it is impossible to determine whether the benefits of the policy outcomes outweigh the costs. In addition to analyzing statistical data provided from a variety of international and national sources, this assessment considers the viewpoints of public and private individuals and organizations, within and external to Colombia and the US. This systematic comparison of outcomes for each goal of the policy against original intent provides the foundation for a critical evaluation of *Plan Colombia*. My overall objective is to determine whether policy outcomes are achieving the principal goals stated in the original plan. I list the goals or pillars of *Plan Colombia* in the next section of this paper.

27

## Chapter 5: *PLAN COLOMBIA*

Problem Identification and Agenda Setting

As noted above, drug production in Colombia was already a major concern of the ongoing 'war on drugs' in the United States during the 1980s. However, the rise of geo-narcotics created an even more serious hemispheric and global concern. Furthermore, the war on drugs had not produced any positive results in the US on the demand side (Carpenter 2003). The urgent need to combat narcotics trafficking placed a high priority on developing an effective US foreign policy towards Colombia. While the problem of illicit drugs originating in Latin America was identified two decades earlier, the reality was that the US needed to take a more proactive role. The threat geo-narcotics posed to the national security of the US became clear during Clinton's second term and the administration was able to convince both the public and congress of the need to address this threat. At the same time, the Colombian government was desperate for international support and foreign aid. Consequently, the Colombian leadership was more than willing to allow the US to become intimately involved in the development of a Colombian public policy initiative, even at the risk of losing other would-be supporters and international criticism (Carpenter 2003). It is also clear that the Colombian people themselves, in the election of Andres Pastrana and more recently hardliner Alvaro Uribe, were supporting a referendum for change after a half century of violent conflict exacerbated by narcotics trafficking.

Formulation and Adoption

There has been controversy over many aspects of the *Plan Colombia* from the beginning. It is instructive to understand the key issues that served as 'bones of contention' during what Anderson terms formulation and adoption of policy. Many academics and foreign policy experts have attempted to portray the plan as nothing more than a continuation of ill-conceived United States strong-arm policies in Latin America. Russell Crandall provides an excellent example of this perspective in a *Survival* journal article, "Clinton, Bush and *Plan Colombia*," and in *Driven by Drugs: US Policy toward Colombia*. Crandall grudgingly acknowledges that *Plan Colombia* was a political success for the Clinton administration but largely a symbolic policy gesture of the Pastrana administration.

28

000718



However, Crandall and Livingstone both argue that the plan does not have an authentic Colombian origin and maintain that the plan was devised by the United States to justify the continued spending of billions of dollars on aid to Colombia for selfish pursuit of a hegemonic agenda (Crandall 2002, Livingstone 2004). According to Crandall, the plan was necessary to gain the support of those in congress who believed that Colombia was on the verge of total collapse and that the US might be getting into another "Vietnam-type quagmire" (Crandall, *Survival* 2002). Furthermore, Crandall argues that the focus on *counter narcotics* and support for *Plan Colombia* was nothing but an *extension of the drug war* with the Clinton administration placing a priority on distinguishing between counter narcotics efforts and counter insurgency efforts, clearly promoting the former. From an opposing viewpoint, Colombian geo-political expert Gabriel Marcella in his study, *Plan Colombia: The Strategic and Operational Imperatives,* explains that the plan was actually authored by the Chief of Staff to the President of Colombia, Jaime Ruiz. Ruiz was educated in both Colombia and the United States and the document was in fact written in English, but it was not a creation of the United States as portrayed by the media and partisan politicians in Washington (Marcella, 2001).

There is also debate over whether *Plan Colombia,* heavily influenced and financed by the US, represents a more 'militarized' approach than the original intent of the Pastrana administration. In a speech to the Colombian people in 1998, the newly elected Pastrana placed major emphasis on the peace process vice counter narcotics and counter insurgency programs as the primary component of a new plan for Colombia (Livingstone 2004). The receptiveness of the Colombian people to the speech was evidence of the public desire for a peaceful solution to the conflict. It also reflected popular support for the government to formulate and adopt a public policy initiative to address these issues. Murillo suggests, however, that after Pastrana took a trip to Washington, he suddenly made an "about face" and shifted his rhetoric to focus on fighting the drug war vice focusing on rural poverty and peace initiatives (Murillo 2004, 128). Murillo echoes the sentiments of many Colombians in the following:

> ...the arrogant, almost ethnocentric determination that the only solutions to resolve these
> problems must emanate from Washington in the name of U.S. national security is disguised

29

000719



as a bilateral approach designed by like-minded people in both countries… (Murillo 2004, 128).

Murillo argues that Washington had pushed its own agenda, to the detriment of the Colombian people, previously. He points to the neo-liberal economic programs promoted by Washington that were implemented in Colombia under former President Cesar Gaviria's (1990-1994) *apertura economica*, or economic opening. These programs exacerbated conflict, devastated the agricultural sector, and increased poverty (Murillo 2004, 129).

US foreign policy towards Colombia was (and still is) a subject of heated debate both in Congress and among foreign policy experts. During the debate over support for *Plan Colombia* as a US foreign policy initiative, many congressional democrats feared (and many still do) that the US was getting further entangled in a foreign civil war that was spilling over into other Andean nations. Past human rights violations by the Colombian Army and paramilitaries were another area of concern in both the US as well as the broader international community. However, *Plan Colombia* was developed with these concerns in mind; it provided for balanced funding between military and social aspects, and funding was conditional on Colombia military and police respect for human rights (Crandall 2002). The US ultimately supported the Colombian government in the adoption and implementation of *Plan Colombia* both symbolically and through major funding of plan initiatives. This (US) support was part of a 'ramped-up' Colombian foreign assistance policy in a mutual effort with the Colombian government to improve regional security and combat the growing narcotics trade. Following a trip to Bogotá in 2000, White House Drug Czar, General Barry McCaffrey, stated in a speech to the Atlantic Council of the United States that "with international solidarity and support for Colombia's broad-based long-term strategy (i.e., *Plan Colombia*), drug traffickers and terrorist groups can be deprived of their income, drug production will be crippled, and Colombia's long-suffering people might secure their basic right to earn a legitimate income without fearing for their lives" (McCaffrey 2000). *Plan Colombia* committed the Colombian government to an overarching goal: "to strengthen the State in order to regain the citizens' confidence and recuperate the basic norms of peaceful coexistence" (*Plan Colombia* 1999, 3).

*Plan Colombia* called for multifaceted approach linking economic projects, counter-narcotics and counter guerilla strategies, social and cultural programs, with a

30

000720




strengthening of state institutions. These strategies were to be executed while concurrently attempting peace negotiations with the insurgent groups and the paramilitary forces (*Plan Colombia* 1999). The hope was that such an approach, with robust international support, would provide a long-term solution to the complex problems facing Colombia. The original plan did not favor one element or overarching goal over another and the goals and elements were not prioritized. However, due to a lack of international funding support for the plan, funding for the plan came almost exclusively from the US and this funding was directed, in large part, to programs related to security and counter narcotics. *The US focus was always clear and this focus provides support for those who view the plan as a one-sided policy focused narrowly on security.*

Regardless of who actually authored *Plan Colombia*, or whether or not the US-influenced version was the original written document, it is obvious that there was strong US influence in the final policy document presented to the US Congress during the funding debate. The 7.5 billion dollar price tag on the plan was based on funding from Colombia, the United States, international donors (primarily the European Union), the World Bank, the Inter-American Development Bank, and other international lending institutions over a five-year period. The US contribution was to be $1.3 billion, or 17% of the total (Carpenter 2003, 59). This US funding commitment reflected a major concern by the United States over the security situation in Colombia, as well as the intent of the US to influence *Plan Colombia's* implementation and ensure its success. Many members of the US Congress and international leaders remained concerned and feared that US military aid would only escalate the conflict. In a speech delivered from a house of justice (*casa de justicia*), Clinton reassured both Colombian skeptics and Americans fearful of a protracted Vietnam-type counterinsurgency that a "condition of this aid is that we (the US) are not going to get into a shooting war. This is not Vietnam; neither is it Yankee imperialism" (Crandall 2002, 157).

Elements of *Plan Colombia*

The 10 strategic elements of *Plan Colombia* are summarized in Table 5.1. These elements are taken directly from the official document: *Plan Colombia: Plan for Peace, Prosperity, and the Strengthening of the State*, or short title: "*Plan Colombia*."

31




**Table 5.1:  Strategic Elements of *Plan Colombia***

(*Plan Colombia* 1999, 7-8)

| | |
|---|---|
| Economic | A strategy focused on employment, legitimate tax collection, international trade, foreign and domestic investment, and modernization. |
| Fiscal and Financial | A strategy that includes austerity and adjustment. |
| Peace | This strategy seeks to negotiate a peace with the guerillas, further strengthening the rule of law and authority. |
| National Defense | This strategy will restructure and modernize the national military and police forces in order that they might restore the rule of law where it does not exist, thus promoting human rights and international law. |
| Judicial and Human Rights | This strategy seeks to impose the rule of law with equal justice to all, and to ensure that reformation occurs within those institutions enforcing the law. |
| Counter narcotics | A strategy that seeks to partner with other countries contributing to the drug-chain that might include production, distribution, sale, consumption, asset laundering, chemicals, and arms dealing. |
| Alternate Development Strategy | This strategy seeks to promote alternative agriculture and economic activities for the rural peasant farmers.  It also seeks to be ecologically viable and promote conservation while preventing further expansion of illegal crops. |
| Social Participation | This aspect of the plan attempts to create a collective awareness and demands accountability at all levels from the government to the local communities and individual Colombians.  It seeks to promote an intolerance of illegal activities and violence through education and grass roots campaigns and garners support from formal and informal institutions to foster significant changes in cultural patterns. |
| Human Development | This provision provides guarantees for adequate education and health care, particularly to the most vulnerable in society. |
| International Participation | This portion attempts to promote a sense of shared responsibility by the international community.  This strategy seeks permanent international involvement that the Colombian government believes is essential to the peace process and successful resolution of the drug issue. |

32



The plan is designed to be easy to read and understand. It is written for the nonprofessional as well as the government technocrat. It contains broad guidance that allows for flexibility in execution. Some specific aspects of *Plan Colombia* are developed in greater detail than others. These detailed sections include the counter drug strategy, plans to reform the judicial system, democratization programs and strategies for social development. The plan presents broadly defined objectives, and does not explicitly weight one initiative or element over another. However, the actual allocation of funds is important to note. Discussed earlier, Pastrana's vision for *Plan Colombia* did not favor a military approach, and in fact focused on the peace process. However, with the US providing the only significant financial support, the focus shifted both in rhetoric and in execution of programs. US military personnel were deeply involved in training and intelligence support for the Colombian armed forces and most of the funding was oriented toward counter narcotics programs. The other aspects of the plan received far less attention although the overall goals remained in place.

It should be noted that Anderson's model takes into account the likelihood that a shift in policy priorities often occurs because continuous evaluation of outcomes during policy implementation. However, in this case policy priorities were shifted even before plan implementation as a result of political necessity. Since funding and support was primarily from the United States, those programs of most concern to the US were the ones that received the highest priority for implementation. It could be argued that the prioritization of programs would have been better decided by Colombian administrators without undue influence by the US diplomats and military advisors who could be viewed as critical 'lobbyists' for *Plan Colombia*. This would likely have resulted in more support for those programs addressing social development goals and objectives with subsequently less emphasis on security and counter narcotics programs.

As discussed above, regardless of the authorship of *Plan Colombia*, the United States was receptive of the plan and an enthusiastic supporter, especially since the policy supported both US foreign and domestic policy initiatives: security and war on drugs. Furthermore, government officials (both military and civilian) in Washington desired to 'jump-start' the initiative and drafted an 'Annex 1' to the original plan in conjunction with Colombian officials. The goal of Annex 1, entitled the *Interagency Action Plan*, was to

33

000723



bring about an immediate reduction in coca production in Putamayo province and southern Colombia. Figure 5.1 depicts the Putamayo region and indicates the high concentration of coca cultivation in the region in 2001; a year after funding by the US was authorized. The efforts in support of this short-term goal included providing alternative employment, strengthening judicial systems, and ensuring human rights protection combined with intense eradication and interdiction efforts.



**Figure 5.1: The Putamayo Department and Coca Cultivation Density in Colombia (2001)**
(DEA Intelligence Division, March 2002)

<u>Funding of *Plan Colombia*</u>

While military support is a significant part of US support for *Plan Colombia*, the military aspect was clearly not intended to be the primary focus. In fact, funding for military assistance amounted to only 7% of the original plan (Marcella 2003, 40). The fact that the *United States was to contribute the majority of that 7% created negative perceptions on the part of other nations and, consequently, several reneged on their original pledges of

34



funding support (which would have supported non military programs). As a result, the percentage of total funding spent on military applications was much greater than originally planned. This disproportionate focus on security efforts over social development program alarmed the international community as well as a number of politicians in the US. According to Crandall, the US Congress had become very concerned about the situation in Colombia and the government's poor record on human rights. This concern was reflected in the lack of congressional backing for funding of counter insurgency operations to suppress civil conflict and support the peace process (Crandall 2002). However, these concerns were largely overridden when President Clinton signed the budget proposal to support *Plan Colombia*. Figure 5.2 shows the total US funding allocated for *Plan Colombia* in 2000 and Figure 5.3 further breaks out the allocation of funds dedicated to Colombia. As seen in Figure 5.2, some funds are allocated to support counter narcotics efforts in neighboring Andean nations. However, it is clear from Figure 6 that the US focus for Colombia is military support. Less than half of total US funding for *Plan Colombia* is available for such critical areas as police and law enforcement, alternative development, aid for displaced persons, human rights, judicial reform, and the peace process. This unequal allocation of funding between military and non-military areas created problems not only in terms of international perception, but also in shortchanging critical non-military programs when implementing the plan. The funding deficit for non-military programs was compounded because of an unwillingness of the international community to 'ante up' to original pledges.



**Figure 5.2: Total US Assistance for Plan Colombia, 2000 ($US Millions)**
(Crandall 2002, 154)

35





**Figure 5.3: Total US Assistance to Colombia, 2000 ($US Millions)**
(Crandall 2002, 155)

International Support for *Plan Colombia*

International support for *Plan Colombia* has been weak. Questions about the Colombian
government's legitimacy and links to human rights abuses on the part of the Colombian
military and police undermine the plan's acceptance around the world. US involvement
and influence in both development and implementation of the Colombian policy also plays
a pivotal role in the negative international reception that *Plan Colombia* received. At the
conclusion of a South American presidential summit in September 2000, leaders of other
Latin American nations praised the efforts of then President Pastrana to end the civil war in
Colombia. However, these leaders, representing countries in the Organization of American
States (OAS), refused to endorse *Plan Colombia* due to its military focus and potential
spillover effects. Brazil's chief security adviser stated explicitly that *Plan Colombia* was a
major concern: "...Our attention is dedicated to the effects it could have on Brazil, like the
flight of guerillas and the transfer of (drug) laboratories and plantations" (Reuters, 2000).
Venezuela's Hugo Chavez was even more vocal in his opposition arguing, "Peace
negotiations are the only way to achieve a solution" (CNN 2000). Senior government
officials in both Ecuador and Panama also expressed concerns over implementation of *Plan
Colombia* (Livingstone 2004). Panamanian President Mireya Moscoso exhibited blunt
dismissal by stating, "(*Plan Colombia*) is between Colombia and the United States...we are
not going to get involved in the plan" (Moscoso in Carpenter 2003, 79). This lack of

36



support was in spite of strong urging from the Clinton administration for Latin American nations to provide support for the plan.

Although *Plan Colombia* solicited broad based international support, much of which was pledged, the major source of funding has been the United States. The basic 6-year plan proposed in 2000 had a price tag of $US 7.5 billion, with $US 3.5 billion to be funded by the international community (to include inter-governmental organizations), primarily Europe. The contribution by the United States was initially to have been $US 1.3 billion with the remaining $US 4 billion to be funded by Colombia (Livingstone 2004, 128). However, as seen in Figure 5.3 above, a majority of US funding was focused on the military aspects of the plan, and, as a result the international community was clearly uncomfortable with this counter insurgency focus (over 50 % of US funds). European nations argued that the US was attempting escalate the conflict for selfish reasons in order to maintain its hegemonic influence (Marcella 2001, 8). As a result, little of the funding pledged by European nations has been released. As discussed above, with the loss of funds that would have been used to support social development programs, in its implementation *Plan Colombia* was slanted far more toward counter insurgency and counter narcotics efforts than on social development. In this manner, what Anderson describes as institutionalism became the driving focus of the policy, not the underlying polity.

Initially, due to the security-first, militarized focus of its implementation, *Plan Colombia* was negatively viewed by other countries in Latin America as well as by many Colombians. However, after terrorist attacks on the United States and the ensuing global war on terrorism, and the failed Pastrana peace process at the end of January 2002, most Latin American nations voiced support for *Plan Colombia* (Roy 2003). This change in heart was largely due to the Bush administration's plans to increase aid packages to Colombia's Andean neighbors under the Andean Regional Initiative (Livingstone 2004, 130). While Latin American support did not result in broad-based international funding for *Plan Colombia*, the shift in rhetoric by Latin American leaders was notable. Even Hugo Chavez in Venezuela, who had previously warned of "Vietnamization of the Andean region," toned down his opposition to US support of the Colombian government. In 2003, the European Union (EU) finally recognized the insurgent guerilla force FARC as a terrorist organization, although the ELN was not recognized on the EU list until April 2004

37

(Ehrenfeld 2002, Green 2004). This international political shift is a clear example of the ability of the United States to influence regional and global geo-politics, through both political and economic means (Carpenter 2003, 79). Further demonstrating a shift in support for *Plan Colombia*, the OAS recently agreed to provide monitors to assist in verification of disarmament by Colombia's paramilitary forces. However, this agreement, backed fully by the OAS Secretary General Cesar Gaviria and former president of Colombia, has come under some criticism because a majority of the 35-member organization was not consulted (Wilson 2004). Human Rights Watch (HRW) sent a letter to all OAS member nations asking for a suspension of any support for Colombia's peace process that might be linked to granting amnesty to paramilitaries (HRW 2004). The controversy over *Plan Colombia* appears to be endless. It is perhaps more useful to focus on the core goals of the original policy.

<u>Goals of *Plan Colombia*</u>

The ten elements of *Plan Colombia* listed above focus on economic and social development strategies to restore long-term economic viability while encouraging a better functioning democratic state and improving security. These ten elements can be broken down into five overarching or strategic goals (*Plan Colombia* 2000). It is progress towards these five goals that I examine in Section III of this paper. In my examination of the five goals, I do not intentionally emphasize one over another and have listed the goals as they appear in the original policy. However, it is important to understand that the political environment and the availability of funds greatly favored programs supporting Goal 1. Since the greatest efforts and the greatest achievements have been made in pursuit of this first goal, it receives the most extensive treatment in this paper. The goals or pillars of *Plan Colombia* as contained in the original document (US version) are as follows:

**Goal 1:  To reduce the production and distribution of illegal drugs and dismantle terrorist organizations;**

**Goal 2:  To build and strengthen public institutions and increase the state presence throughout Colombia;**

*__Goal 3:  To improve the economy;__*

38

000728




**Goal 4:  To advance the peace process, and;**

**Goal 5:  To advance democratization and social development.**

39

000729




# SECTION III.  IMPLEMENTATION &  EVALUATION
## OF *PLAN COLOMBIA*
### *(Assessment of the Five Goals)*

Anderson's approach to policy analysis views policy implementation (or administration) as
beginning once a policy is ratified or, in the case of domestic policy, when a bill becomes
law.  From this viewpoint and from and US perspective, the implementation of *Plan
Colombia* began after the 2000 budget was signed in to law by President Clinton.  In this
budget a significant portion of US foreign aid was earmarked as 'Support for *Plan
Colombia*.'  From the Colombian perspective, it is more difficult to pin down when
implementation actually began.  Moreover, many of the programs funded under *Plan
Colombia* merely continue or enhance previously existing projects.  According to
Anderson, depending on the scope of a policy, the actual document may do little more than
"create a framework of guidelines and restrictions" (Anderson 2000, 202).  This is certainly
the case with *Plan Colombia* which provides broad objectives and guidance while
governments or government agencies are delegated the authority to 'create' policy details
for implementation.  Furthermore, if viewing *Plan Colombia* as an extension of US foreign
policy, this represents an extreme example of delegated administration.  Thus, the US only
influences implementation through a wide range of support and political persuasion.

A complex array of interconnected governmental agencies, private companies as
well as Non-Governmental and Inter-Governmental Organizations (NGOs and IGOs) under
the purview and jurisdiction of the Colombian and US governments are responsible for the
implementation of *Plan Colombia*.  Another aspect that must be taken into consideration
when analyzing the implementation stage of *Plan Colombia* is that many of the policies
and directives being implemented are, as mentioned above, to a large extent merely
extensions of on-going activities, especially with respect to counter narcotics programs.
These are several factors complicating analysis of *Plan Colombia* as a public policy
initiative using Anderson's linear framework.

In assessing public policy, Anderson highlights the importance of public opinion
and points out that public perceptions are largely shaped by the media as well as by
implementing organizations, both governmental and non-governmental.  It is difficult,

40

000730

especially in the US, for the public to follow the many policy initiatives that emanate from *Plan Colombia*. With ten elements in the plan (that are sometimes competing and sometimes complimentary) assessment of progress, while important, is extremely difficult. As a result, this paper focuses on evaluating progress toward achieving the five broad goals of the plan rather than evaluating progress in terms of each of the ten overlapping strategic elements.

The evaluation or assessment of *Plan Colombia* is closely linked to implementation. In fact, at times it is difficult to determine when assessing implementation transforms into an assessment of outputs and outcomes, especially with regard to a policy like *Plan Colombia* that is currently 'in progress' so to speak. Assessment deals with policy impact. Put another way, impacts are results that can be termed as outcomes or consequences for society, both intended and unintended. Anderson describes policy impacts as an "amalgam of outputs and outcomes" (Anderson 2000, 266). While it might be easier to measure outputs alone, assessing outcomes is the most important aspect of evaluating public policy.

Some aspects of *Plan Colombia* have turned out to be more productive than others and the public (and media) tends to focus on the most visible results. Less visible programs and unintended side effects of major programs receive less attention. Although certain aspects of the plan may appear to be producing positive outputs from the viewpoint of administrators or implementing agencies both in the US and Colombia, there may be side effects that are completely unacceptable to the general Colombian population or to the international community. One of the best examples of this is the success in dismantling insurgent organizations at the cost of human rights abuses and high levels of collateral damage (in policy analysis terminology, unanticipated consequences). Similarly, while attempts to eradicate coca crops show impressive statistics, the program outcomes in terms of crops destroyed must be assessed by taking into account the negative economic effects on the peasant community. Some policies entail implementation plans designed to effect observable material and physical changes, other policies focus more on strategies that affect the intangible human dimension.

I have analyzed the implementation of *Plan Colombia* in terms of strategies and programs designed to achieve each of the five stated goals. Following this implementation analysis, I evaluate efforts to accomplish that particular goal based on policy impact,

41

000731



assessing output and outcomes. These implementation analyses and outcome evaluations for each goal are presented in Chapters 5 through 9 of Section III. A table indicating progress toward each goal summarizes the results of my evaluations. The table is found in the conclusion of this paper on page 104.

42

000732



## Chapter 6:  Implementation and Evaluation of Goal 1

*(To reduce the production and distribution of illegal*

*drugs and dismantle terrorist organizations)*

### Implementation of Goal 1

All the goals and objectives of *Plan Colombia* can be viewed as a roadmap to a more effective nation state.  It is clear that any strategy to accomplish this must begin with the reduction of the most corrosive and disruptive elements in Colombian society: the production and trafficking in illicit drugs and the organizations that engage in these activities.  While both the US and Colombian governments were fully committed to counter narcotics efforts prior to implementation of *Plan Colombia*, the existing counter narcotics programs were improved and dramatically reinforced with more funding and greater US material (and materiel) support.  The primary programs implemented to achieve this first goal are illicit crop reduction and alternative farming; counter narcotics and interdiction operations; and military combat operations against insurgent and paramilitary organizations (also called narco-terrorist organizations).

### Illicit Crop Reduction/Eradication

One of the more explicit goals of *Plan Colombia* is a 50 % reduction of cultivation and production of illicit drugs over a 6-year period (*Plan Colombia* 1999).  To this end, a substantial emphasis was placed on volunteer participation in alternative farming programs as well as on the fumigation of large illicit crop plots through aerial spraying.  While both of these programs were operating throughout the 1990s prior to implementation of *Plan Colombia*, this new focus provided a significant increase in funding for aerial spraying.  Under *Plan Colombia*, DynCorp, a defense contractor based in Virginia that had been spraying in Colombia since 1991, was awarded a $US 600 million contract to fumigate illicit crops in Colombia (Walcott 2003).  *Plan Colombia* funded the acquisition of new DynCorp planes and additional pilots.  There was a significant effort to increase the safety of both the planes and pilots (from hostile ground fire) through coordinated 'escort' flights by the Colombian Army as well as designation of quick reaction forces for rescue of

43

000733

downed civilian pilots. This heavily funded program is a good example of *Plan Colombia's* attempt to coordinate counter narcotics and counter insurgency efforts.

Despite the successful reduction of coca cultivation through eradication (the results are discussed the assessment portion of this paper), there are significant negative side effects to aerial spraying. These side effects have been largely overlooked. While media attention tends to focus on corruption and atrocities by the Colombian Army, often unproven, aerial crop fumigation can be considered a legitimate human rights issue that needs to be addressed. The development of crop eradication strategies does not give adequate attention to the negative effects of such spaying. Consequently, the impact of eradication operations is particularly severe on many peasant farmers who farm small plots of coca adjacent to their subsistence crops. The presumption on the part of program officials is that these farmers are trying to conceal coca plants by planting coca adjacent to legal crops. Even though aerial sprayers officially target only large-scale plots of coca, invariably many legal crops are caught in the crossfire. This reality can make it extremely difficult for the peasants in remote regions to feed their families. In fact, the International Rights Fund, on behalf 10,000 Ecuadorian peasant farmers and Amazonian Indians have sued DynCorp because of its eradication efforts along the Colombian and Ecuadorian border (Walcott 2003). Aerial spraying also creates an environmental problem, contaminating streams with chemical run-off, affecting fish and entering the food chain. Spraying has also resulted in the death of cattle and other farm animals (Carpenter 2003, 163). The economic impact of indiscriminate aerial spraying on small farmers is an important consideration. In many instances, rural families are forced to migrate to avoid starvation, adding to the large internal displacement problem. Furthermore, many conservationists argue that with increases in fumigated land, more narco-traffickers will slash and burn forests to make way for new crops. Environmentalists argue this creates a deleterious cycle that increases destruction of rainforests (Walcott 2003).

The unintended side effects aerial spraying often have on adjacent subsistence crops and the overall impact on rural populations has been inadequately analyzed in the implementation of counter narcotics programs. There may be acceptable levels of adjacent crop contamination, especially if the poor peasants are deliberately growing subsistence crops such as yucca in close proximity to 'shield' their coca plots. However, if peasants

44

000734

with no links to the drug trade are victims, then appropriate compensation should be considered. In this regard, lessons should be learned from the ill-conceived compensation program implemented in Bolivia. In Bolivia, coca farmers were compensated $US 2,000 for every hectare of coca sprayed. The peasants eventually demanded $US 6,000 per hectare; their argument was that the potential value for coca had risen significantly (Carpenter 2003, 96). Officials in Washington were opposed to adjusting the rates of compensation fearing peasants could blackmail the government for increased subsidies with the threat of returning to cultivating coca. The complex dynamics of crop eradication are closely linked to the equally difficult-to-measure alternative farming initiatives.

Alternative Farming

*Plan Colombia* links alternative farming programs to aerial eradication efforts. These measures resemble "carrot and stick" approaches that attempt to shift peasant farmers to alternative crops in historic coca regions (Carpenter 2003, 112). In December 2000, as part of the *Inter-Agency Action Plan*, over 500 families accepted volunteer transitions to alternative plant cultivation in Putamayo. Their choice was simple since if they did not convert, they faced eradication of their coca crops through aerial spraying. These families signed up to "grow corn, bananas, plantain, palm, yucca, rice, fish and poultry" (Marcella 2001, 12). Alternative agriculture initiatives face many problems since the areas of concern are located in remote mountainous terrain with poor soil. It is extremely difficult to provide profitable alternatives to coca cultivation (Livingstone 2004). Furthermore, the remote regions where these programs are most needed are regions with the least amount of government authority and security. Many farmers, initially taking part in alternative cultivation, shifted back to growing coca due to a number of factors including both economics and pressure from guerillas and/or narco-trafficking organizations (Carpenter 2003). Furthermore, lack of security is a significant barrier to NGOs and government agencies being able to provide the necessary resources to the farmers; many of the rural areas desperately in need of humanitarian assistance are simply too dangerous for aid workers. (NGO efforts are discussed in the next section.)

The implementation of illicit crop eradication measures and alternative development is one of the most important aspects of achieving Goal 1 of *Plan Colombia*.

45

However, to be an effective strategy and an adequate incentive to encourage voluntary cessation, spraying must be conducted routinely, affect all of the coca in a region, and be predictable (Marcella 2003). Only after an effective aerial eradication strategy is in place, combined with improved governmental security, will the alternative agriculture program have a chance for success over the longer term. In this regard, the economic viability of cultivation of alternative crops is an important factor. If alternative crops can provide economic security, it is much easier to achieve results; "true peasants do not like to be criminals; the more hardened *cocalero* risk takers are another matter" (Marcella 2003, 49). This applies more appropriately to subsistence farmers; Marcella explains that large-scale coca farmers with much at stake perceive little gain in cultivation of alternative crops and their plantations are appropriate targets for forced eradication.

Alternative crop programs are clearly a necessary step in the implementation of an effective counter narcotics program. However, the underlying reality is that most Latin American peasant farmers or *campesinos* can make from four to more than ten times (some estimates are even higher) the income from cultivation of coca than they could make from cultivation of legal crops (Carpenter 2003, 107). Even when faced with the possibility of aerial fumigation, many, if not most, peasants are willing to take the gamble. Poor soil that is not suitable for most (legal) crops works well for the hearty coca plant, marijuana, and even opium poppies. The remote, mountainous and sparsely inhabited regions of Colombia usually have poor soils providing the perfect environment for illegal crop cultivation and drug production (Thoumi 2002). Other factors favoring coca cultivation are the short length of time before the first harvest, the length of production from each plant, and marketing characteristics (Livingstone 2004). Most plants can provide an initial harvest at 18 months and sustain maximum harvest yields at three years. Well-maintained, mature coca plants can be harvested six times per year and produce leaves for up to 25 years (Carpenter 2003). Marketing also proves to be less burdensome than for legitimate forms of agriculture. The leaves stay well preserved for long periods and coca may be the only crop where the buyer comes to the point of cultivation to purchase and transport. Furthermore, farmers of coca do not have to deal with costs of transporting produce to markets over poorly maintained roads. There is probably not another crop on the planet that offers these lucrative production and marketing efficiencies, truly giving the

46

000736




Colombian peasants farming coca an economically comparative advantage. There *is also* recent evidence of genetically engineered 'supercoca' plants now being cultivated that are resistant to glyphosate, the active ingredient found in herbicides (Molinski (2), 2004). The economic realities associated with growing illicit crops, combined with the coercive influence of insurgent organizations that control the remote areas of Colombia make long-term reductions in illicit drug cultivation a tremendous challenge.

<u>Counter Narcotics and Interdiction</u>

This element of *Plan Colombia's* counter narcotics strategy tied to reforms in public institutions (the Colombian Army and National Police) and improvements in the judicial process, both of which are discussed in the next section. The importance of counter narcotics efforts in restoring stability can hardly be overstated. In 1999, an estimated 30% of the total income accumulated for guerilla organizations was from through illicit drug production and trafficking (*Plan Colombia* 1999). While this estimate highlights the connection between narco-trafficking and counter insurgency, recent evidence points indicates that a much higher percentage of guerilla funding is derived from the drug trade. Of all the elements of *Plan Colombia*, the counter narcotics and counter insurgency strategies have been most aggressively implemented. The strategy is separated into three phases: Phase 1, the first year of implementation, focused efforts into the Putamayo region in the far south; Phase 2, designed to be implemented over the second and third years of the plan, focuses on the southeastern and central regions of Colombia; and finally Phase 3 implements the integrated counter narcotics efforts throughout the rest of Colombia in the final 3-6 years (the length of the original plan).

   *Plan Colombia* asserts that counter narcotics is the primary responsibility of the national and state police corps. However, the evolving link between guerillas, narcotics trafficking organizations, and peasant farmers makes the coordinated efforts between the police forces and national defense assets critical to the successful implementation of the counter narcotics strategy, a strategy that concerns many who fear that military authority may eventually trump democracy (LAWG 2004). Key elements of the strategy include linking interdiction operations in the air, marine, river, and ground to an enhanced intelligence gathering effort. These enhanced interdiction and intelligence efforts are

47

000737



possible through critical funding and materiel support from the US.[3] The result of the efforts has help to isolate the narco-traffickers and to make it harder to move illegal drugs eliminating easy avenues of egress and ingress. Another key element of the counter narcotics strategy is the physical destruction of drug-processing infrastructure (Embassy of Colombia 2003). Through improved intelligence collection capabilities, the Colombian Army and police are better able to pinpoint drug-processing labs. Concurrently, improvements in mobility allow government forces to take advantage of this intelligence and quickly attack, decisively engaging and defeating any protective forces while destroying labs, processing materials, and illicit drugs (Charles 2003). The improved ability of the military forces and police to observe human rights and minimize collateral damage while conducting these interdiction and destruction missions are addressed later in this section.

Still another element of the implementation of the counter narcotics strategy includes a systematic attack on illegal financial systems that launder drug money. The lead agency in this effort is the Colombian Department of Administrative Security (DAS) or *Departamento Administrativo de Seguridad* (*Plan Colombia* 1999). The DAS prosecutes economic and financial crime against the state and investigates illegally gained wealth of individuals and insurgent groups. The DAS under *Plan Colombia* coordinates between national and international authorities to share information and jointly prosecute illegal organizations, in a concerted effort to sever the financial links between traffickers, insurgents and paramilitaries. These efforts include targeting the black market peso exchange process, identifying and seizing drug-financed assets for redistribution and retribution to victims of narco-violence (Marshall 2001). However, as the narco-trafficking organizations modernize and develop sophisticated strategies for laundering drug money, identification of illegal assets becomes ever more challenging. On the other hand, the government's restructuring the judicial system and drafting new laws make it easier to prosecute financial crimes and harder for drug trafficking organizations to continue to illegally fund their operations.

---

[3] Among the support and funding provided by the US in 2001 under *Plan Colombia*, 15 Blackhawk and 45 Huey helicopters were perhaps most effective in increasing Colombia's military capability through enhanced mobility. These assets allowed the military to more effectively wage war against the guerilla insurgents (Livingstone 2004, 164).

48

000738



## US Military Involvement and Counter Insurgency

Although *Plan Colombia* is fully supported by the United States government, there are still severe limitations to what the US military can and cannot do with respect to participation in Colombian military operations and the implementation of *Plan Colombia*. Programs under Goal 1, in fact provide the most significant opportunity for the US to be directly involved in implementation of *Plan Colombia*. US Military is tied to counter narcotics operations and not to counter insurgency operations although the lines between the two have become increasingly blurred, in much the same way that the missions of the Colombian military and national police have begun to overlap (LAWG 2004). This focus on counter narcotics was borne of political necessity and did not represent a comprehensive strategy designed to counter the "intersection of drugs, insurgency, and terrorism" (Marcella 2003, 51). Many argue the restraints placed on US military forces operating inside Colombia make little sense tactically or operationally and have greatly hamper the conduct of military operations, frustrating Colombian military leaders and their US advisors (Radu 2002). Constraints include prohibiting US military leaders from discussing operational plans and strategies to deal with internal Colombian conflicts. These restraints on participation by the US military were largely the result of past human rights violations that link atrocities to the Colombian Army (Marcella 2003). Politicians in the US were (rightfully) concerned over the likelihood of negative public response in reaction to overt military support for perceived human rights violators.

In Washington, lawmakers believed that most Americans felt US military involvement in counter insurgency operations (like El Salvador and Vietnam) was unacceptable, but that counter narcotics operations were appropriate and even necessary. To accommodate this perspective, US politicians treated the insurgency as a Colombian issue to be dealt with and resolved by Colombians, and one that could be dealt with by the Colombian military, not the National Police, and especially not the US military (Tickner (2) 2003). This approach ignored the close relationship existing between the insurgents and narco-traffickers in Colombia with the two becoming virtually indistinguishable. The arguments against robust military support to Colombia were based more on domestic politics than on a genuine understanding of the situation in Colombia (Cope 2002). At this stage, the US role in military operations in Colombia is limited to that of advisor. While

49

000739