politically necessary, from a tactical standpoint this limited participation further makes little sense to security analysts; with the initiation of the global war on terror, indications are that such restrictions are likely to be relaxed. In fact, as of 15 Oct 2004, the US Congress authorized an increased military troop cap from 400 to 800 personnel and increased the number of American civilians employed in Colombia from 400 to 600 (Forero 2004). Whether or not US military operational restrictions will remain is uncertain. This aspect of the increasing US involvement with blurred counter narcotics and counter insurgency objectives have profound implications for the future implementation of programs to achieve success in Goal 1 of *Plan Colombia*.

Evaluation of Goal 1

Statistical data are available quantifying results of counter narcotics and counter terrorist programs in Colombia. However, progress toward Goal 1 is not explained entirely through statistics on either drug eradication and interdiction or combat operations. While data provide some important indicators of progress, the unintended consequences of these programs must be analyzed from both domestic and international perspectives. The following sections attempt to make an objective analysis of both positive and negative trends towards the accomplishment of the first goal of *Plan Colombia*.

Results of Illicit Crop Reduction/Eradication

Based on government statistics alone, it would appear that drug eradication programs implemented under *Plan Colombia* have been a resounding success. The reduction in drug production is a significant victory against the narco-traffickers. Even more importantly, it represents a major strategic blow against the insurgent and paramilitary forces that protect and promote development of these illicit resources. *Plan Colombia* called for reducing illegal drug production (in Colombia) by over 50% in six years (2000-2005) (*Plan Colombia* 1999). In the year 2000, there were an estimated 163,289 hectares of cultivated coca (Figure 6.1). According to the July 2003 government analysis of *Plan Colombia*, there were 102,071 hectares remaining at the end of 2002, and at the time of the report (2003), a total of 192,848 hectares of coca had been eradicated either manually (16,000) or through aerial fumigation (176,848) (Embassy of Colombia 2003). Figure 6.2 further

50

000740



demonstrates the impressive results achieved by the end of 2003. While these statistics would indicate the goal set in the original plan was met and surpassed, there are some problems with the underlying assumptions. The government eradication figures do not take into account numbers (or identify) the hectares of land replanted each year or the new acreage put into cultivation through by deforestation. Furthermore, the Colombian government is also assuming reduction in production is directly related to amount of cultivated hectares eradicated. This is a leap of faith. New methods of cultivation and improved genetic modifications (through hybridization and random mutation) have led to herbicidal resistant plants (discussed in implementation of Goal 1) as well as those that can produce more coca leaves (Davis 2004). In short, 50% decrease in hectares cultivated does not necessarily equate to a 50% reduction in production. Finally, the hearty characteristics of the coca leaf allow it to be stored or 'stock-piled' for long periods of time; a fact that negates significant external impact of increased counter narcotics efforts to interdict and disrupt the supply and demand cycle. To summarize, while the crop reduction aspect of Goal 1 is being achieved, it appears that the numbers might not be as positive as the statistics indicate.



**Figure 6.1:  Coca Cultivation in Colombia and Andean Region 2000-2002**
(Embassy of Colombia: http://www.colombiaemb.org/plancolombia/results.html (04/28/04))

000741



**Figure 6.2: Coca cultivation in Colombia from 1991– 2003**
(United Nations Office on Drugs and Crime, June 2004)

Another important factor from the US foreign policy perspective is that the statistics of Colombian-based drug eradication programs do not measure increased coca cultivation in other Andean nations because of a "balloon effect." This balloon effect explains how intensified counter narcotics efforts in Colombia tend to shift coca cultivation to Peru and Bolivia while decreasing cultivation in Colombia (DEA report, 2002). Consulting the top chart in Figure 6.1, the amount of coca cultivation in Colombia decreased from 2001 to 2002 by 42,800 hectares. The decrease of cultivation in the entire Andean region from 2001 to 2002 is 37,800 hectares. This counterintuitive relationship, occurring in both years from 2000 to 2001 and 2001 to 2002 demonstrates that cultivation must be occurring at a greater rate in Peru and Bolivia and offers credibility to the balloon effect theory. Crandall describes this phenomenon as the "push-down, pop-up" effect and claims that it is further reflected by illicit crops turning up with more frequency in Brazil, Ecuador, Venezuela and Panama (Crandall 2003, 116). However, encouraging trends are reflected in Figure 6.3 (and Table 6.1) below as results from 2003 start to become available for analysis. In this figure, according to statistics from the UN Office on Drugs and Crime, increases of cultivation Bolivia and Peru have finally begun to subside because of increased regional efforts and more robust support from Colombia's neighbors. These statistics may foreshadow real gains in reduced coca production throughout the Andean region.

52

000742



**Figure 6.3: Coca cultivation in Bolivia, Colombia and Peru from 1990–2003**
(United Nations Office on Drugs and Crime, June 2004)

It is also useful to compare a similar graph from the Latin American Working Group (LAWG)[4], which portrays the same data (through 2002) in such a fashion to give the appearance of reduced progress in the Andean region, especially Colombia (Figure 6.4). The accompanying analysis in the 2004 LAWG Report asserts that the increased pressure on Colombia's coca cultivation has resulted in an increase in production in other countries in the region (due to the 'balloon effect') and little decrease in production in Colombia (LAWG 2004). This analysis, based on data through 2002, seems premature, if not erroneous and/or deceptive (as there were data that are certainly more recent available in March of 2004). Moreover, it exemplifies some of the hypercritical NGO analysis that serves to purposely discredit *Plan Colombia*.

---

[4] The Latin American Working Group is a non-governmental group highly critical of the US efforts in Colombia; efforts they argue wrongly prioritize military options over social programs and the peace process.

53

000743



**Figure 6.4:  Cultivation in Bolivia, Colombia and Peru from 1988 – 2002**
(US State Dept in LAWG Report, March 2004)

Clearly there is some push-pull effect occurring; however, the more recent trends seem to indicate a reduction in overall regional coca production.  It is also important to note that since 1999 UN reports have been reflecting a reduction of annual coca crop estimates in Colombia (seen in Table 6.1) and, since 2002 and 2003, annual reduction estimates in Peru and Bolivia, respectively.

**Table 6.1:  Coca cultivation (Hectares) in Bolivia, Colombia and Peru from 1994–2003**
(United Nations Office on Drugs and Crime, June 2004)

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | % change 2002-2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bolivia | 48,100 | 48,600 | 48,100 | 45,800 | 38,000 | 21,800 | 14,600 | 19,900 | 24,400 | 23,600 | n.a. |
| Peru | 108,800 | 115,300 | 94,400 | 68,800 | 51,000 | 38,700 | 43,400 | 46,200 | 46,700 | 44,200 | -5% |
| Colombia | 44,700 | 50,900 | 67,200 | 79,400 | 101,800 | 160,100 | 163,300 | 144,800 | 102,000 | 86,000 | -16% |
| Total | 201,600 | 214,800 | 209,700 | 194,000 | 190,800 | 220,600 | 221,300 | 210,900 | 173,200 | 154,100 | -11% |

Sources:
☐ US department of State          ▦ National monitoring systems supported by UNODC

## Alternative Farming Assessment

The Putamayo Department, a province initially targeted in the early implementation phases of *Plan Colombia*, showed mixed results based on field reports in late 2002.  Alternative

54



farming programs in the Putamayo Department were designed to replace coca as a source of legitimate income for peasant farmers. The initial number of participants in the program was relatively small, only 550 farmers in December 2000, compared to the USAID's year 2000 estimate that more than 18,000 small family farms cultivated approximately 90,000 acres of coca (Marcella 2001, 13). However, by late 2001, *Plan Colombia* appeared to be working with, according to the US Embassy in Bogotá, 37,000 voluntary eradication documents signed by individual farmers and with 120,000 hectares of land sprayed (Marcella 2003, 47). The drastic increase in numbers from the same region in one year raises concerns: was USAID underestimating numbers initially or the US Embassy padding numbers to shore up political support. Other concerns were that the agencies/NGOs implementing the program were not using good measures of quality assurance and finally, that there could have been an increase in the number of small coca farmers in one year. One would estimate that there were combinations of errors to achieve those unrealistic results. Either way, statistically, it appeared that coca production was in decline and the coca-based economy had all but disappeared. However, for even more reasons the story is not entirely positive or clear. Many farmers, rather than shifting crops, migrated from the Putamayo region adding to internal (and external) displacement problems. To make matters worse, a large number of farmers moved out of the region to cultivate coca in the adjoining Nariño Department and even Ecuador (Marcella 2003). The farmers that remained and attempted to grow alternative crops complained of inadequate government support and struggled to get by through subsistence farming. This shows that the results of *Plan Colombia* initiatives must be analyzed carefully; while a program may achieve success in one area, e.g. counter narcotics, it may exacerbate problems in other areas, e.g. refugee and socio-economic problems.

Interdiction Results

Increased interdiction efforts by the US, Colombia and Central American and Caribbean nations have resulted in record numbers of arrests; larger amounts of drugs intercepted: 320 tons of cocaine in three years, 120 tons in 2002 alone; and increased destruction of coca laboratories: more than 1,000 laboratories in three years (Embassy of Colombia 2003). *Proponents of interdiction argue this proves that their strategy is working and much media*

55

000745



attention is given to successful counter narcotics operations and capture of well-known narco-traffickers. Encouraging statistics are reflected in a monthly update (*The Colombia Progress Info Sheet*) provided by the US Southern Command (USSOUTHCOM) using various sources, but primarily originating in the Colombian Minister of National Defense. Table 6.2 depicts some of these statistics. Proponents of interdiction efforts cite increased numbers of interdictions and arrests as justification for continued program support and increased spending. However, one might argue that the US Military operational commands have an interest in subjectively interpreting interdiction data from Colombian sources. Furthermore, there is no way to verify that increases in seizures represent an actual reduction in illegal drug production and trafficking. In fact, as will be discussed in the next paragraph, the availability of cocaine in the US does not indicate that such a reduction has taken place.

**Table 6.2:  Counter Narcotics Results Colombia 2003-2004**
(Colombia Progress Info Sheet.  Unclassified update, *USSOUTHCOM*, July 2004)

| Seizures | Jan-May03[1] | Jan-May04[1] | % CHG |
|---|---|---|---|
| Cocaine (MT) | 33.0 | 49.6 | +50% |
| Coca Base (Kg) | 8,883 | 12,366 | +39% |
| Heroin (Kg) | 163 | 366 | +125% |
| Marijuana (Kg) | 53,802 | 79,590 | +48% |
| Traffickers | 17,587 | 25,362 | +44% |
| Drug Labs | 496 | 899 | +81% |
| Weapons | 178 | 220 | +24% |
| Ammo (rnds) | 2,765 | 16,840 | +509% |
| Poppy Sprayed (ha) | 1,658 | 1,814 | +9% |

As more effort is devoted to interdiction missions, it only makes sense that the numbers of arrests and seizures will rise. However, there is no proof that this has reduced the amount of drugs entering the US. Drug traffickers became increasingly cunning and shifted to alternative methods of transit. Once the drug shipment leaves its source, or the departure zone, interdiction in the next stage, the transit zone becomes extremely difficult. Seizure rates from departure to arrival zones are roughly only 10% of total shipments according to US Coast Guard officials (Carpenter 2003, 95). One measurement of the effectiveness of counter narcotics efforts is by tracking the price of cocaine on the US streets. According to the laws of supply and demand, a successful counter narcotics effort would lead to reduced supply of drugs and a corresponding increase in street price. The

56



seemingly major efforts to attack the source of the problem, drug production in Colombia, and efforts to interdict a large volume of drugs transiting from source countries has had little impact on the street value of cocaine in the US (Carpenter 2003). The limited effectiveness of interdiction strategies is the reason so much emphasis is placed on 'source' counter narcotics strategies, primarily crop eradication. Despite the statistics presented above, after nearly 20 years of counter narcotics efforts in Colombia, no definite conclusions can be reached on the success or failure of those efforts (especially with respect to US foreign policy objectives). Furthermore, it is necessary to weigh overall benefits realized from efforts such as fumigation and aerial spraying against the adverse environmental and societal impacts of those programs. What Anderson terms "unintended consequences" of these policy programs, such as deforestation and displacement, reflect a negative impact of what appears to be a positive statistical result. These unanticipated consequences further demonstrate the questionable priorities of eradication and alternative development programs under the first goal of *Plan Colombia*.

## Drugs: Supply vs. Demand

In assessing the programs under Goal 1, it is useful to highlight a discussion that underlies the debate concerning *Plan Colombia*. Most would agree that the primary rationale for backing *Plan Colombia* and targeting Colombia as the third highest recipient in the world for US international support is a long time obsession with curbing the US drug problem by destroying the source.[5] Many experts, including Crandall, Carpenter and Livingstone, would argue that the US has it all wrong. Focusing on the supply side of the problem has for years costs the US billions of dollars, lured our military closer and closer to a protracted Vietnam-type quagmire, and failed to result in the reduction of drug use in the US. Moreover, as explained earlier, the many unintended consequences of *Plan Colombia*'s emphasis on eradication have served to cause internal displacement and have merely pushed illicit crop cultivation across borders. The answers, for these experts, lie with internal programs in the US that serve to both prevent use and rehabilitate users, or even

---

[5] The official shift in US policy happened in the fall of 2002 when Bush signed National Security Presidential Directive 18 that replaced President Clinton's Presidential Directive 73, extending support based on a purely counter narcotics efforts to US funding with an emphasis on counter terrorism and gaining control of the national territory (Marcella 2003).

000747



legalization  It would also appear that the increased interest in Colombia and counter narcotics efforts followed the Cold War era, and notably replaced communism as the next US national security threat (Tickner (2) 2003).  Furthermore, with increased terrorist acts committed by the three outlaw military groups in Colombia and the evolution of the global war on terror, the approach to Colombia has appeared to shift again.  Either way, it appears now that there is conclusive evidence that all three organizations are funding their efforts through illicit trafficking.  However, this certainly does not dismiss the responsibility for reducing demand in the US and internationally.  Much like the global war on terror, the war on drugs must be fought universally on all fronts, and must include balanced efforts on both the supply and demand sides.  From a *Plan Colombia* – US policy perspective, the US should be highly critical of their original objective in providing such broad support for eradication on the supply side.  Interestingly enough, since the original debate, the US has shifted from a purely counter drug perspective to a counter insurgent and counter terrorist agenda.

Expanding on the above discussion, while it appears that there has been a decrease in cocaine originating in Colombia, production increased (at least initially) in other areas of the world (DEA 2002).  Most of this increase has occurred in bordering Andean nations (at least through 2002); a statistic reflected in Figures 6.3, 6.4 and Table 6.1.  Although the chart shows reduced coca cultivation in Colombia, and positive trends in Peru and Bolivia, the overall reduction in the Andean regions was much less comparatively speaking, an indication of increased production in neighboring countries (including Ecuador and Brazil). This demonstrates how Colombian and US perspectives on the success of eradication efforts can differ.  The Colombian government, quite naturally, views a decrease in production in Colombia as the measure of success for its crop eradication and interdiction efforts.  From the US perspective, the measure of success is a reduction of the flow of drugs into this country and that does not appear to have occurred.  In fact, with production shifting to other nations, the problem may have actually worsened from the US security and foreign policy perspective.  This reality highlights the complexity of the geo-narcotics problem in Colombia and in the broader Andean region, and the difficulty in evaluating the effectiveness of *Plan Colombia* with respect to the achievement of its first goal.

58

000748



Results of Counter Narcotics and Combat Operations

After the first three years of *Plan Colombia's* implementation, the ability of the Colombian police and military to conduct combat operations against the narco-traffickers, insurgent forces and paramilitary organizations has been greatly enhanced. Data supporting this assessment are primarily available from Colombian government sources, but also from international non-governmental organizations.[6]    According to the Colombian government, 4,602 guerilla members and 1,986 paramilitaries were captured in a 12-month period from Aug 2002 to Jun 2003. Furthermore, 385 insurgents turned themselves in the first six months of 2003, more than twice as many than the total number recorded in 2002 (Embassy of Colombia 2003). These numbers would indicate that successful operations by the Colombian Army are resulting in a decline in morale among the insurgents. As a further indication of the increased combat effectiveness of government forces, Figures 6.5 and 6.6, obtained from the Colombian Ministry of Defense, depict large increases of FARC and AUC combatants killed or captured over two successive 17-month periods (the second 17 month period represents the first 17 months of Uribe's presidency).



**Figure 6.5: 17 Month Comparison Operational Results against Insurgents (FARC & ELN)**
("The Effectiveness of the Colombian Security and Defense Policy", *Republic of Colombia, Ministry of Defense* 2004)

---

[6]Comisión Inter-congregaciónal de Justica y Paz (CINEP), a Colombian NGO whose comprehensive conflict data is used by University of London researchers Restrepo and Spagat is one example of such organizations.

59

000749





**Figure 6.6: 17 Month Comparison Operational Results against Paramilitaries (AUC)**
("The Effectiveness of the Colombian Security and Defense Policy," *Republic of Colombia, Ministry of Defense* 2004)

Table 6.3 below presents counter terrorism data from a USSOUTHCOM report comparing the first five months of 2003 and 2004. This USSOUTHCOM data also reflects greatly increased effectiveness of government forces and improvements in security. However, all of the above data concerning combat operations, including that from USSOUTHCOM, originates from the Colombian Army and is obviously subject to a significant degree of 'subjective' error. Furthermore, both the Colombian government and US military obviously have a vested interested in showing positive results from counter terrorism/insurgent operations.

**Table 6.3: Counter Terrorism Results for 5 Months 2003-2004 Colombia**
(Colombia Progress Info Sheet. Unclassified update, *USSOUTHCOM*, July 2004)

| Terrorists | Jan-May 03[1] | Jan-May 04[1] | % CHG |
|---|---|---|---|
| KIA | 843 | 1130 | +34% |
| Demob/Deserters | 645 | 1047 | +62% |
| Firearms Seized | 2395 | 3450 | +44% |
| Grenades Seized | 2002 | 2469 | +23% |
| Boats Seized | 26 | 33 | +27% |
| Councilmen Killed | 43 | 9 | -79% |
| | | | |
| Terrorist Attacks on: | | | |
| Electric Pylons | 130 | 50 | -62% |
| Commo Towers | 15 | 0 | -100% |
| Towns | 3 | 1 | -67% |
| Roads | 73 | 42 | -43% |
| Oil Pipelines [2] | 51 | 23 | -55% |
| Water Pipelines | 3 | 0 | -100% |
| Bridges | 16 | 3 | -81% |

60

000750

Two scholars who analyzed conflict data in Colombia accumulated by independent (non-governmental) organizations over the past 15 years, perhaps offer a more objective analysis of the security situation Colombia. Colombia experts Jorge Restrepo and Michael Spagat published an in-depth analysis (*The Dynamics of the Colombian Civil Conflict: A New Data Set*, 2003) of conflict data that dating back to 1988 and a second report analyzing the first 17 months of Uribe's presidency (*The Colombian Conflict: Uribe's first 17 Months*, 2004). Their analysis tends to give legitimacy to Colombian government claims of increased success in operations against insurgent forces since the implementation of *Plan Colombia*. According to their study, a significant 'upsurge' in violence took place following the collapse of peace talks in the beginning of 2002 and lasted through presidential elections later that year.[7] Figure 6.7 below demonstrates this upsurge. However, Figures 6.8 and 6.9 indicate a significant reduction in paramilitary and guerilla attacks and clashes[8] following the election of President Uribe in 2002 (Restrepo and Spagat 2004).



**Figure 6.7:  Quarterly number of people killed and injured in conflict events**
(Restrepo et al., June 2004)

---

[7] The explanation for this upsurge is that that the FARC was attempting to affect the elections (Restrepo and Spagat 2003).
[8] Restrepo and Spagat explain that attacks are non-mutual one-sided events such as massacres, indiscriminate bombings, or terrorist activities, while clashes are mutual fights with two distinct sides, either planned or unplanned (Restrepo and Spagat 2004).

000751



**Figure 6.8:  Quarterly number of attacks by group**
(Restrepo et al., June 2004)



**Figure 6.9:  Quarterly number of clashes by group**
(Restrepo et al., June 2004)

There appears to be little doubt that the numbers of insurgents and paramilitaries killed in combat operations has increased dramatically due to the increased tempo of military operations since the implementation of *Plan Colombia*.  This increase in operational tempo is, due not only to an increase in the size of the Colombian Armed Forces but, even more importantly, to improvements in their training and readiness.  For example, three anti-narcotics and three riverine warfare brigades have been established and

62

000752

trained under the supervision of US military advisors. These improvements to combat efficiency, coupled with an increase professionalism and integrity in both the Colombia National Police and Armed Forces have enabled the government to deal a severe blow to drug traffickers, insurgents, and paramilitary forces. These successes reflect improved security for remote communities, reductions in drug production, and a reduction of local support for the guerilla war and self-defense forces.

In summary, not all programs implemented under Goal 1 of *Plan Colombia* have been successful. The successes associated with crop eradication and alternative farming clearly have some negative consequences. On the other hand, efforts to combat and dismantle the narco-insurgents indicate positive trends and reflect conclusive progress towards Goal 1. President Uribe's hard-line stance against insurgents and his administration's push for improvements in the army and an increase in operational tempo under the *Democratic Security and Defense Policy* also contributes to these successes.[9] If the priority in achieving results under *Plan Colombia* is security, as President Uribe asserts, then significant progress is being made toward accomplishing Goal 1, which leads to positive policy outcomes under Goal 2.

---

[9] The *Democratic Security and Defense Policy* (Política de Defensa y Seguridad) This document provides President Uribe's intent to prioritize security as Colombia's focus in order to regain control of nation form the narco-terrorists, insurgent forces and paramilitaries. Ministry of Defense, Bogotá, 2003

63

000753



## Chapter 7:  Implementation and Evaluation of Goal 2

### *(To build and strengthen public institutions and increase*
### *the state presence throughout Colombia)*

<u>Implementation of Goal 2</u>

Directly linked to the implementation of the counter narcotics strategies discussed in the
previous section are the significant efforts by Colombia to improve its military and police
force and to reform its judicial system.  This section addresses efforts to improve the
Colombian Army with the assistance of the US under the umbrella of *Plan Colombia*, as
well as the many reforms being implemented in other public institutions, most notably the
judiciary.

<u>The Colombian Armed Forces</u>

In the past and to a certain degree more recently, the Colombian Armed Forces themselves
played a role in contributing to the chaos and instability in Colombia, by operating in much
the same fashion as the paramilitary organizations and leftist guerillas did.  There are
numerous credible accounts of human rights violations committed by the regular army.
(Kirk 2003).  Corruption was rampant within the Colombian military and discerning
between the actions of government forces and paramilitary units was nearly impossible.
Many alliances and individual deals were made between individual military units,
paramilitary organizations, left-wing guerillas, and drug dealers.  This corruption in the
Armed Forces resulted in a lack of credibility and a loss of legitimacy for public
institutions in general and the Colombian Army in particular (Nagle 2002).  However, with
the support and encouragement of the United States, military reform has begun to take
hold.  The increased professionalism of the Colombian Army has improved its image as
well as its capability to provide for the security of the country.

   Continued democratization of Colombia is a goal of *Plan Colombia* (discussed later
in this section); one of the areas in where this transformation is taking place is in the
Colombian Army.  Until recently, the preponderance of soldiers who served in combat did
not have high school diplomas; the majority of educated elites did not directly experience
the violence of combat (Sweig 2002).  This disproportionate sharing of the combat burden

000754

contributed to prolonged civil wars; it also helps to explain why much of the leadership in the military was corrupt and inept.[10]  The argument is that soldiers who are more educated would demand better conditions (pay, equipment, public support) and better leadership (Marcella 2001).

*Plan Colombia* hastened the reform of the Colombian Armed Forces, although improvements in military effectiveness were already taking place.  During Pastrana's administration prior to *Plan Colombia*, the Colombian Army was beginning to gain the upper hand in direct conflicts with the FARC.  However, the implementation of *Plan Colombia* greatly facilitates continued improvements in the professionalism and the performance of the Colombian Army.[11]  These improvements are, in no small part, the direct result of the role of the United States military in educating Colombian officers and training/advising Colombian Army units.  In addition to the expanded training and education programs introduced following the implementation of *Plan Colombia*, the Colombian Army also enjoys improved mobility provided by US helicopters and improved intelligence provided by access to sophisticated surveillance and reconnaissance technology.  Another major factor in reforming the Colombian military was improving the continuity of leadership.  For example, instead of serving a symbolic final "one-year" tour, the senior Colombian Army general now serves for three years (Marcella 2001).  This longer term has enabled the head of the Army to bring about significant institutional change that includes improving the professionalism, integrity, and credibility of the army.  All of these improvements have combined make the national army a much more formidable opponent, and just as importantly a much more respected and legitimate institution in the eyes of the Colombian population (Nagle 2002).

The overall focus of *Plan Colombia* is to provide the government's intent for the direction of the country.  This intent in the form of broad guidance and does not focus on detailed the military strategy.  However, it is clear that *Plan Colombia* has influenced that strategy especially with respect to programs designed to improve the relationship between

---

[10] It is easy to criticize Colombia in this area.  However, one should ask how many sons and daughters of the economic and political elite of the United States are serving in the US Armed Forces.
[11] It should also be noted that in addition to *Plan Colombia*, President Uribe issued a Democratic Security and Defense Policy (*Politica de Defensa y Seguridad Democratica*) for Colombia that compliments *Plan Colombia's* objectives, in that it focuses more specifically on security issues and provides much needed detailed 'commander's intent' or guidance to the Colombian Army and National Police (ICG 2003, Marks 2004).

65

000755

the Colombian Armed Forces and the general population. Lessons-learned from any number of civil conflicts including Vietnam, make clear the importance of winning the hearts and minds of the public. *Plan Colombia* also allocates funds to better the lives of the disenfranchised rural population through diverse social programs, an element of *Plan Colombia* that has significantly improved the relationship of the Colombian military with civilians (Embassy of Colombia 2004). This is extremely important as the loyalties of the population swing dynamically between the paramilitaries, the FARC, the ELN, narco-trafficking organizations and the Colombian Army because of many factors including the commission of human rights violations that alienate the local population. The increased professionalism and improved effectiveness of the Colombian Army have increased its legitimacy and made it better able to compete for the hearts and minds of the rural population, a key factor in determining the ultimate outcome of a protracted guerilla war (Marks 2004).

The Colombian National Police

In addition to improving and modernizing the Colombian Armed Forces, in particular the Army, the Colombian government has implemented programs to improve its national police. In addition to increasing the size of the force, police officers are being screened and trained much more thoroughly than prior to the implementation of *Plan Colombia*. This well-trained cadre of professional law enforcement personnel has been dispersed to remote regions of Colombia where little or no government authority previously existed. In addition to creating a larger more professional rural police force, Uribe has also introduced a controversial "Town Police" program that further seeks to establish control over once lawless areas of Colombia (Embassy of Colombia 2003). The improvements in the quality of Colombian police officers as well as increased presence of the government through localized civilian assistance have been accompanied by the promulgation of directives and regulations regarding respect for human rights. Disciplinary measures addressing human rights violations have been implemented within both the military and police forces. A significant reform in the Colombian military and national police system is reflected in directives forcing police and military units to relinquish to civilian courts the investigation,

66

000756

prosecution, and trials of those uniformed personnel accused of the severe human rights violations (Embassy of Colombia 2003).

The National Police have also received a tremendous amount of technical expertise and training via *Plan Colombia* by way of the US Department of Justice (USDOJ 2004). Not only providing professional training to police officers, the USDOJ has provided technical expertise in the use of forensic labs that include DNA and ballistic testing, document analysis, imaging, and upgraded fingerprint identification systems. Much of the training assistance falls under the International Criminal Investigative Assistance Program (ICITAP) that serves to raise the level of professionalism in both the investigative law enforcement as well as the justice sector (USDOJ 2004). The ability to use these resources, as well as implementing new computer equipment and software has provided a means for immediate interagency communications, where before none existed (USAID 2004). While the implementation of programs and reforms in the police elements providing a new measure of security to millions of Colombians has been impressive, individual human rights and acts of vigilantism remain a concern for many.

Judicial Reform

The implementation of *Plan Colombia* included a commitment to reform the government judicial system. Such reform is essential to restoring confidence in Colombia's government (Nagle 2001). Historically corruption has been endemic, permeated all levels of government and contributed to unrest and a fragile civil society, not to mention serious human rights violations. Implementation of *Plan Colombia* seeks to establish a paradigm shift in government agencies that transform a culture of corruption to a culture of legitimacy and integrity (Embassy of Colombia 2003). This transformation provides the foundation for much of the reform under *Plan Colombia.*

Colombian judicial reform is inextricably linked to counter narcotics and counter insurgent efforts. Prominent Colombian scholar and former Medellín judge Luz Nagle explains that the Colombian judicial system has been characterized by inadequate investigations and hampered by coercion and bribery of prosecutors and judges (Nagle 2001). The inefficiency of the judicial process led to a stagnant system of due process. For example, prior to the implementation of reform measures, some 45% of all prison inmates

67

were awaiting trials for an average of over three years (Sistemas judiciales 2003). These systemic flaws in the Colombian judicial system were addressed in the implementation of *Plan Colombia. Plan Colombia* called for aggressive prosecution of narco-traffickers by local authorities in the communities where crimes are perpetrated. In the implementation of judicial reforms under *Plan Colombia*, the authority to conduct such prosecutions has been delegated to local judges and prosecutors who are backed up by military and police presence (Embassy of Colombia 2003).

As part of the program to improve the efficiency and legitimacy of the judicial system, *Plan Colombia* provided funding through organizations such as the US Agency for International Development (USAID) to accomplish critical tasks. These tasks included construction of new courtrooms; training and technical assistance for new judges, prosecutors, lawyers and court system personnel; and building justice houses (casas de justicias[12]) in rural areas (USAID 2004). Judicial system reforms included increased measures of transparency and independent accountability at both the national and local levels, as well as a provision for protecting at-risk individuals including local government officials, unionist, journalist, and human rights workers (USAID 2004).

Another area of reform is found in the incarceration of criminals. Prison security has been improved to prevent narco-traffickers and other criminals from either escaping from insecure facilities or from effectively running their respective organizations from prisons served by corrupt guards. Serious offenders have been identified and moved to maximum-security facilities (Embassy of Colombia 2003). Finally, reform laws requiring harsher sentences for violent crimes, to include murders, terrorism and kidnappings, are part of the overall effort to deter such crimes and improve the security situation for all Colombians. Discussed earlier, corruption has been widespread throughout the Colombian government not just in the judicial branch. This corruption includes alleged associations with narco-trafficking organizations and paramilitaries by individuals at the highest levels of the armed forces and the most senior government officials (Nagle 2001). Clearly institutional reform is only as good as the commitment of the reformers. With this in mind, the implementation of *Plan Colombia* includes policies that implement stringent financial

---

[12] Houses of justice are judicial centers predominantly in lower-income areas that provide mediums of conflict resolution in an attempt to reduce backlog in the regular court system (Embassy of Colombia 2003).

68

000758

disclosure requirements as well as pre-employment background checks for all appointed officials serving in a public capacity (*Plan Colombia* 1999). Furthermore, in order to reduce the potential for corruption and inadequate investigations of human rights violations, the national military and police forces are no longer in charge of investigating and prosecuting crimes such as forced displacement, torture, and massacres. This is now the responsibility of civilian courts. Agencies that serve to provide accountability for many of these reforms under the Presidential Program against Corruption include the Fiscal Branch's Specialized Anti-Corruption Unit (*Plan Colombia* 1999).

Judicial reforms have also been implemented within the Colombian military and these reforms have contributed to an institutional paradigm shift. An equivalent of the US Army's Judge Advocate General Corps (military lawyers) and has been established specifically to adjudicate crimes and human rights violations involving members of the Colombian Army. Moreover, under *Plan Colombia*, an Armed Forces School of Human Rights, International Humanitarian Law and Military Penal Justice has been founded and all US-sponsored training integrates human rights training. Corrupt police officials and military officers with ties to paramilitary organizations have been charged with crimes and tried. Many of these individuals have been convicted and purged from the ranks. Still others have been tried in civilian courts to remove the perception of preferential treatment by military courts (Embassy of Colombia 2003). However, human rights organizations point out that a number of cases have been dismissed and ties between the army and paramilitary organizations and human rights violations by the army are still being documented. Human rights issues are discussed further in the final section of implementation analysis. This on-going aspect of Colombia's crisis, in spite of programs and judicial reforms implemented under *Plan Colombia*, is critical to the final assessment of Goal 2.

Evaluation of Goal 2

The reform of public institutions and increase in state presence must be analyzed with caution. In the process of instituting the reforms necessary to improve the security situation in Colombia there has been a focus on increasing effectiveness of the military and police and perhaps reforms in the judiciary system have been given less attention (Mason

69

2003). This gives rise to concerns about the overextension of government power and the potential for eroding civil liberties. Although overall progress toward Goal 2 has been significant, it has not been without consequence.

## The Colombia Armed Forces

The increased professionalism of the Colombian Army is one of the major successes achieved during the implementation of *Plan Colombia* (Marcella 2003). This increased professionalism has resulted in a corresponding increase in the trust and respect that the Colombian Army enjoys in the eyes of the population. These positive developments are due to what I term an overall 'institutional paradigm shift.' The Army officially no longer tolerates human rights violations and takes a stringent disciplinary approach to those who violate human rights laws and rules of engagement. The execution of military tasks under strict new standards of conduct combined with the increased proficiency of the military in waging counter insurgency operations has contributed greatly to improved security throughout Colombia. The quantifiable results of these improvements, discussed under Goal 1, are measured in terms of increases in the numbers of insurgents captured, wounded or killed and reductions in the numbers of attacks by the FARC and insurgent organizations. Just as importantly, the numbers of reported human rights violations have similarly decreased. The most important factors driving these improvements in the Colombian military include an improvement in the quality of the individual soldier recruited as well as improvements in the quality of training the new recruits receive. Improvements in unit training are just as important, especially in the training of specialized counter narcotics units (Marks 2004). These units receive training from US military advisors and are equipped with modern US equipment. This includes helicopters that enhance mobility and response time. The improvements in the military are reflected in perceptions of public. The military enjoys greater legitimacy and respect with more than a 70% approval rating; the Colombian people feel more secure now than at anytime since the upturn in narco-inspired insurgent and paramilitary violence that occurred during the 1980s and 1990s (Posada-Carbo 2004).

The improvement of Colombia's military is critical not only from a military operational point of view, but also from a political point of view in terms of peace

000760

negotiations with the insurgents and paramilitaries.  One of the key goals of *Plan Colombia* is the peace process and having a formidable and respected national military force allows the government to "negotiate from a position of relative strength rather than weakness" (Marcella 2003, 46).  This perspective will be explored more closely in the assessment of the peace process.

### The Colombian National Police

Colombian National Police, similar to the Colombian military, have undergone a significant transformation in the last 4-5 years.  In addition to increased funding, the size of the police force increased by 78,000 new officers (Embassy of Colombia 2003).  Large numbers of these additional personnel have been placed in rural towns where previously there was little or no government presence (Embassy of Colombia 2004).  Many of the new strategies to increase security through a stronger police force are found in Colombia's new *Democratic Security and Defense Policy* mentioned earlier.  Through this document, the president established his intent that the police work more closely with the local citizens. This approach relies on the understanding that ultimately it is the Colombian people who must take back their society, not the military or police.  This approach is working after almost two years of implementation (albeit with little more than a year of critically analyzed data); the overall security situation has improved for moat Colombians, especially those in the rural departments (Hill 2003).  The following two figures reflect a significant increase in the government's control and presence in rural areas once controlled by the insurgents and paramilitaries (Figures 7.1 and 7.2).

71

000761



**Figure 7.1: State Police Presence in Rural Municipalities Aug 2002 – Dec 2003**
**(for 158 that previously had none)**
*(The Effectiveness of the Colombian Security and Defense Policy, 2004)*

Of particular significance is the effort to compliment the national police with what is termed a 'Town Soldiers' program. This program trains local men and women in limited police work; similar to a 'beefed-up' neighborhood watch program (Embassy of Colombia 2004). This initiative has resulted in tremendous gains in state control and police presence. Combined with other government efforts, the number of police forces in the more rural municipalities increased to 100% for the 158 lacking a previous police presence (Figure 7.2). Similarly, the nascent 'Town Soldiers' program covers 439 municipalities of 1098 in Colombia and is projected by 2006 to increase to 84% of municipalities (Figure 22). While presence alone serves as deterrence, the increase in numbers is yielding positive results and serves to increase a sense of security for a majority of Colombians who had none prior to *Plan Colombia* and its corollary *Democratic Security Strategy*.

72

000762



**Figure 7.2: State Control through 'Town Soldiers' Program 2002-2006 (proj.)**
*(The Effectiveness of the Colombian Security and Defense Policy, 2004)*

Perhaps the best way to measure improvements in the national police is through an analysis of crime rates. Various source documents contain relevant source data, all of which point to a reduction in criminal (and terrorist) activity. Figure 7.3 below is from the Colombian Embassy in Washington, DC, and reflects a significant reduction in both terrorist acts and kidnappings during the same periods in 2002 and 2003.



**Figure 7.3: Terrorist Acts and Kidnappings: 2002-2003 Trends**
*(http://www.colombiaemb.org/plancolombia/results.html) (04/28/04))*

73

000763

Figure 7.4 and Table 7.1 below display crime reduction results. Figure 24 represents kidnapping comparative statistics for a 12-month period between 2002 and 2003, while Figure Table 7.1 contains data extracted from a USSOUTHCOM *Colombia Progress Info Sheet*. These numbers all indicate tremendous progress in reducing (non narco-related or terrorists-related) criminal activities. It is important to point out that the roles and responsibilities of the national police forces are becoming more closely related and sometimes concurrent and overlapping with those of the military. This is necessary to combat insurgent organizations becoming ever more sophisticated and ever more closely aligned with narcotics and terrorism. There are some legitimate concerns associated with this close relationship between the military and police under *Plan Colombia*, issues that are briefly discussed in the next paragraph addressing judicial reform. The reform of the national police, however, has contributed significantly to strengthening the state presence in Colombia, thus improving the once deplorable security situation.



**Figure 7.4: Kidnapping Comparison by Group for 12 months, 2002 and 2003**
(*The Effectiveness of the Colombian Security and Defense Policy*, 2004)

74



**Table 7.1:  Crime Reduction Results for 5 month periods, 2003 and 2004**
(Colombia Progress Info Sheet.  Unclassified update, *USSOUTHCOM*, July 2004)

| Overall Crime Reduction Results 2003-2004 | | | |
|---|---|---|---|
| | **Jan-May 03[1]** | **Jan-May 04[1]** | **% CHG** |
| Homicides | 10,178 | 8,845 | -13% |
| Massacre Events | 42 | 26 | -38% |
| Massacre Victims | 250 | 118 | -53% |
| Kidnappings | 1,064 | 601 | -44% |
| Extortive Kidnappings | 782 | 352 | -54% |
| Illegal Road Blocks | 41 | 17 | -59% |
| Road Block Kidnappings | 152 | 53 | -65% |
| Highway Robberies | 611 | 402 | -34% |
| Bank Robberies | 82 | 33 | -60% |
| Motorcycle Thefts | 4,337 | 3,694 | -15% |
| Vehicle Thefts | 6,237 | 4,566 | -27% |

### Judicial Reform

The efforts to reform state institutions, including the military, national police and the Colombian judicial system are all noteworthy and indeed positive in many respects; however, the attention given to the later may not be as encouraging.  To be sure, the Colombian Ministry of Defense has implemented many reforms that have reflected progress and many others that are gradually producing desired outcomes.  For instance, under *Plan Colombia*, 37 houses of justice have been created and 30 open trial courtrooms constructed, and countless numbers of judges, prosecutors, and councilors have received training (Embassy of Colombia 2004).  Prisons are more secure and police and guards are more professional.  While corruption still exists, it is on the decline.  The increase of municipal court systems and personnel have provided an infrastructure that is much more capable and efficient in adjudicating crimes and in general promoting a democratic society based on equality and justice (USAID 2004).

In addition to structural changes to the judicial system in terms of facilities, under *Plan Colombia* the administration has sought to increase the authority of the judicial branch through expanded prosecution of human rights abuses and the imposition of stiffer sentences.  However, some watchdog organizations argue that these increased judicial powers have actually increased the potential for human rights violations instead of the opposite.  For example, the military, while not allowed to prosecute or sentence non-military combatants, can detain individuals with little reason for up to 36 hours.  This causes concern because, based on a relatively poor human rights record, abuses by the

75

000765

military are almost guaranteed to occur (Schneider 2003). In testimony to the US Congress during the debate over funding for *Plan Colombia* in 2003, Mark Schneider, President of the International Crisis Group (ICG), argued against Colombian anti-terrorist legislation that grants the military permanent legal authority to "… intercept communications, conduct house searches and arrest individuals for up to 36 hours without access…"; in his view this is "…a practice which in Latin America almost always leads to physical abuse and disappearances" (Schneider 2003). Although these concerns are important, the judicial reform may take more time to develop when compared to the relative short-term results from military improvements under *Plan Colombia* (Mason 2003).

In contrast to negative opinions held by some NGOs and many organizations in the international community, the International Transparency Index produced by an independent NGO (Transparency International[13]) reveals significant improvements in reduced corruption in Colombia from 1999 to 2003. Colombia jumped from a ranking of 72 to 59 in four years, a statistic that indicates progress in the right direction (International Transparency Index 1999, 2003). Maintaining the appropriate balance between ensuring security and safeguarding the civil liberties expected in a democratic society can be difficult to achieve.[14] Although these concerns are valid, the deteriorating security situation in Colombia demands extreme measures.

Joint operations and cooperation between the military and police has also been a concern for some international watchdog organizations, such as the Latin American Working Group (LAWG). LAWG argues that the US "encourages military practices, programs and doctrine that promote confusion of civilian and military roles" (LAWG 2004, 1). Again, this may be a legitimate concern, especially when considering the track record of Latin American leadership (dictators) during the last century; many supported by the US. However, these organizations conveniently ignore the strategic and tactical importance of coordinating the planning and operations of the military and uniformed police. Their arguments often misrepresent the military or Colombian government as having an 'ulterior motive' of establishing a 'police state' under the hard-liner Uribe. In

---

[13] Transparency International is an international non-governmental organization that seeks to reduce corruption both at the international and domestic levels through annual reporting in order to reduce social injustices, reduce poverty and promote democracy (http://www.transparency.org/index.html 10/28/04).
[14] A parallel debate is on-going in the United States in the wake of the 9/11 attacks and the global war on terror with respect to the "Patriot Act" which many believe infringes on civil liberties.

000766

reality, to effectively prosecute the narco-terrorist-based conflict that confronts Colombia, there is absolutely no choice but for the military to work closely with the national police. This approach is increasingly evident among government institutions in the United States. Organizations such as the Federal Bureaus of Investigation (FBI), Immigration and Naturalization Service (INS), Central Intelligence Agency (CIA), US Armed Forces, Homeland Security, local law enforcement and various other government agencies are working together to defeat terrorism. While democracy and human rights must be safeguarded, the threat in Colombia is too great to insist on an artificial wall between the military and the police.

The Colombian government under *Plan Colombia* has made significant progress in reforming public institutions and increasing the presence of the state. Its public institutions especially the judicial branch and the military and police forces have seen dramatic improvement resulting in a corresponding increase in their legitimacy in the eyes of the population (Nagle 2003). This improved legitimacy has far-reaching impacts on the security of the average Colombian. Furthermore, the ability of government institutions (representative of the people) to provide a democratic and safe society for its citizens demonstrates that Colombia, from the perspective *Plan Colombia*'s goals, is on the right track and is worthy of additional international support.

Concerns persist, however, with respect to the establishment of an 'institutionality' of security measures. This is what Ann Mason (political science professor, Universidad de los Andes in Bogotá) terms "privileged military response to internal threats" (Mason 2003, 399). In her view, this approach could lead to abusive situations more representative of authoritarian regimes (Mason 2003). The use of local civilians as government informants and 'neighborhood watch posses' is another concern as it tends to further blur the lines between civilian, police and military roles. This concern is compounded by talks of paramilitary demobilization and 'veiled amnesty' or 'alternative sentencing' where armed vigilante groups are simply re-categorized as police (Schneider 2003). This would undermine the reestablishment of law and order and revive arguments that the paramilitaries and government forces are in unlawful collusion. On the other hand, the Uribe government maintains that in order to restore the rule of law, security, through sometimes-coercive powers, must remain the short-term priority. Colombian Defense

77

000767

Minister Marta Ramirez states that security is not undermined by the "...the excess of power, but by the vacuums that allow...threats to flourish" (Ramirez 2002). While there is every indication that the state has increased its presence through institutional reforms and reestablished security to much of Colombia, there are concerns over the side effects of security policies. The balance between maintaining security and promoting civil society begs more analysis than can be accommodated in this paper.

In summary, the progress toward Goal 2 must be viewed from three approaches discussed in this chapter: the Colombian Armed Forces; the National Police; and the Judiciary. There has been clear progress (by the military and police) in physically re-establishing control over the majority of Colombia's sovereign territory, thus adding to the ultimate goal of improving security conditions. In contrast, the progress toward judicial reform has been slower to evolve. On the balance, however, Goal 2 objectives have been (and are being) achieved.

78

000768


## Chapter 8:  Implementation and Evaluation of Goal 3
### *(To improve the economy)*

Implementation of Goal 3

Creating legitimate jobs and establishment of an economy that does not rely on narcotics trafficking is a priority of *Plan Colombia*. Unemployment at the time *Plan Colombia* was developed was at an historic high of 20% (*Plan Colombia* 1999). *Plan Colombia* seeks to improve the economy through growth in private sector trade and investment combined with international financial assistance.

International Assistance

*Plan Colombia* calls for international assistance (technical and financial) from international lending institutions such as the International Monetary Fund, World Trade Organization and World Bank as well as direct support from developed nations. In order to gain this international support, *Plan Colombia* calls for balancing the budget and reducing a debt that grew from 19.1% of GDP in 1995 to 34% in 1999 (*Plan Colombia* 1999). Debt reduction measures include restructuring the social security system and pension funds, while privatizing national electric companies, state-run coal companies and state-owned banks. Under *Plan Colombia*, the government also seeks to court international investors and transnational corporations by providing incentives to move production and manufacturing to Colombia. Furthermore, the Colombian government seeks to encourage foreign direct investment through the managed exploitation of natural resources.

Oil and Natural Resources

Oil is an important factor holding promise for improving the economy in Colombia. The contribution made by oil is limited in that the security of the important oil pipeline linking Arauca to the Caribbean is continuously threatened. ELN guerrillas frequently sabotage this pipeline, an activity that costs the Colombian government millions in lost revenues. In 2001 alone, 111 bombings of the pipeline occurred caused a 30% reduction in Colombian oil exports (Carpenter 2003, 61). The insecurity in the northern regions of Colombia also prevents oil exploration. To meet these concerns, the US allocated money and personnel

79

000769

for the specific mission of training Colombian units to guard the pipeline, as well as funding to enhance the infrastructure around the pipeline—to include better roads, communications, surveillance equipment and military outposts. This funding is as part of one of the programs in the 2003 budget for *Plan Colombia*. Securing this important pipeline (and the surrounding region) will make a significant contribution to Colombian Gross Domestic Product (GPD) and an improved economy. In this regard, improved security throughout the country is essential to the establishment of a growing and healthy economy and creation of an attractive foreign investment climate.

Legitimizing the Economy

One of the major challenges facing Colombia's economy is replacing narco-dollars. (*Plan Colombia* 1999). Although illegitimate, the drug trade makes a major contribution to the national economy of Colombia. The drug trade's contribution to GDP is impossible to quantify accurately, but it is estimated to be as high as 30% (Carpenter 2003, 93). The reliance by Colombia for such a large portion of its GDP is a large part of the difficulty in stemming cultivation and production of illicit drugs. Initially, Colombians did not perceive the economic boom provided by the illicit drug trade to be a threat to Colombian society. Not until the late 1980's, after dramatic increases in homicides and kidnappings, did Colombians begin to recognize that the violence in their country was directly linked to the narco-guerilla movement. In many rural areas, however, the drug trade put food on the peasant family table and many elites were linked to this illegal, but lucrative economy (Thoumi 2002, 114). Discussed earlier in reference to counter narcotics programs, a critical element of *Plan Colombia* is the implementation of programs to provide peasants with alternatives to involvement in the drug trade. Unfortunately, neither *Plan Colombia* nor earlier counter narcotics efforts considered the difficulties involved in taking away such a lucrative source of income from the rural population. Furthermore, without government subsidies to fund agricultural modernization programs and agricultural research and development, Colombian farmers cannot compete in world markets. These programs are important elements of *Plan Colombia*. If Colombian agricultural products are not competitive, small-scale peasant farmers will continue to cultivate illicit crops and will reject inducements to shift from illicit crops to legal crops (Carpenter 2003, Thoumi 2002).

000770

These issues have posed significant obstacles to the successful implementation of the alternative farming programs envisioned by *Plan Colombia.*

Evaluation of Goal 3

Economic progress in Colombia is dependent on achieving progress towards the other goals of *Plan Colombia* and the success of programs implemented to achieve those goals. In particular, the expansion of state control and improvements in security are critical to economic growth. Under the umbrella of *Plan Colombia,* the Uribe administration has made major progress in dismantling guerrilla organizations and asserting government control over the countryside. As a result, the security situation in Colombia is much improved and there is an increased sense of security among the population.

Largely due to the improved security situation, Colombia has witnessed a significant increase in foreign investment since the inception of *Plan Colombia.* Positive economic trends are reflected in Figure 8.1 below. GDP, which dropped 4.3% in 1999, of grew at a rate of 3.3% in 2003 and is projected to grow at a rate of 3.6% in 2004. Figure 8.1 also shows inflation declining from 11% to 7% between 1999 and 2003. Figure 8.2 shows economic progress with a 5% reduction in unemployment between the years 2000 and 2003 (although unemployment was still high at 13%). However, not all of these improvements can be credited to *Plan Colombia.* In general, all Latin American economies have improved over the same period. However, the improvement has been significantly greater in Colombia and the programs implemented under *Plan Colombia* have influenced the Colombian economy in a positive manner. The World Bank's Executive Director Peter Woicke at a press conference in Bogotá explained that Colombia led Latin America and was second in the world in improving investment climate during the past year (Willis 2004). Anne Krueger, of the International Monetary Fund has a positive outlook for Colombia stating that the nation "has made commendable progress in carrying out a strong economic reform program aimed at faster economic growth and improved social equity" (Krueger in Falcoff 2004).

81

000771



**Figure 8.1: Colombian vs. Latin American GDP and Inflation Trends 1999-2005**
EIU Country Report (Colombia), Economic Intelligence Unit Limited 2004



**Figure 8.2: GDP Growth and Unemployment Trends 2000-2003**
http://www.colombiaemb.org/plancolombia/results.html (04/28/04)

The improved economy is not only due in large part to the improved security situation; the economy, in turn, has a positive impact on the security situation, especially over the longer term by increasing support for the central government and reducing

82



reliance on drug production and trafficking. The importance of the interdependence between the economy and the security situation cannot be overstated. The improved security climate encourages international investment by multinational companies seeking to exploit Colombia's vast natural resources. According to the US Department of State, as Colombia diversifies and modernizes its economy the unemployment rate will continue to drop reducing the dependence on coca cultivation for subsistence. As the dependence on the drug trade is reduced, support for insurgents and paramilitaries will be diminished. The success of *Plan Colombia* in establishing security and expanding governmental control under the rule of law has been a catalyst for economic advances. Now economic progress is aiding further progress toward improvements in the security situation in a symbiotic relationship. Furthermore, the improvements in each area are gaining in momentum from that relationship.

83


## Chapter 9: Implementation and Evaluation of Goal 4
### *(To advance the peace process)*

<u>Implementation of Goal 4</u>

Arguably, one of the most important elements of *Plan Colombia* detailed in the original document is the focus on a peace process with the insurgent organizations and paramilitary forces. Politically, the peace process was important; progress toward this goal meant legitimization for the government of Colombia and the policy itself in the eyes of the international community and ultimately meant more support and funding for social development programs. *Plan Colombia* in fact, envisioned the successful conclusion of ongoing peace negotiations involving the FARC and the ELN, an effort that embraced by then-President Pastrana.

<u>Pastrana's Peace Plan</u>

Despite best intentions, serious errors in diplomacy were made prior to *Plan Colombia*, especially in the creation of the FARC distention (demilitarized) zone by President Pastrana's administration in 1999. This demilitarized zone, or *zona de despeje* (see Figure 4, on page 36), was 16,000 square-miles and comprised 4% of the national territory, roughly half the size of Switzerland, but contained only 96,000 people or 1 percent of the population (Marcella 2001, 5). This concession provided the FARC with a base of secure operations where it was able to recruit new members, cultivate coca and produce cocaine unhindered by the Colombian government or the Colombian Army. Not surprisingly, this led to a prolonged "fight and talk" negotiation strategy. Myles Frechette, the US Ambassador to Colombia during the Clinton administration from 1994 to 1997, is extremely critical of what he terms a "naïve and misguided" policy that aided the FARC in its conflict with the Colombia Army (Frechette 2003, 6).

Similar concessions were made in 2001 when the Pastrana administration ceded land in the northern portion of Colombia to the ELN. The wisdom of this concession was hotly debated in Colombia, especially in the wake of accommodations made to the FARC. It could be argued, however, that both these concessions merely reflected reality due to the complete lack of government control in the regions. In this view, Pastrana was attempting

84

to "make lemonade out of lemons" in order to encourage peace negotiations (Carpenter 2003, 69). However, the negative perception of the government "giving in" to the guerillas outweighed any possible benefits from reconciliation with rebel groups. Pastrana's concessions effectively surrendered national sovereignty of large areas of Colombia invoking anger and blunt criticism from Washington on each occasion. One of the negative results of this "carrot-stick" approach to dealing with the leftist groups was the rapid mobilization and intensified efforts by the AUC to counter guerilla control in the newly designated distention zones, especially in the northern zone designated for the ELN. To make matters worse, these actions by the AUC inadvertently promoted a closer relationship between the FARC and ELN (Carpenter 2003).

A series of missteps accompanied the Colombian government's eventual decision to reestablish government control over the sanctuaries. Pastrana postponed delivering ultimatums to the FARC leadership and, in the final hour, United Nations mediators intervened. This resulted in another month of ineffectual diplomacy after which preparations were finally made to send in regular military units. By the time Pastrana actually sent in troops, the guerillas were well prepared (Marcella 2003). Pastrana had the support and will of the Colombian people to retake the land with force, but through his indecision and ineffective peace dealings, the public resolve eventually faltered (Nagel 2002).

Despite the poor record in attempting to achieve a peaceful solution by getting the insurgent and paramilitary forces to lay down their arms, *Plan Colombia* maintains the commitment to the peace process as one of the country's highest priorities (*Plan Colombia* 1999). In theory, a negotiated peace would end the civil war with the least amount of blood shed. Furthermore, a successful peace deal could only have positive impacts on counter narcotics efforts. Key to any peace process is the support of the Colombian population as a whole. The hope was that the Colombians themselves, from whom the combatants draw support and recruits, would exert enough pressure on the insurgent organizations forcing them to give up their fight to overthrow the government and settle for a political solution. These sentiments reflected the attitude of former President Pastrana, whose administration developed *Plan Colombia* as a public policy. However, the disastrous results of peace negotiations during the final two years of the Pastrana

85

000775

administration increased the cynicism of the general public with respect to a negotiated end to conflict, and this cynicism contributed to the election of hard-liner Avalro Uribe to the presidency in 2002.

### New Strategies under President Uribe, May 2002 to December 2004

It had become apparent to most Colombians during the first three years of implementing *Plan Colombia* that the peace talks initiated by Pastrana were a colossal failure. In spite of these setbacks under the previous administration, President Uribe also made efforts to get the FARC and ELN to the negotiating table. However, unlike his predecessor, Uribe has refused (until just prior to this article) to make any accommodations to the insurgents until they cease committing acts of violence.[15] Uribe's administration also established a dialogue with the AUC (paramilitary forces) and discussed some terms of amnesty, an approach that raised concerns, both domestically and in an international community that has difficulty distinguishing the difference between the guerillas and the paramilitaries (Schneider 2003). Uribe has also dramatically increased the strength of the military and police forces and increased the tempo of offensive operations against the insurgent groups (Marcella 2003). In this manner, Uribe hopes to force the guerilla groups to the table from a position of strength. If unsuccessful in bringing the insurgents to the peace table, Uribe intends on continuing reduce their effectiveness through combat attrition, social programs and positive economic progress (alternative employment/incentives) and eventually establishing government control and improving the security situation throughout the country (*Democratic Security and Defense Policy* 2003).

### Evaluation of Goal 4

Overall, very little progress has been made toward Goal 4. Prior to the implementation of *Plan Colombia,* there had been high hopes for the peace process. Under immense international pressure, the FARC agreed to stop terrorist attacks and violent insurgent activities in exchange for the establishment of a safe haven the Pastrana government (Livingstone 2004). Similar concessions were made to the ELN. However, the guerillas

---

[15] The Colombian government under Uribe's direction has recently offered a 'prisoner exchange' with the FARC although the guerilla organization has not ceased combat/terrorist operations (Molinski (1) 2004)

000776

never lived up to their end of the bargain and continued carrying out atrocities and violent attacks (see Figures 6.7-6.9 for conflict data during 2001-2002). The past attempts to negotiate with insurgent organizations proved futile and, in large part, resulted in the overwhelming endorsement of a policy shift and the election of President Uribe who a promised new hard-line approach with the insurgents and paramilitaries.

Learning from the lessons of his predecessor, Uribe refused, at least initially, to deal with these organizations (FARC, ELN, AUC) until they laid down their arms and discontinued attacks. Only recently, has Uribe considered another attempt at peace negotiations, albeit with less accommodating terms and absolutely no offer of any sort of 'safe haven.' Uribe is only willing to negotiate from a position of strength and his strategy appears to be working (see earlier discussion in assessment of Goal 1 with conflict graphics). Uribe is aided in this strategy by the success of many of the programs already discussed including the institutional reforms implemented under *Plan Colombia* and the increase in both the size and professionalism of both the military and the police forces (Marcella 2003). Because of this approach, many of the insurgents and even more of the paramilitaries have already laid down their arms ahead of any broad peace agreements (Figure 9.1). Of course, one can argue that the reason the paramilitaries have been so receptive to relinquishing weapons is that their objectives are closely aligned with those of President Uribe and the Colombian military.



**Figure 9.1: Voluntary Demobilization of FARC, ELN and AUC in 12 months, 2002 and 2003**
*(The Effectiveness of the Colombian Security and Defense Policy, 2004)*

87

Regardless of the apparent success of Uribe's hard-line approach to security, the importance of peace initiatives are still important from a political and diplomatic perspective. Broad-based international support is contingent on a peace plan (Roy 2003). For many years the European community has been unwilling to fully support *Plan Colombia*. It was not until the initiation of the peace process that European nations were interested in supporting conflict resolution, hoping to act as peace broker. However, with the failure of Pastrana's peace negotiations in January 2002, European leaders experienced "apprehension, pessimism, and a certain degree of reality" (Roy 2003, 88). After Uribe's election in May 2002 and after the FARC launched artillery rounds into the Colombian Congress during the presidential inauguration, the European Union finally admitted that the FARC should be listed officially as a terrorist organization (Falcoff 2004). With this international recognition of the insurgent organization as terrorists, there is a greater chance of Colombia finally receiving desperately needed international funding and previously pledged support.[16]   Reflecting this change in attitude, as of July 2004 the European Union no longer insisted on a purely negotiated solution, only stating that the conflict could not be resolved narrowly by a military strategy (Colombia Forum 2004).

There have been several recent moves by the government in the direction of peace negotiations. In a controversial move this past spring, the government invited the jailed leader of the ELN to speak to the Colombian congress about the potential for a temporary ceasefire (Wood 2004). This unlikely invitation is likely a political ploy on the part of the administration in an election year. In any event, while terms for an eventual settlement have been discussed, none has been ratified. Other moves include a recent effort to broker a deal between the Colombian government and the paramilitaries. The government has been debating whether to offer some sort of amnesty to members of the AUC in return for laying down arms, paying fines and serving prison sentences (Canby 2004). The former leader of the AUC, Carlos Castaño, was actually discussing the possibility of demobilization of AUC units when he mysteriously disappeared in April 2004.[17]   Finally, at the end of October 2004, in an attempt to rekindle dialogue with the FARC, Uribe

---

[16] This European funding assistance is entitled "support for the Colombian Peace Process," an obvious effort to disassociate European nations from the US-sponsored counter insurgency agenda (Roy 2003).

[17] Some suggest that Castaño was talking to US agents after being indicted on drug trafficking charges and was possibly seeking protection in return for information, protection that may have come too late.

000778



offered a 'humanitarian deal' that included an exchange of insurgent prisoners for hostages (Molinski (1) 2004). This deal was promptly rejected by the FARC and led to claims that it was a insincere gesture by Uribe undertaken only for political gain to shift focus away from perceived over concern for the paramilitaries as well as to diffuse mounting pressure from hostages' relatives (Colombia Forum 2004). Even without formal peace negotiations, over the course of 2004, the number of insurgent and paramilitaries voluntarily demobilizing is on the rise; there were 1760 individuals from the FARC, ELN and AUC through the first two weeks of August 2004 giving up arms (*Colombia Progress Report* Sept 2004). The period between January through July of 2004 saw an increase of 53% (1078 to 1644) in the number of insurgent and paramilitaries demobilized when compared to the same period in 2003 (Colombia Progress Info Sheet Sept 2004). While these statistics are encouraging, it is unclear that broad peace negotiations will be initiated, much less successfully concluded, with any one of the three major organizations contributing to the violence in Colombia.

The Uribe administration knows, from the experience of the Pastrana administration, that negotiating from a position of weakness lessens the chance of a successful outcome. This reality underpins Uribe's entire approach to any future peace process. The Colombian government will engage in such negotiations only on its terms. Thanks to the success of programs implemented under *Plan Colombia*, the Colombian government currently negotiates from a position of greater power and legitimacy.

89



## Chapter 10:  Implementation and Evaluation of Goal 5
### *(To advance democratization and social development)*

Implementation of Goal 5

Many observers consider the treatment of social and cultural issues by *Plan Colombia* as important, if not more so, than the treatment of security issues.  Unquestionably, it is important to prioritize and balance the support and funding received by each when implementing the policy.  However, as discussed previously, the majority of US funding support for *Plan Colombia* has been militarily based.  Inadequate funding on the non-military side hampers the implementation of programs to address critical social problems. The perceived overemphasis on military solutions costs *Plan Colombia* significantly in terms of international support and makes it difficult for the government to establish its legitimacy in the eyes of Colombians (Tickner (1) 2003, Roy 2003).  This in turn makes it harder for the government to gain control and establish security especially in rural areas. Further complicating the implementation of social programs is the involvement of non-governmental organizations with their own agendas and priorities that may or may not be in harmony with those of the government.  NGOs also have genuine security fears for their aid workers in some of the poorest and remote regions of the country.  The implementation of social programs geared towards improving the human condition for rural populations faces many obstacles.

Human rights

As a condition of financial assistance for *Plan Colombia*, US support comes with 'humanitarian' strings attached.  Based on the past record of human rights violations in Colombia, the US Congress required that aid be conditional in that the Secretary of State was to certify "...that Colombia was taking specific, tangible steps to improve the military's human rights performance..."(Carpenter 2003, 73).  However, the legislation also permitted the President to waive the certification based on considerations of national security.  President Clinton did just that by approving immediate funding in support of *Plan Colombia* in 2000.  This waiver of humanitarian rights conditions infuriated human rights groups such as Amnesty International and Human Rights Watch and was the topic of

90

000780



significant debate (Crandall 2002).   However, under *Plan Colombia* the Colombian government is prosecuting government and military officials engaging in human rights abuses as well as aggressively pursuing other reforms (as discussed earlier) to reduce the occurrence of human rights violations (Embassy of Colombia 2003).  In fact, the military has provided mandatory training in human rights to its uniformed personnel and opened 117 human rights offices run by professionals (Embassy of Colombia 2003).  While the implementation of reformed practices by the Colombian military and judicial systems point to positive changes in Colombia, international human rights organizations give Colombia little credit for these reforms and focus on the need for further improvements in this area. One of the main criticisms from international organizations and nations targeted at both *Plan Colombia* and the current Colombian government is the tragic numbers of internally displaced persons in Colombia, in particular the Afro-Colombian population, a problem for which the government has struggled to find solutions (Jeffrey 2004).

<u>Internal and External Displacement</u>

Colombia has more than one million people displaced internally (from 2000-2003), caught in the deadly crossfire between the military, the FARC, and the paramilitary organizations, according to the United Nations High Commissioner for Refugees (ReliefWeb 2004).  The increased efforts under *Plan Colombia* to eradicate crops and the commitment to offensive military operations against the guerillas has caused some questions with regard to implementation of policies and their unintended consequences.  According to Kamel Morjane, the Assistant UN High Commissioner for Refugees, the situation in Colombia is only worse in the Democratic Republic of Congo and Sudan (BBC (1) 2004).  Figures 10.1 and 10.2 reflect Colombian internal displacement for 2001.  Luz Nagle, a noted Colombian expert, argues that as a direct result of implementation of *Plan Colombia* there is also a brain drain from the rural settings to urban communities, and that a growing international migration of "the best and the brightest" represents a growing Colombian diaspora (Nagle 2002, 3).

91



**Figure 10.1: Internal Displacement Regions of Colombia (2001)[18]**



**Figure 10.2: Internal Displacement in Colombia, 1985 to the Third Trimester of 2002[18]**
**(Estimated that 2.86 million persons have been displaced)**

---

[18] Source: Norwegian Refugee Council: Global IDP Project:
http://www.db.idpproject.org/Sites/idpSurvey.nsf/WebResources?ReadForm&Country=Colombia&p=MP
(11/01/04)

92

000782

Because of the protracted conflict, there is also a regional refugee problem with the spillover effects causing displacement of rural peasants in several of Colombia's Andean neighbors. These external displacements to Venezuela, Panama, and Ecuador depicted in Figure 10.3 are analogous and parallel to the coca cultivation 'balloon effect' with respect to the human dimension and 'spill-over effects' resulting from protracted conflict and crop eradication programs during the initial implementation phases of *Plan Colombia*. Many of the peasant farmers caught in the vicious cycle of conflict and crop eradication simply move across transparent borders and began farming on new land (Millet 2002). As a result of some positive implementation of programs within Colombia, these cross-border issues potentially serve to produce a negative 'net' effect in the Andean region with respect to US foreign policy objectives.



Figure 10.3:  External Displacement from Colombia to Panama, Venezuela and Ecuador (2003)[19]

---

[19] Source: Relief Web: from United Nations High Commissioner on Refugees (UNHCR) http://www.reliefweb.int/w/fullMaps_Am.nsf/luFullMap/71D8479C1BA3B2B485256DAB0056945C/$File/u nhcr_col0703.pdf?OpenElement (10/25/04).

000783

### The Role of NGOs

*Plan Colombia* addresses societal and cultural problems with the assistance of a wide variety of NGOs. In fact, according to the Colombian NGO Confederation (Confederación Colombiana de Organizaciones no Gubernamentales) there were some 5,432 NGOs serving Colombia in January 2003 (Fletcher 2003). Not all NGOs approve of *Plan Colombia*. The International Red Cross and World Vision refuse money related to what they have determined to be a 'militaristic' program (Fletcher 2003). Moreover, the number of organizations competing for funding under *Plan Colombia* programs is staggering. The quantity of organizations, not to mention their differing objectives, makes coordination of efforts next to impossible (PCS 2003). The primary focus of many NGOs is the internally displaced: to assist them in returning home and in reestablishing their former livelihoods. In some cases, return is not possible and organizations are involved in assisting people in developing new lives. Other NGOs work to coordinate government efforts to preclude displacement. For example, NGOs assist in programs to turn farmers from illicit crop cultivation to alternative farming methods described previously (USAID 2004). NGOs also help in establishment of small businesses and micro-enterprises to provide alternative employment to displaced farmers. Other NGOs serve as government and international 'watch dogs' ensuring that human rights violations are immediately exposed and that programs are implemented to address these issues (PCS 2003).

There are some negative aspects to NGO involvement in the implementation of *Plan Colombia*. Both indigenous leaders and government ombudsmen complain about the slow bureaucratic process that complicating the situation for many (Fletcher 2003). Families sign agreements to manually eradicate illicit crops, but never see the subsidy. Government officials then threaten local farmers with eradication because they have not met the stipulations of the contract. In some cases, the Colombian government disburses money under *Plan Colombia* that never gets to the people who need it; corrupt NGO officials pocket the funds or use allocations to sustain top-heavy bureaucratic agencies (Fletcher 2003). Other problems arise from funding going indirectly to local community leaders, which again provides more opportunity for corruption. Furthermore, the ideological agendas of the NGOs sometimes serve to complicate social development efforts.

94



Since the election of Uribe, the relationships between NGOs and the Colombian Government have been eroded to a degree. While cooperation has never been perfect, Uribe's commitment to a balanced approach between military and social programs, with security the short-term priority focus has created a significant divide between the two entities. It is quite clear that President Uribe's *Democratic Security and Defense Strategy* has elevated the role of the military and police; however, in his estimation Colombia is without a choice. To be sure, Uribe has made comments that suggest he is more open to demobilization discussions and some form of amnesty with the paramilitaries than the guerillas.

It is also clear that the NGOs have collectively worked to stifle the government's actions in pursuit of bringing the insurgents to justice as well as diminishing international support for programs under *Plan Colombia*. Moreover, as recently as September 2004, eighty of the most influential NGOs in Colombia published a book condemning virtually all of Uribe's efforts since his election to president. This book is undiplomatic in every sense as is reflected in its title *The Authoritarian Curse: the first year of government of Alvaro Uribe*. The book's harsh criticism presents a picture that in no way reflects any progress in Colombia and as the Project Counseling Service (PCS) puts it, the report presents statistics "strategically selected to serve the critique" (PCS 2003, 5). The PCS has admitted that there is a degree of partiality exhibited generally by the NGO sector that seeks to indict the Colombian government and its links to the paramilitaries while avoiding explicit condemnation of the guerillas (PCS 2004). Contrary to the book's findings, the PCS claims that there is little analytical rigor found in the report and that it serves as a "radical discourse" easily dismissed and ultimately defeating what one logically would think is the overall mission: to ameliorate the deplorable conditions in Colombia (PCS 2004). This non-collaborative approach will not help attainment of objectives and goals found in *Plan Colombia*.

Most NGOs in Colombia are sincerely dedicated to ensuring the availability of basic human needs and social services (even if they do not fully support all elements of *Plan Colombia*). However, it should be pointed out that examples of misconduct can be found within the NGO community executing programs included under *Plan Colombia*. This includes the misuse or misinterpretation of data to achieve political ends as described

95

000785

by the PCS. The British Ambassador to Colombia has alleged that currently many politically motivated NGO websites have links to (terrorist) guerilla organizations (PCS 2004). Furthermore, in addition to questionable political activities, some NGOs have allegedly used funds for unauthorized and even illegitimate purposes. An example is a recent $US 8500 contribution (not from *Plan Colombia* funding) made to the FARC by the Danish NGO Rebellion Association in spite of UN resolution 1374 that prohibits support of terrorist organizations (Embassy of Colombia 2004). There are a number of issues surrounding the role of NGOs in the implementation of *Plan Colombia*. There are more questions concerning the honesty and objectivity of NGOs with respect to their participation in the political discourse surrounding *Plan Colombia*, its stated goals and the evaluation of its impact. These issues will be explored further in the next section.

Evaluation of Goal 5

Goal 5 is linked closely to Goal 2: institutional (military, police and judicial) reform and increased state presence. As discussed previously, the reforms in government institutions, specifically in the military and judiciary, are encouraging. However, the question remains whether or not these efforts are improving the lot of the average Colombian. Are these reforms serving to guarantee individual civil liberties and promote societal progress and do they actually reflect 'democratization.' The analysis of the outcomes and impacts that under Goal 5 with respect to human rights issues, internally displaced persons and NGO involvement are provided below. This analysis rounds out the evaluation of the five goals in *Plan Colombia*.

Human Rights

Rhetoric by human rights activists and the leadership of mainline religious denominations that focuses on human rights abuses has played a significant role in shaping US policy toward Colombia, especially with respect to the imposition of restrictions on US military support. To a large extent, the perception of widespread abuses by government and paramilitary forces has been created by news media. The media tend to play down atrocities committed by insurgents and to play up atrocities committed by right wing paramilitaries and the Colombian Army. While it is undeniable that both sides are guilty of

96

human rights violations, neither the news media nor activists have made an objective analysis of the true situation, preferring to propagandize the issue. For example, many human rights organizations define deaths of combatants in hostilities as human rights violations. Using this definition, the highly effective military actions taken by the Colombian Army under President Uribe, appear to have increased human rights violations (Falcoff 2004). However, if we go back to the report by Restrepo and Spagat, we find a different conclusion. Figure 10.4 below depicts trends that run counter to the arguments that human rights violations by the Colombian government are at an all time high.

Furthermore, Restrepo and Spagat confirm that some of the accounting methods of the NGOs leave much to be desired. Their report explains that critics of the government are "…distorting the overall assessment of government actions and its effects on the population" (Restrepo and Spagat 2004). Falcoff makes the same argument that NGOs many times "…cut excessive slack to the rebels…" as they sensationalize the human rights violations of the government forces using abnormal interpretations of atrocities (Falcoff 2004, 3). Falcoff argues that for ideological reasons some NGOs tend to align themselves with the insurgents and support the guerilla claim that the real war is against American 'imperialism' rather than against the legitimate Colombian government (Falcoff 2004). An objective analysis of these issues is extremely important in the overall assessment of *Plan Colombia*. Such an analysis is necessary to counter unfair criticisms of *Plan Colombia* and the Uribe administration by partisan politicians and international human rights organizations.

000787



**Figure 10.4: Quarterly number of civilians killed in attacks by group 1988-2003**
(Restrepo et al., 2004, 21)

Current US aid packages under *Plan Colombia* are conditional on reforms by the Colombian government in the area of human rights. However, based on national security, waivers to these restrictions on aid are often invoked. Carpenter claims that these waivers render aid restrictions and congressionally mandated standards of conduct "meaningless" (Carpenter 2003, 73). While Carpenter reflects the perspective of most human rights activists, there are two sides to this issue. Characterized by the above discussion, the *measurement of human rights violations is contentious and politicized.* Even a critic of *Plan Colombia*, Arlene Tickner (professor and director of the Center for International Studies at the Universidad de los Andes in Bogotá) admits that the Colombian Military's share of human rights violations dropped from 54% in 1993 to 3% in 2001 (Tickner (1) 2003, 81). According to the Colombian government, complaints about human rights violations on the part of the Colombian military are drastically down: 3,000 complaints in the mid-1990s to 381 in 2002. (Embassy of Colombia 2003). However, human rights watch groups such as Amnesty International remain unsatisfied with progress in this area and continue to urge Washington to withhold support for *Plan Colombia*. Many, if not

98

most of their arguments are not justified by an objective look at the overall situation in Colombia. Consequently, these groups have had limited impact on either Congress or decision makers in the executive branch. On the other hand, these human rights organizations have been much more successful in limiting international support for *Plan Colombia* by downplaying legitimate progress achieved in this area. It is my assessment that, while there are still instances of abuse of force by the military and police, it is hard to argue there has not been significant improvement in this area and that the objectives of *Plan Colombia* and the Uribe administration are indeed tempered with a respect for human rights.

Internal displacement

The number of internally displaced persons continued to rise in the early phases of *Plan Colombia*. This increase is not surprising in that this period marked the end of Pastrana's formal peace process and government forces taking the offensive against insurgents. This government action tended to encourage the paramilitaries that arguably added to the internal chaos further exacerbating the displacement problem. Figure 10.5 depicts the increases prior to 2003. Many of the international organizations and nations opposing Colombia have used these statistics to support their claim that Colombia is a failing state with the government doing little to address societal problems. These organizations also point out the negative side effects of crop eradication and poor implementation of alternative farming programs and under-funding of other social development programs. Figure 10.5 below, however, is based on UN statistics that indicate the situation is improving, at least with respect to displaced persons. Although there are still unacceptable large numbers of people internally displaced relative to world indices, according to the graphic below the number displaced in 2003 was less than half the number displaced in 2002. This reversal hints at the possibility that perhaps *Plan Colombia's* short-term focus on security over social development is appropriate.

99

000789



**Figure 10.5: Internally Displaced Persons in Colombia 1995–2003**
(Social Solidarity Net in United Nations Office on Drugs and Crime, June 2004)

<u>NGOs</u>

Many development programs, funded by the US and implemented by NGOs, are having a positive impact. For example, as of September 2001, The US Aid for International Development (USAID) had issued grants of nearly $US 1 million to nine different NGOs and another $US 100,000 to the Colombian Confederation of NGOs under 'Plan Putamayo.' This aid subsidized more than 3,000 families. It also built schools and health centers, improved access to potable water and sewage systems, and provided electricity to various indigenous communities in the Putamayo region (Fletcher 2003). In concert with security programs, USAID through NGOs is supporting development of an early warning system in rural communities that alerts the military or police of potential events that might culminate in massacres or displacement. To address the problem of internal displacement, NGOs are either working to return people to their former homes or ensuring assimilation into new communities. These organizations have assisted more than 1.4 million displaced persons providing physical and mental health services, shelter, water and sanitation, education and employment services, and community building programs (USAID 2004). Without question, NGOs are making significant contributions to the efforts being made to address societal problems and promote social development in Colombia. These organizations are, in large part, responsible for the progress made towards achieving Goal 5 of *Plan Colombia*. However, as noted previously, there are also some negative aspects

100

associated with NGO participation.  In some instances the actions of NGOs has hampered attainment of the goals of *Plan Colombia*.

One of the principal difficulties is the inability of NGOs and the Colombian Government to work together in collaborative efforts to address Colombia's societal problems.  In large part, this inability is the result of a negative bias on the part of NGOs towards governmental agencies because of past government abuses.  In any event, these biases impact the way NGOs interact with funders, implement and evaluate programs, and report progress.  As Anderson notes, the questions asked when evaluating a policy will shape the answers received.  The political nature of these issues has as much to do with program development and implementation as do concrete empirical outcomes.  Because of Colombia's long-standing drug production problem embedded in a conflicted society, short-term goals targeted by NGOs may be unreasonable and, in fact disconnected with government objectives.  As Ebrahim (2003) shows in his study of NGOs in India:

> *...monitoring and learning systems that emphasize long-term social change will require less of a focus on the physical and financial component of reporting, and much more attention to the design of simpler, qualitative, and less onerous information systems. This will require international funders to relax their demands for narrowly focused (but resource intensive) reports designed to show quick results... (Ebrahim 2003, 158).*

This conceptualization is particularly relevant to the difficult relationship between the Colombian government and NGOs in Colombia.  The social 'paradigm shift' described earlier in this paper is clearly the goal of most, if not all, NGOs operating in Colombia.  However, although this shift appears to be underway, it may yield largely non-quantifiable results over an extended period.  Other necessary short-term efforts to increase national sovereignty and improve security are easier to observe and quantify, but, to some extent, are incongruent with the goals of NGOs and their (political) backers.  Regardless of these issues, it is clear that NGOs should continue to play an important role in social development in Colombia.  Hopefully, as the Colombian government gains legitimacy in the eyes of NGOs, progress can be found through a more collaborative and less

101

000791



confrontational manner. Effective NGO involvement can help to bridge the gap that has developed between civil society and the Colombian government.

000792



## Chapter 11: Conclusions

*Plan Colombia* represents a bold public policy initiative by the government of Colombia, with the support of the United States, to seize the initiative in a complex internal war. A weak and largely ineffectual central government was facing a deteriorating security situation in the 1980s and early 1990s largely due to the rise of the geo-narcotics phenomenon. The civilian population of was caught in the middle of a vicious conflict between government forces, paramilitaries, and insurgents. The dynamics and history of the struggle combined with the economic impact of the narcotics trade created nearly intractable problems for this 'sovereign' Andean nation. In order to tackle the multifaceted problems facing Colombia, a comprehensive public policy was needed. *Plan Colombia* attempts to address the multitude of political and social problems found in Colombia.

Few public policies can adequately be explained by one "grand theory"; most are simply too complex and *Plan Colombia* is no exception (Anderson 2000, 309). Indeed, *Plan Colombia* is exceptionally complex because it represents both US foreign policy and Colombian domestic policy. The US funds *Plan Colombia* in order to support and influence another sovereign nation's public policy. The systematic framework (or model) offered by Anderson allows for the separation of complex policy into "manageable segments" that help to "organize and guide examination" of a particular policy process. However, it must be acknowledged that Anderson's methodology takes a somewhat 'reductionist' approach in that it seeks to explain "behavior of parts" while also promoting an understanding the interrelatedness of the stages of the policy process (Waltz 1979, 60). This approach simplifies the challenge of evaluating *Plan Colombia* as both a Colombian public policy and a US foreign policy. This paper aimed to show how a bilateral international policy might be understood by using the Anderson model that traditionally has been confined to domestic policy analysis.

Colombian Public Policy Perspective

Based on the assessment of the progress towards the five goals of *Plan Colombia*, my conclusion is that *Plan Colombia* is succeeding in improving the overall situation in

103



Colombia. My rationale for this assessment is that the first three goals of *Plan Colombia* have been largely met:

1. Insurgent organizations have been dealt a severe blow and narcotics cultivation and production have been significantly reduced.

2. Public institutions (including the judiciary, military and police) have been strengthened and legitimized with a resulting increase in the control and presence of the state throughout Colombia.

3. The economy has been strengthened and continues to improve.

Progress towards the advancement of democratization and social development, Goal 5 is less dramatic, but still evident. The only area in which progress appears to be minimal at best is towards accomplishment of Goal 4. The peace process is stalled and it is has been unclear, at least until very recently, that the Uribe administration has any interest in restarting negotiations with insurgent organizations. A noted exception are the negotiations with the right-wing paramilitary forces, who have agreed to disarm by 2006 (BBC (2) 2004). Table 11.1 below summarizes the level of progress made toward achievement of each of the five goals assessed. I also indicate the potential for unintended consequences, or negative aspects of 'progress' previously described in detail in Section III of this paper.

**Table 11.1: Progress Toward Five Goals of *Plan Colombia***

| Plan Colombia GOALS | Minimal Progress | Some Progress | Significant Progress | Unintended Consequences of Progress? |
|---|---|---|---|---|
| 1. Reduce drug production/distribution & Fight terrorist organizations | | | X | ✓ |
| 2. Strengthen public institutions & increase state presence | | X | | ✓ |
| 3. Improve the Economy | | | X | |
| 4. Advance the Peace Process | X | | | |
| 5. Advance democratization and social development | | X | | |

104

000794

Based on the assessment of progress towards each of the five goals, a question arises over whether or not *Plan Colombia* overemphasizes security at the expense of social development. Concerns also arise as to whether the emphasis placed on restoring law and order has led to an unacceptable erosion of individual civil liberties. It should be noted that many of these security initiatives, while carried out under the broad umbrella of *Plan Colombia*, are actually initiatives of the Uribe administration elected in 2002. As discussed previously, funding constraints and US influence had oriented the implementation of *Plan Colombia* toward security initiatives. However, Uribe's policies reflected an even greater emphasis on security concerns by the Colombian government. This increased emphasis on security is not surprising. Anderson tells us that during the policy process, because of changes in the policy environment (political, social, etc.), a policy's priorities may be redefined. Anderson explains that policy objectives should reprioritize based on data indicating a change in conditions (Anderson 2000, 310). In the implementation of *Plan Colombia,* it was the dependence on the US for funding support that drove the initial focus of plan implementation. However, in winning the presidential election by a landslide in May 2002, President Uribe received an overwhelming mandate from Colombians in support of this focus on security. In response, the Uribe administration implemented the *Democratic Security and Defense Policy* (2002) that called for increasing the effectiveness of the military and national police (Murillo 2004, 23). This Colombian security policy has refined and superseded the broad guidance contained in *Plan Colombia.* It reinforces the emphasis placed on counter narcotics and security programs implemented *Plan Colombia*. Some could argue that this increased emphasis on security is due to nothing more than the influence of the major funding source and not the result of an objective assessment of policy impact. However, to counter this assertion, one can point to the utter failure of peace initiatives under the Pastrana administration in contrast to the successes enjoyed by the Uribe administration. Because of the increased focus on security issues there have been increasing numbers of insurgents killed, captured or demobilized. President Uribe has waged an all-out counter insurgency using all available assets, including police forces and to some extent the civilian population. He understands the true nature of a protracted guerilla conflict where, to win, the state must established its legitimacy in the eyes of the civilian population.

105

000795

Uribe's approach has drawn criticism that he is "blurring the lines" between Colombian Army, the National Police and civilians (LAWG 2004, 1). Furthermore, there are still human rights issues to be addressed and social development programs have sometimes been lacking in funding and support. However, it is clear that the security situation has improved and, in the final analysis, I would argue that Uribe's initial focus on security issues was (is) well placed. Under Anderson's framework, this reassessment based on the political environment is legitimate. Without progress towards Goal 1, progress towards the other four goals would be impossible.

<u>US Foreign Policy Perspective</u>

*Plan Colombia* is primarily a public policy initiative for Colombia. However, funding support for the plan is a foreign policy initiative of the United States. Applying Anderson's model to assess *Plan Colombia* as a US foreign policy is somewhat difficult since to apply the framework, one needs to link policy to objectives. *Plan Colombia*, the official document, makes no explicit reference to US foreign policy objectives. However, the goals of the plan are directly related to US foreign policy objectives in terms of (1) reducing the flow of drugs into the US and (2) stabilizing a democratically elected government in the Western Hemisphere (McCaffrey 2000). From a US foreign policy perspective, it is difficult to make the case for success with respect to reducing the flow of drugs into the US. In this regard, *Plan Colombia* has been a failure, or at best achieved minimal gains. However, while the Clinton administration may have used the war on drugs to justify funding *Plan Colombia*, the reality is that stabilizing a nation in danger of losing sovereignty was an even more important objective in terms of supporting the United States National Security Strategy. In this regard, *Plan Colombia* has served as an effective 'tool' for ensuring continued US funding and support for counter insurgency operations in Colombia. *Plan Colombia* may be viewed from this perspective as successful US foreign policy. The Colombian government is regaining control over its territory, the insurgency is losing ground, and the security situation is much improved. This is a positive development from the US national security perspective. However, the Colombia situation must be viewed from a regional context. Both illicit crop cultivation and indigenous populations can move across ill-defined (and poorly controlled) borders in response to counter narcotics

106



operations, counter insurgent conflicts, and drug eradication programs. In this light, improving the security situation and reducing drug production in Colombia would constitute a Pyrrhic victory if the result were simply greater diffusion of the security and drug problem throughout the Andean region. In an overall evaluation of *Plan Colombia* as a US foreign policy, to this point, one must conclude that the policy has been only partially successful. While the security situation in Colombia is stabilizing, drug flow into the US is undiminished and coca cultivation and drug production appeared to have increased, at least initially, in neighboring Andean countries.

<u>A Successful Policy Overall</u>

*Plan Colombia*, as a broad, general public policy has served the Colombian government and its citizens well. *Plan Colombia* brought increased funding from the US making Colombia the fourth highest recipient of US military aid (Isacson et al. 2004). While there are certainly areas of concern in Colombia, progress has been made towards the accomplishment of every goal of *Plan Colombia* with the lone exception of advancing the peace process. Even with regard to the peace process, it appears the government might be incrementally shifting focus, extending invitations to negotiate with both the paramilitaries and the insurgent organizations. This is now possible because security is being improving throughout the nation, the military and national police are in the midst of a dramatic transformation and the judicial systems are reforming. Because of the improved security environment, the Colombian economy is growing rapidly, proving more jobs and reducing dependence on the drug trade. However, over the longer term, Colombia's government should temper stringent security measures that have enabled the government to regain control of a lawless society. Consistent and continuous (objective) policy analysis is necessary to determine if goals need to be reprioritized. An analytical model to evaluate policy process similar to Anderson's could prove useful in this regard. As soon as the security situation is stabilized and the Colombian people have adjusted to a liberalized civil society, the government should reduce the power of the military in order to maintain its legitimacy as a democratic state. Perhaps it is time for a *Plan Colombia II*, with a greater

107

focus on social development.[20]  Again, Anderson's approach is useful in explaining how stages and or segments of policy can affect one another.  This new plan, retooled with new objectives and longer term goals covering another five-ten years would be a potential means to court more broad-based international support.  This long-range initiative would lead to a self-sufficient democratic society free of international support.  To be legitimate in the eyes of the Colombian people and the international community, such a plan must be a Colombian-developed proposal with a proper balance between social and security concerns.

There is some question whether or not *Plan Colombia* was just joint US-Colombia propaganda ploy to ensure continued US support and funding for military efforts in Colombia, what Anderson terms a "symbolic" policy with no material substance (Anderson 2000, 14).  Anderson acknowledges that most policy exists somewhere along a broad continuum between material and symbolic, depending on how the policy is implemented (Anderson 2000, 14).  It would seem that *Plan Colombia* exists somewhere in the middle of this continuum, being neither completely symbolic nor material, but having both symbolic and material aspects.  A noted expert on Colombia's military and counter insurgency operations, Dr. Tom Marks, critiques *Plan Colombia* as "…a catalogue of national ills with proposed solutions beyond Bogotá's ability to operationalize or fund…"(Marks 2004).  Regardless of the origin of *Plan Colombia* or the agenda and intent of its authors, *Plan Colombia* has materially contributed to an improved situation in Colombia, although not without several negative side effects. Unfortunately, these unintended consequences affect the very people the policy is meant to help and include environmental degradation, internal population displacement, and a reduction, at least temporarily, in civil liberties.  As discussed in the preceding paragraph, it may be time to move on to a new strategy if not for the US, for Colombia.  The perceived umbilical cord to the US under *Plan Colombia* reduces Colombia's support from international sources and sparks internal suspicions founded in historic US regional intervention.  This is especially true when the US is almost universally viewed by the international community as hegemonic and too involved beyond its borders.

---

[20] Perhaps a new title is more appropriate; one that disassociates itself from the perceived military nature of *Plan Colombia* as well as perceived US sponsorship.

108

The credit for improving conditions in Colombia may be attributed as much to President Uribe as to his predecessor or *Plan Colombia*. In this regard, I concur with Marcella, Restrepo, and Spagat among others who argue that his austere fiscal policies and his emphasis on improved internal security through enhanced government legitimacy and police presence have directly contributed to dramatic changes in Colombia. President Uribe has taken the necessary steps to promote democracy and legitimize the government, implementing policies addressing most of the objectives found in *Plan Colombia*. His strategies appear to be paying off with the US fully supporting his efforts and the international community finally providing more backing. President Bush, in a recent visit to Colombia foreshadowed a renewal of US support for *Plan Colombia*, "The number of arrests is up. The number of murders is down. In other words, this man's plan is working" (Hunt 2004). Bush further remarked, "My nation will continue to help Colombia prevail in this vital struggle" (Miles 2004).

Understanding that foreign assistance will not be the deciding factor in the struggle, Uribe has involved the entire country in efforts to win the counter insurgency. Marcella writes that "Collective sacrifice for the common good has not been a shared value in Colombian culture, and the best efforts of the US Government and military are not likely to inculcate it" (Marcella 2003, 63). President Uribe appears to be accomplishing in Colombia what, as Marcella correctly points out, the US cannot. This is a nation, according to Latin American scholar Francisco Thoumi, "where society imposes very few behavioral constraints…and every Colombian has to develop his or her own ethical norms" (Thoumi 2002, 112). Under President Uribe, it appears a philosophical transformation is taking place in every socioeconomic class as well as in governmental institutions. This societal paradigm shift itself is arguably more important than any other single factor in determining the ultimate outcome of the conflict. This shift is further reflected in recent support for congressional legislation to allow Uribe to serve a second term as president. The bill is supported by 80% of Colombians and was approved in by a 113 to 16 majority vote in the Colombian House of Representatives clearing the way for the Constitutional Court's vote (BBC (2) 3004). Uribe's hard-line approach towards the insurgents and popular support of his policies combined with Colombia's ability to persevere as a nation through the worst times make a positive outcome more likely (Posado-Carbo 2004).

109

President Uribe put it simply during President Bush's recent visit, "We have made progress but the serpent is still alive" (Hunt 2004). Under the umbrella of *Plan Colombia* and through the efforts of a determined president, it appears that a corner has been turned and that Colombians have found the political will to shape their own destiny.

Public Policy Analysis and *Plan Colombia*

The complexities associated with the evaluation of *Plan Colombia* defined as a public policy process are numerous. The sheer diversity of actors involved with each stage of the policy process complicates an attempt to organize analysis. Methodological assessment is further hampered by the very broadly defined goals established in the plan. These broadly defined goals, however, are necessary for the long-term processes that must impact and influence social development, economic progress and the complex issues involved in the Colombian conflict. However, Anderson's approach allows for dissection of a complicated process. Waltz, referring to complex subjects, reminds us that, "to cope with difficulty, simplification is required" (Waltz 1979, 10).

Anderson's systematic approach to policy analysis provides three key insights that proved useful in understanding and evaluating *Plan Colombia* as a public policy process.

    (1) the focus on manageable segments, i.e. the five stages of policy process;

    (2) the importance of interrelatedness of the stages and flexibility in analysis; and

    (3) the evaluation of policy impact can occur at any time and is more art than science.

These insights helped to simplify a complex process, and to understand that each goal of *Plan Colombia* is dependent on the other. Furthermore, the final analysis is largely dependent on the analyst's background and perspective, individual interpretation of outputs and impacts, and what theoretical question he or she is attempting to answer.

Anderson believes that practitioners of policy must be willing to work in a dynamic environment and be able to accept, not resist change. Concerning *Plan Colombia*, the policy changes needed may be a reprioritization of the goals, or a change in approach to achieve a specific goal. Anderson suggests that broadly defined goals stated as absolutes may be detrimental to the overall policy process since absolutes are more easily seen as

110

000800

either 'complete failures' or 'complete successes' (Anderson 2000, 318). In this regard, *Plan Colombia* provides broad generalized goals to address the complex problems in Colombia providing an inherent flexibility that allows for policy adjustments concurrent with implementation of a long-term strategy.

Anderson's model may not be a perfect methodology for an analysis of *Plan Colombia*. However, its approach allows for a decomposition of the assessment into component parts. Some may argue that this assessment dismisses the relative importance of either the political culture or socioeconomic conditions. Other approaches to the analysis might have been based more on Political Systems Theory, Group Theory, or Elite Theory among others, some or all of which may have some utility in examining policy process in Colombia (Anderson 2000, 18). To be sure, the dynamic of elite governance over a group struggle for equality and basic security would have significant application in analyzing the processes at work in Colombia. The usefulness of these interpretive models should not be overlooked; narrowly using one theoretical lens distorts the overall picture.

The evaluation of complex policies that have foundations in one country's domestic public policy and another country's foreign policy, as is the case in *Plan Colombia*, merits further research. The methodology to evaluate such policies must clearly define and evaluate program goals from multidimensional and multinational perspectives that are not easy to balance. Many of these goals may be ambiguous and even conflicting when evaluated through different lenses. Theoretically, regardless of analytical point of origin, *Plan Colombia's* evaluation as a public policy should emphasize the impact of outcomes on Colombian society and to a lesser degree the impact on US citizens as a funded US foreign policy. Based on the experience of this author in the evaluation of *Plan Colombia*, it is difficult to achieve this balance.

The more complex a policy is, the more actors are potentially involved and the policy process and its subsequent evaluation become inherently more challenging. Moreover, in evaluating (bilateral) policy goals, analysts cannot lose sight of other aspects of the policy process such as operational efficiency, administrative accountability, international political concerns, allocation of funding and environmental impacts to name a few. The goal of public policy analysis must be to make clearer the processes at work, whether the policy is a bilateral initiative between two countries or a domestic one. It is

111

000801

not clear that Anderson's conceptual framework alone is sufficient to evaluate the development and implementation of *Plan Colombia;* however, his model provides a good starting point. As discussed previously, several other theories might help broaden understanding, create more questions and enrich the discourse. It remains to be seen whether *Plan Colombia* or subsequent policies will ultimately solve the many problems facing Colombia. However, objective policy analyses, using a variety of conceptual models, should continue to frame the discussion that helps to shape the development, implementation and evaluation of Colombian public policy.

112