

# EXHIBIT
# E-1

## LEA HOY

* No más licencias para buses
escolares y de turismo.                    (Pág. 1)
* ___ eplácito por posible
en ___ dimiento con el ELN.        (Pág. 1)
* Habrá nuevas zonas de ubicación
para autodefensas.                          (Pág. 5)
* Piden que el español sea lengua
de investigación.                             (Pág. 3)
* Le dieron bala al pandillero "Kike".
* Lea en Cristal: "Mi patrona no se
pone brasier".                                 (Pág. 18)
* En el editorial:
Monseñor Saúl Aramburo.               (Pág. 2)

# el Caleño

## la noticia diferente

Edición N° 8.497  Cali, Viernes 9 de Julio de 2004   Valor: $1000

# ¡SICARIADO SIN PIEDAD!

## LO ESPERABAN PARA MATARLO

000845





**JUDICIAL**

Santiago de Cali, Viernes  9  de Julio de

## Lo esperaban para matarlo

# ¡SICARIADO SIN

*\*-La víctima era comerciante en bienes raíces, según se indicó en medios judiciales.*

Quizás lo estaban esperando. Y no era propiamente para saludarlo.

Sus intenciones, aunque nadie pareciera notarlo a simple vista, eran "negras". Lo iban a matar.

Y "la zona rosa de Cali" se tiñó de sangre y de muerte.

Aparentemente "le montaron guardia" por un tiempo prolongado pero supu[...]mente no despertaron sospechas [...] las personas que poco antes del mediodía transitaban o cumplían sus labores en el sector de la Avenida Sexta de esta ciudad. O por lo menos, nadie reportó ante la Policía que había personas merodeando sospechosamente por el lugar.

La muerte estaba rondando y nadie lo percibía. Sólo los dos sicarios sabían lo que iba a pasar antes del mediodía.

Seguramente que ya lo tenían todo debidamente calculado, producto de un seguimiento arduo a la víctima, como es usual en este tipo de acciones delictivas.



*Era comerciante en bienes raíces.*

Y mientras tanto, ajeno a lo que se estaba planeando en su contra, un hombre de aproximadamente 50 años de edad, piel blanca, 1.75 de estatura y contextura mediana, se aprestaba a salir de uno de los edificios de la "zona rosa de Cali".

No se ha precisado si habitaba en algún apartamento del mismo o se hallaba allí en alguna visita o gestión de negocios. Pero de todos modos, ya los emisarios de la muerte estaban al tanto de sus movimientos y lo estaban esperando.

Y eran casi las once y 45 minutos de la mañana, cuando "la pelona" llegó por su cuota al barrio Granada, considerado en un tiempo como uno de los iconos de Cali y que ahora trata de recuperar su imagen perdida.

Desprevenido, sin presentir que se

acercaba su fin, el hombre de piel b[...] ca salió de un edificio situado e[...] calle 15 número 6N-37, a la vuelt[...] que otrora fuera el Teatro Bolívar[...] vestido con camisa negra de m[...] corta, pantalón jean de color a[...] correa negra y zapatos negros.

No alcanzó a dar muchos pasos fuera de la edificación. De repente sicarios se le acercaron y a quemar[...] le dispararon en forma repetida[...] dieron en la cabeza" y en el rostro[...] zándolo sin vida hacia el piso.

Todo fue muy rápido y confuso[...] gente comenzó a correr angustia[...] asustada mientras los pistole[...] aprovechando el caos, emprendía[...] fuga. Algunos dicen que se fueron una moto y otros aseguran que [...] en un automóvil. Pero en fin, en m[...] del miedo y el caos, no hubo quie[...] fijara en esos detalles y eso favor[...] las intenciones de los delincuente[...]

Tendido en el piso, con la cara h[...] el cielo, quedó tendido el hombr[...] la camisa negra. De los orificios de la en el rostro y el cráneo ya bro[...] sangre que regaba la Avenida Sex[...]

Las autoridades encargadas de diligencias de inspección judicia[...] cadáver señalaron que el inform[...] hombre respondía al nombre[...]



*Lo sorprendieron en plena "zona rosa de Cali".*



*Le propinaron varios tiros en la cabeza.*

(el Caleño)

Santiago de Cali, Viernes 9 de Julio de 2004

JUDICIAL

# PIEDAD!



*Su nombre era Salomón Hernando Velasco Haley.*

Salomón Hernando Velasco Haley, tenía 53 años de edad y, según lo señalaron personas allegadas a él, era comerciante en bienes raíces e inmuebles.

No se dieron a conocer en primer momento más detalles sobre la víctima o sobre sus actividades de negocios ni si estaba vinculado con alguna agencia inmobiliaria o trabajaba en forma independiente.

En cuanto a los posibles móviles del crimen, por el momento éstos permanecen en el misterio. La Policía asegura que trata de allegar algún dato sobre los sicarios interrogando a las personas allegadas a él, era como haber visto mientras aguardaban a que su víctima saliera del edificio.

Por ahora no se ha reportado sobre capturas en desarrollo de las pesquisas averiguatorias.

> "El crimen ocurrió en la "zona rosa" de Cali".



*Los curiosos se arremolinan en la zona donde ocurrieron los hechos.*

## Seminario sobre el sistema acusatorio

Un seminario-taller sobre el sistema acusatorio y las técnicas del juicio oral se iniciará hoy en esta ciudad, con el fin de informar y actualizar a empleados de la rama judicial y estudiantes de derecho sobre el nuevo sistema penal que se aplicará en el país a partir del próximo año.

La actividad se llevará a cabo en el Club de Ejecutivos desde las ocho de la mañana hasta las seis de la tarde y continuará mañana sábado con el mismo horario.

La apertura del seminario estará a cargo de Jaime Córdoba Triviño, magistrado de la Corte Constitucional y entre los conferencistas invitados se hallan Luis Eduardo Manrique Bernal, magistrado del Tribunal Superior de Bogotá; Floralba Torres Rodríguez, Oscar Julián Guerrero, asesor de la Procuraduría General de la Nación, entre otros.

El seminario está dirigido a profesionales, funcionarios y estudiantes de Derecho con el propósito de informar y actualizar sobre los procedimientos del contenido del nuevo código de procedimiento penal y las técnicas orales que se deberán aplicar en el nuevo sistema penal que entrará a regir el próximo año.

Las inscripciones e información sobre el evento pueden ser diligenciadas a través del Colegio de Abogados Penalistas del Valle, en la Avenida 2 Norte número 19-00 teléfonos 6850700 y 6534523.

A partir del próximo año, merced a la reforma a la Fiscalía se implantará el sistema acusatorio en Colombia y los fiscales sólo se limitarán a los aspectos investigativos, mientras que la instrucción del proceso y llamamiento a juicio corresponderán a los jueces.

Por eso, el evento es apoyado por la Fiscalía General de la Nación, en convenio con docentes de la Facultad de Derecho de la Universidad Nacional y el Colegio de Abogados Penalistas.

## Asalto en estación de servicio

Una estación de servicio del sur de la ciudad fue asaltada por cuatro hombres, en las últimas horas.

El caso se registró en la calle 16 con carrera 44 del sur de la ciudad, donde cuatro sujetos de tez negra llegaron armados, intimidaron a uno de los empleados y lo obligaron a entregar el dinero que se hallaba en la caja fuerte, cuya cuantía no fue especificada.

Se indicó que uno de los maleantes tenía una cicatriz en la cara.

Los asaltantes lograron huir.

## Asesinaron a Hugo

Por cuanto que las minorías dijeron desconocer, un reciclador fue ultimado a bala, en el oriente de esta ciudad.

Las autoridades identificaron a la víctima como Hugo Fernando Giraldo, de 22 años de edad, quien fue atacado cuando poco antes de las seis de la mañana se hallaba en la carrera 26 con diagonal 71C1 del barrio Villa del Lago de la capital del Valle.

Giraldo recibió varios balazos en diferentes partes del cuerpo, pero la policía dijo que carece de versiones en torno a las circunstancias que rodearon el homicidio.

La fiscalía 71 de turno en la URI adelanta las diligencias de ley.

## Prestamista fue "liquidado a bala"

De varios balazos en diferentes partes del cuerpo, pistoleros motorizados dieron muerte a un prestamista, en el sur occidente de esta ciudad, dijeron las autoridades.

El ahora occiso se movilizaba en motocicleta y fue atacado a tiros por sicarios que viajaban en un vehículo del mismo tipo.

El hecho se produjo a las ocho de la noche, en la carrera 96 con calle 4C del barrio El Jordán, en la comuna 18 de esta ciudad y tuvo como víctima a Freddy Amaya Bolaños, un hombre de 34 años de edad, de quien las autoridades dijeron que se ganaba la vida prestando dinero a interés.

Amaya Bolaños transitaba por la mencionada dirección en una motocicleta Freewind de color rojo y placas MSX 43 cuando fue sorprendido por individuos que ocupaban una motocicleta 125 de colores azul y blanco. Le dispararon repetidamente, alcanzándolo en el tórax y el cráneo. Lo llevaron de urgencias a la clínica del Valle del Lili, pero no sobrevivió al atentado.

La Fiscalía 53 de la URI adelanta las diligencias de ley.

En medios judiciales se cree que se trate de un atentado dirigido directamente a quitar la vida del prestamista, pues no hay evidencia de que en algún momento los pistoleros hubieran intentado apoderarse de la moto de su víctima.

!!Assassinated without Pity!!!  They were waiting to kill him.

Maybe they were waiting for him. And it wasn't to say hello.
At a glance, his intentions, even though no one seemed to notice, were "dark".  They were going to kill him.

And "La Zona Rosa of Cali" died of blood and death.

Apparently "they mounted guard" on him for a prolonged period of time, but supposedly they did not raise any suspicions between the people who shortly before the noon journeyed or fulfilled their work in the sector of sixth avenue of this city. Or at least nobody reported before the police that were people roaming suspiciously by the place.  The dead was making the rounds and nobody perceived it. Only the assassins knew what was going to happen before the noon.

Surely, they had everything calculated, a product of an arduous pursuit of the victim, which is usual in this type of criminal action.

And in the meantime, unaware of what had been planned against him, a man of approximately fifty years of age, fair skin, 5'10" and medium build, was getting ready to exit one of the buildings of "La Zona Rosa de Cali".

It has not been specified if he lived in an apartment building or he was there visiting or on business.  In any case, death emissaries were aware of his movements and were waiting.

It was almost 11:45 in the morning when "Death " came to the Granada suburb for its toll, considered at one point an icon of Cali and now they are trying to recover their lost image.

Off guard, without premonition that his end was coming, the man with fair skin came out of the building located in the 15th street, Number 6N-37, around from the Bolívar theater use to be, dressed in a black short sleeve shirt, blue jeans, black belt and black shoes.

He did not walk very far from the building when he was suddenly approached by the assassins to kill him; they shot him repeatedly, shooting him in the head and in the face, leaving him lying on his back on the floor.
Everything was so confusing and happened very fast.  People became scared and started to run, taking advantage of the confusion the assassins fled.  Some say that they left on a motorcycle, other are sure that they left on a vehicle.  At last, in the middle of caus and fear, nobody took time to look at those details and that favored the assassins intentions.

Spread on the floor, with the fact to the sky, the man with the black shirt laid dead.  From the bullet holes in the face and cranium blood was gushing and was spilling out on 6th Avenue.

The corresponding authorities in-charged of the corpse said that the unfortunate man went by the name of Salomón Hernando Velasco Haley was 53 years old and, according to people close to him, he was a Real State agent.



There were no details released at first about the victim, his business activities or if he had ties with any real state agency or if he worked independently.

As to the possible motives of the crime, at the moment these remain a mystery. The police are assuring that they are trying to collect information about the murder by interrogating people who could have seen the assassins while they were waiting for the victim to leave the building.

For now there have been no reports about any arrests made during the investigations.

*Same as COA?*

*Evidence?*

"I, Martha Cornejo, declare and certify that I am competent to translate documents from English to Spanish and Spanish to English."

*Martha Cornejo*
Martha Cornejo

000849

# EXHIBIT
# E-2

NIGHT
FILED
JAN 2 9 1996

CARLOS JUENKE
CLERK, USDC / SDFL / MIA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA )  CASE NO.  95-769-CR-GRAHAM
                                 )
v.                             ) **GOVERNMENT'S RESPONSE TO THE**
                                   ) **DEFENDANT'S OBJECTIONS TO THE**
SALOMON HERNANDO VALASCO-ALHEY, ) **PRESENTENCE INVESTIGATION REPORT**
  a/k/a Miguel J. Asseff        )
_____ )

     COMES NOW, the United States of America, by and through the undersigned Assistant United States Attorney, and files its response to the defendant's objections to the Presentence Investigation Report.

     1.   The defendant objects to paragraph nine (9) of the Presentence Investigation Report (PSI) which, pursuant to §2L1.2(b)(2), increases the offense level by sixteen (16) additional levels if the defendant was previously deported after a conviction for an aggravated felony. Application note 7 of §2L1.2 defines an aggravated felony to include "any illicit trafficking in any controlled substance." The defendant argues that as he is not an aggravated felon as he plead guilty to a "telephone count," in violation of 21 U.S.C. §§ 843(b), 843(c) and 18 U.S.C. §2, and therefore, does not fall within the purview of §2L1.2(1).

     In <u>United States v. Perez-Torres</u>, 15 F.3d 403 (5th Cir. 1994),

the defendant, Perez, was convicted of using an interstate communication facility to facilitate a felony drug transaction in violation of 21 U.S.C. §843(b). Pursuant to said conviction, Perez was deported. Perez later re-entered the United States and was indicted for illegally re-entering the United States, in violation of 8 U.S.C. §1326. In Perez-Torres, as in the instant case, the government filed a Notice of Intent to Seek Enhancement of Sentence under 8 U.S.C. §1326(b)(2). While the issue in Perez-Torres was whether the defendant's due process rights were violated, the Court implicitly found that conviction for use of an interstate communication facility to facilitate a felony, to wit, a drug transaction, in violation of 21 U.S.C. §843(b) did constitute an aggravated felony.

The defendant's only prior conviction, as in Perez-Torres, is for violation of 21 U.S.C. § 842(b). As the underlying offense involved illicit trafficking in a controlled substance, this Court should increase the defendant's offense level by sixteen (16) additional levels.

2.     The defendant objects to paragraph fourteen (14) which gives the defendant a two (2) level reduction for acceptance of responsibility. The defendant argues that, should the Court find that he is not an aggravated felon, then a two (2) level reduction is appropriate. However, if the Court finds that the defendant is an aggravated felon, he should be given a three (3) level reduction for acceptance of responsibility.

Section 3E1.1(a)(2) allows for a three (3) level only when the defendant "timely notif[ies] authorities of his intention to enter

. plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently . . ." U.S.S.G. §3E1.1(a)(2).

As this Court is well aware, the defendant did not timely notify the government of his intention to plead guilty. In fact, the defendant refused to plead guilty on two separate occasions. Consequently, this Court scheduled the case for trial. After this Court made all the necessary arrangements for trial, and only after the government had thoroughly prepared its case and subpoenaed all its witnesses, including an out of state witness, did the defendant announce his intention to plead guilty. This announcement came the very day the trial was scheduled to commence.

Therefore, the government would respectfully request that the defendant not receive an additional level reduction for acceptance of responsibility.

3.  The defendant objects to paragraph eighteen (18) which properly assesses the defendant three (3) points based on his prior criminal history. The defendant argues that to assess him criminal history points in addition to increasing his offense level by sixteen (16) points, constitutes double jeopardy or double counting.

The United States Sentencing Commission specifically allowed for an increase in offense level and an increase in criminal history points. It is apparent that to compute the defendant's sentencing guideline range in this manner does not constitute double jeopardy and said method of calculation was the intent of the United States Sentencing Commission. See, United States v.

<u>Adeleke</u>, 968 F.2d 1159 (11th Cir. 1992) (finding the Commission clearly intended for prior felonies to count against the defendant under both the criminal history section and criminal offense).

4. The defendant objects to paragraph fifty three (53) which alerts this Court, pursuant to §4A1.3, to the existence of reliable information that the defendant's criminal history may not adequately reflect his past criminal conduct or his likelihood that he would commit other crimes.

Pursuant to §4A1.3, this Court may consider this information as a basis for an upward departure or as a basis for imposing a sentence at the upper end of the applicable guideline range.

WHEREFORE, the United States of America respectfully requests that this Court overrule the defendant's objections and sentence the defendant pursuant to the United States Sentencing Guidelines as reflected in the Presentence Investigation Report.

Respectfully submitted,

KENDALL COFFEY
UNITED STATES ATTORNEY


YVONNE RODRIGUEZ-SCHACK
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 794686
99 N.E. 4th Street
Suite 600
Miami, Florida 33132-2111
Tel: (305) 536-5923
Fax: (305) 530-7976

cc: U.S. Probation Officer Ricardo Garcia
    Special Agent Rick Maxwell



# EXHIBIT
# E-3



- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    8/31/95

On August 25, 1995, at the Dade County Detention Center, Miami, Florida, Federal Bureau of Investigation (FBI), Special Agent (SA) PETER S. COLLIER, Drug Enforcement Administration (DEA) SA RENEE M. BABIC, and Los Angeles Police Department (LAPD) Detective FRANK X. GALVAN, contacted MIGUEL ASSEFF who is being held at this location. ASSEFF was being held by the Immigration and Naturalization Service (INS) for being in the country illegally.

The purpose of the visit was to solicit ASSEFF's assistance with unresolved matters in San Francisco, California, and Los Angeles, California. ASSEFF was advised that his cooperation is totally voluntarily, and that possible consideration could be given towards his INS problems. ASSEFF was advised specifically that he would be required to clarify and provide intelligence regarding all intercepted communications between he and ANA BEATRIZ BIOCINI, during the court authorized wiretap on BIOCINI's telephone. ASSEFF was receptive to this idea.

ASSEFF advised that he was currently trying to obtain an attorney. ASSEFF was having some problems getting together the necessary funds, and was against accepting a public defender. SA COLLIER advised ASSEFF that once he obtains an attorney, he should instruct his counsel to contact SA COLLIER so that negotiations for ASSEFF's assistance may begin.

ASSEFF advised that he has known BIOCINI for many years. ASSEFF advised that he and BIOCINI were childhood friends in Cali, Colombia. ASSEFF advised that he has never conducted any narcotic transactions involving BIOCINI. ASSEFF advised that they have spoken about conducting transactions, but they never materialized. ASSEFF advised that earlier this year, he attempted to broker a marijuana transaction between BIOCINI and people living in New York City, New York. ASSEFF advised that he was willing to elaborate on these comments, but first he requested the following conditions be met:

1. ASSEFF wants to be released from jail.

Investigation on   8/25/95    at   **Miami, Florida**

File #   281B-SF-112277

281B-SF-112277

Continuation of FD-302 of  MIGUEL ASSEFF _____ , On  8/25/95 , Page  2

   2.  ASSEFF wants to remain in the United States
      legally.

   3.  ASSEFF wants his two sons brought from Cali,
      Colombia, into the United States.

   4.  ASSEFF wants to be paid for his involvement.

    ASSEFF advised that he would consult with his attorney,
and instruct him/her to contact either SA COLLIER or DEA SA MIKE
CHASE.

039015



# EXHIBIT
# E-4

000858

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    2/16/96

On February 14, 1996 and February 15, 1996 MIGUEL JORGE ASSEFF, a Colombian citizen, Date of Birth June 1, 1951, was interviewed at the Federal Detention Center in Miami, Florida by SAs JEFFREY J. IVERSON and MARIO GALINDO. ASSEFF was interviewed with the knowledge and concurrence of his attorney, LUIS CAZUZO. ASSEFF was in custody pursuant to a finding of guilty for a felony immigration violation. On February 13, 1996 in Miami, Florida, ASSEFF was sentenced to 52 months in prison. The basis of the charge was ASSEFF's re-entry into the United States following a prior conviction on a federal felony narcotics charge.

ASSEFF spoke with the interviewing agents in both Spanish and English, mostly reverting to his native Spanish when he wished to clarify a statement.

ASSEFF was advised that the focus of the interviews was to be his knowledge of narcotics distribution by ANA BIOCINI, who ASSEFF knows by the name BEATRIZ JARAMILLO. After being advised as to the nature of the interview and the identity of the interviewing Agents, ASSEFF provided the following information:

ASSEFF has known ANA BIOCINI since he was 18 years old. They first met in Cali, Colombia, where they both grew up. ASSEFF stated that BIOCINI was born and raised in Cali. ASSEFF is acquainted with members of BIOCINI's family, including her sister, PATRICIA JARAMILLO, and brother, HERNAN. ASSEFF was aware that HERNAN JARAMILLO had in earlier years served a prison sentence, perhaps for money laundering charges. ASSEFF thought that JARAMILLO's criminal trouble stemmed from having helped his sister, ANA BIOCINI.

ASSEFF and BIOCINI lost touch with each other for approximately 20 years. Then, in approximately April, 1994, ASSEFF re-initiated contact with BIOCINI, having first sent her a letter to her Sausalito post office address. Shortly after, ASSEFF called BIOCINI at her residence in Sausalito, California. ASSEFF explained that among his reasons for contacting BIOCINI at that time was to borrow $2000. He added that BIOCINI never lent him this money, but at the time stated she had a bank account in the Caymen Islands.

201B-SF-112277

Investigation on MARIO GALINDO        at _____
SA JEFFREY J. IVERSON                                    2/16/96

File #  _____        Date dictated  _____

by  _____

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

281B-SF-112277

Continuation of FD-302 of   MIGUEL JORGE ASSEFF _____ , On   2/15/96 , Page   2

      For a period of approximately 13 months, after initially contacting BIOCINI in April, 1994, ASSEFF advised that he and BIOCINI had numerous conversations regarding cocaine and marijuana trafficking. The vast majority of these conversations focused on ASSEFF's efforts to arrange 20 to 50 kilogram cocaine purchases from BIOCINI. During many of these conversations ASSEFF was living in Los Angeles.

      Through his conversations with BIOCINI, and as a result of his knowledge of cocaine dealers in Colombia, ASSEFF learned much about BIOCINI's cocaine-distribution operation. ASSEFF described his knowledge of BIOCINI's operation, and of her drug associations, at the onset of the interview. Later in the interview ASSEFF and the interviewing agents reviewed tapes of conversations between him and BIOCINI. The information initially provided by ASSEFF was supported by the tapes.

      ASSEFF stated that BIOCINI had cocaine suppliers within the Cali and the Medellin cocaine cartels. BIOCINI's cocaine contact in the Cali cartel was SANTIAGO VELEZ, described by ASSEFF as an upper level cartel member who is well known in Cali.

      BIOCINI's Medellin contact was known to ASSEFF by the nickname, "CONEJO". ASSEFF knows only that this person's first name is JORGE, and that he owns a jewelry store in Medellin, Colombia. "CONEJO" has a close contact by the name of GABRIEL LONDONO, who served time in New York on unknown charges. ASSEFF met "CONEJO" approximately 15 years ago and described him as tall and thin, and who today would be approximately 40 years old. According to ASSEFF, BIOCINI spoke more about her cocaine contacts in Medellin, and often made references to these contacts using the code "la finca" (the ranch) in that there was a ranch near Medellin which was associated with these persons, and which these persons used as a weekend retreat.

      ASSEFF recalled instances in 1994 and early 1995 when BIOCINI was having difficulty obtaining cocaine from her Cali contacts, stating that for some reason, during one period, suppliers in Cali were holding back shipments of cocaine to the United States. BIOCINI told ASSEFF that she was not too concerned by this because she had additional contacts in Medellin who could supply her with up to 50 kilograms of cocaine.

      BIOCINI's suppliers made arrangements for BIOCINI to pick up supplies of cocaine in Los Angeles, California. BIOCINI picked up loads of approximately 20 kilograms. BIOCINI was "fronted" the cocaine. BIOCINI told ASSEFF that she used her husband, GEORGE

JUN-03-98  22:18  From:US ATTORNEYS STRIKE FORCE              4154366753              T-815  P.06/19  Job-217

FD-302a (Rev. 10-6-95)

281B-SF-112277

Continuation of FD-302 of  __MIGUEL JORGE ASSEFF_____. On __2/15/96__. Page __3__

BIOCINI to pick up the cocaine and later return to Los Angeles with the payment. During conversations with BIOCINI, BIOCINI and ASSEFF referred to GEORGE BIOCINI by the nickname, "TONO", a name that BIOCINI used to conceal GEORGE BIOCINI's identity from others and because she repeatedly had concerns that her telephone lines were tapped by law enforcement.

Discussions between ASSEFF and ANA BIOCINI regarding ASSEFF's efforts to purchase cocaine from BIOCINI took place over the telephone and face-to-face. ASSEFF recalled an incident in the Summer of 1994, in about July, in which BIOCINI flew to Los Angeles to meet ASSEFF, to discuss negotiations for a 20 kilogram deal. ASSEFF clearly recalled that this meeting took place during the World Cup soccer games. ASSEFF stated that he met ANA BIOCINI at the Los Angeles airport and noticed that BIOCINI was being followed by two people he suspected to be law enforcement officers. ASSEFF was with his girlfriend, ANDREA SPIELMAN, and was driving Ms. SPIELMAN's black BMW 633. ASSEFF pointed out to BIOCINI that she had been followed by persons suspected of being law enforcement. Upon leaving the airport with BIOCINI and SPIELMAN, ASSEFF drove evasively to elude the surveillance. Negotiations that day between ASSEFF and BIOCINI broke down, in part because of their suspicion that BIOCINI had been followed by law enforcement. BIOCINI soon returned to the Bay Area.

Sometime after this meeting in Los Angeles, ANA BIOCINI called ASSEFF and told ASSEFF she was driving to Los Angeles with GEORGE BIOCINI. ASSEFF expected to hear from ANA BIOCINI once she and GEORGE arrived, but he did not.

Sometime after this second trip by ANA BIOCINI to the Los Angeles area, ANA BIOCINI called ASSEFF in search of someone who was willing to return 4 kilograms of poor quality cocaine to her source in Los Angeles. She explained that "TONO" (GEORGE BIOCINI) had originally picked up a 20 kilogram load and delivered the cocaine to her in Sausalito. BIOCINI later determined that 4 of the kilograms were of poor quality, and she asked GEORGE BIOCINI to return the 4 kilograms. GEORGE BIOCINI refused, stating that he was then earning adequate money in real estate, and did not wish to continue to take such risks. As a result, ANA BIOCINI needed someone to transport the cocaine. ASSEFF declined, and does not know how this situation was resolved.

ASSEFF made two trips to Sausalito, California, to meet ANA BIOCINI. The first of these trips took place sometime after June, 1994. The second took place in mid-March, 1995. During the first of these trips ASSEFF went to ANA BIOCINI's Sausalito home

FD-302a (Rev. 10-6-95)

281B-SF-112277

Continuation of FD-302 of __MIGUEL JORGE ASSEFF_____ , On __2/15/96__ , Page __4__

one time. During the second trip, ASSEFF met ANA BIOCINI at her home two times.

During the first of these trips, ASSEFF met GEORGE BIOCINI at ANA BIOCINI's Sausalito residence. Also during the first of these trips, ASSEFF was accompanied by a male friend whose nickname was "COQUITO". COQUITO travelled with ASSEFF, hoping to take part in the cocaine deal that was the subject of on-going negotiations between ASSEFF and ANA BIOCINI.

According to ASSEFF, none of the cocaine deals he and BIOCINI discussed ever came to fruition. ASSEFF said that BIOCINI never trusted him enough to "front" him with the number of kilograms he wanted to buy, adding that a "front" would be necessary because he did not have the money to pay for the cocaine in advance. In other instances, BIOCINI claimed that she was having difficulty locating supplies of cocaine when ASSEFF was ready for such purchases.

One scheme arranged by ASSEFF to build trust with BIOCINI was to have an associate in Colombia offer BIOCINI collateral, in the form of real estate, as a guarantee for payment for cocaine which ASSEFF wanted to obtain from BIOCINI. ASSEFF identified one such associate as a Colombian man who went by the nickname, "PACHO". PACHO's true name is FRANCISCO RENGIFO. ASSEFF further explained that "PACHO" is the husband of the niece of an associate by the name of ALFREDO CURE, known by the nickname, "El Brujo". CURE is a mutual associate of ASSEFF and BIOCINI. ASSEFF had arranged for RENGIFO to send BIOCINI a facsimile of a deed for a parcel of land in "Calima". ASSEFF further explained that "Calima" was a code used by ASSEFF and BIOCINI to represent Cali, Colombia, where there is a lake known as "Calima". On a separate occasion, ASSEFF had arranged for his associate, "COQUITO", to send BIOCINI a facsimile of properties which "COQUITO" alleged he owned and which were valued at over $1.4 million. These properties were also to be used as collateral by ASSEFF to get BIOCINI to front cocaine to ASSEFF.

In the spring of 1995, after he moved to Miami, Florida, ASSEFF devised another plan to put together a cocaine deal with BIOCINI. While in Miami, ASSEFF met a Cuban male named PEPE HURTADO, who owns a chain of supermarkets. HURTADO told ASSEFF he wished to buy 3 to 4 kilograms at a time, for several days in a row. ASSEFF had several telephone discussions with BIOCINI regarding HURTADO's cocaine order. It was ASSEFF's belief that this business offer held out promise because the buyer (HURTADO) would be able to pay for the cocaine "up front", and thus eliminate the

JUN-03-98 22:19  From:US ATTORNEY STRIKE FORCE          4154366753          T-815 P.08/19 Job-217

FD-302a (Rev. 10-6-95)

281B-SF-112277

Continuation of FD-302 of   MIGUEL JORGE ASSEFF _____ , On  2/15/96 . Page   5

difficulties ASSEFF had been having with BIOCINI in getting cocaine "fronted" to him. In one discussion with BIOCINI about this proposal, ASSEFF stated that he referred to the kilograms of cocaine as "white cards", as opposed to "green cards" (marijuana). ASSEFF stated that this deal never materialized because HURTADO never came through with the money.

ASSEFF knew from his discussions with ANA BIOCINI that she had a contact for marijuana. ASSEFF learned that this person was a Cuban male, who was also one of her cocaine customers. ASSEFF also knew from ANA BIOCINI that the Cuban male had a girlfriend who left him in early 1995. It was ASSEFF's impression that this Cuban male lived near ANA BIOCINI.

ASSEFF stated that in March, 1995 he tried to put together a marijuana deal with BIOCINI. Again, BIOCINI was to supply the drugs, which ASSEFF intended to distribute to contacts in New York. ASSEFF added that he was very broke at the time and was continuing to attempt to find a means of setting up narcotics deals with BIOCINI.

It was ASSEFF's belief that BIOCINI may have contacts with marijuana suppliers, given Northern California's reputation as a source of high grade marijuana. During his trip to Sausalito in March, 1995, ASSEFF negotiated with BIOCINI to set up a marijuana deal.

BIOCINI arranged to supply ASSEFF with slightly more than one pound of marijuana which was to serve as a sample for ASSEFF's New York contacts. BIOCINI charged ASSEFF at the rate of $900 per pound for the marijuana, and ASSEFF paid approximately $1200 for what BIOCINI supplied him. ASSEFF recalled that BIOCINI kept the marijuana in a hiding place in the laundry room. ASSEFF and BIOCINI agreed that this could lead to marijuana deals in the range of 50 to 100 pounds per delivery.

ASSEFF took the marijuana to New York soon after this March, 1995 meeting with ANA BIOCINI. ASSEFF stated that his New York contacts rejected the quality of the marijuana based on the belief that it was a mixture of two different types of marijuana. As a result, ASSEFF lost money on this deal and no further marijuana transactions were arranged between him and BIOCINI.

ASSEFF recalled that, while he was at ANA BIOCINI's residence in mid-March, 1995, the Cuban male marijuana supplier referenced above visited BIOCINI's home. ANA BIOCINI asked ASSEFF to remain in another room so that he did not meet this person, but

JUN-03-98  22:20  FROM:US ATTORNEYS OFF STRIKE FORCE          366753          7-815  P.09/19  Job-217

FD-302a (Rev. 10-6-95)

281B-SF-112277

Continuation of FD-302 of   MIGUEL JORGE ASSEFF _____ .On ___2/15/96___ .Page ___6

ASSEFF was able to overhear a conversation between BIOCINI and this Cuban male. ASSEFF said he was able to tell from the accent that this person was from Cuba. During the time that ASSEFF was in another room while BIOCINI and the Cuban male spoke, ASSEFF recalled having placed a lengthy telephone call to his girlfriend in Los Angeles, California, from BIOCINI's home telephone.

ASSEFF stated that during his discussions with ANA BIOCINI in early 1995, BIOCINI became increasingly more concerned that her telephone was being wiretapped and that law-enforcement officers were following her. ASSEFF identified codes, in addition to the nicknames and codes already referenced, which were used by him and BIOCINI during their many telephone conversations. Codes used (in Spanish) are listed below. It is noted that ASSEFF identified these codes and nicknames, and those previously identified prior to reviewing the tapes of conversations between him and BIOCINI. These additional codes included:

"el profesor" (the professor), which was used to refer to the head of the cocaine distribution organization associated with ANA BIOCINI;

"el doctor" (the doctor), which was also used to refer to the head of the cocaine distribution organization associated with ANA BIOCINI:

"Calima", which was used to refer to Cali, Colombia

"El Polado", which was used to refer to Medellin, Colombia

ASSEFF listened to the taped telephone conversations which follow, and was asked to furnish clarification about the codes used between BIOCINI and ASSEFF in these conversations and about the true nature of the discussions.

ASSEFF was played a taped telephone conversation between him and ANA BIOCINI, which occurred on January 24, 1995, at 10:35 AM.

In summary, during this conversation BIOCINI and ASSEFF made references to an illness that BIOCINI had recently suffered, to taking her pills, and to BIOCINI seeing the same "doctor". ASSEFF remarked that BIOCINI should consider taking a vacation away from her home because of this. BIOCINI told ASSEFF not to call anymore, adding that she does not like it that when ASSEFF calls her because she is left waiting too long.

FD-302a (Rev. 10-6-95)

281B-SF-112277

Continuation of FD-302 of __MIGUEL JORGE ASSEFF__ , On __2/15/96__ , Page __7__

    ASSEFF stated to the interviewing agents that the terms, "illness", "pills" and "doctors" were used to express BIOCINI's concerns that she had recently noticed persons surveilling her. ASSEFF recommended that BIOCINI leave the area for a while until these surveillances stop. ASSEFF explained that BIOCINI's statement about being left to wait too long referred to BIOCINI's worry about waiting at pay telephones for ASSEFF to call her. ASSEFF said that when BIOCINI told him she was having a good day, she was telling ASSEFF that she was expecting good news that day about a cocaine supply.

    In this same conversation, ASSEFF told BIOCINI that he would send her a "fax" that day by 1:00 PM. BIOCINI asked ASSEFF if the fax was about the matter in "Calima" that they had previously discussed. ASSEFF responded that this was why he needed to speak with BIOCINI, that the "mother" is the owner of the property, and that "El Polado" knows the mother. BIOCINI said she wanted documentation to support this woman's ownership of the property. ASSEFF replied that this documentation would be faxed to BIOCINI. BIOCINI told ASSEFF that she would put her "faith" and time into this project.

    ASSEFF told agents that the "fax" mentioned above was in reference to documents which demonstrated proof of ownership of the property in Colombia that ASSEFF wanted to use as collateral in obtaining cocaine from BIOCINI. The property was in fact in the name of the mother of "PACHO", ASSEFF's associate, and ASSEFF was informing BIOCINI that this woman was well known. During this conversation, BIOCINI was telling ASSEFF that BIOCINI wished to see documentation proving the ownership of property, and that she would apply effort in seeing that this cocaine deal with ASSEFF was completed.

    ASSEFF was then played a taped telephone conversation between him and BIOCINI that occurred on January 24, 1995, at 7:31 PM.

    In summary, during this conversation ASSEFF asked BIOCINI if the fax had arrived. ASSEFF can be heard in the background, asking someone if the fax had been sent from Colombia. Before ASSEFF continued speaking, BIOCINI warned ASSEFF to be careful about what he said on the line. ASSEFF asked if BIOCINI spoke with the "Pueblo". BIOCINI replied that the person was on vacation and would return later that night. BIOCINI agreed to call this person the following day. ASSEFF told BIOCINI that all of his telephone lines where he was were new. BIOCINI suggested that people around her have figured things out and that they are interested in her

000865

FD-302a (Rev. 10-6-95)

281B-SF-112277

Continuation of FD-302 of    MIGUEL JORGE ASSEFF _____ , On __2/15/96__ , Page __8__

area or zone. ASSEFF said he would leave the following Monday and would wait for her. As ASSEFF began to mention locations, BIOCINI warned him not to mention cities over the telephone. ASSEFF asked BIOCINI to call the following day, and BIOCINI then accused ASSEFF of not following through on his promises in the past. ASSEFF told BIOCINI to "put on her batteries" for this matter. BIOCINI asked about the fax from "Calima" and when she could expect it. ASSEFF then placed a man on the telephone who identified himself as "PACHO". "PACHO" stated he was associated with the property. PACHO then told BIOCINI she could expect the fax the following day, but warned BIOCINI that telephone lines down there may not be working because of the recent earthquake. BIOCINI said that she wanted to. be reached on her pager when the fax was sent.

ASSEFF told agents that in this conversation he informed BIOCINI that the fax containing information about the property in Colombia to be used as collateral for the cocaine deal would be sent to BIOCINI shortly. In the background ASSEFF asked "PACHO", who was in Los Angeles with ASSEFF, if the persons in Cali had sent the fax yet. BIOCINI told ASSEFF that her cocaine contact in Colombia ("El Pueblo") was away from town but would return that night. BIOCINI agreed to call this person the following day. When BIOCINI referred to persons being interested in her zone, she was saying that it appeared that law enforcement seemed to have developed an interest in the drug activity occurring in BIOCINI's neighborhood. ASSEFF recalled that on other occasions BIOCINI had commented that she had begun noticing surveillance in her neighborhood and was concerned. BIOCINI once told ASSEFF that she had asked her friend, the girlfriend of her Cuban male marijuana supplier, to conduct a check through her contacts to determine if there was a law enforcement investigation occurring in her area.

When BIOCINI accused ASSEFF of not fulfilling his promises in the past, ASSEFF explained that she was referring to the incomplete negotiations between BIOCINI and ASSEFF that had taken place when BIOCINI flew to Los Angeles, California in July, 1994. ASSEFF placed "PACHO" on the telephone with BIOCINI as a means of increasing ASSEFF's credibility with BIOCINI, to demonstrate how serious ASSEFF was, and to demonstrate his wish to complete the cocaine deal.

ASSEFF then listened to a taped telephone conversation between him and BIOCINI that occurred on January 26, 1995, at 10:15 AM.

In summary, ASSEFF apologized to BIOCINI during this conversation. He told BIOCINI that he was honest and that he meant

FD-302a (Rev. 10-6-95)

281B-SF-112277

Continuation of FD-302 of  __MIGUEL JORGE ASSEFF_____ , On __2/15/96__ , Page ___9___

no wrong when he went to "COQUITO"; he simply wanted to show
"COQUITO" things as they were. ASSEFF stated he felt bad about the
situation and admitted to having made a mistake. ASSEFF said he
went with another person in an honest manner and told BIOCINI that
he would not cheat her. BIOCINI continuously warned ASSEFF
throughout this conversation that he should be careful about what
he says over the telephone line, that she did not want to commit
mistakes again on the "line". BIOCINI asked ASSEFF how much money
he stood to make on this deal. ASSEFF told BIOCINI that he would
make the contract right for her. BIOCINI told ASSEFF that she was
not on ASSEFF's side, but entirely on the other side. BIOCINI
stated that all she was asking for was collateral. ASSEFF
responded, telling BIOCINI that she would not earn as much if she
did not want to take responsibilities. BIOCINI stated that she
would not do it for less, and that ASSEFF had no right to tell her
how much she could earn. BIOCINI was upset and cut the call off.

        ASSEFF told agents that this conversation related to an
argument he and BIOCINI had over the profit each of them should
earn on the sale of the cocaine that BIOCINI was to supply to
ASSEFF. ASSEFF said that in an earlier conversation with BIOCINI,
BIOCINI had accused him of attempting to take a higher profit than
her, and she became upset. ASSEFF said that the reference to
"COQUITO" was made in this conversation because "COQUITO" was to
have been one of ASSEFF's cocaine customers in this deal. The
collateral BIOCINI mentioned referred to the real property that she
had insisted on as collateral before fronting ASSEFF cocaine.
ASSEFF explained that initially, he was negotiating with BIOCINI
for the supply of 50 kilograms of cocaine, but by this point in his
discussions with her he would have been happy to receive any amount
of cocaine that her suppliers would have furnished.

        ASSEFF next listened to a taped telephone conversation
between him and BIOCINI that occurred on January 26, 1995, at 10:55
AM.

        In summary, ASSEFF asked BIOCINI during this conversation
to go to a pay telephone and call him so that they could speak
further. ASSEFF insisted that BIOCINI let him explain things and
that they reach an agreement. ASSEFF told BIOCINI that she would
have the fax by the afternoon, adding that this fax would contain
the name of the woman, her telephone number and address in
Colombia. ASSEFF assured BIOCINI that this woman would be
responsible for her son and that she would show the ranch. BIOCINI
responded that she called a person, but that the person was at the
ranch. This same person was calling BIOCINI about the conference
that he had. BIOCINI stated this was what she and ASSEFF must wait

000867

FD-302a (Rev. 10-6-95)

281B-SF-112277

Continuation of FD-302 of __MIGUEL JORGE ASSEFF_____ , On __2/15/96__ , Page __10__

for, that things must occur step-by-step. ASSEFF stated he would
send the photocopy. BIOCINI said that (the photocopy) was one of
the first things her contact would ask for. ASSEFF urged BIOCINI to
call him back from a pay telephone so that ASSEFF could explain two
available options.

ASSEFF explained to agents that during this conversation
he told BIOCINI he was going to send the fax which would contain
information about the property to be used as collateral for the
proposed cocaine deal, and that this fax would contain information
about the woman (PACHO's mother) who owned the property. ASSEFF
explained that this woman would be responsible for ensuring the
collateral for her son (PACHO), and that she was willing to show
the property to BIOCINI's people if necessary. BIOCINI told ASSEFF
that she had placed a call to her cocaine supplier, but that this
person was at the weekend ranch at that time, and had gone to
attend a meeting with others to discuss the matter about supplying
cocaine to BIOCINI for ASSEFF. BIOCINI told ASSEFF that they had to
wait for information about her supplier's decision. With respect to
the photocopy, ASSEFF said that referred to documentation ASSEFF
was to send to BIOCINI that demonstrated proof of title for the
property to be used as collateral for the proposed cocaine deal.
BIOCINI told ASSEFF that this paper work was very important because
it would be one of the first items her cocaine supplier would
require if he were to agree to furnish cocaine in this case. ASSEFF
wanted BIOCINI to call him (ASSEFF) because he wanted to discuss in
detail two options for arranging the use of this collateral to
complete the cocaine deal.

ASSEFF next listened to a taped telephone conversation
between him and BIOCINI that occurred on January 31, 1995, at 1:33
PM.

In summary, during this conversation ASSEFF continued to
apologize to BIOCINI for what happened between them. ASSEFF began
to explain matters to BIOCINI, who again warned ASSEFF about the
telephone line. ASSEFF then explained that when one buys a property
on auction that was repossessed by the bank, one invests his/her
money at equal risk with the other investors, and that each
investor earns and loses the same. BIOCINI stated that it was not
possible for her to do things the way ASSEFF wanted, that her
contacts were not interested in that. ASSEFF then told BIOCINI that
he had spoken with ADRIANA DE BEBUTT, who said she would put ASSEFF
in direct contact with GABRIEL LONDONO and "EL CONEJO". BIOCINI
told ASSEFF to do as he pleased, and later in the conversation said
that this "compania" (company) had told her to discard ASSEFF's
matter. BIOCINI was upset and ended the conversation.

JUN-03-98 22:23  From:US ATTORNEYS OFF ST FORCE            4154366753                P.14/19  Job-217

1a (Rev. 10-6-95)

B-SF-112277

lation of FD-302 of    MIGUEL JORGE ASSEFF _____ , On  2/15/96  , Page  11

      ASSEFF told agents that during this conversation, he and
BIOCINI were still arguing about how they would divide the profit
of the cocaine sale. ASSEFF used the example of purchasing real
estate as a coded example to explain to BIOCINI how each of them
should share equally in the risk and gain of selling the cocaine.
BIOCINI disagreed because she wanted a larger share of profit. When
BIOCINI was unreceptive, ASSEFF insinuated to BIOCINI that he was
capable, through a friend named ADRIANA DE REBUTT and GABRIEL
LONDONO, of making direct contact with BIOCINI's cocaine (Medellin)
supplier, "EL CONEJO". BIOCINI responded that ASSEFF could do as he
pleased, but that she had already been told by those persons that
they were not interested in conducting business with ASSEFF. ASSEFF
said that when BIOCINI referred to the company, she was indicating
the cocaine suppliers in Medellin, Colombia. ("EL CONEJO" is the
nickname of BIOCINI's Medellin cocaine supplier, whose true first
name is JORGE.)

      ASSEFF reviewed a taped telephone conversation between
im and BIOCINI that occurred on March 29, 1995, at 9:17 AM.

      In summary, during this conversation ASSEFF told BIOCINI
that he had the money, in Miami, for 25 units. BIOCINI asked if
ASSEFF was referring to the "white card" or the "green card".
ASSEFF specified the "white". ASSEFF wanted BIOCINI to find the
product and give him a figure so that he could determine if the
deal would be viable. BIOCINI expressed anger over their last
arrangement that did not work. ASSEFF told BIOCINI that he had
taken a personal loss of $2700 on that deal, but was not
complaining. ASSEFF stated that he had a check for "425 pesos" and
wanted the price to fall between "15 1/2 and 16". BIOCINI responded
that a friend from Miami was then calling her about the same thing.
BIOCINI stated that she had spoken with her friend the previous day
and that the friend was expecting the arrival of an unnamed person.
ASSEFF told BIOCINI that he had the money only until the following
Friday. BIOCINI said she could not do things that fast, and that
she would not speak to her person until the following Saturday.
ASSEFF stated he would have to check with his contact to see if the
deal could go beyond the following Friday. BIOCINI asked about the
collateral. ASSEFF responded that he would give "papers" for "one",
and that BIOCINI could then come with as many as 3 or 4. BIOCINI
said she had a friend in Miami, but that she would have to go in
person to set up the deal. BIOCINI and ASSEFF argued about who
would pay for her plane fare if she flew to Miami. BIOCINI said she
would not contact her person until she heard from ASSEFF on the
following Saturday. ASSEFF confirmed that his friend with the
"papers" was the man who owned the supermarkets. BIOCINI said she
was told the thing was ready to arrive. BIOCINI's friend, who would

FD-302a (Rev. 10-6-95)

281B-SF-112277

Continuation of FD-302 of   MIGUEL JORGE ASSEFF _____ , On   2/15/96   , Page   12

  contact her on Saturday, told BIOCINI to remain there until he
called her. BIOCINI told ASSEFF that she often calls "Macondo"
(Colombia), and she is worried that those calls could be
wiretapped. ASSEFF told BIOCINI that his contacts would buy "25-28"
depending on the price. ASSEFF wanted to sell 5 of the items per
day. BIOCINI stated she had a kid there (in Miami) who could move
them. ASSEFF stated that when he returned to Los Angeles the
following week to collect money, he would have the money to buy
more.

   ASSEFF told agents that in this conversation he told
BIOCINI he had access to $425,000 from an associate in Miami, to be
used for the purchase of 25 to 28 kilograms of cocaine at $15,500
to $16,000 per kilogram. ASSEFF said that BIOCINI used the code,
"white card" for cocaine and "green card" for marijuana. BIOCINI
talked of traveling to Miami to set up the supply of the cocaine.
BIOCINI referred to her calls to cocaine suppliers in Colombia as
her calls to "Macondo", and expressed concern that these calls
could be wiretapped by law enforcement.

Cf. R's

dec E

low level

portrayal

which is accurate?

# EXHIBIT
# E-5



JUN-03-98  22:24  From:US ATTORNEYS OFF STRIKE FORCE              415436675           T-815  P.18/19  Job-217

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    6/2/98

    HERNANDO VELASCO, date of birth June 1, 1951, was interviewed at the United States Marshals Service, San Francisco, California, by the interviewing agents and Assistant United States Attorney (AUSA) Barbara Brennan-Silano, on May 27 and May 28, 1998.  VELASCO was advised that the purpose to the interview was to know if he would testify as a government witness in a federal trial against ANA BIOCINI, and, if so, to review information about BIOCINI which VELASCO previously furnished to the Federal Bureau of Investigation (FBI) in a 1996 interview.

    VELASCO, who is currently serving a federal prison sentence for re-entry into the United States as an undocumented alien with a prior conviction, stated a willingness to provide information and to testify and wanted to know if in return he could receive a reduction in his remaining year in prison, and/or avoid deportation to Colombia upon completion of his sentence.

    Interviewing agents and AUSA Silano clearly stated to VELASCO that no assurances could be made regarding either a reduction in his sentence or his ability to remain in the United States upon his release from prison. AUSA Silano stated that she would make VELASCO's cooperation known to the appropriate Department of Justice authorities. With this understanding, VELASCO provided the following information.

    VELASCO communicated with the interviewers primarily in English but used Spanish, his native language, to communicate with Special Agent (SA) Mario Galindo, when he wanted to clarify information that he did not understand as well in English.

    VELASCO informed that in the past he has used the aliases of MIGUEL JORGE ASSEFF and SALIM NITRI, and an alternate birth date of June 1, 1948. He also informed that he also knows ANA BIOCINI by her other name, BEATRIZ JARAMILLO.

    VELASCO has known BIOCINI since they were both young and lived in Cali, Colombia. He and BIOCINI socialized in the same circle of friends.

    VELASCO estimated that it was in about 1993, when he returned to Colombia from Europe, that he learned that BIOCINI

03925 1

---

Investigation on    5/28/98    at San Francisco, CA

File #  281B-SF-112277                         Date dictated    6/2/98

by  SA's Mario Galindo and Steve L. Christie/mg

U.S. ATTORNEYS OFF STRIKE FORCE
415438
T-815  P.17/19  Job-217

FD-302a (Rev. 10-6-95)

281B-SF-112277

Continuation of FD-302 of  HERNANDO VELASCO                    , On  5/28/98  , Page  2

lived in California and selling cocaine that she obtained from
suppliers in Colombia. He first heard that BIOCINI was successful
cocaine dealer in the United States in about 1986, from a former
boyfriend of BIOCINI's. VELASCO estimated that he became involved
in the sale of cocaine some years before BIOCINI was.

It was in 1994 that VELASCO sought to get into contact
with BIOCINI in California, and he obtained a post office box
address for her from a friend in Colombia. It was VELASCO's
intention to contact BIOCINI so that he could become involved
with her in the sale of cocaine in California and he hoped that
through BIOCINI he could establish some valuable connections.
VELASCO's first attempt at contacting BIOCINI was with a letter
that he mailed to her post office address.

VELASCO moved to Los Angeles, California in early 1994.
By then he had provided BIOCINI with his pager number in a
letter. In about April, 1994, VELASCO received a page from
BIOCINI. His call to her was the first time that the two spoke in
years. VELASCO remembered that BIOCINI made remarks about how
fortunate the timing was that he had contacted her when he did.
She asked VELASCO if he had any cocaine available. VELASCO said
that he did not. BIOCINI said that she would perhaps be able to
obtain some the following week and would tell VELASCO if so.

VELASCO and BIOCINI had several subsequent telephone
conversations in which they reached an understanding that each
would provide the other with cocaine depending on who was able to
find supplies.

VELASCO explained that in the cocaine trade, it is a
basic condition that at times some cocaine suppliers will have no
cocaine available. Because of this, it is not uncommon that
sometimes the person who is typically the customer of a supplier,
becomes a supplier instead. VELASCO said that his understanding
in dealing cocaine with BIOCINI in part rested on this premise.

At the time that VELASCO began his contact with BIOCINI
in 1994, cocaine supplies to California from Cali, Colombia were
low.

VELASCO said that, as he had informed agents in his
previous interview, he knew that BIOCINI had made connections

039252

JUN-03-98  22:25  From:US ATTORNEYS OFF STRIKE FORCE                4154366752           T-815  P.18/19  Job-217

FD-302a (Rev. 10-6-95)

281B-SF-112277

Continuation of FD-302 of  **HERNANDO VELASCO**                                         .On **5/28/98**      .Page    3

with well known cocaine suppliers from Cali and Medellin, Colombia. VELASCO named SANTIAGO VELEZ from Cali and a Colombian cocaine supplier from Medellin known best by the nickname, "EL CONEJO" or "CONE" (first name JORGE) as suppliers to BIOCINI. VELASCO said that these cocaine suppliers were people who he is frightened of because of their powerful stature and their reputation for harming those who turned on them.

VELASCO was kidnaped in Cali, Colombia on January 9, 1987 by persons he believes were close friends of "EL CONEJO", because they thought VELASCO owed a cocaine debt of $60,000. VELASCO had to pay that amount to be released.

VELASCO was shown address books that were seized from BIOCINI's residence in Sausalito, California in May 8, 1995. He reviewed some entries that reflected "CONE" and said that those entries likely referred to cocaine supplier, "EL CONEJO".

VELASCO was asked about an entry in one address book showing "Inmobiliara Aurora", telephone 895041. He recognized that as a business in Cali, Colombia that was commonly known as a money laundering establishment owned by an infamous cocaine trafficking family named SANTA CRUZ LONDONO.

VELASCO remembered that beginning in about May, 1994, BIOCINI contacted him in Los Angeles to discuss their cocaine trafficking plans, over a paging device and a cellular telephone which were in the name of VELASCO's girlfriend, ANDREA SPIELMAN. VELASCO thought the cellular telephone number was 213-712-3666.

For the remainder of VELASCO's interview, he was asked to listen to recorded telephone conversations between him and BIOCINI which had been intercepted over BIOCINI's home telephone and over pay telephones during the FBI's investigation. VELASCO had listened to some of the played conversations during his first interview in 1996 and he provided general interpretations for these calls. VELASCO listened to conversations with the following dates and times.

| DATE | TIME |
| --- | --- |
| 1/26/95 | 10:35 AM |
| 1/30/95 | 12:18 PM |

03925

JUN-03-98  22:25  From:US ATTORNEYS OFF STRIKE FORCE      4154366          T-815  P.19/19  Job-217

FD-302a (Rev. 10-6-95)


281B-SF-112277


Continuation of FD-302 of  **HERNANDO VELASCO**                    . On **5/28/98**    . Page ___4___

| | |
|---|---|
| 1/31/95 | 1:33 PM |
| 2/3/95 | 10:44 AM |
| 2/9/95 | 8:24 PM |
| 2/20/95 | 2:20 PM |
| 3/3/95 | 5:23 PM |
| 3/17/95 | 8:43 AM |
| 3/29/95 | 9:17 AM |

Over the two days of his interview, VELASCO expressed a
serious concern for the safety of his two sons in Colombia should
his cooperation as a U.S. government witness against BIOCINI ever
become known by some of BIOCINI's previously mentioned cocaine
suppliers. VELASCO stressed that he wished to receive help in
relocating his sons out of Colombia before word spread there that
he is to testify. Specifically, VELASCO requested that his sons
be furnished with sufficient funds to travel out of Colombia to
stay with family members in the United States as a precaution.

Tentatively, the interviewing agents advised VELASCO
that an amount of about $4,500 may be provided to his sons for
their prompt departure from Colombia and for their short term
subsistence.

039254

000875

# EXHIBIT
# E-6

AO 245 S (Rev. 4/90)(S.D.Fla. rev.) S          - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Southern District of Florida

UNITED STATES OF AMERICA

v.

**Case Number: 95-769-CR-GRAHAM(01)**
Ivonne Rodriguez-Schack, Assistant U. S. Attorney

SALOMON HERNANDO VALSCO-ALHEY,
a/k/a Miguel J. Asseff
Reg. No. 17683-004
Defendant.

```
┌─────────────────────────┐
│ FILED by        D.C.     │
│                          │
│    FEB 2 1 1996          │
│                          │
│    CARLOS JUENAE         │
│   CLERK U.S. DIST. CT.   │
│   S.D. OF FLA. - MIAMI   │
└─────────────────────────┘
```

## JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

The defendant, SALOMON HERNANDO VALSCO-ALHEY, a/k/a Miguel J. Asseff, was representeLouis Casuso, Esq., 200 S. Biscayne Boulevard Suite 3420 Miami, FL 33131d by .

The defendant pleaded guilty to count(s) 1 of the Indictment. Accordingly, the defendant is adjudged guilty of such count(s), involving the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 8 U.S.C. §§ 1326(a) and (b)(2) | Reentry of Deported Alien | 8/17/95 | 1 |

As pronounced on February 9, 1996, the defendant is sentenced as provided in pages 2 through 3 this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant shall pay to the United States a special assessment of $ 50.00, for count(s) 1 of the Indictment, which shall be due immediately.

It is further ordered that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this Judgment are fully paid.

Signed this the ___21st___ day of ___February___, 1996

DONALD L. GRAHAM
United States District Judge

MICROFILM
FEB 2 5 1996
SOUTHERN DISTRICT
MIAMI

Defendant's SSAN: 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
Defendant's Date of Birth: 5/31/48
Defendant's address: Federal Detention Center, Miami, Florida

000877

AO 245 S (Rev. 4/90)(S.D.Fla. rev.) S___? - Imprisonment

Judgment--Page 2 of 3

Defendant: SALOMON HERNANDO VALSCO-ALHEY, a/k/a Miguel J. Asseff
  ⁊se Number: 95-769-CR-GRAHAM(01)

### IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of (52) months as to the on Count Indictment.

The defendant shall receive credit for time served as applicable by statute.

The defendant is remanded to the custody of the United States Marshal.

### RETURN

I have executed this Judgment as follows:

_____
_____
_____
_____

Defendant delivered on _____ to _____
at _____, with a certified copy of this Judgment.

_____
United States Marshal

By _____
Deputy Marshal

Case 3:08-cv-00885-SI    Document 1-25    Filed 02/08/2008    Page 36 of 46

AO 245 S (Rev. 4/90)(S.D.Fla. rev.) S         - Supervised Release

Judgment--Page 3 of 3

Defendant: SALOMON HERNANDO VALSCO-ALHEY, a/k/a Miguel J. Asseff
Case Number: 95-769-CR-GRAHAM(01)

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of Three (3) years as to Count 1 of the Indictment.

While on supervised release, the defendant shall not commit another federal, state, or local crime; shall not illegally possess a controlled substance; shall comply with the standard conditions that have been adopted by this court (set forth below); and shall comply with the following additional conditions:

1.  If ordered to the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

2.  If this judgment imposes a fine, special assessment, costs, or restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine, assessments, costs, and restitution that remain unpaid at the commencement of the term of supervised release.

3.  The defendant shall not own or possess a firearm or destructive device.

4.  If deported, this term of supervised release shall be non-reporting and the defendant shall not re-enter the United States without the permission of the Attorney General.

## STANDARD CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this Judgment:

1)  The defendant shall not leave the judicial district without the permission of the court or probation officer.
2)  The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month.
3)  The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.
4)  The defendant shall support his or her dependents and meet other family responsibilities.
5)  The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons.
6)  The defendant shall notify the probation officer within seventy-two hours of any change in residence or employment.
7)  The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute or administer any narcotic or other controlled substance, or any paraphernalia related to such substances.
8)  The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.
9)  The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.
10) The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer.
11) The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.
12) The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court.
13) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.



# EXHIBIT
# E-7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

**95- 0769** CR-GRAHAM

CASE NO.

v.

MAGISTRATE JUDGE    8 USC 1326(a),(b)(2)
TURNOFF

SALOMON HERNANDO VALASCO-ALHEY
a/k/a Miguel J. Asseff

**INDICTMENT**

The Grand Jury charges that:

On or about August 17, 1995, at Miami, Dade County, in the

Southern District of Florida, the defendant,

SALOMON HERNANDO VALASCO-ALHEY,
a/k/a Miguel J. Asseff,

an alien, having previously been deported to Colombia on or about

June 22, 1992, was found to be in the United States, knowingly and

unlawfully, that is, without the Attorney General having expressly

consented to such alien's reapplying for admission to the United

States; in violation of Title 8, United States Code, Section

1326(a),(b)(2).

A TRUE BILL

_William A Kupan_ _for_
FOREPERSON

KENDALL COFFEY
UNITED STATES ATTORNEY

_Y Rodriguez Schack_
YVONNE RODRIGUEZ-SCHACK
ASSISTANT UNITED STATES ATTORNEY

Certified to be a true and
correct copy of the original.
Carlos Juenke, Clerk
U.S. District Court
Southern District of Florida
By _____
Deputy Clerk
Date 4/8/95



# EXHIBIT
## F-1

# United States District Court

## Southern District of Alabama

UNITED STATES OF AMERICA

v.

**Felix Bernal Fernandez**

**JUDGMENT IN A CRIMINAL CASE**

(For Offenses Committed On or After November 1, 1987)

Case Number:  1:95CR00068-001

Kathryn Ferrell, Esq.

Defendant's Attorney

## THE DEFENDANT:

[X] pleaded guilty to count(s)  1 (one) of the Information

[ ] pleaded nolo contendere to count(s)
which was accepted by the court.

[ ] was found guilty on count(s)
after a plea of not guilty.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. § 1952 (a) | Interstate travel in aid of racketeering | 05/25/1994 | 1 |
| 18 U.S.C. § 2 | aiding & abetting | 05/25/1994 | 1 |

The defendant is sentenced as provided in pages 2 through  6  of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ] The defendant has been found not guilty on count(s) _____

[ ] Count(s) _____  (is)(are) dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendant's Soc. Sec. No.:  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

Defendant's Date of Birth:  06/21/1954

Defendant's USM No.:  00091-249

Defendant's Residence Address:

652 Fulton Street

*the street were felix live live now*

Brentwood City          CA     94061

Defendant's Mailing Address:

652 Fulton Street

*Reduced...*

Brentwood City          CA     94061

09/18/1996

Date of Imposition of Judgment

Signature of Judicial Officer

Charles R. Butler, Jr.

Chief U.S. District Judge

Name & Title of Judicial Officer

9-30-96

Date

*A small city in...*

DEFENDANT:     Felix Bernal ~~~~~ ~~~~~dez
CASE NUMBER:    1:95CR00068-001

Judgment-Page __4__ of __6__

# CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5, Part B.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| Totals: | $      50.00 | $ | $ |

☐ If applicable, restitution amount ordered pursuant to plea agreement . . . . . . . . . . . . .  $ _____

# FINE

The above fine includes costs of incarceration and/or supervision in the amount of $ _____ 0.00 .

The defendant shall pay interest on any fine of more than $2,500, unless the fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 5, Part B may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ The interest requirement is waived.

    ☐ The interest requirement is modified as follows:

# RESTITUTION

☐ The determination of restitution is deferred in a case brought under Chapters 109A, 110, 110A and 113A of Title 18 for offenses committed on or after 09/13/1994, until _____ . An Amended Judgment in a Criminal Case will be entered after such determination.

☐ The defendant shall make restitution to the following payees in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below.

| Name of Payee | ** Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
|  |  |  |  |

| | Totals: | $ | $ |

** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994.

000884

AO 245B (Rev 3/95) Sheet 3 - Supervised Release

DEFENDANT:   **Felix Bernal Fernandez**

CASE NUMBER:   **1:95CR00068-001**

Judgment-Page __3__ of __6__

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of _____3_____ year(s) .

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994:*  ⟵  *R̶e̶l̶e̶a̶s̶e̶ o̶F̶ F̶e̶L̶i̶x̶ B̶e̶r̶N̶A̶C̶*

~~The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.~~

[ ] The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

[X] The defendant shall not possess a firearm as defined in 18 U.S.C. § 921. (Check, if applicable.)

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below) . The defendant shall also comply with the additional conditions on the attached page (if indicated below).

*See Special Conditions of Supervision - Sheet*    **3.01**

# STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
2) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AR <u>886-87</u> have been deleted.

Please see AR 337-38



# EXHIBIT
# G-2





# AR <u>890-91</u> have been deleted.

# Please see AR 350-51