

CHRISTOPHER TODD, Attorney at Law
IMMIGRATION LAW CLINIC
University of California, Davis School of Law
1 Shields Avenue TB-30
Davis, CA 95616-8821
Tel.:   (530) 752-6942 or
        (415) 846-9311
Fax:    (530) 752-0822

Attorneys for Respondent
ANA BIOCINI

Assisted by: Dia Moua & Chad Greeson

DETAINED ALIEN

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## SAN FRANCISCO, CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF:<br><br>ANA BIOCINI<br><br>Respondent.<br><br>In Removal Proceedings. | ) File No.  A 091-182-333<br>)<br>) **RESPONDENT'S POST-HEARING**<br>) **BRIEF IN SUPPORT OF RELIEF UNDER**<br>) **THE COVENTION AGAINST TORTURE**<br>) **AND FOR WITHHOLDING OF**<br>) **REMOVAL UNDER INA § 241(b)(3)**<br>)<br>) Date:   March 10, 2005<br>) Judge:  Murry |

**TABLE OF CONTENTS**

I.    Introduction..................................................................................................................1

II.   Relevant Facts .............................................................................................................1

III.  **Respondent's Removal to Colombia Must be Deferred Because She Satisfies the Eligibility Requirements for Relief Under the Convention Against Torture (CAT)...2**

    A.   **Ms. Biocini is entitled to CAT relief because she faces imminent death if removed to Colombia, thus satisfying CAT's definition of torture...................3**

    B.   **The Colombian Government is aware of the torturous nature of the drug cartel but is unable or unwilling to protect Ms. Biocini from harm .................4**

    C.   **Based on the current country conditions, continuing human rights violations, the impossibility of relocation, it is more likely than not that Ms. Biocini will be killed by the drug cartels if removed to Colombia.........................................5**

        1.   **Due to the internal conflict between drug traffickers, terrorist groups, and the government, the current country conditions in Colombia are marked by instability...............................................................................6**

        2.   **Colombia's instability provides fertile ground for massive human rights violations ........................................................................................7**

        3.   **Ms. Biocini cannot be relocated to another part of Colombia where she would be safe from retribution by the drug cartels. .......................9**

IV.   **Conclusion .................................................................................................................10**

001315

## I.    Introduction

Ms. Biocini satisfies the eligibility requirements for relief under the Convention Against Torture. First, the facts show that Ms. Biocini provided substantial assistance to the U.S. government regarding the trafficking of illegal Colombian cocaine. Furthermore, Ms. Biocini status as a U.S. informant has been revealed to others in Cali by a former contact. Due to her status as an informant and her past relationships with high-level cocaine traffickers, Ms. Biocini cannot be relocated to any part of Colombia where she would be safe from death or torture. Finally, although the Colombian government knows of the torturous actions taken by Colombian drug cartels, it cannot and will not do anything to protect Ms. Biocini from death if she returns to Colombia.

Ms. Biocini also satisfies the requirements for Withholding of Removal under INA § 241(b)(3). First, the facts show that Ms. Biocini belongs to a well-defined social group.[1] Second, it is more likely than not that that Ms. Biocini will be killed if she returns to Colombia because of the assistance she provided to the U.S. government. As above, the Colombian government agents are not capable or willing to protect Ms. Biocini from harm. Finally, since Ms. Biocini is not a danger to the community of the United States, there are no bars to her application for Withholding of Removal.[2]

## II.    Relevant Facts

Respondent Ana Biocini fears death if removed to her native country of Colombia.[3] Ms. Biocini became an informant for the U.S. government after accepting a plea agreement on drug-related charges in June of 1998. As an informant, Ms. Biocini provided substantial information to the U.S. government about Colombian cocaine trafficking in the United States. Ms. Biocini agreed to testify as the Government's witness against Norberto Duarte for drug-related charges. Because of her cooperation, Mr. Duarte ultimately accepted a plea agreement and avoided a jury trial. Moreover, Ms. Biocini continued to work for the FBI and even attempted to negotiate an illegal transaction with a Bay-Area narcotics dealer tied to a Colombian supplier. Because of her assistance to the U.S. government and her relationships with members of the Colombian drug trade, Ms. Biocini now fears death if removed to Colombia. Ms. Biocini's fear stems from her personal relationships with three high-level cocaine traffickers: Elias Giannakapolous (The Greek), Felix Bernal Fernandez (Bernal), and Hernando Velazco (Gordo).

Gordo's assassination plainly illustrates the imminent danger Ms. Biocini faces if removed to Colombia. Gordo had extensive connections to Colombian drug cartels, dating back to the mid-1970s. According to FBI and DEA reports, Gordo agreed to cooperate with the U.S. government in return for leniency on a string of drug-related charges. As part of his cooperation, Gordo agreed to testify for the government's against Ms. Biocini. Sometime after his 1995 arrest, Gordo was removed to Colombia. Before his death, Gordo revealed Ms. Biocini's status

---

[1] Social group is defined as Colombian women with connections to high-level cocaine traffickers, who played a subordinate and marginal role in any drug-related activities, and who provided information to the U.S. about Colombian cocaine trafficking

[2] While this brief focuses on Ms. Biocini's request for CAT relief, she does not waive her request for withholding of removal under INA § 241(b)(3) as set out in section III(B) of Respondent's Pre-Hearing Brief.

[3] This factual history is based on Ms. Biocini's declaration, attached as Ex. A-1, unless otherwise noted.

*RESPONDENT'S POST-HEARING BRIEF*          - 1 -
*Biocini, A91-182-333*

as a U.S. informant to others in Cali. In the summer of 2004, armed assassins shot and killed Gordo in Cali.

In addition to Gordo, other acquaintances of Ms. Biocini likely communicated the details of her plea agreement and cooperation to others in the narcotics business.[4] Furthermore, it is quite likely that this information reached cartel members in Colombia. Finally, due to the cartels' power and influence, it is also quite likely that the cartels learned of Ms. Biocini's cooperation directly through their own sources within the Colombian government. See Ex. I-1.[5]

The dire country conditions that exist in Colombia today further support the conclusion that Ms. Biocini will be killed if removed to Colombia. Colombia has been and continues to be the world's leading producer and supplier of illegal cocaine. Not only has cocaine trafficking destabilized and corrupted all levels of the Colombian government, it has also directly caused massive human rights violations and spawned numerous terrorist and paramilitary organizations.

### III. Respondent's Removal to Colombia Must be Deferred Because She Satisfies the Eligibility Requirements for Relief Under the Convention Against Torture (CAT)

A person qualifies for CAT relief if "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2); Ochoa v. Gonzales, 406 F.3d 1166 (9th Cir. 2005). As implemented by the Foreign Affairs Reform and Restructuring Act of 1998, "it shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . ." 8 U.S.C. § 1231; 8 C.F.R. §§ 208.16-18. CAT relief depends largely on the following factors: (A) whether the future acts feared by the applicant satisfy CAT's definition of torture; (B) whether such torture will occur with the consent or acquiescence of the government in the country of removal; and (C) whether the applicant satisfies CAT's "more likely than not" burden of proof.

In the present case, Ms. Biocini has presented substantial evidence proving she will be tortured as defined by the CAT. If removed to Colombia, Ms. Biocini faces imminent death by the Colombian drug cartels as a direct result of her cooperation with the U.S. government. Imminent death clearly falls within the CAT's definition of torture. Second, due to instability and internal corruption within the country, the Colombian government cannot and will not protect Ms. Biocini from harm. Third, Ms. Biocini has shown more likely than not she will be tortured if removed, thus satisfying the burden of proof for CAT relief and qualifying her for deferral of removal. Ms. Biocini has offered credible testimony about her contacts with several high-level cocaine traffickers and about her cooperation with the U.S. government. Furthermore, Ms. Biocini has presented substantial evidence that corroborates the key points of her declaration and testimony. This evidence, summarized below, clearly demonstrates that Ms. Biocini has satisfied the 51 percent or greater standard required for deferral of removal under CAT.

---

[4] E.g., other acquaintances include Bernal, The Greek, and the co-defendants named in Ms. Biocini's criminal case.

[5] Exhibits referenced in this brief reference Respondent's three most recent evidentiary submissions.

**A.    Ms. Biocini is entitled to CAT relief because she faces imminent death if removed to Colombia, thus satisfying CAT's definition of torture.**

Regulations implementing CAT define torture "as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as punishing him or . . . or intimidating or coercing him or her or a third person . . . when such pain or suffering is inflicted . . . with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). The feared torture, however, need not be on account of an enumerated basis. Ochoa v. Gonzales, 406 F.3d at 1166.

More likely than not, Ms. Biocini will be killed by members of the drug cartels if she returns to Colombia. Ms. Biocini fully cooperated with federal authorities and provided substantial assistance to the U.S. government concerning cocaine trafficking from Colombia to the U.S. In addition, she provided this information despite fears for her personal safety and the safety of her family. For example, Ms. Biocini agreed to testify against Norberto Duarte. See Ex. C-2 at III. In the government's opinion, Biocini's willingness to act as a witness in Norberto Duarte's trial had an impact on Duarte's ultimate decision to plea. Ms. Biocini also agreed to participate in a set-up by the FBI involving a restaurant owner in the Bay Area who received cocaine from a Colombian contact. See Ex. A-1 at 7. Due to her substantial assistance, U.S. District Judge Breyer entered a downward departure of Ms. Biocini's sentence by three levels. See Ex. C-2. The 501.k motion was made by the U.S. Attorney because of Ms. Biocini's substantial assistance. See Ex. C-4 at 22. Judge Breyer recognized the obvious danger that Ms. Biocini would face if she ever returned to Colombia for serving as an informant to the U.S. government and said "that there is a significant danger to the defendant and to her family in connection with cooperation that has been provided." See Ex. C-4 at 28.

Gordo's assassination illustrates the imminent danger Ms. Biocini faces if removed to Colombia. After Ms. Biocini was arrested, Gordo was arrested for illegal re-entry after deportation and detained in Miami, Florida.[6] During his detention, Gordo agreed to cooperate with the U.S. government and testify for criminal charges against Ms. Biocini. Gordo met with the FBI on three occasions from 1995 to 1998. The primary purpose of these interviews was to gather information about Ms. Biocini. See Ex. E-3. Gordo was "advised specifically that he would be required to clarify and provide intelligence regarding all intercepted communications between he and Ms. Biocini. Id. at 1. The FBI reports clearly show that Gordo was extremely afraid for his own personal safety and that of his family if he cooperated with the U.S. government. Gordo knew that if his status as an informant was ever be leaked to the Colombian drug cartels, it would place him and his family in grave danger. See Ex. E5. Therefore, Gordo asked the U.S. government to allow him to remain in this country and to relocate his two sons from Cali to the U.S. See Ex. E-3. During the May 28, 1998 interview, FBI agents advised Gordo that they had tentatively agreed to provide him with $4,500 to relocate his sons. Id.

Sometime after these interviews, Gordo was returned to Colombia. Ms. Biocini heard that Gordo was in Cali sometime after 2000. Ms. Biocini also learned that Gordo told several of her friends that she had been arrested on drug-related charges and served as a U.S. informant[7].

---

[6] Gordo pled guilty on February 21, 1996. See Ex. E-6.

[7] This includes Iliana Balcázar, who told Ms. Kluckhohn, Ms. Biocini's sister, that Gordo said she had been arrested on drug-related charges and that she was a U.S. informant. Benito Lopez, Ms. Biocini's ex-boyfriend, reported the

*RESPONDENT'S POST-HEARING BRIEF*          - 3 -
*Biocini, A91-182-333*

1   On July 9, 2004, Gordo was brutally killed in broad daylight by the emisarios de la muerte
2   (emissaries of death). Gordo was shot in the head and face by two assassins who were stalking
    him outside a building in Cali. There was no witness to the actual murder. However, there were
3   reports that two men dressed from head-to-toe in black clothing fled the scene by car and/or
    motorcycle. See Ex. E-1. The most logical conclusion to draw from the style and the manner of
4   Gordo's death is that his assassination was not a random act of violence, but rather a revenge
5   killing carried out by organized terrorists working for the Colombian drug cartels. According to
    Ms. Biocini's family, "it is public notice that in the case of my sister, an informant, Hernando
6   Velazco, was killed by the Cali Cartel's mafia in his deportation from USA to Colombia. See
7   Ex. A-2 through A-4. Violent assassinations are a common occurrence in Colombia. Gordo's
    death was simply one of hundreds of similar deaths that occur in Colombia every year. See Ex.
8   D-1 through D-3.

9       Ms. Biocini is terrified that she will suffer the same fate as Gordo. See Ex. A-1. Ms.
    Biocini and Gordo were both U.S. informants who shared common friends in Cali. Gordo
10  compromised Ms. Biocini's safety by "outing" her as a U.S. informant in Colombia. The label
    "U.S. informant" makes Ms. Biocini's death imminent Colombia. In addition to Gordo, Ms.
11  Biocini's other contacts were also capable of placing her in danger with the Colombian drug
12  cartels. See Ex. A-1 through A-4. In summary, based on Gordo's death, Ms. Biocini's other
    contacts, and her status as a known U.S. informant, she faces imminent death by the Colombian
13  drug cartels if she returns to her native country.

14      **B.    The Colombian Government knows of the torturous nature of the**
               **drug cartels but is unable or unwilling to protect Ms. Biocini from**
15             **harm**

16      For CAT relief, an applicant need only prove that the government is aware of a third
    party's torturous activity and does nothing to intervene to prevent it. Ochoa v. Gonzales, 406
17  F.3d 1166, 1172 (9th Cir. 2005) (quoting Zheng v. Ashcroft, 332 F.3d 1186, 1194 (9th Cir. 2003)
18  (holding that the "BIA's interpretation and application of acquiescence impermissibly requires
    more than awareness and instead requires that a government be willfully accepting of a third
19  party's torturous activities," thus overruling willful acceptance requirement of Matter of S-V-, 22
20  I. & N. Dec. 1306 (BIA 2000)). The Colombian government cannot provide protection for Ms.
    Biocini from the Colombian drug cartels. The Colombian government is fully aware of the
21  torturous activity of the drug cartels and has been unable to prevent or protect civilians from
    violence by the cartels. "Colombian narcotraffickers are particularly brutal toward informants,
22  and Ms. Biocini's cooperation with the U.S. government will come to the attention of Cali
    narcotraffickers, if it has not happened already. The fact that she was involved in drug
23  trafficking operations over the course of several years is particularly problematic for her." See
24  Ex. I-1 at ¶ 25.

25      Corruption within the Colombian government is so pervasive that the drug cartels can
    seriously hinder any effort by government to curtail violence or provide assistance to Ms.
26  Biocini. For example, the Department of Justice in a recent press release stated that the drug

27

28  same information to Ms. Biocini by telephone. Mr. Lopez was also a longtime friend of several other men
    connected with Gordo and who were involved in cocaine trafficking with him (e.g., Messrs. Capete, Villegas, and
    Miller).

**RESPONDENT'S POST-HEARING BRIEF**          - 4 -
Biocini, A91-182-333

1    cartels[8] have utilized the assistance of the AUC to provide protection for their members, drug
2    routes, and drug laboratories. In addition, the cartel has bribed and corrupted Colombian law
     enforcement along with Colombian legislators. Moreover, they have conducted their own
3    wiretaps and intercepted information between Colombia and United States law enforcement
     officials. See Ex. D-4. Not only do the drug cartels have their own network, but they have
4    tapped into all levels of the government. Id.

5         The cartels are so powerful that they have been able to intimidate public officials into
     resigning from office. If intimidation fails, the drug cartels simply kill them. See Ex. D-1. For
6    example, in February 2002 FARC hijacked a plane and kidnapped a Colombian Senator; in
7    another instance FARC attacked the Presidential Palace where the current Colombian President
     was being inaugurated. See Ex. I-3 at ¶ 6. This corruption is further explained in the 2004
8    Country Profile on Colombia, which states that "the country's political and social foundations
9    have been undermined by the violence and corruption associated with the enormous wealth
     created by the drug cartels. Most Colombian government institutions have a reputation for
10   inefficient, corrupt and bureaucratic management . . . ." See Ex. D-6 at 23. In summary, it is
     almost certain that the Colombian government cannot and will not do anything to protect Ms.
11   Biocini from harm by members of the drug cartels.

12   **C.    Based on the current country conditions, continuing human rights
            violations, and the impossibility of relocation, it is more likely than
13          not that Ms. Biocini will be killed by the drug cartels if removed to
14          Colombia.**

15        An applicant bears the burden of proof under CAT and must show that "it is more likely
     than not that he or she would be tortured if removed to the proposed country of removal." 8
16   C.F.R. § 208.16(c)(2). An applicant "carries [his] burden whenever he . . . presents evidence
     establishing 'substantial grounds for believing that he would be in danger of being subjected to
17   torture in the country of removal.'" Kamalthas v. INS, 251 F.3d 1279, 1284 (9th Cir. 2001)
18   (referencing 8 C.F.R. § 208.16(c)(2)). If the applicant proves he or she faces future torture by a
     margin of 51 percent or more, then the applicant is entitled to relief under CAT. Khup v.
19   Ashcroft, 376 F.3d 898, 908 (9th Cir. 2004). The Ninth Circuit has also held that no further
     corroboration of credible testimony is required "when an alien credibly testifies to certain facts,
20   those facts are deemed true, and the question remaining to be answered becomes whether these
21   facts, and their reasonable inferences, satisfy the elements of the claim for relief." Ladha v. INS,
     215 F.3d 889, 900 (9th Cir. 2000).

22        In assessing whether an applicant meets the "more likely than not" standard, section
23   1208.16(c)(3) requires the IJ to consider "all relevant evidence to the possibility of future
     torture." 8 C.F.R. § 1208.16(c)(3). This includes but is not limited to: (i) evidence of past
24   torture inflicted upon the applicant; (ii) evidence that the applicant could relocate to a part of the
     country of removal where he or she is not likely to be tortured; (iii) evidence of gross, flagrant or
25   mass violations of human rights within the country of removal, where applicable; and (iv) other
26

27   _____
28   [8] The article refers to the Norte Valle Cartel that operates mainly from the area of Valle del Cauca, which
     encompasses both Bogota and Cali. The Norte Valle Cartel was formed by Jose Orlando Henao Montaya who seized
     some control from the Cali bosses based in Norte de Valle. Therefore, "many Valle de Norte bosses were once part
     of the more militant members of the Cali mafia. Ex. D-6 at 12.

*RESPONDENT'S POST-HEARING BRIEF*          - 5 -
*Biocini, A91-182-333*

1  relevant information regarding conditions in the country of removal. Id.; see Nuru v. Gonzales,
2  404 F.3d 1207, 1219 (9th Cir. 2005); see also, see Kalmalthas, 251 F.3d at 1282; see also,
   Camara v. Ashcroft, 378 F. 3d 361 (4th Cir. 2004).

3      The sum of these factors exceeds the 51 percent threshold and thus weighs in favor of
4  granting Ms. Biocini deferral of removal under CAT. Ms. Biocini has shown that Colombia is
   marked by instability, corruption, and violence. The primary cause of this instability is the
5  illegal trafficking of narcotics— namely cocaine. Furthermore, drug trafficking and instability
   have led to massive human rights violations within the country. Finally, Ms. Biocini has also
6  shown that the reach of the drug cartels in Colombia extends to all corners of the country.
7  Therefore, Ms. Biocini cannot be relocated to another part of Colombia where she would be safe
   from future torture.

8
9              **1.      Due to the internal conflict between drug traffickers, terrorist
                        groups, and the Colombian government, the current country
10                      conditions in Colombia are marked by instability.**

11     After more than forty years, Colombia continues to suffer from internal armed conflict
   between government forces and terrorist groups. See Ex. D-3 at 12. The country remains one of
12  the primary producers of cocaine consumed in the U.S. See Ex. D-9. Furthermore, the
   boundaries between Colombian government, terrorist groups, and the drug cartels have become
13  indistinguishable. See Ex. D-6. "The situation has also been made complicated by the transitions
   of guerrillas groups to their own involvement in the drug trade, making profit as much or more of
14  a motive for them than ideology." See Ex. I-3 at ¶ 7.

15     There are currently three major terrorist groups fighting for power and control in
   Colombia. The largest group is the Colombian Revolutionary Armed Forces (FARC) with at
16  least 18,000 members. Next, the National Liberation Army (ELN) has approximately 5000
   members. Lastly, the paramilitary group United Self-Defense Forces of Colombia (AUC) has
17  approximately 5000 members. See Ex. D-1 at 2. These terrorist groups continue to violate
18  domestic laws and international humanitarian law by committing unlawful killings, kidnapping
   civilians and military personnel, torturing captive, displacing populations and recruiting child
19  soldiers. See Ex. D-3 at 13. In addition, Amnesty International reports growing concerns about
20  the recently elected Colombian government of Alvaro Uribe. The reports suggest that Uribe may
   be initiating legislation to grant impunity for members of the various paramilitary groups, armed
21  forces, or guerillas who have committed atrocities such as war crimes or crimes against
   humanity. See Ex. D-2. Furthermore, the U.S. Department of State in Country Reports on
22  Human Rights Practice 2004 for Colombia states that impunity remained the core of the
23  country's human rights problem. See Ex. D-3 at 1.

24     These terrorist groups have also become involved in drug production and trafficking
   activities for monetary funds. Each of the major terrorist groups competes for control of key
25  coca cultivation areas "and their involvement in narcotics is a major source of violence and
   terrorism in Colombia." See Ex. D-4 at 15. As a result, the terrorist groups and the drug cartels
26  are no longer two distinct groups with separate interests. This symbiotic relationship has been
27  further solidified by the increased reliance by the drug cartels on services provided by the
   terrorist groups. "Drug mafia bosses have referred to paramilitary militia forces for security,
28  assassination and terrorist services. Over the years, drug mafia bosses have become more and
   more involved with the paramilitaries to the point where, in some cases, there is no difference

between a Colombian drug boss and a Colombian paramilitary commander." See Ex. D-6 at 18-19. The integration of these two groups has led to a hydra effect. Once the U.S. or Colombian government decapitates a drug cartel or terrorist group, a new group quickly emerges. See Ex. I-3. The "hydra effect" makes any attempt to deter drug trafficking to the U.S. exponentially more difficult.[9] See Ex. D-6. Hydra effect has ensured mafia proliferation and adaptation in response to DEA and CNP efforts to hunt down their bosses. See Ex. D-6 at 33.[10]

### 2. Colombia's instability provides fertile ground for massive human rights violations.

The narcotics industry in Colombia is the root cause of the country's massive human rights violations. For example, "in May 2004, the United Nations announced that Colombia's decades long war had created the worst humanitarian crisis in the Western Hemisphere." See Ex. I-3 at ¶ 9. The problem is intensified by an increasing demand for illegal drugs and tighter cooperation between terrorist groups and drug cartels. See Country Condition section and Ex. D-4. Oftentimes, it is the terrorist groups that do the dirty work (e.g., assassinations, kidnappings, torture, or intimidation) on behalf of the drug cartels. The relationship between the terrorist groups and the drug cartels has become inseparable. Like the private armies of Afghan warlords, the Colombian paramilitary groups are funded by money made on the insatiable global demand for illegal drugs. Their close ties with the drug trade ensure professional training and equipment, war-grade firearms, explosive and munitions, and modern technology for communications and logistics. See Ex. D-6 at 16.

As a result, former Colombian President Pastrana (1998-2002) initiated Plan Colombia to "end the country's 40-year old armed conflict, eliminate drug trafficking, and promote economic and social development." See Ex. J-1 at 1. Current Colombian President Uribe continues to implement Plan Colombia. Id. Under the plan, Colombian government has pledged $4 billion of Colombian resources and called on the international community for assistance to help reach the plan's goal of $7.5 billion dollars.[11] See Ex. J-2 at 1. The plan has four primary goals: (1) reduce the production and distribution of illegal drugs, (2) build and strengthen public institutions and increase the State's presence throughout Colombia, (3) revitalize the economy; and (4) advance the Colombia peace process. See Ex. J-3 at 2-3. In addition, the plan consists of two major components: social and economic aid along with enforcement. Id.

The United States has been an active supporter of Plan Colombia since its inception.[12] It has provided assistance in the form of monetary contributions, training, goods, and services. See Ex. J-2 at 2. In addition, U.S. assistance to Colombian military and police forces is based upon

---

[9] A term named after the mythical nine-headed beast that grows another head as soon as one is chopped off. The Greeks believed one head to be immortal. See Ex. D-6 at 8.

[10] Colombian National Police

[11] Plan Colombia was created to sunset in six years from its inception, expiring at the end of 2005. However, the Bush Administration has requested continued financial support from Congress beyond the sunset date. See J-1 at 1.

[12] United States involvement began in 2000, at which time Congress passed legislation contributing $1.3 billion to Plan Colombia. Based on the May 9, 2005 CRS Report to Congress, the United States has provided $4.5 billion to Colombia.

*RESPONDENT'S POST-HEARING BRIEF*      - 7 -
*Biocini, A91-182-333*

Colombia's compliance with the strict guidelines of the Leahy Amendment.[13] Id. Initially the United State's objective was to prevent the flow of illegal drugs from Colombia into the U.S. by promoting economic development to establish peace. See J-1 at 2-3. Over time, however, this objective has shifted mainly to helping Colombia fight illegally-armed groups (IAG) such as the FARC. Id.

The United State's assistance can be divided into five components that range from supporting enforcement of human rights to fighting narcotics operations in Colombia.[14] Many of these components have been designed to help Colombia reach its goal of eliminating narcotic trafficking and bringing political stability to the country. Based on a review report by the Office of National Drug Control Policy updated in March 2005, Plan Colombia has achieved many of its goals. See J-4 at 1-4. For instance, in 2003 coca cultivation has been reduced by 21 percent. Also, there has been an "increase [in] the presence and effectiveness of the justice system" along with "[strengthening] institutional presence, efficiency and effectiveness at the national, regional and local levels."[15] Id.

Despite the many successes, there have also been reports of ineffectiveness, particularly with respect to controlling paramilitary groups and reducing drug production. For example, a 2005 progress report by the Congressional Research Service states that "U.S. government agencies responsible for tracking drug trends report that the availability, price, and purity of cocaine and heroin in the United States have remained stable." See J-1 at 3. Furthermore, re-planting coca crops in previously eradicated areas has further stabilized 2004 coca production in Colombia. Id. at 5.

Paramilitary groups show no signs of demobilization as intended under Plan Colombia. A 2005 report by Human Rights Watch states that "the Colombian military continue to tolerate, support, and commit abuses in collaboration with members of paramilitary groups." See J-5 at 2. In addition, 2005 marks the passage of Law 975 by the Colombian Congress, which if not found unconstitutional by the Colombian Supreme Court, is intended to be part of the demobilization process.[16] However, Human Rights Watch reports that "the law fails to include effective mechanism[s] to dismantle the country's mafia-like armed groups [and] utterly fails to satisfy international standards on truth, justice, and reparation for victims." Id. at 1. Lastly, HRW reports that human rights monitors are still frequently being attacked and threatened in Colombia. Id. at 3. For example, "in May 2005 three prominent journalist received anonymous funeral wreaths accompanied by notes of condolence, at their home and offices . . . such threats and prevailing impunity for killings of journalists have a chilling effect on the media" Id.

---

[13] The Leahy Amendment provides that should any Colombian unit which receives US assistance be determined to have committed gross human rights violation shall cut off from the assistance unless the Secretary of State determines that the particular unit is making efforts to bring those responsible to justice.

[14] The five components of US assistance are: (1) support for Human Rights and Judicial Reform; (2) expansion of Counter-Narcotics Operations into Southern Colombia; (3) alternative Economic Development; (4) increased interdiction; and (5) assistance for the Colombian National Police. See Ex. J-2 at 2.

[15] See the ONDCP fact sheet for further details. See J-4.

[16] In a recent report by Human Rights Watch, the organization states that Colombia is in the process of passing a bill which would allow top commanders [of the paramilitaries] to serve as little as two years for their crimes. To receive this reduced sentence these individuals simply have to "accept" their charges without having to provide any information in return. The effect of this one way deal is that many of the paramilitaries remain active. See J-6 at 2.

Therefore, despite the billions of dollars and resources provided by <u>Plan Colombia</u> from countries such as the United States, Colombia does not appear any closer to achieving its goals as set out in the original plan.[17]  As the 2004 Congressional Research Report states, there were between 3,000 to 4,000 civilian deaths, the civilian judiciary "is reported to be 'overburdened, inefficient, and subject to intimidation and corruption by terrorist groups and common criminals,' and there are still reports of security forces committing serious human rights violation." <u>See</u> J-1 at 11.

### 3.  Ms. Biocini cannot be relocated to another part of Colombia where she would be safe from retribution by the drug cartels.

Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured is relevant to the possibility of future torture.  <u>Kamalthas v. INS</u>, 251 F.3d 1279, 1282 (9th Cir. 2001) (quoting 8 C.F.R. § 208.16(c)(3) (2000)).  However, the Ninth Circuit has stated that "it will rarely be safe to remove a potential torture victim on the assumption that torture will be averted simply by relocating him to another part of the country." <u>Nuru v. Gonzales</u>, 404 F.3d 1207, 1219 (9th Cir. 2005).

Ms. Biocini cannot return to Cali because of the imminent threat of death and because of the danger it brings to her immediate family.  Furthermore, Ms. Biocini cannot be relocated to another part of Colombia where she would be free from torture, because there is no place in Colombia where Ms. Biocini would be safe from the Colombian drug cartels.  The extent of the drug cartel network in Colombia is expansive both geographically and politically.  The negative influence of the drug cartels pervades all levels of the Colombian government.  <u>See</u> Ex. D-10.  Therefore, Ms. Biocini could not safely be relocated to any other part of the country.  <u>See</u> Ex. I-3.

Ms. Biocini is a known U.S. informant in Colombia and a prime target for retaliation by the drug cartels.  <u>See</u> Ex. D-1.  In her affidavit Clemencia Jaramillo states, "we heard that he [Gordo] was telling others about my sister Ana, being the one that incriminated the Cali Cartel in her case." <u>See</u> Ex. A-2.  Ms. Biocini's other family members share similar concerns, including her sister in Cali and her brothers in Bogotá.  <u>See</u> Ex. A-3 through A-4 & B-1.  In addition to immediate family members, Ms. Biocini's friends Iliana Balcázar and Benito Lopez both reported having conversations with Gordo about Ms. Biocini.  In these conversations, Gordo discussed Ms. Biocini's plea agreement and her cooperation with U.S. authorities .  <u>See</u> Ex. A-1.

If removed to Colombia, Ms. Biocini would require financial and emotional support from her Colombian family.  However, providing such support would place Ms. Biocini's family in grave danger.[18]  Ms. Biocini's immediate family could not provide her with financial or emotional support because of the danger it would place on her members of her extended family, several of which include young children.  "The narcotraffickers routinely go after the family members of those who have cooperated with the government in order to set an example of intimidation and to terrorize into silence possible witnesses against their operations." <u>See</u> Ex. I-1

---

[17]For instance, on March 6, 2006, it was reported that the FARC killed at least 20 civilians in two separate massacres with cylinder bombs as the national elections approach in Colombia.  In addition, in February 2006, the FARC declared a "paro" which called for the enforced shutdown of civic and commercial activities. To strengthen their declaration, the following week FARC "blocked roads, burnt cars, attacked electricity towers, and threatened the civilian population if they fail to comply with the general shutdown." <u>See</u> J-7 at 1-2.

[18]It has been over a decade since Ms. Biocini's last visit to Colombia.

1   at 25. Because of her her concern for her sister, Ms. Kluckhohn sent Ms. Biocini a copy of the
2   article from the local newspaper, El Caleño, regarding Gordo's assassination. See Ex. A-3 & A-
    4.
3
        Fear of reprisal prevents Ms. Biocini's family from making further inquiries into Gordo's
4   death. See Ex. A-1. Like many in Colombia, Ms. Biocini's family cannot ask any questions
    about Gordo's death — otherwise, they become immediate targets for retribution. Other
5   individuals who sought further information about international human rights violation in
6   Colombia or have spoken out about these atrocities have been tortured, kidnapped, and or killed.
    Religious leaders and laypeople who publicly discuss the conflict, promote dialogue, or who
7   denounce human rights abuses or corruption face retribution — primarily from guerrilla and
    paramilitary forces. See Ex. D-2 at 10. Therefore, Ms. Biocini's family cannot provide or
8   inquire about additional information beyond what has been submitted by Respondent.
9       The only remaining alternative for Ms. Biocini is to relocate to another part of Colombia.
    However, no place in Colombia exists beyond the reach of the drug cartels. "Most taxi cab
10  drivers, airport employees, hotel and restaurant workers, bankers and business men are in the
    employ of Cali drug traffickers. Almost nothing and no one goes unnoticed in Cali or in the
11  Valle de Cauca." See Ex. D-1 at ¶24. Furthermore, the joint enterprise between the drug cartels
12  and the terrorist groups in Colombia only intensifies and expands the cartels' reach. There is no
    part of Colombia where Ms. Biocini, a known U.S. informant, could seek refuge. See Ex. D-1,
13  III-1-(a) through (b), and D-10 at 3.
14  **IV.    Conclusion**
15      Ms. Biocini does not deny or take lightly her criminal conviction. She made serious
    mistakes and engaged in extremely risky behavior. However, Ms. Biocini has done a
16  complimentary job of turning her life around. Since her arrest, she as taken every opportunity to
17  rehabilitate herself, to rid herself of a debilitating addiction, and do whatever it took to make a
    better life for herself and for her family. The purpose of Ms. Biocini's request for relief is not
18  rehash her criminal record, but to show the injustice of removing her to a country where she
    faces a certain death.
19
        When the United States signed the Convention Against Torture on April 18, 1988, and
20  Congress passed the Foreign Affairs Reform and Restructuring Act (FARRA) implementing
    Article 3 of CAT, this country made it clear that no person should be returned to another state
21  where he or she would be tortured. As the record shows, Ms. Biocini is a known U.S. informant
22  in Colombia and it is more likely than not that she will be killed if removed. Moreover, the
    Colombian government is unable and unwilling to protect her. Ms. Biocini has served her time,
23  made many positive changes in her life, and will quickly become a productive member of
    society. Ms. Biocini is not a danger to the community of the United States and deserves the
24  opportunity to stay in this country, her home of almost 25 years. For the reasons mentioned
25  above, Respondent Ana Biocini respectfully asks that this Court grant her relief under CAT and
    grant her application for Withholding of Removal.
26
27
28

**RESPONDENT'S POST-HEARING BRIEF**        - 10 -
*Biocini, A91-182-333*

001325

1   Date: March 10, 2006                    Respectfully submitted,

2

3

4

5                                          **CHRISTOPHER TODD**
                                           **Immigration Law Clinic,**
6                                          *UC Davis School of Law*
                                           *Attorney for the Respondent*
7

8                                          **CHAD GREESON & DIA MOUA**
                                           **Immigration Law Clinic**
9                                          *UC Davis School of Law*
                                           *Student Advocates for Respondent*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*RESPONDENT'S POST-HEARING BRIEF*              - 11 -
*Biocini, A91-182-333*

001326

**CERTIFICATE OF SERVICE**

On March 10, 2006, I served the following document(s): *Respondent's Post-Hearing Brief in support of relief under the Convention Against Torture and Withholding of Removal under and § 241 (b)(3)* upon the parties in said action by placing a true and correct copy in a sealed envelope and each envelope addressed as follows:

> US-ICE Office of Chief Counsel
> 550 Kearny Street, Ste. 1000
> San Francisco, CA 94941

___ *By Facsimile Machine (Fax).* By personally transmitting a true and correct copy thereof via an electronic facsimile machine during regular business hours.

___ *By Mail.* I am readily familiar with the business practice for collection and processing of correspondence for mailing with the United States Postal Service and that this document, with postage fully prepaid, will be deposited with the United States Postal Service this date in the ordinary course of business.

___ *By Certified Mail.* I am readily familiar with the business practice for collection and processing of correspondence for certified mailing with the United States Postal Service and that this document, with postage fully prepaid, will be deposited with the United States Postal Service on this date in the ordinary course of business.

___ *By Overnight/Express Mail.* I am familiar with the business practice for the collection and processing for Overnight/Express Mail with the United States Postal Service and/or Overnight service provider. Such correspondence will be deposited with a facility regularly maintained by the United States Postal Service for receipt of express mail or other overnight service providers/entities (i.e., Federal Express, United States Parcel Service, etc.) For receipt of Overnight Mail on the same day in the ordinary course of business.

_X_ *By Personal Service.* By personally delivering a true copy thereof to the office of the addressee above.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 10, 2006 in Pleasant Hill, CA.

Chad Greeson
Student Advocate, UCD-ILC

# EXHIBIT

# J-1



Order Code RL32774

# CRS Report for Congress

Received through the CRS Web

# Plan Colombia: A Progress Report

**Updated May 9, 2005**

Connie Veillette
Analyst in Latin American Affairs
Foreign Affairs, Defense, and Trade Division

*Congressional Research Service ❖ The Library of Congress*

001329



# Plan Colombia: A Progress Report

## Summary

Plan Colombia was developed by former President Pastrana (1998-2002) as a six-year plan to end Colombia's long armed conflict, eliminate drug trafficking, and promote economic and social development. The Andean Counterdrug Initiative (ACI) is the primary U.S. program that supports Plan Colombia. In addition, Colombia receives assistance from the Foreign Military Financing (FMF) program and the Department of Defense's central counternarcotics account. ACI funding for Plan Colombia from FY2000 through FY2005 totals approximately $2.8 billion. When FMF and DOD assistance is included, the total level of U.S. support to Colombia is $4.5 billion. The Administration has requested Congress to continue support for Plan Colombia beyond FY2005, with an additional $463 million in ACI funding, and $90 million in FMF requested for FY2006.

The objectives of Colombia and the United States differ in some aspects, although there is a significant overlap of goals. The primary U.S. objective is to prevent the flow of illegal drugs into the United States, as well as to help Colombia promote peace and economic development because it contributes to regional security in the Andes. The primary objectives of Colombia are to promote peace and economic development, increase security, and end drug trafficking. Both U.S. and Colombian objectives have also evolved over time from a strict counternarcotics focus to encompass counterterrorism activities.

Because Plan Colombia is a six-year plan, due to expire at the end of 2005, Congress will likely assess its progress in light of the Administration's request to continue funding the ACI account, the latter having no statutory end-date. Congress has expressed the expectation that funding would begin to decrease in FY2006. Some Members have also expressed the opinion that the ratio between interdiction and alternative development should become more balanced, and that the U.S. role should diminish as Colombia develops more operational capabilities.

While there has been measurable progress in Colombia's internal security, as indicated by decreases in violence, and in the eradication of drug crops, no effect has been seen with regard to price, purity, and availability of cocaine and heroin in the United States. Military operations against illegally armed groups have intensified, but the main leftist guerrilla group seems no closer to agreeing to a cease-fire. The demobilization of rightist paramilitary fighters is proceeding, but without a legal framework governing the process. Critics of U.S. policy argue that respect for human rights by the Colombian security forces is still a problem, and that counternarcotics programs have negative consequences for the civilian population, and for the promotion of democracy in general.

For more information on Colombia and the Andean Counterdrug Initative, see CRS Report RL32250 *Colombia: Issues for Congress* by Connie Veillette, and CRS Report RL32337 *Andean Counterdrug Initiative (ACI) and Related Funding Programs: FY2005 Assistance* by Connie Veillette. This report will be updated as new data becomes available.




## Contents

Plan Colombia and the Andean Counterdrug Initiative . . . . . . . . . . . . . . . . . 1
Objectives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Assessment of Key Objectives and Issues . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Drug Flows to the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Cultivation of Drug Crops . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Violence and Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Armed Conflict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Economic Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Promotion of Democracy, Rule of Law, and Human Rights . . . . . . . . 11
    Regional Stability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Prospects for U.S. Disengagement . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## List of Tables

Table 1.  Eradication of Drug Crops, 2003-2004 . . . . . . . . . . . . . . . . . . . . . . . . 6
Table 2.  Change in Acreage Under Cultivation, 2002-2004 . . . . . . . . . . . . . . 6
Table 3.  Measures of Violence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Table 4.  Attacks on Oil Pipelines, 2001-2004 . . . . . . . . . . . . . . . . . . . . . . . . 11

001331



# Plan Colombia: A Progress Report

## Plan Colombia and the Andean Counterdrug Initiative

Plan Colombia was developed by former President Pastrana (1998-2002) as a six-year plan to end the country's 40-year old armed conflict, eliminate drug trafficking, and promote economic and social development. President Uribe (2002-present) has continued the work of Plan Colombia, but with an increased emphasis on security concerns. It was envisioned that a significant portion of the costs of Plan Colombia would be provided by the international community, although to date, the United States has been the most significant contributor.[1]

The Andean Counterdrug Initiative (ACI) is the primary U.S. program that supports Plan Colombia, as well as assistance to other nations in the Andean region. In addition to ACI funding, Colombia also benefits from the Foreign Military Financing (FMF) program, and the Department of Defense's central counternarcotics account. U.S. support for Plan Colombia began in 2000, when Congress passed legislation (P.L. 106-246) providing $1.3 billion for the region in interdiction and development assistance. ACI funding for Plan Colombia from FY2000 through FY2005 totals approximately $2.8 billion. When FMF and DOD assistance is included, the total level of U.S. support to Colombia is $4.5 billion.

The Administration has requested Congress to continue support for Plan Colombia beyond FY2005 with an additional $463 million in ACI funds, and $90 million in FMF requested for FY2006. U.S. resources support the eradication of coca and opium poppy crops, the interdiction of narcotics trafficking, and the protection of infrastructure, through the training and material support for Colombia's security forces. U.S. programs also support alternative crop development and infrastructure development to give coca and opium poppy farmers alternative sources of income, and institution building programs to strengthen democracy. Components of U.S. assistance include human rights training.

Because Plan Colombia is a six-year plan, due to expire at the end of 2005, Congress will likely assess its progress in light of the Administration request to continue ACI funding, the latter having no statutory end-date.[2] The House-passed

---

[1] The original plan estimated costs to be $7.5 billion, with $3.5 billion coming from international donors and the remainder from the government of Colombia. "Plan Colombia Fact Sheet," Bureau of Western Hemisphere Affairs, U.S. Department of State, March 14, 2001. European countries provide economic and social development funds but do not consider them to be in support of Plan Colombia.

[2] Several congressional hearings were held in 2003 and 2004 to assess the progress of Plan Colombia, with Members specifically referring to its expiration at the end of 2005. In 2005,

(continued...)



CRS-2

FY2005 Foreign Operations Appropriations Act (H.R. 4818) expressed concern that the FY2005 budget request increased ACI levels for Colombia, despite its scheduled conclusion. *The language noted the Committee's expectation that the FY2006 request for Colombia would be less.* However, the FY2006 request essentially maintains the same level of funding for Colombia, $463 million. The House bill, as well as some individual Members of Congress, expressed the opinion that the ratio between alternative development and interdiction should be more balanced. The FY2006 request maintains the same balance as in FY2005: $124.8 million for alternative development and institution building; $27.4 million for rule of law programs; and $310.9 million for interdiction. Other Members have suggested the need for an exit strategy that would have Colombia develop the capabilities to take over the types of operations for which the United States is now providing support.

## Objectives

The objectives of Colombia and the United States for Plan Colombia differ in some aspects, although there is a significant overlap of goals. The primary U.S. objective is to prevent the flow of illegal drugs into the United States, as well as to help Colombia promote peace and economic development because it contributes to regional security in the Andes.[3] The primary objectives of Colombia are to promote peace and economic development, and increase security. Addressing drug trafficking is considered a key aspect of those objectives.[4]

The objectives of each country have evolved over time. This evolution became evident when President Uribe was elected on a platform of taking a tougher approach to the illegally armed groups (IAG) that operate in the country and benefit from participation in drug trafficking. He vowed not to negotiate with any of the armed groups until they declared a cease-fire and disarmed. In addition, Uribe implemented new laws giving the security forces increased powers, and instituted a one-time tax to be used to increase the troop strength and capabilities of the Colombian military. He increasingly equated the guerrillas with drug traffickers and terrorists, and initiated a military campaign, called *Plan Patriota*, to recapture guerrilla-controlled territory.

---

[2] (...continued)
Senator Norm Coleman asked then Secretary-designate, Condaleeza Rice, at her confirmation hearings about the next phase of Plan Colombia, considering its expiration in 2005.

[3] Statement of the President, William J. Clinton, Office of the Press Secretary, January 11, 2000.

[4] *Plan Colombia: Plan for Peace, Prosperity, and the Strengthening of the State,* Government of Colombia, Office of the Presidency, October 1999. "The government is committed to consolidating the central responsibilities of the state: promoting democracy and the rule of law and the monopoly in the application of justice, territorial integrity, employment, respect for human rights and human dignity, and the preservation of order as established by political and social rules....It is central to this strategy to move forward decisively in partnership with the countries which produce and those which consume illegal drugs, under the principles of reciprocity and equality."



CRS-3

U.S. policy has also evolved from a strictly counternarcotics focus to support for Colombia's fight against IAGs. In 2002, the Administration requested, and Congress approved, expanded authority to use U.S. counternarcotics funds for a unified campaign to fight both drug trafficking and terrorist organizations in Colombia.[5]  The three main armed organizations in Colombia — the leftist *Revolutionary Armed Forces of Colombia* (FARC), *and the National Liberation* Army (ELN), and the rightist United Self-Defense Forces of Colombia (AUC) have been designated foreign terrorist organizations (FTOs) by the State Department, [pursuant to section 219 of the Immigration and Nationality Act, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (P.L. 104-132)].[6]  In 2003 the FARC and AUC were designated Significant Foreign Narcotics Traffickers under the Foreign Narcotics Kingpin Designation Act (P.L. 106-120).

## Assessment of Key Objectives and Issues

**Drug Flows to the United States.**  Despite increased eradication of drug crops and interdiction efforts under Plan Colombia, U.S. government agencies responsible for tracking drug trends report that the availability, price, and purity of cocaine and heroin in the United States have remained stable. Colombia produces most[7] of the world supply, with 90% of the cocaine entering the United States originating in or transiting through Colombia. The country also produces significant quantities of high quality heroin. The supply of drugs is often judged by changes in price, with higher prices signifying decreased supply. However, for the period covering December 2002 through May 2003, the Office of National Drug Control Policy (ONDCP) reports that prices for both cocaine and heroin remained stable, with prices falling in some of the 25 cities surveyed.[8]  An April 2004 report from the Justice Department's National Drug Intelligence Center (NDIC) found that cocaine, in both its powder and crack forms, is "readily available throughout the country and overall availability appears to be stable." NDIC also reported that heroin availability has remained stable and has increased in many suburban and rural areas.[9]

There are several reasons why prices and supply have remained stable despite increased eradication efforts. In testimony before Congress in June 2004, John P. Walters of the ONDCP argued that interdiction efforts take time to show their impact on price and availability, and that the effect would begin to show in the next 12

---

[5] The State Department and DOD explain this expanded authority as providing them with flexibility in situations where there is no clear line between drug and terrorist activity.

[6] The ELN and FARC were first designated FTOs in 1997, and subsequently redesignated in 2001.  The AUC was first designated in 2001.

[7] The United Nations Office on Drugs and Crime (UNODC) estimates that 67% of the world's cocaine supply was produced in Colombia in 2003.  The State Department's *International Narcotics Control Strategy Report* (INCSR) puts the figure at 80%.

[8] Office of National Drug Control Policy, *Pulse Check*, January 2004.

[9] U.S. Department of Justice, National Drug Intelligence Center, *National Drug Threat Assessment 2004*, April 2004.

001334



CRS-4

months.[10]  Some argue that an increase in the street price of cocaine and heroin is unlikely to appear in the near term because of the large profit margin.  Even if the availability of coca leaf and opium poppies is decreasing, and consequently the price for the raw materials is increasing, they constitute a very small fraction of the U.S. retail price.[11]  Traffickers are easily able to absorb this increased cost.[12]

With regard to drug purity, according to the ONDCP, the purity of cocaine has remained stable since the mid-1980s. Heroin purity has steadily increased since the 1980s,[13] with current purity levels possibly reflecting a higher quality of heroin produced in Colombia.  At the same time, the National Institute on Drug Abuse (NIDA) reported that drug use among young people has declined by 11% from 2001 to 2003, and again by 6% from 2003 to 2004.[14]  While these surveys report a declining trend in overall drug use, they also report that the use of cocaine and heroin has remained stable. In fact, the National Survey on Drug Use and Health reported that "There was no change in the overall rate of illicit drug use between 2002 and 2003."[15]  The same report showed that cocaine and heroin use has remained stable over the same time period at 2.3 million persons (not limited to young Americans) and 119,000 users respectively.  Some observers criticize the value of these types of surveys because they rely on self-reporting.[16]

The interdiction of the final product, rather than the raw ingredients, imposes greater costs on traffickers.  In June 2004, the Drug Enforcement Agency (DEA) reported that domestic seizures of heroin had steadily increased from 1,152 kilograms in 1999 to 2,351 kilograms in 2003.  Seizures of cocaine, both domestic and maritime, have increased from 106,623 kilograms in 2000 to 115,725 kilograms in

---

[10] John P. Walters, ONDCP, testimony before the House Government Reform Committee, "A Status Report on Plan Colombia Successes and Remaining Challenges," June 17, 2004. "...we believe we will see a change in the availability in the United States in the next 12 months as a result of what happens here....It takes some time between the planting and the processing and the shipping and the dealing, we believe that will probably first appear in reductions in purity, because most of the market for this product as you know is dependent individuals."

[11] According to a 1994 study, coca leaf constitutes 2% of the retail price of cocaine. James Painter, *Bolivia and Coca: A Study in Dependency*, Boulder: Lynne Rienner Publishers, 1994. See also Kathryn Ledebur, "Bolivia: Clear Consequences" in *Drugs and Democracy in Latin America: The Impact of U.S. Policy*, edited by Coletta A. Youngers and Eileen Rosin, Lynne Rienner Publishers, 2005.

[12] John M. Walsh, *Drug War Monitor: Are We There Yet?*, Washington Office on Latin America, December 2004.  "For less than $1,000, traffickers can purchase the coca leaf needed to produce a kilogram of cocaine that retails for about $150,000 in the United States (when sold in $100 units of one gram each, two-thirds pure.)"

[13] Ibid. ONDCP *Pulse Check*.

[14] National Institute on Drug Abuse, *2003 Monitoring the Future*, December 2003, and *2004 Monitoring the Future*, December 21, 2004.

[15] Substance Abuse and Mental Health Services Administration (SAMSHA), *Findings from the 2003 National Survey on Drug Use and Health*, September 2004.

[16] Ibid. Walsh.



CRS-5

2003. Much of this gain is from maritime seizures in the South Atlantic and Caribbean, and southwest Pacific regions. Operation Panama Express, which targets Colombian cocaine trafficking in the Caribbean and eastern Pacific oceans, resulted in seizures of more than 15.7 metric tons since it began operations in February 2000.[17] In Colombia, the Ministry of Defense reports cocaine seizures of 148 tons in 2004, a 30% increase from 2003, and heroin seizures of 721 kilograms in 2004, a 43.9% increase from 2003. The State Department's *International Narcotics Strategy Report 2005* (INCSR) credited the Air Bridge Denial (ABD) program (a joint U.S.-Colombian aerial interdiction program) with the destruction of 13 aircraft, the capture of three aircraft in Colombia and eight in Central America, and the seizure of about 3 metric tons of cocaine in 2004. This is in addition to the destruction of several aircraft and the seizure of more than five metric tons of cocaine during 2003. The U.S.-funded Special Reconnaissance and Assault Unit of the Colombian Navy seized 12 metric tons of cocaine, 12 kilograms of heroin, 17 "go-fast" boats, 34 outboard motor boats, 2 commercial fishing vessels, and 75 traffickers. The Colombian Police Anti-Narcotics Directorate (DIRAN) is credited with destroying 83 laboratories, and seizing 48 metric tons of cocaine and cocaine base, 1,539 metric tons of solid precursors and 755,588 gallons of liquid precursors. (Solid and liquid precursors, such as kerosene, are used to process coca leaf into cocaine base.)[18]

**Cultivation of Drug Crops.** Both the State Department and United Nations report significant decreases in acreage devoted to growing drug crops since 2001, although the Office of National Drug Control Policy (ONDCP) recently reported no significant reduction of coca cultivation during 2004.[19] A key component of Plan Colombia is the manual and aerial eradication of coca and poppy crops. (See the tables below for eradication and cultivation statistics.) The United Nations Office on Drugs and Crime (UNODC) estimates that at the end of 2003, Colombia had 212,506 acres of coca under cultivation, having reduced its production by 47% since 2000. Opium poppy under cultivation covered about 10,000 acres, from 16,000 acres in 2000.[20] In 2004, ONDCP reports that 337,000 acres of coca and 27,000 acres of opium poppy were sprayed. However, its recently completed survey concluded that the area under cultivation for coca remained stable in 2004, due to replantings of previously eradicated crops. Although the 282,000 acres of existing coca crops remained stable, ONDCP argues that cocaine production fell from 460 to 430 metric

---

[17] U.S. Drug Enforcement Agency, Drug Intelligence Briefing, *Federal-Wide Drug Seizures 1999-2003*, June 2004.

[18] U.S. Department of State, *International Narcotics Control Strategy Report 2004* (covering 2003, released in March 2004), and *International Narcotics Control Strategy Report 2005* (covering 2004, relased in March 2005).

[19] ONDCP, *2004 Coca and Opium Poppy Estimates for Colombia and the Andes*, March 25, 2005.

[20] United Nations Office of Drugs and Crime, *2004 World Drug Report*, June 2004. While the State Department reports that 323,400 acres were sprayed in 2004, the United Nations reports that there were 212,506 acres of coca under cultivation by the end of 2003. The difference could be due to different survey methodology used, or to replantings. Spraying does not prevent, although it may discourage, replantings of illicit crops.

CRS-6

tons in the previous year because newly-planted crops are less productive. Opium poppy cultivation decreased by 52% between 2003 and 2004.

In order to induce growers to give up illicit crops, ACI funding supports alternative development programs administered by the U.S. Agency for International Development. The State Department reports that 12,845 families benefitted from this type of assistance in 2004, and a total of 44,015 families have benefitted since 2001. The program supported the development of 40,791 acres of licit crops in 2004, and 136,000 acres since 2001. In 2004, USAID completed 244 infrastructure projects, bringing the total to 874 since 2001.

### Table 1. Eradication of Drug Crops, 2003-2004
(in acres)

|  | 2003 | 2004 |
| --- | --- | --- |
| Coca crops sprayed | 313,800 | 337,427 |
| Opium poppy sprayed | 7,000 | 7,561 |
| Coca crops manually eradicated | 21,000 | 27,159 |
| Opium poppy manually eradicated | 2,500 | 3,699 |

Source: U.S. Department of State, *INCSR 2005*.

### Table 2. Change in Acreage Under Cultivation, 2002-2004

|  | 2002 | 2003 | 2004 |
| --- | --- | --- | --- |
| Coca | — 15% | — 21% | — 0% |
| Opium Poppy | — 24% | — 10% | — 52% |

Source: U.S. Department of State, *INCSR 2005*, and ONDCP.

The eradication program, including the aerial fumigation of crops, has been controversial. Criticism has centered on the possible environmental and health effects of the fumigant used, and on the pace of development programs to provide farmers with alternatives to drug crop cultivation. Some critics argue that the ratio of security assistance to alternative development programs is skewed too heavily in favor of the former. They contend that more resources need to be devoted to development as the only sustainable method to reduce drug crop cultivation in the long run.[21] They believe the focus on counternarcotics at the level of coca cultivation

---

[21] Lisa Haugaard, Adam Isacson, Kimberly Stanton, John Walsh and Jeff Vogt, "Blueprint for a New Colombia Policy," March 2005, and Coletta A. Youngers and Eileen Rosin, "The
(continued...)

001337



CRS-7

causes serious problems for growers who rely on illicit crops for their livelihoods. They contend that spray drift has destroyed licit crops and that growers seeking compensation, as provided by law, are regularly denied benefits.[22] Some observers also contend that eradication of crops in one area results in their displacement to other areas, and they cite coca production increases in Bolivia of 17% in 2003. In the same period, cultivation in Peru dropped 15%. In 2004, cultivation increased slightly in Bolivia and fell slightly in Peru, according to ONDCP. This information counters the prediction of an official with Peru's anti-narcotics agency that acreage devoted to growing coca probably increased in 2004 and that further increases could be expected in 2005.[23]

Some observers argue that reporting the acreage of crops sprayed does not reflect actual cultivation, and that the technology used does not produce accurate assessments. Fumigation causes defoliation, but does not always kill the plant. Further, spraying does not prevent, although it may discourage, the replantings of illicit crops. There are also indications that growers are resorting to smaller plots, and are interspersing them with legitimate crops, making the aerial imaging of plantings difficult. The UNODC reported that the size of single plots had decreased, with the majority on plots of 7.4 acres or less.[24]

**Violence and Crime.** Most observers agree that public safety conditions in Colombia have improved. Police have been redeployed to areas from which they had been previously ousted by armed groups, and now have a presence in every municipality. A greater security presence has significantly given Colombians more confidence to travel by road. According to the State Department, the Colombian National Police has trained and deployed 9,176 officers to rural areas, 8,166 to protect major roadways, and 397 to defend 12 of the country's 16 petroleum pipelines. Although the rate of kidnappings has decreased significantly, Colombia still has the highest kidnapping rate in the world. Various studies conclude that the cost of the armed conflict to the Colombian economy is between 3% and 7% of GDP.[25]

---

[21] (...continued)
U.S. 'War on Drugs': Its Impact in Latin America and the Caribbean," in *Drugs and Democracy in Latin America: The Impact of U.S. Policy*, Lynne Rienner Publishers, 2004.

[22] Maria Clemencia Ramirez Lemus, Kimberly Stanton and John Walsh, "Colombia: A Vicious Circle of Drugs and War," in *Drugs and Democracy in Latin America: The Impact of U.S. Policy*, Lynne Rienner Publishers, 2004.

[23] Robin Emmott, "Colombia Cocaine Purge Drives Up Peru Drug Output," *Reuters*, January 8, 2005. Fernando Hurtado, deputy head of DEVIDA, the government anti-narcotics agency, was quoted: "Coca eradication in Colombia has been successful, but less coca means prices rise and drug traffickers are coming to Peru to plant."

[24] Ibid. UNODC. See also, "War And Drugs in Colombia," International Crisis Group, January 27, 2005, and "Going to Extremes: The U.S. Funded Aerial Eradication Program in Colombia," Latin American Working Group, March 2003.

[25] Mauricio Cárdenas, Ximena Cadena, and Carlos Caballero, "Análisis del Incremento en el Gasto en Defensa y Seguridad: Resultados y Sostenibilidad de la Estrategia," Fundación
(continued...)

CRS-8

## Table 3. Measures of Violence

|  | 2004 |
|---|---|
| **Homicides** | — 15% |
| **Massacre Events** | — 52% |
| **Massacre Victims** | — 48% |
| **Kidnappings (total)** | — 34% |
| **Kidnappings for Extortion** | — 49% |
| **Illegal Road Blocks (Jan.-Oct.)** | — 62% |

**Source:** Ministry of Defense, Government of Colombia

**Armed Conflict.** A major goal of the Colombian government is to end the armed conflict that has plagued the country for more than 40 years. Several illegally armed groups of both the right and left operate in the country and derive profit from participating in the drug trade. The two main leftist guerrilla groups are the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN). Most of the rightist paramilitary groups are coordinated by the United Self-Defense Forces of Colombia (AUC). The AUC, with estimated membership ranging from 12,000 to 19,000, has agreed to demobilize, resulting in their planned disbandment by the end of 2005. While legislation that would provide for conditional sentencing for their human rights abuses and other crimes, as well as their reintegration into society, has not yet been approved by the Colombian legislature, the demobilization process has been proceeding. By the end of 2004, about 3,500 members have demobilized. In January 2005, another 900 laid down their arms. Critics of the program argue that a legal framework is not in place that would hold AUC members accountable for their crimes, that the process is being exploited by common criminals seeking government relief, and that the AUC has not abided by the terms of a cease-fire that was an integral component of the demobilization process.[26]

Negotiations with the FARC have not taken place under the Uribe Administration, since the FARC has refused Uribe's demands that they first agree to a cease-fire and demobilization. The FARC controls vast territory in the country, mainly in the southern and eastern regions. There is conflicting evidence of FARC resources, most likely due to the difficulty in determining the extent of their business activities. The United Nations estimates that the FARC's average annual income is $342 million of which $204 million comes from the drug trade. However, the

[25] (...continued)
Seguridad y Democracia, February 2005.

[26] Human Rights Watch, "Colombia Demobilization Scheme Ensures Injustice," January 18, 2005.



CRS-9

Colombian Finance Ministry reports FARC revenue in 2003 at $77.16 million, of which drug trafficking accounted for $11.54 million.[27]

In mid-2003, the Colombian military's *Plan Patriota*, a campaign to recapture FARC-held territory, began operations to secure the capital and environs of Bogotá from FARC attack. This phase was largely seen as successful, based on the decrease in kidnappings and roadblocks in the region. In 2004, military operations, conducted by up to 17,000 troops, turned to regaining FARC territory in the southern and eastern regions of the country. Anecdotal evidence indicates that the Colombian military has forced the FARC to change tactics by atomizing into smaller cells to avoid detection and reducing the number of large-scale attacks on military facilities.[28] However, recent FARC attacks on military facilities and other military engagements have resulted in about 70 Colombian military casualties and indicate an offensive capability.

The Colombian military claims that *Plan Patriota* has reduced FARC ranks from 18,000 to 12,000 in the past year.[29] Information provided by the Office of the Colombian President reports that the campaign was able to take back control of 11 FARC-run villages, destroy more than 400 FARC camps, capture 1,534 explosive devices and 323 gas-cylinder bombs, kill 2,518 combatants, and capture large amounts of ammunition and weapons. With regard to FARC drug trafficking activities, as of September 2004, it was reported that the Colombian military located and destroyed more than 47 tons of solid chemical supplies, 18,000 gallons of liquid precursors, half a ton of cocaine base, and $34,000 in cash.

The smaller ELN, which some observers believe is less involved in the drug trade, has been more amenable to talks with the government. Both the ELN and the Colombian government accepted a 2004 Mexican offer to facilitate peace negotiations, although a cease-fire is not in effect. However, in April 2005, the ELN rejected Mexican facilitation after Mexico voted to condemn Cuba at the U.N. Human Rights Commission. Earlier in 2004, the group indicated its willingness to participate in elections scheduled for 2006, although its leadership has stated that it will not stop kidnappings for ransom.

With regard to *Plan Patriota*, critics argue that because the territory is so rugged and inaccessible, complete defeat of the FARC may be impossible. They further point to the campaign's negative effects on the civilian population by measuring the number of internally displaced persons (IDP). There are conflicting reports on IDP levels. The Colombian government reports that displaced persons dropped 37% from

---

[27] United Nations Development Program, *National Human Development Report 2003: Solutions to Escape the Conflict's Impasse*, October 8, 2004, and "Las Cuentas de las Farc," Semana.com, January 30, 2005.

[28] "FARC Losing Battle to Colombian Government, Analyst Says," BBC, October 13, 2004.

[29] Juan Pablo Toro, "Colombian General Says Rebels on the Run," *Associated Press*, February 3, 2005, Steven Dudley, "Rebels Kill 15 in Raid on Navy Base," *The Miami Herald*, February 2, 2005, Juan Forero, "Image Offensive: Rebels Undercut Colombian President," *New York Times*, February 12, 2005, "Rebels Kill 17 Colombian Troops With Mines, Guns," *Reuters*, April 7, 2005.

CRS-10

2003, while a Colombian human rights groups reported that levels increased 39% from 208,000 in 2003 to 289,000 in 2004, many of whom have not registered with the Colombian government as displaced.[30] The Department of Defense reports that Southern Command (Southcom) is supporting the development of a civil affairs capability of the Colombian military to mitigate the negative impact of military operations, and to integrate humanitarian assistance into military planning.

Some critics of U.S. policy believe that assistance to the Colombian military serves to increase its autonomy from civilian authority, and provides a rationale for the military to be concerned with internal enemies, in the form of drug traffickers, rather than external threats, the standard function of militaries. This is of particular concern in Latin America where militaries have often intervened in civilian politics. Critics contend that the United States should not be expanding the role of foreign militaries to perform functions that would not be in line with its own laws or those of other democracies. (The U.S. Posse Comitatus Act of 1878 established the principle prohibiting the use of the armed forces in law enforcement activities.) According to this argument, U.S. assistance counters other U.S. objectives, such as to promote democracy by ensuring civilian control of the military. Instead, it blurs the distinction between police and military functions.[31]

**Economic Development.** Confidence in the economy has increased with the improved security situation, although some observers believe the country's economic rebound may be stalling.[32] The World Bank characterizes Colombia as a middle income country, with per capita GDP of $7,040 in 2003, according to the U.N. Development Program. GDP growth was 3.5% in 2004 with an inflation rate of 5.5%. It is estimated that the drug trade contributes between 2.0% and 2.5% to Colombia's annual GDP.[33] Colombia had the best performing stock market in the world in 2004. Colombian exports help the economic situation, especially the benefits it receives under the Andean Trade Promotion and Drug Eradication Act. Colombia, with Peru and Ecuador, is currently negotiating a free trade agreement with the United States.

Colombia has been an important petroleum exporter, but the armed conflict has led to production decreases. Oil exports are its largest single source of foreign revenue, accounting for 28% of export revenues and 10% of government revenues in 2003. Production declined to 560,206 barrels per day (bbl/d) in 2003 from a high of 830,000 bbl/d in 1999. It exported 195,000 barrels per day to the United States in 2003, a decrease of 25% from 2002. This follows a 13.5% decline the previous

---

[30] Cesar Garcia, "Colombian Rights Group: Offensive Against Rebels Forcing Thousands of Peasants to Flee Their Homes," *Associated Press*, February 1, 2005.

[31] Adam Isacson, Lisa Haugaard, and Joy Olson, "Creeping Militarization in the Americas," in *NACLA Report on the Americas*, November-December 2004, and Adam Isacson, "The U.S. Military in the War on Drugs," in *Drugs and Democracy in Latin America*, 2004.

[32] "Colombia: Country Risk Summary," *Economist Intelligence Unit*, February 3, 2005.

[33] "Country Briefings: Colombia. Economic Structure," *Economist Intelligence Unit*. December 29, 2003.


CRS-11

year.[34] Both the FARC and ELN have targeted energy production and transportation infrastructure. A major target has been the 490-mile Caño Limón Coveñas oil pipeline. In 2001, it was bombed 170 times resulting in shutdowns for seven months at a cost of approximately $500 million in revenues and royalties to Colombia. Since then, there has been a marked decrease in attacks. Aggressive exploration of new reserves has been hindered by the fighting and the lack of effective government control of all parts of the country. Colombian officials have warned that the country could soon become a net importer of oil if no new significant fields are found.

### Table 4. Attacks on Oil Pipelines, 2001-2004

|  | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| Caño Limón Coveñas | 170 | 41 | 34 | 17 |
| All Pipelines | 263 | 74 | 179 | 103 |

**Source:** Ministry of Defense, Government of Colombia.

**Promotion of Democracy, Rule of Law, and Human Rights.** The promotion of democracy and rule of law, and respect for human rights are shared components of both Colombian and U.S. objectives for Plan Colombia. The State Department's annual report on human rights for 2004 reported that some progress had been made, but that serious problems remained. In 2004, there were between 3,000 and 4,000 civilian deaths due to the armed conflict. While the civilian judiciary is considered independent of the executive branch, it is reported to be "overburdened, inefficient, and subject to intimidation and corruption by terrorist groups and common criminals."[35] The State Department report recognized that the security forces were under the effective control of civilian authorities, but that there were still instances in which members of the security forces committed serious violations of human rights, including cooperation with paramilitary groups. Labor union leaders continued to be targeted by illegally armed groups, hindering trade union activities, but killings of trade union leaders declined 25% during 2004.

The U.S. Agency for International Development supports programs to modernize the criminal justice system, promote human rights, strengthen local government, and increase transparency. Thirty-seven "justice houses," providing access to legal services, have been created, handling about 2.7 million cases since 2001. USAID also helped establish 35 oral trial courtrooms, and provided training for judges in oral trials, legal evidence and procedures. The establishment of oral courtrooms is part of a larger effort to transition Colombia's judicial system from a Napoleonic to an accusatorial system, that it is believed will also improve its efficiency. Transparency International, a non-governmental organization that monitors corruption, reported that Colombia's ranking in its annual survey had improved by 17% between 2000 and 2003.

---

[34] U.S. Energy Information Administration, U.S. Department of Energy, "Colombia: Country Analysis Brief," July 2004.

[35] U.S. Department of State, *Country Reports on Human Rights Practices, 2004.*

001342



CRS-12

Non-governmental organizations monitoring human rights have consistently criticized the State Department for certifying that the Colombian government is making progress with regard to human rights. U.S. law requires that the Secretary of State annually certify that the Colombian military is suspending any personnel credibly alleged to have committed human rights violations or to have aided paramilitaries; that the government is cooperating with human rights investigations and is prosecuting those involved in violations; and that steps are being take to sever links between the military and paramilitaries and dismantle paramilitary leadership and financial networks. Critics point to the State Department's own annual human rights report indicating that there is still collusion between paramilitaries and members of Colombia's security forces and that little progress has been made on a number of pending investigations. Human rights organizations have also expressed alarm at the passage of anti-terrorism legislation that grants Colombia's security forces increased powers to detain suspects for up to 36 hours, to search homes, and to tap phones, without a legal warrant. In September 2004, the country's constitutional court ruled the legislation unconstitutional.

**Regional Stability.** A justification for U.S. policy in the region is that drug trafficking, with its money laundering and corruptive influences, and armed insurgencies in Colombia have a destabilizing effect on the region. With porous borders amid rugged territory, and an inconsistent state presence in some areas, border regions are seen as particularly problematic. Colombia shares lengthy borders with Venezuela, Peru and Brazil, and much shorter borders with Ecuador and Panama. The State Department's *2004 Patterns of Global Terrorism* report states that Venezuela "continued to be unwilling or unable to assert control over its 1,400-mile border with Colombia," with the FARC and ELN using Venezuelan territory as safehavens, and to transship arms and drugs, secure logistical supplies, and commit kidnappings and extortion. Ecuador has been affected, according to a Colombian human rights monitoring organization, by a flow of displaced Colombians fleeing the fighting in the south of Colombia.[36] The situation has at various times heightened tension between Colombia and Venezuela, the most recent tensions due to the kidnapping of a FARC official in Venezuela, who then turned up in Colombian custody.

**Prospects for U.S. Disengagement.** Plan Colombia was presented to Congress as a six-year plan, and several committees held hearings in 2003 to assess its progress at the mid-way point. Despite some expectations that U.S. support for Plan Colombia would end, or begin to decrease in FY2006, U.S. and Colombian officials have argued that significant progress has been made, but that more needs to be done.[37] While there has been measurable progress in Colombia's internal security, as measured by decreases in violence, and in the eradication of drug crops, no effect has been seen with regard to price, purity, and availability of cocaine and heroin in the United States. Military operations against illegally armed groups have intensified, but the main leftist guerrilla group has neither been defeated, nor brought closer to wanting to enter peace negotiations. The demobilization of rightist

---

[36] Ibid., Garcia, February 1, 2005.

[37] Pablo Bachelet, "Bush Wants Spending on Colombia Drug War Altered Little," *The Miami Herald*, February 8, 2005.

001343



CRS-13

paramilitary fighters is proceeding, but without a legal framework for holding demobilized persons accountable for criminal activity, human rights abuses, or preventing them from joining armed groups in the future.

While the demobilization process holds the promise of removing up to 19,000 fighters from the conflict, Congress has expressed concerns that the process ensures that illegally armed groups are dismantled, deters members from resuming illegal activities, and holds accountable those who have violated human rights and committed other crimes. The FY2005 Consolidated Appropriations Act (P.L. 108-447) recommended that the State Department not request funding for demobilization until the Department of Justice determines that the process is consistent with U.S. anti-terrorism laws, that the demobilizing groups are respecting a cease-fire and cessation of illegal activities, and that the legal framework eventually adopted not prevent the extradition of suspected criminals to the United States.

Some Members of Congress have urged the "Colombianization" of the program, under which Colombian security forces would assume the operational capabilities to take over functions now provided by the United States. General James T. Hill testified to Congress in 2004, when he was the head of the U.S. Southern Command, that the capabilities of the Colombian military had measurably improved, as evidenced by *Plan Patriota*.[38] On the other hand, the Government Accountability Office reported in 2003 that Colombia was not capable of assuming more responsibilities in the near future, despite U.S. training programs.[39] The Colombian government is now spending more on its security forces than ever (4.5% of GDP), but some observers doubt the sustainability of the effort without fiscal reforms.[40]

Some Members believe the international community should be providing more support for Plan Colombia. The Western Hemisphere Subcommittee of the House International Relations Committee held hearings on the topic on November 18, 2004. Rates of cocaine abuse have increased in Europe, yet critics argue that Europe has not provided sufficient levels of assistance. The Colombian Agency for International Cooperation reported that the European Union and its member states spent about $120 million in Colombia in 2003.[41] At a February 3-4, 2005 international donors conference held in Cartagena, Colombia, attended by the United States, Europe, Japan, Canada, Argentina, Brazil, Chile and Mexico, the Colombian government presented its demobilization plan and the need for international support. It is

---

[38] Testimony of General James T. Hill, Commander, U.S. Southern Command, U.S. House Government Reform Committee, June 17, 2004.

[39] U.S. Government Accountability Office, *Drug Control. Specific Performance Measures and Long-Term Costs for U.S. Programs Have Not Been Developed*, June 16, 2003, GAO-03-783.

[40] Cárdenas, et al., 2005.

[41] Testimony of Robert R. Charles, Assistant Secretary, Bureau of International Narcotics and Law Enforcement, U.S. Department of State, Western Hemisphere Subcommittee of the House International Relations Committee hearing on Aid to Colombia: The European Role in the Fight Against Narco-Terrorism, November 18, 2004.

001344

CRS-14

estimated that the AUC demobilization will cost about $160 million.[42] Donors expressed support for the demobilization process, but insisted that Colombia adopt a legal framework that ensures demobilized fighters are prosecuted for crimes, citing the need for "truth, justice, and reparations," before aid would be committed.[43]

---

[42] Gary Marx, "Colombia Demobilization Plan Faulted," *Chicago Tribune*, January 19, 2005.

[43] Hugh Bronstein, "Colombia Is Told New Laws First, Then Aid," *Reuters*, February 3, 2005.



# EXHIBIT
# J.-2

Facing the Threat Posed by Iranian Regime  |  Daily Press Briefing

SEARCH

| Home | Issues & Press | Travel & Business | Youth & Education | About State Department |

Fact Sheet
Bureau of Western Hemisphere Affairs
Washington, DC
March 14, 2001

# Plan Colombia

The Government of Colombia developed "Plan Colombia" as an integrated strategy to meet the most pressing challenges confronting Colombia today -- promoting the peace process, combating the narcotics industry, reviving the Colombian economy, and strengthening the democratic pillars of Colombian society. Plan Colombia is a $7.5 billion program. President Pastrana has pledged $4 billion of Colombian resources and has called on the international community to provide the remaining $3.5 billion to assist this effort.

**U.S. Support**
In response to Plan Colombia, and in consultation with the Colombian Government, the United States is providing a $1.3 billion total U.S. interagency assistance package to Colombia.

Adding to previously approved U.S. assistance to Colombia of over $330 million, the assistance package provided an additional $1.3 billion as an emergency supplemental. The total U.S. interagency assistance package will help Colombia address the broad range of complex and inter-related challenges it faces -- its efforts to fight the illicit drug trade, to increase the rule of law, to protect human rights, to expand economic development, to institute judicial reform, and to foster peace.

**Five Components of U.S. Assistance**
**I. Support for Human Rights and Judicial Reform**
The total U.S. interagency assistance package provides $122 million for a broad range of human rights, judicial reform, and other programs designed to support the peace process and to strengthen democracy and the rule of law in Colombia. Specific initiatives include protecting nongovernmental organizations (NGOs) concerned with human rights ($4 million); strengthening human rights institutions ($7 million); establishing human rights units within the Colombian National Police (CNP) and the Colombian attorney general's office ($25 million); training judges and prosecutors ($7.5 million); and providing funding to train and support Colombian law enforcement personnel in anti-corruption, anti-money laundering, and anti-kidnapping measures.

**II. Expansion of Counter-Narcotics Operations into Southern Colombia**
The total U.S. interagency assistance package includes $390.5 million to support the Government of Colombia's objective to gain control of the drug producing regions of southern Colombia. These funds will support certain aspects of training and equipping the second and third counternarcotics battalions in the Colombian army. It will fund procurement and support of 14 UH-60 Blackhawk helicopters ($208 million); procurement, refurbishment, and support of 30 UH-1H Huey II helicopters ($60 million); and support for 15 UH-1N helicopters ($60 million) for use by the Colombian army.

Funding for this element of Plan Colombia includes important humanitarian assistance and development components. It includes $15 million to help persons displaced by conflict in the region. This funding is in addition to funds previously provided by the U.S. Government to the International Committee of the Red Cross (ICRC) and the United Nations High Commissioner for Refugees (UNHCR) to assist internally displaced persons in Colombia. This funding component also provides $10 million in developmental assistance, including technical and agricultural assistance to farmers in southern Colombia.

**III. Alternative Economic Development**
The total U.S. interagency assistance package provides $81 million to support alternative and economic development programs in Colombia to assist small farmers who now grow coca and opium poppies make the transition to legal economic activity as interdiction and eradication make narcotics farming less profitable. These funds are in addition to funds provided for alternative development associated with the Colombian Government's efforts focused on southern

001347

Colombia. Included within this package are $27.5 million to assist internally displaced persons, more than $30 million for voluntary eradication programs, $12 million in assistance to local governments, and $2.5 million for environmental programs to protect fragile lands and watersheds. Funds are also made available for alternative and economic development in Bolivia ($85 million) and Ecuador ($8 million).

## IV. Increased Interdiction

The assistance package provides $129.4 million to enhance U.S. and Colombian narcotics interdiction efforts. The majority of these funds ($68 million) are dedicated to upgrading the radar systems in four U.S. Customs Service P-3 airborne early warning interdiction aircraft used to detect and monitor suspect targets destined for the United States from cocaine source zones, including Colombia; $16.9 million has been made available to upgrade the Colombian Air Force OV-10 aircraft, $19.5 million to support Colombian air interdiction programs, $14 million to support and provision Colombia's riverine interdiction program, and $1 million to support the Colombian navy's counternarcotics intelligence infrastructure. In addition $18 million has been made available to support interdiction programs in other countries in South and Central America and the Caribbean, including specifically Bolivia and Ecuador.

## V. Assistance for the Colombian National Police

The total U.S. interagency assistance package includes $115.6 million to support the CNP. This includes $26 million for procurement, training, and support for two UH-60 Blackhawk helicopters; $20.6 million for 12 UH-1H Huey II helicopters; and $20 million for purchase of Ayers S2R T-65 agricultural spray aircraft and OV-10 aircraft. Funds are also made available for communications equipment, ammunition, spare parts, training, and logistical support.

### Related Issues
### The Peace Process

The U.S. and Colombian Governments agree that ending the civil conflict is central to solving Colombia's problems. A peace agreement would stabilize the nation, speed economic recovery, and help assure the protection of human rights. A successful peace process would also restore the authority and control of the Colombian Government in the coca-growing region. The U.S. Government is hopeful that the peace negotiations now going on between the Colombian Government and the Revolutionary Armed Forces of Colombia (FARC) guerrilla group and the Colombian Government and the National Liberation Army (ELN) guerrilla group prove successful.

U.S. assistance in support of Plan Colombia is intended to counter the illicit trade in narcotics. All U.S. counternarcotics assistance to Colombia will continue to be in the form of training, goods, and services. The counternarcotics components of Plan Colombia will be implemented by the Colombian police and the Colombian armed forces.

### Human Rights

U.S. assistance to Colombian military and police forces is provided under strict application of U.S. law designed to protect human rights – the so-called "Leahy Amendment." No U.S. assistance is provided to any unit of the Colombian security forces for which there is credible evidence of gross human rights violations, unless the Secretary of State is able to certify that the Government of Colombia has taken effective measures to bring those responsible to justice. The U.S. Government has in place a rigorous process to screen those units being considered to receive assistance or training.

### Displaced Persons

NGOs report that Colombia has the fourth-largest population of internally displaced persons in the world. The vicious conflict between paramilitaries and guerrillas is largely responsible for the forced displacement of Colombians. A recent UNHCR report estimates an "accumulated total" of 525,000 internally displaced persons (IDPs) in Colombia who have not satisfactorily resettled or returned home. In 1999, the U.S. Government provided $5.8 million to the ICRC's Western Hemisphere operations for assistance to IDPs, with an additional $3 million earmarked for Colombia. The U.S. contributed another $4.7 million to UNHCR's general fund for the Western Hemisphere, a portion of which was used for institutional capacity building in Colombia.

Note: Funding levels as contained in the Military Appropriations Act for FY 2001 (H.R. 4425)

[End.]



**Updates | Contact Us | Email this Page | FOIA | Privacy Notice | Subject Index | Search**
The Office of Electronic Information, Bureau of Public Affairs, manages this site as a portal for information from State Department. External links to other Internet sites should not be construed as an endorsement of the views or policies contained therein.
**Copyright Information | Other U.S. Government Information**

http://www.state.gov/p/wha/rls/fs/2001/1042.htm

3/9/2006

001348

# EXHIBIT

# J -3

**Previous**

**Public Statement**

AI Index AMR 23/049/2000 - News Service Nr. 121
21 June 2000
**External -- For response**

## Amnesty International's position on Plan Colombia

The Colombian Government has presented to the international community an aid package known as APlan Colombia@. The Plan - presented as the means by which the international community can support the peace process between the Colombian government and armed opposition groups - is seeking around one and a half billion US dollars from the United States of America and some two billion US dollars from Japan, Canada, the European Union, Switzerland, other western governments and international financial institutions.

According to the Colombian government: "...the government has drawn up Plan Colombia, which in the framework of a peace building policy, [has] joined together strategies for negotiations with the guerrillas, the protection of human rights, the strengthening of the state, the recovery of the economy, control on the expansion of unlawful crops, and the protection of the environment".

Amnesty International believes it is of vital importance that the international community seek effective ways of contributing to ending the human rights crisis and to achieving a settlement of the armed conflict in Colombia. However, the organization has serious concerns regarding the impact of Plan Colombia on human rights and the armed conflict.

Plan Colombia is based on a drug-focussed analysis of the roots of the conflict and the human rights crisis which completely ignores the Colombian state=s own historical and current responsibility. It also ignores deep- rooted causes of the conflict and the human rights crisis. The Plan proposes a principally military strategy (in the US component of Plan Colombia) to tackle illicit drug cultivation and trafficking through substantial military assistance to the Colombian armed forces and police. Social development and humanitarian assistance programs included in the Plan cannot disguise its essentially military character. Furthermore, it is apparent that Plan Colombia is not the result of a genuine process of consultation either with the national and international non-governmental organizations which are expected to implement the projects nor with the beneficiaries of the humanitarian, human rights or social development projects. As a consequence, the human rights component of Plan Colombia is seriously flawed.

1. Amnesty International opposes the military aid program for Colombia because the organization believes that it will escalate the armed conflict and the human rights crisis. The organization has documented overwhelming evidence of the responsibility of illegal paramilitary organizations for widespread, systematic and gross human rights violations.

There is also conclusive evidence that paramilitary groups continue to operate with the tacit or active support of the Colombian armed forces. Evidence has also emerged that Colombian army personnel trained by US special forces have been implicated by action or omission in serious human rights violations, including the massacre of civilians. Military equipment provided by the US to the Colombian armed forces has reportedly been used in the commission of human rights violations against civilians. Amnesty International does not believe that mechanisms are in place to ensure that future weapons transfers to the Colombian armed forces will not be transferred to illegal paramilitary organizations or will not be used by the military to facilitate human rights violations by paramilitary or their own forces. As long as the Colombian government fails to disband paramilitary groups allied with the Colombian armed forces, US military aid to the Colombian armed forces inevitably risks exacerbating the human rights crisis. Moreover, military operations contemplated in the Plan anticipate the internal displacement of tens of thousands of Colombians thereby aggravating an existing humanitarian crisis of alarming proportions.

2. AI is also concerned that paramilitary organizations may be employed as part of the military strategy contemplated in Plan Colombia. Although a formal role is not acknowledged in Plan Colombia, their recently established presence in key areas targeted for military operations (Putumayo department and the Catatumbo region of North Santander) would appear to be more than coincidental. The paramilitary strategy of attacking and eliminating civilian organizational and grassroots structures is designed to anticipate and prevent any organized opposition to the military eradication of illicit crops.

3. The organization is also concerned about the consequences of any financial support for infrastructure or other development projects which will inevitably fuel land speculation in those regions. Such speculation may encourage the development of paramilitary activity in those areas in order to seize control of assets (land or other) in order to capitalize on their increase in value. Any economic development project funding cannot, therefore, be separated from the issue of human rights. It is essential to prioritize action on combatting and dismantling paramilitary groups in advance of the dispersal of funds to ensure that aid for development projects does not, even inadvertently, encourage paramilitary activity and human rights violations.

4. The human rights assistance component of Plan Colombia is inadequate and largely misdirected. It fails to address the principal causes of the human rights crisis identified by the UN and other international bodies including the root causes of impunity and the need to combat illegal paramilitary organizations. Unless the Colombian government adopts international recommendations and acts on these two key fronts, human rights programs contained in Plan Colombia will be little more than cosmetic.

5. Humanitarian assistance programs for internally displaced persons fail to address the causes of displacement and are merely designed to mitigate its consequences and thereby reduce the visibility of the internally displaced, including those people displaced as a consequence of the Plan's military operations.

6. The framework for international support for human rights in Colombia must be the recommendations made by the United Nations High Commissioner for Human Rights and other UN human rights mechanisms. In particular the international community should ensure that programs it supports form part of a clear government policy to address key issues such as impunity and the dismantling of paramilitary organizations. Respect for human rights is an essential pre-requisite to achieving a negotiated resolution of the armed conflict. Only by ensuring that fundamental civil and political rights are protected can Colombia hope to achieve genuine national reconciliation based on peace and justice.

Amnesty International opposes Plan Colombia for the reasons given above. However, the organization believes that it is essential that the international community engage more actively with Colombia and that it find ways of contributing to ending human rights violations and to achieving a genuine and lasting settlement to the conflict. As a first urgent step, the international community should demand that the Colombian government and the parties to the conflict urgently discuss, reach and implement a verifiable agreement to fully respect fundamental human rights and international humanitarian law.

June 2000

Amnesty International public document
*****************************************************************:
For more information please call Amnesty International's press office in London, UK, on 44 171 413 5566

**Previous**



# EXHIBIT

## J. -4



SEARCH
CONTACT
PODCAST
MOBILE WEB
BLOG

International

**Fact Sheets**
Bolivia
Mexico
Peru
Synthetic Drugs
Interdiction
  Operations
Money Laundering
Democracy and
  Human Rights
Regional Drug
  Control
Precursor Chemicals
Forward Operating
  Locations
Certification
Heroin Sources
Cocaine Sources
Reducing Corruption
U.S.-Colombia
  Initiative

Drug Sources

Publications

Resources

| Home | About ONDCP | News & Public Affairs | Policy | Drug Facts | Publications | Related Links |
|---|---|---|---|---|---|---|
| Prevention | Treatment | Science & Technology | Enforcement | State & Local | International | Funding |

## The U.S.- Colombia Initiative
### ONDCP FACT SHEET

**Overview**

On July 13, 2000 the Congress approved a two-year funding package to assist Colombia in vital counter-drug efforts aimed at keeping illegal drugs off U.S. shores and to help Colombia promote peace, prosperity, and a stronger democracy. The aid package was one of the largest and most comprehensive efforts by the U.S. to help an ally in Latin America deal with a national drug emergency.

Plan Colombia was developed in 1999 by the Government of Colombia (GOC) with strong US Government (USG) encouragement. It focuses on five critical areas:

- Curbing narcotrafficking
- Reforming the justice system
- Fostering democratization and social development
- Stimulating economic growth
- Advancing the peace process

U.S. assistance is part of a balanced strategy developed by Colombia to deal with that country's multiple problems. A combination of law enforcement, interdiction, alternative economic development, and judicial reform has contributed to reduction in drug production in other countries, such as Peru, Bolivia and Thailand.

**Results**

The results of Plan Colombia have met all of the goals in the areas listed above. Below is an outline of progress in Colombia to date:

1. *Reduce the production, processing, trafficking, and corruptive influence of drug trafficking organizations.*

   - Reduced coca cultivation by 21 percent in 2003 and 15 percent in 2002. Cultivation in Putumayo has decreased by over 90 percent. Overall coca cultivation was 113,850

001354

Case 3:08-cv-00885-SI    Document 1-30    Filed 02/08/2008    Page 42 of 53

International Fact Sheet: The U.S. Colombia Initiative - ONDCP    Page 2 of 4

hectares in 2003, significantly below the record highs of 169,800 hectares in 2001.

- Interdicted over 150 metric tons of cocaine in the Source and Transit Zones in 2003—will exceed that for 2004.

- Have extradited to the U.S. 92 traffickers in 2004; 68 in 2003; and 181 total under President Uribe since August 7, 2002.

2.  *Increase the presence and effectiveness of the Justice System.*

- 37 houses of justice have been established in Colombia that have handled over 2.6 million cases. Thirty-five oral trial courtrooms have been established and in 2005 Colombia will begin phasing in an accusatory system of justice.

3.  *Strengthen institutional presence, efficiency and effectiveness at national, regional and local levels in order to improve governance in the nation and increase the citizens' confidence in the State.*

- Improved public services at 38 municipalities.

- Fiscally strengthened 97 municipalities.

- Colombian National Police have established a presence in all 1098 municipalities in Colombia for the first time in history.

- Municipal elections in 2003 were held across Colombia without interruption by illegal armed groups.

4.  *Promote citizen involvement as a means for developing participatory democracy.*

- Over 220 citizen oversight committees have been formed and 100 have been strengthened

5.  *Instill respect for Human Rights and promote compliance with international humanitarian law in Colombian society.*

- Commission of jurists reported that of 2,500 human rights allegations in Colombia over the past year, less than 2% were against the Colombian military (constituted 40-50 percent of allegations 6–7 years ago). There have been no allegations of human rights abuses filed against U.S.-trained units. There have been 21 regional Early Warning System offices established that prompted 195 responses from the GOC.

6.  *Provide humanitarian assistance to those segments of the population which have been victimized by violence, with special emphasis on the displaced population and the most vulnerable groups.*

- Over 2,000,000 internally displaced persons (IDPs) have been assisted; the number of IDPs requesting assistance

http://www.whitehousedrugpolicy.gov/publications/international/factsht/us-columbia.html    3/9/2006

001355

has dropped in the past year.

7. *Prevent further deterioration of ecosystems and implement measures to conserve and recover their environmental functions and build sustainable development options.*

   - President Uribe established the Forest Ranger program with over 20,000 participants to protect several national parks that are being threatened by coca cultivators.

8. *Initiate rapid steps in the South to facilitate the transition to legal activities and to generate socially, economically, and environmentally sustainable alternatives to drug trafficking and violence.*

   - With the help of U.S. AID, sustainable alternatives have been established in Putumayo and other regions affected by coca and poppy cultivation—over 44,000 families have benefited and over 22,000 hectares of illicit crops have been manually eradicated. Over 55,000 hectares of licit crops have been supported and 25,000 hectares of forest have been maintained and protected.

9. *Create the conditions for peace in Colombia.*

   - President Uribe increased the size and capability of public security forces and engaged the narco-terrorist organizations, forcing the AUC to the negotiating table and severely hampering FARC and ELN capabilities to wage terrorism against the populace.

   - In 2004 2,972 insurgents voluntarily repatriated, of whom 1,703 belonged to either the FARC or the ELN. In November 2004 a paramilitary peace process began in earnest that has demobilized an additional 2,397 combatants.

10. *Establish the security conditions which permit the implementation of government programs.*

    - The GOC has increased its presence throughout Colombia. Through special security measures, roads outside of Bogotá can be traveled by ordinary citizens without fear of being kidnapped. Capital is flowing back into Colombia, compared to a high rate of capital flight at the start of Plan Colombia.

    - President Uribe has reduced lawlessness and human rights violations throughout Colombia:

|  | 2002 | 2003 | 2004 | 2004 vs 2002 |
|---|---|---|---|---|
| **Terrorist Attacks** |  |  |  |  |
| **All types** | 1,645 | 1,247 | 709 | -56% |
| **Electric Pylons** | 483 | 329 | 121 | -74% |
| **Towns** | 32 | 5 | 1 | -96% |

| Roads | 248 | 113 | 134 | -46% |
|---|---|---|---|---|
| Massacre victims | 680 | 504 | 259 | -61% |
| Kidnappings | 2,986 | 2,200 | 1,441 | -51% |
| Common Homicide | 28,837 | 23,509 | 20,012 | -30% |

### Additional Information/Links

One of the most comprehensive sources of information on international drug policy is the State Department Bureau of International Narcotics and Law Enforcement Affairs' (INL) publication, the International Narcotics Control Strategy Report, or INCSR. It can be found online at http://www.state.gov/p/inl/rls/nrcrpt/2003/. For information on Plan Colombia, consult the "Policy and Program Developments" section as well as the "South America" section.

At the State Department website other resources on Colombia can be found at:

- Country Program: Colombia
- U.S. Support for Plan Colombia
- Andean Region Initiative Remarks
- Plan Colombia and the Andean Region Initiative
- Andean Region Initiative FY 2001–FY 2002 Budget Request
- Plan Colombia Fact Sheet
- Counternarcotics Efforts in the Andean Region
- Civilian Contractors and U.S. Military Personnel Supporting Plan Colombia
- Andean Regional Initiative Fact Sheet
- Briefing on the Andean Regional Initiative

*Last updated March, 2005*

Download Adobe Acrobat Reader

Reader

PRIVACY POLICY | SITE MAP | DISCLAIMER | ACCESSIBILITY

*Last Updated: August 24, 2005*

001357

# EXHIBIT

# J.-5

HUMAN RIGHTS WATCH

# Colombia

Colombia presents the most serious human rights and humanitarian situation in the region. Battered by an internal armed conflict involving government forces, guerrilla groups, and paramilitaries, the country has one of the largest populations of internally displaced persons in the world.

Colombia's irregular armed groups, both guerrillas and paramilitaries, are responsible for the bulk of the human rights violations, which in 2005 included massacres, killings, forced disappearances, kidnappings, torture, and extortion. Despite ongoing negotiations with the government, paramilitary groups repeatedly committed abuses in breach of their cease-fire declaration.

Members of the armed forces have at times been implicated in abuses, independently or in collaboration with paramilitaries. Impunity for such crimes, particularly when they involve high-ranking military officers, remains a serious problem. Ties between military units and paramilitary groups persist, and the government has yet to take credible action to break them.

### *Demobilization of Paramilitary Groups*

2005 was marked by the passage of Law 975, a controversial package for the demobilization of armed groups that the government called the "Justice and Peace Law." The law offers reduced sentences to members of these groups responsible for serious crimes, if they participate in a demobilization process. Drafted in the context of extended negotiations with paramilitaries, the law fails to include effective mechanisms to dismantle the country's mafia-like armed groups, which are largely financed through drug trafficking. It also utterly fails to satisfy international standards on truth, justice, and reparation for victims.

Although Colombian President Alvaro Uribe signed the demobilization law in July 2005, the government has not begun applying it. The law faced several constitutional challenges, which were still pending at this writing in late November 2005.

Even before the demobilization law was passed, the government sponsored large-scale demobilization ceremonies in which thousands of paramilitaries handed over weapons. The government portrayed these demobilizations as important steps towards peace, but there were widespread reports of continuing abuses and illegal activity by paramilitaries around the country, including the recruitment of new troops.

Little effort has been made to investigate the past crimes of demobilized paramilitaries or to collect intelligence that could be used to dismantle the groups' structures or identify their supporters and assets. Cross-checking of individuals' names against prosecutors' records resulted in only a few dozen paramilitaries being linked to ongoing investigations, given that in most investigations, the perpetrator is not identified by name but rather by alias or other factors.

Many top paramilitary commanders remain in the specially designated area of Santa Fe de Ralito, safe from arrest or prosecution. In June 2005, prosecutors ordered the arrest of top paramilitary commander, Diego Murillo Bejarano (also known as "Don Berna" or "Adolfo Paz"), for allegedly ordering the assassination of a local congressman and two other people two months before. Nonetheless, the government announced that Murillo would be allowed to demobilize and eventually receive the benefits of Law 975. The government also

001359

suspended extradition orders for Murillo and commander Salvatore Mancuso, both of whom are wanted in the United States for drug trafficking.

### Impunity and Military-Paramilitary Ties

The overwhelming majority of investigations involving human rights abuses are never resolved. The problem of impunity affects crimes committed by all armed groups, as well as the military.

Units of the Colombian military continue to tolerate, support, and commit abuses in collaboration with members of paramilitary groups. In 2005, there continued to be reports of abuses by members of the Army's 17th Brigade as well as by members of the armed forces operating in the region of Chocó.

In February 2005, eight residents of the Peace Community of San Jose de Apartadó, including four minors, were brutally killed. The government's immediate reaction to the massacre, prior to any investigation, was to blame it on guerrillas and deny any military presence in the area. Yet members of the community have alleged that military and possibly paramilitary groups were involved, and there is evidence pointing to military movements near the location of the massacre. The investigation has proceeded slowly, in part due to the unwillingness of witnesses to come forward, apparently out of fear and distrust of authorities.

During the tenure of Attorney General Luis Camilo Osorio, starting in 2001, major investigations into abuses by high-ranking officers were seriously undermined. This troubling trend continued in 2005, as the Attorney General's office closed its criminal investigation into Rear Admiral Rodrigo Quiñonez's alleged involvement in the Chengue massacre, in which paramilitaries killed over 20 people.

In May 2005, the Attorney General's office also closed the investigation of General Eduardo Avila Beltran for his alleged complicity in the 1997 paramilitary massacre of 49 civilians in the town of Mapiripán. Two separate courts—military and civilian—had previously ordered the Attorney General's office to investigate Avila's role in the massacre.

Osorio's term ended in mid-2005. The new Attorney General, Mario Iguarán, has expressed an interest in working more closely with human rights groups.

### Human Rights Monitors and Other Vulnerable Groups

Human rights monitors, as well as labor leaders, journalists, and other vulnerable groups are frequently threatened and attacked for their work in Colombia. Investigations into such threats and attacks generally move slowly and are rarely resolved. The problem has at times been exacerbated by high-level government officials, who in 2005 once again made public statements suggesting that legitimate human rights advocacy was aimed at promoting the interests of armed groups.

In May 2005, three prominent journalists received anonymous funeral wreaths, accompanied by notes of condolence, at their homes or offices. As reported by the OAS special rapporteur for freedom of expression in 2005, such threats and prevailing impunity for killings of journalists have a chilling effect on the media.

Monica Roa, the lead attorney in a constitutional challenge to Colombia's almost complete ban on abortion, received numerous death threats in 2005. Confidential case files and two computers were stolen from her office during a break-in.

Human rights defenders from the Colectivo de Abogados Jose Alvear Restrepo and other organizations were

also threatened in 2005. Meanwhile, there was no obvious progress in the investigation into Operación Dragon, a large scheme allegedly involving retired members of military intelligence, to conduct surveillance of human rights defenders, trade unionists, and politicians in Cali.

### Violations by Guerrilla Groups

After a prolonged slowdown in their armed activity, guerrillas from the Revolutionary Armed Forces of Colombia (FARC) once again increased their level of violent activity in 2005. FARC attacks on government forces were accompanied by numerous and serious abuses, including massacres of civilians and targeted killings.

In April, the FARC used gas cylinder bombs in the region of Cauca, launching them in an indiscriminate manner in the direction of residential areas. The attacks primarily affected members of indigenous communities, resulting in numerous deaths and the displacement of much of the population. Other FARC attacks targeted media, including radio stations.

Both the National Liberation Army (ELN) and the FARC continue to kidnap civilians, holding them for ransom or political gain.

### Child Recruitment

At least one of every four irregular combatants in Colombia is under eighteen years of age. Of these, several thousand are under the age of fifteen, the minimum recruitment age permitted under the Geneva Conventions. Eighty percent of the children under arms belong to one of two guerrilla groups, the FARC or the ELN. The remainder fights for paramilitaries.

### Internal Displacement

Colombia has the world's largest internal displacement crisis after Sudan. In the last three years alone, more than three million people, as much as 5 percent of Colombia's population, have been forcibly displaced because of the country's armed conflict. More than half of all displaced persons are children under the age of eighteen. While Colombia is among a handful of countries that have enacted legislation to protect the internally displaced, displaced families are often denied access to education, emergency healthcare, and humanitarian aid.

In 2004, Colombia's Constitutional Court held that the government's system for assisting displaced persons was unconstitutional. In September 2005, the Court found that the steps taken by the government to comply with its ruling were insufficient in terms of both resources and institutional will.

### Key International Actors

The United States remains the most influential foreign actor in Colombia. In 2005 it provided close to U.S. $800 million to the Colombian government, mostly in military aid. Twenty-five percent of U.S. security assistance is formally subject to human rights conditions, but the conditions have not been consistently enforced. Certification of 12.5 percent of the assistance was delayed in the first half of 2005 due to serious setbacks and lack of progress in key investigations of military abuses, among other factors. Nonetheless, the certification was ultimately granted, with the U.S. State Department citing late progress in some specific cases.

In February 2005, the member countries of the G-24 group of international donors to Colombia met in Cartagena to discuss continuing cooperation with Colombia. Members of Colombia's human rights

community expressed disappointment over the resulting Cartagena Declaration, which, while reaffirming the terms of the preceding London Declaration, was viewed as weaker than the earlier document on various human rights issues.

While some European and U.S. assistance to the demobilization process seems likely, its extent and nature remained an open question as of this writing in late November 2005. The U.S. Congress approved U.S. $20 million in assistance for the demobilization process, but the aid is conditioned on full Colombian cooperation with U.S. extradition requests and on specific measures to ensure accountability and the dismantlement of paramilitary structures.

The E.U. Council of Ministers stated that Law 975 could, if effectively implemented, contribute to peace. It expressed concern, however, over the law's failure to adequately take into account international standards on truth, justice, and reparation.

The OAS Mission to Support the Peace Process in Colombia, which is charged with verifying the demobilization process, was widely criticized by victims and human rights groups. Not only has it failed to adequately monitor paramilitaries' cease-fire declaration, it has also failed to follow up on complaints of abuses, and it shows little or no independence from the government. As of November 2005, the OAS Secretary General reportedly was considering possible reforms to the Mission's structure and activities.

The Office of the U.N. High Commissioner for Human Rights is active in Colombia, with a presence in Bogotá, Medellín, and Cali. Its relations with the government are difficult due to Colombia's repeated failure to implement the office's human rights recommendations.

Related Material

More Information on Human Rights in Colombia
Country Page

Download PDF
World Report Chapter, January 18, 2006

World Report 2006
Report  January 18, 2006

From  http://hrw.org/english/docs/2006/01/18/colomb12206.htm

© Copyright 2006 Human Rights Watch   350 Fifth Avenue 34th Floor   New York, NY 10118-3299   USA

# EXHIBIT

# J.-6





hrw.org | DEFENDING HUMAN RIGHTS WORLDWIDE

PORTUGUÊS  FRANÇAIS  РУССКИЙ  DEUTSCH
ESPAÑOL  中文  العربية  OTHER

Home
News Releases
About HRW
Get Involved
Publications
Info by Country
Africa
Americas
Asia
Europe/Central Asia
Middle East/N. Africa
United States

Global Issues
Arms
Children's Rights
Counterterrorism
Economic, Social &
Cultural Rights
HIV/AIDS
International Justice
LGBT Rights
Prisons
Refugees
United Nations
Women's Rights
More...

Campaigns
Film Festival
Photo Galleries
Audio / Video
Site Map
Contact Us
Corrections
Permissions
RSS

[Search]

# A Bad Plan in Colombia

By José Miguel Vivanco, director of Human Rights Watch's Americas Division, and
Maria McFarland Sánchez-Moreno, Human Rights Watch Colombia researcher

Published in *The International Herald Tribune*

BOGOTÁ: After pouring $3 billion into Plan Colombia, the United States is about to be
betrayed by one of its closest allies in the fight against drugs and terror. The Colombian
government is putting the final touches on a scheme to launder the criminal records of
top paramilitary commanders - including some of the country's most powerful drug
lords - while allowing them to keep their wealth and maintain their control over much
of the country. Should the plan be approved, it will be an enormous setback for U.S.
counternarcotics and counterterror efforts, as well as for human rights in Colombia.

It was the United States, ironically, that set the stage
for this scheme by requesting the extradition of these
commanders. Not only has the United States deemed
Colombia's paramilitaries to be a terrorist group,
government prosecutors have indicted a number of
paramilitary commanders for bringing tons of cocaine
into the country. It was those commanders who
initiated demobilization negotiations with the
Colombian government, hoping to reach a deal that
would allow them to avoid extradition to America.

Handled well, the negotiations could benefit both
Colombia and the United States. Paramilitaries and
guerrillas have been fighting for control of Colombia's
resources for decades. Fueled by money from drugs
and extortion, these mafia-like groups have killed
thousands of civilians with impunity. The
paramilitaries, in particular, are notorious for their
atrocities, which include countless massacres,
abductions and "disappearances."

A real demobilization, one that dismantles the
criminal and financial structures of paramilitary
groups and holds their members accountable for
crimes, would be an important step toward peace,
human rights and the rule of law. It would also be a
major victory for the United States in the fight against

🖨 Printer Friendly Version

**Related Material**

Colombia: Letter to U.S.
Ambassador William Wood on
Demobilization Process
*Letter, January 24, 2005*

Colombia: Demobilization Scheme
Ensures Injustice
*Press Release, January 18, 2005*

Colombia: Letting Paramilitaries Off
The Hook
*Report, January 18, 2005*

Colombia: Bill Must Ensure Justice
*Press Release, April 5, 2004*

Colombia: Letter to OAS Foreign
Ministers on Paramilitary
Demobilization Process
*Letter, March 31, 2004*

More Information on Human Rights
in Colombia
*Country Page*

Free Email Newsletter

Contribute to Human Rights Watch

001364



drug trafficking.

Unfortunately, powerful political forces in Colombia have been pressing to give the paramilitaries a pass, letting them keep their wealth and power. Colombia's Congress is poised to approve a bill, backed by President Álvaro Uribe, that would allow top commanders to serve as little as two years behind bars for their crimes. These pathetically short prison terms would cover even the worst atrocities and the narco-trafficking for which they are wanted in the United States.

To get these reduced sentences, commanders would have to "accept" the charges against them. But they would not have to confess their abuses, disclose the location of their hidden bank accounts and drug processing labs or reveal the names of their arms suppliers and financial backers. They would not even have to ensure that their troops disarm fully.

After two years, commanders' records will be clean, but their criminal networks and the wealth fueling their activities will almost certainly be intact. And their already considerable political power - paramilitaries claim to control 30 percent of Colombia's Congress - will be strengthened.

The U.S. reaction to this scheme has been surprisingly weak and unclear. To Colombians it looks like the U.S. government is either divided or just not very interested in the issue.

This perception has occasionally been challenged, most notably in January, when a bipartisan group of U.S. lawmakers sent Uribe a letter saying that the demobilization process must effectively dismantle paramilitaries' "narco-terrorist" structures. And during her recent visit to Colombia, Secretary of State Condoleezza Rice said that she hoped the pending demobilization bill would "dismantle illegal armed groups, bring justice and reparation to victims, and punish those guilty of major crimes and atrocities."

While helpful, the secretary's remarks are not enough. To many here, they sound like rhetoric that will never translate into policy. Colombian policy makers still believe that regardless of what bill they enact, U.S. endorsement and financial support can be taken for granted.

The United States should be unequivocal in its objection to this record-laundering operation. To do otherwise would be to admit defeat in this front of the fight against drugs and terror. It would mean letting drug lords and mafias take over not only economic but also political control of a strategic ally in the region. And it would mean abandoning any hope for peace, human rights and the rule of law in Colombia.

*(José Miguel Vivanco is Human Rights Watch's Americas director and Maria McFarland Sánchez-Moreno is the organization's Colombia researcher. )*

Contribute to Human Rights Watch

A Bad Plan in Colombia (Human Rights Watch, 20-5-2005)



Home | About Us | News Releases | Publications | Info by Country | Global Issues | Campaigns | What You Can Do | Community | Bookstore | Film Festival | Search | Site Map | Contact Us | Press Contacts | Privacy Policy

© Copyright 2006, Human Rights Watch    350 Fifth Avenue, 34th Floor    New York, NY 10118-3299    USA