# EXHIBIT

# J.-7





hrw.org | DEFENDING HUMAN RIGHTS WORLDWIDE

PORTUGUÊS  FRANÇAIS  РУССКИЙ  DEUTSCH
ESPAÑOL   中文   العربية   OTHER

Home
News Releases
About HRW
Get Involved
Publications
Info by Country
  Africa
  Americas
  Asia
  Europe/Central Asia
  Middle East/N. Africa
  United States

Global Issues
  Arms
  Children's Rights
  Counterterrorism
  Economic, Social &
  Cultural Rights
  HIV/AIDS
  International Justice
  LGBT Rights
  Prisons
  Refugees
  United Nations
  Women's Rights
  More...

Campaigns
  Film Festival
  Photo Galleries
  Audio / Video
  Site Map
  Contact Us
  Corrections
  Permissions
  RSS

[ Search ]

# Colombia: FARC Steps Up Attacks Before Elections

## Use of Gas Cylinder Bombs and Killings of Civilians Violate Laws of War

(Washington, March 6, 2006) — As national elections approach, Colombia's largest guerrilla group has intensified its attacks on civilians, Human Rights Watch said today.

**❝ These massacres appear timed to spread terror before the elections and undermine the democratic process. By continuing to commit atrocities, the FARC has once again displayed a complete disregard for the lives and well-being of the people it claims to represent. ❞**

**José Miguel Vivanco, Americas director at Human Rights Watch**

Over the past week, the Revolutionary Armed Forces of Colombia–People's Army (Fuerzas Armadas Revolucionarias de Colombia, or FARC–EP) have killed at least 20 civilians in two separate massacres and an attack using gas cylinder bombs. On March 12, Colombia will hold congressional elections, which will be followed by presidential elections on May 28.

🖨 Printer Friendly Version

Also Available in

ESPAÑOL

Related Material

More Information on Human Rights in Colombia
Country Page

Colombia: Displaced and Discarded
Report, October 14, 2005

Colombia: More FARC Killings with Gas Cylinder Bombs
Press Release, April 13, 2005

Free Email Newsletter

Contribute to Human Rights Watch

"These massacres appear timed to spread terror before the elections and undermine the democratic process," said José Miguel Vivanco, Americas director at Human Rights Watch. "By continuing to commit atrocities, the FARC has once again displayed a complete disregard for the lives and well-being of the people it claims to represent."

Human Rights Watch pointed out that recent FARC attacks have included grave violations of the right to life and the laws of war, including deliberate killings of civilians and the indiscriminate use of gas cylinder bombs.

In February the FARC declared a "paro" (or enforced shutdown of civic and commercial activities) in several Colombian states. In the weeks following the announcement, the

001368

FARC has blocked roads, burnt cars, attacked electricity towers, and threatened the civilian population if they fail to comply with the general shutdown.

On the night of Saturday, February 25, members of the FARC reportedly stopped a passenger bus that was traveling in the state of Caquetá. The group shot up the bus and then, with civilians still on board, set it on fire, killing nine people and injuring at least 11 more. On Monday, February 27, in the nearby state of Huila, FARC members broke into a meeting of the Rivera town council, shot and killed nine council members, and injured three other people.

Over the weekend, in an attempt to take control of the town of Montebonito, in the state of Caldas, FARC guerrillas launched gas cylinder bombs into the town. One of the bombs fell into a civilian residence, killing a man and his six-month old baby. Other civilians were also injured in the attack.

"The FARC's indiscriminate use of gas cylinder bombs has repeatedly resulted in civilian casualties," said Vivanco. "Yet year after year, they continue to use these inaccurate and devastating weapons, in clear violation of international humanitarian law."

Meanwhile, amid negotiations with the Colombian government, representatives of the rebel National Liberation Army (Ejército de Liberación Nacional, or ELN) on March 3 announced that the ELN would abstain from "any military action" that would affect the congressional elections. However, the ELN has failed to make any long-term commitment to respect international human rights and humanitarian law. During the past year it has continued to flagrantly violate these laws through kidnappings and other atrocities.

"Given the ELN's record of vicious attacks on civilians, a promise not to interfere with elections is simply not enough," said Vivanco. "Both the ELN and the FARC must immediately cease their atrocities, release all their hostages, and respect the laws of war."



Contribute to Human Rights Watch

Home | About Us | News Releases | Publications | Info by Country | Global Issues | Campaigns | What You Can Do | Community | Bookstore | Film Festival | Search | Site Map | Contact Us | Press Contacts | Privacy Policy

© Copyright 2004, Human Rights Watch    350 Fifth Avenue, 34th Floor    New York, NY 10118-3299    USA

001369

# EXHIBIT

# J-8



# THE SEARCH FOR ACCOUNTABILITY
## AND TRANSPARENCY IN PLAN COLOMBIA:
### REFORMING JUDICIAL
### INSTITUTIONS—AGAIN

**Luz Estella Nagle**

**May 2001**

001371



*****

The views expressed in this report are those of the author and do not necessarily reflect the official policy or position of the Department of the Army, the Department of Defense, or the U.S. Government. I am most grateful for having been invited to participate in the North Center/U.S. Army War College conference, *Implementing Plan Colombia: Strategic and Operational Imperatives for the U.S. Military*, which paved the way for the writing of this monograph. The opinions expressed in this article are solely my own. This report is cleared for public release; distribution is unlimited.

*****

Comments pertaining to this report are invited and should be forwarded to: Director, Strategic Studies Institute, U.S. Army War College, 122 Forbes Ave., Carlisle, PA 17013-5244. Copies of this report may be obtained from the Publications and Production Office by calling commercial (717) 245-4133, FAX (717) 245-3820, or via the Internet at Rita.Rummel@carlisle.army.mil

*****

Most 1993, 1994, and all later Strategic Studies Institute (SSI) monographs are available on the SSI Homepage for electronic dissemination. SSI's Homepage address is: http://carlisle-www.army.mil/usassi/welcome.htm

*****

The Strategic Studies Institute publishes a monthly e-mail newsletter to update the national security community on the research of our analysts, recent and forthcoming publications, and upcoming conferences sponsored by the Institute. Each newsletter also provides a strategic commentary by one of our research analysts. If you are interested in receiving this newsletter, please let us know by e-mail at outreach@carlisle.army.mil or by calling (717) 245-3133.

ISBN 1-58487-054-0

ii

001372



# FOREWORD

This monograph, written by Professor Luz Estella Nagle, is another in the special series to emerge from the February 2001 conference on *Plan Colombia* that was cosponsored by the Strategic Studies Institute of the U.S. Army War College and The Dante B. Fascell North-South Center of the University of Miami. In it, she stresses what has been defined by President Andrés Pastrana as one of the five strategic issues included in *Plan Colombia*. Nevertheless, the author argues that the issue of judicial reform deserves long-term attention and a higher priority within the larger context.

Professor Nagle, a former judge in Medellin, writes from a keen perspective of and close association with Colombian political and judicial institutions. She argues that *Plan Colombia* does not address the root causes of Colombia's problems, but if it did it would begin by directly strengthening the moral legitimacy of the government, holistically enhancing socioeconomic development, and meticulously reforming the legal system. Those fundamental reforms would enable the reestablishment of the rule of law. The rule of law, in turn, is critical to the achievement of the ultimate purposes of *Plan Colombia*—peace, prosperity, and the strengthening of the state. Luz Nagle rightly points out, however, that systemic reform requires well-conceived, long-term, and careful implementation. Unless thinking and actions are reoriented to deal with these realities, the alternative is social calamity, criminal anarchy, and civil war.

The Strategic Studies Institute and the North-South Center are pleased to offer this monograph as part of our attempt to clarify the issues surrounding *Plan Colombia*,

iii

001373

 

focus the debate, and learn from it. This is important because, one way or another, what is happening in Colombia is affecting us all.

DOUGLAS C. LOVELACE, JR.
Director
Strategic Studies Institute

iv

# PREFACE

The intention of the U.S. Army War College and The Dante B. Fascell North-South Center has been to elucidate as broadly as possible the many facets of the Colombian dilemma, the worst security problem which the Western Hemisphere faces today. This monograph concerns the challenge to reform Colombian judicial institutions.

*Plan Colombia* carries with it, by the reckoning of President Andrés Pastrana's government, a $7.5 billion price tag. The United States has committed $1.3 billion to the effort, largely in military aid, antinarcotics programs, and the equipment and training that go with them. Europe is supposed to provide $1 billion in humanitarian aid, social programs, and other nonmilitary assistance, but its money has not been forthcoming.

Meanwhile, the United States does, through the United States Agency for International Development, offer a $122 million package for judicial reform and, in fact, has carried out programs of judicial reform in the past. This monograph demonstrates the urgent need for this money, and much more.

The author's purpose is to argue that confidence in an efficient, courageous, and transparent judiciary goes to the very heart of the governability of Colombia. Transparency and accountability are crucial factors that must be "well developed and incorporated into any serious effort to strengthen the judicial institutions."

The problem with *Plan Colombia*, according to the author, is, among others, that it "fails to attack the root of Colombia's real problems." These are "weak government, inequality, absence of citizen participation, corruption, and an ineffective legal system." After denouncing the corruption and lack of accountability in the executive and

v

legislative branches, the author provides a veritable tour de force outlining the ills of the weakest branch. What comes across in this analysis is a daunting challenge, remediable only in the medium to long term. It is a discouraging picture of failure and disarray, although, as one might imagine, there are honest heroes who work tirelessly for the good of their country. The author concludes, "If *Plan Colombia* is to succeed in any sector, it should be with the judiciary."

In the debate over *Plan Colombia*, judicial reform is often mentioned, but usually only superficially. This in-depth essay convinces us that it deserves higher priority. It is central to helping Colombia to its feet.

Ambler H. Moss, Jr.
Director
The Dante B. Fascell North-South
   Center
University of Miami

vi

001376



## BIOGRAPHICAL SKETCH OF THE AUTHOR

LUZ ESTALLA NAGLE is Assistant Professor of Law at Stetson University College of Law in St. Petersburg, Florida, where she teaches international criminal law, Latin American business law, and international comparative business law. Professor Nagle served as a judge in Medellin, Colombia, in the mid-1980s until assassination attempts by drug traffickers forced her to leave Colombia for the United States. Her writings and presentations on national security law and mutual legal assistance, drug interdiction, guerrilla insurgency, international white collar crime, and judicial mechanisms probe the realities of foreign policy and the rule of law in the Americas from a critical perspective that reflects her training and experience in both the Anglo-American and continental law systems. Professor Nagle holds an LL.D. from the Universidad Pontificia Bolivariana, a J.D. from the College of William and Mary, an LL.M. from the University of California at Los Angeles's Law School, and an M.A. in Latin America studies from the University of California at Los Angeles.

vii

001377



# THE SEARCH FOR ACCOUNTABILITY AND TRANSPARENCY IN PLAN COLOMBIA: REFORMING JUDICIAL INSTITUTIONS—AGAIN

## INTRODUCTION

The Colombian government presented *Plan Colombia* to the world as an ambitious proposal to address the many problems that have paralyzed Colombia over the last decade or more. *Plan Colombia* carries a $7.5 billion price tag. The United States has committed $1.3 billion, with the lion's share going to military aid, materiel, and training, while other global partners, namely the Europeans, were to shoulder much of the cost for the humanitarian, social, and institutional components of the plan. Their support has not been forthcoming, because little funding for the plan is actually devoted to human rights, social programs, and other nonmilitary aid. Nevertheless, these nonmilitary components are being pursued, and reform of the judiciary is a primary plank in the plan. The United States Agency for International Development (USAID) is leading the way in judicial reform projects under its long-established administration of justice (AOJ) and rule of law (ROL) program mechanisms. A small portion of *Plan Colombia* funds, about $122 million, has been earmarked for the task.[1] Reform programs are nothing new to Colombia's third branch, which in fact has been the recipient of many millions of dollars in aid packages from various government and nongovernment sectors over the last 2 decades.

The purpose of this monograph is to examine the judicial reform and reinforcement components of *Plan Colombia*, and to argue that transparency and accountability are crucial factors that must be well developed and incorporated into any serious efforts to strengthen the judicial institutions. Discussion, however, must begin with

1

a brief, albeit critical, look at the Colombian political terrain and government institutions in the context of *Plan Colombia* in general, and the judicial institutions in particular.

## PAVING THE ROAD FOR PLAN COLOMBIA

President Andrés Pastrana set the total cost for *Plan Colombia* at around $7.5 billion, with contributions coming mainly from the United States, Europe, Canada, Japan, and Mexico, and from Colombia itself, although it is not clear precisely how Colombia will fund its $4.5 billion share.[2] The plan is a complicated mix of public relations, propaganda, show of force, nationalism, and sleight of hand. Regardless of *Plan Colombia*'s actual composition, many believers in the plan see it as the last hope for Latin America's oldest democratic nation, and they are willing to do anything to make the plan succeed.

Colombia has the dubious distinctions of enduring the longest running guerrilla insurgency in the 20th century, holding one of the world's worst human rights records, and being one of the leading countries of origin for global drug trafficking. *Colombia is a weak state, struggling to overcome its bloody history, institutionalized corruption,[3] and lawlessness in hopes of finding its place in the new millennium.*

Other than its unprecedented price tag, there is little new to offer in *Plan Colombia* to distinguish it from aid packages the United States has already committed to Colombia over the last 5 decades. The plan includes nearly all that has been given before to little or no effect: copious amounts of military hardware,[4] technical advisers and support personnel, a modest contribution for human rights and social programs,[5] and many opportunities for an army of consultants and experts to reform, reorganize, or otherwise "improve" various government institutions. United States support for the plan faithfully follows the

2

001379



well-established tradition of the United States as the "good neighbor" in the hemisphere, paternalistically assuming what is best for its Latin family while upholding the spirit of a mandate so eloquently articulated during the drafting of the Foreign Assistance Act of 1961.

> The essence of the West's responsibility is to use its resources imaginatively and generously as time moves a swiftly changing world into an uncertain future. . . . To many thoughtful citizens, foreign aid represents the only means of aligning this country and its allies with the forces that are shaping the world that lies ahead.[6]

*Plan Colombia* has also been promoted as an agenda for dealing with a myriad of underlying causes that allowed the nation to fragment into near anarchy and lawlessness. The framers of *Plan Colombia* both here and in Colombia have acknowledged that there is no question that Colombia suffers from the problems of a state yet to consolidate its power: a lack of confidence in the capacity of the armed forces, the police, and the judicial system to guarantee order and security; a credibility crisis at different levels and in different agencies of government; and corrupt practices in the public and the private sectors.[7]

The stakes in the gamble for *Plan Colombia*'s success are very high. At risk is political and economic stability throughout much of Latin America, the strategic significance of Colombia in the hemisphere, and the long-established access to Colombia's precious natural resources so vital to high-tech industries.

One problematic aspect of the plan is its susceptibility to *annual U.S. Congressional review for continued funding*, especially with a new Republican Administration on board. Such funding uncertainty poses a troubling impediment to its long-term success. Changes, lack of continuity, and cutbacks on foreign aid often frustrate U.S. policy. This reality is well described by a maxim expressed by a U.S. administration official in 1961 when foreign aid policy was

001380

 
driven by Cold War concerns over whose political orientation would take hold in the developing world:

> We know in our hearts that we are in the world for keeps, yet we are still tackling 20-year problems with 5-year plans staffed with 2-year personnel working with 1-year appropriations. It's simply not good enough.[8]

While the world under the U.S. sphere of influence has changed in 50 years, the situation described above has not. In this context, the plan seems little more than a $1.3 billion gamble. At the very least, *Plan Colombia* benefits the U.S. military industrial complex and an army of political and technical consultants chasing *Plan Colombia* dollars.

There are a number of issues *Plan Colombia* fails to address. First, there is no consideration of the impact of the plan on the region, and it ignores the direct geopolitical threats imposed on Colombia's neighbors.[9] Guerrillas crossing Colombian borders into neighboring countries are nothing new. However, what is new and all too frightening to Colombia's neighbors is the spillover of thousands of displaced people, narcotraffickers moving their enterprises across borders, the collateral impact of money laundering and contraband smuggling, and paramilitaries wreaking havoc while chasing their prey across frontiers. Colombia's neighbors, while supportive of its peace goal, fear what they believe is an unnecessary and dangerous military buildup in the hemisphere. Colombia committed a diplomatic blunder by not considering such concerns of it neighbors. Instead of engaging them during the formative stages of the plan, Colombia imposed on its neighbors after the fact a heavy burden of potential incursions and refugee movements across Colombia's porous borders. The European Parliament's 474 to 1 vote against *Plan Colombia* in early February 2001 did little to bolster regional support for Colombia.

Brazil, the largest and most influential country in South America, stated that it would not participate in any type of

4

001381



multinational action or effort in Colombia. In addition, Brazil labeled *Plan Colombia* its biggest security risk and has massed 6,000 troops along its 1000-mile-long Amazon border with Colombia, with 6,000 more troops planned to be sent there so long as *Plan Colombia* is in force.[10]  Peru, Ecuador, and Venezuela are also growing more alarmed by possible incursions of refugees and combatants, although Venezuela's President Hugo Chavez has himself been accused of supplying Colombian guerrillas with weapons and supplies, thereby making his government less than a passive bystander in the crisis.

Second, the issues addressed by *Plan Colombia* lack the right methodology and balance under the plan's umbrella. Section 2.7 of *Plan Colombia* reads, "Colombia's situation does not allow for partial solutions." But *Plan Colombia* is, in fact, a piecemeal solution because it subordinates or excludes crucial elements necessary for a comprehensive solution to the Colombian crisis. *Plan Colombia* is a plan for the moment and disregards the long-term consequences of its implementation. The United States has already claimed significant successes in coca crop spraying, boasting that more than 74,000 acres were sprayed in the first 6 weeks in one of the major coca-growing regions.[11]  But the operation does not account for the collateral destruction of thousands of acres of legal crops,[12] nor does it provide compensation for the losses, for mitigating environmental and ecological damage done to the regions being sprayed, or for monitoring the long-term health effects spraying may have on farmers, children, and other rural inhabitants.

Third, *Plan Colombia* fails to attack the root of Colombia's real problems. Drug trafficking is only one of its effects; the real causes are a weak government, inequality, an absence of citizen participation, institutional moral and cultural corruption, and an ineffective legal system. In sum, the real issues are one of Colombia's long-ignored internal problems. The U.S. agreement to fund the plan because drug production and trafficking directly impacts it

5

001382



domestically shortchanges the people of both nations. The plan overlooks its long-term effects. If Colombia does not become a strong democracy with an effective, responsible government, drug trafficking and its consequences will continue increasing. As it stands, by pouring money into a society plagued by overwhelming domestic problems, the plan is in effect attacking a cancer with hot compresses. One must ask whether any foreign aid would resolve Colombia's ingrained issues considering that *Plan Colombia* covers ground already covered in many prior aid packages and assistance agreements over the last quarter century.

## A QUESTION OF PRIORITIES

A broader and more balanced institutional reform is essential to the success of *Plan Colombia*. The military/counternarcotics component of the plan will fail if serious resources and policies are not devoted to the plan's institutional development, revitalization, and reform agenda. The military/counternarcotics objectives directly impact other sectors of the civil society and an ailing economy.

One of the most important priorities of *Plan Colombia* is to strengthen the nation's judicial institutions, since so much of the survival of Colombia is dependent on the judiciary's ability to reimpose the rule of law while protecting the rights and enforcing the obligations of both citizens and foreign investment. The obvious criticism of the plan is that so little of the $7.5 billion has been allocated for this purpose. A World Bank study revealed that there is a strong causal relationship between good governance and better development and economic growth.[13] Good governance requires strong, transparent, and uncorrupted institutions throughout the government—not just the judiciary. Under a system of good governance, courts are expected to be impartial, the Congress is expected to legislate clearly and effectively, and the executive is expected to lead and execute its constitutional mandate.

6

001383

Unfortunately, Colombia lacks any of these ingredients. Moreover, according to Transparency International, Colombia's corruption is the worst in the region.[14] For Colombia to have good governance and improve its development and economic growth, all institutions must be reformed or else the effort to solve Colombia's crisis is doomed.

## PLAN COLOMBIA AND COLOMBIA'S INSTITUTIONAL CRISIS

Abraham Lowenthal, a respected scholar on Latin American issues, has written, "Colombia's fundamental problem is a crisis of authority, legitimacy, and governance; the drug trafficking, the guerrilla insurgencies, and the paramilitary violence are more effects than causes of Colombia's underlying difficulty."[15]

Colombia's problems run so deeply in the fabric of the nation that no package of foreign aid could address them adequately. Yet, *Plan Colombia* has been presented as a magic bullet for stopping drug trafficking, ending violent political conflict, curtailing human rights transgressions, reuniting the nation, ending corruption, and redeveloping the country economically and socially. Unfortunately, *Plan Colombia is not the cure for the problems that exist today in* Colombia, and politicians know this. The problems must yield to a well-developed strategy that will attack the embedded corruption of the Colombian institutions, and that will permit meaningful participation by all Colombians in the political and economic life of the nation.

## THE THREE BRANCHES OF GOVERNMENT

Corruption has cast a shadow over the three branches of government. Colombia came to be known as a "narco-democracy" because the vast sums of illegally acquired money coming mainly from drug sources heavily influenced Colombia's political process and institutions.

7

001384

The first step to ending corruption is to make officials accountable for their conduct. Accountability means to hold the government to the legal standards expected under established and recognized conduct of a civil society. Accountability improves the quality of administration and increases a government's legitimacy because officials behave better when they know that they are being watched, and are constrained to abide by inviolable codes of conduct. Accountability also protects citizens' rights from being trampled, ensuring that laws will be applied fairly and accurately. When they know their rights, the citizens of a nation hold a government accountable and demand services to be delivered as promised and in an efficient and effective manner. A democratic, accountable government educates its citizens so as not to exclude them from decisions that affect their lives.

The second step is to make government transparent to the citizens. This is a basic tenet of representative democracy. Transparency means that the citizens have a right to review and examine the operations of its governmental institutions and the conduct of government officials by direct observation or through the news media. However, this right may be overridden by certain national security matters and public policy concerns such as the right to secure a fair trial and to protect individuals from unwarranted invasion of privacy. Transparency forces elected officials to bring the government to the people who elected them by informing citizens of their actions and decisions. Transparency is achieved through methods that enable the publicizing of governmental actions and decisions; by laws protecting free speech and the safety of reporters; by establishing freedom of information, passing whistleblower statutes, and appointing ombudsmen; and by establishing conduits for citizen complaints.

Transparency and accountability are essential to good governance. They will discourage nepotism and curb the bestowing of favors on family and friends. They increase the

8

prestige of government service. Unfortunately, there is a presumption by the Colombian people of corruption and mediocrity in government. It will take years to build the prestige and authority required if democracy in Colombia is to succeed.

## The Executive Branch.

The executive branch under the Pastrana Administration has shown little progress in lifting the veil of scandal and corruption that has shadowed the Colombian presidency throughout the history of the Republic.[16] In a true democracy, the executive branch must be transparent and accountable, particularly if one accepts that the executive sets the tone for the political behavior and conduct of the other branches. The Colombian executive has a long history of action without accountability, and *Plan Colombia* represents a glaring example of the executive's ability to chart a course for the country without a mandate or approval from the citizenry. The argument that *Plan Colombia* was not debated by or publicized to the nation because "that's the way things have always been done" is not acceptable and ought to be dropped. There is no excuse for continued ignorance based on past behavior. Nations willing to sign on to help Colombia should not tolerate such conduct no matter to what extent the end may seem to justify the means. Without transparency and accountability, it is not difficult to see the specter of another Vietnam looming on the political horizon of United States foreign policy with regard to the Colombian crisis. The United States simply cannot afford to nod benignly at the cavalier autocracy of successive Colombian administrations, particularly now when so much is at stake.

For democracy to exist and flourish, citizens must have access to information. The monopoly of power in a centralized system prevents citizens from scrutinizing the behavior of their elected officials and the policies of what is supposed to be a representative government. Even now, the

9

001386



governors of the departments that stand to bear the brunt of *Plan Colombia* have charged that officials in Bogotá never consulted with them when *Plan Colombia* was being formulated.[17] This is not surprising if one recognizes that *Plan Colombia* largely escaped debate in the forum of public opinion because so few in the news media, in academia, or in critical nongovernmental organizations had the opportunity to examine the proposed details of the plan and debate them publicly. President Pastrana bypassed his countrymen and took his case for *Plan Colombia* directly to the international stage in the formative process for the plan. In fact, a Spanish language version of *Plan Colombia* was not made available until months after a revised English language version was already in circulation.[18] Selling the plan abroad before ever promoting it to the nation runs counter to the notions of accountability and transparency in government. It is remarkable that *Plan Colombia* underwent far more debate and review abroad than occurred in Colombia.

As a clear measure of executive power, the genesis of *Plan Colombia* follows the typical scenario of Colombian executive actions: a state of emergency is declared, which allows the president to issue decrees that may then be translated into ordinary law by the consent of the Congress at a later date. There is almost no opportunity to hold the President accountable because his actions are constitutionally protected. *Plan Colombia*, however, opens new questions about accountability and transparency because both the foreign and domestic policies of other nations are intrinsically involved in this case.

Another problem with the lack of accountability and transparency in the executive branch concerns the composition of an executive administration. With few exceptions, the Colombian executive has traditionally been plagued by the appointment of officials long on political connections, but short on substance and competency.

10



### The Legislative Branch.

The Colombian Congress is perceived as one of the most corrupted institutions in the nation. This is the institution in which the late drug lord Pablo Escobar, long former head of the Medellin-based drug group, served as a representative elected to its ranks. The legislative body's lack of integrity received international attention in 1994 when Prosecutor General Valdivieso implicated over 100 political figures, including numerous members of Congress and important government officials, on charges of acquiring money from drug lords. Valdivieso opened a sweeping investigation "without regard for the political implications"[19] into government corruption that became known as Case 8000.[20] The investigation arose out of allegations that former President Ernesto Samper and some of his closest associates had received millions of dollars in campaign contributions from the Cali drug cartel. After Valdivieso brought the charges, the constitutional responsibility for an investigation of the presidency fell to the Indictment Commission of the Congress. Unfortunately, 11 of the 15 members of the Commission were "suspected of having received drug money for their own electoral campaigns."[21] Samper's Congressional supporters passed legislation suspending the law that would allow for his indictment under corruption charges to proceed. There are allegations that the drug mafias paid the lawmaker who brought the legislation $80,000, and those who voted for it in Congress received $40,000 each.[22]

More recently, there were several accusations of members of Congress abusing power and using political influence over contracts and hiring.[23] An investigation revealed that congressional staff were skimming millions of dollars off contracts, and several top congressmen were investigated on suspicion of sharing in the kickbacks.[24]

Congress has a long and dubious history of such conduct, especially in failing to pass effective regulations if doing so

11

in any way impacts the body's power base. The Congress has also been able to effectively shield its activities from critical citizen scrutiny, as if citizens did not have the right to know what their representatives were doing. Even following such highly publicized national scandals, Congress has yet to pass strong anti-corruption legislation with harsh penalties because they will themselves stand to be bitten by their own lawmaking.

The Congress's failure to pass as well effective freedom of information statutes allowing the news media to have access to the business of Congress is further evidence of the lack of transparency and an indication of how badly transparency and accountability are needed in the legislative branch.

Congress must also be made transparent and accountable because it is so intertwined with the vitality of the other branches. The judiciary cannot operate unless Congress properly writes codes, laws, and statutes that make it possible for the judiciary to administer justice. Thus, for judicial reform to succeed, it must go hand in hand with congressional reforms.

### The Judiciary.

The judiciary is the Cinderella of the three branches. Throughout Colombia's history, the judiciary has been the meekest and most subservient branch of government, susceptible to the vagaries of political ambition and government corruption, and suffering from a systemic lack of respect.[25] The judiciary has been the target of brutal attacks and acts of intimidation, and the government has a very poor record of ensuring the safety and security of judicial officers.[26]

Throughout Colombia's history the judiciary has been the tool by which repressive colonial regimes enforced first monarchical and later executive authority over the populace. In the process, the subservience of the judicial

12

branch negatively impacted the protection of individual and social rights in the face of state power and conservative constitutional authoritarianism. Thus, the judiciary in Colombia "assumed a defensive role compared to major political actors such as the military and political establishments."[27] That defensiveness comes from an inferiority complex imbedded in the whole system. Admitting that the judiciary is incompetent, however, goes against the Latin mentality of machismo and infallibility,[28] and therein lies the resistance to transparency and accountability.

The judiciary's infrastructure has long languished though it began to rally somewhat when judicial reform became an important component in aid packages from foreign lending institutions and first-world nations attempting to prop up democratic governments in developing nations.

The people don't trust the judicial system in Colombia. The other two branches laugh at the judiciary system and bypass its authority. Multinational corporations fear to enter into contracts in Colombia because they do not trust in the judicial system's ability to enforce agreements fairly. It is widely thought that justice goes to whoever pays the most money to the judge.[29] But an honest and effective judiciary is crucial to sustaining economic development and guaranteeing a successful democracy.

> Legal and judicial systems that work effectively, efficiently, and fairly are the backbone of national economic and social development. National and international investors need to know that the rules they operate under will be expeditiously and fairly enforced. Ordinary citizens need to know they, too, have the surety and protection that only a competent judicial system can offer.[30]

For many historical reasons, the Colombian judiciary also suffers from a lack of independence. Because of its low status among the three branches, the judiciary has often

13



been made the scapegoat for the wrongs in the country. For example, following the adoption of a new Constitution in 1991, a Constitutional Court emerged that, among other things, increased the independence and activism of the high court and established a textual recognition of the Constitution, at least on paper, as the fundamental and supreme law of the land.[31] The Constitutional Court quickly ran afoul of the executive branch when it issued a highly controversial opinion legalizing the possession and use of drugs on the grounds that drug use constituted a right of personal autonomy and free development of the personality.[32] The decision touched off a power struggle between the court and the executive branch, which moved quickly to negate the decision by considering a referendum, legislative action, and even a constitutional amendment. The challenges to the court failed, however, and in an unprecedented move the executive declared that it did not seek confrontations with other branches of government.

The bad blood persisted, however, into the 1990s, when the judiciary again came under fire for exercising its judicial authority to investigate and prosecute corruption in relation to Case 8000. In retaliation for the court's attempts to prosecute government officials, the executive and legislative branches introduced legislation to do away with the faceless justice mechanism that was leading the investigation. The faceless courts were eventually disbanded to some extent,[33] and a potentially useful tool (although not without its own egregious problems) was discredited.

Whether the criticisms of the judiciary have been deserved is now irrelevant, however, for the justice system is on the brink of disintegration in the face of unprecedented lawlessness. If *Plan Colombia* is to succeed in any sector, it should be with the judiciary. Unfortunately, most analysts believe too little of the plan's resources have been devoted to such a Herculean task. Nevertheless, the goals for improving the judiciary are worthwhile.

14



Over the last 2 decades, the United States, through USAID, the Department of Justice, and other institutions, has implemented a number of judicial reform projects aimed at ensuring a healthier and more effective judiciary in Colombia. In fact, the largest administration of justice program ever funded went to Colombia in 1991 to create the faceless justice mechanism at an unprecedented cost of more than $36 million, after already having committed many millions of dollars to laying out the judicial groundwork for faceless justice throughout the 1980s.[34] But the judicial reforms never seemed to take hold or were mired in such controversy that the reforms were abandoned or not renewed.[35]

The judiciary's failure is due to internal and external factors that plague the structural underpinnings and daily operations of the justice institutions. Some of the internal factors are lack of independence, accountability, and transparency. Accountability and transparency, if present, would vaccinate against judicial corruption. The level of corruption is so high that reforms do not achieve a meaningful result. Money is siphoned off into officials' pockets either through direct embezzlement or from kickbacks from sub-contractors working with the judiciary. Furthermore, greed stops reforms from trickling down through the institution toward the most needy recipients—the lower courts and judicial offices outside the major cities.

Among the external factors, we find governmental and societal corruption, narcotrafficking, subversion, intimidation of witnesses, bribery of officials, widespread vigilantism, uncontrollable violence, and extortion against government officials. Both the external and internal factors inflict a toll on the rule of law by rendering the justice apparatus impotent. Moreover, as more Colombians become disaffected and unprotected by the state, and fewer citizens use the courts to resolve disputes, the notion of the rule of law becomes so abstract as to have no meaning in their lives.

15

Without a branch that ensures public order and justice, resolves disputes, and checks the political and executive branches, a breakdown in civil society and social morale becomes inevitable, as is the case in Colombia today. Without a strong judiciary there is no basis upon which to hang a framework to institute reforms under *Plan Colombia* or any other plan.

More judicial reform programs are included under *Plan Colombia* because prior reform programs did not provide for comprehensive institutional reform for the entire government. This failure produced greater disarray in the judicial system and rendered it more impotent.

## PLAN COLOMBIA'S JUDICIAL REFORMS AGENDA

The section on judicial reform in the plan states that

effective reform is a key element in restoring public confidence in the State. Dealing with narco-trafficking and its culture of violence, corruption and lawlessness involves the entire criminal justice system.

While the drafters of *Plan Colombia* recognized this challenge, one must ask what constitutes "effective reform" in Colombia if other reform programs in the past that were supposed to guarantee effectiveness could not? The Pastrana government recognizes that political will is essential and that the three branches of government must work effectively together to reach the goals of the plan.

These issues transect a number of Colombian agencies—and indeed the three branches of Government. The Executive Branch will work closely with the Legislative and the Judiciary to ensure that coordination and implementation of these strategies is effective.[36]

Within the framework of combined inter-governmental cooperation and foreign assistance, *Plan Colombia* is

16

001393

intended to tackle the following issues in an effort to strengthen justice institutions and the rule of law:

- Securing the rule of law, by improving investigation and prosecution of criminals;

- *Making the judicial system accountable for its conduct and management by strengthening the* judicial mechanisms, including moving away from the civil law tradition of an inquisitorial criminal justice system to an accusatory system such as that embraced in the Anglo-American or common law tradition;

- *Promoting institutional respect for human rights by* enforcing the nation's commitment to international agreements on human rights;

- *Eliminating institutional corruption throughout the* government by strengthening the judiciary's ability to prosecute such corruption;

- *Depriving criminals of illegal profits through* interdictory enforcement of money laundering laws and laws requiring forfeiture of ill-gotten assets;

- *Reinforcing the judicial apparatus to combat* contraband and narcotics trafficking, and;

- *Enhancing the criminal justice system's ability to* reduce demand for drugs by strengthening and expanding education campaigns and improving rehabilitation infrastructure.

None of these goals can be met without accountability, however. In recognition of this, the drafters of *Plan Colombia* have inserted accountability as a primary plank of the justice institutions' reform agenda. The following planks of the *Plan Colombia* judicial reform package are

17



clearly articulated under the heading of accountability; they merit closer examination:

*Support for the continuing transition to an accusatory system.* This is perhaps the most problematic and controversial aspect of *Plan Colombia*'s judicial reforms. Why is it that Latin American nations have been jettisoning the traditional inquisitorial traditions of the continental system in favor of an Anglo-American oral accusatory system for which no precedent, historical context, or experience exists in the region? From a legalistic point of view, one could argue that invalidating an inquisitorial criminal justice system with roots going back to the Roman forum of ancient times makes no sense, and that strengthening the traditional institutions would better serve the region than discarding centuries of judicial traditions and normative elements.

Forcing reforms based on one legal system's methodology onto an entirely different justice system results in the square peg-round hole problem. Even if the *possibility exists for making viable reforms*, the injection of an accusatory system into a centuries-old inquisitorial tradition cannot be achieved in the period of time allocated to most reform projects. Lack of follow-up in monitoring and an absence of continuing funding and training dictate that *when the project is over, the experiment is either* abandoned, or it has caused so much havoc in the process as to be jettisoned at a later date.

Although hard to substantiate, I have suspected for some years that the long push toward an accusatory system is a form of inertia sustained by the judicial reform "industry," which is comprised of American lawyers, judges, and court officials. These consultants have little or no substantive understanding or formal training, let alone interest, in the continental law system. Therefore, it is much easier for them to go to Colombia and urge upon the judiciary the American judicial mechanisms of which they are intimately familiar and in behalf of which they are

18



strongly biased, than for them to fix the existing judicial system by using best models and methodologies of both the common law and continental law traditions. The point should be to adapt the Colombian judicial system rather than transplant elements into it. This error of intent is a matter of normative arrogance and laziness that has been committed over and over during the last 2 decades, resulting in a judicial system that is completely fragmented and convoluted by legal processes that do not fit in the Colombian judicial milieu. If the plan follows the same modus operandi, then the methods employed are a prescription for failure.

The judicial reformists in Colombia would do well to review the lessons learned in the 1980s in El Salvador after a committee of judges convened to institute changes to the judicial sector in keeping with the adoption of a new Constitution. The key emphasis of the reform agenda was to eliminate human rights abuse and immunity to the force of law, "especially as it related to abuses of power by the military and paramilitary groups."[37] Over the course of a decade consultants and experts from the United States and the United Nations were employed in the judicial reform process, but few of the outside parties at the time had specific expertise in the type of reforms being undertaken.[38] The committee members pushed for local reform initiatives, but the direct input of the locals was usurped. Explains one reform scholar writing on what took place,

> This [local] group was gradually sidelined from the more detailed development of programs, where the expertise was provided by outsiders and the negotiation of terms occupied the foreign donors and government actors. This development did not dilute the reform goals, which retained much of their initial focus on human rights, due process, and depoliticization. It did, however, eliminate the only individuals with sufficient knowledge of the target institutions to detect emerging problems as reform proposals, including many of their own, clashed with local reality. Those who did not withdraw entirely retained less than effective

19

001396



> participation. They became junior partners in the reform design teams, or external critics, concerned less with the mundane details of implementation than with the programs' doctrinal purity.[39]

Many scholars and practitioners in the continental law system feel strongly that changing from an inquisitorial system to an accusatory system is not the proper solution. They are frustrated that reformists are ignoring their viewpoints, namely, that what needs to be done to fix the judiciary has more to do with holding the judiciary accountable to the procedures and processes already established by law.

*Faster movement of cases through the judicial process.* One attorney interviewed by the author stated with frustration that when he goes to court in the rural areas, he must supply the court with paper for the proceedings. Case backlogs have been the most visible and frustrating failure of the judiciary for the last 3 decades. Many attempts have been made to fix the problem, but more often than not the changes in procedures have contributed to delays and backlogs. Prior administration of justice programs have attempted to improve case processing and initiate delay reduction mechanisms. In fact, it was reported in 1999 that, after so many millions of dollars were poured into Colombia's judiciary, up to 98 percent of crimes still went unpunished, 74 percent went unreported, and human rights violations went unpunished 100 percent of the time.[40] These horrendous statistics raise the questions, what did all that money go for, and why are we going to do it all again under *Plan Colombia*? One explanation may be that too many reforms bombard the judiciary in a less than cohesive and coordinated way, impeding efficient processes from emerging. The result is simply more confusion.

Arbitrary decisions are also a constant problem at all levels of the judiciary, and the legal system appears incapable of fixing this. Part of the difficulty is that the laws

001397

are confusing, hard to interpret, and erratic.[42] This leads to needless and time-consuming errors in procedure.[43]

> In addition to the inherent unfairness of a system in which those in control are also its prime beneficiaries, those willing to subject their claims to such a system must contend with an equally daunting reality: the length of time necessary to resolve a case once it reaches a Latin American courtroom. Cases commonly take up to twelve years to be resolved in court. Such delays lead to two additional problems: backlogs that limit access to the judicial system, and additional losses caused by the delay and prolongation of litigation for those fortunate enough to secure a place on the court docket.[44]

Under such a scenario, distrust of the judiciary continues to deepen, particularly among the private sector, which worries over the "judiciary's ability to respond to conflict resolution challenges arising from increasingly integrated and competitive markets, including sectors formerly dominated by public monopolies, that demand specialized enforcement based on an understanding of prevailing business practices."[45]

Colombian reformists should notice efforts elsewhere to identify and acknowledge problems in the system. In Paraguay, a Supreme Court reform commission acknowledged the following impediments to timely judicial performance:

- tardiness in trials,

- deficient quality in trial procedure and sentencing,

- inadequate, insufficient, or untimely resources,

- expensive justice,

- inadequate internal information,

- inefficient public relations,

- insufficient judicial authority,

21

001398

- inefficient justice-related organs, and

- *inadequate and insufficient decentralization.*[46]

The application of new technologies has greatly enhanced the capacity of courts to manage caseloads more efficiently. Colombia has already received many such technical upgrades through prior reform projects. But the benefits of court technology never seem to reach beyond the large urban jurisdictions, leaving small-town courts still in the dark ages. Secretaries of lower court judges routinely buy supplies from their own salaries, coax documents out of dilapidated manual typewriters using carbon paper to make copies, and work by candlelight during frequent power outages. Even in the larger cities where technology has been made available to the courts, some judicial officials seem not to care whether the hardware gets used. During an interview with a judge in Colombia in 1999, he pointed to the computer behind his desk and told me he had never used it because no one was available to train him on how to operate it. The computer had been there for months and had never been turned on. This indifference is due in large measure to the absence of consistent, motivated, and progressive judicial education and to the failure to hold judges and staff accountable for gaining competence with the new technology made available to them.[47]

*The Government will provide leadership to make the judicial system more fair, effective, transparent, and accessible.* The primary question to ask here is this: In a government in which corruption is the rule rather than the exception, where does the Pastrana Administration intend to find leaders with the credibility, influence, and charisma required to bring the judiciary into line? Without question, the judiciary must find within itself the heart and integrity to stand independently and coequally with the other two branches.

22

001399

For decades the judiciary has been little more than a rubber stamp for congressional statutes and presidential decrees, swaying with the political winds and bending to the will of whichever ideology was dominant in the government at any given time. Any reform package must address the issue of judicial independence and autonomous status in government. But part of the move toward greater independence must emphasize political will on the part of the other branches to allow the judiciary to realize its position as an equal member of a tripartite government. There must be oversight and supervision by independent monitoring commissions over the work the judiciary does day in and day out and a uniform methodology for processing any concerns raised in the evaluative process. There must be rules of procedure to follow and sanctions to be applied if the judiciary falls short of its mandate, such as expediting cases and enforcing the rule of law. The judiciary must also be open to greater scrutiny by the news media and society in monitoring its proceedings and conduct. There must be a code of personal and professional conduct to hold judges and judicial officials accountable for their behavior. They must be held to a high moral and ethical standard if the citizens are to begin to have any faith in the institutions of justice, even if doing so entails submission to some sort of vetting process such as that to which members of the armed forces must undergo under the dictates of *Plan Colombia.*

The purpose of the judiciary in any society is to order social relationships among private and public entities and individuals and to resolve conflicts among these societal actors. Unfortunately, the Latin America judicial system is widely perceived to be in a state of crisis because it cannot fulfill these basic expectations. A climate of distrust and frustration permeates the system and has been acknowledged by virtually every sector of society including private individuals, the business community, and system insiders like judges and lawyers. This perception of ineffectiveness by the institution's potential users discourages its intended beneficiaries from seeking its services and leaves them with

23



low expectations of justice when forced to participate in judicial proceedings.[48]

This lack of trust in the efficacy of the courts is in part responsible for the rise of vigilantism. The judiciary cannot hope to assert control of the rule of law if there is no discernible leadership capable of gaining the confidence of the people.

There is also a clash between how the judiciary attempts to enforce the law, and how the population sees the judiciary as interfering with the natural order of society. How can the judiciary enforce laws which rural groups from indigenous cultures have no association with or understanding of? The basic norms of a modern democracy assume that the population understands democratic principles and submits to life under one rule of law. But how can a judiciary function in a country where more than one rule of law exists, such as guerrilla law, indigenous law, and the official law of the land? The government has neglected the duty of educating citizens about their rights and how the system operates. This neglect is partly responsible for the people's distrust and suspicion of the judicial system. At the same time, such education will bring transparency and accountability by empowering the people to be more critical and demanding of the institutions that serve them.

Reform of the judiciary must begin with committed leadership at the highest level of the judicial branch. The leadership must make judicial outreach and public education a priority. In this regard, the experience of courts in the United States could clearly benefit the Colombian judiciary under a carefully devised reform program. As one scholar convincingly explains,

> The design of judicial policies must start with the clear leadership of judges as main characters of the reform strategy. It is equally incontrovertible that such a reform binds the other bodies of the state in the same imperative manner, and

24



demands that leaderships coordinate actions, lay bridges toward dialogue, and solidify consensus.[49]

*The Government will seek to reduce immunity to law through improved prosecution, more effective investigations, and speedier trials.* Millions of dollars have been pumped into Colombian judiciary reforms over the last 25 years without significant success. How does the Pastrana Administration intend to attain such reforms if nothing has worked yet? Notwithstanding that corruption is the number one problem in the judicial institution, the judiciary sorely lacks an effective investigative arm capable of doing its job in a professional, forthright, and accountable manner. The investigative and prosecutorial arms of the judiciary are lacking in numerous respects. Members have little relevant education and training to do their work effectively and competently, and they are not subjected to rigorous background checks during the hiring process. Because they lack professionalism and self-esteem, they are susceptible to bribery from the drug mafias, they deal drugs themselves, or they work with self-defense groups (paramilitaries, death squads, or citizen militias) in order to make extra money or settle personal vendettas (unfortunately, sometimes judges and colleagues are targets of such vendettas).

Such involvement presents obvious impediments to the administration of justice. For instance, it becomes nearly impossible to prove cases against paramilitary groups for massacres and other human rights violations without risking one's life in the process. As a case in point, a narcotrafficking investigation was underway in the Pacific coast port of Buenaventura, a major drug trafficking and smuggling transit point. When the judge overseeing the investigation requested a status report from the judicial police assigned to the case, they told the judge, "We like you, and you know nothing." The judge was forced to drop the proceedings or risk grave bodily harm.[50] In the face of such intimidation from within the organization itself, how can

25



meaningful change occur in the scope of a 3-year project under *Plan Colombia*?

*Provide effective coordination, including open communication and effective policy implementation, between the judiciary and different branches and offices of the State responsible for judicial reform and administration.* Colombia is a government marked by centralization and tight compartmentalization. This encourages secrecy and impedes the free exchange of talent and ideas across the political landscape. To attain open communications and a free flow of information is to ask an entire government in only 3 years to shed a mindset that traces its origins back to colonial rule. There are sharp divisions and even open animosity between investigative bodies of the judiciary, the national police, and army units assigned to judicial operations. The turf battles that erupt result in the production of false evidence or the destruction of evidence in an attempt to discredit another body's work product. Sometimes human rights violations result and actual violence occurs between agencies.

Other branches of government strongly resist developing more effective communication with the judicial branch, and any attempts on the part of the judiciary to improve its status and independence are often met with suspicion or evasion. Judicial activism is viewed with distrust and skepticism. The traditional role of the judiciary was to condone the exercise of executive power, so there is little interest today in granting to the judiciaries new authority or autonomy that might liberate the courts from executive tutelage—and in the process expose the executive to judicial scrutiny or loss of political clout. For change to take place, the other two sisters must be willing to let Cinderella come to the ball.

There is an ironic denouement, glanced at earlier, concerning the idea of better communication and coordination between the judiciary and the other two branches. The faceless courts were once praised by the other

26

001403



two branches of government as the last hope for Colombia to fight drug trafficking, guerrilla insurgency, sedition, and *human rights abuses*. *Four consecutive presidential administrations solicited and received millions of dollars in foreign aid from the United States to develop, train, and fund the court*. However, when the faceless courts turned their prosecutorial attention on government corruption, the politicians cried foul and accused the courts of incompetence and vigilantism. When the courts focused a corruption investigation on President Samper, his associates in the Congress promptly introduced a bill that would have repealed the crime of illegal enrichment and accumulating wealth without being able to justify its origin.[51] *Shortly thereafter members of the Congress unsuccessfully introduced a bill that would have done away with the faceless courts altogether.* Only the vehement opposition of an honest Justice Minister prevented the bill from passing even though the fight resulted in his resignation. His successor was more inclined to play ball with the executive and vowed to remove from the jurisdiction of the faceless courts all crimes that were not classified as atrocities.[52] The faceless courts were largely legislated out of existence in June 1999.

The irony of this episode is that the executive branch lobbied the United States intensely for aid in establishing the faceless courts as a conduit to judicial reform, but then turned on the courts when they showed any sign of judicial independence. The episode well demonstrates the chasm of communication and distrust between the judiciary and the other two branches.

*Increase training for judicial officers.* There is plenty of solid evidence to suggest that this initiative, if adequately addressed, could set the entire reform process moving forward. But at the present time, there is a serious lack of tools, training methodologies, and infrastructure. Incompetence within the judicial apparatus is a serious obstacle to raising the status of the judiciary as a

27

001404


respectable branch of government. Court procedures are often not followed or intentionally ignored. Required steps such as verifying the identity of witnesses or securing physical evidence are often not taken, or taken in such an incompetent manner as to render the witnesses unavailable, or the evidence useless. While many members of the judiciary do their best to make do with what resources they have, they do not receive the proper training to conduct methodical investigations and gather evidence. Nor do they necessarily have the forensic facilities to support the work.

Many personnel have little education and are young and inexperienced. Often their families live below the poverty line and experience some of the worst living conditions. Salaries are so low and working conditions so poor that criminal elements have little difficulty buying off judicial police and investigators. Also, as already mentioned, many judicial investigators and police are known to moonlight with self-defense groups, paramilitaries, and death squads.[53] There is a critical urgency to create a better-educated, better-trained, and better-compensated corps of professionals. Getting to this point requires thorough background investigations and vetting of applicants and ongoing review of their performance, qualifications, and integrity. Low self-esteem in the court system is also a grave problem. *Implementing improvements by professionalizing and empowering judicial officers is crucial to improving morale.*

Moreover, a strong code of conduct must be established and enforced, transparency must be achieved by regular review of court activities, and all must feel the certainty that the full weight of the law will be brought down on any judiciary officer who violates the rules.

*Ensure that judicial decisions are open to public scrutiny and that the result is just in all cases—including military cases in civilian jurisdictions.* This is another goal stymied by centuries of legal tradition that cannot be undone in the time allotted under *Plan Colombia.* The criminal justice

28


tradition in Colombia is directly descended from the secret inquisitorial processes of the ecclesiastic courts and subject to normative conduct not easily discarded.[54] This manner of conducting court business has generally allowed the judiciary to work free from public scrutiny because the laws being enforced are not based on *stare decisis* (i.e., the principle that legal precedent will govern) which we in the Anglo-American legal system take so much for granted. There is a disconnect between the judicial decisionmaking process and how the decisions are justified to the society. This is because the courts have been so closely associated with doing the bidding of the executive that there is simply no trust in the judicial branch.

Judicial procedures must be transparent to public scrutiny, but with carefully crafted exceptions, narrowly defined in law. Public scrutiny should be suspended when there is a need to protect citizens against falsehoods or unwarranted invasion of privacy, to secure a fair trial, and to prevent breaches of national security. Today, serious violations of the democratic process occur, such as when arrests, particularly by the military in zones of conflict, are routinely made without the issuance of warrants as required under the Constitution. "Between 1993 and 1996, the military arrested 6,019 persons on suspicion of membership in guerrilla organizations; in 5,500, or over 90 percent of the cases, the Office of the Procurador-General found there was insufficient evidence to issue formal charges."[55] Regardless, the civilians were held for months without charges being brought or dropped.

Any reforms intended to open the courts to scrutiny do not necessarily entail abandoning the judicial procedures in place. Rather, emphasis must be placed on following the procedures, and there must be accountability if the procedures are ignored or abused.

*Implement a core curriculum for judicial police investigators within a single judicial police training academy.* This is actually a realistic and possible goal under

29



the plan. The United States has a great deal to offer Colombia in this area of reform, and units within the U.S. Department of Justice, along with programs instituted by nongovernmental organizations such as the American Bar Association, the American Judicature Society, the National Judicial College, and the National Center for State Courts, have exceptional assets and strategies for instituting effective training curriculums. But due to the serious lack of tools and reliable infrastructure, one must wonder whether such an academy could be established and institutionalized within the 3-year funding limit of *Plan Colombia.*

Nevertheless, establishing a national institution or academy for training judicial police and investigative units would bring some cohesiveness, esprit de corps, and consistency in training and preparation. Raising the service requirements along with the regimen and discipline instilled in such a curriculum, along with the improvements in career benefits mentioned earlier, could significantly reduce the level of corruption within the judiciary and bring discernible positive change to the third branch. Such an academy would also function as a clearinghouse and coordinator for the continuing education of judicial officers, and as a center for court research and support. Establishment of this institution would be in itself another method of making the judiciary accountable, and could result in citizens becoming less suspicious and negative toward the judicial system.

*Ensure public access to justice and a fair defense nationwide.* This is another area of the plan that has potential to succeed. The court process in Colombia has for centuries been plagued by abuse and tyranny. In the last quarter century, one particularly odious practice, cloning of witnesses, has been allowed to occur routinely in court proceedings nationwide, in which the identities of witnesses have been withheld by the court in order to compel testimony in notorious cases. "Cloning occurs when the

30

same person is presented on two or more separate occasions as different witnesses."[56]

In one particular such case that gained international attention, a group of trade union workers were arrested, accused of committing terrorist acts, and brought before the regional courts.[57]

> Their capture and detention were based on the testimony of at least four "faceless" or anonymous informants who collaborated with Army investigations. The Attorney-General (Procurador-General), while carrying out his oversight function in this case, determined that some of these anonymous witnesses had been cloned.[58]

Such practices lead citizens to lose faith in the judiciary, and compel them to seek justice from paramilitary and vigilante groups (known as *autodefensas*) that exact justice with their own swift and brutal methods.[59] Citizens have become tolerant of vigilantism because they know that the alternative is to wait years for official justice to be served.[60] The same vigilante and paramilitary groups that take the law into their own hands, however, have been responsible for acts of violence and intimidation against judges, prosecutors, and judicial police units whose investigations threaten the operations of such groups.

Opening the courts to public scrutiny and criticism would do much to improve access to justice. Along with speedier proceedings, improvements in court procedures, and broader dissemination of court decisions, citizens could again go to the courts to seek justice and better evaluate whether justice was being served.

*Eliminate corruption.* The drafters of *Plan Colombia* have recognized that "the proceeds of drug trafficking have corrupted officials in all branches of Government and private activity, and eroded public confidence in civil institutions."[61] The primary intention should be to address corruption head on, "by building upon existing initiatives— including the Presidential Program Against Corruption and

31




the Prosecution Services Anti-Corruption Unit and by implementing effective financial disclosure and rigorous pre-employment and in-service integrity checks." The details are too complicated to address here, but it must be noted that even the Anti-Corruption Units are susceptible to bribery and corruption. An overabundance of precedent would dictate that this is so.

Other such special units and organizations have been created in Colombia in the past, and proved to be little more than smoke and mirrors to appease the United States and watchdog organizations monitoring Colombia from abroad. The effort merely validates the grand Latin American tradition of obfuscation and disinformation.

The paucity of controls on institutional corruption is aggravated by the power and influence of the executive, which exert a shield of protection over corrupt investigative agencies. Added to the mix is the military, which casts an ever-present shadow on the surface of popular democracy. Along with the military, both branches often work in concert to prevent the judiciary from holding investigative units to high standards of conduct and efficiency. The excuse for such conduct and collusion is often simply political expediency.

It might truthfully be said that the institution of corruption constitutes a fourth branch of government that pervades the other three branches. Unless *Plan Colombia* meets the issue of institutional corruption head on, the billions of dollars spent on the effort will have been wasted.

*Deprive criminals of illegal profits.* The goal, it seems, in going after the assets of criminals is to create a fund for supporting "law enforcement and other social initiatives (including land reform, alternative development, and the strengthening of civil institutions) which are critical to a lasting peace."[62] The laundering[63] of drug profits has a dramatic impact on the economies of both the United States and Colombia, and much of the laundering occurs in major

32

001409



U.S. cities. Estimates are that Colombian drug traffickers launder as much as $6 billion a year[64] through a process known as the Black Market Peso Exchange. This was a money-changing strategem that originated in the 1950s as a way to circumvent the Colombian government's restrictions on citizens' access to U.S. currency in an effort to enforce compliance with trade policies, tariffs, and taxes of goods sold in Colombia.[65]

There has been a fairly successful mutual assistance mechanism in place for some time, known as the Customs Service Mutual Assistance Agreement of 1999. The agreement has yielded impressive results in cracking down on money laundering and seizing trafficker assets, most notably in 1999 when Operation Juno and Operation Millennium struck significant blows to drug traffickers in the United States and Colombia. The success of the operations was attributed to an exceptional and, in the words of U.S. Attorney General Janet Reno, "unprecedented collaborative effort"[66] between U.S. and Colombian authorities. Given the mechanisms already in place, it is difficult to understand from *Plan Colombia*'s vague language how the fight against money laundering under the plan would be distinguished or revised from its current form.

The existing mechanisms that can be used for depriving criminals of illegal profits only seem to reach those profits resulting from drug trafficking. But what about illegal profits resulting from tax evasion, political corruption, bribery, and the crimes of extortion and committed by guerrillas?

## A COMMENT ON THE NATURE OF JUDICIAL REFORM PROGRAMS

Reform programs are dependent on the window of opportunity created when funds are allocated to accomplish specific foreign policy goals. Once the program funding is

33

001410



exhausted, the program ends, regardless of whether the goals of the program have been met. The nature of judicial reform, however, cannot be limited to beginning and ending dates. Reform projects require a significant commitment of time and resources over a period of years. If there is no opportunity for fine-tuning newly installed programs or for follow-up monitoring, there is a risk that the programs will be abandoned or cause additional problems down the road.

This leads then to another concern: reform programs must undergo careful and diligent risk analysis prior to implementation and commitment of significant public monies. Otherwise, rather than doing good deeds to bolster Colombia's justice system, that system will be further destabilized, thereby adversely affecting U.S.-Colombian relations. Unfortunately, the scramble by contractor consultants to respond to requests for proposals has resulted in bad projects because due care was not exerted during what is often a frantic competition time frame. *Plan Colombia* has led to a feeding frenzy in the consulting industry. Let us hope that the gatekeepers of the funds will exercise careful discretion in how the monies are disbursed.

## CONCLUSION

There is little disagreement that a strong judiciary insures a strong rule of law. If the judiciary can be empowered, revitalized, restructured within the bounds of its best normative traditions, and if corruption is purged, *Plan Colombia* could succeed. To do this, however, codes must be updated, penalties for certain crimes must be increased, judicial officials must be held accountable for their actions, human rights violations must be prosecuted to the fullest extent, and transparency must allow new light to shine on the judicial institutions.

Such changes do not take place overnight. But at the same time one must hope that change for the better is possible. For as much as I have been critical of *Plan*

34



*Colombia* and the government, I can also attest that there are many in government who are without guilt, honest to a fault, faithful to the rule of law, and wear their patriotism on their sleeves. These individuals deserve our full support, hopes, and prayers every day of the week. But such individuals are often powerless to make real changes happen because they are marginalized by the corrupt majority and stymied by the vagaries of the system. Perhaps that is one of the most frustrating reasons why *Plan Colombia* is so problematic.

Most Americans want to help Colombia out of its crisis, to help the Colombians who dream of an equitable social and economic system and a civil society that honors the rule of law. The problem is that while such Colombians may represent the majority of the Colombian population, they represent an almost powerless minority within the government institutions themselves. One can be as honest as the day is long, but if a superior is corrupt, or a subordinate staffer is corrupt, any effort to change the system will be an exercise in futility and may even get oneself killed in the attempt.

An exodus from Colombia is now underway at an unprecedented level as lawyers, judges, even supreme court justices, and other professionals throw in the towel and leave their beloved homeland. If this brain drain continues, then who will be left minding the store but those who stand to gain the most from the money being thrown at Colombia under the terms of the plan? The rest who are not in a position to leave are thus in a very difficult and tenuous situation.

Finally, for any kind of plan with the ambitions of *Plan Colombia* to succeed it has to be developed based on the country's needs and historical conditions. But more importantly it must conform to the nation's economic capacity to execute it. I fervently hope I am wrong about my analysis and the criticisms I have leveled at *Plan Colombia*. But I fear my analysis is tragically accurate, and that rather

35

001412




than *Plan Colombia* solving the Colombian crisis, it will instead push the country over the brink into anarchy, civil war, and social calamity for decades to come.

## ENDNOTES

1. Carol Clark, *Plan Colombia: Is the U.S. Addicted to Military Fixes?* CNN.com (visited January 30, 2001) *http://www.cnn.com/ SPECIALS/2000/Colombia/story/essays/clark/index.html* (on file with the author).

2. According to a report issued by the Economist Intelligence Unity in November 2000, "About $2.2bn covers Colombia's annual budget allocations for defense, police and the judiciary over the three-year period of the plan. An additional $850m comes from Colombian "peace bonds" sold to the wealthy, while another $950m will be loaned to Colombia by multilateral lenders, aiming at boosting spending for job creation and training and infrastructure projects." Country Finance Report, November 6, 2000 (visited January 20, 2001) *http://biz.yahoo.com/ifc.co.news/110600-1.html* (on file with the author).

3. Angel Ricardo Oquendo, *Corruption and Legitimation Crisis in Latin America*, 14 Conn. J. Int'l L. 475, 486 (1999) (stating that what distinguishes today's corruption is precisely the fact that it is accompanied by a sense of crisis with a legitimacy deficit).

4. Considering that Colombia is already the most heavily armed country in Latin America, it hardly needs more military weapons within its borders. A table compiled by the Federation of American Scientists of materiel going to Colombia is available for review at *http://www.fas.org/asmp/profiles/Industry/Colombiadefensecontra cts.htm* (on file with the author).

5. As a less than successful attempt to pacify human rights advocates.

6. S. Rep. No. 612 (1961), 1961 U.S.C.C.A.N. 2476.

7. Preface, *Plan Colombia: Plan for Peace, Prosperity, and the Strengthening of the State*, United States Institute of Peace Library, (visited November 9, 2000) *http://www.usip.org/library/ pa/colombia/adddoc/plan_colombia_101999.html* (on file with the author).

001413

8. S. Rep. No. 612 (1961), 1961 U.S.C.C.A.N. 2478.

9. See Andrew Reding, "Survey of Latin American Press-The Closer You Are to Colombia, The Worse the New Aid Plan Looks," *Pacific News Service*, August 18, 2000.

10. "Brazil Says Plan Colombia Biggest Security Risk," *Reuters*, August 29, 2000 (visited January 20, 2001) *http://www.cnn.com/2000/WORLD/americas/08/29/brazil.army.Colombia.reut* (on file with the author).

11. David Adams, "Plan Colombia Gets Off to Rocky Start," *St. Petersburg Times*, February 11, 2001, at 1A.

12. *Ibid.*

13. Daniel Kaufman, et al., "Governance Matters," Policy Research Working Paper, The World Development Research Group, October 1-2, 1999.

14. *Transparency International, 2000 Corruption Perceptions Index*, (last visited September 27, 2000) *http://www.transparency.org/documents/cpi/2000/cpi2000.html* (Colombia ranks in the bottom half at 60 out of 99 countries) (on file with the author).

15. Commenting on the results of his participation in drafting a report, *Toward Greater Peace and Security in Colombia: Forging a Constructive U.S. Policy: Report of an Independent Task Force Sponsored by the Council on Foreign Relations and the Inter-American Dialogue* (Council on Foreign Relations, 2000), at p. 30.

16. For example, the Secretary of the President, Juan Hernandez, has benefited from several government contracts through a company, Acertar Ltd., whose president and legal representative is Hernandez's wife.  The contract is for making uniforms for the police and the Departamento Administrativo de Seguridad (DAS).  See Lazos familiares, *Semana.com* (March 2, 2001). The news journals uncover a new scandal in any of the three branches on an almost daily basis.

17. Ana Carrigan, "A Foolish Drug War," *New York Times*, February 10, 2001, at p. A15.

18. According to Ambassador Robert White, President of the Center for International Policy.

37

001414



19. The World Geopolitics of Drugs, *Annual Report 1995/1996*, (visited January 20, 2001) *http://www.odg.org/rapport/gb/RP12_1_COLOMBIE.html* (on file with the author).

20. For a detailed and probing analysis of the case, see Chapters 16ff in Édgar Torres and Armando Sarmiento, *Rehenes de la Mafia*, Bogotá: Intermedio Editores, 1998.

21. See *World Geopolitics*, p. 19.

22. *Ibid.*

23. "Colombia Corruption" (visited January 20, 2001) *http://www.fas.org/man/dod-101/ops/war/2000/04/000420-col1.htm* (on file with the author).

24. *Ibid.*

25. See Felipe Saez Garcia, "The Nature of Judicial Reform in Latin America and Some Strategic Considerations," 12 Am. U. Int'l L. Rev. 1267, 1287 (1998).

26. Between 1979 and 1991, 278 judges were killed by narcotraffickers, guerrillas, and paramilitaries.

27. See Garcia, note 26, at p. 1287.

28. See Martha I. Morgan, "Taking Machismo to Court: The Gender Jurisprudence of the Colombian Constitutional Court," 30 U. Miami Inter-Am. L. Rev. 253 (1998).

29. See *Transparency International*, note 14.

30. *Legal and Judicial Reform*, Statement of the World Bank Clearinghouse for International Judicial Reform (visited January 23, 2001) *http://wbweb4.worldbank.org/legal/legop_judicial.html* (on file with the author).

31. For an in-depth examination of the Constitutional Court and the history of the Colombian judiciary, see Luz E. Nagle, "Evolution of the Colombian Judiciary and the Constitutional Court," 6 Ind. Int'l & Comp. L. Rev. 59 (1995).

32. *Ibid.*, pp. 85-88.

001415



33. See Luz E. Nagle, "Colombia's Faceless Justice: A Necessary Evil, Blind Impartiality or Modern Inquisition?" 61 U. Pitt. L. Rev. 881, 953 (2000).

34. *Ibid.*, pp. 936-937.

35. See generally, Nagle, note 34; and *Lawyers Committee for Human Rights*, Report, Colombia: Public Order, Private Injustice, 1994.

36. Section of *Plan Colombia* titled, "Reform of the Justice System and the Protection of Human Rights."

37. Linn Hammergren, *The Politics Of Justice And Justice Reform In Latin America*, 1998, p. 16.

38. *Ibid.*

39. *Ibid.*

40. Javier Giraldo, "Corrupted Justice and the Schizophrenic State in Colombia," 26 Soc. Just. 4, 1999.

41. See Edgardo Buscaglia and William Ratliff, *Judicial Reform in Latin America*, 1995, p. 2.

42. For an extensive analysis of the problem, see Edgardo Buscaglia, "A Quantitative Assessment of the Efficiency of the Judicial Sector in Latin America," 17 Int'l Rev. L. and Econ. 275, 1997.

43. See Maria Dakolias, "A Strategy of Judicial Reform: The Experience in Latin America," 26 Va. J. Int'l L. 167, 170(1985)).

44. See Garcia, note 25, p. 1269 (citing Maria Dakolias, "A Strategy of Judicial Reform: The Experience in Latin America," 26 Va. J. Int'l L. 167, 168 [1985]).

45. Enrique A. Sosa Elizeche, "Restructuring of Justice Administration in Paraguay," 42 St. Louis U. L.J. 1153, 1157 (1998).

46. See Andean Commission of Jurists, *The Andes: Emergent or in Emergency? Executive Summary 47*, 1997.

47. Dakolias, note 44, p. 173.

48. See Fernando Carrillo Flórez, "Supreme Courts of the Americas Organization: Judicial Independence and Its Relationship with the Legislative Bodies," 42 St. Louis U. L.J. 1033, 1041 (1998).

39



49. See Nagle, note 31, p. 947.

50. Douglas Farah, "U.S.-Colombia Ties Strained Over Drugs; Americans See Pervasive Cartel Influence," *The Washington Post,* January 7, 1996, p. A21.

51. *Ibid.* This attempt to change the jurisdiction of the court was a veiled attempt to shield leaders of the Cali Cartel from prosecution by the faceless courts since they were never charged with committing violence.

52. Author's interview of a faceless judge, conducted in July 1999.

53. Nagle, note 34, pp. 886-893.

54. Commission on Human Rights, *Question on Human Rights of All Persons Subjected to Any form of Detention or Imprisonment: Report of the Special Rapporteur on the Independence of Judges and Lawyers, Mr. Param Cumaraswamy: Addendum: Report on the Mission of the Special Rapporteur to Colombia,* United Nations Report E/CN.4/1998/39/Add.2, March 30, 1998.

55. *Ibid.,* para. 74. "This abuse of regional justice has been confirmed in several cases where regular army informants—some of whom are paid monthly wages to testify—are used to accuse persons of rebellion or terrorist acts."

56. Nagle, note 31, p. 951.

57. See Commission on Human Rights, note 55, para. 74.

58. For a practical examination of the *autodensas* and paramilitary groups in Latin America, see Carlos Medina Gallego, *Autodefensas, Paramilitares y Narcotrafico en Colombia: El Caso Puerto Boyaca,* Bogotá: Editorial Documentos Periodísticos, 1990.

59. *Ibid.*

60. Section on *The Reform of the Justice System and the Protection of Human Rights,* subsection titled "Eliminate Corruption."

61. *Ibid.*

62. See The Money Laundering and Financial Crimes Strategy Act of 1998, Pub. L. 105-310, October 30, 1998.

40



63. See Suzanne Timmons, "Looking to Crack Down on Contraband," *Business Week*, October 30, 2000, p. 29; and Luz E. Nagle, "U.S. Mutual Assistance to Colombia: Vague Promises and Diminishing Returns," 23 Ford. Int'l L.J. 1235 (2000).

64. In order to control trade and charge high tariffs on goods imported to Colombia, the Colombian government required importers to purchase merchandise in dollars that could only be obtained at the Colombian central bank. The dollar/peso broker allowed the purchase of dollars without the government's knowledge so that the importer could avoid the Colombian tariffs and taxes by "smuggling" the goods without government scrutiny. The broker purchased dollars from Colombian exporters who then sold goods in the United States and deposited them into U.S. accounts. The brokers then paid the exporter in pesos in Colombia. Even though the customers paid a small premium for the dollars that were passed to them by the broker, it was cheaper than paying the tariffs and taxes on the goods obtained in Colombia. Drug traffickers have adapted their money laundering operations to the Exchange in the following manner: First, the Colombian traffickers export drugs to the United States. Next, the drugs are sold for money. Then the trafficker enters into a "contract" and sells the money to the Colombia Black Market Peso Exchanger. The Exchanger, or his representative, then introduces the bulk currency into the U.S. banking system. Then the U.S. dollars are sold to Colombian importers. The importers next purchase goods, either from the United States or from collateral markets. Finally, the goods are transported to Colombia, and in this way the wholesale value of the drugs is returned to Colombia in the form of trade goods. See The Department of the Treasury & Department of Justice, *The National Money Laundering Strategy For 1999*, The Department of the Treasury and Department of Justice, September 1999, p. 26 (visited April 9, 2000) *http://www.treas.gov/ press/releases/docs/money.pdf* (on file with the author). For additional discussion, see Nagle, note 64, pp. 1263-1267.

65. Michael Kirkland, "US, Colombia Snap Alleged Drug Ring," U.P. Int'l, October 13, 1999.

41

001418