FILED

FEB - 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

1  HOLLY S. COOPER SBN 197626
   U.C. DAVIS IMMIGRATION LAW CLINIC
2  University of California, Davis School of Law
   One Shields Ave., TB-30
3  Davis, CA 95616-8821
   Tel: (530) 752-6942
4  Fax: (530) 752-0822

5  Attorney for Petitioner
   ANA BIOCINI
6
   Assisted by: Tanya Tambling, Cassandra Lopez, Raymond Kim, Wajahat Ali, Chad Greeson,
7  Dong Zee, Hoa Hoang, Sheerin Karimian

8

9                    **UNITED STATES DISTRICT COURT**

10          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11                                                                    *SI*

12  ANA BIOCINI,                          ) Case No **08        0885**
13  A 91 182 333, an individual,          )
                Petitioner,               )
14                                        )   **MEMORANDUM OF POINTS AND**
        vs.                               )   **AUTHORITIES**
15                                        )
    MICHAEL MUKASEY, in his official      )
16  capacity as Attorney General of the United )
    States; MICHAEL CHERTOFF, in his official )
17  capacity as Secretary of the Department of )
    Homeland Security; NANCY ALCANTAR, in )
18  her official capacity as San Francisco Field )
19  Office Director of U.S. Immigration and    )
    Customs Enforcement, Detention and    )
20  Removal; DONNY YOUNGBLOOD, in his     )
    official capacity as Sheriff of Kern County )
21  Sheriff's Department and Lerdo Detention )
22  Facility,                             )
                                          )
23              Respondents.              )
                                          )
24                                        )
                                          )
25                                        )
                                          )
26                                        )
                                          )
27
28

# TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................................i

TABLE OF AUTHORITIES .....................................................................iii

I.    INTRODUCTION ............................................................................2

II.   JURISDICTION ..............................................................................2

III.  EXHAUSTION ................................................................................4

IV.   PROPER RESPONDENTS ..............................................................5

V.    STATEMENT OF FACTS ...............................................................5

    A.  Family Background................................................................5

    B.  Immigration Status Prior To Conviction ............................6

    C.  Criminal History ....................................................................6

        1)  Drug Cartels Are Aware Of Petitioner's Status As An Informant ...........6

        2)  Narcotics Contacts.................................................................7
            a)  Elias Giannakapolous – "The Greek" ...................................7
            b)  Felix Bernal Fernandez – "Bernal" .......................................7
            c)  Hernando Velazco – "El Gordo" ...........................................8

        3)  Cooperation With The U.S. Government – Creation Of Special Relationship ............................................................8

        4)  Sentencing ..............................................................................9

        5)  Removal Proceedings ...........................................................10

        6)  Immigration Detention ........................................................11

        7)  Equities Favoring Ms. Biocini's Release...........................11
            a)  Supervised Release ...............................................................11
            b)  Drug Abuse And Rehabilitation ...........................................12
            c)  Access To Counsel .................................................................12
            d)  Physical Hardship .................................................................12

        8)  Country Condition: The Colombian Government Has Known Ties In Drug Trafficking ..............................................13

VI.    LEGAL ANALYSIS ……………………………………………………...13

    A. **Ms. Biocini Demonstrates A Likelihood Of Success On The Merits And Raises Serious Legal Claims** ………………………………………………………14

        1) **Ms. Biocini's Prolonged Detention Does Not Bear A Reasonable Relation To Her Removal** …………………………………………..15

        2) **Since Ms. Biocini's Liberty Interests Are At Stake, Section 1226(c) Should Be Construed Narrowly, Allowing For Her Immediate Release Or Bond Redetermination Hearing**………………………………..16

        3) **DHS's Anticipated Contention That Ms. Biocini Is Partly Responsible For The Length Of Her Removal Proceedings And Detention Is Unwarranted** ……………………………………………………..17

        4) **The Government's Decision To Try To Deport Ms. Biocini Violates Her Substantive Due Process Rights Under The "Danger Creation" Exception** …………………………………………………………18

          a) **The U.S. Government Has A Duty To Protect Petitioner Because Of Her Status As A U.S. Drug Informant** …………………………...18

          b) **The  Federal Government, By Affirmative Conduct, Placed Petitioner in Danger**…………………………………………...19

          c) **Morgan v. Gonzales is Substantively Distinguishable from Petitioner's Situation**…………………………………………20

        5) **Ms. Biocini's communication with counsel is hampered by distance** ………………………………………………………………...21

    B. **The Balance Of Hardships Tips Sharply In Ms. Biocini's Favor** ………………22

    C. **The Federal District Court Has Jurisdiction And Authority To Admit Bail To Habeas Petitioners Detained By ICE** ……………………………………..23

VII.    CONCLUSION …………………………………………………………...25

# **TABLE OF AUTHORITIES**

## CASES

*Abbassi v. INS,* 143 F. 3d 513, 514 (9th Cir. 1998) -------------------------------------------------------- 13

*Benda v. Grand Lodge of Int'l Ass'n of Machinists,* 584 F.2d 308 (9th Cir. 1978) ------------------------------------- 20

*Brackett v. United States,* 206 F.Supp.2d 183 (D.Mass. 2002) ---------------------------------------------------------4

*Calley v. Callaway,* 496 F.2d 701 (5th Cir. 1974)------------------------------------------------------------------ 23

*Demore v. Kim,,* 538 U.S. 510 (2003) ------------------------------------------------------------------- 15, 16, 22

*Deshaney v. Winnebago County Dep't of Social Services,* 489 U.S. 189 (1989)------------------------------------ 18

*Franklin v. Duncan,* 891 F. Supp. 516 (N.D. Cal. 1995) --------------------------------------------------------- 23

*Hernandez v. Gonzales,* 424 F.3d 42, 42-43 (1st Cir. 2005) -------------------------------------------------------3

*Hilton v. Braunskill,* 481 U.S. 770 (1987)------------------------------------------------------------------------ 23

*INS v. St.* Cyr, 533 U.S. 289, 301 (2001) -----------------------------------------------------------------------4

*Kennedy v. Ridgefield City,* 439 F.3d 1055, 1057-1058 (9th Cir. 2006)-------------------------------------------18, 19

*Lopez v. Heckler,* 713 F.2d 1432 (9th Cir. 1983)----------------------------------------------------------------- 14

*Ly v. Hansen,* 351 F.3d 263 (6th Cir. 2003) -------------------------------------------------------------------- 17

*Mapp v. Reno,* 241 F.3d 221 (2d Cir. 2001)-----------------------------------------------------------------22, 23

*Marino v. Vasquez,* 812 F.2d 499 (9th Cir. 1987) --------------------------------------------------------------- 23

*Morena v. Gonzales,* 2005 WL 1367414, at *2 & n.2 (M.D. Pa. June 6, 2005)-------------------------------------3

*Munger v. City of Glasgow Police Dept.,* 227 F.3d 1082 (9th Cir. 2000) ----------------------------------------18, 20

*Nadarajah v. Gonzales,* 443 F. 3d 1069 (9th Cir. 2006)---------------------------------------------3, 15, 16, 22, 23

*Ostrer v. U.S.,* 584 F.2d 594 (2d Cir. 1978)---------------------------------------------------------------------- 23

*State of Alaska v. Native Village of Venetie,* 856 F.2d 1384 (9th Cir. 1988)------------------------------------------ 20

*Tijani v. Willis,* 430 F. 3d 1241 (9th Cir. 2005) -----------------------------------------------------------------15, 16

*U.S. ex rel. Paetau v. Watkins,* 164 F.2d 457 (1947)------------------------------------------------------------- 22

*Wang v. Reno,* 81 F.3d 808 (9th Cir. 1996) ------------------------------------------------- 3, 4, 15, 16, 18, 19, 20

*Wood v. Ostrander,* 879 F.2d 583 (9th Cir. 1989)--------------------------------------------------------------- 18

*Zadvydas v. Davis,* 533 U.S. 678 (2001) ----------------------------------------------------------------- 15, 16, 22

<u>S</u>TATUTES

18 U.S.C. § 3553(b)(2)(A)(iii), § 3553(e) ---------------------------------------------------------------- 10

21 U.S.C. § 846---------------------------------------------------------------------------------------------------6

28 U.S.C. § 1331 -------------------------------------------------------------------------------------------------3

28 U.S.C. § 1651 -------------------------------------------------------------------------------------------------3

28 U.S.C. § 2201 *et seq*------------------------------------------------------------------------------------------3

28 U.S.C. § 2241 *et seq*------------------------------------------------------------------------------------------3

8 C.F.R. § 1208.18 --------------------------------------------------------------------------------------------- 10

8 C.F.R. § 1241.1 ----------------------------------------------------------------------------------------------- 14

8 U.S.C. § 1103 --------------------------------------------------------------------------------------------------5

8 U.S.C. § 1226(a)----------------------------------------------------------------------------------------16, 22

8 U.S.C. § 1226(c)---------------------------------------------------------------------------------2, 15, 16, 17, 22

8 U.S.C. § 1231(b)(3)(B)(ii) ---------------------------------------------------------------------------------- 10

8 U.S.C. § 1101 *et seq*------------------------------------------------------------------------------------------2

<u>O</u>THER <u>A</u>UTHORITIES

H.R. Cong. Rep. No. 109-72, at 2873 (May 3, 2005)---------------------------------------------------------3

<u>R</u>ULES

Fed. R. Civ. P. 65------------------------------------------------------------------------------------------------2

N.D. Local R. 65-231 --------------------------------------------------------------------------------------------2

U.S. Sentencing Guidelines Manual § 5K1.1 (1989) --------------------------------------------- 9 , 10, 11

1

<u>CONSTITUTIONAL PROVISIONS</u>

Art I § 9, cl. 2 -------------------------------------------------------------------------------------------------3, 4

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOLLY S. COOPER SBN 197626
U.C. DAVIS IMMIGRATION LAW CLINIC
University of California, Davis School of Law
One Shields Ave., TB-30
Davis, CA  95616-8821
Tel:  (530) 752-6942
Fax:  (530) 752-0822
hscooper@ucdavis.edu

Attorney for Petitioner
ANA BIOCINI

Assisted by:  Tanya Tambling, Cassandra Lopez, Raymond Kim, Wajahat Ali, Chad Greeson, Dong Zee, Hoa Hoang, Sheerin Karimian

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANA BIOCINI,<br>A 91 182 333, an individual,<br>Petitioner,<br><br>vs.<br><br>MICHAEL MUKASEY, in his official capacity as Attorney General of the United States; MICHAEL CHERTOFF, in his official capacity as Secretary of the Department of Homeland Security; NANCY ALCANTAR, in her official capacity as San Francisco Field Office Director of U.S. Immigration and Customs Enforcement, Detention and Removal; DONNY YOUNGBLOOD, in his official capacity as Sheriff of Kern County Sheriff's Department and Lerdo Detention Facility,<br><br>Respondents. | Case No.<br><br><br>**MEMORANDUM OF POINTS AND AUTHORITIES** |

1

# I.  **INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure 65 and Local Rules 65-231 of the United States District Court for the Northern District of California, Petitioner Ana Biocini ("Ms. Biocini") moves this Court to issue a Preliminary Injunction enjoining further detention in the custody of the United States Immigration and Customs Enforcement ("ICE") and to enjoin her removal order pending a final resolution of her Petition for Writ of Habeas Corpus filed concurrently.  An order enjoining removal and further detention is necessary to preserve her constitutional rights and to prevent irreparable injury.

Ms. Biocini has been subject to mandatory detention, as provided in 8 U.S.C. § 1226(c) since March 2, 2006.  On April 25, 2007 the Immigration Judge ("IJ") denied Ms. Biocini an individualized bond hearing stating that an administrative court does not have the power to adjudicate her constitutional claims.  On June 28, 2007, the Board of Immigration Appeals ("BIA") upheld the IJ's denial.  Thus, Ms. Biocini, by this petition, seeks her release from ICE detention or, in the alternative, an individualized bond hearing.

There is no reasonable likelihood that the government will eventually effect her removal because she has raised a substantial argument against her removability.  Moreover, Ms. Biocini is statutorily eligible for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") and her claim is currently on Petition for Review before the Ninth Circuit.  In addition, Ms. Biocini continues to suffer severe physical harm while in detention, including rectal prolapse (loosening of the rectal tissue).  Because Ms. Biocini demonstrates a likelihood of success on the merits and because she has suffered irreparable injury which threatens to continue if she remains detained, this Court should order Petitioner's immediate release from custody.  In the alternative, she seeks an individualized hearing, consistent with the Due Process Clause of the United States Constitution, as to whether her prolonged and ongoing detention is sufficiently justified.

# II.  **JURISDICTION**

This action arises under the Constitution of the United States, and the Immigration & Nationality Act of 1952, as amended ("INA"), 8 U.S.C. § 1101 *et seq*.  This Court has habeas

1    corpus jurisdiction pursuant to Art. I § 9, cl. 2 of the United States Constitution (the "Suspension

2    Clause"), 28 U.S.C. § 2241 *et seq*., and the common law.  This Court may also exercise

3    jurisdiction pursuant to 28 U.S.C. § 1331, and may grant relief pursuant to the Declaratory

4    Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, and the All Writs Act, 28 U.S.C. § 1651.  The

5    amendments to the Immigration & Nationality Act by the REAL ID Act of 2005 have no effect

6    on the jurisdiction of this Court in actions, such as this one, challenging detention independent of

7    removal orders. *See* H.R. Cong. Rep. No. 109-72, at 2873 (May 3, 2005).  As the legislative

8    history of the Act indicates, the jurisdiction-stripping provisions were not intended to "preclude

9    habeas review over challenges to detention that are independent of challenges to removal

10   orders." *See* H.R. Cong. Rep. No. 109-72, at 2873 (May 3, 2005).  Courts that have considered

11   this issue have reached the same conclusion.  *Hernandez v. Gonzales*, 424 F.3d 42, 42-43 (1st

12   Cir. 2005); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1075-76 (9th Cir. 2006).

13        Moreover, despite the changes in jurisdiction created by the REAL ID Act, this Court has

14   jurisdiction over Ms. Biocini's "state created danger" claim pursuant to *Wang v. Reno*, 81 F.3d

15   808 (9th Cir. 1996).  In bringing this habeas petition, Ms. Biocini is not challenging the validity

16   of her order of removal; rather, she is seeking a permanent injunction preventing her removal to

17   Colombia.

18        In *Wang,* a noncitizen from China was brought to the United States to testify in a drug

19   conspiracy case. *Id.* at 812. Wang alleged that returning him to China would violate his Fifth

20   Amendment due process rights. *Id.*  The Ninth Circuit determined that pursuant to 28 U.S.C. §

21   1331, federal courts have jurisdiction over constitutional claims. *Id.*  Because Wang's due

22   process claim "does not implicate the INA at all," the court concluded that the district court had

23   jurisdiction over the claim even though Wang had not exhausted his administrative remedies

24   with respect to his excludability.  *Id*. at 814.  The court explained that "the INS is not empowered

25   to grant effective relief for the governmental misconduct at issue: it lacks institutional

26   competence to resolve the constitutional issue." *Id*. at 816.

27        Likewise, Ms. Biocini's claim stems from the violation of her Fifth Amendment due

28   process rights.  She asserts that the BIA order of removal violates her substantive due process

rights because returning her to Colombia will subject her to a government-created danger due to her status as a government informant. Because of the inability of ICE to adjudicate the constitutional claims raised by Ms. Biocini, she is not required to exhaust her administrative remedies concerning her removability. *Id*. at 814.

Lastly, should this Court determine that it does not have jurisdiction to hear Ms. Biocini's "state created danger" claim, this will raise substantial Suspension Clause issues. Article I, § 9, cl. 2 of the United States Constitution provides that: "The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it." In *INS v. St. Cyr,* 533 U.S. 289, 301 (2001), the Supreme Court noted that "at its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." Ms. Biocini's "state created danger" claim is part of her writ of habeas corpus. If neither the Ninth Circuit nor the district court have jurisdiction to hear her claim, Ms. Biocini will be denied her right to habeas corpus. In *St. Cyr,* the Court determined that serious and difficult Suspension Clause issues would be presented if Congress withdrew jurisdiction from federal judges over habeas claims without providing an alternative. *Id*. at 305. Although Congress is empowered to limit the district courts' jurisdiction, both "Congress and the courts are limited…in how they may restrict availability of the writ of habeas corpus." *Brackett v. United States,* 206 F.Supp.2d 183, 184 n.3 (D.Mass. 2002). This writ is constitutionally protected. *Id*.

### III.  EXHAUSTION

Ms. Biocini requested release twice from the San Francisco Field Office of ICE and was denied both times. Exhibit J, K.  She has also requested a bond hearing. On April 25, 2007, the IJ denied her motion, stating that an administrative court does not have the power to adjudicate her constitutional claims. Exhibit B. On June 28, 2007, the BIA upheld the IJ's denial. Exhibit C. Therefore, Ms. Biocini has exhausted her administrative remedies and her only recourse is by way of this judicial action.

### IV.  PROPER RESPONDENTS

Respondent, Michael Mukasey, is the Attorney General of the United States and he is responsible for the administration of the immigration laws under 8 U.S.C. § 1103, and the implementation and enforcement of the Immigration and Nationality Act.  As such, he has ultimate legal control and authority over Petitioner.

Respondent, Michael Chertoff, is the Secretary for the Department of Homeland Security, the agency charged with enforcement of the nation's immigration laws.  In his official capacity, he has the authority over the detention and departure of aliens in the Petitioner's position.  Given this authority, he is the legal custodian over Ms. Biocini, and is empowered to carry out any administrative order of deportation entered against her.

Respondent, Nancy Alcantar, is the Field Office Director of the Detention and Removal Operations ("DRO") for the San Francisco District.  The DRO is an arm of U.S. Immigration and Customs Enforcement responsible for promoting public safety and national security by making certain through the enforcement of U.S. immigration laws that all removable aliens depart the United States.  In her official capacity, Ms. Alcantar is the local ICE official who has legal custody over Ms. Biocini.  She is directly charged with the responsibility of determining whether Ms. Biocini will be detained in the custody of the ICE or released pending the conclusion of judicial proceedings.  Ms. Alcantar signed Ms. Biocini's "Decision to Continue Detention."

Respondent, Donny Youngblood, is the Sheriff of the Kern County Sheriff's Department and Lerdo Detention Facility, where Ms. Biocini is currently being detained.  Mr. Youngblood is the chief law enforcement officer in the county and is responsible for providing prisoner transportation service to the courts.  As such, he is the local Kern County Sheriff's Department official who has immediate custody of Ms. Biocini.

## V.  STATEMENT OF FACTS

### 1)  Family Background

Ms. Biocini was born in Calí, Colombia on June 30, 1954.  Exhibit L, AR at 1084.  All of the events that have taken place related to Ms. Biocini's arrest and detention have had a traumatic impact on her son, Peter.  *Id.* at 293-294.  Peter reports that since he was thirteen years of age, he has been depressed with little motivation to do anything.  *Id.* at 318-319.  With

medication and therapy, Peter's condition improved, but Ms. Biocini continues to worry about Peter's mental health and how her situation affects him.  Peter has told Ms. Biocini on countless occasions that all he wants in life is to have his family back to normal.

### 2)  Immigration Status Prior To Conviction

Ms. Biocini was twenty-four years old the first time she came to the United States.  She arrived in Miami, Florida on February 11, 1981. Exhibit L, AR at 401. On September 23, 1987, Ms. Biocini became a Lawful Temporary Resident.  She became a Lawful Permanent Resident on May 5, 1989.  *Id.*

### 3)  Criminal History

The federal government investigated Ms. Biocini from the early 1990s until the date of her arrest on May 5, 1995.  Exhibit L, AR at 225-226.  She pled guilty pursuant to 21 U.S.C. § 846 to one count of conspiracy to distribute a kilogram of cocaine on June 6, 1998, her first and only felony conviction. *Id.* at 225. From May 25, 1995 to January 16, 2004 (approximately eight and a half years), Ms. Biocini was under supervised release.  *Id.* at 225, 378. On January 16, 2004, she began her thirty month sentence at the Federal Correctional Institute in Dublin, California ("FCI-Dublin").  *Id.* at 406.

### 1)  Drug Cartels Are Aware Of Petitioner's Status As An Informant

Petitioner acted as a U.S. informant and had close ties to three key figures in the narco-trafficking industry.  Exhibit L, AR at 97-99. At Ms. Biocini's sentencing hearing, Federal Bureau of Investigations (FBI) agent Jeffrey Iverson stated, "It was our belief that Ms. Biocini had the highest and most direct access to the…original sources in Colombia."  *Id.* at 442.  The FBI believed this because it had intercepted calls from Ms. Biocini to her contacts in Colombia concerning drug deals.  *Id.*

Petitioner had relationships with Elias Giannakapolous ("The Greek"), a major cocaine vendor living in Miami, *Id.* at 424, Felix Bernal Fernandez ("Bernal"), a drug-trafficker operating in the San Francisco area since the 1990's, *Id.* at 301, and Hernando Velazco ("Gordo"), a well-known drug trafficker from Calí, Colombia.  *Id.* at 302. Each of these

individuals was involved in the cocaine business and had connections with drug cartel members. *Id.* at 299-306. Petitioner provided the FBI with extensive information about all three of these powerful players. *Id.*

### 2) Narcotic Contacts

#### a. Elias Giannakapolous — "The Greek"

Ms. Biocini began a personal relationship with The Greek in 1985. Exhibit L, AR at 300. Later, The Greek confided in Ms. Biocini and told her that he was in the cocaine business. *Id.* Ms. Biocini never learned the intimate details of The Greek's operations, but he asked her to do small tasks for him. *Id.* Ms. Biocini would pick up his clients at the airport, show them around Miami, and run errands for The Greek. *Id.* She complied with his requests because she loved him, and because she was addicted to cocaine. *Id.*

Large quantities of cocaine were shipped directly by Colombian suppliers to San Francisco. *Id.* From 1984 to 1988, Ms. Biocini witnessed numerous cocaine transactions in both Miami and San Francisco. *Id.* at 301. Ms. Biocini is afraid of The Greek because of his strong ties to the Colombian drug cartels. The Greek conducted business on a large scale (at times more than thirty kilos per week). *Id.* The fact that he was able to obtain such large quantities of cocaine on a regular basis demonstrates the extent of his involvement with the Colombian cartels, who supplied him with bulk quantities of cocaine.

#### b. Felix Bernal Fernandez — "Bernal"

As soon as they met, Bernal offered to sell Ms. Biocini cocaine. He then asked if she had a source for cocaine in Colombia. *Id.* The two began speaking more regularly, which eventually evolved into a brief, long-distance relationship in 1994. *Id.* Ms. Biocini's relationship with Bernal did not last long after she learned of his violent temper. *Id.* On more than one occasion, Bernal told her that "if anybody fucks with me, I will kill them." *Id.* He also told Ms. Biocini that he would not hesitate to kill a person he suspected of being an undercover agent. *Id.* Despite the termination of their relationship, Bernal continued to call Ms. Biocini, even after her arrest. *Id.* At that time, May of 1995, Bernal told Ms. Biocini about a large shipment of cocaine

he was working on with a friend in Los Angeles.  *Id.*  Ms. Biocini does not know what happened

with this transaction and never negotiated any deals for cocaine with Bernal.  *Id.*

Ms. Biocini is very afraid of Bernal because of his violent temper and his knowledge of

her and her family.  *Id.*  Bernal had her contact information and knew where she lived.  *Id.*  He

also knew several of Ms. Biocini's friends in Colombia.  *Id.*

### c.  Hernando Velazco — "El  Gordo"

Ms. Biocini first met Hernando Velazco or "Gordo" in the early 1970s in Calí, Colombia

through mutual friends.  *Id.*  By the mid-70s, Gordo was well-known in Calí, and he had a

reputation for selling narcotics.  *Id.*  From 1977, Ms. Biocini did not see or hear from Gordo until

she received a letter from him in 1994 stating that he was traveling to Los Angeles, California

and wanted to meet with her.  *Id.* at 303.  Gordo wanted to transport forty or more kilos per week

from California to New York.  *Id.*  Ms. Biocini told Gordo that he should think about the

consequences doing this type of business.  *Id.*  Nonetheless, Ms. Biocini called her friend Jorge

Luis Mesa or "Cone" to see if he was interested in dealing with Gordo.  *Id.*

Ms. Biocini learned that Gordo was back in Calí sometime after 2000 after having been

deported.  *Id.*  In addition, Ms. Biocini learned that Gordo was discussing her arrest and her

status as a U.S. informant with other people in Calí.  *Id.*

In the summer of 2004, Ms. Biocini's sister told her that Gordo had been assassinated.

*Id.*  His death was front-page news in El Caleño, the local newspaper.  *Id.* at 395-397.  The

article stated that Gordo was killed in the middle of the afternoon by two armed assassins.  *Id.*

Her sister sent Ms. Bioncini a copy of the article hoping it would show the danger she faces if

she returns to Colombia.  *Id.* at 310.

### 3)  Cooperation With The U.S. Government – Creation Of Special Relationship

As part of her plea agreement on June 6, 1998, Ms. Biocini agreed to cooperate truthfully

and completely with the government and testify anywhere she is called.  Exhibit L, AR at 486.

At her plea hearing the government explained that in the event that the defendant provides

substantial assistance in the sole discretion of the United States, the government may make a

1    motion for a U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 5K1.1 (1989) departure.  *Id.* at

2    488.  After accepting a plea agreement, Ms. Biocini spent several days answering questions for

3    the FBI in San Francisco.  *Id.* at 297, 410-411.  She told the FBI agents and the U.S. Attorney

4    that she was very afraid of debriefing them about Colombian cocaine suppliers.  *Id.* at 297.

5    Subsequent to her sentencing, the U.S. Attorney Ms. Barbara Silano denied Ms. Biocini's

6    multiple requests for a special "S" visa to keep her and her family safe.  *Id.* at 380-381.

7        Ms. Biocini debriefed the government about key narcotraffickers in the notorious Calí

8    and Medellin drug cartels.  *Id.* at 298.  The FBI was particularly interested in one of her contacts

9    -- a high-ranking Colombian politician with ties to Miguel and Gilberto Rodriguez-Orejuela

10   (founders of the Calí cartel).  *Id.*  Ms. Biocini answered all of the questions honestly and to the

11   best of her ability.  *Id.* at 298, 411.  She told the agents about her experiences, prior relationships,

12   and current contacts in the cocaine business.  *Id.*

13       Ms. Biocini remembers meeting with special agents approximately nine more times from

14   June of 1998 to 2001.  Exhibit L, AR at 298.  The Government acknowledged that information

15   provided by Ms. Biocini was corroborated with existing drug intelligence.  *Id.* at 412.  The

16   special agents wanted her to meet with a suspect and negotiate a cocaine deal as part of a set-up.

17   *Id.*  Ms. Biocini was terrified, but she agreed to help the government.  *Id.*  She waited across the

18   street from the suspect's restaurant in Mill Valley for four hours, but he never showed up.  *Id.*

19   Furthermore, the U.S. Attorney asked Ms. Biocini to testify against a co-defendant in her

20   criminal case, Norberto Duarte.  *Id.* at 411.  The U.S. Attorney said that Ms. Biocini's assistance

21   was a substantial factor in Mr. Duarte's ultimate decision to plead guilty.  *Id.*  Because of these

22   connections and her work for the U.S. government, Ms. Biocini now lives in constant fear that

23   she will be killed if she is returned to Colombia.  *Id.*

24                    **4)  Sentencing**

25       At Ms. Biocini's sentencing hearing, Judge Breyer granted the government's

26   recommendation for a two point reduction in Ms. Biocini's sentence pursuant to U.S.S.G. §

27   5K1.1, based on the substantial assistance Ms. Biocini provided the government.  Exhibit L, AR

28   at 409, 455.  The §5K1.1 motion authorizes a downward departure in sentencing if the defendant

1    "has provided substantial assistance in the investigation or prosecution of another person who

2    has committed an offense." §5K1.1, p.s.; *cf* 18 U.S.C. §§ 3553(b)(2)(A)(iii), 3553(e).  During

3    the hearing Judge Breyer stated that "the government has candidly and forthrightly argued" that

4    Ms. Biocini was of substantial assistance.  Exhibit L, AR at 383.  Judge Breyer further stated that

5    "there is a significant danger to the defendant and to her family in connection with cooperation

6    that has been provided."  *Id.* at 461.

7            Agent Iverson explained that the FBI "believed that Ms. Biocini had the highest and most

8    direct access to the…original sources in Colombia" and it "intercepted calls from Ms.

9    Biocini…to contacts in Colombia."  *Id.*  The Judge stated that "she obviously traveled with a

10   crowd that was a pretty dangerous crowd."  *Id.* at 465.

### 5) Removal Proceedings

12           Upon completion of her thirty month sentence at FCI-Dublin, Ms. Biocini was scheduled

13   for release on March 2, 2005.  Exhibit L, AR at 406.  However, on February 9, 2005 the DHS

14   issued a Notice to Appear ("NTA") and a warrant for her arrest.  *Id.* at 399-404.  She has been in

15   custody of the Bureau of Immigration and Customs Enforcement ("BICE" aka "ICE") since that

16   date.  *Id.* at 402.  Ms. Biocini appeared for a master calendar hearing, admitted the factual

17   allegations in the NTA, and conceded removability as charged.  *Id.* at 83.

18           On May 16, 2005, Petitioner submitted an application for asylum and withholding of

19   removal and deferral of removal under the Convention Against Torture.  8 C.F.R. § 1208.18.  *Id.*

20   The IJ denied all applications and designated Colombia as the country of removal, stating that

21   Petitioner failed to show sufficient harm or threat of harm that would indicate a greater

22   likelihood than not of torture. Exhibit L, AR at 89.  The IJ also found that the Colombian

23   government did not acquiesce to the drug cartels' torturous treatment of drug informants as

24   required by CAT.  *Id.* at 88-89.  Petitioner appealed on June 7, 2006.  *Id.* at 964.  On August 31,

25   2006, the BIA dismissed Petitioner's appeal on the basis that Petitioner's offense was a

26   "particularly serious crime," making her ineligible for relief under 8 U.S.C. § 1231(b)(3)(B)(ii).

27   *Id.* at 2.  In addition, the BIA relied on the IJ's reasoning in denying Petitioner's claim under

28   CAT.  *Id.* at 3.

On September 11, 2006, Petitioner requested a temporary stay of removal and submitted a Petition for Review to the Ninth Circuit Court of Appeals. Exhibit D.  Respondent submitted a Motion to Dismiss and Opposition to Petition for Stay of Removal on December 18, 2006, which was denied.  At mediation, the parties agreed to a joint motion to remand the matter to the BIA, which was granted by the Ninth Circuit Court of Appeals on January 29, 2008.  Based on the agreement, Petitioner's removal is stayed pending a BIA decision.

### 6)  Immigration Detention

On March 2, 2006, Ms. Biocini was released from FCI-Dublin and immediately taken into ICE Custody at the Yuba County Jail in Marysville, California.  Exhibit A.  On June 6, 2006 she was released from the Yuba County Jail and transferred to the Lerdo Pre-Trial Facility in Bakersfield, California, where she is currently detained in ICE custody.  *Id.*  She has remained in the custody of ICE continuously since March 2, 2006.

### 7)  Equities Favoring Ms. Biocini's Release

#### a.  Supervised Release

During the criminal proceedings, Judge Breyer recognized, at the hearing for the Government's U.S.S.G. § 5K1.1 Motion for Downward Departure on April 28, 2003, that Ms. Biocini had been on supervised release for eight years and had not gotten into any trouble; therefore, "she is not going to walk around like she's a danger to the community."  Exhibit L, AR at 464.  Judge Breyer referred to her as "living evidence of not being a danger to the community."  *Id.* at 465.

While on supervised release from May 24, 1995 to January 16, 2004, Ms. Biocini worked as much as possible and took college-level classes to improve her job prospects.  *Id.* at 336.  To further her career, she took a number of courses at Cañada College in Redwood City, California and completed a certificate for Computerized Accounting in 1999.  *Id.* at 336, 362.  At Cañada, she also completed courses in Web Design, Networking Essentials, Stock and Bond Investment, Fashion Industry Marketing, and Payroll and Business Taxes.  *Id.* at 336.  Finally, in 2003, she worked as a Junior Accountant for Pacific Graduate School of Psychology.  *Id.*

### b.  Drug Abuse And Rehabilitation

Ms. Biocini's first experiences with drugs began in the early-1980s in Miami.  At the time, Ms. Biocini used drugs socially and to escape from her past.  At first she only used cocaine once a month, then it became twice a month, and eventually she was using the drug every weekend.

After her arrest, Ms. Biocini immediately realized that she needed to make some drastic changes in her life.  Exhibit L, AR at 297.  Ms. Biocini has not used cocaine since 1995.  *Id.*  She completed a three month rehabilitation program at the Liberty Center in Redwood City and attended Alcoholics Anonymous for several years.  *Id.* at 297, 422.  At FCI-Dublin, Ms. Biocini voluntarily enrolled in an intensive drug treatment program, which took nine months and 500 hours to complete.  *Id.* at 297, 363.

### c.  Access To Counsel

Ms. Biocini's counsel is located in Davis, California.  Due to Ms. Biocini's placement at the Lerdo facility in Bakersfield, located about 300 miles from Davis, communication between Ms. Biocini and her attorney has been extremely difficult.  It has often been difficult for Ms. Biocini and her attorney to communicate via telephone and should counsel need to speak with Ms. Biocini in person, she must drive at least ten hours round trip.

### d.  Physical Hardship

Ms. Biocini has been suffering from indigestion, hemorrhoids, and most severely, rectal and vaginal prolapse, which is a loosening of the internal tissue causing frequent displacements of organs and serious bleeding.  This condition had been so severe at times that emergency care was required.  Exhibit A, E.  Several doctors at the Kern County Medical Center, where Ms. Biocini has been seen multiple times, have confirmed the severity of the medical conditions, and twice recommended her to have surgery.  The second recommendation labeled her case as "urgent."  However, the Division of Immigration Health Services officially refused to fund such surgeries both times, stating lack of emergency as its rationale. Exhibit A, F, G.  Similarly, due to her illness, Ms. Biocini has been unable to sustain the weight of the metal shackles around her legs.  She requested to be shackled less severely, but was summarily denied.  Exhibit H.

8)  **Country Conditions: The Colombian Government Has Known Ties in Drug Trafficking**

Colombia produces ninety percent of the world's cocaine, and supplies the United States with seventy percent of its heroin.  Exhibit L, AR at 517.  After forty years, it is still a country torn by continuous internal armed conflict between government forces, terrorist groups and other armed factions.  *Id.* at 548.  Much of the violence in Colombia is committed by a mixture of different armed groups: rebel forces, terrorist groups, paramilitary organizations, government security forces, organized crime rings and drug cartels.  *Id.* at 517.  Paramilitary groups have become involved in drug production and trafficking for money.  *Id.* at 579.  Each of the major terrorist groups competes for control of key coca cultivation areas "and their involvement in narcotics is a major source of violence and terrorism in Colombia."  *Id.*  As a result, the terrorist groups and drug cartels are no longer two separate groups with separate interests, but rather, groups with a symbiotic relationship.  Drug cartels also fund paramilitary groups, who protect farms, cocaine labs, airstrips and other drug-related assets.  *Id.* at 596.  "Over the years, drug mafia bosses have become more and more involved with the paramilitaries to the point where, in some cases, there is no difference between a Colombian drug boss and a Colombian paramilitary commander."  *Id.* at 609-610.  Corruption has permeated so many levels in the Colombian government that Colombia has come to be known as a "narco-democracy" because of the influence of drug money on Colombia's institutions.  *Id.* at 1384.

## VI.  <u>LEGAL ANALYSIS</u>

Injunctions should be granted where the petitioner (1) demonstrates a probability of success on the merits and the possibility of irreparable injury or (2) raises serious legal questions and the balance of hardships tips sharply in the petitioner's favor.  *See Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998).  In the present case, Ms. Biocini presents a compelling legal argument that her Fifth Amendment rights will be violated if she is removed and that she is entitled to release from custody.

Ms. Biocini is currently seeking review of the BIA's removal order before the Ninth Circuit Court of Appeals.  Exhibit D.  The Ninth Circuit granted Ms. Biocini's Motion for Stay

13

of Removal pending a BIA decision. Consequently, Ms. Biocini's current detention is pursuant to the pre-removal order statute, 8 U.S.C. § 1226(c) (2006). As such, Ms. Biocini's final removal period has not commenced, and her detention is pending completion of her removal proceedings. To date, ICE has detained Ms. Biocini for almost two years; her detention began on March 2, 2006.

### A. Ms. Biocini Demonstrates A Likelihood Of Success On The Merits And Raises Serious Legal Claims

This Court should issue an order to release Ms. Biocini if she can demonstrate a combination of probable success on the merits and the possibility of irreparable injury *or* if serious legal questions have been raised and the balance of hardships tips in her favor. *See, e.g., Lopez v. Heckler*, 713 F.2d 1432, 1436-37 (9th Cir. 1983) *rev'd in part on other grounds*, 463 U.S. 1328 (1983). In order to determine whether Ms. Biocini has raised serious legal questions or whether she has shown a probability of success on the merits, this Court must evaluate the substantive arguments that she raises. Ms. Biocini contends the following:

1. Ms. Biocini's prolonged detention does not bear a reasonable relation to her removal.

2. Since Ms. Biocini's liberty interests are at stake, 8 U.S.C. § 1226(c) should be construed narrowly, allowing for her immediate release or a bond redetermination hearing.

3. DHS's contention that Ms. Biocini is partly responsible for the length of her removal proceedings and detention is unwarranted.

4. The Government's decision to try to deport Ms. Biocini violates her substantive due process rights under the "danger creation" exception.

    a. The U.S. government has a duty to protect Petitioner because of her status as a drug informant.

    b. The federal government, by affirmative conduct, placed Petitioner in danger.

    c. *Morgan v. Gonzales,* 2007 WL 2127707 (9th Cir. July 26, 2007), is substantively distinguishable from Petitioner's situation.

5. Ms. Biocini's communication with counsel is hampered by distance.

14

These claims demonstrate that Ms. Biocini raises serious legal questions and is likely to succeed on the merits.  The details of Ms. Biocini's arguments are set forth below.

### 1)  Ms. Biocini's Prolonged Detention Does Not Bear A Reasonable Relation To Her Removal

The Supreme Court and the Ninth Circuit have ruled that the detention of aliens pending removal must bear a "reasonable relation" to its purpose.  *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Tijani v. Willis*, 430 F.3d 1241, 1249 (Cal. 2005) (Tashima, J. concurring) (citing the Supreme Court in *Zadvydas*, 533 U.S. at 690); *see also Nadarajah v. Gonzales*, 443 F.3d 1069, 1078 (Cal. 2006).  In the immigration context, the purpose of detention is to effect the aliens' deportation in the event that removal proceedings have concluded in the government's favor.  *Zadvydas*, 533 U.S. at 690, 699; *Tijani*, 430 F.3d at 1249 (Tashima, J. concurring) (citing the Supreme Court in *Zadvydas*, 533 U.S. at 690).  The United States Supreme Court has otherwise stated that the purpose of detention is to "prevent deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will successfully be removed."  *Demore v. Kim*, 538 U.S. 510, 527-28 (2003).  An alien's detention may not be "reasonably related" to its purpose of preventing flight under two circumstances.  First, an alien's detention is not "reasonably related" to its purpose if the alien's ultimate removal is not likely.  *Zadvydas*, 533 U.S. at 690; *Demore*, 538 U.S. at 527; *see Ly v. Hansen*, 351 F.3d 263, 269, 271 (6th Cir. 2003).  Second, detention incidental to removal is not "reasonably related" to its purpose when the length of detention is clearly "unreasonable" and it becomes "so egregious that it can no longer be said to be 'reasonably related' to an alien's removal."  *Tijani*, 430 F.3d at 1249 (Tashima, J. concurring).

Ms. Biocini's detention is not "reasonably related" because it evinces both of the circumstances outlined above.  First, the purpose of 8 U.S.C. § 1226(c), preventing flight, is "no longer practically attainable" since the government is not likely to remove Ms. Biocini.  Ms. Biocini has a substantial claim that her removal is not likely to occur.  Pursuant to the Ninth Circuit's holding in *Wang v. Reno* 81 F.3d 808, 818 (9th Cir. 1996), the government has a "constitutional duty to protect a person when it creates a special relationship with that person, or

when it affirmatively places that person in danger." *Id*. at 810-11, 818-19.  Therefore, because Ms. Biocini's actual removal is not ultimately likely, her detention is not reasonably related to its purpose.

Second, Ms. Biocini's detention is not reasonably related to its purpose because the sheer length of her detention is "unreasonable".  The government has detained Ms. Biocini for almost two years.  Ms. Biocini's length of detention is not "brief," as required by the *Demore* holding and exceeds the presumptively reasonable six month period of the *Zadvydas* and *Nadarajah* holdings.  In addition, the Ninth Circuit Court of Appeals recently remanded the case to the BIA.  The length of time necessary for the BIA to decide her case is indefinite.  As a result, the length of Ms. Biocini's detention is so prolonged that it can no longer be "reasonably related" to her removal.

### 2)   Since Ms. Biocini's Liberty Interests Are At Stake, 8 U.S.C. § 1226(c) Should Be Construed Narrowly, Allowing For Her Immediate Release Or A Bond Redetermination Hearing

Undoubtedly, "individual liberty is one of the most fundamental rights protected by the Constitution." *Tijani*, 430 F.3d at 1244; *see Zadvydas*, 533 U.S. at 690.  In consideration of this principle, the Ninth Circuit has expressed that the mandatory detention provision in 8 U.S.C. § 1226(c) should be construed more narrowly when deciding who falls under the statute's provisions.  *Id*. at 1247.  In his concurring opinion, Judge Tashima opined that "only those immigrants who [can] not raise a 'substantial' argument against their removability should be subject to mandatory detention."  *Id*.  This "substantial argument" standard safeguards the alien's liberty rights and "ensures that the alien's detention will be relatively brief" while satisfying the government's interest in ensuring the removal of aliens who pose a flight risk.  *Id.*

Similarly, courts should interpret the mandatory detention requirement in 8 U.S.C. § 1226(c) narrowly by ensuring that an alien is detained only for a "reasonable" period of time.  Detention extending beyond a "reasonable" time should be deemed a violation of the alien's due process rights.  Courts should thereby order the alien's immediate release or order a bond redetermination hearing pursuant to 8 U.S.C. § 1226(a).

16

1    Although the felony underlying Ms. Biocini's deportation order subjects her to

2    mandatory detention under in 8 U.S.C. § 1226(c), she has demonstrated that the government has

3    violated her due process rights.  The length of her detention is unreasonable and indefinite, and

4    her detention is not reasonably related to its purpose of preventing flight.  Because her individual

5    liberty right is at stake, this Court should consider offering her an immediate release under

6    reasonable conditions of supervision or a hearing for bond redetermination.

7         **3)  DHS's Anticipated Contention That Ms. Biocini Is Partly**

8            **Responsible For The Length Of Her Removal Proceedings And Detention Is Unwarranted**

9        The government contends that Ms. Biocini holds the keys to her own freedom by

10    withdrawing her stay of removal.  The significant facts of this particular case, however, render

11    that possibility moot due to the extremely chilling and realistic possibility of her assassination

12    upon deportation to Colombia.  If Ms. Biocini withdraws her stay of removal to Colombia, she is

13    placing her life in danger, specifically due to her former role in debriefing the FBI about the Calí

14    Cartel.  The government and courts may be concerned about the possibility of deportable

15    immigrants raising frivolous objections to extend their removal proceedings in hopes that the

16    federal court will find the detention unreasonable and order their release.  This concern,

17    however, does not readily apply to the present case because Ms. Biocini has a substantial

18    substantive due process claim against removability based on state-created danger.  She is legally

19    entitled to offer this argument and seek any available appeals as a defense against her

20    deportation.  *Ly v. Hansen*, 351 F.3d 263, 272 (6th Cir., 2002).  Therefore, the government

21    cannot legitimately contend that Ms. Biocini is responsible for the length of her detention.

22        The Sixth Circuit in *Ly* directly addressed the concern of delays resulting from appeals.

23    *Id.*  The *Ly* court explained that an alien cannot be indefinitely detained because of delays by

24    INS, and the entire process is subject to reasonability.  *Id.*  Although Ms. Biocini has sought

25    judicial review of her deportation, her prolonged and indefinite detention cannot be justified.

26    Arguing that she may end her detention by accepting deportation ignores the fact that our

27    Constitution has provided fundamental rights, such as the right to judicial review, for situations

28    such as hers.

17

1

2

### 4) The Government's Decision To Try To Deport Ms. Biocini Violates Her Substantive Due Process Rights Under The "Danger Creation" Exception

3    Constitutional violations may arise when state action creates danger or places an

4 individual in jeopardy. *Deshaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189

5 (1989) (Brennan, J. and Blackmum, J., dissenting).  Following *Deshaney*, this Court has found

6 that the state has no duty to protect persons from harm inflicted by private parties unless 1) a

7 "special relationship" exists between the state and the victim, or 2) the state, by affirmative

8 conduct, places the victim in danger. *Kennedy v. Ridgefield City*, 439 F.3d 1055, 1070 (9th Cir.

9 2006); *see also Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989); *Munger v. City of Glasgow

10 Police Dept.* 227 F.3d 1082 (9th Cir. 2000).

11    ### a. The U.S. Government Has A Duty To Protect Petitioner Because Of Her Status As A U.S. Drug Informant

12    In *Wang v. Reno* 81 F.3d 808, 818 (9th Cir. 1996), a combination of a "special

13 relationship" and the government's affirmatively placing Wang in danger constituted a violation

14 of due process.  Owing to the "special relationship" inherent in Wang's placement in custody,

15 this Court states that the government had an obligation "…to protect him from liberty

16 deprivations he faced by virtue of his testimony in court." *Id.*

17    Ms. Biocini, like Wang, had a special relationship to the U.S. due to her status as a drug

18 informant.  For over three years, Petitioner provided substantial information about Colombian

19 cocaine trafficking. Exhibit L, AR at 298.  She provided information about drug traffickers and

20 suppliers with connections to the Calí and Medellín drug cartels. *Id.* at 97, 298.  Petitioner also

21 provided the FBI with over forty names, numbers, and addresses of individuals connected to the

22 cocaine business in Colombia. *Id.* at 97.  For a period of three years, from 1998-2001, she

23 reviewed recorded telephone conversations and continued to debrief the government. *Id.* at 298.

24 Petitioner also agreed to testify against Norberto Duarte, a Cuban drug trafficker from Miami

25 well-known to the DEA and closely associated with the drug supplier involved in Petitioner's

26 case. *Id.* at 410, 412, 427.  As a result, Petitioner was instrumental in Mr. Duarte's decision to

27 accept a plea agreement. *Id.* at 412.  Petitioner additionally volunteered to negotiate a deal with

28

18

1    a local narcotics dealer named Joe, who was tied to a Colombian supplier, as part of an FBI set-

2    up.  *Id.* at 97, 298.

3                      **b.  The  Federal Government, By Affirmative Conduct,**
                            **Placed Petitioner in Danger**

4              The Ninth Circuit examines a variety of factors when making a determination of "danger

5    creation":  (1) the state must affirmatively place Petitioner in danger and (2) the petitioner must

6    be in a worse position because of the government's action.  *Wang*, 81 F.3d at 818-819.  The

7    opinion raises, but does not address, whether the government's conduct must be so egregious as

8    to have "shocked the conscience." *Id*.

9              In *Kennedy v. Ridgefield City*, thirteen year old Michael Burns killed plaintiff's husband

10   and injured plaintiff after Burns was told by a police officer that the plaintiff reported him to the

11   police for child molestation.  *Kennedy v. Ridgefield City*, 439 F.3d 1055, 1057-1058 (9th Cir.

12   2006).  The Ninth Circuit found a constitutional violation when the officer created and

13   aggravated the danger plaintiff faced from Burns.  *Id.* at 1067.  The court asked whether the

14   danger was "known or obvious" and whether the state "acted with deliberate indifference to it."

15   *Id.* at 1064.  The court also asked whether the state's action would have "…made plaintiffs

16   vulnerable to a particularized danger they would not have faced but for that action." *Id*. at 1067.

17             Removal to Colombia subjects Ms. Biocini to significant dangers that she would not have

18   faced, but for her assistance to the FBI.  By assisting the government, Ms. Biocini foreclosed her

19   opportunity to return to Colombia without facing retribution.  Respondent may argue that Ms.

20   Biocini's willing and voluntary act of informing for the government refutes the proposition that,

21   but for the government's act of removal, Ms. Biocini would not face danger. Even accepting this

22   argument on its merits, the argument fails.  Ms. Biocini credibly testified that she was promised

23   "special visas" in exchange for her assistance.  Exhibit L, AR at 297.  No such visas were

24   provided.  Ms. Biocini also testifies that she was unable to discuss the immigration consequences

25   of her actions prior to informing for the government.  *Id*.  Ms. Biocini's assistance, provided

26   without knowledge of its consequences, can hardly be deemed either willing or voluntary.

27   Regardless, the Ninth Circuit does consider what the situation would have been if the state had

28

                                                      19

1   not been involved.  When examining whether the state affirmatively placed an individual in

2   danger, the Ninth Circuit "…[does] not look solely to the agency of the individual, nor do we

3   rest our opinion on what options may or may not have been available to the individual. Instead,

4   we examine whether [the state] left the person in a situation that was more dangerous than the

5   one in which they found him.  *Munger v. City of Glasgow Police Dept.* 227 F.3d 1082, 1086 (9th

6   Cir. 2000).

7        Thus, this Court, like *Wang*, should enjoin Petitioner's removal to Colombia because the

8   federal government has created a dangerous situation for Petitioner that would not have existed

9   without government involvement.

10               **c.   *Morgan v. Gonzales* is Substantively Distinguishable
                              from Petitioner's Situation**

11        In the recent case of *Morgan v. Gonzales*, 2007 WL 2127707 (9th Cir. July 26, 2007), the

12   petitioner filed a habeas petition in the Ninth Circuit challenging a deportation order on

13   substantive due process grounds under the state-created danger exception.  The court dismissed

14   Morgan's claim for three reasons: 1. he failed to allege sufficient affirmative government

15   misconduct; 2. the government had not acted with "gross negligence and deliberate

16   indifference"; and 3. there was no indication that his country of origin would be unwilling or

17   unable to protect him.

18        In the *Morgan* case, "Morgan does not allege anything approaching the kind of

19   affirmative government misconduct found in *Wang*." *Morgan*, 2007 WL 2127707, at *7.  In

20   Petitioner's case, the government affirmatively placed Petitioner in a more vulnerable position

21   than it found her by using her services as an informant for over three years, to the knowledge of

22   individuals involved in the drug cartels in Colombia.  Barbara Silano, the Assistant US Attorney

23   at the time of Petitioner's case, FBI agents, as well as Judge Breyer all found that Petitioner was

24   of "substantial assistance" to the government.  Not only did she provide the government with

25   copious amounts of information and agree to go to trial to testify against Noberto Duarte (her co-

26   defendant), but Judge Breyer also found that her willingness to act as an undercover agent in a

27   drug deal was "part of a complete sort of adherence to the concepts of substantial assistance in

28

the sense that she did what she could."  During the sentence hearing, Judge Breyer specifically found "that there is a significant danger to the defendant and to her family in connection with cooperation that has been provided."  He further found that "in light of her cooperation. . .no one is going to press on the issue of her deportation. . .Let's give her every possible break in that regard, whatever happens down the road…"  (transcripts from 4/28/03 proceedings).

On the facts, as asserted, it would be "gross negligence and deliberate indifference" on behalf of the government to deport Petitioner. *Id.* at *7.  Petitioner is likely to be tortured or murdered if she returns to Colombia.  To use the Petitioner for her information and then deport her despite the huge risk to her wellbeing would be "gross negligence and deliberate indifference" on the part of the U.S. government. *Id.*

In *Morgan*, the court stated that "Unlike in *Wang*, there is no suggestion that the English government would be unwilling or unable to protect him." *Id.* at *7.  However, in Petitioner's case, there is ample reason to believe that the Colombian government would be unwilling and unable to protect her. Unlike England, where Morgan was to be deported, Colombia is a country where violence and corruption are the norm (AR 611- 12), and informants such as Petitioner face possible execution; drug mafia bosses refer to paramilitary forces for security, assassination and terrorist services.  Unlike England, the Colombian drug cartels' methods of assassination and bribery are something its government has consistently been unable or unwilling to control, and consequently individuals like Petitioner could not rely on any institution for safety there.  *See* AR 609- 10.  Thus, it is likely that the Colombian government would be both unwilling and unable to protect Petitioner.

Petitioner's case is factual distinguishable from the Morgan case. First, the government committed affirmative misconduct against Petitioner. Second, the government would be acting with "gross negligence and deliberate indifference" if it were to deport Petitioner.  Finally, it is likely that Colombia would be unwilling and unable to protect Petitioner.

### 5)  Ms. Biocini's communication with counsel is hampered by distance

Ms. Biocini's counsel is located in Davis, California.  Due to Ms. Biocini's placement at the Lerdo facility in Bakersfield, located about 300 miles from Davis, communication between Ms. Biocini and her attorney has been extremely difficult.  It has often been difficult for Ms. Biocini and her attorney to communicate via telephone and should counsel need to speak with Ms. Biocini in person, she must drive ten hours round trip. Therefore, placement at the Lerdo Detention Center interferes with Ms. Biocini's right to counsel.

### B.  The Balance Of Hardships Tips Sharply In Ms. Biocini's Favor

The test for determining whether an injunction is appropriate creates a continuum: the more certain this Court is about the likelihood of success on the merits, the less Petitioner must convince the Court that the public interest and balance of hardships tip in her favor.  The critical element in determining the test is the relative hardship to the parties.  If the balance of harm tips decidedly toward the Petitioner, then she need not show as robust a likelihood of success on the merits.  *See e.g. State of Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1389 (9th Cir. 1988); *Benda v. Grand Lodge of Int'l Ass'n of Machinists*, 584 F.2d 308, 315 (9th Cir. 1978).

The balance of hardships tips sharply in Ms. Biocini's favor.  She has remained in detention for almost two years since she was taken into custody by Respondents on March 2, 2006.  Ms. Biocini has been deprived of her liberty for close to two years that can never be recovered.

Ms. Biocini's family has also suffered enormously due to her continued detention.  Her son who is a U.S. citizen has suffered from Acute Stress Disorder, Depression, and Generalized Anxiety Disorder beginning with his mother's incarceration.  Exhibit L, AR at 318.

Ms. Biocini has also suffered a series of health problems related to her continued detention and the threat of deportation to Colombia where she fears for her life.  Around March 2006, when Ms Biocini was detained in Yuba County Jail, she began to experience discomfort in her bowels and a "small ball" exiting her body when she tried to use the bathroom.  Exhibit A. On May 3, 2007, the resident doctor within the Bakersfield Detention Facility told her that her bowel discomfort was caused solely by her mental stress and anxiety.  On May 30, 2007, Ms. Biocini was transported to the Kern Medical Center for emergency care after a detention center

nurse confirmed that Ms. Biocini had "a small ball" protruding from her rectum when she was trying to use the bathroom.  It took the doctors several hours to help restore her intestine.  *Id.*  On July 26, 2007, Dr. Nicole Thomas of the Kern Medical Center confirmed that Ms. Biocini had rectal prolapse – a loosening of the bowel tissues causing intestinal organs to be displaced.  *Id.* Since then, several doctors at the Kern County Medical Center have confirmed the severity of her medical conditions and twice recommended that she have surgery.  However, the Division of Immigration Health Services officially refused to fund such surgeries both times, stating lack of emergency as its rationale despite the opinion of medical professionals from Kern Medical Center that Ms. Biocini's situation has become "urgent." Exhibit A, F, G.

The public interest is not being served by detaining Ms. Biocini because she is neither a danger to the community nor a flight risk.  Should she be released, Ms. Biocini will spend time with her son, whom she adores and misses terribly, and her other family members.  Ms. Biocini was on supervised release for eight and a half years prior to her incarceration for her criminal conviction and at no time did she pose a risk of flight.  During her supervised release, she did not use drugs and she showed up for her court appearances.  Exhibit L, AR 465-465.  At Ms. Biocini's sentencing hearing, Judge Breyer acknowledged that she was not a danger to the community.  *Id.*  Her son Peter expressed that prior to her incarceration his mother had "done all the right things for years."  *Id.* at 318.  Her sister and brother have also expressed that Ms. Biocini turned her life around for the better after her arrest.  *Id.* at 308-316.

### C.  The Federal District Court Has Jurisdiction And Authority To Admit Bail To Habeas Petitioners Detained By ICE

Ms. Biocini, seeks remedy from this Court to release her after almost two years of immigration detention. The Petitioner also requests a bond hearing to be determined under the discretion of this Court for such time pending the resolution of her legal challenge to the government's claims. In this particular case, since Ms. Biocini is in *pre-removal period*, the applicable standard for release is set forth by statute and Supreme Court precedent. Although the federal district court has the discretion to remand bond hearings to the IJ, the federal courts also have the inherent authority to admit to bail habeas petitioners being detained by the INS.

1  *Nadarajah v. Gonzales*, 443 F.3d 1069, 1083 n.5 (9th Cir. 2006); *Mapp v. Reno*, 241 F.3d 221,

2  224-25 (2d Cir. 2001).  It has also been held that federal district court had authority, pending an

3  alien's appeal from an order dismissing writ of habeas corpus and remanding him to custody of

4  Director of Immigration for deportation, to admit him to bail. *U.S. ex rel. Paetau v. Watkins*, 164

5  F.2d 457 (2d Cir. 1947).

6          An influential Supreme Court case suggests that once civil detention becomes

7  "unreasonable or unjustified," a lawful permanent resident alien could be entitled to an

8  individualized determination as to risk of flight and dangerousness. *Demore*, 538 U.S. at 525-

9  526.  Furthermore, the Supreme Court has held, "[w]hile alien removal proceedings are in

10  progress, most aliens may be released on bond or paroled. 66 Stat. 204, as added and amended,

11  110 Stat. 3009-585,  8 U.S.C.S §§ 1226(a)(2), (c) (1994 ed., Supp. V)." *Zadvydas v. Davis*, 533

12  U.S. 678, 683 (2001).  Existing statutes, United States Supreme Court case law, and Ninth

13  Circuit case law dictate that Ms. Biocini, as a lawful permanent resident since 1989, currently in

14  civil pre-removal detention for almost two years, has met the standard to seek an individualized

15  bond hearing under the jurisdiction of federal district court.

16          The government will claim the federal court has "limited power" to grant a bond to a

17  habeas petitioner and can do so "only when extraordinary or exceptional circumstances exist

18  which make the grant of bail necessary to make the habeas remedy effective." *Calley v.*

19  *Callaway*, 496 F.2d 701, 702 (5th Cir. 1974), cited in *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir.

20  2001); *Ostrer v. U.S.*, 584 F.2d 594, 596 n.1 (2d Cir. 1978).  However, even in these

21  "exceptional circumstances," the Supreme Court has indicated that a district court has broad

22  discretion in conditioning a judgment granting habeas relief, including whether to release the

23  prisoner pending appearance. *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987). Furthermore, it has

24  been held that federal courts are authorized, under 28 U.S.C. § 2243, to dispose of habeas corpus

25  matters "as law and justice require." *Franklin v. Duncan*, 891 F. Supp. 516, 518 (N.D. Cal.

26  1995).  Moreover, F.R.A.P. Rule 23 "establishes the authority of the federal courts to release

27  both successful and unsuccessful habeas petitioners pending appeal." *Marino v. Vasquez*, 812

28  F.2d 499, 508 (9th Cir. 1987).  The Ninth Circuit recently stated that the "government's

1    argument that the court 'should not consider, let alone grant, extraordinary relief by motion

2    where entitlement *vel non* to release is the very issue on appeal' is baffling: such a release is

3    precisely what [Rule 23] contemplates."  *Nadarajah v. Gonzales*, 443 F.3d 1069, 1083 n.5 (9th

4    Cir. 2006).

5        Therefore, Petitioner requests that this Court order her immediate release under

6    reasonable conditions of supervision or hold a bond hearing to determine whether continued

7    detention is justified.  In the event that this Court should deny her petition for release, the

8    Petitioner prays that she be transferred to the ICE detention facility in Marysville, California,

9    where she can better communicate with her attorney of record.

10                   **VII.  <u>CONCLUSION</u>**

11        Continued detention has already caused irreparable injury to Ms. Biocini.  Because Ms.

12    Biocini demonstrates a likelihood of success on the merits and because she has suffered

13    irreparable injury which threatens to continue if she remains detained, this Court should order

14    her immediate release from custody and enjoin her removal order.

15

16    Dated:                          Respectfully submitted,

17

18

19

20                          By: _____

21                              Holly Cooper
                                Attorney for Petitioner

22

23

24

25

26

27

28

25

# CERTIFICATE OF SERVICE

ANA BIOCINI,                                        )
A 91 182 333, an individual,                        )
                                                    )
           Petitioner,    )    Case No.:
                                                    )
    vs.                           )
                                                    )
MICHAEL MUKASEY, in his official                    )
capacity as Attorney General of the United          )
States; MICHAEL CHERTOFF, in his                    )
official capacity as Secretary of the               )
Department of Homeland Security;                     )
NANCY ALCANTAR, in her official                     )
capacity as San Francisco Field Office              )
Director of U.S. Immigration and Customs            )
Enforcement, Detention and Removal;                 )
DONNY YOUNGBLOOD, in his official                   )
capacity as Sheriff of Kern County Sheriff's        )
Department and Lerdo Detention Facility,            )
                                                    )
           Respondents.  )

My business address is UC Davis Immigration Clinic, One Shields Avenue, TB-30, Davis, California 95616.  I am employed in the County of Yolo.  I am over the age of 18 years and not a party to the above named action.

On February 7, 2008, I served a copy of Petitioner's Memorandum of Points and Authorities and accompanying attachments on the interested parties in said action addressed as follows:

Michael Chertoff
Office of the General Counsel
U.S. Department of Homeland Security
Washington, DC 20528

Joseph Russoniello
Office of the U.S. Attorney
450 Golden Gate Ave. 11th Floor
San Francisco, CA 94102

Michael B. Mukasey
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington D.C. 20530-0001

Nancy Alcantar
Field Office Director, San Francisco
630 Sansome Street, Rm. 590
San Francisco, CA 94111

Donny Youngblood
Kern County Sheriff's Office
1350 Norris Road
Bakersfield, CA 93308-2231

by Federal Express by placing a true and correct copy of the documents listed
above enclosed in a sealed box fully prepaid in the United States at Davis,
California.

I declare under penalty of perjury that the foregoing is true and correct to the best
of my knowledge.

Executed on February 7, 2008 in Davis, California.

Teresa Medina